# In The United States Court of Federal Claims

No. 05-186 L

(Filed: April 20, 2006)

| | | |
|---|---|---|
| LAVETTA ELK,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Sioux Treaty of April 29, 1868; Motion to dismiss for lack of jurisdiction; RCFC 12(b)(1); Alleged failure to exhaust administrative remedies; Sioux Treaty does not explicitly require exhaustion in the form of awaiting an agency decision; *McCarthy v. Madigan*; Failure of agency to adopt time limits on the consideration of Treaty claims; Exhaustion of remedies not judicially imposed; Exhaustion likely effectuated. |

**ORDER AND OPINION**

*Jeffrey M. Herman,* Herman & Mermelstein, P.A., Miami, FL, for plaintiff.

*Sara E. Culley*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Sue Ellen Wooldridge*, for defendant.

**ALLEGRA, Judge**:

Plaintiff, a member of Oglala Sioux Tribe, filed suit in this court seeking relief under the Article I clause of the Sioux Treaty of April 29, 1868, which provides that if "bad men" among the whites commit "any wrong" upon the person or property of any Sioux, the United States will reimburse the injured person for the loss sustained. Defendant has filed a motion to dismiss plaintiff's case under RCFC 12(b)(1), asserting that plaintiff has failed to exhaust her administrative remedies.

## I. BACKGROUND

In 2002, Lavetta Elk, who was living on the Pine Ridge Indian Reservation in Wounded Knee, South Dakota, was recruited to join the U.S. Army by Sergeant Joseph P. Kopf, a staff sergeant within the United States Army Recruiting Command stationed in Rapid City, South Dakota. Following an evaluation by the U.S. Army in Sioux Falls, South Dakota, to which Sergeant Kopf drove Ms. Elk, Ms. Elk was informed that she was admitted into the U.S. Army. According to plaintiff, following these initial interactions, Sergeant Kopf initiated direct contact with her on a number of occasions. Ms. Elk moved to Kansas City in August 2002 to attend

school. Sergeant Kopf reportedly telephoned and emailed her there, approximately three times per day. When Ms. Elk returned to the Pine Ridge Indian Reservation, Sergeant Kopf made repeated excuses to visit and call her at home.

On January 7, 2003, plaintiff avers that Sergeant Kopf made an unannounced visit to her home, and told her father, Emerson Elk, that she needed to travel to Sioux Falls to resubmit her height and weight evaluation, claiming that the original evaluation had been lost. As she had before, Ms. Elk accompanied Sergeant Kopf in his car to go to the supposed evaluation. Allegedly, Sergeant Kopf instead drove Ms. Elk to an isolated area and then sexually assaulted her. Ms. Elk reported the incident to the Bureau of Indian Affairs police, the Oglala Nation tribal police, and eventually the Army Recruiting Station at which Sergeant Kopf was stationed.

Sometime before April 7, 2004, plaintiff sent a Notice of Claim to the Department of the Interior (Interior), which claim was received by Interior on April 7, 2004. On April 21, 2004, her claim was forwarded to the Field Solicitor, Northeast Region, Twin Cities, responsible for the geographic area encompassing the Pine Ridge reservation in South Dakota, in which office it was received on April 26, 2004. The Notice of Claim asserted two claims: (i) an administrative claim based on the Federal Torts Claims Act (FTCA); and (ii) a claim based on the Treaty with the Sioux of April 29, 1868. In accordance with 28 C.F.R. § 14.2(b)(1), the FTCA claim was transferred to the Army. On April 30, 2004, the Army notified plaintiff that it would be handling the FTCA claim, while Interior would be reviewing the treaty-based claim. By letter dated October 1, 2004, the Army administratively denied plaintiff's FTCA-based claim.

Five more months passed and plaintiff received no communications from Interior about the treaty portion of her claim. At some point during this period, the United States Department of Justice declined to prosecute Sergeant Kopf. Plaintiff subsequently filed her complaint with this court on February 3, 2005, demanding a judgment in the amount of $100 million, costs, attorney's fees, and all other damages permitted by the Treaty and other relief as the court may find proper. On March 16, 2005 – eleventh months after her Notice of Claim was filed – a representative from Interior finally contacted plaintiff's counsel, requesting documentation to support the treaty-based claim. On April 19, 2005, defendant filed its motion to dismiss the complaint for lack of subject matter jurisdiction under RCFC 12(b)(1), claiming that plaintiff had failed to meet the prerequisites for bringing a claim under the Treaty. Plaintiff filed its response to defendant's motion on June 13, 2005 – the same day that she provided Interior with further information regarding her claim. Defendant filed its reply on its motion on June 20, 2005.

On January 20, 2006, oral argument was held, at the conclusion of which the court denied defendant's motion. This court held that neither the Treaty nor any other source of law required plaintiff to await a decision on her claim before filing suit and suggested that, even if such an exhaustion requirement existed, plaintiff had essentially met that requirement by not filing her suit until after the Army had denied her FTCA claim and the Department of Justice had decided not to prosecute Sergeant Kopf. At this time, the court indicated that it would later provide a fuller explanation for its ruling – the purpose to which this order and opinion is directed.

## II. DISCUSSION

As a member of the Oglala Sioux Tribe, Ms. Elk is a beneficiary of the Treaty with the Sioux of April 29, 1868. 15 Stat. 635, ratified Feb. 16, 1869, proclaimed Feb. 29, 1869. Article I of the Treaty, the so-called "Bad Men" clause, states:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also re-imburse the injured person for the loss sustained.
>
> * * * *
>
> And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper. But no one sustaining loss while violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor.

15 Stat. 635. Notwithstanding the latter provision, neither the President, Interior nor any other agency of the Federal government has ever promulgated rules or regulations governing the handling of claims under the "Bad Men" clause.

Despite its failure to comply with the Treaty, defendant claims that plaintiff has failed to exhaust her administrative remedies under the Treaty – a prerequisite, it asserts, to bringing an action in this court under the Tucker Act, 28 U.S.C. § 1491. To be sure, the courts "have long acknowledged as a general rule that parties must exhaust prescribed administrative remedies before seeking relief from the federal courts." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *see also Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938). But, under well established principles, a statute or other Congressional enactment creates an independent duty to exhaust only when it contains "'sweeping and direct' statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim." *Avocado Plus, Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004) (quoting *Weiberger v. Salfi*, 422 U.S. 749, 757 (1975)).[1] This degree of specificity is required, at

[1] *See Coit Independent Joint Venture v. FSLIC*, 489 U.S. 561, 579 (1989) (requirement must be "explicit"); *McGee v. United States*, 402 U.S. 479, 483, n. 6 (1971) (requirement must derive from a "specific congressional command"); *see also Wright v. Morris,* 111 F.3d 414, 420-21 (6th Cir.), *cert. denied*, 531 U.S. 1156 (1997); *Chelette v. Harris*, 229 F.3d 684, 687 (8th Cir. 2000), *cert. denied*, 531 U.S. 1156 (2001); Richard J. Pierce, Jr., Administrative Law Treatise § 15.3, at 986 (4th ed. 2002).

least in part, because federal courts are otherwise "vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them." *McCarthy*, 503 U.S. at 146 (*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976)); *see also Cohens v. Virginia*, 6 Wheat. 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). Preliminarily, then, this court must decide whether the Sioux Treaty requires exhaustion as a precursor to filing this suit and, if so, what that requirement entails. *See Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 502 (1982); *see also Wilson ex rel. Estate of Wilson v. United States*, 405 F.3d 1002, 1016 (Fed. Cir. 2005).

As a condition to receiving reimbursement, the Sioux Treaty plainly requires that "proof [be] made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City." This claim requirement was identified by the Court of Claims in *Hebah v. United States*, 192 Ct. Cl. 785, 795 (1970), the first case apparently to involve a damage claim under a "Bad Men" clause. But, nothing in the Sioux Treaty indicates that a claimant must await a decision from Interior before filing suit. Significantly, in this regard, the Sioux Treaty is different from other treaties, such as the Navajo Treaty, with the latter precluding the payment of damages until a claim is "thoroughly examined and passed upon by the Commissioner of Indian Affairs." *See Begay v. United States*, 219 Ct. Cl. 599, 602 n.4 (1979) (*Begay I*) (citing 15 Stat. 667, 667-68). Moreover, unlike other exhaustion statutes, *see, e.g.*, 41 U.S.C. § 605 (Contract Disputes Act), 42 U.S.C. § 1395oo (social security), the Sioux Treaty neither specifies the particulars of the proof that should be supplied nor indicates that the claimant must wait any particular time for an agency to respond to her claim. Nor has Interior or any other federal agency issued regulations specifying these particulars. Accordingly, both the terms of the Treaty and the absence of any regulations thereunder suggest that neither the Congress nor the Executive Branch has "meaningfully addressed the appropriateness of requiring exhaustion in this context," *McCarthy*, 503 U.S. at 149, at least in terms of clearly requiring a claimant to await a decision from Interior before filing suit.[2]

"Where Congress has not clearly required exhaustion," the Supreme Court has said, "sound judicial discretion governs." *McCarthy*, 503 U.S. at 144; *see also Maggitt v. West*, 202 F.3d 1370, 1377 (Fed. Cir. 2000) ("It is well settled that when Congress has not clearly mandated the exhaustion of particular administrative remedies, the exhaustion doctrine is not jurisdictional, but is a matter for the exercise of 'sound judicial discretion.'"). Exhaustion has been imposed as

---

[2] Construing the Treaty in the fashion that defendant claims would also run counter to the principles that treaties are to be interpreted liberally in favor of the Indians, *Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658, 675-676 (1979), with treaty ambiguities to be resolved in their favor, *Winters v. United States*, 207 U.S. 564, 576-577 (1908); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 n.5 (1999).

a matter of judicial discretion where viewed as allowing an agency to apply its expertise, develop the facts underlying a claim, and thereby avoid unnecessary lawsuits. *See Bowen v. City of New York*, 476 U.S. 467, 484 (1986); *McKart v. United States*, 395 U.S. 185, 194 -95(1969). Nonetheless, the Supreme Court has "declined to require exhaustion in some circumstances even where administrative and judicial interest would counsel otherwise." *McCarthy*, 503 U.S. at 146. In such circumstances, the Court has "balance[d] the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *Id*. This approach is "'intensely practical,'" *Bowen*, 476 U.S. at 484 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 331 n.11 (1976)), requiring consideration of "both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *McCarthy*, 503 U.S. at 146.

In *McCarthy*, the Supreme Court identified "at least three broad sets of circumstances" that mitigate against imposing exhaustion judicially. *McCarthy*, 503 U.S. at 146. The first is where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action." *Id*. at 146-47 "Such prejudice may result," the Court indicated, "from an unreasonable or indefinite timeframe for administrative action." *Id*. at 147 (*citing Gibson v. Berryhill*, 411 U.S. 564, 575, n.14 (1973)); *see also Coit Independence Joint Venture*, 489 U.S. at 587 ("[b]ecause the Bank Board's regulations do not place a reasonable time limit on FSLIC's consideration of claims, Coit cannot be required to exhaust those procedures"); *Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 591-92 (1926) (claimant "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"). Under the second set of circumstances, exhaustion may not be required "'because of some doubt as to whether the agency was empowered to grant effective relief.'" *McCarthy*, 503 U.S. at 147 (quoting *Gibson*, 411 U.S. at 575). Third, exhaustion also is not required "where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *McCarthy*, 503 U.S. at 148 (citing *Gibson*, 411 U.S. at 575 n. 14).

Contrary to defendant's claims, more than one of these circumstances need not exist. In *McCarthy*, the Supreme Court neither purported to provide an exhaustive list of the circumstances that would support immediate judicial review, *see* 503 U.S. at 146 (indicating that there are "at least" three such circumstances), nor even suggested that a court ought to approach this issue from anything remotely approaching a strict formulaic standpoint. Indeed, in other cases, the Supreme Court has identified other grounds upon which to dispense with exhaustion. *See Bowen*, 476 U.S. at 483 (excusing exhaustion where a substantial constitutional issue was presented by a claim). As such, any one of the listed situations – and undoubtedly others – may outweigh the countervailing institutional interests favoring exhaustion, depending on the facts presented. *See Thomson Consumer Electronics, Inc. v. United States*, 247 F.3d 1210, 1215 (Fed. Cir. 2001) (refusing to require exhaustion based solely on futility); *see also Iddir v. INS*, 301 F.3d 492, 498 (7th Cir. 2002) (claimant "need only show that one of the . . . exceptions outlined above applies"); *Welch v. Reno*, 101 F. Supp. 2d 347, 351-52 (D. Md. 2000) (same).

In the court's view, the potential for delay here, and the concomitant possibility of prejudice, outweigh the interests favoring further exhaustion. By defendant's own admission, Interior not only has failed to prescribe procedures for considering "Bad Men" claims, but, most importantly, has not established any fixed time within which to consider those claims. In the case *sub judice*, plaintiff waited nearly ten months for Interior to address her claim and, in fact, did not receive any formal request for further information from Interior until after her lawsuit was filed. As defendant admitted at oral argument, at that point, Interior lacked the authority to resolve her claim, as control over the case, and any settlement thereof, had passed to the Justice Department. *See* 28 U.S.C. §§ 516, 519; *see generally*, *Sharman Co. Inc. v. United States*, 2 F.3d 1564, 1571-72 (Fed. Cir. 1993). Defendant, nonetheless, asserts that the delay in Interior's consideration of plaintiff's claim was neither undue nor prejudicial. But, that assertion is far from apparent – particularly, as it is unsupported by anything in the way of evidence, and, especially, given the nature of the harm alleged here and the possibility that important evidence might be lost or diminished over time. On the latter count, this court must be concerned not only with the time that elapsed before plaintiff filed her suit, but also with the time that might pass, if this case were dismissed and Interior was left on its own to decide the claim.[3] Indeed, as defendant admits, in one treaty case in which the plaintiff waited for an Interior decision, it took that agency over four years to decide the claim. *See Herrera v. United States*, 39 Fed. Cl. 419, 419-20 (1997).

On brief and at the oral argument, defendant attempted to analogize this case, for other purposes, to one brought under the FTCA. Perhaps, then, it is notable that the latter statute indicates that a claim thereunder must be decided within six months of its filing or will be deemed denied. *See* 28 U.S.C. § 2675(a). This likely explains why the Army decided the FTCA claim before Interior even made its first contact with plaintiff. Moreover, sometime within ten months of the filing of the claim, the Justice Department also determined that prosecution was unwarranted, with the timing of that decision undoubtedly also driven by an external limitations provision. *See* 18 U.S.C. § 3281, *et seq*. (prescribing various criminal limitation periods). Yet, defendant insists that Interior should have more time to resolve the treaty portion of plaintiff's claim than either the Army or Justice Department took to resolve their respective matters. At oral argument, defendant's counsel would not specify how long Interior should have to perform that task before exhaustion, in the form of receiving a decision, would no longer be required. She would not even agree that ten years was too long, asserting instead that if there were such a lengthy delay, a claimant could file a suit under the Administrative Procedure Act, 5 U.S.C. § 706(1), to compel Interior to act. But, assuming *arguendo* that such an injunction could be granted, defendant's claims in this regard are self-defeating, as it simply cannot be true that, before bringing a lawsuit here, a claimant might have to file a lawsuit in a district court to obtain

[3] While defendant assures the court that, if this case were dismissed, Interior would promptly resolve the claim, there is, of course, no way for this court to enforce that promise upon a dismissal.

an injunction requiring Interior to render a decision.[4] The fact of the matter is that Interior has not established a specific timetable for deciding treaty claims and the cases demonstrates that where, as here, the period for considering a claim is indefinite, defendant cannot insist that a claimant await an agency decision before coming to this court.[5]

Nor, contrary to defendant's claim, does any binding precedent dictate otherwise. Defendant's reliance on the orders issued in *Begay I*, *supra*, and *Begay v. United States*, 224 Ct. Cl. 712 (1980), *cert. denied*, 450 U.S. 1040 (1981) (*Begay II*) is misplaced for several reasons. Most importantly, those orders did not involve the Sioux Treaty, but rather the differently-worded Navajo Treaty, which, as noted, contains specific language requiring the Commissioner to examine thoroughly and pass upon claims presented. It is also notable that the plaintiffs in *Begay* waited not months, but only seventeen days from the filing of their claims before filing suit. Nonetheless, the Court of Claims, in its order in *Begay I*, made a point of saying that the agency's failure to pass on the claims during the fifteen months between their filing and the time the government's motion to dismiss was argued "might well warrant our now considering the claims to have been administratively denied through unreasonable delay." *Begay I*, 219 Ct. Cl. at 602. Moreover, defendant seemingly overlooks the critical fact that the court, in *Begay I*, ***denied***

---

[4] Adopting defendant's argument here could expose future claimants to being whipsawed – if they do not await a decision from Interior, they could be accused of failing to exhaust administrative remedies; yet, if they await such a decision and more than six years pass from the time of the alleged offense, defendant could invoke the statute of limitations of 28 U.S.C. § 2501. Lest one think the latter scenario unlikely – in *Estate of Brown v. United States*, No. 99-996, a case in this court involving a breach of trust claim, defendant actually argued that the decedent's claim arose when the alleged breach of trust occurred and not when Interior resolved various claims made by the decedent, arguing that the decedent's "informal requests to the Department were not made pursuant to any procedure, whether mandatory or permissive," and thus "cannot toll the statute of limitations." *See Estate of David Brown v. United States*, No. 99-996, Defendant's Motion to Dismiss, at 17 (Fed. Cl. July 5, 2000).

[5] *See White & Case LLP v. United States*, 67 Fed. Cl. 164, 170 (2005) (exhaustion not required where no time frame specified under customs statute); *Lewis v. United States*, 32 Fed. Cl. 59, 65 (1994) (same); *see also U.S. Shoe Corp. v. United States*, 907 F. Supp. 408, 423 (C.I.T. 1995) (exhaustion not required where administrative refund procedures "do not provide a time frame for the resolution of a claim for refund"); *B-West Imports, Inc. v. United States*, 880 F. Supp. 853, 858-59 (C.I.T. 1995) (no exhaustion where administrative remedies set up indefinite timetable); *Welch*, 101 F. Supp. 2d at 351 (exhaustion not required where government was "unable to provide any definitive time for the conclusion of those proceedings"). One might be tempted to distinguish these cases and await an agency decision if Interior had particular expertise or discretion in resolving claims such as this, but there is no indication of that. *See McKart*, 395 U.S. at 194; *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1354-55 (Fed. Cir. 2000). Indeed, in explaining why it had not issued regulations governing "Bad Men" claims, defendant indicated that very few such claims have ever been filed with Interior.

its motion to dismiss the plaintiffs' complaint and retained jurisdiction while ordering the Assistant Secretary of Interior to render an opinion within 90 days. *Id*. at 603. The *Begay* orders thus hardly stands for the proposition that a claimant must obtain an actual decision from Interior before bringing suit under the Tucker Act. Defendant, of course, now notes that, under decisions that post-date *Begay II*, Interior lacks the authority to rule on plaintiff's claim herein, even pursuant to an order of this court. Given this and the many other differences between *Begay* and the case *sub judice*, this court simply cannot view the orders in the former case as definitively resolving whether an exhaustion requirement should be imposed here – at least one that required plaintiff to wait for a decision.[6]

The other case cited by defendant, the unpublished opinion in *Zephier, et al. v. United States*, No. 03-768L (Fed. Cl. Oct. 29, 2004), concerned a situation in which the plaintiff did not file a claim with Interior under the Sioux Treaty before filing suit. This court dismissed the complaint for lack of jurisdiction, finding that "the courts either have found that the plain language of the treaties mandates exhaustion of administrative remedies or have accepted without question that such remedies are available." *Id*. at 13. But, with all due respect, the latter statement does not flow from the analysis that precedes it, which, *inter alia*, overlooks several key distinctions. For example, while the court noted the significant differences between the Navajo and Sioux treaties, *id*. at 12 n.4, it freely cited cases involving the former as precedent for construing the latter – a *non sequitur*. And while it suggested that *Begay II* is not precedential, *id*. at 11, but rather only persuasive, *id*. at 11 n.3, it, nonetheless, proceeded to apply that case as if it had resolved definitively the precise issue before the court, doing so largely without further independent analysis of the exhaustion issue. Some of these deficiencies, of course, may reflect arguments that were not made to the court. For example, while the court described the balancing test required by *McCarthy*, *id*. at 7, it did not consider whether the lack of any deadline for resolving treaty claims could occasion prejudice so as to render exhaustion of administrative remedies unnecessary, apparently because that argument was not raised. The latter argument, of course, proves the sockdolager here. At best, then, *Zephier* is inapposite; at all events, its analysis is unpersuasive.

---

[6] Interestingly, the only Federal Circuit case to consider these orders suggests that they may not be binding precedent. *See Tsosie v. United States*, 825 F.2d 393, 398 (Fed. Cir. 1987). Although, at oral argument, defendant's counsel admitted, after being pressed by the court, that the *Begay* orders were not binding precedent, that admission may have been premature. Research, in fact, does not reveal whether such orders actually constitute binding precedent – indeed, there is neither indication whether the Court of Claims drew any distinction between the binding nature of opinions and orders, whether published or not, nor any statement from the Federal Circuit clarifying how it would treat such orders of its predecessor court. *See Davis v. United States*, 50 Fed. Cl. 192, 211 (2001) (holding that a Court of Claims opinion not published in "F.2d" is, nonetheless, binding); *see also South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc). Although the court obviously is inclined to err on the side of treating the orders as binding, as described, the facts in *Begay* render the orders therein distinguishable, making it ultimately unnecessary for the court to resolve how much precedential weight to afford those orders.

Finally, if the Sioux Treaty imposes exhaustion requirements like those urged by defendant, plaintiff ought to be viewed as having met them. Plaintiff, indeed, filed a claim under the Treaty and then waited ten months for a decision before filing her suit, doing so, only after receiving a denial of the tort portion of her case from the Army and a decision not to prosecute the alleged perpetrator from the Department of Justice. The latter decision, in particular, could be viewed as rejecting plaintiff's treaty claim, as the "Bad Men" clause in the Sioux Treaty requires that following proof, "the United States will . . . proceed at once to cause the offender to be arrested and punished according to the laws of the United States." 15 Stat. 635. Moreover, as hinted in *Begay I*, this court might readily conclude that Interior's ten-month delay in considering her claim amounted to a deemed denial thereof, at least for purposes of exhausting her administrative remedies. Not so, defendant argues, asseverating that plaintiff's claim did not contain adequate information. But, again, there are no regulations or other guidance defining what Interior believes is the appropriate content of a treaty claim. *Compare* 28 C.F.R. § 14.2 (specifying the content of FTCA claims). And, of course, Interior waited until after this lawsuit was filed before first indicating to plaintiff that her claim was inadequate.

Defendant would have this court impose an exhaustion requirement that Interior solipsistically can define on a case-by-case basis – there is enough proof to allow it to consider a claim when it says so, and a claim is not subject to judicial review until it gets around to deciding it. But, the law does not countenance such *ad hocery* and neither will this court.

## III. CONCLUSION

Finding defendant's other claims in support of dismissal here likewise lacking,[7] this court will not paint the lily. In this case, there simply is neither warrant nor necessity to impose the exhaustion requirement defendant urges. Based on the foregoing, the court **DENIES** defendant's motion to dismiss. A schedule for further proceedings in this case will be entered by separate order this day.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

[7] In particular, the court views defendant's ripeness arguments as a rehashed version of its exhaustion claims.