UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-186L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 271

Place: Rapid City, South Dakota

Date: April 28, 2008

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAVETTA ELK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 05-186L |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

3rd Floor Courtroom
U.S. Courthouse
519 9th Street
Rapid City, South Dakota

Monday,
April 28, 2008

The above-entitled matter came on for trial, pursuant to notice, at 10:00 a.m.

BEFORE: HONORABLE FRANCIS M. ALLEGRA
Judge

APPEARANCES:

For the Plaintiff:

ADAM D. HOROWITZ, ESQ.
Herman & Mermelstein, P.A.
18205 Biscayne Boulevard, Suite 2218
Miami, Florida 33160
(305) 931-2200

For the Defendant:

STEVEN D. BRYANT, ESQ.
SARA E. COSTELLO, ESQ.
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424

LANNY ACOSTA, JR., ESQ.
U.S. Army Legal Services Agency
901 North Stuart Street, Suite 400
Arlington, Virginia 22203
(703) 696-1636

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Lavetta Kathy Elk | 62 | 100 | 207 | -- | |
| Daverine Elk | 213 | -- | -- | -- | |
| David Swallow, Jr. | 221 | 227 | -- | -- | |
| Noritta High Hawk | 231 | 237 | -- | -- | |
| Jerilyn Elk | 253 | -- | -- | -- | |
| For the Defendant: | | | | | |
| (None) | | | | | |

# E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| PX-1 | 13 | (withdrawn) | (Joint Exhibit) |
| PX-2 & PX-3 | 13 | 24 | (Not described) |
| PX-4 | 13 | -- | Cangleska records |
| PX-5 | 13 | (withdrawn) | SGT Kopf mil. records |
| PX-6 and PX-7 | 13 | 24 | (Not described) |
| PX-8 | 13 | 13 | Manlove expert report |
| PX-9 | 13 | (withdrawn) | (Joint Exhibit) |
| PX-10 thru PX-18 | 13 | 24 | (Not described) |
| PX-21 | 13 | 24 | (Not described) |
| PX-22 | 13 | 24 | Complaint |
| PX-23 thru PX-26 | 13 | 24 | Elk responses |
| PX-27 | 13 | 24 | (Not described) |
| PX-29 thru PX-33 | 13 | 24 | (Not described) |
| PX-36 thru PX-40 | 13 | 24 | (Not described) |
| PX-41 and PX-42 | 13 | (withdrawn) | Elk statements |
| PX-43 thru PX-46 | 13 | 24 | (Not described) |
| PX-47 and PX-48 | 13 | (withdrawn) | (Not described) |
| PX-49 | 13 | 24 | (Not described) |
| PX-51 | 13 | -- | (Not described) |
| PX-52 | 13 | (withdrawn) | (Not described) |
| PX-53 | 13 | 24 | DoD record |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| DX-1 | 28 | 41 | Expert report |
| DX-2 | 28 | 41 | MMPI report (Mills) |
| DX-3 and DX-4 | 28 | 41 | (Not described) |
| DX-5 | 28 | -- | Stephenson report |
| DX-6B and DX-6C | 28 | -- | Medical records |
| DX-9, 9A thru 9H | 28 | (rejected) | Depositions |
| DX-11 | 28 | -- | BIA incident report |
| DX-12 | 28 | 42 | Interrogatory answers |
| DX-13 | 28 | 42 | Interrogatory supplemental answers |
| DX-14 | 28 | (withdrawn) | Admissions/responses |
| DX-15 thru DX-17 | 28 | 42 | (Not described) |
| DX-18 | 28 | 42 | Elk statement |
| DX-19 | 28 | 42 | (Not described) |
| DX-20 | 28 | 42 | MMPI report (Manlove) |

E X H I B I T S

| JOINT EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| JX-1 | 9 | 9 | Article 15 findings |
| JX-2 thru JX-4 | 9 | 9 | (Not described) |
| JX-5 | 43 | 43 | Stipulations |

P R O C E E D I N G S

(10:00 a.m.)

THE CLERK: The United States Court of Federal Claims is now in session. The Honorable Francis M. Allegra presiding. Please be seated.

THE COURT: We're here this morning to conduct trial in Lavetta Elk v. United States, case number 05-186L.

Mr. Horowitz, you're over there. Okay. Very good. Have you given a card with your identifying information to the reporter?

MR. HOROWITZ: I have.

THE COURT: Very good. Mr. Bryant, have you likewise?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. What I want to do is to deal with a variety of preliminaries so that we're going to do several things here right at the outset. So one is that we're going to deal with exhibits, and as I indicated to you all at the pretrial conference, we're going to try to admit as many of those as possible.

At least -- sort of going over a few logistical things, so we started at 10:00 today. We start at 9:30 for the remaining days this week. Ms. Dawley here is the reporter, and I'm going to ask that if for some reason at any point she doesn't hear somebody or she loses signal,

that she would stand up. That will be my cue that something's amiss and that the witness or the attorneys that are speaking need to pause.

Basically the way I see this is we'll start first by going through the exhibits and getting those in, as I said, as many as possible en masse. If there's objections, if they're the types of objections that we can deal with here at the outset, we'll do so, and if they're not, then we'll take them up, in conjunction with particular witnesses.

A few other preliminary things. Let me just ask. Is anybody going to be invoking Federal Rule of Evidence 615?

MR. BRYANT: For excluding witnesses, Your Honor? Yes, we are for fact witnesses.

THE COURT: All right. So fact witnesses then are going to be excluded. The way that works is that I need the two of you to police the courtroom for me, because you know who's a fact witness and who's not and who's just here, for example, maybe as opposed to not being a witness at all. All right. So I need you to, at least when we get to the point of opening arguments -- you don't have to do it right now -- to make sure that whenever you hear the door go open and closed, or periodically you're going to turn around and make sure, because I'm not going to know what these people

look like.

All right. So the -- and it doesn't apply to experts. The experts on both sides can stay here through the remainder of the proceedings.

All right. Let's go ahead and deal with the exhibits next, and, again, we'll deal with several things here. Let's start with Plaintiff's exhibits. Am I correct at this point? You've already distributed, because the binders I have up here represent -- stay seated; it's actually easier, Mr. Bryant. As far as I know, you have three different sets of exhibits. You have one set of Joint. Then you have a set of Plaintiff's and a set of Defendant's. Is that correct?

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. So let's -- obviously we don't need to deal with the Joint ones. I'm looking up here at what I have. Have you distributed the Joint exhibits yet?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Because I'm looking at the spines of the binders I have here, and I don't see a set that says Joint.

MR. BRYANT: It may not have a Joint. It's the thinnest one, Your Honor. There's several that are the big three-ring binders. There's one that's -- it's very thin. If we've not brought that up there, my apologies. It's a

white binder that's thin.

THE COURT: No. I don't see that binder.

MR. BRYANT: May I approach?

THE COURT: You may.

MR. BRYANT: (Handing documents.) My apologies.

THE COURT: All right. So we're going to start out with the Joint exhibits. So am I correct? We have four of these. Is that correct?

MR. BRYANT: Correct.

MR. HOROWITZ: Yes, Your Honor.

THE COURT: All right. And so I'm going to operate under the assumption that obviously there's no problems with these, so we'll admit into evidence then Joint Exhibits 1 through 4.

(The documents referred to were marked for identification as Joint Exhibits 1 through 4 and received in evidence.)

THE COURT: All right. Now let's move to the Plaintiff's exhibits. Have you distributed, by the way, the original one, the one that has the colored stickers? Is that the one the reporter has?

MR. BRYANT: Yes, Your Honor.

MR. HOROWITZ: Yes.

THE COURT: Okay. So I'm seeing two volumes of

Plaintiff's exhibits, and it is, Mr. Horowitz, 1 through 28 inclusive. Is that correct?

MR. HOROWITZ: That's correct.

THE COURT: Actually I take it back. That's the first volume is 1 through 28, and the second volume is 29 -- and I see some of these are withdrawn. Are they in the binders still or --

MR. HOROWITZ: There should be a page that says they're withdrawn if it's been withdrawn.

THE COURT: All right. Well, then they're not inclusive, so let's go back and just make sure I know what we're talking about before we find out whether Mr. Bryant has any objections. All right. So I have particular pages -- is that what's withdrawn, Mr. Horowitz?

MR. HOROWITZ: No. For instance, if --

THE COURT: You can stay seated.

MR. HOROWITZ: If Exhibit 20 was withdrawn, rather than renumber everything, we just put in a page that said, Withdrawn.

THE COURT: Right. But I'm looking, for example -- let's look at Number 5 on your list.

MR. HOROWITZ: Okay.

THE COURT: And it says, Military personnel records of Sergeant Kopf and Plaintiff's Army documents. And that's DEF 0104 through DEF 0305. Then it says 306 to

450 are withdrawn. So those are pages of Exhibit 5 -- correct? -- that are withdrawn.

MR. HOROWITZ: Correct.

THE COURT: Okay. Not the entire exhibit.

MR. HOROWITZ: The entire exhibit -- I'm sorry. 306?

THE COURT: I'm looking right at your list, so take a look at your -- 306 to 450. Correct. So 104 to 305 remains.

THE COURT: All right. So -- but those are pages of the exhibit that are withdrawn, so the exhibit's there, but it's smaller than it was before.

MR. HOROWITZ: Exactly.

THE COURT: All right. But some of these are --

MR. HOROWITZ: It's not the pages. It's the Bates number. It doesn't start with page 1. It starts with page 104.

THE COURT: All right. I understand what you're saying, but when you're saying something's withdrawn, are they in the book or are they not in the book?

MR. HOROWITZ: The ones that are not withdrawn are in the book. The ones that are withdrawn have been removed.

THE COURT: They're not in here.

MR. HOROWITZ: Correct.

THE COURT: Okay. And then -- but in some cases, it looks like entire exhibits have been withdrawn. Correct?

MR. HOROWITZ: Exactly.

THE COURT: All right. So let's just make sure that we know what we have so far. So what I see is 1 through 4, and then 5 is some pages withdrawn. But I see 6 through 18. Correct?

MR. HOROWITZ: Correct.

THE COURT: And I am right that 19 is entirely withdrawn?

MR. HOROWITZ: Correct.

THE COURT: All right. And that 20 is entirely withdrawn. Correct?

MR. HOROWITZ: Correct.

THE COURT: All right. Now, let's keep going on here. The next one I see withdrawn is 28. Is that entirely withdrawn?

MR. HOROWITZ: Yes.

THE COURT: Okay. And same thing on 34.

MR. HOROWITZ: Correct.

THE COURT: Okay. And same thing 35.

MR. HOROWITZ: Correct.

THE COURT: Okay. And also withdrawn are a portion of 49. Is that correct?

MR. HOROWITZ: Correct.

THE COURT: All right. And a portion of 50. Correct? No. 50's entirely withdrawn. Correct?

MR. HOROWITZ: In its entirety.

THE COURT: All right. And then am I right that 54 through 60 are all withdrawn? Correct?

MR. HOROWITZ: Yes.

THE COURT: All right. So let's go back then and talk about what we have here. All right. So we have then 1 through 18, recognizing that we have some pages missing from -- you know, that are being withdrawn from one of those, but we have 1 through 18. Then we have 21 through 27. We have 29 through 33. We have 36 through 49, although 49 is a somewhat diminished exhibit. And then we have 51 through 53. Correct?

MR. HOROWITZ: Correct.

(The documents referred to were marked for identification as Plaintiff's Exhibits 1 through 18, 21 through 27, 29 through 33, 36 through 49, and 51 through 53.)

THE COURT: All right. Now, to you, Mr. Bryant, any objections as to any of those exhibits, please?

MR. BRYANT: Yes, Your Honor. The first one is actually a Joint exhibit, so we can probably cross that off

of --

THE COURT: Yes. I don't want two of anything here so --

MR. BRYANT: So PX-1 should be crossed off. That's a Joint exhibit. Number 2, we do not have an objection. Number 3, we do not have an objection.

THE COURT: No. I want to know the ones you do.

MR. BRYANT: Okay. Fair enough, Your Honor. Number 4 we have an objection. That's hearsay, Cangleska records. That's a women's advocacy group that the Plaintiff spoke with.

THE COURT: All right. We'll deal with it in a second. Right now I'm just trying to figure out the numbers.

MR. BRYANT: Fair enough. All right. We do object to Sergeant Kopf's military records to the extent that they weren't withdrawn within here as being irrelevant.

THE COURT: All right.

MR. BRYANT: The map we don't object to.

THE COURT: I want to know the ones you're objecting to, Mr. Bryant.

MR. BRYANT: I'm sorry, Your Honor. Number 9 is a Joint exhibit now. Cross that off.

THE COURT: All right.

MR. BRYANT: The documents relied on by the

experts, we're not going to object if they're used for the same purpose for both sides. That's all I can say with that. There's a number of these documents relied on by Plaintiff's experts through 18, so if they're going in for the purpose of what that expert relied on, we don't object to that purpose.

THE COURT: All right.

MR. BRYANT: The paragraph 22 is the complaint. We object to that.

THE COURT: You object to the complaint?

MR. BRYANT: Well, I mean, it's --

THE COURT: On what basis? Cite a rule.

MR. BRYANT: In terms of the Plaintiff's allegations, her statements in and of themselves would be hearsay for purposes of the trial. I mean, the complaint is --

THE COURT: Well, there's an evidentiary -- I understand your point.

MR. BRYANT: Okay.

THE COURT: There's no need -- once something's in the record, it's in the record.

MR. BRYANT: Fair enough. We would object to the responses by Ms. Elk to interrogatories and other discovery requests, but they have qualified them by saying to the extent that their expert relied on them. Again, for that

purpose, we're not objecting, but otherwise we would.

THE COURT: What are the numbers?

MR. BRYANT: 23 through 26, Your Honor. 27 we would object to for Plaintiff putting it into evidence. Same for 29. We'd object to Plaintiff putting that into evidence. 30 object to. No objection to 31.

THE COURT: All right. But all of these are relied on by Plaintiff's experts, so if they're only being brought up essentially as an indication of what they relied upon, then you don't have an objection to that.

MR. BRYANT: That's correct, Your Honor. 41 we would object to for Plaintiff putting her statement into evidence. Same with 42. Same for 45 -- actually I take that back. No objection to 45. 51, for Plaintiff putting that into evidence. And 53 we'd object to.

THE COURT: All right. Let's go back through these. Number 4 is what, Mr. Horowitz?

MR. HOROWITZ: These are records from Cangleska, a women's advocacy support group, and to make things simple, I can withdraw the majority of these documents and just talk about a few isolated documents.

THE COURT: Pages, you mean?

MR. HOROWITZ: Yes.

THE COURT: All right. Go ahead, sir. What pages do you want to focus on?

MR. HOROWITZ: Sure. Only pages 3 and 4, 6 and 7, and 16. Everything else is withdrawn.

THE COURT: All right. So Exhibit 4, the pages you want now are 3 and 4. What was the other page?

MR. HOROWITZ: 6 and 7 and 16. Everything else, we'll withdraw.

THE COURT: That last page number again? I'm sorry.

MR. HOROWITZ: 16.

THE COURT: 16. All right. So let's back then. 3 and 4 is what, Mr. Horowitz?

MR. HOROWITZ: Page 3 and 4 are intake reports. Lavetta Elk placed a call to this support group --

THE COURT: Intake from this organization? Is that what you mean?

MR. HOROWITZ: Correct.

THE COURT: All right. And 6 and 7 looks like a court document. Correct?

MR. HOROWITZ: Yes. Not in this case. She sought and obtained a restraining order.

THE COURT: And 16 is what?

MR. HOROWITZ: Another intake record.

THE COURT: Intake for who?

MR. HOROWITZ: It pertains to Lavetta Elk, seeking referral for the sexual assault by Cangleska, the

Cangleska records.

THE COURT: Mr. Bryant, these records, what's the nature of your objection to those pages?

MR. BRYANT: These are hearsay. These are Plaintiff's own statements being --

THE COURT: They're business records, aren't they?

MR. BRYANT: I mean, I haven't seen the sort of foundation for that, so, I guess, if that foundation is established, perhaps. I don't know.

THE COURT: What are you going to do to establish foundation that these are --

MR. HOROWITZ: Well, number one, we're going to have a representative from Cangleska here today who was an advocacy representative for Ms. Elk. Second --

THE COURT: And that person might be able to confirm where these documents come from?

MR. HOROWITZ: Yes. Second, they're also -- another hearsay exception is applicable, which is they're statements of Lavetta's for purposes of diagnosis or treatment. She's going to an advocacy group for purposes of a referral. She -- it's an aid of getting a diagnosis or treatment. And they also separately reflect Lavetta's emotional and mental condition in providing --

THE COURT: Let's do this on 4 then. What we're

going to do on 4 is we're going to hold that objection and let you seek to admit those pages when the appropriate witness is on the stand.

MR. HOROWITZ: Okay.

THE COURT: 5, what's your objection to 5, Mr. Horowitz?

MR. HOROWITZ: I can save time. We can withdraw that one. All these documents are repeated.

THE COURT: So 5 you're withdrawing.

MR. HOROWITZ: Yes.

THE COURT: All right. The next one I have -- now, we have a number of them here that Mr. Bryant objected to but didn't object, I guess, to the extent that all these reflected they were documents that were relied upon by a given expert.

MR. HOROWITZ: Yes. I concur. I mean, the documents that an expert relies on are not evidence if they wouldn't otherwise be admissible. They only could be relied on to sort of evaluate --

THE COURT: So effectively you're relying on them only for that purpose.

MR. HOROWITZ: The ones where its preface says, Documents relied on by Plaintiff -- yes. Just to the extent that the expert relied on them.

THE COURT: Just as indication that that's the

document the expert read in forming opinions.

MR. HOROWITZ: Yes. And provided that the ruling's consistent with the defense expert, not for the truth of the matter.

THE COURT: I hear you. All right. So what does that do, then, I guess, to the nature of your objections, Mr. Bryant, to the ones that have that preface?

MR. BRYANT: To the extent they're relied on by the expert, we don't object on that basis, but Plaintiff -- I mean, if Plaintiff's counsel was referring to seeking treatment and the like, we'd point the Court to page 1 of this document, which --

THE COURT: Which document are you talking about?

MR. BRYANT: The same exact exhibit, but just go back to page 1. This is --

THE COURT: What's the number?

MR. BRYANT: Are we past 4 already?

THE COURT: I'm past 4. Yes. I'm talking about --

MR. BRYANT: Oh, I'm sorry. I -- okay.

THE COURT: I said 4 we'd hold until we got to --

MR. BRYANT: Okay. I'm sorry. I didn't hear you, Your Honor. Where are we now?

THE COURT: We're dealing with the ones talking about -- that have the language that says, Document relied

upon by expert.

MR. BRYANT: No objection beyond --

THE COURT: All right. So that -- all right. So that applies to all of those like that, and that would apply -- am I correct, Mr. Bryant, then? -- to the ones in 23 through 30 that have that preface?

MR. BRYANT: That's correct, Your Honor.

THE COURT: Let's go to 41. What is this one, Mr. Horowitz?

MR. HOROWITZ: It's a statement of Lavetta Elk to law enforcement, and I can withdraw it.

THE COURT: You can withdraw it?

MR. HOROWITZ: Yes.

THE COURT: All right. How about 42, Mr. Horowitz?

MR. HOROWITZ: Same.

THE COURT: All right. How about 51?

MR. HOROWITZ: One second. (Perusing document.)

MR. BRYANT: I actually withdraw the objection on 51. We're going to be using that as an exhibit.

THE COURT: All right. So 51 is withdrawn as an objection. Okay. The only other one you have then is 53, Mr. Horowitz. What's that?

MR. HOROWITZ: This is a public record, a government record or action case referral, reflecting

Lavetta Elk's calls to the defense hotline in connection with --

THE COURT: Is this a Department of Defense record?

MR. HOROWITZ: Yes.

THE COURT: Mr. Bryant?

MR. BRYANT: Withdraw the objection to this one, Your Honor.

THE COURT: All right. Let's go back and see what we have.

MR. HOROWITZ: I have a couple more I'd like to withdraw.

THE COURT: All right. Go ahead.

MR. HOROWITZ: That will make things a little simpler, to streamline things. 47 and 48. And this may tie in the conversation we're going -- I know you wanted us to have later about the miscarriage issue and how that ties in to the expert.

THE COURT: All right. I guess I might need some clarification on that, based upon what you're saying, but we'll do that in a minute.

MR. HOROWITZ: Okay. 47 and 48 we'll withdraw.

THE COURT: All right. Then let me go through them and see what I have as a result of our discussions. All right. So I have -- I'm just going to read these

through first, just to make sure I'm right, and then I'll indicate that they're admitted after that.

So what I see admitted are Plaintiff's 2 and 3; 4 being held for the moment, waiting for a witness for its admission; Plaintiff's 6 through 8; Plaintiff's 10 through 18, some of those being covered by the caveat that's been explained regarding the use of documents that were reviewed by experts.

Then I have Plaintiff's 21 through 27; Plaintiff's 29 through 33, also some of those covered by the discussions involving reliance upon the documents by experts. Then I have 36 through 40, and I have 43 through 46. Then I have 49. Then I have --

MR. HOROWITZ: No. Not 49.

THE COURT: Not 49. Withdrawn entirely?

MR. HOROWITZ: No. Pages -- right. Just 91 to 103. I'm sorry.

THE COURT: All right. The exhibit's 49. Right?

MR. HOROWITZ: Correct.

THE COURT: Are the pages that are withdrawn in the book or not?

MR. HOROWITZ: The pages that are withdrawn are not in the book.

THE COURT: Okay. So 49. Then 52 and 53. Correct? All right. Now, so one more time then, so let's

make sure for both of you.

What I see then is admitted would be 2 through 3, 6 through 8, 10 through 18, 21 through 27, 29 through 33, 36 through 40, 43 through 46, 49, and 52 and 53.

MR. HOROWITZ: And we'll withdraw 52.

THE COURT: All right. You're going to withdraw 52.

MR. HOROWITZ: And I think that's it.

THE COURT: Okay. All right. Mr. Bryant, any objections to those that we missed?

MR. BRYANT: No, Your Honor.

THE COURT: All right. So then admitted into evidence are: 2 through 3, 6 through 8, 10 through 18, 21 through 27, 29 through 33, 36 through 40, 43 through 46, 49, and 53.

(The documents referred to, having been previously marked for identification as Plaintiff's Exhibits 2 and 3, 6 through 8, 10 through 18, 21 through 27, 29 through 33, 36 through 40, 43 through 46, 49 and 53, were received in evidence.)

THE COURT: Any questions about Plaintiff's

exhibits beyond those that we've just discussed?

MR. BRYANT: I do have one question, Your Honor. On Plaintiff's Exhibit 4, the Cangleska records --

THE COURT: Yes.

MR. BRYANT: The first two pages of that -- or I should say, the -- yes. The first two pages of that, we would want to use as exhibits ourselves if the others are going to -- I mean, I know that we're reserving that objection until trial, but it's our understanding that these documents were included within Plaintiff's Exhibit 4 until this moment.

THE COURT: Well, that's fine, but why -- I mean, you objected to 4, so how are you telling me now that you're going to rely upon it?

MR. BRYANT: Well, I mean, to the extent if they are admitted for business record exception or whatever the case may be, then we would want the full panoply of these documents admitted for --

THE COURT: I don't see how you can object to the exhibit, and then they say they're going to introduce particular pages, and then you're going to say that if I admit those pages, you want more pages included. I don't understand what you're telling me.

MR. BRYANT: Well, if these documents meet the standard of a business record exception, with respect to, in

particular, page 1 explains what these records are about, and we can use this on cross-examination. It's fine. But I'm just trying to make it clear for the Court that it will be helpful -- this particular document explains what these Cangleska documents are.

THE COURT: Do you have an objection to -- if it's hearsay, if it's hearsay. You just told me it was hearsay. So all of a sudden because it's useful to you, it became not hearsay?

MR. BRYANT: It's contingent on the Court allowing it in under the business record exception, if Plaintiffs establish that foundation.

THE COURT: Well, if you're telling me it's useful and if we have a -- I mean, I feel like you're wasting my time. I mean, either it is hearsay or it's not. If you think it's covered by a business record exception, then you shouldn't be objecting to it, if you know that that's what's going to happen when they put the witness on the stand.

MR. BRYANT: I really don't know, Your Honor.

THE COURT: All right. Well, then, let's wait. But he can admit whatever he wants to admit, and if you think you need something for purposes of cross-examination, you can try to use it at that point, subject to the same types of caveat, so you better make sure that you are

establishing that something's a business record as well, because if you just try to pull some other documents out of this page that have not been validated by a witness and that witness is unavailable, they won't come in. Do you understand?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Any other questions about Plaintiff's exhibits?

MR. BRYANT: No, Your Honor.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: No other questions on the Plaintiff's.

THE COURT: All right. So let's turn to Defendant's exhibits. All right. Mr. Bryant, do you have an index for your binders? I don't see anything in front of the binders. Oh, wait a minute. I see what you're talking about. This chart in the beginning is actually the index. Okay. So am I right? Let's just see if I can take a look at the numbers here.

We have -- what? -- 1 through 5, and then we have 6A, B, C -- I really wish you would have numbered these consecutively. I thought we made that kind of clear during the pretrial discussions, because it gets very confusing when we start talking about 9A, 9B, 9C, et cetera.

All right. So let's just go with what we have

here. So we have 1 through 5. Then we have 6A, 6B, 6C --

MR. BRYANT: 6A, Your Honor, is now JX-2.

THE COURT: All right. So that's gone? All right. And then so 6B, 6C, and then 7 and 8.

MR. BRYANT: 7 and 8 are JX-3 and JX-4 respectively.

THE COURT: So they're withdrawn as well. Correct?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. And then when you say potential rebuttal exhibits, they're -- what? -- 9, 9A, B, C, 9D, 9E, 9F, 9G, 9H, 10 --

MR. BRYANT: 10 is now JX-1, Your Honor.

THE COURT: All right. So that's one.

MR. BRYANT: Yes.

THE COURT: All right. And then we have 11 through 20. Correct?

MR. BRYANT: Yes, Your Honor.

(The documents referred to were marked for identification as Defendant's Exhibits 1 through 5, 6B and 6C, 9, 9A through 9H, and 11 through 20.)

THE COURT: All right. Let's go back and find out what Mr. Horowitz's views are on these. Anything in

terms of objections, Mr. Horowitz, to 1 through 5?

MR. HOROWITZ: Yes.

THE COURT: Go ahead.

MR. HOROWITZ: Starting with Number 1, I believe the rule on reports is the same as the rule on documents relied on by experts; that is, they're not evidence themselves. I mean, they're replete with hearsay, but, you know, to the extent that --

THE COURT: I always admit the expert reports, so if that's going to be the basis for the objection --

MR. HOROWITZ: Okay.

THE COURT: -- it's going to be overruled.

MR. HOROWITZ: Okay.

THE COURT: Anything else about 1 through 5?

MR. HOROWITZ: Yes. Number 2 is the MMPI, and I believe that should be treated much like the documents relied on by experts, not as evidence itself for the truth of the matter.

THE COURT: So this was something relied upon by whom, Mr. Bryant? Dr. Mills?

MR. BRYANT: Correct, Your Honor.

THE COURT: All right. So are you willing to accept that limitation that Mr. Horowitz just mentioned, which is similar to the one we just --

MR. BRYANT: As long as it's applied to both

sides for expert documents, yes.

THE COURT: All right. So the answer is, yes, you're willing to accept that limitation.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. Is that true also with respect to the personality assessment inventory?

MR. HOROWITZ: It is.

THE COURT: All right. Anything else on 1 through 5, Mr. Horowitz?

MR. HOROWITZ: Number 5. Your Honor asked us to do a brief memorandum of law. At the pretrial conference, you asked us to do -- each party to do a brief memorandum of law on why Dr. Stephenson's opinions have not been rendered moot. You may recall, she's the expert on the subject of miscarriages.

THE COURT: I think you want to bring that microphone a little closer to you, Mr. Horowitz.

MR. HOROWITZ: You had asked us to do a --

THE COURT: This one, too. I think this is actually the one that I can hear.

MR. HOROWITZ: This one?

THE COURT: Yes. One is helping the reporter. The other one is helping me.

MR. HOROWITZ: I understand. You had asked both parties to do pretrial memoranda on the subject of why Dr.

Stephenson's opinions and report have not been rendered moot, but by virtue of the fact that we do not intend to put evidence on that Lavetta Elk's miscarriages were proximately caused by the assault. Given that we do not intend to put that evidence on, her collateral impeachment on the issue, so to speak, is improper collateral impeachment, is not evidence. It's not relevant.

She does not opine that Lavetta Elk suffered from her miscarriage. She never -- she's an OB/GYN. She doesn't conclude that certain -- that these were stressors on her, that they caused psychological harm. She merely takes issue with the amount of miscarriages, the dates of the miscarriages, and that's collateral impeachment.

THE COURT: All right. So 5 -- and you said you have the memorandum?

MR. HOROWITZ: I do. I didn't know if you wanted us to deal with it at the end of --

THE COURT: Well, I think that, recognizing, Mr. Bryant, that you're going to disagree with the characterization, this is the report on miscarriages. Do you agree to that extent?

MR. BRYANT: I do, Your Honor.

THE COURT: All right. And --

MR. BRYANT: I can probably cut this off. We don't plan on putting this into evidence or having her

testify, as long as the trial plays out without any claim of stress causing the miscarriages. If that's how it plays out as Mr. Horowitz has offered --

THE COURT: Well, let's do this then. We're going to just hold 5, and if the issue comes up, it comes up, and if it doesn't come up, well, then we don't have to deal with it.

MR. HOROWITZ: Sure. And if it does come up, I'd like an opportunity to provide you with our memo.

THE COURT: And I think that makes perfect sense, Mr. Horowitz, and I'll expect the same from Mr. Bryant if it comes up. All right. So 1 through 4, with the caveats we've indicated.

So the next ones I'm going to ask you about then, Mr. Horowitz, are 6B and 6C.

MR. HOROWITZ: 6 -- well it's almost easier to use the numbers. Pages 781 through 1090 are these prenatal care records, miscarriage records, and to me, it's one and the same issue as what we were just discussing with Dr. Stephenson. She didn't go there for counseling. There's no references to treatment for injuries related to the assault, simply prenatal and miscarriage type records.

THE COURT: What were the numbers of those? So, wait a minute. You skipped then to 6C. What's the problem with 6B?

MR. HOROWITZ: No. 781 to 1090 is part of --

THE COURT: 6C. So what's the problem with 6B?

MR. HOROWITZ: I have 6B as including -- it's 454 to --

THE COURT: 497 is what I have in this index.

MR. HOROWITZ: Well, they're duplicative of something we already have listed, but to that extent, I have no objection.

THE COURT: They're the same pages of something you already have listed?

MR. HOROWITZ: Yes.

THE COURT: Are you sure that they're the same pages?

MR. BRYANT: I think there's a typo on our exhibit list, the main exhibit list that we filed. I think that's what Mr. Horowitz is --

MR. HOROWITZ: Okay. What's 6A then? What should 6A be?

MR. BRYANT: 6A is JX-2.

MR. HOROWITZ: Okay.

MR. BRYANT: 6B is DEF 454 to 497.

MR. HOROWITZ: Okay. That might clear it up. Well, again -- okay. 6B, prenatal care records, treatment during her pregnancy, and we don't intend to raise those issues. We don't find them relevant.

THE COURT: All right. Mr. Bryant?

MR. BRYANT: The miscarriages, to the effect that they have an impact on her psychological -- sort of the psychological harm that she discusses -- and we talked about this during the pretrial conference -- certainly is relevant to that. Now, the issue of --

THE COURT: In other words, the allegation being that some mental distress that she may be attributing to the assault instead would be attributed to the --

MR. BRYANT: Correct, Your Honor.

THE COURT: All right.

MR. BRYANT: And these, of course --

THE COURT: What we're going to do on 6B and 6C is we're going to hold off on them, so we're not going to admit them at this point, and I'm going to wait for Mr. Bryant to introduce them at the appropriate stage of the proceeding. We'll see what happens at that point in terms of establishing relevancy.

All right. Then we have these rebuttal exhibits, 9, and then we go 9A through 9H. Anything with that list, Mr. Horowitz?

MR. HOROWITZ: I mean, they're depositions of some witnesses and non-witnesses. To the extent that they're non-witnesses, I don't see how they could be used.

THE COURT: I'm not even sure how they come in as

witnesses.

MR. HOROWITZ: Yes. I was going to say --

THE COURT: I mean, if you're going to use these for impeachment purposes, there's a process for that, but bringing in the entire depositions seem to be inappropriate.

MR. BRYANT: It's not our intent -- we were just trying to put everyone on notice that we may use those for impeachment purposes, Your Honor. That's why they're there.

THE COURT: All right. Well, then --

MR. BRYANT: We're not going to admit the whole deposition.

MR. HOROWITZ: They're not admitted.

THE COURT: Well, I can't admit them, because they would be hearsay. All right. So they're not for use for impeachment purposes, so when you get to the appropriate spot and you're going to use them to impeach somebody, then you can admit them using the appropriate process, and they're going to come in in that way, but not the entire depositions. All right. So 9 through 9H -- okay -- are not going to be admitted.

Let's go to 11, then, through 20, Mr. Horowitz.

MR. HOROWITZ: 11, 11 is a Bureau of Indian Affairs incident report, which, among other things, contains a reflection on the decision whether to prosecute criminally. The decision whether or not to prosecute

criminally is irrelevant, and to that extent, should not be admitted.

THE COURT: Are there portions of that document that are relevant?

MR. HOROWITZ: I was going to continue that there are also double hearsay. Although the title of the document is, Interview of Lavetta Kathy Elk, they're actually summaries of interviews and therefore hearsay.

THE COURT: Wouldn't they be business records perforce? I mean, they have to be.

MR. HOROWITZ: Okay.

MR. BRYANT: Your Honor, these are on Plaintiff's exhibit list as well, 51, all but one of these pages. The page about --

THE COURT: The other thing, I thought -- you know, I'm not really happy about the organization of these binders. I mean, for one thing, I told you I didn't want, you know, to have two things in the same binders, and that looks to be the case, because we've got pages overlapping of exhibits here. I told you specifically not to do that. All right. So that's one thing.

Two, by the time we get done with the ones that are withdrawn and everything else, we're going to end up with Swiss cheese. You should anticipate that, not during trial here, but you're going to have refile a new set of

binders with the Court that includes all the other stuff stripped out, and basically just the exhibits that are admitted. That's going to be something I'll make due after the close of trial, because a lot of the things --

There's no reason I should have in a binder up here a withdrawn exhibit. If you're withdrawing it in the face of an objection, that's one thing. If you knew you were going to withdraw it before you even had an objection, then it shouldn't have been here to begin with, because it just basically makes things a little bit more cumbersome than they need to be.

All right. So 11, you're telling me now, is a duplicate or not?

MR. HOROWITZ: I don't believe the entire exhibit is a duplicate.

THE COURT: Portions of it are.

MR. HOROWITZ: Yes.

THE COURT: For now, we'll just let it sit.

MR. HOROWITZ: Okay.

THE COURT: I do not want -- because what's going to happen -- the reason why I don't want duplicate exhibits, one of you will cite to that exhibit one place, one way; another of you will cite to the exhibit someplace else a different way, and then we're going to have to figure out that you're actually talking about the exact same page. All

right. So I don't -- that's why we don't want duplicates of the same documents.

MR. BRYANT: I proposed that be a joint exhibit and was declined.

THE COURT: All right. 12 through 20, Mr. Horowitz?

MR. HOROWITZ: The only one we have -- well, the first one we have an objection to is 14. 14 is --

THE COURT: They're admissions. What's the nature of the objection? Relevancy objection?

MR. HOROWITZ: Yes. Let me see. Just that a lot of these documents which accompanied the response to the discovery requests are -- they're duplicative.

THE COURT: All right. So attached to these interrogatories are -- oh, this is document production. Correct?

MR. HOROWITZ: Yes. It's a document production, and to the extent that they've been admitted, I have no objection. To the extent that they have not been admitted -- you know what I'm saying? I don't think it should be admitted, just because they attached it to the discovery response -- it was attached to the discovery response.

THE COURT: Mr. Horowitz, what are you doing with these documents? Evidentiary-wise, what are you doing with

these documents?

MR. BRYANT: Do you mean Mr. Bryant? Are you talking to me, Your Honor?

THE COURT: Yes. I'm sorry. Mr. Bryant, I'm trying to say you. I'm sorry. I'm looking at you and saying, Mr. Horowitz. That's probably why you're confused.

MR. BRYANT: Well, some of these documents are medical records that we talked about that we may need to use, and --

THE COURT: Are they the same or -- see, one of the problems I'm going to have here -- so let's say you use a medical record that's in the record twice to try to impeach somebody. Okay? And that I have to figure out, whether there's any difference at all between the one that's in the record that you use in one spot versus the one that you're using in the record someplace else. And so are these duplicates or not?

MR. BRYANT: I think they are in large measure, Your Honor, but --

THE COURT: All right. You're going to come back to me and tell me which pages of 14 that you --

MR. BRYANT: Okay. Fair enough, Your Honor. We'll withdraw that Exhibit 14. I think it's duplicates.

THE COURT: All right. Mr. Horowitz, what else do you have in terms of 15 through 20?

MR. HOROWITZ: Just 19 and 20, to the extent that the expert relied on them only, rather than the truth of the matter asserted.

THE COURT: All right. Well, that would be true of 19. It looks like 20 is the report itself. What is that one, Mr. Bryant?

MR. BRYANT: Your Honor, in DX-20 I should clarify. That is the MMPI, but the one that Plaintiff's expert did. There's an MMPI that Dr. Mills did and an MMPI that Dr. Manlove did. I didn't receive that one until Thursday night before I flew out on Friday morning. That's why it is not identified in the covers of your binders, Your Honor, DX-20.

THE COURT: Is this something that your expert relied upon then or not?

MR. BRYANT: It is -- it's something his expert relied upon, and I'm going to use it for -- and ours as well, yes.

THE COURT: They did rely upon it.

MR. BRYANT: Yes. He is relying on it as well.

THE COURT: All right. So if we use this notion of just -- the notion that it's here, but it will only have evidentiary value to the extent it was relied upon by an expert witness. So does that cover 19 and 20 then, Mr. Horowitz?

MR. HOROWITZ: Yes.

THE COURT: So let's go back and see what we have left here. All right. So if I'm reading this correctly, we have 1 through 4 admitted now. We have an objection to 5, and any of these that are objected to, Mr. Bryant, it's going to be your job at the appropriate time to try to move that exhibit into evidence. Don't forget that they're there.

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. So 1 through 4, and then it looks like the next exhibit that we have admitted now is 12 and 13, and then 15 through 20. Is that correct, Mr. Horowitz?

MR. HOROWITZ: Yes.

THE COURT: All right. So 1 through 4, 12 through 13, 15 through 20 for now. Any questions about those being the ones admitted, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: All right. So then, just for official purposes then for the reporter, I'm admitting 1 through 4, admitting 12 through 13, and 15 through 20 inclusive, and none of those -- those are all numerical exhibits with no letters. So those are just the basic numbers.

(The documents referred to,

having been previously marked for identification as Defendant's Exhibits 1 through 4, 12 and 13, and 15 through 20, were received in evidence.)

THE COURT: All right. And that means that the ones that could come in at a later point here that have been withdrawn would be 5, 6B, 6C, any of the deposition testimony represented by the 9A through 9H series, the -- and I think that's it. Am I right, Mr. Bryant?

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. Any questions about that, Mr. Horowitz?

MR. HOROWITZ: No questions.

THE COURT: Any other questions about Defendant's exhibits, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: All right. Then I think we're done with that. I've received your stipulations. I'm correct that Joint exhibits go up to 4. Is that correct?

MR. HOROWITZ: Yes.

THE COURT: All right. So I'm going to then -- I'm then going to file the joint stipulation as Joint Exhibit 5, so for reference purposes, that's going to be Joint Exhibit 5.

(The document referred to was marked for identification as Joint Exhibit 5 and received in evidence.)

THE COURT: Any other questions about exhibits? Mr. Horowitz?

MR. HOROWITZ: No, Judge.

THE COURT: Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: All right then. Let's talk about a few other things. We're going to start with opening statements of about 20 minutes max. Following that, then we'll start with Plaintiff's case, Mr. Horowitz, with you calling witnesses.

In terms of breaks, if you need one, you just need to let me know. You know, I try to take one periodically. I mean, lunch hour and how much time we have is going to be somewhat dependent upon how fast we're going. I want to try to make as efficient of time as we can, and so in particular, you know, if we're in a situation here where, you know, we have a witness who's a relatively short witness, we can take them up today, for example, or tomorrow, and not carry that person over to a second day, we're going to try to do that, so just anticipate I'm going to find out what the rules are in the courthouse in terms of

departure time and that we're going to try to make as effective use of our time as possible on a day-by-day basis.

The marshals reported to me that they allowed you to bring in cell phones, but it turns out that that, in fact, is against the policies of the courthouse, so I'm going to ask that when you go out for your lunch break, if you can, that you're going to put your phone someplace else before you come back in. If you come back in with them after lunch, they're going to probably take them, and they're going to hold them probably at the United States Attorney's office. So I'm going to tell them that, you know, coming back in from lunch, that they can apply the normal protocol that they have here in this courthouse.

Any logistical questions we haven't talked about yet? Mr. Bryant?

MR. BRYANT: Your Honor, we talked about exclusion of witnesses. We're not sure if there are some in the courtroom at the moment or not.

THE COURT: Yes. We'll deal with that before we get to opening argument, opening statements. Any other logistical questions, Mr. Bryant?

MR. BRYANT: Not from the Government, Your Honor.

THE COURT: Any questions?

MR. HOROWITZ: No. Just with regard to a couple of witnesses that have been withdrawn, I notified Mr.

Bryant. Do you want to know who they are?

THE COURT: That would be helpful to me, so if you've withdrawn some, then you might as well let me know.

MR. HOROWITZ: Sure. Let's see here. We will not be calling Lloyd Elk.

THE COURT: Okay.

MR. HOROWITZ: We will not be calling Cecilia Fire Thunder.

THE COURT: What was the last -- the first name?

MR. HOROWITZ: Cecilia Fire Thunder. Cecilia is the first name.

THE COURT: All right. That was on your may-call. Correct?

MR. HOROWITZ: Correct. And there was another one. Shane Montgomery is also on the may-call.

MR. BRYANT: I think, Your Honor, I was also informed Carol Ann Black Elk Weston.

MR. HOROWITZ: Yes. Carol Ann --

MR. BRYANT: And Emerson Elk as well.

MR. HOROWITZ: Correct. Yes. Those are a few may-calls that we're not going to be calling.

THE COURT: All right. In terms of your will-calls, I mean, I did indicate that you needed to let the Government know or actually each other know about that ahead of time, so is that going to cause any problems with the

will-calls, Mr. Bryant?

MR. BRYANT: No problems.

THE COURT: All right. So at this point, Mr. Horowitz, you intend to call Ms. Elk obviously and then Ms. Randall, Ms. Hawk, Ms. Elk, Jerilyn Elk, and Leah White Bear Claw.

MR. HOROWITZ: Yes. On that point --

THE COURT: Do you know who you're calling yet on this may-call list or not?

MR. HOROWITZ: Yes. Anyone unless I've named them. I don't have it in front of me, but unless I've told you I wasn't calling them.

THE COURT: They're coming.

MR. HOROWITZ: Yes. With one exception. I'm waiting on confirmation on Jackie Randall, that she's going to be appearing.

THE COURT: All right. And then, of course, you have your experts.

MR. HOROWITZ: Correct.

THE COURT: Is your list modified at all, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Okay. All right. Then -- so basically then the way that we're going to deal with the miscarriage issue is we're going to wait and see how

evidence develops. If you're going to bring it in then to -- for purposes of attempting to essentially establish that some of the emotional distress, other types of potential injuries that are associated with the assault instead relate to that, then I'm going to expect you to tie it that way, so that witness had better be able to sort of tie it to something that's going to provide, for example, a temporal linking, because it's not going to make sense to be talking about the impact of a miscarriage if the emotional distress that we're talking about occurred, you know, at the time of the assault and shortly thereafter.

All right. So you're going to have to be prepared to do that, because if all of a sudden temporally we have a situation where the damage period we're talking about is here, and the miscarriages are happening at some later point in time, then I think you're going to have to be able to explain to me how it's relevant.

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. So that witness better be prepared to do so.

MR. BRYANT: And if I can just do a proffer, Plaintiff has claimed sort of the emotional distress from the time of the assault until present day, so it would fall within certainly that time period.

THE COURT: And I assume that you've also looked

at issues involving how that would impact, for example -- I mean, one of the things I still need from you and you should anticipate having to do this in your post-trial briefs, is I still don't feel like I have a good sort of analysis of what type of legal framework we were functioning under here in terms of the establishment of damages. I mean, at points we've talked about tort regimes, and at other points we've talked about not necessarily operating in those regimes.

And so I think we're going to need to know that, because, for example, I'm sure that there are rules in tort regimes that impact questions like this, so if somebody is subject to emotional distress, for example, as a result of a tort, and then something else happens in their life that also causes emotional distress, I suspect that the tort law figured out how to deal with that, so that --

But I'm not sure in this context whether those tort principles necessarily apply here or not, so it just seems to me that you need to continue to sort of be thinking in terms of not so much during the course of the trial, but in your post-trial briefing, that you're going to really have to tie the factual evidence here legally back to the damages questions that may be associated with the Treaty here, because it's not obvious to me that we just default to tort law.

I mean, there may be reasons for that, and there

may be reasons not. That's what I want you to explore in terms of your post-trial briefs. All right. So -- but for purposes of evidence, I think that the main thing I'm concerned about is that there be a direct tie there, so that -- I'm not going to allow all kinds of testimony about the miscarriages if, in fact, the only issue that's going to come in here is the fact that there might be some alternative basis for emotional distress, and that's where the testimony is going to have to be focused upon.

So we'll see what happens when we get to that point of the trial. Any other questions about preliminary things that we need to discuss that we haven't resolved? Mr. Horowitz?

MR. HOROWITZ: No, Your Honor.

THE COURT: Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Okay. Let's take a short recess, just until eleven o'clock, so that's just six, seven minutes. At that point, we'll start with Mr. Horowitz's opening statement.

(Whereupon, a short recess was taken.)

THE COURT: All right. So at this point, we're going to start with opening statements. Here's what I'm going to need, you, Mr. Bryant, and you, Mr. Horowitz, to -- I just want to make sure there's nobody in the courtroom who

is going to be excluded under the rule. For 615 purposes, that starts now, that prohibition.

I've been informed that there are waiting areas for each of you that you can use if witnesses come in and you're looking for a place for them to stay while they're waiting to be called. And the only other thing I'll remind you about Rule 615 is that the nature of that rule also means that once you call a witness to the stand if we take a break, the way I interpret Rule 615 is that you cannot work with that witness or talk to that witness or counsel that witness once they've taken the stand.

So, for example, if we call somebody before lunch and then we take a lunch break, you can't meet with the witness during the lunch break, you know, and try to go over something that maybe, for example, they didn't answer the way that you liked and try to set them up for providing a better answer, say, post-lunch. And so I view that sort of as just part and parcel of that rule being invoked, because you have information in terms of what's going on in the courtroom, and it's impossible at that point for you to be able to separate out that which you've heard and that which you didn't hear for purposes of figuring out how to talk to that witness. Understood?

MR. HOROWITZ: Yes.

THE COURT: All right. Okay. Anything else that

we need to take up before we move to Mr. Horowitz? Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Mr. Horowitz, if I could go ahead and have you go to the podium, please.

MR. HOROWITZ: Am I correct it's this microphone?

THE COURT: Yes. Anytime you're ready, sir.

OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

MR. HOROWITZ: Your Honor, the evidence you will hear in this case pertains to an undisputed event. A military recruiter named Sergeant Joseph Kopf sexually assaulted a 19-year-old girl named Lavetta Elk. Lavetta Elk, you will hear, was raised on the Pine Ridge Indian Reservation and is a full-blood member of the Oglala Sioux Tribe.

And you'll hear that as a child on the reservation, she was ambitious and successful. You will hear that she performed well in school, was the captain of sports teams, and was a leader in community service projects on the reservation. Throughout her childhood, Lavetta had a dream, a dream to join the military, like her grandfathers and her uncles, and her brother before her. You'll hear that she wanted to hear the Army like them.

And her family taught her, you'll hear, to believe in military values and to respect and hold its

officers in the highest regard, and there could be no greater way for Lavetta to serve her country than to join the military. And you'll hear that for Lavetta, this dream was particularly special, because she wanted to be the first woman in her family to join the Army. And this, you'll hear, made her mom and dad very proud.

And in 2003, Lavetta decided to leave behind a full-tuition college scholarship to pursue this dream. Now, life, you'll hear, wasn't always easy for Lavetta on the reservation. In high school, she had some unfortunate events. She had a sponsor who died, and that made her sad. She had two grandparents who died later, and she had a friend who committed suicide. But life happens for Lavetta, just like it did for many other young people.

But you'll hear that Lavetta overcame each of these obstacles. The evidence will show that she, when she graduated high school, received, as I said, multiple scholarship offers to attend college on a full tuition scholarship. And Lavetta will testify that she made the Army first aware of her interest in joining the military when she was in the eleventh grade at age 16, and while she was in the eleventh grade, the Army assigned her a recruiter named Sergeant Joseph Kopf.

Sergeant Kopf started recruiting Lavetta at the young age of 16 and would talk to Lavetta about her military

ambition, her dreams, and what she needed to do to make that happen. He would meet with her at her high school and at her home, and as he was recruiting Lavetta, you'll hear that he began what is known as the grooming process, gaining her trust and confidence and that of her family as well, and showing an interest in her as a person.

And by gaining the trust of her family members, too, he was grooming her for what was to occur on January 7, 2003. You will hear from Lavetta that on that date, Sergeant Kopf arrived at the home of Lavetta's parents in Wounded Knee, South Dakota, and he told her and her dad that he needed to take her to Sioux Falls to resubmit to a height and weight evaluation. Lavetta will testify that she trusted him. She went in her home, and she packed an overnight bag, and they headed into his military vehicle.

And then she'll testify that he told her he needed to make a recruiting stop, but instead of taking there, he went on some back roads and in a different direction, past all the housing developments on the reservation, into an even more remote, isolated part of the reservation where he could not be seen and Lavetta could not be heard.

Lavetta will describe how he parked his car behind a hill and shut off the ignition, and Lavetta asked him what he was doing, and he alluded to hiding a body out

there in the hills where no one could find it. It is then undisputed that Sergeant Kopf sexually assaulted Lavetta Elk. He positioned himself on top of her, grabbing at her breasts, attempting to remove her pants against her will.

You will hear Lavetta describe her struggle, her plea for him to stop, and each time she pushed him away, he came back at her, and this went on for several minutes, and Lavetta cried uncontrollably. Lavetta will describe how she felt trapped. The doors in his car were locked. You'll hear that she was trapped, because Sergeant Kopf had the key to her future. You will hear that she was scared, thinking that she was going to be raped and that her body was going to be left behind that hill.

You will hear that she was vulnerable, vulnerable because this was a man in a position of power, and he was using her as his sexual object. And you will hear that she felt worthless. This was a man in a position of power, and she had been raised to trust in this military officer, and so she felt betrayed because her dream to join them was being destroyed by one of their own. And it is undisputed that this sexual assault occurred in the manner Lavetta Elk will testify.

Lavetta insisted after the assault, when Sergeant Kopf finally relented, that he take her to her cousin Jackie's home, and he did so, and the first person that

greeted her, her cousin Jackie, required 20 minutes to calm her down from crying hysterically before she could get bits and pieces of what happened that day. And they immediately reported this event to law enforcement and the tribal police.

And you will hear that since this horrific assault, which has now been over five years ago, Lavetta has been through a lot. She suffers and continues to suffer. She has been diagnosed with depression, anxiety, insomnia, and panic attacks. Dr. Manlove will explain that she post traumatic stress disorder, and she has recurring memories of this molestation, and when this happens, she'll describe how she feels paralyzed and short of breath. And she'll describe how she has sleepless nights and nightmares, filled with images of Sergeant Kopf ravaging her against her will.

And she'll testify that she cries uncontrollably at times, and though she tries to push away the memories, they always come back. And for Lavetta, sometimes it's as if the abuse just happened. She hears his voice. She smells his cologne. She feels his breath on her neck. And when she feels these sensations, she'll tell she wants to be alone, away from her children, away from her husband, and this interferes with her relationship with her family.

And she'll describe how sometimes she loses her appetite and other times she goes on eating binges to make

the pain go away. And even with a newborn child, she finds it hard to focus, and she's given up so much. In the months following the assault, she left her family. She left the reservation to get away from these memories. She traveled to North Carolina, to Texas, to Wisconsin, to Illinois, just to get away, before finally coming back to the reservation.

To deal with these emotional difficulties, she's been to a therapist. She's been to a hospital. She's been to group support for battered women. She's met with a traditional medicine man. She's met with her own minister. And Lavetta will describe that these steps have provided some comfort, but, of course, they don't undo what happened. And, of course, and perhaps most of all, she'll testify that her dream of joining the military has been shattered.

And the experts will tell you she can't function the same way as she did before the assault, and her prognosis is for more of the same for years to come. But in the end, we're left with one single undisputed fact. A military recruiter, a trusted authority figure, sexually assaulted Lavetta Elk.

THE COURT: Mr. Bryant.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

MR. BRYANT: Good morning, sir, Your Honor. First of all, Your Honor, we are not here to defend Sergeant Kopf. What he did was wrong. He committed an indecent

assault, and he was found guilty in an Article 15 proceeding and punished under the Uniform Code of Military Justice. He was demoted in rank. He lost pay. And that punishment and resulting administrative relief for cause from recruiting duties were an appropriate resolution of what he did, given the relatively minor nature of his offense.

Plaintiff, however, is attempting to turn this into something it's simply not. There's a continuum of sexual assaults. On one end, you have violent rape, gang rape, forcible sodomy and the like. On the other end, you have what we have in this case, which is essentially a groping incident. And as a result of being groped, Plaintiff is now sinking $100 million, and this is overreaching of the highest order.

You just heard Plaintiff's counsel's opening statement, and they talked about this being an aggressive sort of -- she felt scared and helpless and paralyzed in terms of during the assault. The evidence, including Plaintiff's own statements, within hours of the assault belie that assertion. In fact, there's a huge credibility gap between what Plaintiff claims and what the evidence shows.

That is a theme that courses through every aspect of this case, and it sort of can be broken into two categories. There's embellishment, exaggeration of the

assault itself and then of the psychological impacts of that assault subsequently, and then the corollary to that is a minimization of a variety of other psychological stressors that Plaintiff has experienced, both before and after the assault.

Starting with the embellishment relating to the assault itself, the claims of aggressiveness and the paralyzing fear and so forth do not hold water when scrutinized, which you'll see. Generally speaking, her description of the assault and her fear become more embellished as time passes with additional statements, additional interviews, and the like.

The day of the assault, January 7, 2003, Plaintiff prepared a handwritten statement of what happened. The account of what happened is a far cry from what Plaintiff claims later. You'll also hear from Special Agent Robert Bennett, who's currently with the Federal Bureau of Investigation. At the time of this incident, he was with the Bureau of Indian Affairs. He was the agent assigned to this matter. He interviewed Ms. Elk on the day of the incident. Within a few hours of the assault, he will come in and tell you that he observed her. He interviewed her, and the story she told him does not mesh with the Plaintiff's story now in large measure.

He observed her demeanor, her acknowledgment that

there were no threats of harm, there were no injuries of any sort, and he'll tell you about that. There's also the factors I mentioned, the exaggeration of psychological impacts from the assault itself. The evidence just doesn't support what Plaintiff and her counsel just described.

Her minimal record of psychological treatment -- and really it was following the assault, a matter of weeks and tops a handful of visits --

THE COURT: Could I get you to pause, because somebody just came walking in.

(Pause.)

MR. BRYANT: Her minimal record of psychological treatment immediately following the assault is reflective of the type of assault it was, a minor groping assault. She had in the weeks that followed, as I mentioned, perhaps a handful of visits to a professional therapist.

Additionally, as you'll learn from forensic psychiatrists from both sides will testify, that she was administered some psychological tests. Our expert, Dr. Mark Mills, administered the MMPI he will explain in detail and the PAI, and Plaintiff's own expert also administered the MMPI. And these tests, these psychological tests, indicated exaggeration.

In fact, Plaintiff's own expert's test indicated extreme exaggeration in terms of her assessment of her

psychological symptoms, and that's something that needs to be given serious consideration to and thought throughout the process of this -- throughout the course of this trial.

And then the other corollary, as I mentioned, is the minimization of other psychological stressors that Plaintiff has experienced, and that goes hand in hand with the exaggeration of the sexual assault itself. There were deaths of loved ones, as Plaintiff's counsel mentioned, a friend that committed suicide just months before, a couple months before the incident, and Plaintiff's counsel mentioned depression. Well, that's a very important point.

She had preexisting depression, diagnosed and treated within the year leading up to January 2003, and following the assault, Plaintiff had -- Plaintiff claims to have had several miscarriages, five miscarriages, over -- the first being roughly, I think, eight, nine months after the assault in October, and then four consecutive ones thereafter in the ensuing year and a half or so. And, of course, those would have a -- and she would tell you a strong impact in terms of how she felt, felt like a failure, and was depressed and so forth.

However, in her meetings with the psychiatrist, with our psychiatrist, she tends to minimize the impact of the miscarriage, as she does those preexisting depression and other psychological stressors that she had. What she's

attempting to do is shift the focus exclusively to Sergeant Kopf. And, again, as we said, what he did was wrong, but it's not the full picture of what is going on with Plaintiff.

And whether this is a case of a Plaintiff -- Plaintiff's misattribution or intentional deceit or a combination of the two, we look forward in the coming days to demonstrating their claims are simply unsupported. In the final analysis, even assuming that the type of psychological injuries that Plaintiff claims are compensable under the "bad man" clause -- and that's something we will argue in post-trial briefing, of course, that it's not available -- the evidence nevertheless will show that compensation that would be appropriate, if any at all in this case, is minimal. Thank you.

THE COURT: Your first witness, Mr. Horowitz?

MR. HOROWITZ: Your Honor, before calling Lavetta Elk, can I have permission to publish to the Court and read into evidence Joint Exhibit 1?

THE COURT: No. There's no reason to. So go ahead.

MR. HOROWITZ: We'll call Lavetta Elk.

Whereupon,

LAVETTA KATHY ELK

having been first duly sworn, was called as a witness herein

and was examined and testified as follows:

THE COURT: If you'll please take a seat, please.

THE WITNESS: (Complying.)

THE COURT: Would you begin by stating your full name for the record, and then please spell it.

THE WITNESS: My name is Lavetta Kathy Elk. L-A-V-E-T-T-A, Kathy, K-A-T-H-Y, Elk, E-L-K.

THE COURT: And can I get you to move just a little bit closer to that microphone, please. Thank you.

Whenever you're ready, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Lavetta, what is your date of birth?

A December 8 of 1983.

Q You're 24 years old?

A Yes.

Q Okay. And where do you live?

A In Wounded Knee, South Dakota.

Q Is that a reservation?

A Yes. It's on a reservation.

Q Which Indian reservation is that?

A Pine Ridge.

Q And where is that located in relation to Rapid City?

A South of here.

Q And are you a Native American?
A Yes.
Q All right. Full-blood?
A Yes.
Q Which tribe is that?
A Oglala, Oglala Lakota.
Q Is that the Oglala Sioux Indians?
A Yes.
Q And who do you live with?
A My parents.
Q Anybody else?
A My sister and my brothers, my family.
Q And how many siblings do you have?
A I have six.
Q All raised in one home?
A Yes.
Q And what number child are you?
A The fifth.
Q Fifth oldest?
A Oh, sorry. Yes. The fifth oldest.
Q Okay. And how many boys and girls are there?
A There are two girls other than me -- there's three girls -- and four boys.
Q And of the daughters, of the girls, where do you -- what number are you?

A I'm the youngest.

Q Okay. So you're your parents' youngest girl.

A Yes.

Q Okay. Do you have a close-knit family?

A Yes.

MR. BRYANT: Your Honor, excuse me. I'm having a hard time hearing. I don't know if we can turn up or --

THE COURT: Why don't you get as close to that mike -- I don't know how much -- maybe you can move that chair up and try to get as close as you can.

THE WITNESS: (Complying.)

THE COURT: All right. Thank you.

BY MR. HOROWITZ:

Q You mentioned you had a tight-knit family. Give me an idea how many people were living in your house at one time growing up.

A It was always just me and my brothers, my sisters, and my parents.

Q So about eight of you?

A Yes.

Q Okay. Give me an idea of how big a house this is.

A It's a four-bedroom house.

Q So a lot of sharing space.

A Yes.

Q Are you married?
A Yes.
Q Okay. And what's your husband's name?
A Jorge Romero.
Q Okay. And do you have any children?
A Yes. I have two.
Q Okay. Boys?
A Yes.
Q Where did you attend high school?
A Red Cloud.
Q Where is that located?
A That is located on the reservation, outside of Pine Ridge.
Q As a teenager, what sort of career ambition did you have?
A I wanted to be in the medical field. I wanted to be in the military.
Q How did you perform in high school?
A I did good. A's and B's.
Q Were you a good student?
A Yes.
Q Did you have any trouble in school, disciplinary problems, anything like that?
A No. No trouble.
Q Did you get along with all your teachers?

A Yes.
Q Okay. Did you receive any awards or accolades in school?
A I was involved in a lot of -- I was involved in sports, volleyball, basketball. I was involved in community service.
Q Did you get any awards in sports?
A Yes. I was the team captain.
Q Tell me about the community service you did growing up.
A It was a group called the outreach team. We went -- we cleaned up communities about the reservation. We helped clean up neighborhoods in Denver, Colorado, and in Chicago, Illinois.
Q Was that volunteer work?
A Yes.
Q And then for how long a period of time did you do that type of community service?
A Throughout high school.
Q And was that something you were chosen for or was that something you decided to do on your own, or how did that work?
A Well, it started with a group called Youth Opportunity. You volunteered for community service, and eventually, you know, if you do good, they'll hire you as a

part of their team.

Q Did you have many friends in high school?

A Yes.

Q Was high school overall a pleasant time for you?

A Yes.

Q Okay. Were there some days when you felt sad or depressed in high school?

A Sad, yes. I had a sponsor who passed away. We were really close, and, you know, I felt sad through that time.

Q Okay. Tell me about what a sponsor is.

A A sponsor is somebody who comes to the reservation. They help children with whatever they need, whether it be clothes or supplies for school or anything.

Q Did you meet with anyone in connection with when your sponsor passed away?

A I went with the counselors.

Q And how many times did you meet with them?

A A few times.

Q Okay. And what sort of things did you complain about at that time?

A College. Like I said, I was sad because my sponsor passed away, so --

Q Why did you stop going to that counselor?

A I felt better. It wasn't something that just was

drug out.

Q Did she prescribe any medications to you? Anybody prescribe you any medications for that?

A Yes.

Q Now, did there come a time when you developed an interest in the military?

A Yes.

Q Okay. What sort of interest in the military did you have?

A Well, my family, a lot of my family was in the military, and they always talked about the people that took care of them whenever they were hurt or injured, and I wanted to be one of the ones to help take care of everybody.

Q Which family members of yours were in the military?

A Both my grandparents, my father's side, my mother's side, my uncles, my brother.

Q Were there any women --

THE COURT: Could I get you to pause? I think I need you to be louder, and I definitely need you to be louder, so project your voice a little bit more, because we want to make sure everybody's hearing.

MR. HOROWITZ: Certainly.

BY MR. HOROWITZ:

Q Were there any women in your family in the

military?

A No. None.

Q And did that provide any special meaning to you?

A Yes. I wanted to be the first female in my family in the military.

Q Did you talk about that with your family?

A Yes. They were the ones that brought it up.

Q How did you notify the military of your interest in joining?

A Through the Internet.

Q Okay. How do you go about doing that?

A I went to Goarmy.com, and you fill out a form with your information, and they send you information in the mail.

Q Okay.

MR. BRYANT: Your Honor, I'm still having a difficult time with both counsel and the witness hearing.

THE COURT: You need to speak much louder and just do as best as you can, Ms. Elk.

MR. HOROWITZ: Sure.

THE COURT: It would be helpful, Mr. Horowitz, if you'd pull that mike a little closer to you, too.

MR. HOROWITZ: It's taped, so --

THE COURT: This is the one that's amplifying.

MR. HOROWITZ: This is the one.

THE COURT: Yes.

MR. HOROWITZ: Okay. Got it.

BY MR. HOROWITZ:

Q How old were you when you notified the military of your interest?

A Sixteen.

Q And were military values and respect for the military something that was discussed often in your house?

A Yes. We grew up with the values in our home and the main one was respect.

Q After you went on the Internet and contacted the military, what was the next contact you had with them?

A They assigned me a recruiter out of Rapid City recruiting station.

Q Okay. And what was his name?

A Joseph Kopf.

Q Okay. And what grade were you in when you were contacted by him?

A Eleventh.

Q How old were you?

A I was 17.

Q And what was his first contact with you?

A It was in high school. He came. He introduced himself. He brought some literature, some books.

Q Did he recruit you in the eleventh grade?

A Yes.
Q And what sort of things did you discuss at that point in time?
A Just the different fields in the military, different branches, different opportunities.
Q Did he continue to recruit you in the twelfth grade?
A Yes.
Q Did you tell him which fields you were interested in?
A Yes.
Q Okay. What did you tell him about the fields you were interested in?
A I wanted to be in the medical field.
Q Did you share with him your grades?
A Yes.
Q Did you take an aptitude test?
A Yes.
Q When was that?
A That was -- I took one my junior year, my junior year and my senior year.
Q And what were the results?
A They contact you if you don't do good, and I wasn't contacted.
Q Okay. And what sort of literature did he share

with you about the military?
A He brought pamphlets about different opportunities in the Army, places you could go and see, things you could do.
Q And where would you see Sergeant Kopf with these discussions about the military?
A At first in school.
Q Okay. Where else did you see him?
A He would come to my home or I would come up here to the mall in Rapid City.
Q Okay. And when he came to your home, did he also meet with other members of your family?
A Yes.
Q Okay. Did they seem to get along with him as well?
A Yes. He was welcome.
Q What sort of things would your parents talk about with him?
A They asked -- they were worried. You know, they asked what kind of training I would get, just how it would be overall.
Q Okay. Did your family share with Sergeant Kopf the family history with the military?
A Yes, yes. We told him I had grandpas and uncles and my brother, and he just went from there, asking where

everybody was and what they did.

Q Okay. Did there come a point in time when you and Sergeant Kopf discussed things other than strictly military business?

A Yes.

Q Now, when you and Sergeant Kopf talked about military business, how did you address him?

A Sergeant Kopf.

Q Okay. When you talked about nonmilitary business, personal things, how did you address him?

A Sergeant Kopf.

Q At what point in time did he start talking about personal matters with you?

A In my senior year of high school.

Q And what sort of things would you and he talk about?

A He was really interested in my family. He asked a lot of questions about my family. He asked about where I wanted to go to college. He asked about boyfriends. He was really interested in my schooling.

Q Okay. And by this time, did you trust him?

A Yes.

Q Okay. You placed confidence in his status as a sergeant?

A Yes.

Q How did you feel about him sort of talking about personal things?
A I didn't like it, but I trusted him.
Q Did you view the military recruitment process as sort of getting to know each other, you getting to know him, him getting to know you?
A Yes.
Q Following high school, what were your plans?
A To go to college.
Q Okay. And when did you decide that that was going to be the route you were going to take?
A Whenever I got accepted to colleges, whenever I got approved for scholarships.
Q How many colleges did you get accepted to?
A Four.
Q Okay. And how many offered you scholarships?
A Three -- well, all four of them offered me scholarships. Three of them offered me full tuition.
Q Okay. And where did you decide that you were going to attend college?
A Rockhurst University in Kansas City.
Q And did you notify Sergeant Kopf of your intention to go to college?
A Yes.
Q Okay. And so at that point in time, what were

your plans in terms of the military?
A To wait till after college.
Q Okay. And did you notify Sergeant Kopf of that?
A Yes.
Q All right. Did you have any contact with Sergeant Kopf during the time you were at Rockhurst?
A Yes.
Q And how did he -- who contacted who? How did he --
A He was always emailing me. He would email me. Eventually he started calling.
Q And what sort of things was he saying in these emails?
A He would tell me that the field I wanted to be in in the military was open, and if I wanted to get in, the time was now, and --
Q Did he continue to recruit you?
A Yes.
Q Did you still consider him your recruiter, even though you were away at college?
A Yes.
Q Did you ever initiate contact for purely social reasons?
A No.
Q Approximately how old is Sergeant Kopf?

A In his thirties.

Q Okay. At that point in time, he was in --

A Yes.

Q -- his thirties. And how would you describe him physically?

A He was tall. He was well built. He was strong.

Q Were there any contacts he made with you at Rockhurst that made you uncomfortable?

A Yes. A couple of times he would call in the middle of the night. He would get upset if I didn't answer the phone.

Q Now, did there come a time when you left Rockhurst College?

A Yes.

Q Okay. Approximately how long were you at college?

A Over almost two months.

Q And why did you leave college initially?

A My grandpa passed away.

Q Okay. Now, when you say grandpa, do you mean grandpa in sort of the traditional sense, or --

A Yes. We were a really tight family, and it was my mom's uncle that passed away, but he was -- we considered him as my grandfather.

Q So for clarification, if you use the word

"grandfather," it could be what we might call a great-uncle?

A Yes.

Q Okay. So a great-uncle passed away?

A Yes.

Q Who you were close with.

A Yes.

Q And what did you do after he passed away?

A I came home to be with my family.

Q And at that point in time, did you plan to go back to Rockhurst?

A Yes.

Q And when you say you came back to Pine Ridge, what did you do with your time?

A I stayed with my family and grieved.

Q Did you and Sergeant Kopf, when you returned to Pine Ridge, continue to talk military business?

A Yes.

Q Okay. Did he continue to recruit you?

A Yes.

Q Did you take any trips with him at that point in time?

A Excuse me?

Q Did you take any trips with him? Did you go anywhere?

A Yes.

Q Okay. What sort of reasons would you accompany him?

A He told me there was a few girls that wanted to join the military, but they weren't sure, because they haven't heard of any other females wanting to join.

Q And what was the reason he wanted -- you know, why did you accompany him?

A I went to talk with the other recruits.

Q To recruit along with him?

A Yes.

Q Okay. And where were those recruiting trips? On the reservation?

A Yes. They were throughout the whole reservation.

Q Okay. Now, prior to January 7, had Sergeant Kopf made any romantic overtures toward you?

A I wouldn't call them romantic. I'd call them sexual.

Q Okay. What kind of sexual overtures did he make to you before January 7?

A I went with him to see a couple of potential recruits, and he told me he had to check into his hotel in Martin, South Dakota, because he had to give an ASVAB test at a high school the next day. He said he had to be there by 6:00 in the morning, so we pulled in to his hotel in Martin, and he had at least six bags with him. He asked me

to help carry them upstairs, so I helped him.

Q Okay. And what happened there?

A He said that he had lost my paperwork, and he would want to get my measurements and my weight there, since he had his equipment, so he -- we did my paperwork over.

Q Okay. And what sort of advances did he make toward you there?

A Well, measuring around my waist, he tried to hug me. When we were leaving, he turned off the light, and he grabbed me and he kissed me.

Q And did you say -- what did you say?

A I got angry. I pushed him away.

Q Okay. And did he stop at that point?

A Yes.

Q Okay. And did he drive you home after that?

A Yes. I asked him to take me home, but along the way there is another town called Batesland, and he pulled off to the side of the road there, and he tried to kiss me again. So again I got mad and I told him to take me home, or I have friends that live there. I could get a ride with them, and he apologized. He said he was sorry and that it wouldn't happen again.

Q Okay. Did you accept his apology?

A Yes.

Q Okay. Did you believe him when he said he

wouldn't do it again?

A Yes.

Q Okay. Did you still trust him?

A Yes.

Q Do you remember the events of January 7, 2003?

A Yes.

Q Where were you living at that time?

A In Wounded Knee.

Q And were you still on leave from college, or were you at that point planning on joining the military?

A At that point I was planning to join the military.

Q Okay. The events of January 7, 2003, do you think about them often?

A Yes.

Q Give us an idea of how --

THE COURT: Counsel, please speak up --

BY MR. HOROWITZ:

Q How often do you think --

THE COURT: Mr. Horowitz, I need you to double your voice, because you're talking so soft, I think it encourages her to talk soft, and while I can understand she might have some problems projecting, I really need you to project.

MR. HOROWITZ: Certainly.

THE COURT: All right.

BY MR. HOROWITZ:

Q How often do the events of January 7, 2003, replay in your mind?

A All the time, and something always triggers them.

Q Did you see Sergeant Kopf that morning?

A Yes.

Q What time of day was that?

A In the morning, in the early morning.

Q And what did you say when you saw him?

A I asked him what he was doing there.

Q Did you know he was coming?

A No.

Q And where were you when you saw him?

A I was walking from my aunt's house, and I seen him in our driveway.

Q And did he indicate why he was there?

A He had said that my paperwork had been lost again and that I needed to go and resubmit my height and weight evaluation.

Q Okay. And did he indicate where he needed to take you for the height and weight evaluation?

A To the MEP station in Sioux Falls.

Q Is that where you had done the height and weight evaluation the first time?

A Yes.
Q All right. And you said you were still interested in joining the military on that date?
A Yes.
Q Did you still consider him to be your recruiter on that date?
A Yes.
Q Okay. And was he still recruiting you on that date?
A Yes.
Q Okay. When he arrived, was he in a military vehicle or a civilian vehicle?
A Yes. He was in a military vehicle.
Q Now, you indicated that you had previously submitted to a height and weight exam. Is that right?
A Yes.
Q And do you remember how far in the past that had been before January 7?
A Like a month before.
Q Okay. And did Sergeant Kopf provide you with any documents after the exam was completed?
A No.
Q At that point in time, after the first exam was completed, what was your understanding as to your status in the military?

A Kopf told me that I was accepted, but my field had closed, and I had to be in a delayed-entry program.

Q Okay. What did you understand the delayed-entry program to involve?

A He told me I had to wait until the field opened up again.

Q Okay. Did he encourage you to keep training?

A Yes.

Q When he arrived, were you packed and ready to go?

A No.

Q Okay. What did you need to do before you left your home?

A He said I needed to get some clothes, because we were going to Sioux Falls, and he would bring me back the next day, so I grabbed a pair of clothes.

Q For a one-night trip?

A Yes.

Q Okay. Now, when he said he was going to Sioux Falls, did he indicate whether you were going straight there, or whether you were going to have to stop somewhere along the way?

A He said we --

MR. BRYANT: I'm going to object to the leading nature. I've let a lot of these go, but --

THE COURT: Let me give you my normal leading

speech -- okay? -- which is that it has two impacts on me, because, one, some questions are difficult to ask without being careful about how you do it. Second thing is it can really undercut the evidentiary value, even if we don't have an objection posed. All right. So that one -- and you've gotten close on a few other occasions as well. So I think you can probably reframe that in a way where it's not leading.

MR. HOROWITZ: Sure.

BY MR. HOROWITZ:

Q After you left your home, did you make any stops along the way?

A Yes. He said we needed to visit a recruit in another town called Manderson.

Q And did he start driving towards Manderson?

A Yes. We drove towards Manderson.

Q Okay. Did he stop in Manderson?

A He -- no. He turned on a dirt road. It's called White Horse Creek Road.

Q How far did he drive on White Horse Creek Road?

A Three, four miles.

Q And can you give us an idea of sort of the landscape of White Horse Creek Road.

A It's secluded. It's real secluded. There's nothing out there. It's just open. It's a dirt road.

Q You drove on a dirt road. Okay. Did he drive off of that dirt road?
A He drove off on a trail behind a hill.
Q And does that trail have a name?
A No.
Q How far did he drive on that trail?
A At least a mile.
Q Okay. And as he's driving on this trail, what's going on through your -- in your head?
A I was scared. I knew nobody lived that far out, but he said we needed to talk.
Q Did he eventually stop the car?
A Yes. He drove behind a hill, and he stopped the car, and he --
Q Okay. Can you describe where it is that he stopped?
A Describe where he stopped?
Q It was on the trail or off this dirt trail?
A It was off the dirt road. There's no actual road leading to it. It's --
Q Okay. And then what happened?
A He tried to rape me. He grabbed my hand. He was telling me that I was pretty. He was telling me he liked me. He tried to kiss me. I pushed him away. He kept trying, no matter how hard I pushed. He pushed himself on

top of me. He had his hand between my legs. He was pulling at my zipper. He was -- he undid my button to my pants. He put his hand up my shirt. He was rubbing my breasts.

I tried pushing him away, but he grabbed my hand, and he held it above my head. He was on top of me, and I was telling him, No, and I was crying, but he just said he liked tall and feisty. I tried to push him away, but he was holding my hand above my head, and he was leaning on me. He was leaning on my other arm, so I couldn't move. I was shocked. I felt paralyzed.

Q How many times did you push him away?

A I kept pushing him away until he put my hand above my head, and he -- I can't count how many times I pushed him away.

Q Did you try and escape?

A I was too scared. Even at that, there's no place to go out there.

Q How far are you away from the nearest house or building?

A At least four miles.

Q Were his doors opened or locked?

A He locked his doors. He locked his doors when he turned his car off.

Q You described he had his hand between your legs. Can you just tell us --

A He was rubbing my vaginal area, and he was trying to get his hand down my pants.
Q Did he touch your zipper?
A Yes. He was pulling at my zipper. He had undone my button, and he was pulling at my zipper.
Q What did you do when he put his hand up your shirt?
A I was in shock. I couldn't move. I couldn't believe it was happening to me.
Q How long a period of time was this going on for?
A At least 30 minutes, but it felt like forever.
MR. BRYANT: Your Honor, I couldn't hear the last answer. I'm sorry.
THE COURT: I'll let counsel republish the answer. Go ahead.
MR. HOROWITZ: She said, At least 30 minutes, but it felt like forever.
THE COURT: Yes. That's what I heard her say as well.
BY MR. HOROWITZ:
Q Did he say anything that caused you to think he was going to rape you?
A He didn't have to say anything. He was doing it. He -- I was too scared to do anything, because he asked me if somebody hid a body out there, would anybody find it. I

thought he was going to rape me and leave me out there.

Q Did you think of him as a powerful person?

A Yes.

Q Physically strong?

A Yes. He was on top of me, and I couldn't move.

Q What about his status as a recruiter? How did you feel about his status as a recruiter? Did you think that he had the key to your future?

A Yes. He -- I trusted him. I looked to him to show me -- you know, to help me get in the Army.

Q And how did you get him to finally relent, to stop attacking you?

A I kept telling him, No. I kept crying. He was asking me why I was crying. I was telling him that it was wrong and that we shouldn't be doing it, and I asked him what all he had to do that day, and he said he canceled all his morning appointments so we could be together.

Q Did there come a point when you left that dirt road?

A Yes. He -- I'm sorry. He said he had to drive to Little Wound High School to visit my brother, so he started the car. He drove a couple yards, and he stopped, and he asked me -- he said he thought I liked him, and he asked me why I was crying, and he said it wasn't a big deal. I told him we should be going. So he drove back to the dirt

road, and he got on the main road in Manderson, and he started driving towards Little Wound, Kyle.

Along the way, there's a convenience store. It's called Sharp's Corner. I asked him to stop there, because I wasn't feeling good, and I had a friend that worked there, so I was going to report it to him, but whenever we got there, he wasn't there. He wasn't working that day, so I went to the bathroom and I threw up. I was going to go out the back door of the store, but whenever I came out of the bathroom, Kopf was there waiting.

Q Then what happened?

A We got back in his car, and he started driving towards Kyle. Along the way, my cousin, Jackie Randall, has a house, a trailer house, out there, so I told him that I wanted to wait there instead of at the school. So he pulled in, and he said, Who lives here; your boyfriend? I said, No; my cousin stays here. And I said, I don't want to wait at the school all day. So he said, Well, I'll drop you off here; I'll be as quick as I can. He said, Don't go nowhere; I'll come back for you.

Q What happened when you got to Jackie's house?

A I got out of his car. I ran inside. I was trying to tell Jackie what happened, but I was crying so hard. She was trying to calm me down, but -- it took her at least 20 minutes to calm me down. I finally told her what

happened, so she told her boyfriend, and her boyfriend called the recruiting station and talked to Kopf's supervisor.

Q Okay. Who did you next report it to?

A Excuse me?

Q Who did you next report this to?

A I reported it to the tribal cops. After we called the recruiting station, I called my aunt Noretta, and I told her what happened, and she called my dad. My dad called me at Jackie's house, but I was too ashamed to say anything to him. He asked me what happened, but I just started crying, so he told me, I'm going to call the cops. He said there was a female police officer named Alana Clifford that was going to come and take my statement and take me to the police department.

Q Okay. And did you give that statement to the police?

A Yes.

Q Okay. And did you give any other statements that day?

A No. That was the statement I gave to the police that day. Oh, I talked to Bob Bennett at the police station whenever I got there, but I was still in shock. I just wanted to go home. I told them what -- I just summarized what happened, and I --

Q What happened when you got home?

A We were on our way home, and my dad called me and told me that Kopf was at my house, so I told the CI, Bob Bennett, so he said that he had a unit over there. He was going to send a unit over there for him.

Q When you got home, you started staying with your family again?

A Excuse me?

Q You came home from the police station, and you stayed with your family for --

A Yes. I stayed there. I didn't go anywhere for weeks. I just stayed home.

Q Tell us about the first few weeks when you came home.

A I couldn't sleep. I couldn't eat. I was so sick. I couldn't -- my body ached. I was too scared to sleep, because I had nightmares. I was too scared to go anywhere, because I thought he would be there. I just kept hearing his voice saying he'll come back for me.

Q What sort of things triggered these memories?

A Certain cologne, things he used to eat; just driving somewhere, I would hear his voice ask me if somebody hid a body out there, how long it would take to find it.

Q How were your sleeping habits after this happened?

A I wouldn't sleep. I'd stay up. It was really hard to sleep, and I was so scared. Whenever I would sleep, I'd have nightmares.
Q And what would happen in those nightmares?
A I'd be reliving the whole thing over again.
Q What happened to your dream of joining the military?
A It's gone.
Q After January 7, did you make any attempts to join the military, contact another recruiter?
A No.
Q Any interest at all?
A No.
Q And do you attribute that to what happened to you?
A Yes.
Q Have you seen any doctors or therapists since the assault?
A Yes. I've seen several.
Q And what facilities did you go to?
A I went to the mental health facility at Indian Hospital in Pine Ridge. I went to support groups held by Cangleska. I talked with my minister. I talked with our medicine man.
Q Okay. Did you receive therapy at the Kyle Mental

Health?

A Yes. We had one or two sessions, and they didn't know what to do with me, so they sent me to Pine Ridge.

Q Okay. And what happened at Pine Ridge?

A They wanted to put me on medication, and they wanted to send me up here to Rapid.

Q Do you know what they were prescribing medicine for?

A For anxiety, for needing sleeping pills for my insomnia. They prescribed me antidepressants.

Q You mentioned you went to a women's support group as well?

A Yes. Cangleska.

Q Okay. What is Cangleska?

A It's a program for battered women and domestic violence.

Q And why did you go to them? What were you looking for?

A Supporting. I needed somebody to talk to. I was scared. A couple days after this happened, even though I reported it, Kopf called me and wanted to talk, so I got -- they helped me get a restraining order against him.

Q You said that Sergeant Kopf contacted you after January 7.

A Yes.

Q What sort of contact did he have with you after that date?
A He called. He called on my phone.
Q How did that make you feel?
A Scared.
Q And you said that you worked with Cangleska to get a restraining order?
A Yes.
Q Okay. Did you, in fact, get that restraining order?
A Yes.
Q You mentioned you also saw a medicine man.
A Yes.
Q What is a medicine man?
A He is like a counselor. He's a spiritual advisor.
Q What sort of things would he talk about with him?
A I'd explained to him how I'm feeling, how I felt lost.
Q What sort of emotions did you describe to him?
A Scared, feeling worthless, vulnerable.
Q And I think you -- you said you also went to a minister.
A Yes.
Q And who was that?

A John Two Bulls.
Q And what did you go to him for?
A My faith.
Q Did he provide you with any coping strategies?
A Yes. He taught me how to meditate. He helped me write again.
Q Did you take some of the prescription pills that you'd been provided?
A Yes. I took the ones for anxiety and for insomnia.
Q Okay. How did that work out for you?
A It didn't help.
Q After the assaults, did you stay on the reservation for a long time, or did you move around?
A No, no. I left. I didn't -- I couldn't stay there. It hurt to be around there. I worked a job for two weeks, enough for a paycheck. I got a bus ticket, and I left. I didn't tell anybody. I just grabbed some clothes, and I left.
Q Okay. And where did you go?
A I went to North Carolina. I went to my brother's in Idaho. I went to Texas, Wisconsin, Illinois, Iowa.
Q And why did you keep moving in between each of those places?
A It was hard to stay in one place, because I kept

remembering what happened. I kept hearing his voice. I would see him.

Q Did you go to any school after --

A Yes.

Q -- the assault?

A In Wisconsin, I went to a career college for medical assisting.

Q And did you receive a certificate?

A Yes. I received my medical assistant.

Q I'm sorry?

A Medical assistant.

Q Medical assistant. Okay. And that career college, did you have the same scholarship as you did at Rockhurst?

A No.

Q Have you been employed as a medical assistant?

A Yes. Briefly.

Q Have you tried working since the assault?

A Yes. It's really hard to concentrate. It's hard to focus. Whenever a memory comes up, I just want to stay home. I lay in bed. I don't want to get out. I don't want to eat. And when I do eat, I just overeat, and --

Q As we sit here today, what sort of symptoms are you still experiencing?

A Depression, anxiety, insomnia.

Q You mentioned that you're now married.
A Yes.
Q Okay. How is the marriage?
A Some days it's good; some days it's bad.
Q Are there certain things that trigger problems?
A Yes. Whenever a memory comes up, I don't want my husband near me. I don't want him to touch me. It's hard to have him try to hold my hand. I'm always end up pushing him away. And my kids, my son tries to play with me, and some days it's just hard to go outside with him.
Q What are your plans for the future?
A I want to move. I want to work. There's no jobs here. It's hard to get a job.
Q Do you plan to move off the reservation?
A Yes.
Q Do you plan to go back to work --
A Yes.
Q -- when your children get a little older?
A Yes.
Q And would you like to still be in therapy?
A Yes.
Q Would you ever consider joining the military?
A No.
MR. HOROWITZ: I have no other questions.
THE COURT: Just an estimate, Mr. Bryant, of the

length of cross-examination.

MR. BRYANT: I think at least an hour, Your Honor.

THE COURT: All right. Then we're going to break for lunch now, so we will break from now till 1:30. Be back promptly at 1:30, and remember what I said about cell phones, because I'm going to be telling the marshals that the -- in fact, I'm telling the marshal right now that the normal rule that applies in the courthouse will apply to you all when you come back from lunch, so that the normal rule that they have in this courthouse is no cell phones in the courtrooms.

MARSHAL: Excuse me, Your Honor. I'm having trouble hearing you.

THE COURT: Even me, huh? I was informed by the marshals on the way in that the normal rule in the courthouse is no cell phones in the courtrooms and that they were being nice to let them come in this morning. I just wanted you all to know that I told them when they came back this afternoon, the rule would be enforced, and so they should either not bring their phones back, or they should expect you all to take them when they came through security. Okay? Thank you.

THE CLERK: All rise.

THE COURT: Actually, why don't you sit back

down. I want to ask if there's anything else.

All right. Anything that we need to take up before we break? Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: No.

THE COURT: All right. Then 1:30. Be back promptly, please. Thank you.

(Whereupon, at 12:30 p.m., the trial in the above-entitled matter was recessed, to reconvene at 1:30 p.m., this same day, Monday, April 28, 2008.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

A F T E R N O O N S E S S I O N

(1:30 p.m.)

THE COURT: Please be seated.

Ms. Elk, if I could have you come back to the stand, please.

Whereupon,

LAVETTA KATHY ELK

having been previously duly sworn, resumed as a witness herein and was examined and testified further as follows:

THE COURT: Anything we need to take up before we go back to the witness, Mr. Horowitz?

MR. HOROWITZ: I'm sorry. I didn't hear you.

THE COURT: Anything else we need to take up before we go back to the witness?

MR. HOROWITZ: I don't think so.

THE COURT: Anything, Mr. Bryant?

MR. BRYANT: One housekeeping matter, Your Honor. Our forensic psychiatrist expert, Dr. Mark Mills, is going to sit in the well so he could hear, if that's okay.

THE COURT: That's fine. All right. So we're ready then for cross-examination.

MR. BRYANT: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:

Q Good afternoon, Ms. Elk. I wanted to clarify a

few things from direct examination. And you said that you have two children now. Is that right?

A Yes.

Q And they're both boys?

A Yes.

Q Okay. And you are still married. Is that right?

A Yes.

Q Okay. And how long have you been married?

A (No response.)

Q Since December '03?

A No. January '04.

Q January '04? And does your husband currently live with you and your family?

A Yes.

Q But you met your husband in December '03. Is that correct?

A Yes.

Q And where did you all meet?

A In Texas.

Q And that's when you were traveling --

A Yes.

Q -- around. Okay. And you would agree that your marriage is obviously a significant event in your life. Is that right?

A Excuse me?

Q You would agree that your marriage is a significant even in your life. Is that correct?
A Yes.
Q And it brings you happiness.
A Yes.
Q And from Texas, did you move with your husband to Wisconsin?
A Yes.
Q And how long did you live there?
A Two years.
Q Two years. And then after those two years were up, where did you go?
A Back to my parents'.
Q Okay. At that time, you had one baby. Is that right?
A Yes.
Q And all three of your --
A No. I came back to have my first one.
Q Oh, I see. And then you all lived with your parents since then.
A Yes.
Q Okay. Now, when did your parents find out about your marriage?
A The deposition.
Q Which was in December of 2006. Is that right?

A Yes.

Q Can you explain why you didn't tell your parents about your marriage for approximately three years?

A I wanted to do a traditional marriage, a traditional ceremony with my family there.

Q So you would agree that you concealed that information from your parents for three years?

A My mom was -- I informed my mom, but at the time, she --

Q When did you inform your mom?

A In May of '04.

Q May of 2004?

A Yes.

Q And you're certain of that?

A Yes.

Q And how do you know it was May 2004? Why does that strike a memory?

A Because that was whenever I started my externship for school.

Q Okay. And I think you -- I'm sorry. I couldn't hear everything on direct. I think you said you're very close with your extended family.

A Yes.

Q Is that right? Okay. Now, I want to turn for a moment with -- for your -- to Sergeant Kopf and how you all

knew each other and so forth which you talked about to a certain degree on direct examination. You met your junior year of high school. Is that right?

A Yes.

Q Okay. And you didn't start conversing, I guess, regularly until your senior year. Is that right?

A What do you mean by regularly?

Q Fair enough. In your senior year, did you talk roughly two times a month?

A My senior year?

Q Generally speaking, not -- it didn't have to be every month, but generally two times a month? Is that fair?

A It was more, more than two times a month.

Q More than that? How many would you estimate you talked a month?

A At least once a week.

Q At least once a week. And you would talk on the porch in front of your house. Is that right, sometimes?

A Sometimes.

Q And you'd talk about military family members of yours that died.

A Yes.

Q And you'd talk about his marriage and his kids. He would bring them up. Is that fair? Is that correct?

A He brought them up. Yes.

Q Okay. And did you tell him any personal information about your life?
A No.
Q Did you ever tell him personal information about your life?
A I told him about a boyfriend. He asked questions about if I had boyfriends. He asked questions about school. He asked questions, you know, about my family.
Q So when he would ask a question, you would respond.
A Yes.
Q But you wouldn't bring up personal matters.
A No.
Q And would you talk to him about arguments with your family, your father?
A One time I did. Yes.
Q And in addition to talking to each other in person, you would email one another and call one another. Is that correct?
A He would email me and call me. Yes.
Q And you would talk to him?
A Yes.
Q Now, did he bring flowers to you at work on one occasion?
A He brought a floor.

Q A floor? And what did you -- how did you take that? What was your -- did you think he was romantically interested in you?
A No. I thought he was a friend.
Q So what did you -- so you just thought he was a friend bringing a flower to you?
A Yes.
Q Okay. Have any of your other friends brought flowers to you at work?
A At work?
Q Yes.
A No.
Q Okay. At home?
A At school.
Q At school. And are those friend, were they boyfriends or just friends?
A Friends.
Q And how often did that happen?
A Not too often. For a birthday, for celebration.
Q I gather these were close friends, though. Is that right?
A Yes.
Q And did Sergeant Kopf ever ask you out on dates?
A Yes.
Q Like to the movies?

A Yes.
Q And you said no?
A Yes.
Q But I gather you understood him to be romantically interested in you. Is that fair?
A No.
Q And at some point, did you ask for a female recruiter?
A Yes.
Q And can you tell me about that?
A He brought in a lady who just got out of boot camp.
Q Okay. So you requested a female recruiter, because you felt that --
A I needed to talk to a female who was in the service. I didn't know any females in the service.
Q Okay. Was it because you were uncomfortable with Sergeant Kopf, or you just wanted to talk to a female in the service?
A I wanted to talk to a female.
Q Okay. So you asked to do that, and the Army provided a female to talk to?
A Yes.
Q And after you talked to her that one time, did you request to have her be your recruiter permanently?

A She wasn't a recruiter.
Q She wasn't a recruiter. Were there any female recruiters at the office?
A No.
Q Were there other recruiters at the office that were males?
A All the recruiters were males.
Q Did you ever ask for another recruiter to be assigned to you?
A No.
Q Now, you talked about going to Rockhurst University. Is that --
A Yes.
Q And that was in August of '02?
A Yes.
Q And did you give Sergeant Kopf your phone number when you were there?
A He asked for it. Yes.
Q And you gave it to him?
A Yes.
Q And did you give him your address?
A Yes.
Q And did he send you letters?
A No.
Q He never sent you a letter?

A He sent me paperwork.
Q Are you sure he didn't send you a letter that says, South Dakota misses you?
A Yes. I'm sure he didn't send me that.
Q You're sure of that? And you would have phone calls while you were away at school as well. Is that right?
A Yes.
Q And how far -- this is in Kansas City?
A Yes.
Q So did you drive to school or fly?
A My sister drove me.
Q And about how far was it? Roughly, I mean. Twelve hours away or --
A Eight-hour drive.
Q Long drive. Okay. And in these phone calls you would have with him, would he tell you that -- personal things about his life, his family situation?
A Yes.
Q That his wife cheated on him and --
A Yes.
Q -- he wanted a divorce? And did you tell him that you were not getting along with your dad?
A Not while I was in Kansas, no.
Q And when you were at Rockhurst, were you very homesick for those two months?

A No.

Q You weren't homesick at all?

A No.

MR. BRYANT: Permission to approach the witness with an exhibit, Your Honor?

THE COURT: What are you going to do?

MR. BRYANT: I'm going to impeach on a deposition or at least refresh her recollection.

THE COURT: Very well. You need to make sure you give a copy of it first to Mr. Horowitz or at least a page reference.

MR. BRYANT: Okay. It is DX-9C, page 1593, DEF 1593, Your Honor.

THE COURT: Okay.

MR. HOROWITZ: Can you stay that one more time?

MR. BRYANT: DX-9C, page DEF 1593.

(Pause.)

BY MR. BRYANT:

Q And you were deposed in this matter. Is that right, Ms. Elk?

A Excuse me?

Q You were deposed in this matter.

A Yes.

Q And when you were deposed, you were put under oath, like you are today. Is that right?

A Yes.

Q Okay. And that deposition was on December 12, 2006. Is that right?

A I'm not sure of the exact date, but --

Q But in December of 2006.

A Yes.

Q Okay. If you could look at line 11, and I'm going to read to you. "While you were at Rockhurst, did Kopf exchange any letters -- did you exchange any letters with Sergeant Kopf?

"He sent me a letter in the mail.

"Did you write him back?

"No.

"What was the letter about?

"Well, actually twice, because the first time he sent me a letter, and he just told me that, South Dakota misses you basically, and then again the second time he sent me the enlistment papers again."

Does that refresh your recollection regarding a letter about South Dakota missing you?

A Yes.

Q And so he did send you such a letter?

A Yes.

Q So you received two letters from him. One of them was personal, and one of them was related to the

recruitment?

A Yes.

Q But all your other personal discussions with him were him initiating and you responding?

A Yes. He would email -- other times he would email and say, I need you to call me right away, so I would call him.

Q Didn't you email him to tell him about your grandfather dying, your great-uncle?

A He called, and I was really sad, and he asked me what was wrong, so I told him.

Q So that was after he called you. You did not initiated that notification of your grandfather dying.

A Not that I remember.

Q And did you tell him that you felt alone and you didn't have anyone to talk to? Is that the reason why you shared that with him?

A I'm not sure of the exact words, but probably.

Q If you could turn to page DEF 1590, and look in the bottom right-hand corner of the document. Do you see that, just a few pages away from where you are? And on line 4 of DEF 1590, the question to you is, "Did you initiate any of the emails?" And your answer was, "Once or twice."

Question: "Why would you send him an email?

"Like I said, my grandpa died, and I didn't have

anybody, and I was the only one out there from my family."

Question: "Was it helpful to talk to him about when your grandfather died?"

Answer: "It was. Like I said, I considered him a friend, so it was helpful to talk about a lot of things."

Does that refresh your --

A Yes. I remember now. Yes.

Q Okay. So you did initiate the discussion with him about your father dying?

A My grandfather, yes.

Q I'm sorry. Your grandfather. My apologies. And that certainly was very personal information. Right?

A Yes.

Q And do you want to change your answer about being homesick, about feeling alone at school or no?

A I want to clarify it.

Q Please do.

A I was the only one there. Of course, I missed my family. I wasn't to a point where I wanted to come home. Yes. At the time, I did consider him a friend, and I did share some personal information with him then.

Q Okay. Now, in September of '02, you left Rockhurst -- is that right? -- University to come home.

A Yes.

Q And that was, you said, for your grandfather's,

great-uncle's funeral.

A Yes.

Q Can I just say grandfather, or should I say great-uncle? What would you prefer?

A Grandfather's fine.

Q Grandfather, okay. Now, at this point -- and then Sergeant Kopf said to you that, hey, the medical field is wide open. Is that right?

A Yes.

Q And that's when you decided to quit college and pursue a military career?

A After I came back. Yes.

Q And how was -- and your father was not terribly happy about that. Is that correct?

A No. They weren't too happy about it, but they supported me --

Q Because they wanted you to stay in school.

A Yes.

Q And that was your dream, I think you said, was a military career.

A Yes.

Q And that's why you decided to quit school, to pursue one.

A Yes.

Q Did you ever explore the possibility of becoming

an officer in the military?

A I wanted to retire.

Q Well, let me clarify my question. You're familiar with -- many of your family members are in the Army. Is that right?

A Yes.

Q And several have retired from the Army. Is that right?

A Yes.

Q Okay. And are you familiar with the structure that there are enlisted personnel --

A Yes.

Q -- and officer personnel?

A Yes.

Q Okay. And did you ever explore the possibility of become an officer in the Army?

A I'm not sure how to say it. I wanted to go as far as I could. If that means being an officer, then whatever I could attain.

Q Okay. So you wanted to enlist first and go from there.

A Yes.

Q Did you -- so you didn't consider a Reserve Officer Training Cadet program, ROTC?

A No.

Q At Rockhurst?

A No.

Q What about Officer Candidate School? You didn't look at that either?

A No.

Q In terms of a career in the military, did you want to be a nurse? Is that what you wanted to be?

A Yes.

Q A nurse.

A Yes.

Q And are you aware that nurses have to be officers?

A I -- that's what I --

MR. HOROWITZ: Your Honor, I'm going to object to counsel testifying.

THE COURT: If you're making a statement, in fact, it's not in the record, so if you're going to use it for cross-examination, you'd better make points on it. I'm not going to let you testify from the lectern there.

BY MR. BRYANT:

Q What is your understanding of what a nurse -- what position in the military they have to hold?

A What position?

Q I mean, whether they're enlisted or officers.

A It didn't matter to me.

Q No. The -- I guess the question I'm asking is: Did you research whether nurses in the Army could be enlisted?

A No.

Q Okay. So you didn't do any website research or otherwise about becoming an officer or a nurse in the Army.

A No.

Q Now, when you -- at that point, you decided to quit college to pursue this career.

A Yes.

Q But at that point, you were not yet accepted into the Army. Is that right?

A At that point in time that I quit college, no.

Q Okay. Did you consider completing the first semester of Rockhurst University and then -- while your military application was ongoing?

A I considered it, but Kopf told me the position was there; it was open; if I wanted to do it, I had to do it then.

Q I thought you said on direct examination that it was a delayed-entry program.

A That was --

MR. HOROWITZ: I'm going to object to misstating the testimony.

THE COURT: It is misstating the testimony.

BY MR. BRYANT:

Q Was it your understanding that --

THE COURT: If you provide a temporal limitation on your question, I think it would be a lot easier than -- because the statement you made was, I think, something she testified to at one point, but I don't get the sense that you're talking about the same point in time necessarily.

BY MR. BRYANT:

Q So what was your understanding that when you considered completing your first semester at Rockhurst, but then what did Kopf tell you?

A Like I said, he said the field that I wanted was open. If I wanted to do it, I had to do it then.

Q Did at some point that position become no longer open, closed?

A In December after my MEPS visit.

Q Okay. So the time we're talking about when you decided to terminate your college career, that was in September or October?

A In late September.

Q Okay. Now, you were also aware that one is not automatically accepted into the Army. Is that right?

MR. HOROWITZ: Objection. Again, counsel's testifying.

BY MR. BRYANT:

Q Are you aware there's an application process?
A From what I understood, the application process is at MEPS.
Q Okay. And are you -- and that includes looking at your criminal history?
A We signed papers for, I think, a background check. I'm not sure I'd have to look through.
Q And your drug history, if any?
A Yes.
Q And your age?
A Yes.
Q And your physical examination?
A Yes.
Q And a mental -- and whether your mental as well?
A Yes.
Q So it's contingent on those things being satisfied. Is that right?
A Yes.
Q And, in fact, you had at that MEPS a comprehensive physical exam. Is that right?
A And did you fill out paperwork to request that exam?
A No. Not that I remember.
Q Okay.
MR. BRYANT: Permission to approach one more

time, Your Honor.

THE COURT: Sure. Give the page number --

MR. BRYANT: JX-3, 299.

MR. HOROWITZ: Which exhibit is this? Or is this the deposition?

MR. BRYANT: Joint Exhibit 3.

MR. HOROWITZ: Thank you.

THE COURT: And I actually think that in the future, unless there's some purpose to you coming to the stand, that you can tell her, and she can try to find it first and find it.

MR. BRYANT: That's fine. It's a separate binder.

THE COURT: But they're all up here. Correct?

MR. BRYANT: Fair enough, Your Honor.

BY MR. BRYANT:

Q And, Ms. Elk, are you looking at DEF 299?

A Yes.

Q And that refers to the drug and alcohol testing acknowledgment form.

A Yes.

Q And that's your signature at the bottom?

A Yes.

Q Now, I'd like you to turn two pages to DEF 301, and that document is entitled, Request for examination. Is

that right?

A Yes.

Q And if you could look down to block 21, in the middle of the page basically --

A Uh-huh. Yes.

Q Is that your signature?

A Yes.

Q So it's your understanding that you did request this comprehensive physical examination?

A (Perusing document.) Now that I look at it, yes.

Q And if you could look at the next page as well --

A (Perusing document.)

Q -- the -- that's your signature in block at the very top, isn't it, again?

A Yes.

Q Okay. And if you could go down just a little further to where it says, Applicant medical prescreening, do you see that?

A (Perusing document.) Yes.

Q And it says, just below that, in block 33, "Have you ever been given a medical exam at MEPS?"

A Uh-huh.

Q And you did not put in a date.

A It says, No.

Q So you'd never had an exam before at MEPS. Is

that right?
A Yes.
Q Okay. And then just below that, it says height of 65, in block 34.
A Yes.
Q And in block 35 next to it is weight 160.
A Yes.
Q And in block 36 it says, Maximum weight allowed 141.
A Okay.
Q What was your understanding of what that meant?
MR. HOROWITZ: Objection. Foundation.
THE COURT: Well, I don't know about the foundation question. Give me a sense, Mr. Bryant, I guess, as to which part of the direct testimony this line of questioning is directed to.
MR. BRYANT: This goes to credibility, Your Honor. It goes to the damages claim that they're going to have about --
THE COURT: Well, she's not your witness, so I asked you specifically: Which portion of the direct testimony does this relate to?
MR. BRYANT: That she was a military applicant. That's their claim.
THE COURT: So what part of the question you just

asked, I guess, then relates to that issue?

MR. BRYANT: I'm going to show as we go along through this that she was disqualified for military service at this point before January '03, before the assault.

THE WITNESS: Can I ask --

THE COURT: Well, we'll get to some questions. Don't worry.

Mr. Horowitz, your point?

MR. HOROWITZ: Yes. The question was, What was your understanding. And she hasn't testified that she had seen this. Do you mean, now had -- I mean, it was a vague question, too.

THE COURT: All right. Well, one thing I need you to do, Mr. Horowitz, is I need you to stand, by the way, when you're going to object, because that's the only way I'm going to necessarily know for sure that you want me to stop. I mean, I'm going to see you stand before I hear your mouth open, and that way I'll know to stop the question in midst, if I have to.

But apart from that, I think that at this point, with the understanding that maybe the exact way the question was phrased was just a little ambiguous, I think the line of questioning is appropriate. So go ahead, Mr. Bryant.

BY MR. BRYANT:

Q Was it explained to you what these blocks meant

when you filled this out and signed it?

A I filled this out before my exam, so these numbers, I haven't seen them.

Q You never saw those. Okay. So then you had no understanding at that time.

A No.

Q I'd now like you to turn to -- back towards the beginning of this on page DEF 284. And let me know when you get there.

A I'm there.

Q Now, this is entitled, Report Medical Examination. Is that right?

A Yes.

Q And did you complete this document when you were at the MEP station? And feel free to look through it, at least --

A (Perusing document.)

Q And let me be clear. I don't mean that you filled out every single block here, but that you filled out part of this where it asked you questions.

A Yes. The clinical evaluation.

Q And on the next page, DEF 285 --

A Okay.

Q -- in block 53 --

A Okay.

Q -- it says, 65-1/2 inches.
A Okay.
Q And in block 54 the weight is 181 pounds.
A Okay.
Q And then the next block, 55A is minimum weight 106, maximum weight 146.
A Okay.
Q Was it explained to you that you did not meet the height/weight standards?
A No.
Q It was not? And in the next block, 55B, it says, Actual BF percentage, maximum BF percentage. So you agree that that's referring to body fat percentage?
A That's what BF stands for?
Q Please? I'm sorry?
A That's what BF stands for, body fat.
Q You agree with that?
A Yes.
Q Okay. And it says, Actual body fat percentage of 35.52.
A Okay.
Q I'm sorry?
A Okay.
Q And the maximum body fat percentage is 30 percent.

A Okay.
Q Now, on the next page, DEF 286 --
A Okay.
Q Block 75 at the top -- actually first block 74A, it said, Examined the applicant, and then there's a check in the block, Is not qualified for service. Do you see that?
A Yes.
Q And then the next block, 75, it says, "I have been advised of my disqualifying condition. I have been advised to see my private medical care provider within 24, 48, 72 hours, 30 days, routine follow-up. Circle one" -- which none of those was circled -- "for further evaluation and/or treatment." And then just below that, Signature of examinee. Is that your signature?
A Yes.
Q And next to that, is that your handwriting, printing the date, 2002/12/17?
A Yes.
Q And then in block 76, it says, "Significant or disqualifying defects." Do you see that?
A Yes.
Q And it says item number 54, "Medical condition diagnosis, overweight." Do you see that?
A Yes.
Q And then further across, it has, Disqualifying.

Again that's checked. Do you see that?

A Yes.

MR. HOROWITZ: Objection. The document speaks for itself, and I think counsel is misrepresenting certain aspects of the document.

THE COURT: Well, I'm having problems, because in part, Mr. Bryant, I don't know yet who filled out which blocks here, and so at some point here, it does start to get a little confusing in terms of what she checked or somebody else checks; if it is somebody else, who they are; whether or not that person is qualified to make, you know, the markings on here, so I'm having some difficulties, I guess, with the whole approach to this, because you're sort of -- clearly some of the things here, it appears that she's filling out. Clearly some of the things in here, I take it, somebody else filled out.

I don't recall you laying any foundation -- and I'm not sure that you could with this witness -- that tells me who those other people are, and, you know, I don't even know for that matter what role this form plays, I guess, in the process yet, because I don't have any testimony about that either, so I think you need to move this along, because if you don't have this witness listed and I think you're getting far afield here from what I think is appropriate cross-examination, so if you're going to bring this in to

some issues involving qualification, you better tie that up quickly.

MR. BRYANT: Okay.

BY MR. BRYANT:

Q In turning page DEF 289 -- let me know when you're there, Ms. Elk.

A Yes.

Q Now, this portion of the exam, did you fill these out, the checked box?

A Yes.

Q And that handwriting where it says, Explanation of yes answers, that's your handwriting?

A Yes.

Q Okay. And looking at block -- well, let me preface by saying: You understood that this was a serious matter of filling out this form --

A Yes.

Q -- because it was deciding whether you were going to be accepted into the Army. Is that right?

A Yes.

Q So you knew that it was important to be honest in your answers.

A Yes.

Q And completely forthcoming. Is that right?

A Yes.

Q Okay. For block 17F, it says, "Depression or excessive worry," and you checked, No. Is that right?
A Yes.
Q And then it also says, just above that, "Received counseling any type," and you checked yes for that. Is that right?
A Yes.
Q And then I also look at 24, "Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past five years for other than minor illnesses. If yes, give complete address of doctor, hospital, et cetera." You first checked no and then crossed that out and checked yes. Is that right?
A Yes.
Q And then you explain that in the explanation section at number 24. You wrote, "Family problems, counseling Pine Ridge Hospital, May 1999, one visit."
A Yes.
Q Were there other visits in that same year of 2002 for depression?
A At the time, I didn't remember.
Q You didn't remember those, but there were then.
A In May of 2002?
Q No. I'm sorry. At the time you filled out this form, you identified this problems counseling at Pine Ridge

for May 1999, one visit. Is that --
A Yes.
Q -- what you named there?
A Yes.
Q Okay. And what I'm asking you is: Were there other visits for counseling or depression within that same year of 2002, the year that you're filling out this form, earlier in the year?
A For school or college?
Q Well, did you seek help from a mental health professional earlier that year for depression?
A Not that I remember.
Q One second.
(Pause.)
BY MR. BRYANT:
Q I'd like to have you pull out the binder that has 6C, if you could, and I'll tell you the page in just a moment. Page 1104, DEF 1104. Let me know when you find that.
THE COURT: That was 1104, Mr. Bryant?
MR. BRYANT: Correct, Your Honor.
THE WITNESS: Okay.
BY MR. BRYANT:
Q And do you see the date of this document at the bottom right-hand corner, February 28, 2002?

A Yes.

Q And it indicates here that there was a patient referral. Do you agree with that?

A Yes.

Q And block 10 talks about the reason for the referral. It says, "Patient is an 18-year-old student at Red Cloud School who is experiencing grief due to deaths of her sponsors. Her female sponsor died two years ago, and her male sponsor died a few weeks ago. Her boyfriend and her let go of their four-year relationship two weeks ago. Patient denies any suicidal" -- SI, it says -- "but admits to ongoing depression for one year. She denies any use of ETOH or drugs. Patient wants counseling to cope with losses."

A Okay.

Q Did you go seek treatment in February of 2002?

A Now that I see it, yes.

Q Okay. So when you were filling out the form for your comprehensive physical exam, you just forgot to put that on there. Is that right?

A Yes.

Q Okay.

A I made a mistake.

Q I'd now like you to turn to page 1103, just one in front of it. And the date of this document, again at the

bottom right-hand corner, is April -- I believe it's a 24 or 23 -- I'm not sure -- of 2002. And this is a PCC mental health/social service encounter record.

A Yes.

Q "Patient transported by Red Cloud School. Patient states she has been feeling depressed, anxious, with symptoms that are becoming worse. Her sponsor died two years ago. Their relationship was very close, and he lived in North Carolina. Patient has not gone to summer camp in North Carolina since. Patient is a senior and has applied to six colleges. Four have offered full scholarships. Patient's intelligent, articulate, oriented. Insight and judgment are good." And then it talks about purpose of visit, "Depressive disorder."

Do you agree with that?

A I wasn't --

MR. HOROWITZ: Object --

THE WITNESS: -- aware of that.

MR. HOROWITZ: Objection, Judge.

BY MR. BRYANT:

Q Did you seek --

THE COURT: Pause one second, Mr. Bryant. Yes. the objection, please?

MR. HOROWITZ: It was a compound question. He recited an entire paragraph, and then said, Do you agree

with it. It's about ten questions in one.

THE COURT: Yes. Let's -- which part are you asking about? I assume you're asking about just the last part, or which part are you asking about, Mr. Bryant?

MR. BRYANT: I'm asking about the last part.

THE COURT: So reask that question.

BY MR. BRYANT:

Q Did you seek treatment for depression in April of 2002?

A I sought treatment for being sad. I wasn't told I was depressed. As a patient, I don't see these unless I ask for them.

Q Okay. Let's go back to the first paragraph that I read earlier, the second sentence. "Patient states she has been feeling depressed and anxious with symptoms that are becoming worse." Is that an accurate reflection of how you felt at that time?

A I had been feeling sad and anxious.

Q Okay. And were your symptoms becoming worse?

A The anxiousness was for school.

Q And you were sad and depressed because your sponsor died?

A Yes.

Q And your boyfriend of four years, that relationship ended?

A He wasn't a boyfriend. He was a male that was a friend.

Q Okay.

A He was her -- Bear's son.

Q But that led to your depression. Is that correct, those two things?

MR. HOROWITZ: Objection. Misstating the testimony.

THE COURT: Well, the word "depression" -- I mean, it seems to me if you're going to use that terminology, you better ask her again whether that's her characterization, because I'm not quite hearing her say that.

BY MR. BRYANT:

Q Okay. It says in the second sentence again, it says, "Patient states she has been feeling depressed."

THE COURT: And she answered your question saying she felt sad, so let's go from that point.

BY MR. BRYANT:

Q So your -- is it your testimony then that the person who filled this out interpreted what you said as said as sad as being depressed, that you didn't say --

MR. HOROWITZ: Objection. Calls for --

BY MR. BRYANT:

Q -- that?

MR. HOROWITZ: -- speculation.

THE COURT: Calls for speculation. Sustained.

BY MR. BRYANT:

Q Let's turn to page 1102 then. And this is dated April 17, 2002, at the bottom and at the top as well. For chief complaint, it says, I believe, "OP wants" -- I'm not sure what that is, but -- "appointment with Dr. Wortel and wants med for depression." Did you go to -- did you want to meet with Dr. Wortel and seek meds for depression?

A As it states, I went with my teacher, Letha [phonetic], and she suggested that medicine would be good for me.

Q So it was the teacher --

A But the only person who could prescribe antidepressants at this hospital is Dr. Wortel.

Q And did you want meds for depression or was it just the teacher that wanted that?

A She thought it would be good if I tried it.

Q What did you think?

A I wasn't sure.

Q And did you make that known to the doctor?

A She went in there with me, and she talked to them.

Q And did you talk as well?

A Yes. I told them I wasn't sure, but she thinks

it was a good idea, because she -- she was very smart, and --

Q I'm sorry?

A She's very smart, and she was --

Q So then you deferred to her?

A Yes.

Q So -- but then when it says, "Patient" -- in the Subjective/objective section, second sentence, "Patient wants meds for depression and wants appointment with Dr. Wortel," it was the teacher that wanted that, and you deferred to her. Is that right?

A She convinced me. Yes.

Q And then the next line, it says, "Teacher reports that patient told her that she has been depressed for two months with mood swings and feeling of hopelessness." Did you state those things to your teacher?

A I guess I did.

THE COURT: I need you to stay close to the microphone when you answer.

THE WITNESS: I guess I did.

BY MR. BRYANT:

Q And you didn't report this on that request for medical -- that medical examination with the Army either, did you?

A I forgot.

Q You forgot. And page 1101 -- no. This might be a -- that's a duplicate so -- oh, no, it's not. I take that back. DEF 1101, yes, it looks to be close, but it's not. Again, your chief complaint is depression. Is this again where you're saying you were sad, or did you -- or were you depressed at this time?

A I was sad.

Q Okay. And it says under, Subjective/objective, "Patient again transported by Red Cloud School. Patient states she is feeling overwhelmed by finals, graduation, applying for scholarships and summer camp. Last week was the birthday of her sponsor's husband. That was one reason she was brought in. Patient misses her sponsors. They were supportive and always there for her. Mood and affect depressed." Is that an accurate statement of how you were feeling at that time?

A Yes. I was sad and overwhelmed and anxious, which all comes with finals and applying to college, worrying about getting accepted.

Q And again this wasn't reported on your --

A No.

Q -- exam either for the Army.

A No.

Q And turning to page DEF 1093, if you would --

A Okay.

Q Now, this is dated January 15, 2003. Is that right?

A Yes.

Q So this was after the assault. I want to refer you to the middle of the paragraph that begins with the letter S, and it's going to start with the, "During the mental status exam," and let me know when you get there.

A (Perusing document.) Okay.

Q It says, "During the mental status exam, patient was asked about suicidal ideation, and she acknowledged that she had thought about it, particularly since her boyfriend completed a suicide in November and an uncle about the same time." Is this just an inaccuracy that the person was described as a boyfriend?

A He wasn't a boyfriend. He was a male friend.

Q And now I'd like you to turn to page 979, DEF 979. Actually let's make it 978, so we can put it in context.

A Okay.

Q This was a visit in May 19, 2005, to the Mercy Walworth Medical Center.

A Okay.

Q That's in Wisconsin. Right?

A Yes.

MR. HOROWITZ: Your Honor, I object to the

relevance of this document.

MR. BRYANT: Which page are we at this point, Mr. Bryant?

MR. BRYANT: Well, first we were -- I was identifying where it is and what it is on 978. Now we're going to turn to DEF 979.

THE COURT: All right. The relevancy of that?

MR. BRYANT: It's along the lines of the depression at the moment.

THE COURT: All right. I'll let you go a little bit here.

BY MR. BRYANT:

Q Under the section that says, ED course, do you see that?

A Yes.

Q The --

THE COURT: Which page is that on, because I'm not seeing -- are we starting on 78 -- 978 or 979?

MR. BRYANT: We already -- I already did 78 just to show that --

THE COURT: So 979 is where you're at.

MR. BRYANT: I'm on 979. Correct, Your Honor.

THE COURT: All right. So ED course, is that where you asked?

MR. BRYANT: Correct, Your Honor.

BY MR. BRYANT:

Q The fourth sentence -- or I should say, five sentence, "I had asked her earlier if she had problems with depression, and she said that she has for many years but that she's never been on any medication and that she does not feel any worse or better than usual."

A Okay.

Q So is it correct that you'd been depressed for many years? Is that accurate?

A It's been two years after the assault.

Q So you're referring -- when you say -- when it says, many years, you're referring only to the two years since the assault.

A Yes.

Q Not to the other sadness you felt in the year leading up to --

A No. The rest was just sadness.

Q I'm sorry?

A The rest was just sadness.

Q Okay. So you've made your own determination that you -- after the assault you felt depressed. Is that correct?

A Yes.

Q But what you felt before was just sadness?

A Yes.

Q Did any of the doctors that you spoke with or mental health professionals distinguish between those two in their discussions with you in your treatment?
A When?
Q Before the assault in 2002.
A Did they distinguish the --
Q Did they consider it -- did they describe to you that what you're feeling is sadness, something short of depression?
MR. HOROWITZ: Objection. Foundation.
THE COURT: I'm having problems also with time frames and a few other things here. If you're going to -- if you ask her that type of question, I think you need to be a lot more specific, because that could include a whole range of doctors. It might include some doctors that are qualified, some doctors that are not, so if you want to ask her that question, go ahead and get very specific.
MR. BRYANT: That's okay. I withdraw that question.
THE COURT: At some point, Mr. Bryant, you've got to -- you've been making references to pages that are not in the record, so I just want you to understand that at this point, your oral statements about them are in the record, but I don't have a document in the record.
MR. BRYANT: The document is DX-6C. These are

medical records. I was going to move them in, the portions that I'm citing, at the end of the examination.

THE COURT: Okay. Well, I mean, I think that -- I just want you to make sure that the portions of the pages you're talking about, if you want them in the record, right now they're not.

MR. BRYANT: Yes, Your Honor. I was just going to do them all at the conclusion of the examination.

THE COURT: That's fine. I want you to be specific at that point, so I hope you're keeping track of the page numbers.

MR. BRYANT: We're trying to do that. Yes, Your Honor.

THE COURT: All right.

BY MR. BRYANT:

Q I now want to turn to the assault itself for a moment. All right. You indicated on direct, I believe, that the assault lasted 30 minutes. Is that correct?

A Around there. I didn't have a watch.

Q And is that 30 minutes from when the car was parked or when Sergeant Kopf first touched you, your hand or --

A When the car was parked.

Q And then that 30 minutes ended when you drove off or when he stopped?

A When he stopped.
Q And you also said, I believe, that you were crying throughout this -- the assault.
A Yes.
Q So crying for a good number of minutes. Is that right?
A Yes.
Q Close to the 30 minutes you're estimating?
A Yes.
Q And you also said, I believe, that you were scared while driving out into the secluded area.
A Yes.
Q That's -- had you been given any indication -- why were you scared at that point?
A Because I knew nobody lived that far out.
Q And then you said during the assault, you felt helpless and scared and so forth. Is that right?
A Yes.
Q And that he pinned your arm?
A Yes.
Q And unbuttoned your pants and tried to unzip your pants. Is that right?
A Yes.
Q And the other thing you said was about the hiding of a body. Did you consider that a death threat?

A Yes.

Q And that made you scared, I gather.

A Yes.

Q And when did he make that statement?

A While we were driving.

Q While you were driving. And on a scale of 1 to 10, 1 being totally unafraid and 10 being totally frightened, how would you gauge your fear during the assault?

MR. HOROWITZ: Objection, Your Honor.

THE COURT: No. I think that's an appropriate question. Go ahead.

THE WITNESS: At the time it was happening?

THE COURT: Specify the time again, Mr. Bryant.

BY MR. BRYANT:

Q During the assault.

A A 10.

Q A 10. And what about when you were driving, when you first became scared?

A Six.

Q And is that when the threat of hiding the body that you viewed as a death threat, is that when that occurred?

A Yes.

Q So it was a combination of the driving to the

remote location and him issuing that death threat that caused you to have a fear of 6 on that scale of 1 to 10?

A The threat was. The whole reservation's remote. The whole reservation's secluded, but it's what he said and the way he was talking, his demeanor.

Q When he made that "hide the body" --

A Yes.

Q -- reference.

A Yes.

Q Okay. Now, you did say -- I think you mentioned on direct examination that he stopped and he said he wanted a chance to talk to you.

A Yes.

Q Is that right? And he had noticed you'd been sad -- he said he noticed that you'd been sad and wanted to make it better. Did he say that?

A Yes.

Q And that he wanted to take care of you?

MR. HOROWITZ: Objection to the hearsay.

THE COURT: Where are you getting this from?

MR. BRYANT: This is from her deposition. It's not hearsay. It's a statement against interest if Kopf was making these types of statements.

MR. HOROWITZ: How is it a statement against interest?

THE COURT: It's an appropriate -- he can ask her questions that are based upon statements. A statement like that, it seems to me, is an appropriate question. If he starts to introduce into evidence things which have no foundation whatsoever or -- I was concerned about the descriptions about the medical records, because I didn't think there would be any basis or any way to get that testimony in the record.

It seems to me that something like this, if he wants to ask her something specific -- particularly, he didn't quote. He made a general reference, so if you want to ask her questions about that, it seems to me that that's appropriate. Go ahead and rephrase the question, Mr. Bryant.

BY MR. BRYANT:

Q He said he wanted to take care of you?

A Yes.

Q And that he thought you were cute?

A Yes.

Q And he thought you liked him?

A Yes.

Q And that you made him happy and that he wanted to make you happy?

MR. HOROWITZ: Judge, I've got to object to this hearsay.

THE COURT: Are you going to read the whole deposition in the record, Mr. Bryant? If you're going to introduce the -- I mean, first of all, I don't see where this is cross-examination per se, so tell me where you're going with this.

MR. BRYANT: What I'm trying to do is put this assault in perspective. There was a description of this aggressive fear and so forth, and what I'm trying to do is put it in context of what was actually --

THE COURT: You could have brought a witness in to do this, so the answer is going to be that I'm going to sustain this, because I think it's outside the scope of cross.

MR. BRYANT: This is during the assault --

THE COURT: That's the ruling, Mr. Bryant. Continue. You were told during the course of pretrial that if you needed to bring witnesses in -- I know that you couldn't bring this witness in, you said, because of difficulties in locating him, but I'm not going to allow you to basically sit here and testify from the lectern based upon lack of other type of witnesses to corroborate.

MR. BRYANT: Well, these are statements from her deposition, not from Sergeant Kopf's.

THE COURT: Well, then do it the right way, and if you want to ask her if she said something or not, then

you can use the deposition, but I'm not going to let you continue to ask questions without knowing what the source of those statements are. So --

MR. BRYANT: Fair enough, Your Honor.

THE COURT: Pause. So the right way to do that, if you wanted to, is if you want to impeach her or you want to ask her, Do you recall that question and she says, No -- but I want to know where these things are coming from. I don't want you just asking questions at the lectern.

MR. BRYANT: Okay.

THE COURT: All right.

BY MR. BRYANT:

Q I'll refer you back to DX-9C, page DEF 1623, which is your deposition. We looked at that earlier.

THE COURT: The way to frame your questions, Mr. Bryant, I think, that would make them inadmissible is that you ask her, Did he say anything about X. And if she says, No, and you want to then impeach her, you can impeach her with her own -- with her deposition testimony.

But I don't want you to continue to sit here basically reading from her deposition into the record without me knowing whether or not it really is in the deposition, whether you've changed a word or not. I have no idea at that point, so if you want to ask her questions along the line of this, it seems to me that I'll allow you

to do some leading -- all right -- because that's appropriate for cross-examination. But I don't want you just to sort of continuously essentially providing statement after statement and not knowing where they're coming from.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q Do you have 1623, page 21 -- I mean -- I'm sorry -- line 21? Are you there? Oh, I'm sorry. Take your time.

A Okay.

Q Line 21. The question -- actually line 20, the question asked is, "Did you ask why he stopped?"

Answer: "I asked what he was doing, and he said he wanted to get a chance to talk to me."

And the question is: "Did you talk about that point?

"Yes. He asked if I was still arguing with my dad. He said he noticed I was sad lately. He said he wanted to know what he could do to help make it better."

MR. HOROWITZ: Judge, I object that this is completely the opposite of what you just instructed counsel to do.

THE COURT: Ask her -- yes. The problem I'm having here is if you wanted to list her as a witness, you could have.

MR. BRYANT: Okay.

THE COURT: You didn't. Okay? Correct me if I'm wrong. She's not on your list. Right?

MR. BRYANT: That's correct.

THE COURT: All right. So there's only so far I'm going to let you go here on cross-examination in terms of impeachment of subject matter that goes beyond the specific subject matters. Not everything that deals with the assault, every single feature of it, as far as I'm concerned about, was something that was testified, so I'm having real problems, I guess, when you're using this deposition in this fashion.

BY MR. BRYANT:

Q All right. Let's turn to DEF 1625.

THE COURT: You're not following the process I told you. The process I want you to follow is --

MR. BRYANT: This is --

THE COURT: -- to start by asking her a generic question. You ask her a question in which you basically say to her, Did you have discussions about X? Okay. And she says yes or no. You can follow those lines, but I do not want you reading to her from this deposition, basically saying, Did you say this, did you say that.

MR. BRYANT: I was moving on to something else.

THE COURT: Well, you're referring to an exhibit

that's still not in the record. Correct?

MR. BRYANT: Okay.

BY MR. BRYANT:

Q You said that -- earlier in your testimony that you cried for a good portion, if not all of that 30 minutes. Is that right?

A Yes.

Q During the time that Sergeant Kopf was assaulting you. Is that right?

A Yes.

Q And that's while you were pushing him away and he was resisting your push.

A Yes.

Q Is that right?

A Yes.

Q Okay. I want to turn to DEF 1625, if you would, line 22. The question you were asked is: "Did Sergeant Kopf stop touching you?" Your answer was, "Yes, when I started crying. He sat back in his seat, and he said he thought it was what I wanted." Is that correct?

A Yes.

Q Is your answer -- do you want to revise your answer today?

MR. HOROWITZ: Objection. Misleading. It's taking a particular statement --

THE COURT: No. I think it's an appropriate question. All right. So the question -- rephrase the question, Mr. Bryant.

BY MR. BRYANT:

Q Is your statement today that you cried for most if not all of that 30 minutes correct, or is this one correct that when you started crying, he stopped?

MR. HOROWITZ: Objection. Misleading. Misstating the testimony.

THE COURT: I don't think it is. Go ahead. Ask that question again.

BY MR. BRYANT:

Q You said earlier in your testimony that you cried throughout most if not all of that 30 minutes, your estimated time. Your answer in your deposition when you were under oath was that, "Did Sergeant Kopf stop touching you?" Your answer was, "Yes, when I started crying." Which is correct? Did you cry throughout the 30-minute estimated assault, or when you started crying, he stopped?

(Pause.)

THE COURT: Ms. Elk, just do the best you can.

THE WITNESS: I don't know how to describe it. I -- I was crying. That's correct. I kept asking him to stop. He relented whenever I asked him about what he was supposed to do that day.

BY MR. BRYANT:
Q So he relented when you asked him what you were supposed to do that day.
A Yes, because I didn't know what to do.
Q So when you started crying, he didn't stop then?
A No.
Q So this statement in your deposition is wrong?
A It's inaccurate. Yes.
Q Now, Sergeant Kopf didn't present any sort of weapon, a gun or a knife or anything else, did he?
A No.
Q Did he hit you or slap you or anything like that?
A What do you mean by, or anything like that?
Q Okay. We'll leave it at that. Did you hit --
A He pinned me down.
Q -- you?
A No.
Q Did he slap you?
A No.
Q Did you experience any bruises as a result of the assault?
A No bruises.
Q Scratches?
A No scratches.
Q Red marks?

A Not that I recall. My shoulder was sore.
Q I'm sorry?
A My shoulder was sore.
Q Okay. Did you request to get medical assistance?
A No.
Q Did Sergeant Bennett -- I'm sorry -- Special Agent Bennett, did he ask if you needed medical assistance?
A No.
Q And were your clothes torn?
A No.
Q And just to clarify, on the hiding-the-body statement, it was my understanding on direct that you said he made that statement after he parked the car, but I think on cross you said that he made that statement somewhere else, if you could please clarify that.
A I was terrified. I can't pinpoint a certain time.
Q So you don't know when that statement was made?
A It was made while driving.
Q How far from where you ended up parking was that statement made roughly?
A I don't understand. Do you want me to say, a mile away? A few minutes away?
Q Either one, whatever is easier.
A It was a few minutes before we stopped.

Q So a mile or two?
A A mile, mile and a half.
Q But you did consider it a death threat. Is that right?
A I considered it a threat. Yes.
Q I want to now turn to DX-18, which is in another binder that -- if you can't find it, I'll try to find it for you.
THE COURT: It's actually in the same binder that the Exhibit 9 deposition is in. Correct? Some of it.
MR. BRYANT: It shouldn't be. No, Your Honor.
THE COURT: In my set it is. The number again, Mr. Bryant?
MR. BRYANT: DX-18, Your Honor. It should be in the last binder. Let me -- I'll help.
THE COURT: Go ahead.
(Pause.)
BY MR. BRYANT:
Q And let me know when you get there and have a chance to look at that document.
A (Perusing document.) Okay.
Q Is this -- have you had a chance?
A Yes.
Q Okay. And is this your handwritten statement?
A Yes.

Q And is this the statement that you provided to Special Agent Bennett?
A I provided it to Milana Clifford, the officer on duty, who gave it to Bennett. Yes.
Q Okay. And that was the same day as the assault. Is that right?
A Yes.
Q Do you agree that your memory on the day of the assault is better than it would be five years later?
A The day of and five years later is a big gap. No, I don't.
Q I'm sorry. I didn't hear you.
A The day of and five years later is a big gap. No, I don't agree.
Q So you -- I'll rephrase my question. Is your memory better now about what happened on January 7, '03, or would your memory be better at the time you wrote this statement, which is a few hours after the assault?
A Now.
Q Now it would be better?
A (No audible response.)
Q And what do you base that on?
A My fear. This is a summary of what happened.
Q This is?
A Uh-huh.

Q So when you filled out this statement, you --
A I was in shock.
Q You were in shock.
A Yes.
Q And is that why in this statement you didn't mention -- or did you mention anywhere in here that -- how long the assault took place?
A No.
Q Did you mention anywhere in this statement that you were scared?
MR. HOROWITZ: Objection, Judge. The document speaks for itself.
THE COURT: Well, no. I think that there's potential for interpretation here, so that's an appropriate question.
BY MR. BRYANT:
Q And take your time to read it, if you'd like.
A (Perusing document.) I didn't write that I was scared.
Q Okay. And did you write anywhere in here about the threat of hiding a body in that remote location?
A No. Like I said, This is a summary.
Q It's a summary, and that's why you left out that threat?
A It's a summary that the police officer wanted

before Bennett got there.

Q Did the police officer tell you that -- was it a he or a she?

A She.

Q Did she tell you that you should describe everything about the assault or --

A No.

Q -- only parts of it?

A She said, Here's a piece of paper; finish your summary before the CI gets here.

Q Did you think it was important to state what happened?

A It was important for me to be safe. It wasn't important for me to write down every single time he touched me, every single time I cried. At the time, it wasn't important to me, because I felt I was in danger, and I wanted to get someplace safe.

Q Well, when you made this statement, you were at your cousin's house at that point.

A Yes.

Q And Sergeant Kopf wasn't there anymore, was he?

A He said he would come back.

Q He said he would come back. And who else was present at that time?

A My cousin Jackie and her boyfriend Shane.

Q And this officer?

A This police officer, yes.

Q Okay. And so the reason why you didn't write everything about the assault was because you were afraid that Sergeant Kopf was going to come back?

MR. HOROWITZ: Objection. Misstates the prior testimony.

THE COURT: No. I don't think it does. Go ahead. Ask the question again.

BY MR. BRYANT:

Q So the reason why you didn't write down everything that occurred during the assault is because you were afraid that Sergeant Kopf was going to come back?

MR. HOROWITZ: Same objection.

THE COURT: And same answer, so don't object the second time to the same question, please. I just -- I overruled your objection. I do not want you to object a second time when it's exactly the same question. Ask the question a third time.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q So you didn't write down everything that happened in the assault, because you were afraid that Sergeant Kopf was going to come back to your cousin's house.

A Yes.

Q But you did write down a page and a half about the assault. Is that right?

A Yes.

Q Okay. And you wrote down -- did you go back and edit any parts of this?

A As I was writing, I made a few mistakes that I crossed out.

Q Okay. And I notice on -- this is kind of difficult, because the pages are not -- or the lines are not numbered, but from the -- counting from the bottom, one, two, three, four, five -- eleven lines up, I believe --

A Okay.

Q It seems to be written in there, "Pretty soon he started putting his hand up my shirt."

A Okay.

Q Did you read through the document and then add that back in?

A I was writing faster than I could think.

Q But, I mean --

A I'm sorry. I was thinking faster than I could write.

Q Okay. So my point is, though, that you went back and read it. Is that right?

A I stopped right there. I started the next sentence, and I just wrote it in there.

Q Okay. So but when you completed writing it the first --

A When I completed writing it the first time, Milana Clifford took it from me.

Q I didn't hear the last part. I'm sorry.

A The officer took it from me.

Q Okay. So you only wrote this once and didn't read it again at all?

A Yes. Until --

Q Well, did --

A Excuse me?

Q Can you explain to me then why, on that section right there, that line, that it appears that, "Pretty soon he started putting his hand up my shirt," is kind of added in and there's a little arrow there? Why did you put that in if it was only written once and you didn't review it?

A Like I said, I started writing and then I wrote so far, and I just wrote it in.

Q So in other words, you wrote -- let me just try to clarify this. The previous sentence is, "He leaned over and said he was going to take care of me. He started kissing me again." Period. "I kept asking him" -- I'm sorry. "I kept pushing him away." Was it at that point then that you noticed you forget or that you failed to put in about him going up your shirt, and then you added it in

at that point, or did you keep writing?
A I added it in at that point.
Q Right then.
A Yes.
Q And you have a specific recollection of that today?
A I -- I have a specific recollection of that every day.
Q Of adding that line in after you put the next sentence in.
A Of my whole statement.
Q Okay. And so the next line, "Pretty soon he stopped," that was then the next line you wrote after adding in the part about him putting his hand up your shirt?
A Yes.
Q And then you say, "I was asking him where he needed to go and suggested that we go."
A Yes.
Q "And then we started back towards Manderson."
A As I have said, this is a summary.
Q Okay. And you didn't think in your summary it was important to mention that you were crying the whole time or how long it lasted?
A I was crying while I was writing this.
Q And did you -- this statement also doesn't

mention that he was rubbing your legs or your vaginal area. Is that right?

A Yes.

Q And it doesn't mention that he unbuttoned your pants. Is that right?

A Yes.

Q Or attempted to put his hand down your pants. Excuse me. It doesn't mention that, does it?

A No.

Q I'm sorry?

A It doesn't mention it.

Q And you did another handwritten statement, did you not?

A Yes.

Q And was that statement done just a couple days later?

A I don't remember the exact date, but it was after this statement.

Q Okay. If you could turn, please, to -- back to 9C-3. Well, it's the other -- page DEF 1790, DX-9C-3, page 1790. If you want me to help you, please let me know.

A Please.

MR. BRYANT: May I approach, Your Honor?

THE COURT: You may.

(Pause.)

BY MR. BRYANT:
Q Is this the statement you're referring to as the one you did a couple days later?
A Yes.
Q Okay. And it says at the top, Received 1/9/03.
A Yes.
Q Is that the date you wrote this statement?
A I wrote it the day before, and that's the day they took it from me.
Q Okay. So you wrote it then on January 8.
A Yes.
Q Which was the day after the assault.
A Yes.
Q And in this statement, again, you do not mention that the assault lasted 30 minutes. Is that true? And if you'd like a chance to review it, please do.
A I don't mention any time.
Q I'm sorry?
A I don't mention how long it was.
Q And you don't mention crying or being scared in this document, do you?
A No.
Q In fact, if you go to the middle portion of the first page of the statement --
THE COURT: Keep making references to the Bates

numbers, please.

MR. BRYANT: Bates number DEF 1790, first page, Your Honor.

BY MR. BRYANT:

Q "He started asking me about my family and how college was. He slowly started rubbing my hand, and I pulled away, but he grabbed my hand. He started talking about how I was cute and how he liked me. He was making me really uncomfortable, and soon he leaned in and tried to kiss me."

A Okay.

Q You were pushing him -- "I was pushing him away, and he kept asking me what was wrong." Is that what happened during this -- the assault?

A Yes.

Q And then if you go to the very last line of this statement -- well, let's start from the second -- third from the top. "He said he was going to take care of me. I tried once again to push him away, but he started kissing me. He looked like he was trying to position himself to climb on top of me. I pushed him with my right arm, but he grabbed it and help it above my head."

A Okay.

Q Do you agree with that?

A Yes.

Q Okay. "I turned my head so he wouldn't kiss me, and I tried to push him away. He let go of my arm and started putting his hand up my shirt." Is that right?

A Yes.

Q And then in this statement the next day, you mention him having his hands on your legs. Is that right?

A Yes.

Q Okay. A few lines down --

THE COURT: Let's be clear. What's the statement? Since you've been reading all the other ones, why don't you read that one into the record, too?

MR. BRYANT: Okay.

BY MR. BRYANT:

Q "Then he tried to unbutton my pants, and I was putting his hand" -- "and he was putting his hand between my leg. I pushed him and pushed him. Finally he stopped."

THE COURT: Okay.

BY MR. BRYANT:

Q "I told him I wanted to go, and I was asking him where he needed to go. He told me he canceled all morning appointments so we could be together. I was telling him that what he was doing was illegal, and he asked how. I told him because he was married, he had kids, he was older than me, and that he was my recruiter. He said it didn't matter to him, because he does a lot of illegal things."

Is that what he said during the assault?

A Yes.

Q Okay. "He started talking about how" -- I don't know what that word is -- "paperwork and how he liked to get some people in the military. I said it didn't matter what all he did. I just was uncomfortable with him and suggested we go." Is it correct that you were uncomfortable and suggested that you go?

A Of course I was uncomfortable.

Q And you suggested that you go?

A Yes.

Q And then that's when he started back to Manderson?

A Yes.

Q I want to talk briefly about what happened next. You stopped -- you requested to stop, I believe you said in your direct, at a convenience store.

A Yes.

Q That's Common Cents?

A Yes.

Q Okay. And you requested and he complied with that request. Is that right?

A Yes.

Q And you walked inside the convenience store and went into the bathroom. Is that right?

A I looked for my friend.
Q Okay. And your friend wasn't there?
A No.
Q Was there anyone else in the store?
A Yes.
Q How many people were in the store?
A I don't know.
Q More than one?
A Yes.
Q More than five?
A I'm not sure.
Q But at least one.
A Yes.
Q Did you lock the bathroom door behind you?
A Yes.
Q Could you have stayed in the bathroom?
A Yes.
Q But you unlocked the door and went back out into the convenience store?
A Yes.
Q And Sergeant Kopf had a cup of coffee. Is that right?
A Yes.
Q Did you request the person or persons that were there in the convenience store to stay with them?

A Excuse me?
Q There were other people -- at least one other person in the convenience store. Right?
A Yes.
Q And that person worked at the convenience store?
A Yes.
Q Were there any customers there?
A Yes.
Q How many? One or two?
A More than two.
Q More than two. Did you go up to any of those customers and tell them you needed help?
A No.
Q Did you tell Sergeant Kopf you wouldn't go back with him?
A No.
Q Did you tell him you just wanted to stay there, you didn't want to go with him?
A No.
Q So you got back in the car with him.
A Yes.
Q And then you asked to go to your cousin's house?
A Yes.
Q And he took you there.
A He was driving to Kyle, Little Wound High School,

and it was on the way.

Q Okay. But you asked to go to your cousin's house, and he --

A Yes.

Q -- took you there. Now, you also said that you were sick in the bathroom. When you were in the bathroom, you vomited.

A Yes.

Q It's also true that you'd been sick for several days leading up to the assault. Is that right?

A Yes.

Q You had -- you were vomiting and diarrhea and so forth.

A Yes.

Q In fact, you couldn't keep water down. Is that correct?

A Yes.

Q And did you seek treatment at the hospital?

A Yes.

Q If you'd also look at Exhibit 6A, which is DEF 37 -- I'm sorry. That's a joint exhibit, Joint Exhibit 2.

MR. BRYANT: May I approach, Your Honor?

THE COURT: Yes.

(Pause.)

THE COURT: Page number, Mr. Bryant?

MR. BRYANT: Page DEF 37, Your Honor.
BY MR. BRYANT:
Q Let me know when you're there, Ms. Elk.
A Yes.
Q Now, this is a PCC ambulatory encounter record, title at the top. Is that correct?
A Yes.
Q And it's dated January 6, 2003.
A Yes.
Q Could you review this quickly and tell me if this is a -- documenting your hospital visit related to your sickness and the days leading up to January 7, '03?
A Yes.
Q It is that document?
A Yes.
Q Okay. Now, after you -- going back to the day of the assault, after you wrote the handwritten statement out, at some point thereafter, you met with Special Agent Bennett. Is that right?
A Yes.
Q And he interviewed you. Do you recall how long that was?
A It wasn't too long, no more than 20 minutes.
Q No more than five minutes?
A Twenty, no more than 20 minutes.

Q No more than 20 minutes. Okay. And I asked you a question earlier in our examination about a scale of fear, 1 being totally unafraid and 10 being totally frightened, totally afraid.

A Yes.

Q Did Sergeant Bennett -- I mean, Special Agent Bennett ask you a similar question?

A No.

Q He did not?

A No.

Q You're certain of that?

A Yes.

Q I'd like you now to look at DX-11. If you can't find that, please let me know.

A Okay.

THE COURT: Mr. Bryant, I have this exhibit withdrawn on the list. Is that incorrect?

MR. BRYANT: No. We did not withdraw this exhibit.

THE COURT: So was it admitted either?

MR. HOROWITZ: No.

MR. BRYANT: I think they were objecting to it. They were going to object to it.

THE COURT: Right.

MR. BRYANT: But we certainly didn't withdraw

this exhibit.

THE COURT: All right. So are you going to lay some foundation and get it entered into the record before you ask her questions about it?

MR. BRYANT: I don't know if I'm going to be able to enter it with this witness, but at least I'm trying to refresh her recollection, if she recalls the --

THE COURT: All right.

BY MR. BRYANT:

Q Now, the first page of this, DEF 91, do you have that page?

A Yes.

Q At the top it says, Bureau of Indian Affairs, Office of Law Enforcement Services.

A Yes.

Q Is that where you met with Special Agent Bennett?

A In Pine Ridge? No.

Q Pine Ridge Agency?

A No.

Q No, it's not?

A I was in Kyle when I met with --

Q I'm sorry?

A I was in Kyle when I met with Bennett.

Q Kyle. Okay. But you met with him on January 7, as we said, the day of the --

A Yes.

Q -- incident. Okay. If you could turn to -- oh, I'm sorry -- the next page, which is titled, Bureau of Indian Affairs, Pine Ridge Agency, report of interview, interview of Lavetta Kathy Elk. Was that the date and time that you met, January 7, 2003, at 1:45 p.m.?

A It's the date. I'm not sure of the time.

Q Okay. And the location, as you just said, was the Kyle Tribal Prosecutors Office.

A Yes.

Q And you met with Special Agent Bennett. Is that right?

A Yes.

Q I want you now to turn to page DEF 94. And before we talk about that specifically, did you report to the special agent, your recollection anyway, that there were threats of harm, that Sergeant Kopf threatened you at the time?

A I'm not sure. This is his statement.

Q This is his report of the interview with you. But I'm just asking you -- I'm not asking you about the document at the moment. I'm just asking what you recall that you said to him. Did you report any injuries to him?

A No.

Q Did you report any threats of harm to him?

A I'm not sure.

THE COURT: There was a specific question that you were going to --

MR. BRYANT: I'm going to do that now, Your Honor.

THE COURT: All right. So limit yourself to what's appropriate within the rule, because if you're going to basically ask her to refresh her recollection, then you're not going to ask her about the entire document. The question you started out with was the scale, was the pain -- was the frightened scale. Correct?

MR. BRYANT: That's where I'm going.

THE COURT: So let's limit ourselves to that question.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q On the bottom of page DEF 94, the very last paragraph there, can you read that?

A Yes.

Q Please read it.

A You want me to read it?

THE COURT: To yourself.

BY MR. BRYANT:

Q Just read it to yourself, please.

A (Perusing document.)

Q You don't need to turn the next page. It's just that -- the last two lines there. Does that refresh your recollection as to whether he asked you that same question about the scale of fear, 1 to 10?
A He hasn't asked me the --
Q I'm sorry?
A He hasn't asked me.
Q He didn't ask you that question?
A No. I know that. I'm certain. He didn't ask me.
Q You know that for certain.
A Yes.
Q So if he says that he did ask you that question, he's either mistaken or lying?
A Yes.
THE COURT: Let's take a break at this point until a quarter after the hour.
(Whereupon, a short recess was taken.)
THE COURT: Please be seated.
Okay. Are we ready, Mr. Bryant?
MR. BRYANT: Yes, Your Honor.
BY MR. BRYANT:
Q I'm going to shift gears for a moment now, Ms. Elk, and talk about treatment you've sought since the assault. And you mentioned on direct examination that

you've seen a medicine man. Is that correct?
A Yes.
Q You didn't start seeing the medicine man until 2006. Is that correct?
A He's helped my family. He's helped my family for a while. He's somebody that my family as a whole goes to.
Q Okay. And how long has your family gone to him?
A I can't be exact. It's been a while.
Q When you say a while, has it been more than five years?
A Yes.
Q Ten years?
A I'm not sure.
Q But more than five years.
A Yes.
Q But you didn't go see him about treatment with respect to the assault until 2006. Is that correct?
A Yes.
Q And in fact, that was mid-2006. Is that correct?
A Yes.
Q And you also mentioned seeing a minister.
A Yes.
Q And is that minister your uncle?
A Yes.
Q And same question with respect to him: You

didn't see him about the treatment related to the sexual assault, indecent assault, until 2006 also. Is that right?

A No. I've always talked to him.

Q Always talked to him. Have you always talked to him about this incident, to Sergeant Kopf?

A He's not the only one I talked to about it. He's one of them.

Q Well, I'm referring to him right now. I'm just trying to get an idea of the time frame of when you talked to -- and you're talking about John Two Bulls. Is that correct?

A Yes.

Q Okay. And what is the time frame that you talked to him about the assault and Sergeant Kopf?

A A couple months after the assault occurred.

Q A couple months after, through -- are you currently seeing him now?

A Yes.

Q And so you saw him for that whole period of time?

A Yes.

Q Related to the indecent assault?

A Yes.

Q And you're certain of that?

A Yes.

Q I want to direct your attention to DX-13, please.

And let me know if you need some assistance.
A I think I've got it.
Q I'm sorry?
A I think I got it.
Q Okay. Is it -- does it have a caption of this lawsuit at the top, Lavetta Elk versus United States?
A Yes.
Q And then below that, it says, Plaintiff's, Lavetta Elk's supplemental answers to Defendant, United States of America's first set of interrogatories?
A Yes.
Q Did you ever have a chance to review this document?
A To review it? Yes.
Q And did you assist with answering this document, answering the questions posed in this document?
A I answered them.
Q Let's turn to -- this is only a portion of the interrogatories, but please turn to DEF 519. Interrogatory 4 states, "Describe in detail any counseling, assistance, or treatment Plaintiff received for the injuries alleged in paragraph 15 of her complaint, identifying the names of facilities, where the counseling assistance or treatment was received, the names of the treating professionals, the dates of the counseling, assistance or treatment, the counseling

assistance or treatment received, including any tests that were taken, any medications prescribed and the costs associated with the counseling, assistance or treatment."

And your response is a four-paragraph answer. Is that right?

A Yes.

Q Would you like a chance to review that?

A No.

Q Okay. The third paragraph refers to the minister John Two Bulls.

A Yes.

Q And it says, "I've been seeing my minister John Two Bulls during the past year for emotional problems related to the assault."

A Yes.

Q Is that statement correct?

A Yes.

Q Okay. And this is dated -- please go to DEF 521 -- the 20th day of December 2006. Is that right?

A I am not certain of the date.

Q You're not certain of the date?

A Yes.

Q So you think the date in here is wrong? Or let me ask you this. What this is saying is that you saw John Two Bulls for the past year. If that answer were referring

to -- were answered on December 2006, would your understanding be that you only saw him for the past year, being the year of 2006, assuming that date is accurate, the 20th day of December 2006?

MR. HOROWITZ: Objection. Confusing.

THE COURT: Well, part of the problem with your question, Mr. Bryant, is that you're assuming that the date that this document was served is the date that is reflected in her answers. She could have given this answer to her attorney several months or more before that date, and it may be that the document got filed then. So unless you're going to -- you're prepared somehow to show some relationship between the time she answered this question and the filing date, I don't really see where your question's getting us anywhere.

MR. BRYANT: Okay. Let's hold off just for a second. We'll turn to -- one moment, Your Honor. I believe it's DX-12, but let me verify that.

(Pause.)

MR. BRYANT: It is DX-12.

BY MR. BRYANT:

Q Let me know when you're there.

A Okay. Now, this document is entitled, Plaintiff's Lavetta Elk's answers to Defendant United States of America's first set of interrogatories. Is that right?

A Yes.

Q Now, just going back to 13, that's Plaintiff's Lavetta Elk's supplemental answers to Defendant United States of America's first set of interrogatories. Is that right?

A I'm not sure what you mean.

Q Okay. Well, let's stick with DX-12 for the moment. If you would please turn to DEF 508.

A Okay.

Q Okay. The question at interrogatory number 6 is, "Describe in detail therapy, counseling, psychological or psychiatric treatment Plaintiff received following January 6, 2003, identifying names of facilities, where treatment was received, the names of the treating professionals, the dates of the treatment and treatment received, including any tests that were taken, any medications prescribed and the costs associated with the treatment."

And in response to this, there's a mention of -- well, the answer is, "I went to Kyle Mental Health in January 2003, and I was treated by Jean Hammond. I also went to Pine Ridge Mental Health at IHS Indian Hospital, Pine Ridge P.O. Box 1201, Pine Ridge, South Dakota, beginning in January 2003 and was treated by Laura Graham and Kim last name unknown."

Now, there's no mention of your uncle, John Two

Bulls, or the medicine man. Is that right?

MR. HOROWITZ: Objection, Your Honor. The answers were clearly supplemented, so this is a little bit misleading.

THE COURT: Well, I think she can answer the question as to whether or not the document does or does not have the reference to the other materials. Go ahead and ask that question again, Mr. Bryant.

BY MR. BRYANT:

Q I'm sorry. I pointed to the wrong -- let's go to this interrogatory number 4, which is the page in front, DEF 507 -- my apologies -- which is the same interrogatory we were referring to in DX-13. It's the same question. "Describe in detail any counseling, assistance or treatment Plaintiff received for the injuries alleged in paragraph 15 of her complaint, identifying the names of the facilities where the counseling, assistance or treatment was received, the names of the treating professionals, the dates of counseling, assistance or treatment, the counseling assistance or treatment received, including any tests that were taken, any medications prescribed and the costs associated with the counseling, assistance or treatment."

And the response here is, "I went to" -- it's the same response I just mentioned, going to Kyle Mental Health. Is that correct?

A Yes.

Q And there's no mention here of your uncle John Two Bulls or the medicine man. Is that correct?

A Yes.

Q Okay. Now, this was done, as we just discussed in the beginning, on page DEF 503, this was Plaintiff Lavetta Elk's answers to Defendant, the United States of America's first set of interrogatories.

A Yes.

Q Okay. And the last page of this is DEF 516.

A Okay.

Q And the date there is the 13th day of October 2006.

THE COURT: That's the service date. And I have to tell you, this is getting you no place, because basically, as far as I can tell, you have nothing that establishes when she answered the question that's being reflected in that second set, and there's nothing about the certificate pages that are going to get you there, so --

MR. BRYANT: Page DEF 515, Your Honor, the page right in front of that.

THE COURT: All right. So there's --

BY MR. BRYANT:

Q Is this your signature on this page, DEF 515?

A Yes.

Q And you reviewed these answers before you --
A Yes.
Q -- submitted them. Is that correct?
A Yes.
Q Okay.

THE COURT: It still doesn't tell you the day that she originally made the statement. It tells you the day she signed the affidavit about the statement. The problem you have is that the statement is not specific, so I understand the difficulty you're having. But this only tells you the day that she signed the affidavit. There's nothing here that says that, As of this date, that's the answer that goes back six months.

BY MR. BRYANT:

Q Okay. But just for clarification, you did only begin seeing the medicine man in 2006. Is that right?
A Yes. Personally, yes.
Q For this purpose of related to the assault. But your uncle John Two Bulls, you're saying, when you -- let's go back to DX-13 for that. EX-13, page DEF 519 -- are you there?
A Yes.
Q Okay. So the last paragraph says, "I have also been seeing a traditional medicine man, David Swallow, Jr., for approximately the past six months." So when you

answered that question, you were referring to six months from December 2006, six months previous. Is that right?

A (Perusing document.)

Q You just -- you indicated earlier in your testimony --

THE COURT: Let her answer the question, please.

MR. BRYANT: I'm trying to help out.

THE COURT: And keep your eyebrows together, please. I didn't like your facial expression in reaction to my statement to you, please.

MR. BRYANT: Oh, yes, Your Honor.

THE WITNESS: I have been seeing my minister John Two Bulls for a while relating to the assault. At this time, everything -- whenever the -- I had to fill out the questions, read, look through my statements, everything was coming back up, and I started seeing him for the assault.

BY MR. BRYANT:

Q I'm sorry. Could you repeat that? I didn't understand the last part of that.

A I had been seeing him for a while, but at this time, I was -- I seen him for the assault, because I had to fill out all the paperwork, answer all these questions, and everything was coming to mind again, so I saw him for this assault.

Q You're talking about your uncle John Two Bulls?

A Yes.

THE COURT: Can you ask your question again, Mr. Bryant, because I'm not sure we got an answer to the question I thought you posed.

BY MR. BRYANT:

Q The question before you is: For the medicine man, David Swallow --

A Yes.

Q Now, I think you said a couple times now that you began seeing him in mid-2006. Is that right?

A Yes.

Q Okay. So my earlier question was: In your answer here in the fourth paragraph, it says, "I've also been seeing my traditional medicine man, David Swallow, for approximately the past six months." And this document, as we talked about, the certificate anyway, is dated 20th of December 2006. What I'm asking is: When you refer to that past six months, are you referring to the six months from December previous to that in that answer, to coincide with your --

A In reference to the medicine man?

Q Yes.

A Yes.

Q Okay. So you're referring to mid-2006 to the end when you say, past six months.

A Yes.

Q Okay. Now, with the minister John Two Bulls, it says you've been seeing him for the past year. Are you not also referring to one year from December 2006 previous to that, as you were with the medicine man?

A I'm sorry. I don't understand. If you're asking if this is correct, yes, it is.

Q This answer's correct.

A Yes.

Q The past year -- what I'm trying to figure out, though, is: What is the time frame for that past year, that one year related to your uncle John Two Bulls? Was it the year from the end of December 2006, as it was with the medicine man, going back 12 months? In other words, the whole year of 2006?

A Yes. I always see him. He's my uncle.

Q So then is it incorrect that it just says, the past year? Did you mean to say the past several years? The past five years?

A Pertaining to the assault --

Q Yes.

A -- it's been the past year, but I always see him.

Q Okay. All right. I understand. So then maybe I was mistaken. I thought you said earlier that you began seeing your uncle John Two Bulls about the assault,

treatment for the assault, a couple weeks after the assault and continuously until now.

A No. I always see him.

Q I know. I understand. He's your relative.

A Yes.

Q I'm saying, related to treatment for the indecent assault, you're not saying that you've seen him from a couple weeks after the indecent assault until now related to that.

A Yes, because I -- excuse me?

Q You're not saying. Right?

A No.

Q You only saw him for basically the year of 2006 relating --

A About the assault.

Q Thank you very much. That's what I was trying to get at.

A I thought you asked --

Q My apologies. It's confusing. Well, while we're there, actually, DX-13, the first paragraph -- and we've already read this in -- it talks about going to Kyle Mental Health, and I'm referring to interrogatory number 4, page DEF 519, answer to the same interrogatory. You were treated by Jean Hammond beginning in January 2003 -- I'm sorry -- and you also went to Pine Ridge Mental Health for --

beginning in January 2003, for treatment by Laura Graham and Kim, and you're not sure of her last name.

A His last name.

Q That was a limited number of treatments. Is that correct?

A Yes.

Q Would you say it's less than a handful?

MR. HOROWITZ: Objection --

BY MR. BRYANT:

Q Less than five?

MR. HOROWITZ: Objection. Vague.

THE COURT: I don't know what a handful, I guess, means, so maybe --

MR. BRYANT: I'm --

THE COURT: I don't know what a handful means.

BY MR. BRYANT:

Q Is it less than five visits?

A With Jean Hammond, I saw her once. I'm not sure -- it might have been twice, but she left, and she didn't know what to do with me, so she referred me to Pine Ridge.

Q And let's -- referring to Jean Hammond, you were uncomfortable talking to her about the incident. Is that correct?

A I was uncomfortable talking to anybody about it.

Q Okay. But, I mean, my point is, you saw her one, maybe two times.

A Yes.

Q And that was not -- there was not ongoing counseling and treatment with her.

A She left.

Q I'm sorry?

A From what I understood, she left.

Q So was it your intent to keep seeing her --

A Yes.

Q -- for treatment?

A Yes.

Q You wanted to?

A Yes.

Q Did you trust her?

A She was a counselor.

Q Okay. And but for the fact that she was leaving, you would have kept seeing her?

A Yes.

Q And then with respect to -- so one or two visits, and then she had to leave. Now, with respect to Pine Ridge Mental Health and Laura Graham, how many times did you see her?

A Once, maybe twice. I'm not sure.

Q Once, maybe twice?

A Yes.
Q Okay.
A Kim, I only saw him once.
Q Oh, that's a male?
A Yes.
Q One time. So then he total number of visits with these individuals was five or less. Is that correct?
A Yes.
Q Were there any other mental health professionals that you saw anywhere else?
A No.
Q I'm sorry?
A No.
Q And then the next paragraph talks about three to four months you participated in the women's group Cangleska. Is that right?
A Yes.
Q And once that three or four months ended, you stopped going to see them. Is that correct?
A I left.
Q I'm sorry?
A I left.
Q You left to go traveling?
A Yes.
Q All right. And that was the women's support

group --

A Yes.

Q -- you were talking about earlier on direct?

A Yes.

Q Did you join any women's groups or similar type support groups anywhere else that you were living subsequent to that?

A No.

Q What about in Wisconsin?

A No.

Q And since you've returned to this area, to the Pine Ridge Reservation, have you gone back to Cangleska?

A No.

Q And what about any other mental health professionals since returning to Pine Ridge?

A No.

Q And the treatment there doesn't cost anything. Is that correct?

A No.

Q Just to clarify for the record, you said, no, for the treatment -- the mental health treatment not costing any money. Is that correct?

A Yes.

Q You also mentioned on direct examination about obtaining a restraining order against Sergeant Kopf.

A Yes.

Q Now, after the assault, how many times did he call you?

A Three or four times on one night.

Q Three or four times in one night. Did he call any other times?

A No.

Q Did he follow you?

A I seen him at a gas station once up here in Rapid.

Q You saw him one time at a gas station?

A Yes.

Q Did you see him any other times?

A In the mall, but that was where he worked.

Q So you saw him one time at a gas station and one time at the mall?

A Twice in the mall.

Q Any other times?

A No.

Q Was it your understanding that he was following you?

A I didn't know.

Q And when he called you those three or four times on that night, what did he say?

A I can't be sure, but the first time I answered

the phone, he wanted to know what was going on, and he was sorry, but I hung up on him. I didn't answer the second or third time. The fourth time, he said that it was -- I blew the -- what happened out of proportion, and he didn't think it would go that far, but I hung up on him.

Q And how -- so the second and third time that he called, you answered the phone?

A No.

Q Who answered the phone?

A Nobody.

Q He called. How did you get on the phone with him?

A He called the first time, I answered. The second and third time he called, I didn't pick up.

Q You didn't pick up the phone. And how did you know he was calling?

A I had a caller ID.

Q Caller ID. And then the third time he called?

A I didn't answer.

Q I mean, I'm sorry. The fourth time he called, you picked up the phone that time?

A Yes. It said, Private name and number.

Q And how long was that conversation?

A A few seconds.

Q And in that conversation, he expressed that you

were, you said, Blowing it out of proportion. Is that right?

A Yes.

Q Did he say he was sorry in that conversation?

A The first time he did, but not the last time.

Q The first call he did --

A Yes.

Q -- but not the last one. All right. I'd like to direct your attention again to 9C, page DEF 1638.

A Page what?

Q DEF 1638. All right?

A Yes.

Q On line 13, the question is, "After Sergeant Kopf dropped you off at Jackie Randall's house, did you have any further contact with him?"

Your answer: "He called my house and said he wanted to apologize and he didn't think that it would go that far."

Question: "Did you speak to him?"

Answer: "Yes. Well, he called and I answered, and he apologized, and he kept saying he was sorry."

Question: "Did you say anything to Sergeant Kopf?

"No. I just hung up."

That was the first call you're talking about?

A Yes.

Q And there was -- the two other calls were caller ID?

A Yes.

Q And is there any reason why you didn't add those in your deposition testimony?

A I was --

Q I'm sorry?

A (Perusing document.) I don't know. I don't know why I didn't add them.

Q And then the next question on 24 is, "Did you ever see Sergeant Kopf in person again?"

Answer: "I saw him once at the mall, but after that, no.

"What mall is that?

"The Rushmore Mall."

So I think you just said today that you also saw him at a gas station, and you saw him twice at the mall.

A Yes.

Q So when you were giving your testimony in the deposition, did you forget about those two other times?

A Yes. I made a mistake.

Q But in any of those three times, did you view him as stalking you, or did you believe you just ran into each other at the mall?

A The thought never came to mind.
Q Okay. Now, I want to turn to after the assault, and specifically some miscarriages that you suffered.
MR. HOROWITZ: Objection to relevance, Your Honor.
THE COURT: You're going to have to -- if you want to recall her, maybe you can, but I'm not going to let you go into this course of conduct until you develop some evidence that indicates there's some relationship between the miscarriages and some other aspect of this case, which I don't think you're going to be able to do vis-a-vis your -- until you get your expert on the stand.
MR. BRYANT: That's when it will be tied together, Your Honor. I'm just --
THE COURT: Well, I'm not going to let you ask the questions now and then tie them up later, so --
MR. HOROWITZ: Well, can I speak to that?
THE COURT: Yes.
MR. HOROWITZ: There's a separate objection, which is Rule 412. We're talking about other sexual encounters, but on top of that, this expert testimony, she does not opine that the miscarriages caused any emotional injuries.
THE COURT: Is there anything in the expert report about that, Mr. Bryant, about the miscarriages

causing depression or other types of symptoms?
MR. BRYANT: It's absolutely referred to in the expert report. Yes.
THE COURT: Why don't you find it for me right now.
MR. BRYANT: Sure.
THE COURT: That's in the record. Correct?
MR. BRYANT: It's DX-1, Your Honor. Let me find the exact page.
THE COURT: Okay.
MR. BRYANT: Just for clarification, Your Honor, I'm not referring to Dr. Stephenson's report. I'm referring to Dr. Mills's report.
THE COURT: Yes. Either one. I just want to see some reference to some tie between the miscarriages causing -- and some causation with respect to -- what was the number, Mr. Bryant?
MR. BRYANT: DX-1, and I'm going to have to find the page number, Your Honor.
(Pause.)
MR. BRYANT: Page DEF 1170.
THE COURT: 11-what?
MR. BRYANT: 1170, Your Honor.
THE COURT: All right. And where's the language in which this documents -- where does he indicate that the

miscarriages caused depression?

MR. BRYANT: If you go to the -- it begins the fourth paragraph actually.

THE COURT: The fourth full one on this one?

MR. BRYANT: Yes, Your Honor. He talks in the beginning about miscarriages, and then specifically refers to his professional experience in the middle of the paragraph.

THE COURT: (Perusing document.) All right. But I don't see anything there that is indicating that the source of her depression is the miscarriages. Isn't that what you're arguing? You're arguing -- let me get this straight. My sense is the way that you still want to bring this testimony into the record here is to argue that some of the depression that's being associated with the assault is, in fact, attributable to the miscarriages. Do I have that correct?

MR. BRYANT: That's correct.

THE COURT: All right. So where is that said here?

MR. BRYANT: It says --

THE COURT: Show me the language.

MR. BRYANT: "The emotional distress referrable to a miscarriage would have been significant greater. This is even more" --

THE COURT: Well, read the whole sentence. "My professional experience with multiple victims of sexual assault and actual rape suggest that where the assault was relatively minor and arguably represented a misunderstanding, the emotional distress to a miscarriage would have been significantly greater." What is that? What reference -- I'm having a hard time, I guess, understanding what that sentence means.

MR. BRYANT: That in our -- our forensic psychiatrist is an expert with many victims of sexual assault, that having miscarriages, particularly multiple miscarriages, would have -- it's a significant psychological stressor on one that would affect depression and the like, and there's --

THE COURT: Does he make a finding with respect to her in that regard?

MR. BRYANT: There is her own testimony that she felt like a failure and was sad and so forth as a result of the miscarriages as well.

THE COURT: All right. But he goes on to talk about, "This is even more true when one desires to have a child and one has repeatedly had spontaneous abortions. Granted, while individual's sense of loss is different, Ms. Elk's refusal that her miscarriages, at least the longer term ones, were mostly traumatic appears disingenuous."

All right. So she's testifying, if I'm understanding this record, it's basically saying that that's not the source of her depression.

MR. BRYANT: She's attempting to minimize. That our argument, that she's minimizing the effect of the miscarriages on her psychological well-being. There's evidence of her own testimony, as I just mentioned, of feeling like a failure and the grief and so forth associated with it, and what we're trying to inform the Court is there is an attempt to minimize other psychological stressors and to focus exclusively on the sexual assault alone. And miscarriage is certainly relevant to that, particularly when you have -- alleging five of them.

THE COURT: All right. Let's go ahead with the questions. If I determine at a later point in time that they're not going to get linked up, then we'll go back and strike the testimony.

MR. HOROWITZ: Can I just address one issue?

THE COURT: Yes, of course.

MR. HOROWITZ: Because if Mr. Bryant wants to point for Dr. Mills' report for that issue, then I think that the --

MR. BRYANT: I --

MR. HOROWITZ: -- implication is --

THE COURT: Let him finish, please.

MR. BRYANT: Sorry.

MR. HOROWITZ: By implication, it doesn't appear in Dr. Thompson's report, and I think it's plain from that report, of what use is she, and why --

THE COURT: Who's the "she" you're referring to, Mr. Horowitz?

MR. HOROWITZ: Dr. Stephenson. Excuse me.

THE COURT: If we're going to deal with a question about that witness, we'll deal with that witness, I guess, at a later point in time, so I'm not sure how that's relevant to what we're discussing right now.

MR. HOROWITZ: Okay. When I said it didn't appear in the report, I was talking about Dr. --

THE COURT: It seems that the component of proof here is going to be to show whether or not particular types of symptoms are attributable to the assault or attributable to something else. I don't think that that's so far afield to do that, but you need to understand, Mr. Bryant, that that witness better be testifying consistent with their report, and if I see them deviating substantially from their report, then I'm going to strike the testimony.

MR. BRYANT: Yes, Your Honor. Understood.

THE COURT: All right, because at this point, I don't think the purpose of the report really was to focus on what we're talking about. It seems like it was talking

about other things, because at that point, the miscarriage -- correct me if I'm wrong. When this report was generated, were the claims regarding the impact of the miscarriages being the direct result from the assault still in play?

MR. BRYANT: Well, that's one piece of it, but Dr. Mills was certainly considering all of the entire psychological make-up of Plaintiff and what goes into her claims of depression, PTSD, and so forth. So, no. That was absolutely considered all along. Dr. Stephenson is a separate issue.

THE COURT: All right. Well, we're going to -- we'll let it go, and -- at this point, but as I said, we'll consider whether or not it's appropriately before me, because if I end up striking the experts' testimony, Mr. Bryant, then I'll strike all the testimony that you're bringing forth at this point.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q I think my question was: You suffered a miscarriage some months after in 2003.

A Yes.

Q Was it in October?

A Yes.

Q And you suffered a number of miscarriages

following that. Is that correct?
A Yes.
Q How many?
A I can't be certain.
Q Okay. Might it have been five?
A I am not sure.
Q Okay. Now, I'm trying to be delicate, but can you tell us how miscarriages made you feel?
A Sad.
Q I'm sorry?
A Sad.
Q Okay.
A I don't -- to be honest, I really don't remember my feelings at the time.
Q Would you consider it deep sadness?
A I am not sure.
Q Did the miscarriages makes you feel like a failure?
A At the time, yes.
Q Did each successive miscarriage make you feel worse?
A I can't remember.
Q Was there sort of an up and down of emotions that when you got pregnant, you'd be happy, and then when you suffered a miscarriage, you would fall to the precipice of

being sad again? Is that correct?

A Naturally, yes.

Q I'm sorry?

A Naturally, yes.

Q And did you cry often as a result of the miscarriages?

A Not often.

Q Okay. I'm going to direct your attention again to -- one moment, please -- DX-9C yet again, specifically page 1668. Let me know if you need assistance, please. Are you there?

A Yes.

Q Okay. Starting at the first line, question: "For your first pregnancy, how many weeks had passed when a miscarriage occurred?"

Answer: "I counted 25, but my doctor says 16. Somewhere in between there."

Question: "And when did that miscarriage occur?"

Answer --

THE COURT: Are you using this for impeachment purpose, to refresh recollection, or are you just reading it?

MR. BRYANT: I'm trying to build a context. I'm going to get down to the --

THE COURT: No. Use it either for impeachment

purposes or to refresh recollection, but do not just read it.

MR. BRYANT: Okay. Fair enough.

BY MR. BRYANT:

Q And so I think you said that you had the same feelings for each of these successive miscarriages in terms of sadness and feeling like a failure. Is that correct?

A At the time, yes.

Q And did you seek any treatment or counseling for that sadness?

A No.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Okay.

MR. BRYANT: Oh, I'm sorry. The exhibits, if I can move those in.

THE COURT: You're going to need to get me specific page numbers. Why don't you do that as a clean-up matter after we're done with this witness.

MR. BRYANT: Yes, Your Honor.

MR. HOROWITZ: Brief redirect?

THE COURT: Yes. Go ahead.

REDIRECT EXAMINATION

BY MR. HOROWITZ:

Q Lavetta, when you were asked to provide the witness statements to law enforcement, were you asked to

describe facts of the assaults or your emotions?

A The facts.

Q Now, when you provided the written statements to -- the two written statements to law enforcement, did you also provide verbal statements at the same time?

A Yes.

Q Okay. And were those verbal statements provided with more detail than your --

A Yes.

Q -- written statements?

A Yes.

Q On the occasions in which you had the miscarriages, were those pregnancies wanted or unwanted?

A Wanted.

Q Okay. Were all of them wanted, or were you sometimes using birth control at the time?

A Sometimes I was using birth control.

Q Okay. So they weren't all planned pregnancies. Is that --

A No. They weren't all --

MR. BRYANT: Objection to leading, Your Honor.

MR. HOROWITZ: Withdrawn.

BY MR. HOROWITZ:

Q Were the pregnancies that you had when you miscarried, were they all intended pregnancies, or were some

inadvertence?

A Not all intended.

Q Now that you have successfully delivered two children, do you think much about the miscarriages?

A No.

MR. HOROWITZ: No further questions.

THE COURT: Any --

MR. HOROWITZ: Oh, I'm sorry. Just one more.

THE COURT: Yes.

BY MR. HOROWITZ:

Q There was a reference to -- in the cross-examination, you mentioned that you weren't seeing the counselors at Pine Ridge between 2004 and 2006. Is that right?

A (No audible response.)

Q Does that coincide with the period that you were out of the state?

A Yes.

MR. HOROWITZ: Okay.

THE COURT: Anything else, Mr. Bryant?

MR. BRYANT: Your Honor, do you want to do the housekeeping matter after --

THE COURT: I'll do that next. I want to know if you have any other questions for the witness at this time.

MR. BRYANT: No, Your Honor.

THE COURT: Ms. Elk, in the process that the Court's going to use for other witnesses, I just have a couple questions for you. I'm going to ask those questions to you first. Then I'm going to give Mr. Horowitz a chance to follow up in case I ask something that he wants to ask about, and then likewise, I'll also give Mr. Bryant an opportunity.

I just want to pin down some things about your testimony, to make sure I understand some things. So you had some experiences prior to the time of the assault that you describe as causing sadness. Is that a fair statement?

THE WITNESS: Yes.

THE COURT: All right. Did the assault make you feel worse, though, from the standpoint of how you were feeling in terms of your mental state?

THE WITNESS: Yes. I have never experienced anything that low.

THE COURT: Were the types of things that you explained in terms of the dreams and the other types of symptoms that you described, were those things that were sort of unique to the assault, or did they exist prior to the time of the assault?

THE WITNESS: I have never had them until after the assault.

THE COURT: All right. And once again, why don't

you recap the symptoms that you say occurred for the first time after the assault?

MR. BRYANT: Your Honor, could you please speak up? It's hard to hear.

THE COURT: I'm sorry. I thought this was picking me up.

Could you one more time sort of make clear the symptoms that were sort of unique that occurred after the assault?

THE WITNESS: Loss of self worth, irritable, loss of sleep, insomnia, depression. I got severe anxiety.

THE COURT: Describe the anxiety.

THE WITNESS: I get short of breath. It feels like something's sitting on my chest. I can't breathe. It feels like the room's been, say -- my stomach starts to hurt. I get aches.

THE COURT: The military recruitment situation that you were asked about on direct and on cross-examination and issues involving your height and weight, body fat, and the like, did you have discussions with any of the military recruiters or military personnel about the need to lose weight for you to qualify for entering into the service?

THE WITNESS: Not with anybody else but Kopf.

THE COURT: And what did he say about the weight issues? Anything?

THE WITNESS: He told me I was accepted, but he said it would be good if I kept working out. He said it wouldn't hurt to lose a few more pounds.

THE COURT: All right. So no one in the military ever indicated to you that your weight was disqualifying.

THE WITNESS: No.

THE COURT: All right. I have nothing else. Mr. Horowitz?

MR. HOROWITZ: I have nothing.

THE COURT: Mr. Bryant?

MR. BRYANT: No further questions, Your Honor.

THE COURT: All right. Then the witness is excused.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: All right. Mr. Horowitz, your next witness, please.

MR. HOROWITZ: Okay. We're next going to call Daverine Elk. Do you want me to go get her?

THE COURT: Yes, please.

(Pause.)

Whereupon,

DAVERINE ELK

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Please take a seat. Could I have you begin by stating your name for the record and then please spell it.

THE WITNESS: Okay. My name is Daverine Elk, and it's spelled D-A-V-E-R-I-N-E. Elk, it's E-L-K.

THE COURT: Very good.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Daverine, where do you live?

A I live in Wounded Knee, South Dakota.

Q Okay. And who do you live with?

A My parents, Lavetta and her family.

Q And where are you employed?

A The Oglala Lakota College Headstart Program. I'm a family helper.

THE COURT: Okay. I need you to get as close to that mike as you can comfortably and speak up.

BY MR. HOROWITZ:

Q One more time. Where are you employed?

A I work at Oglala Lakota College. I'm a family helper.

Q Okay. And what kind of work do you do for them?

A It's with the Headstart Program.

Q Okay. What's that?

(Microphone malfunction.)

THE COURT: We need to work on microphones tomorrow. Sorry.

THE WITNESS: I work with Oglala Lakota College Headstart. I'm a family helper for that program.

BY MR. HOROWITZ:

Q Okay. And what is your relationship with Lavetta Elk?

A She is my younger sister.

Q All right. Can you tell us -- first of all, did you grow up in the same home?

A Yes.

Q Okay. And that was on the Pine Ridge reservation?

A Yes.

Q Okay. Can you tell us a bit about Lavetta Elk's personality growing up?

A She was happy. She's really ambitious, and she won a four-year full scholarship down to Rockhurst University.

Q And did she have many friends growing up?

A Yes. She had a lot of friends. She had a lot of her friends coming over, and they would stay and have supper with us and play volleyball and different games.

Q And how did she do in school?

A She was like an A/B student.

Q Okay. And before getting to high school, what were her career ambitions?

A To join the military.

Q Okay. And what sort of things did she say about the military?

A She said that it was her dream, because she was -- wanted to be the first female in our family to be in the Army.

Q Growing up in your household, was being in the military something that was valued?

A Yes.

Q Tell me a little bit about the value that the military held in your home?

A We had some -- our grandfathers were in the Army and the Marines, and my uncle was in the Marines, and my brother was in the Army.

Q Now, did there come a time when Lavetta decided to go to college first?

A Yes.

Q Do you know how that came about? Were you living at home at that point?

A Yes.

Q How did that come about?

A She applied for a scholarship from Red Cloud High School, and she won a scholarship to Rockhurst University in

Missouri, and --

MR. BRYANT: Still having a hard time hearing.

BY MR. HOROWITZ:

Q If you could just speak up a little bit.

A Okay. She won a full-ride scholarship to Rockhurst University, and she won that when she was a senior at Red Cloud High School.

Q Now, before she decided to go to Rockhurst, were you aware that she had the recruiter?

A He came by with some information he dropped off, literature for her to look at.

Q Okay. Was that when Lavetta was in high school?

A Yes.

Q Okay. Did you ever meet with him as well, sort of as a family meeting with Sergeant Kopf?

A Yes.

Q Okay. What sort of things did you discuss?

A Just her options. She was interested in the medical field.

Q Now, were you at home on January 7 when Lavetta Elk got picked up to go to Sioux Falls?

A No.

Q Okay. Where were you that day?

A I was working at the Indian Health Service Hospital in Pine Ridge, and I was at work. I didn't know

she left.

Q Okay. Now, did Lavetta contact you later that day?

A Yes.

Q Okay. And what time of day was that?

A It was early in the morning. I can't remember exactly what time, but she was crying and wanted me to get to Kyle. She said she was at Kyle, and she was crying, and I never heard her cry like that, so I took time off from work, and I left that way.

Q Okay. You were at work, and she called you there?

A Yes.

Q And do you know where she was calling you from?

A It was the Kyle Police Department.

Q And after she stopped crying, what did she tell you?

A She just told me, Get over here right away; I need you to come over. And I never heard her cry that way, so I didn't really question. I just took leave, and I left from work.

Q Okay. And did you go to the Kyle police?

A Yes. I picked up my aunt over at our place in Wounded Knee, and then we went to Jackie Randall's residence, and she wasn't there. Lavetta wasn't there, and

they told us she went to the Kyle Police Department, so we continued on to the police department. And when I got there, they were interviewing her in the back room.

Q Okay. Were you able to watch her being interviewed?

A No.

Q Did you talk to her after the interview?

A Yes. She was crying and told me that her recruiter did something to her.

Q Okay. What was her emotional state? I know you mentioned she was crying, but can you describe a little more?

A Emotional duress. I'd never seen her -- like I said, I'd never seen her cry that way.

Q At that point in time, were you living with your parents still?

A Yes.

Q Okay. Tell me a little bit about how Lavetta spent the first few weeks -- first few months after this assault.

A She was emotional, and she was crying, and trying to deal with the issue. She was having nightmares. I think she had some doctor's visits that she went to, and they were giving her medication, but the medication was giving her nightmares, and it was a tough time for our whole family.

Q What kind of sleep habits did she have?

A Like I say, she was having nightmares, and so she would sleep whenever she could, but -- she'd sleep for so many hours at night, and then she'd tell us that she was having these nightmares and wake up, and there was times when she couldn't sleep at all.

Q Okay. Did she tell you what kept her up at night?

A She kept having a dream that this recruiter was coming after her.

Q Okay. Did you observe any other changes in her behavior?

A Yes. She was withdrawn. She tries to deal with -- I don't know. Sometimes she'll say, I think I seen somebody that looked like this recruiter. And it's like she withdraws from everything. It's still affecting her today, and she's trying to get her life back together.

Q Did you observe any changes in her eating patterns after the assault?

A Yes. Her weight was fluctuating for a while. She would lose weight, and then she would go see the medicine man, David, and he would talk with her, and I'm sure she'd talk with our mother, and it was just periods where she would be okay, and then she would say, I'm having these nightmares again.

Q Did you accompany Lavetta to any doctors?
A I worked at the Indian Health Service Hospital, so sometimes when she has her appointments and I'd wait outside for her, but I never did go inside with her.
Q Okay. Do you know what happened to Lavetta's dream of joining the military?
A She's not going into the military now. That dream is gone.
Q Okay. We're now about five years after the assault. Do you see any changes between the way Lavetta was before the assaults and the way she is today?
A Yes. I keep thinking she wanted to go to school to be a surgeon and at Rockhurst to be a doctor, and she's trying to get her life back together. She has two sons, but sometimes she becomes withdrawn, and she's -- her husband takes care of the sons when she's -- she can't sleep. She's been having nightmares in trying to deal with everything, and like it keeps coming back to haunt her.
MR. HOROWITZ: Okay. I have no further questions.
THE COURT: Cross-examination?
MS. COSTELLO: No questions, Your Honor.
THE COURT: All right. You're excused, ma'am.
(Whereupon, the witness was excused.)
THE COURT: We're next going to call David

Swallow, Jr.

THE COURT: All right. Go ahead. Why don't you go get him.

(Pause.)

Whereupon,

DAVID SWALLOW, JR.

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Thank you. Please take a seat, sir. If I could have you begin by stating your name for the record, and please spell it.

THE WITNESS: Okay. In English, my name is David Swallow, Jr.

THE COURT: And could you please spell it?

THE WITNESS: D-A-V-I-D, S-W-A-L-L-O-W, and a J-R at the end.

THE COURT: Very good. Thank you.

Proceed, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Where do you live, sir? Where do you live?

A I live on the Pine Ridge Indian Reservation, a place called Porcupine, South Dakota, also known camp 344. That's where I'm from.

Q Okay. And what do you do for work?

A I help -- for manual living, I make -- I sell arts and crafts and stuff like that. Then I help my people.
Q Am I correct that you're a medicine man?
A As an English word, yes.
Q Okay. And can you just tell us what a medicine man is?
A Okay. There is two different worlds we're talking here. Okay? One is the old world that I'm going to try to explain in that manner. And my Lakota way is way different, see. In English way, the white man way, a medicine man here still exists today from the days of my grandfather and today, up to today now. We carry on the teachings of healing the body and the mind and the spirit, see.
Q Okay. And is that a traditional healing method for Lakota Sioux?
A It's a very, very old, traditional -- older than this system right here.
Q Okay. Have you provided medicine man healing services for Lavetta?
A Yes, I did.
Q How long have you known Lavetta?
A I've known her since maybe when she was about a few months old.
Q Did there come a time when she reported to you

having been assaulted by a military recruiter?
A Yes, she did.
Q Okay. I'm sure it's been a while, but do you recall when you first heard that? When did she first tell you?
A When did she first --
Q When did she tell you that?
A She told me about, I believe, maybe about a month or so forth after it happened, and I was -- she told me about this incident right here, you know, not full details, but something bad happened to her, see.
Q Okay. Tell me a little bit about her emotional state when she reported that to you?
A As she was talking, she was beginning to cry, you know, and that led into a fear, see, a fear of being hurt again or fear of that individual to come back, you know, when he threatened her, see, threatened her that people disappear, see. So then I said, No, you know; you take courage. There is a law for this, I said, you know. There is a law that's supposed to protect us, especially us Indian people, you know, especially protect us. Somebody committed a crime. I told her all this to do the right thing and go, you know, proceed on what you're doing.
Q When did you start provide healing services for her?

A Right then after that.
Q Okay. All right. And that was in 2004 -- or in 2003?
A Yes.
Q Okay. Now, shortly after that, she left the reservation. Is that right?
A Right. Uh-huh.
Q Okay. And when she returned in 2006, did you provide healing services again for her?
A Yes. Uh-huh.
Q How many times --
A You see --
Q I'm sorry.
A Okay. She come -- I told her to come when she's feeling down or when she needed to come, see. That's what I told her.
Q Okay. And how many times would you estimate that she has come to you to discuss Sergeant Kopf?
A Well, we discussed, I think, two times about that, and otherwise, you know, I said that healing must take place. It has to. So let's discuss about your healing, your spirit, you know, everything.
Q So approximately two times you discussed Sergeant Kopf.
A Uh-huh.

Q And the remainder of the sessions, you talked about the motions that she felt?
A Right.
Q And how many times would you say you discussed the emotions she felt as a result of the events with Sergeant Kopf?
A Well, every time she comes for healing, then that's what we discussed about, so approximately, I would say that I would have helped her, even including this past Saturday, so approximately about seven times, I would say.
Q Now, you told us you've known Lavetta a long time. Did you see a change in her personality after the assaults?
A Yes, I did. I did notice --
Q What sort of changes did you see?
A I see that she's not like herself, like she's afraid or in that manner, you know, or she's like bashful or, you know --
Q You said that you last saw Lavetta on Saturday?
A Saturday.
Q This past Saturday?
A Yes, this past Saturday.
Q Can you tell us about that healing session?
A Well, she's -- let's say, she's getting better, and she's going to need more than that.

Q Okay. Have you told her that you'd like her to continue seeing you for sessions?

A Yes. I told her the same thing, you know. When you need it, come back. When you're feeling down, when you're feeling frightened, all this, or give me a call. Let me know, see. This is what I said.

Q Okay. Were there any other -- or strike that. Has Lavetta talked to you about her ambition to join the military before this happened?

A So far as I know, she was going college.

Q Okay. And when she came back from college, do you know what her plans were in terms of the military?

A No.

Q Okay. All right. Have you treated Lavetta's family or provided healing services for Lavetta's family for other matters?

A Yes. The whole family, in fact, the whole family plus the brothers and sisters, everybody, the father, too, you know, mother. What happened to her affect the whole family. As a matter of fact, it affect the cousins, the community, you know, especially if it's coming from a recruiter doing this, you know, that they put -- you know, they want to be proud of the United States, because her grandfathers, they all served in the military, see.

Q Sure.

A And I --

MR. HOROWITZ: I have no further questions. Thank you.

THE WITNESS: Okay. Thank you.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. ACOSTA:

Q Good afternoon, Mr. Swallow. My name's Lanny Acosta.

A Uh-huh.

Q You said that she talked to you immediately afterwards, within a couple of weeks of the event occurring. Is that correct?

A Not immediately, but a couple weeks.

Q A couple of weeks.

A Uh-huh.

Q But you also said that she didn't tell you the details then. She just told you that something bad had happened. Correct?

A She was assaulted by Army recruiter, these exact words.

Q Okay. And how many times did you treat her before she went away?

A One time.

Q One time before she went away?

A Yes.
Q Okay. And you said that you've known her since she was a young girl. That's correct?
A Yes. Uh-huh. I know her.
Q And that now she seems bashful. Correct?
A She's what?
Q Now she seems different to you, you said.
A Yes. It's obvious, looking at her.
Q Okay. How often would you see her on a regular basis, not treating her? I mean --
A How often do I see her? Well, like every day.
Q You see her every day?
A Uh-huh. I see her places here. You know, I could see her.
Q So you see her about, around town.
A About, around town, yes.
Q Okay. So you treated her once before she went away, and you said including the treatment on Saturday, you've treated her a total of seven times.
A Approximately seven times.
Q Okay. So once before she left, and then about six times since she came back in 2006. Correct?
A Yes.
Q Okay. Have you ever -- you mentioned that you've treated her whole family for -- related to the incident.

Correct?

A Oh, yes.

Q Now, have you treated them as a family or anyone in the family for -- or excuse me. Withdrawn. Have you treated Lavetta for any other type of emotional or spiritual healing related to something besides the incident?

A No. Just this.

Q No. Just that.

A Yes. Just -- that's the reason why they came to me.

Q Are you a friend of the family?

A Not -- no.

Q No?

A Relative.

Q A relative?

A I'm related to everybody on the reservation.

Q So when -- so she sought your -- she did not seek treatment for any other events in her life. Correct?

A No. Not when she comes to me. That's the only reason why she came.

MR. ACOSTA: Okay. No further questions.

MR. HOROWITZ: Next witness?

THE COURT: Anything else, Mr. Horowitz?

MR. HOROWITZ: No questions.

THE COURT: Sir, you're excused with the thanks

of the Court.

THE WITNESS: Okay. Thank you.

(Whereupon, the witness was excused.)

MR. HOROWITZ: Noretta High Hawk's going to be next.

THE COURT: All right. Go ahead and get her.

Whereupon,

NORETTA HIGH HAWK

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Could I have you please take a seat.

THE WITNESS: (Complying.)

THE COURT: Could I get you to stay as close to that mike as you can without bumping into it, because we've figured out that we need you close, but that if you bump into it, we get a lot of noise.

All right. And could I have you begin by please stating your name, and then please spell it for us.

THE WITNESS: My name is Noretta High Hawk.

MR. HOROWITZ: Where do -- I'm sorry. were you done?

THE COURT: And she needs to spell it, so --

MR. HOROWITZ: I'm sorry.

THE COURT: Please spell it.

THE WITNESS: Noretta is N-O-R-E-T-T-A. And High

Hawk is H-I-G-H, H-A-W-K.

THE COURT: Proceed, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Where do you live?

A In live in Wounded Knee, South Dakota.

Q Okay. And is that the Pine Ridge Indian Reservation?

A Yes, it is.

Q Okay. And how far away from Lavetta's family do you live?

A I live about eight houses up the road.

Q Okay. And what is your relationship with Lavetta Elk? How are you related?

A Lavetta is my niece, and her dad is my brother.

Q Okay. Have you known Lavetta her whole life?

A Yes, I did.

Q Okay. Have you always lived so close to her?

A Yes.

Q Okay. Can you tell us about Lavetta as a child, what her personality was like?

A She was always happy, getting along with others, doing things, and always one to get along with.

Q Did she have a lot of friends?

A Yes.

Q Okay. How did she do in school?
A She did pretty -- they did good in school. She was always a good student.
Q Okay. Can you remember any incidents in which she got into trouble at school?
A No.
Q In Lavetta's family, is being in the military something that's valued?
A Yes. That -- can you repeat that again?
Q Sure. In Lavetta's family, in your family, is the military something that you hold in high regard?
A Yes. Lavetta was interested in going to the military, and the reason was because we had family members in the military.
Q Okay. When did Lavetta start talking to you about an interest in joining the military?
A Somewhere in the middle of high school.
Q Now, do you remember the events of the day when Sergeant Kopf came to pick up Lavetta to go to Sioux Falls?
A Yes.
Q Now, did you know that Sergeant Kopf was coming to pick up Lavetta that morning?
A No.
Q Now, do you remember that in your deposition,you indicated that you knew that he was coming?

A It was like a mistake that I said, but I didn't know that he was coming until the day that he came.

Q Okay. Now, when did you first see Lavetta that morning?

A About maybe 7:00, maybe 7:30, eight o'clock, right around when the school buses were coming around.

Q Okay. And where did you see her?

A She came to visit up at my house.

Q Okay. And was there any discussion that Sergeant Kopf was coming over, anything like that?

A No.

Q Okay. Now, when did you first find out that Sergeant Kopf had come to the reservation that morning?

A Lavetta's mom gave me a call and said Lavetta was leaving.

Q And what did you do at that point?

A I walked down to her house, and I wanted to, you know, see her, to tell her goodbye.

Q Did you think that she might be joining the military, enlisting that day, and you might not see her?

A I guess it was because he was a recruiter. I figured that it was something that had to do with the military.

Q Okay. Did you have an opportunity to say goodbye to Lavetta that day?

A I believe she was already backing out from the car.

Q Okay.

A The car was already backed out leaving.

Q Okay. Now, when was the first time that Lavetta told you what Sergeant Kopf did to her?

A It was that day about eleven o'clock in the morning when I was at home.

Q And what happened?

A She gave me a call, and she was crying, and she told me that the military man that she left with had did something to her, and I asked her where she was calling from, and she said she was calling from Jackie's.

Q And did she ask you to do anything?

A Well, I actually asked her if she called her parents, and we couldn't answer, because we got cut off, and then so I went down to her parents' house, and they were already on the phone with the police.

Q Okay. Now, did you go down to the police station as well?

A We went to Jackie's house to meet with Lavetta, and then from there, we went to the police department, Kyle.

Q When you finally met up with Lavetta, what was her emotional state that day?

A She was crying, and she couldn't talk.

Q Did she seem like she was still shocked at what happened?

MR. BRYANT: Objection, Your Honor.

THE COURT: Ask a more generic question. That is leading.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Did she seem -- was she composed, or was she in a state of shock?

MR. BRYANT: Objection.

THE COURT: I don't think that's as leading. Go ahead.

THE WITNESS: She seemed scared, like shaking.

BY MR. HOROWITZ:

Q Was she able to tell you what happened?

A Not right then and there.

Q After the assault did you spend a lot of time trying to comfort Lavetta?

A Yes.

Q Okay. Did you see any changes in her behavior after the assault?

A She was no longer like happy, like she was like in a depressed mood and like she just wasn't herself.

Q Okay. After the assaults by Sergeant Kopf, did she ever talk about joining the military again?

A No.

Q Was she still the happy girls that you've described she was as a child?

A No. She's -- she just isn't herself anymore.

Q How can you tell when Lavetta's feeling down?

A She's always crying. She's scared. She just doesn't want to be alone.

Q Did you accompany her to any of her doctor visits?

A Yes, I did.

Q And where did you go with her?

A We went to Pine Ridge, the women's clinic.

Q Okay. And did you sit in on that visit?

A I was just there to support her. I didn't go in to the doctor's office with her.

Q Okay.

A I sat out in the waiting room.

Q Okay. And what was her emotional state when she was going to the doctor? How was she felling?

A She was feeling sick, you know, just like sad and depressed. I don't know what else to describe.

MR. HOROWITZ: Okay. I have no other questions. Thank you.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BRYANT:

Q Is it Ms. High Hawk or Ms. Hawk?

A High Hawk.

Q Ms. High Hawk, you have a very close relationship with Lavetta, do you not?

A Yes.

Q And how often do you see her?

A Almost all the time.

Q A few times a week? Every day?

A Every day.

Q And is that true for most of her life?

A Yes.

Q Does she look to you for guidance?

A No.

Q She does not?

A Just on certain things, but not for everything.

Q I'm sorry?

A Just on certain things, but not for everything.

Q What kind of things does she look to you for guidance?

A She has two children, so, you know, I just -- I'm happy to see the babies, and we just talk about the babies.

Q Could you speak a little louder and lean in?

A Okay. She has two children, so we, you know,

discuss the children, you know, how to feed the children and how many -- you know, what's a headache or a toothache.

Q So you're a parent also, I gather.

A Yes.

Q And you give her advice on parenting?

A Yes.

Q It has -- have her babies given her great happiness?

A Yes.

Q And what makes you say that?

A Who wouldn't be happy?

Q Have you observed her being happy with her babies?

A Yes.

Q Has she told you that they make her happy?

A Yes.

Q Is that true also about her marriage? That makes her happy?

A Yes.

Q And did she tell you -- you talked about the way Lavetta has been depressed, I believe the word you used. Were there other reasons other than the assault by Sergeant Kopf that led to her depression, as you called it?

A Can you say that again?

Q Well, you mentioned that you've observed Lavetta

being depressed since the assault, I guess. Is that right?

A Uh-huh.

Q What I'm asking: Are there other things in her life that happened shortly before the assault that caused her to be depressed?

A She had her grandparents that passed away.

Q And how many grandparents were there that passed away?

A I remember two of them.

Q Two grandparents? And was she close with them?

A Yes.

Q And did those grandparents live nearby as well?

A Yes.

Q And how often would they be with Lavetta when they were alive?

A Every time they were in Wounded Knee, they would visit.

Q Okay. And you would agree that your extended family with Lavetta is a very close-knit family. Is that right?

A Yes.

Q And you said that two grandparents died. Were those grandfathers? Grandmothers?

A Grandfather and grandmother.

Q So one grandfather and one grandmother. Was

there also another grandfather that died?

A Actually there was two grandfathers and one grandmother.

Q And what was the time frame that they died?

A They were all within the year.

Q Within the year of the assault? And I'm not going to hold you to the month, but give or take.

A I don't really remember, but they were closely together.

Q And was the assault, the incident with Sergeant Kopf, was that near in time to those deaths?

A I don't actually remember the date.

Q But you would agree that those three grandparents dying was within the group of things that happened to her that caused her to be sad and depressed. Is that correct?

A Yes.

Q I'm sorry?

A Yes.

Q And are you also aware that a friend of hers committed suicide around that time frame?

A Yes.

Q And that contributed to her sadness and depression?

A Yes.

Q And are you also aware of Lavetta suffering some

miscarriages?

A Yes.

Q And can you describe how those made her feel?

MR. HOROWITZ: I'm going to object to foundation. That's --

THE COURT: Explain yourself, and stand up while you're talking.

MR. HOROWITZ: How miscarriages affected her, I mean --

THE COURT: He's asking her about personal observations, so I don't really see a foundation issue.

MR. HOROWITZ: Okay. All right.

THE COURT: Ask the question again, Mr. Bryant.

BY MR. BRYANT:

Q You're aware of Lavetta suffering some miscarriages. Is that right?

A Yes.

Q Did you observe a change in her mood stemming from those?

A Yes. She was sad.

Q Depressed?

A Depressed.

Q And did those -- following those miscarriages, did she inform you that she was having sleep problems as a result?

A Actually she was having sleep problems that I know of from when the --

Q Can you speak a little louder? I'm sorry.

A She was having sleep problems with the assault, after the assault from Sergeant Kopf.

Q And I understand that, but did the miscarriages also contribute to the sleep loss?

A Depressed and being sad. I don't really remember any sleep loss.

Q Okay. I'm going to direct your attention to DX-9D.

MR. BRYANT: Should I assist the witness, Your Honor?

THE COURT: Yes. Go ahead. Give me the --

MR. BRYANT: Page DEF 1856.

(Pause.)

THE COURT: That page again, Mr. Bryant?

MR. BRYANT: 1856, Your Honor.

BY MR. BRYANT:

Q And the question on line 7 is -- are you there with me, Ms. High Hawk, line 7?

A Yes.

Q The question: "Do you know if she was losing sleep after the miscarriages?" And your answer was, "Yeah." Does that refresh your recollection?

MR. HOROWITZ: Objection. Improper impeachment. They're two separate questions.

THE COURT: Well, if you're going to ask her if she's going to -- I mean, he can ask -- I think it's an appropriate question, so he can ask her whether or not that statement refreshes her recollection. She can answer the question yes or no, so go ahead and answer the question.

MR. HOROWITZ: Maybe it's the next question.

BY MR. BRYANT:

Q Does that refresh your recollection about Lavetta losing sleep following the miscarriages?

A (Perusing document.) Okay. Yes.

Q And is that true that she did lose sleep following the miscarriages?

A Yes, now that I recall.

Q Okay. So the miscarriages contributed to her depression, sadness and loss of sleep. Is that correct?

A Yes.

Q Now on direct examination, you mentioned that your deposition testimony may have been mistaken with respect to when Sergeant Kopf was going to come over to the house. Is that right?

A Yes. I gave you an answer that I made a mistake on, and I guess it was I didn't know that he was coming until the morning that he was there.

Q And so your deposition testimony that you knew he was coming the night before, that he was coming the next morning, you're saying that that was a mistake.

A Yes. That's the mistake that I made.

Q And when did you learn, when did you recall that that was a mistake?

A It's been a -- it's about a -- what do you want, like exact dates or --

Q Well, roughly when did you realize that you made a mistake in your deposition testimony, as you described it?

A About maybe six months after I realized that I said that.

Q And please tell me the circumstances of that. Were you -- what were you doing? What caused you to think about this, this specific question? What was going on at that time? What were you doing?

A Let me see.

Q Were you talking with someone?

A (No response.)

Q Your deposition was in December of 2006. Is that right?

THE COURT: Are you going to keep asking her questions, or are you going to let her answer one of those?

MR. BRYANT: I'm trying to help her out is what I'm trying to do.

THE COURT: If you want to withdraw the question, you can ask her another one, but you can't keep asking her questions. I'm waiting for an answer.

MR. BRYANT: Yes, Your Honor. I'll withdraw the question, and we'll try to work through this.

BY MR. BRYANT:

Q Your deposition was in December of 2006. Is that right?

A I don't remember when it was. I don't remember the date.

Q If you could turn to the beginning of this document that's in front of you, DX-9D, page DEF 1833. Are you there?

A 1833?

Q Yes. DEF 1833. It's just about 20 pages, 23 pages in front of where you were before. Are you there?

A Yes.

Q Okay. Now, this is a -- it says a deposition of Noretta High Hawk at the top right-hand corner. Do you see that?

A Yes.

Q And the date in the middle of the document is December 14, 2006, at 10:25 a.m. Does that refresh your recollection of when the deposition was?

A Yes.

Q So it was in December of 2006?
A Yes.
Q And I think you said a moment ago that six months after the deposition is when you recall that you made a mistake with your answer relating to when Sergeant Kopf -- when you had knowledge that Sergeant Kopf was going to be coming over the morning of January 7. Is that right?
A (No audible response.)
Q And so that would be in mid-2007. Is that correct?
A Yes.
Q And can you tell me what you were doing at that time?
A Actually I was reading -- I can't remember; I think it was a Reader's Digest about women telling their story about recruiters, you know, treating them wrong, taking them out and treating them bad, and then that's when I remembered the situation that I did during this deposition.
Q And did that article, did that cause you to be angry?
A No.
Q Did it cause you to be upset?
A No.
Q Did it trigger sort of memories of what happened

to Lavetta or no?

A No. I just thought about what I said during this deposition, and I kind of got mixed up myself in that situation, about saying the wrong thing that I said I knew the night before when I knew that the recruiter came the morning of.

Q And did you talk to anybody about your deposition testimony, that specific part of it, about knowing that Sergeant Kopf was going to arrive? Did you talk about that with anybody else?

A I don't remember.

Q But you felt like your memory six months later was better than your memory on the day of the deposition?

A Yes. Six months later.

Q And did you think of that specific question, about Sergeant Kopf, knowing when he was going to arrive on January 7? Was that the specific thing you were thinking of, or were you thinking of your entire deposition?

A I guess I was just thinking about the whole thing.

Q And that's -- was there anything else that you found that was mistaken about your testimony?

A No. I don't remember.

Q And what did you testify? What did you testify as to how you learned about Sergeant Kopf arriving on

January 7, knowing about that at the time of the deposition, which you now think is mistaken?

A Could you say that again?

Q The information -- at the time of your deposition in December of 2006, when you're now saying that your testimony was mistaken, that you knew the day, you knew on January 6 that Sergeant Kopf would be arriving the next morning, do you recall where you thought you received that information, from who?

A No. I don't remember.

Q If you'd turn to DEF 1867, this is going to be a little bit long, so --

THE COURT: Can you explain to me the relevancy, I guess, of the difference between her answer in the deposition and her recollection now, in terms of how it applies to any issue in the case?

MR. BRYANT: It goes to credibility, Your Honor.

THE COURT: So everything that she said that you think is inaccurate goes to credibility?

MR. BRYANT: I don't think it's everything, Your Honor, but this is a pretty important piece of when Sergeant Kopf was arriving.

THE COURT: Okay. Go ahead.

BY MR. BRYANT:

Q On line 6 -- I'm starting there, just to shorten

this; it's still going to be long -- "So I thought I told him, you know, well, if you pass --you know, if you take your papers that they need -- I don't know, because there was -- I remember her mom was telling me that they lost her Social Security card and something, and they needed copies of them, so they were taking her down there for that again to Sioux Falls, so --

"And then I've heard of people that, you know, they just take them from Sioux Falls right away, and they leave. So I thought maybe that's what they were going to do to her, so I went down there in the morning time, hugged her, and she left, and then I went home, and that's when I got the call from her that this incident happened."

Question: "And when did you hear that she was going to be taken to Sioux Falls at 6:00 or 7:00 in the morning?"

Answer: "Actually the night before. I can't remember what I went down there for, but I went down there, and that's when they told me Lavetta was going to be leaving in the morning.

"And who told you that?"

Answer: "Her mother did."

Question: "And she said that she was leaving in the morning with -- to go to Sioux Falls."

Answer: "Uh-huh."

Question: "And that was for -- because I think you mentioned, lost papers. Is that --"

Answer: "Yes. Lost paperwork. They lost her important papers that she needed, documents, Social Security card."

Question: "And so you went over there, I guess, before 6:00 or 7:00 in the morning to say goodbye."

Answer: "Oh, about 7:00, because whenever the buses were going by, and yeah."

And then down on line 19 or line 18 -- I'm sorry. Line 19, question: "Yes, sure. No problem. You said that night before Lavetta's mom told you that she was going to Sioux Falls the next day for -- because the Army had lost papers. Is that correct? And so you came by the next morning to say goodbye to her."

Answer: "Yeah."

And so that discussion there about them, the Army, taking them away, were you referring to recruits going down to Sioux Falls and then being enlisted and then immediately going off to a duty station?

A Yes.

Q And so you'd want to say goodbye to Lavetta before that, because you loved her and you're close to her. Is that right?

A Yes.

Q And it would be a significant thing if she were to depart without you having a chance to say goodbye. Is that right?

A Yes.

Q And you did go over the morning of January 7, the incident, and hugged her goodbye. Is that right?

A Now that I -- yes. Now that I read this and remember, yes.

Q Okay.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Okay. Any redirect?

MR. HOROWITZ: No further questions.

THE COURT: Then the witness excused with the thanks of the Court.

(Whereupon, the witness was excused.)

THE COURT: Think we can squeeze one more in, Mr. Horowitz?

MR. HOROWITZ: Pardon me?

THE COURT: Think we can squeeze one more witness in?

MR. HOROWITZ: What time are we going to go to?

THE COURT: Well, I was originally going to go to 5:15, but the building doesn't shut down until 5:30, so if you have somebody here that you don't want to have come back tomorrow and you think you can get them in, we can still do

it.

MR. HOROWITZ: Yes. We're going to call Jerilyn Elk.

Whereupon,

JERILYN ELK

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Please take a seat.

THE WITNESS: (Complying.)

THE COURT: Without prejudicing you in terms of the questions you're going to ask, let's see if we can finish this witness and not bring her back for two minutes in the morning, but if it turns out we need more time, we'll call her back, so we'll just see.

MR. HOROWITZ: I think we can do it.

THE COURT: All right. Go ahead.

MR. HOROWITZ: Did you want to --

THE COURT: Oh, I'm sorry. Correct. I'm going to have you begin by stating your name for the record, and then please spell it.

THE WITNESS: Okay. My name is Jerilyn Elk.

THE COURT: You got to get a little closer to the microphone for me.

THE WITNESS: Oh, okay.

THE COURT: Go ahead.

THE WITNESS: My name is Jerilyn Elk, and you spell it with a J-E-R-I-L-Y-N, Elk, E-L-K.

MR. BRYANT: Your Honor, did you administer the oath? I didn't hear it.

THE COURT: I did.

MR. BRYANT: I'm sorry. My apologies.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q What is your relationship to Lavetta Elk?

A She's my youngest daughter.

Q Okay. And how many children do you have?

A I have seven.

Q Okay. Do you live with Lavetta?

A Yes.

Q Okay. And other than a couple years when she was traveling, have you lived with her her entire life?

A Yes.

Q Okay. How wold you describe Lavetta as a child, her personality and things of that sort?

A Throughout the school years, she's been well liked by the teachers, family. She's very popular at school.

Q Okay. Did she -- what kind of grades did she get growing up?

A She got A's and B's.

Q And what sort of activities did she participate in outside of school?

A She was in basketball and volleyball. She was the captain of the volleyball team.

Q Okay. Did she get any awards or accolades in school?

A Yes. Basketball, her team won Big Foot Conference, which is reservation-wide. As a child, in kindergarten, she brought trophies back for the nursery rhymes and things that she did. She was well liked at school.

Q All right. Did Lavetta work in high school?

A No.

Q Okay. Did she do volunteer work?

A Oh, yes. Yes. She did some volunteer work.

Q Okay. What kind of volunteer work did she do?

A Helping her other students trying to get through school.

Q And what sort of things did she do?

A Studying or helping, any problems, even just sitting and listening. She would be a listener.

Q Did she do any youth work off the reservation elsewhere around the country?

A I'm not aware of any.

Q Have you heard of a program called Youth

Opportunity?

A Oh, yes. Yes. That was through the summer, summer program.

Q Okay. Was Lavetta involved in Youth Opportunity?

A Yes.

Q What is Youth Opportunity?

A Youth Opportunity is a program that helps the children through the summer try to get -- earn money, plus try to get help through schooling.

Q And what sort of role did Lavetta have in Youth Opportunity?

A Lavetta helped with some of the children, to get their GED through the college center. She was there to help.

Q Did you have any major trouble with Lavetta growing up, or was she --

A No.

Q -- pretty much an easy child?

A No. I never had any trouble with her.

Q Ever get calls from the school that Lavetta's getting into trouble or anything like that?

A No.

Q Did she have any emotional problems that you ever had to take her to the doctor for?

A No.

Q Okay. Do you remember ever getting into big trouble at school?

A No.

Q How long was Lavetta involved in that Youth Opportunity program?

A It was a summer program. It goes a couple years that she was involved in it.

Q And this was in her high school years?

A High school year.

Q When did Lavetta first talk -- start talking about the military?

A In her junior year.

Q And in your family, can you share with us, you know, a little about the military history of your family?

A My father, my grandfather, my husband's father, and most -- a lot of relatives, her bigger brother, her older brother, were in the military, and she wanted to join the military, to be the first woman in our family to wear the uniform.

Q And how did you feel about that?

A I was very proud of her.

Q Were you also a little worried?

A Yes. I was worried.

Q Now, when did you first hear about her recruiter, Joseph Kopf?

A In the junior year. I can't recall the date, but I know she mentioned that she was talking with a recruiter so she can join.

Q And did you encourage her in the pursuit of this interest of hers?

A I was kind of skeptical. I wasn't really -- I didn't really want her to, because of all the things I've heard, but I knew this is what she wanted.

Q Did she talk about joining the military often?

A Yes. She wanted to. She really wanted to. She wanted to be a -- have a medical career.

Q Was there a particular branch that she was interested in?

A Yes. The -- she never told me exactly the branch, but always she wanted to be a doctor.

Q Okay. When was the first time that you met Joseph Kopf, the sergeant?

A I met him at the Rushmore Mall, at the recruiting center.

Q Okay. And did you travel to the recruiting center to meet with him?

A Yes.

Q Okay. And who were you with?

A We were -- my husband and I and Lavetta and her brother, Emerald. They both wanted to join the military

together.

Q And what happened during that meeting?

A Emerald had signed up to join, and we got to visit with him. He seemed pretty nice.

Q Okay. Did you get along with Sergeant Kopf when you met him?

A Yes.

Q Okay. This was when Lavetta was in the eleventh grade?

A Yes.

Q Okay. Now, in her junior and senior years, do you remember Sergeant Kopf coming to the house?

A Yes.

Q And what took place during those visits?

A Most of the time, he would tell us where she was going or what they were going to do.

Q Okay. And what sort of things were they doing?

A Most of the time he would tell us about her height and weight, that she wouldn't pass the height and weight.

Q And did Lavetta ever accompany Sergeant Kopf on recruiting trips to see other children on the reservation?

A Yes.

Q Okay. And were you okay with that?

A Yes. I wasn't, but I had to -- I wasn't

comfortable with that, but she was trying to help.

Q Did you think that Sergeant Kopf was interested in her future?

A Yes.

Q Okay. And was looking out for her best interests?

A Yes.

Q Okay. How many times do you think you saw Sergeant Kopf at your home?

A I wasn't counting, but maybe four.

Q And did you provide Sergeant Kopf -- did Sergeant Kopf provide you with any literature about Lavetta's opportunities in the military?

A Just Lavetta would show me what he gave her, so I would see through there.

Q Okay. Now, did there come a time when Lavetta opted to go to college instead of joining the military?

A Yes.

Q Okay. Do you know how that came about?

A She was awarded a four-year college for graduation.

Q Okay. And that was at Rockhurst?

A Yes. Rockhurst University.

Q And do you know why she came home from Rockhurst initially?

A She came home, because I had a relative that passed away.
Q And when she came home, did Sergeant Kopf continue to recruit her?
A Yes.
Q He would call or how would he get in touch with her?
A She would tell me he called or he emailed her.
Q And while she was home from college, did she start thinking about the military instead of returning to college?
A Yes.
Q Okay. Now, do you remember the events of January 7, 2003?
A Yes.
Q Okay. Now, did you see Sergeant Kopf that morning?
A No, I didn't.
Q Okay. Where were you when he arrived?
A I was inside the house, and I heard he was -- he pulled in outside.
Q Now, had you spoken to him recently before that?
A No.
Q Okay. Do you remember being on the phone with him the night before?

A Oh, yes. The night before I spoke with him, because Lavetta was feeling nauseous, and she was throwing up, and she mentioned about this shot that they gave her. And she went to the doctor. She went to see why she was feeling this way.
Q Okay. Did he say anything about, Hey, I'm going to see Lavetta tomorrow, or anything like that?
A No. He never mentioned coming to our home.
Q All right. Now, when Sergeant Kopf pulled in to your driveway, did you see Lavetta come into the house?
A She went out to see what he wanted, and she came back in.
Q Okay. And did you speak with Lavetta and ask her where she was going?
A Yes. That's when she told me that she had to go.
Q And where did she say she was going?
A She said Sergeant Kopf had told her that she had to go to Sioux Falls to do the height and weight evaluation.
Q You said goodbye?
A Yes.
Q Okay. And when was the next time you spoke with Lavetta?
A Not until the next evening.
Q Okay.
A That evening. That evening.

Q That evening?

A Yes.

Q What happened that evening?

A She didn't tell me what happened exactly. I heard from her aunt and her sister, but the next -- that night I asked her what was happening, and she just said that he did something bad to her.

Q Okay.

A And she was crying. I couldn't really -- I didn't want to hear what she was going to tell me.

Q You mentioned that she was crying.

A Uh-huh.

Q In the 19 years that you had known her, had you ever seen her cry like that?

A No.

THE COURT: I'm sorry. I need you to say that one more time a little bit louder.

THE WITNESS: Could you repeat the question?

BY MR. HOROWITZ:

Q Yes. In the 19 years that you had known her, had you ever seen her cry like that?

A No. Never heard her cry that way.

Q Did she continue to cry at home for a long time after that?

A Yes. She was crying. She was upset. She didn't

eat. She didn't feel good at all.

Q Okay. Now, at home, do you usually sit down and eat dinner as a family?

A Yes.

Q Can you tell me how her eating habits -- what her eating habits were like after the assault?

A She didn't eat. Then there was times that she did eat, and then she would throw it up. She didn't eat; she didn't sleep. I'd catch her sitting up at night.

Q Before the assault by Sergeant Kopf, did she eat like any of your other children?

A Yes. She was happy. She hate when everybody ate. She was happy to tell us about her day.

Q And before the assault by Sergeant Kopf, did she sleep like a normal --

A Yes.

Q -- 18-, 19-year-old?

A Yes.

Q Okay. What kind of other changes in her behavior did you see immediately after the assault?

A She had mood swings. She didn't sleep, and she hardly ate. She'd throw up. She didn't talk much either.

Q I'm sorry. You said she didn't talk much?

A She didn't talk much at all.

Q Before the assault, was she a chatty, talkative

girl?

A Yes. She would always be laughing and telling me things. She was happy.

Q And how would you describe it afterwards?

A She was a completely different person than the loving child that I had.

Q Did you ever ask her what kept her up at night?

A Yes. She told me she'd have dreams of seeing him or hearing him saying things to her, and she couldn't sleep.

Q And were there certain events that would cause her to think about -- that she told you, that caused her to think about Sergeant Kopf more than other things?

A Most of the time it was she couldn't sleep. Most of the time she'd say she'd hear him, she'd see him in her dreams.

Q Okay. After the assault, did Lavetta ever talk about joining the military again?

A No.

Q Now, did there come a time when Lavetta decided to leave Pine Ridge Indian Reservation?

A Yes.

Q Okay. Did you talk to her about that decision?

A I tried to talk and understand what she was going through, but she needed to go and find herself and try to get better.

Q And did you support her?

A Uh-huh.

Q Yes?

A Yes.

Q And did you keep in touch with her?

A Yes. She would call me and tell me she was okay.

Q And would you --

A But it was very hard for me to let her go.

Q Did she report to you about how she was dealing, coping with the effects of the assaults?

A Yes.

Q What kind of things would she tell you when she was away from the reservation?

A One time she called me and told me that --

MS. COSTELLO: Objection, Your Honor.

THE COURT: Which one of you is going to be dealing with this witness?

MS. COSTELLO: Me.

THE COURT: Okay.

MS. COSTELLO: Ms. Costello. This is hearsay, reporting Lavetta's statements.

THE COURT: This one, I think, is, Mr. Horowitz. Some of the ones before probably were covered by present sense impressions, but this one is a time after that we're talking about things here.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Did you form an impression as to whether Lavetta was getting over this assault or whether she was still haunted by it while she was away?

A Yes. I knew she was still haunted by it.

Q Okay. And why is that?

A Because one time she told me she felt like she seen him in an elevator.

THE COURT: She can talk about the basis for an impression. That's not hearsay, because she's not talking about the truth of it. She's just talking about the basis of her impression. It's not hearsay.

MS. COSTELLO: Yes, Your Honor.

MR. HOROWITZ: I don't know if the answer got cut off by the objection.

THE COURT: Well, ask that question one more time.

BY MR. HOROWITZ:

Q Why did you come to believe that she was still haunted by what Sergeant Kopf did to her while she was living off the reservation?

A She told me one time she was in an elevator and she felt like she seen him, and she couldn't sleep again. She was throwing up. She couldn't handle it.

Q How would you describe Lavetta's relationship with her husband?

A It's a trying one. She's moody, but he stands by her, tries to understand, but I see the hurt in his eyes, but still he loves her, so he stands by her.

Q And how would you describe her relationship with her young children?

A She loves her children.

Q Does she sometimes struggle with being close to them?

A Yes.

Q How does that sort of play out?

MS. COSTELLO: He's leading.

THE COURT: You are leading.

BY MR. HOROWITZ:

Q How does it manifest itself, any problems she may have with her children?

A Sometimes she calls me and asks me, I feel this way, you know. And I tell her, No, you be patient with your babies. She's still hurting. I know she is.

Q Before Sergeant Kopf assaulted Lavetta, did you have the impression that he was someone that she trusted?

A Yes.

Q Before --

MS. COSTELLO: Objection. This is speculation,

Your Honor.

THE COURT: No. I don't think that is. Go ahead and ask the question again.

BY MR. HOROWITZ:

Q Before Sergeant Kopf sexually assaulted Lavetta, did you have the impression that this was someone that she trusted?

A Yes.

Q Does Lavetta ever talk about joining the military anymore?

A No.

MR. HOROWITZ: I have no other questions.

THE COURT: Cross-examination?

MS. COSTELLO: Yes, Your Honor.

THE COURT: All right. It's going to be tomorrow then, because we have to be vacated by 5:30, and I don't see any way we're going to do that and even ask a few questions. So despite trying to avoid having you come back tomorrow morning, you're going to have to come back tomorrow morning.

THE WITNESS: Okay.

THE COURT: All right. So we will resume tomorrow morning at 9:30. That's the time we're starting up. If it turns out that I feel like we can complete on Wednesday if we start at 9:00, you might want to keep in the back of your mind the possibility that I might want to move

it a little bit earlier. We do not have any options to move later, because the courthouse closes at 5:30. The courthouse, however, is open to the public at 7:30 in the morning, so if we need to pick up some time, we're going to pick it up earlier in the day, not later, so you might want to keep that in mind in terms of lining up your witnesses, to make sure that that half-hour time change on Wednesday wouldn't create a lot of difficulties.

All right. So at this point, I don't know whether we're going to do it or not. We'll see how we're doing, but if I get to the point where I thought I could finish on Wednesday with another half-hour or so, then I'm going to take that half-hour and try to use it.

Yes, Mr. Bryant.

MR. BRYANT: I was just going to say, yes, Your Honor, and then we have some housekeeping matters, just to remind you.

THE COURT: Well, let's do those housekeeping things first thing in the morning, because I do not want to leave the marshals hanging out there.

MR. BRYANT: Yes, Your Honor.

THE COURT: Yes, Mr. Horowitz?

MR. HOROWITZ: Can I find out what the housekeeping matters are?

THE COURT: I have a feeling it has to do with

admission of the document. So, again, just make sure that you're both in agreement as to what the page numbers are. I don't want to have a disagreement tomorrow morning regarding which of the page numbers we're talking about in terms of the admission of the exhibits that were used for purposes of impeachment. All right?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. So if you need to work it out, work it out tomorrow morning. Okay?

All right then. Any other questions?

(No response.)

THE COURT: All right. Then we will resume tomorrow morning at 9:30. I'm just going to ask you to leave promptly so we don't leave these marshals outside the normal routine.

(Whereupon, at 5:27 p.m., the trial in the above-entitled matter was recessed, to reconvene at 9:30 a.m., Tuesday, April 29, 2008.)

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NUMBER: 05-186L

CASE TITLE: Lavetta Elk v. USA

DATE: April 28, 2008

LOCATION: Rapid City, South Dakota

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 5/15/2008

Carol Dawley
Official Reporter
Heritage Reporting Corporation
1220 L Street, N.W.
Washington, D.C. 20005