UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-186L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 272 through 521

Place: Rapid City, South Dakota

Date: April 29, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-186L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

3rd Floor Courtroom
U.S. Courthouse
519 9th Street
Rapid City, South Dakota

Tuesday,
April 29, 2008

The above-entitled matter resumed for trial, pursuant to recess, at 9:30 a.m.

BEFORE: HON. FRANCIS M. ALLEGRA
Judge

APPEARANCES:

For the Plaintiff:

ADAM D. HOROWITZ, ESQ.
Herman & Mermelstein, P.A.
18205 Biscayne Boulevard, Suite 2218
Miami, Florida 33160
(305) 931-2200

For the Defendant:

STEVEN D. BRYANT, ESQ.
SARA E. COSTELLO, ESQ.
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424

LANNY ACOSTA, JR., ESQ.
U.S. Army Legal Services Agency
901 North Stuart Street, Suite 400
Arlington, Virginia 22203
(703) 696-1636

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Jerilyn Elk | -- | 283 | -- | -- | |
| Jacqueline Randall | 289 | 292 | -- | -- | |
| Stephen Manlove | 295 | 347 | 426 | 438 | |
| Donald Frankenfeld | 439 | 461 | -- | 491 | |
| Lea White Bear Claws | 495 | 506 | 516 | 516 | |
| For the Defendant: | | | | | |
| None | | | | | |

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| PX-4 | (previously) | 505 | Cangleska records, pages 3 and 4 |
| PX-21 | (previously) | (withdrawn) | (Not furnished) |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
| --- | --- | --- | --- |
| DX-5 | (previously) | (withdrawn) | Stephenson report |
| DX-6C | (previously) | (rejected) | Cangleska record, page 1105 |
| DX-21 | 399 | -- | Manlove interview notes |

P R O C E E D I N G S

(9:30 a.m.)

THE CLERK: The United States Court of Federal Claims is now in session. The Honorable Francis M. Allegra presiding. Please be seated.

THE COURT: I know we might have some preliminary things, so let me just go through each of the attorneys. First, Mr. Horowitz, anything that we need to take up before we go back to the witness from you?

MR. HOROWITZ: Yes.

THE COURT: Go ahead.

MR. HOROWITZ: I'm sorry?

THE COURT: I said, anything we need to take up before we go back to the witness from you?

MR. HOROWITZ: No, Your Honor.

THE COURT: Okay. Mr. Bryant, you had talked about potentially dealing with some exhibits first thing here. Do you want to do that now, or do you want to wait for some reason now?

MR. BRYANT: That's fine with me, Your Honor.

THE COURT: Go ahead. Why don't you tell me what you need to do.

MR. BRYANT: First with respect to DX-6C, those are a portion of the medical records. We actually intend to --

THE COURT: Why don't you go ahead and stay seated, Mr. Bryant, so you'll be closer to the microphone. Go ahead.

MR. BRYANT: Yes, Your Honor. We used a portion of those in the cross-examination of Ms. Elk. I'm going to admit more of those documents through our experts, so I thought it might be easier just to hold off on that till later.

THE COURT: Okay. And I think that would make sense. And the pages that you're going to seek to admit through the expert would allow you to be able to combine them up, both the two different uses? In other words, the pages that you used with her cross-examination, together with what the expert is going to be using?

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. Well, let's wait and do it that way then. There was a second exhibit then?

MR. BRYANT: There were a few. DX-9C was the deposition of Ms. Elk, and we have a select number of pages that I can read off.

THE COURT: What I want you to do is together with me -- since they're in the book, I'm not worried about that, but I would like the reporter to get an exhibit that just includes the hard pages of the ones that you're going to include, rather than just reading them off, because

that's the clearest way, making sure that we've got the right ones.

MR. BRYANT: I will do that.

THE COURT: And the thing, by the way, that Mr. Horowitz needs to do is, depending upon the usage that you put to that deposition, he has the option of the rule of supplementing the -- to provide context, for example, to something, so what I think I want you to do on that one is pull the pages that you think are -- that you used, give him an opportunity to make sure that there's not like half a page before that or a half a page after that that he wants to add in to the exhibit, and then just go ahead and provide one copy of that to the reporter, and then, yes, you can read the pages into the record at the appropriate time. I just want it as a double-check to make sure I have a physical copy that includes just the correct pages.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay?

MR. BRYANT: And that same would apply to DX-9D, which is also -- that's the deposition of Noretta High Hawk.

THE COURT: All right. And let's use the same procedure there. So pretty much one copy that you can give to the reporter that pulls the pages, but giving Mr. Horowitz the opportunity to make sure that he doesn't need to add -- and just to make sure, the way the rule talks

about is to provide context so that -- so we're not talking about adding in page after page here. We're talking about if he thinks a question right before that somehow provides context or a question right after provides context under the rule, he has the option of adding those in.

So just give those pages to him at your earliest opportunity, which may be the lunch break. Figure out whether or not he needs something from, you know, the page before, for example, and then that physical copy would be something that we would give to the reporter right at the start of the afternoon session, and then you can read the pages into the record at that point, and we'll admit those exhibits for that purpose.

MR. BRYANT: Okay. The two documents that are going to be going in in their entirety, Your Honor, are DX-18, which is Ms. Elk's statement of January 7, '03, DEF 0096 through 97.

THE COURT: I thought -- I had listed, I guess, that that was already in, 15 through 20, I thought was in of your exhibits.

MR. BRYANT: I think for the purposes of our expert relying on them. I think that was the --

THE COURT: Well, I understand the caveat, but to a certain extent, once a document's in the record, it can't be admitted a second time.

MR. BRYANT: Fair enough.

THE COURT: But your point is that you want to rely on 18 for more than the fact that it's being relied upon by the expert, essentially for impeachment purposes. Correct?

MR. BRYANT: That's correct, Your Honor.

THE COURT: All right. I think that with that understanding, that helps us determine the appropriate use of that document. So that was 18. You said there was another one like that?

MR. BRYANT: DX-13 is the supplemental answers to Defendant's interrogatories, and we would admit that entire document as well.

THE COURT: All right. I had 13 already in. Was that in for some other limited purpose previously? I had 12 and 13 in.

MR. BRYANT: Okay. It would be the same thing, for the reliance of our experts. It would be the same exact question.

THE COURT: Well, did it come in with that limitation? I didn't think it did.

MR. BRYANT: It did not? I guess there just was no objection, because it's an admission of the Plaintiff. Well, in any event, I have 13 already admitted, so I don't think we need to readmit it.

MR. BRYANT: Fair enough, Your Honor. All right. That just leaves 9C and 9D which we talked about, and DX-12 which is part of that, and you said those are already in as well, so I won't refer to those. So we'll deal with 9C and 9D at the break, and deal with 6C with our expert later on.

THE COURT: All right. Sounds good, Mr. Bryant. There's one other -- a PX, Your Honor, 21, that I believe Plaintiffs are withdrawing. We haven't received it, and it's not in the exhibit binders, PX-21.

THE COURT: 21 has been withdrawn? Well, I have 21 as being admitted, so --

MR. HOROWITZ: It's withdrawn.

THE COURT: I'm sorry?

MR. HOROWITZ: It's withdrawn.

THE COURT: It's withdrawn.

MR. HOROWITZ: Yes. I think we --

MR. BRYANT: It was admitted yesterday, Your Honor. We discovered it's not in the binder, so --

THE COURT: All right. So 21 -- all right -- should not have been admitted, so basically then those numbers would have been 22 through 27 were admitted. All right. Anything else housekeeping-wise, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Okay. Anything else, Mr. Horowitz?

MR. HOROWITZ: No. But I think I was informed

that one of the experts was withdrawn by Defendants. Is that correct?

MR. BRYANT: Oh, that's correct. Actually Dr. Stephenson we are not going to call to testify in light of Ms. Elk's testimony.

THE COURT: All right. So Dr. Stephenson's not coming either. All right. So the -- all right. Thank you for letting me know that.

MR. BRYANT: And I guess what follows with that, Your Honor, is DX-5, we won't be admitting that either. That's her expert report.

THE COURT: All right. Well, it's not admitted now, so I guess the answer is you're not going to attempt to.

MR. BRYANT: It's withdrawn.

THE COURT: Okay. All right. Mr. Horowitz, anything we need to do before going back to the witness?

MR. HOROWITZ: Nothing else.

THE COURT: Would you please go get her then?

MR. HOROWITZ: Certainly.

Whereupon,

JERILYN ELK

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

THE COURT: Whenever you're ready.

CROSS-EXAMINATION

BY MS. COSTELLO:

Q Good morning, Ms. Elk.
A Good morning.
Q I'm Sara Costello. You live on the Pine Ridge Reservation. Right?
A Yes.
Q And your children grew up on the reservation?
A Uh-huh. Yes.
Q Living conditions are hard on the reservation?
A Yes.
Q I'd like to ask you a few questions about after Lavetta's assault.
A Uh-huh.
Q After the assault, she visited the Pine Ridge Hospital for psychological treatment. Correct?
A Yes.
Q Lavetta told you she didn't like the treatment and the medication prescribed by the doctors at the Pine Ridge Hospital. Right?
A Yes.
Q There were rumors going around the reservation that Lavetta was raped by Sergeant Kopf. Right?

MR. HOROWITZ: Objection, Your Honor. Exceeds --

THE COURT: What's the relevance, Counsel?

MS. COSTELLO: I think it goes to the witness's understanding of what happened and may --

THE COURT: You need to be more specific. Why do you need to pose that question?

MS. COSTELLO: I think it goes to the credibility of this witness and how --

THE COURT: Too anomalous. Sustained.

BY MS. COSTELLO:

Q You testified that Lavetta was depressed when she was in Milwaukee. Right?

A Yes.

Q Other than the assault, are there other events that had an impact on Lavetta?

A Not as extreme as this one. Only that we had a relative that passed away, a close relative.

THE COURT: Can I ask you to stay just a little bit closer to the microphone?

THE WITNESS: Okay.

THE COURT: Thank you.

BY MS. COSTELLO:

Q In the past few years, Lavetta has had miscarriages. Right?

A Yes.

Q More than one?

A Yes.

Q There was a burial service for Lavetta's stillborn baby. Right?

A Uh-huh. Yes.

MR. HOROWITZ: Objection to the relevance.

THE COURT: No. I think that's relevant. Go ahead. Please ask the question.

BY MS. COSTELLO:

Q Who attended the service?

A The family and Lavetta and the minister.

Q Did Mr. Swallow, the medicine man, attend?

A No.

Q And how did Lavetta appear at the service?

A She was sad. She lost a boy. We were all -- we were devastated by it. All of us were devastated by it.

Q And how far along was Lavetta when she miscarried?

A She was 14 weeks.

Q And was she showing?

MR. HOROWITZ: Objection. Relevance, Your Honor.

THE COURT: I think it's already been established that this is relevant, and I would appreciate you not asking -- posing objections that you know I'm not going to sustain.

BY MS. COSTELLO:

Q Was she showing --

THE COURT: Let me pause. If you want to make a continuing objection, you can do so for record purposes, but at this point, I think it's rather clear what I think about the relevance of this matter, and I don't want you interrupting the witness.

MR. HOROWITZ: I understand, Your Honor. I'll just leave a standing, continuing objection. And we're also at certain points exceeding the scope of the direct.

THE COURT: I don't think we are, because I think that since of scope of direct was talking about the nature of her depression and what caused it, that this is relevant as a theory for something that might be an alternative source.

Continue with the questioning.

BY MS. COSTELLO:

Q Was Lavetta showing when she miscarried?

A No.

Q The miscarriages caused Lavetta a lot of sadness. Right?

A Yes.

Q Lavetta didn't seek any help from a psychologist or a therapist to deal with this sadness. Right?

A She confided in family, mostly family. In our culture, family, I or her aunties or her sisters, you know, so the female side of the family is what she confides in.

Q So she confided in family, but she didn't seek any help from a psychologist or a therapist. Right?

A No.

Q Lavetta got married in January 2004. Right?

A Yes.

Q And you didn't find out Lavetta was married until much later. Right?

A Yes.

Q In fact, you found out right after you gave your deposition in December 2006. Right?

A Yes.

Q And Lavetta's relationship with her husband has helped her. Right?

A Yes. Very much.

Q In the past couple of years, Lavetta has had two sons. Right?

A Yes.

Q And having these children has brought a lot of happiness to Lavetta's life. Right?

A Yes.

MS. COSTELLO: No more questions.

THE COURT: Any redirect?

MR. HOROWITZ: No redirect.

THE COURT: You're excused with the thanks of the Court.

THE WITNESS: All right. Thank you.

(Whereupon, the witness was excused.)

MR. HOROWITZ: The next witness is going to be Jackie Randall.

THE COURT: Go ahead. Thank you.

MR. BRYANT: Just to let the Court know, this witness was withdrawn and, I guess, is being added back in.

THE COURT: I don't see it withdrawn on my list. Is it something there was communication between the two of you?

MR. HOROWITZ: No. It wasn't formally withdrawn. I made a comment to opposing counsel that Jackie wasn't responding to the subpoena. It was never formally withdrawn. I was sort of giving him a heads-up that she might be withdrawn, but it was never formally withdrawn.

THE COURT: Well, I don't have it as withdrawn, so as far as I'm concerned she --

MR. BRYANT: My mistake.

MR. HOROWITZ: I was extending him a courtesy.

MR. BRYANT: I appreciate that.

(Pause.)

Whereupon,

JACQUELINE JUANAMARIE RANDALL

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Please take a seat.

THE WITNESS: (Complying.)

THE COURT: I'll have you start by please stating your full name for the record, and please spell it.

THE WITNESS: Jacqueline Randall. My first name is J-A-C-Q-U-E-L-I-N-E; middle name is J-U-A-N-A-M-A-R-I-E, Randall, R-A-N-D-A-L-L.

THE COURT: And if I could ask you to get a little bit closer to that microphone so we can hear you.

THE WITNESS: (Complying.)

THE COURT: All right. Proceed, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Can you please tell us where you live.

A In Kyle, South Dakota.

Q Okay. And is that on the Pine Ridge Indian Reservation?

A Yes.

Q Okay. And how is it that you're related to Lavetta Elk?

A Cousin.

Q Okay. Is this first cousins or extended cousins?

A Extended.

Q Okay. Do you see Lavetta often?

A Every so often.

Q Okay. Can you give us an idea of how often you see Lavetta?

A Probably once or twice a year.

Q Okay. Now, do you recall her coming to your house on January 7?

A Yes.

Q Okay. Who dropped her off that day?

A Army recruiter.

Q Okay. And when she came in the house, were you in the home?

A Yes.

Q Okay. And were you the first person that saw her?

A Yes.

Q Okay. And what was her emotional state when she walked in to your house?

A Hysterical. She was crying. I couldn't figure out what was wrong with her.

Q Did you try and calm her down?

A Yes.

Q How long did it take you to calm her down?

A About 20 minutes or so.

Q And when you finally -- when she was a little bit more calm, was she able to tell you bits and pieces of what took place?

A Yes. Eventually she told me.
Q Okay. Was it -- did you find it easy or difficult to get the words out of her about what happened?
THE COURT: I need you to speak as loud as you can.
THE WITNESS: It was difficult.
BY MR. HOROWITZ:
Q And what did you and Lavetta do after she finally started telling you bits and pieces about what took place?
A We went to a -- I asked her to repeat everything she told me to my boyfriend, because I believed he was coming back, the Army recruiter, so I was scared for her, because I didn't want her to go.
Q Did Lavetta appear scared that he was coming back?
A Yes.
Q And after she repeated her story to your boyfriend, what happened next?
A He got on the phone and called -- I can't remember who he called.
Q Okay. Did you subsequently go with Lavetta to the police department?
A No.
Q Okay. She went with somebody else?
A Yes. We had her call her mom.

MR. HOROWITZ: Okay. We have no other questions. Thank you.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. COSTELLO:

Q Good morning, Ms. Randall.

A Good morning.

Q I'm Sara Costello. You testified that you normally see Lavetta once or twice a year. Right?

A Yes.

Q And when you'd see Lavetta, she wouldn't talk about personal matters with you.

MR. HOROWITZ: Outside the scope of direct.

BY MS. COSTELLO:

Q Lavetta told you bits and pieces of what happened with Sergeant Kopf. Is that right?

A Yes.

Q And she didn't tell you exactly what happened. Right?

A More or less, yes, she did.

Q She was vague about the details?

A When she first walked in the house. Yes.

Q You weren't the first person to see her when she walked in the house. Right?

A My boyfriend opened the door. Then he brought

her to me.

Q After she left your house, you didn't see Lavetta again on January 7. Right?

A No. After she left the house, no.

Q You did see her again?

A After she left the house, no.

Q And you didn't speak with Lavetta again on January 7.

A After she left the house?

Q After she left the house.

A No.

MS. COSTELLO: No more questions.

THE COURT: Anything, Mr. Horowitz?

MR. HOROWITZ: No redirect.

THE COURT: Ms. Randall, you're excused with the thanks of the Court.

(Whereupon, the witness was excused.)

THE COURT: Next, Mr. Horowitz?

MR. HOROWITZ: I next intend to call Lea White Bear Claws, but I just want to check that she's here. Let me just check on that.

(Pause.)

MR. HOROWITZ: Your Honor, my apologies to the Court, but apparently Lea White Bear Claws is not here. She's having transportation issues.

THE COURT: Who's your next witness, Mr. Horowitz?

MR. HOROWITZ: I'd like to be able to call Dr. Manlove, but I hadn't anticipated him being called this early.

THE COURT: Well, you need to call someone.

MR. HOROWITZ: Can we take a ten-minute recess, and I can make a phone call?

THE COURT: We can take a ten-minute recess. At that point, I expect you to call a witness.

MR. HOROWITZ: Certainly.

THE COURT: Ten o'clock.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated.

Next witness, Mr. Horowitz.

MR. HOROWITZ: Next witness is Dr. Stephen Manlove.

THE COURT: All right. Very good.

Whereupon,

STEPHEN MANLOVE

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Please take a seat, sir. And could you begin by stating your name for the record and then please spell it.

THE WITNESS: Yes. My name is Stephen, S-T-E-P-H-E-N, Manlove, M-A-N-L-O-V-E.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Good morning, Doctor.

A Good morning.

Q Can you start off by telling us a little bit about your educational training?

A I attended St. Olaf College, Northfield, Minnesota. I went to Harvard University Divinity School for one year, from '77 till '78, University of Minnesota Medical School from 1978 until 1982. Then I went to the University of Virginia where I did a residency -- I did two residencies simultaneously. One was in internal medicine, and one was in psychiatry. Since then, I have done the things that I needed to do to get board certified in forensic psychiatry and done ongoing continuing medical education.

Q How long have you been practicing psychiatry?

A I've been out of residency since 1987.

Q And where are you licensed to practice psychiatry?

A I'm currently licensed in South Dakota and in New Mexico.

Q All right. And where is it that you actually

practice now?
A Excuse me?
Q Where do you practice now?
A I currently practice in Rapid City.
Q Okay. And where is your office located?
A It's 636 St. Ann Street, Suite 100, Rapid City, South Dakota. It's on the -- it's kind of the south side of town.
Q All right. And are you primarily a clinician or an expert witness?
A I spend about 80 percent of my time doing clinical work, and about 20 percent of my time doing forensic work.
Q And how many patients do you personally supervise in, say, a year, or whatever time frame is easiest to describe it?
A Yes. Well, I see about -- I think on the average, it's been about 600 new patients a year. I supervise nurse practitioners who are also seeing several hundred each themselves. And that's been pretty much the practice for the past three or four years. Before that, I supervised a larger clinic. We had about ten clinicians at that time who I supervised.
Q All right. You mentioned that you were board certified. What year was that?

A Board certified in internal medicine in, I believe it was, 1986, and in psychiatry in, I think it was, 1992, and in forensic psychiatry in 1996, and then I redid my boards in 2006.

Q Okay. And have you held any professional appointments?

A Excuse me?

Q Have you held any professional appointments? Do you want to defer to your CV?

A Well, I just want to be sure I'm understanding what you're -- I --

THE COURT: Could I have you pause for a second?

(Pause.)

BY MR. HOROWITZ:

Q Have you worked in any hospitals?

A Yes. I've worked primarily at Rapid City Regional Hospital, which is a local hospital here in Rapid City.

Q Okay. How long have you worked there?

A I've worked there since 1989.

Q And in what capacity?

A I've been both a staff psychiatry and the medical director.

Q The copy of your CV was admitted into evidence. Is that an accurate account of your professional activities?

A I believe so.
Q Okay. In your practice, do you work with many Native Americans?
A I do.
Q Okay. Can you give us a context?
A Well, there's three different settings. In our hospital, I average -- in the past four years I've averaged admitting about 350 patients each year, and out of that group, about 50 percent of them are Native American, so approximately 175 per year in that setting.

I also started and have been the medical director and clinical supervisor of a residential treatment center for adolescents. It's called Wellspring, and that is about 70 percent American Indian, and I see every child who goes through that program in the residential setting. I don't see every one in the outpatient setting. I see every one who goes through the residential setting. So I've gotten to know and gotten to interview many -- I suppose it's on the order of ten a month or so over the past ten years through that situation.

In my private practice, I have a lesser percentage of American Indian folks. It's probably more like 10 to 20 percent in that setting. I also am a -- I also do consultation at a facility called Black Hills Children's Home which is for younger children, and that is

over 50 percent American Indian children. And I supervise Catholic Social Services, their clinical staff, which has offices in Pine Ridge and in Rosebud and in Eagle Butte, which are all reservation towns, so they do primarily Indian folks in those settings.

Q Okay. And through your professional contacts with Native Americans, have you become acquainted with their culture?

A I think that I've obtained some acquaintance. Yes.

Q Okay. And did that assist you in formulating your opinions?

A Yes.

Q How many times have you been retained as an expert witness?

A It's --

Q Say in the past two years.

A In the past three years?

Q Two years.

A I think I've averaged doing about 25 or 30 cases per year.

Q And what percentage of your income is from expert work?

A About 20 percent.

Q Okay. Have you been qualified as an expert

before in court?
A Yes.
Q Okay. In federal court?
A Yes.
Q Here in South Dakota?
A Yes.
Q Have you provided expert testimony in cases involving victims of sexual abuse?
A I have.
Q Have you provided testimony in civil cases?
A I have.
Q And have you been retained in this case to form an expert opinion?
A I have.
Q And are you being compensated for your time here today?
A I am.
Q Okay. And on what subject matters were you asked to form an opinion?
A I was asked to form an opinion about the psychological injuries that may have occurred as a result of the assault and to assess the damage caused by the assault.
Q Okay. And did you --
MR. BRYANT: I'm sorry. I didn't hear the last part of that answer.

THE COURT: Go ahead. Please repeat.

THE WITNESS: To assess the damage caused by the assault.

BY MR. HOROWITZ:

Q And did you form an opinion within a reasonable degree of medical certainty on these matters?

A I did.

Q And what did you do to formulate your opinions on these subject matters?

A Well, I interviewed Lavetta Elk on a couple of different occasions, and I reviewed all the depositions. I could list those for you if you'd like me to. Would that be helpful?

Q Are they the ones mentioned in your report?

A I think there are more than the ones mentioned in my report. Would you like me to go through those?

Q Yes. Why don't you go through those.

A I reviewed the deposition of Lavetta Elk, Joseph Kopf, Emerson Elk, Jerilyn Elk, Noretta High Hawk, and Carol Weston. Those are the depositions I reviewed. And then I reviewed the legal briefs and so forth that were prepared in preparation for this case from you folks. I could review those, if you want me to tell you which ones I saw.

Q That's okay. Anything else?

A Yes. I reviewed Dr. Mills' report and his

rebuttal letter, the report by Dr. Stephenson, some of the reports from the Army which concludes that there was a sexual assault that took place. I reviewed the MMPIs.

MR. BRYANT: I didn't hear that last sentence. I'm sorry.

THE WITNESS: I reviewed the MMPIs. Is it better if I -- well, it seems like it reverberates if I do that.

THE COURT: It is reverberating.

THE WITNESS: Yes. I'm sort of --

THE COURT: Yes. I'm not sure about the placement of the speakers, because I'm hearing him fine, so it must just be the way the courtroom is oriented.

THE WITNESS: If you'll let me know, then I'll try to do better.

I reviewed the cultural situation on the reservation. I think that that plays a significant role. I've talked with many -- I've had the opportunity to interview, as I've said, thousands of Indian folks and seen their response to trauma and seen their response to similar situations to this.

BY MR. HOROWITZ:

Q And in your experience as an expert witness, are these the types of methods you would use to normally go about forming an opinion?

A They are.

Q And at the end of reviewing all these documents and materials, what diagnosis did you give Lavetta Elk?

A Post traumatic stress disorder and major depression.

Q Okay. And can you explain to us in the simplest terms that you can what post traumatic stress disorder is?

A Sure. I can tell you exactly what the DSM says about it. That might be helpful. The central feature of post traumatic stress disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity. So that's the central -- that's the first feature.

And then the person's response to the event must involve intense fear, helplessness or horror. The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma, and numbing of general responsiveness, and persistent symptoms of increased arousal.

The next group is the full symptom picture must be present for more than one month. The disturbance must cause clinically significant distress or impairment of social, occupational or other areas of functioning. Those

are the -- that is the definition of post traumatic stress disorder.

Q And did Lavetta Elk meet all the elements of PTSD?

A She did.

Q Now, if I heard you correctly, the first element of PTSD, the first one that you mentioned, is that there has to be an underlying event causing the trauma.

A Yes. There has to be an extreme -- an event that causes extreme fear.

Q Okay. And does the fact that the United States of America has admitted that the assaults occurred, is that significant in arriving at your diagnosis?

A Yes.

Q Okay. Can you explain that?

A Well, we don't need to question whether or not there was a trauma or not. I understand that there's some question about how extreme the trauma was, but there's no question that there was a trauma of some severity.

Q Normally when we're trying to reach an evaluation of -- a determine whether PTSD exists, do you have to consider the possibility that these events didn't occur or that they occurred in a manner different than the victim reported them?

A Yes. Sometimes the -- whether the event occurred

or not is disputed. In this case, it's not disputed.

Q Now, did you prepare a report in this case?

A I did.

Q Okay. Do you have a copy of the report in front of you?

A I do.

MR. HOROWITZ: Okay. For the record, it's the Plaintiff's Exhibit 8.

BY MR. HOROWITZ:

Q Do you have it in front of you?

A I do. Yes.

Q Okay. With your report in hand, can you walk us through each of your opinions as to the effects of the sexual molestation on Lavetta Elk?

A I can. The first issue is the question of the trauma or the fear-invoking response. In Ms. Elk's case, there are several issues that contribute to the level of trauma that she occurred here -- that she experienced here. And I think to understand that, to understand her level of trauma, you need to understand to some degree the cultural situation that she comes out of.

Ms. Elk lives on Pine Ridge Reservation. Pine Ridge Reservation is about the size of Delaware. Delaware has 783,000 people. Pine Ridge has 30,000 people, so I'm just trying to help you understand how remote the

situation -- how remote you can be in Pine Ridge.

Lavetta Elk lives in Wounded Knee, and I don't know if people here understand the story of Wounded Knee, but it's important in this case, because Lavetta drove by Wounded Knee every day probably, where the Wounded Knee massacre occurred every day, and I think that that's important because just briefly to explain what happened, the Wounded Knee massacre occurred in 1890.

And there was a group of Indians that had moved on to Pine Ridge Reservation who were doing what was called a ghost dance, and the U.S. military had said that they could no longer do the ghost dance. It was outlawed. And this was kind of an apocalyptic, religious group that was doing -- that had gotten together and was doing this ghost dance.

MR. BRYANT: I'm going to interpose an objection, Your Honor. None of this was discussed in Dr. Manlove's report, this discussion of the importance of the cultural history and the story of Wounded Knee and Pine Ridge Reservation.

THE COURT: Give me a sense, Mr. Horowitz, because the exact point doesn't have to be made, but is there subject matter in the report that talks about this?

MR. HOROWITZ: Sure. And perhaps, Dr. Manlove, you can sort of assist me as we go through this. But I

think he touches on the cultural significance and the power imbalance, and perhaps that's where he's going.

THE COURT: Can you give me a page reference?

MR. HOROWITZ: Sure.

THE WITNESS: It's on page 9. It says that she was with a man who was older than she who believed he was more powerful than she since he was an Army recruiter. He held her future in his hands, and since he could choose to bring her into military or prevent that from occurring.

THE COURT: Right. But I'm asking -- and I actually want Mr. Horowitz to answer this question -- which part of the report is making references to the basic subject matter that the doctor is now talking about.

(Pause.)

MR. HOROWITZ: I think the bottom of page 9 is directly where it goes to.

THE COURT: So basically it factors into the evidence that he was considering in terms of how she would perceive the recruiter?

MR. HOROWITZ: Exactly. Both the power imbalance and by virtue of his position in the military and being a non-Native American, and simply the struggle between Native Americans.

THE COURT: Okay. Overruled. Go ahead and ask the questions.

THE WITNESS: Should I just proceed?

BY MR. HOROWITZ:

Q I think you were telling us a brief account of sort of the history of that location.

A So, anyway, what occurred was -- and just briefly synopsizing it -- was that the -- this band of Indians was kind of rounded up to an area by Wounded Knee Creek, and there was 350 Indians. There was 500 American cavalrymen, and they decided to disarm the Indians. A gun went off, and there was a massacre of about 200 Indians. And this occurred on, interestingly, December 29, 1890. It was in the winter.

That is a cultural background that every Indian child grows up with, and particularly if you grow up in Wounded Knee where you drive by that every day, and the mass burial grave is at the church right by Wounded Knee also. So in my mind, that would -- and I think that this is a fair conclusion. This might make Indian children and Indian people somewhat suspicious of the motives of Army people.

I was trying to think of an analogy, and I think it's pertinent of the situation. If you don't want me to do it, then, I guess, tell me not to, but I was thinking about when I was a young man and I traveled to East Germany, and I was sitting on a -- getting ready to get on a railroad -- in a railroad station, and I was going to get on a train, and

there was an authoritative German voice that said, you know, If you -- basically, if you mess up, you're in big trouble, you know.

And here I'm a Caucasian young man, and I'm thinking -- this kind of scared me. I thought they were going to throw me into jail. And at the time I thought, What if I was Jewish. You know, how would that affect me then. I think it would have been quite frightening. And I think there's an analogy here. There was a cultural -- there's a history that Lavetta took with her into this, that comes out of this Wounded Knee experience that the Native community, especially the Pine Ridge community, always carries with them.

So --

THE COURT: Could I get you to pause at that point?

Mr. Horowitz, I don't want a narrative answer, so you're going to need to take him through this report piece by piece. I don't want him just going through the entire report, because it deprives, among other things, Mr. Bryant opportunities to object, so you're going to need to walk him through it.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Dr. Manlove, with this report in hand, can you

walk us through the first of the opinions, and then --

A Sure.

Q -- I may stop you, but if I don't, we'll just sort of -- tell us when you're moving on to the next one.

A Okay. So the trauma was that she was with a man who was older, who she believed was more powerful than she, since he was an Army recruiter. He held her future in his hands since he could choose to bring her in to the military or prevent that from occurring. He took her to a remote part of Pine Ridge Reservation and made comments which made Ms. Elk feel that he might be planning to kill her and abandon her in that remote area where no one could find her.

Q Okay. And the next one? I'm sorry.

A Then he proceeded to make sexual advances toward her --

THE COURT: Can I get you to pause? I don't really need you to read the report in the record, because it's already in the record, so I'm going to ask you to summarize here today basically the essence of your opinion, but I don't need you to read the report back into the record.

THE WITNESS: Okay. Well, okay. So she -- that is pretty much the trauma. He took her back -- he threatened her. She felt that her life was threatened, and this is something that she would be aware of, living in Pine

Ridge. There's a lot of history of people being driven to remote areas and killed. And then he proceeded to attempt to sexually assault her, molested her, and she -- he finally stopped after she cried and she, through her protestations, got him to stop.

BY MR. HOROWITZ:

Q On page 7, you start talking about the effects of the molestation.

A Page 7?

Q Yes. We'll go back to earlier.

A Okay.

Q I just want to turn your attention there. Can you tell us sort of that paragraph?

THE COURT: Mr. Horowitz, I'm having trouble hearing you. You need to really keep your voice up.

MR. HOROWITZ: Certainly.

BY MR. HOROWITZ:

Q Paragraph (a), you talk about frequent memories. Can you talk about how that manifested itself for Lavetta?

A Yes. She explained that, you know, throughout many days, most days, she has memories of a sexual molestation. She told me that at those times, she sometimes feels paralyzed, like she did at the time that she was molested, and she feels short of breath, anxious.

Q And is that a classic symptom for a sexual abuse

victim?

A Yes.

Q And is that consistent with one who's been diagnosed with PTSD?

A It is.

Q And when you said she has frequent memories of the molestation, did she report to you having frequent memories with regard to any of the other stressors in her life?

A No, she did not.

Q You report that she told you she felt paralyzed and short of breath.

MR. BRYANT: Object to leading again.

THE COURT: You really are, Mr. Horowitz.

BY MR. HOROWITZ:

Q Okay. The next paragraph is paragraph (b). What did Lavetta tell you about her sleep habits and what were your findings?

A She said that she was often unable to sleep because of nightmares, and they would wake her up. In these nightmares, she was often raped or injured, and interestingly, she indicated that often the nightmares ended up worse than the actual event.

Q Is that common, that the nightmares and the recollections will be --

THE COURT: Pause. Mr. Horowitz, how common, not is it common. I mean, if you're producing a yes-or-no answer, you're doing two things that are problematic. One is leading. Two, even if it's not objected to, the evidentiary value of the answer is limited. All right. So stop leading questions. Okay?

BY MR. HOROWITZ:

Q How often does that happen in your experience to sexual abuse victims?

A That's a common symptom of PTSD from sexual abuse. I think it is less common that people actually experience more trauma in their nightmares than they did in real life, but nightmares after traumatic events are common.

Q Okay. And did Lavetta acknowledge to you that the nightmares were worse than the event itself?

A Yes, she did.

Q Okay. Paragraph (c), can you tell us what Lavetta reported to you about her -- whether she cried.

A Yes. She said that she was frequently sad and cried a lot.

Q Okay. And do victims of sexual abuse often cry for long periods of time?

MR. BRYANT: Objection.

THE COURT: Sustained.

BY MR. HOROWITZ:

Q Can you tell us whether sexual abuse victims cry for long periods of time?

A I mean, depression is a common aftermath of traumatic events. It goes along with PTSD frequently.

Q Okay. Can you tell us the difference between sadness and depression?

A Sure. You know, depression has all kinds of meanings, even using our standard nomenclature in psychiatry. You know, there are what we call major depressive episodes which have to have a certain number of specific kinds of symptoms. They need to be prolonged, kind of -- there are different levels of severity.

And there are people who have depression that are adjustment disorders with a depressed mood. In that situation, somebody's had some kind of stressful event and has had some depression afterward, but it's not the level that one would expect from a major depressive episode.

There's the dysthymia where people have chronic, low-level depression. There are depressions that we attribute to biological causes.

Q Did Lavetta report any intimacy issues?

A Yes, she did. She told me that frequently sexual experiences would remind her of the assault and would -- and she would, therefore, become upset and not be able to continue with the sexual experience.

Q Okay. And how often do you see that in your practice with sexual abuse victims?

A That's common.

Q Okay. And how often in your practice among PTSD -- persons with PTSD diagnosis do you see that?

A It's a common problem with PTSD particularly from a sexual trauma.

Q Can you tell us a little bit about whether you formed an opinion as to whether Sergeant Kopf's assault of Lavetta had an effect on her self-worth?

A Yes. I mean, she told me that she had feelings of guilt about the event, which is paradoxical but common in assault victims or sexual trauma victims particularly. She indicated that she had a sexual experience shortly after the assault that was sort of prompted by a need for affirmation, to be affirmed by another person in a cleaner way, so she had a sexual experience with a friend.

She has had a lot of problems from the aftermath of this assault that have made it difficult for her to function, you know, in work situations, family, with her children, that sort of thing, which has made her feel bad about herself also.

Q Why do innocent victims sometimes feel guilty about their events?

A You know, I don't know that I can tell you

exactly why. We can hypothesize about that, but probably it's kind of related to a sense of somehow they did something stupid, that they could have gotten out of it in some manner if they would have just, you know, done the right thing or said the right thing. It's very common, though, for people to blame themselves for an event, even when they have no real control over it.

Q Okay. You heard Lavetta talk about -- and her family members talk about Lavetta's ambition to join the military. What impact did it have that the perpetrator of this act was a member of the military?

A Well, I think there's a fairly obvious direct connection between this act occurring from a member of the military and her decision to, you know, choose not to pursue that career. She didn't want to be near the military anymore after this event.

Q Okay. You heard Lavetta testify about the remoteness of the location, and you have some familiarity with that yourself. What impact does it have that this occurred, this act occurred in such a remote part of the reservation?

A Well, as I mentioned before, the Pine Ridge Reservation has some areas that nobody goes to ever, and there are known abductions and assaults that have occurred in those areas over the years. There's one that's coming to

trial right now that's very well known from the Wounded Knee of 1972 in which a lady named Anna Mae Aquash was taken out to a remote part of the reservation, was murdered, and her body was left. This is well known in this -- in western South Dakota and in the Pine Ridge community.

So whenever somebody in Pine Ridge is taken against their will to a remote area, most people -- and I've asked 20 people this question who are in that -- in the Pine Ridge area, who live in the Pine Ridge area or who have lived there, what would be the significance --

MR. BRYANT: Object. This is beyond the --

THE COURT: I don't think it is. Overruled.

THE WITNESS: What would be the --

THE COURT: Repeat the last statement, please.

THE WITNESS: Excuse me? Oh, I've asked perhaps, you know, 20 people who have lived on the Pine Ridge or who live there now, what they would think is happening if somebody takes them against their will to a remote part of Pine Ridge, and every one says they would be concerned that they would be beaten, raped or killed. So that's an important other sort of piece of the background to this case.

BY MR. HOROWITZ:

Q Would you expect an assault victim in a remote part of the reservation might be more substantially impacted

than someone in a less remote location?
A Well, certainly, because there's no way to tell.
Q Lavetta and her family testified that Lavetta oftentimes wants to be alone. Did you draw any connection between this assault and Lavetta wanting to be alone and distant from family members?
A Well, certainly withdrawal is a symptom of depression, and we -- you know, I certainly believe she's been depressed since that assault, and I think her depression has been worse since that assault. I think that if you look at the internal experiences that Lavetta Elk has been having, the flashbacks, the hallucinations, the anxiety, and so forth, I think that probably makes her feel like she's a person who shouldn't be around other people. You know, she feels odd and unusual and would try to isolate herself because of that.
Q You mentioned the word "flashbacks." Did she indicate any particular trigger points for flashbacks?
A Yes. She told me certainly sexual relationships, as we talked about, created flashbacks. She also indicated that certain kinds of experiences, like certain smells, certain -- being in certain situations with men, those kinds of things, would cause flashbacks.
Q And were these trigger points specific to just Kopf, or were they sort of more general trigger points?

MR. BRYANT: Objection. This is leading and compound.

MR. HOROWITZ: I'm going to withdraw the question and ask it differently.

BY MR. HOROWITZ:

Q Did you find that these trigger points were related -- strike that. What did you attribute these trigger points to?

A Well, they weren't an issue before the assault. There's nothing in the records that suggests that these were a problem before the assault, so -- and then the fact that we know that sexual assaults cause these kinds of things commonly and then -- and her description of these flashbacks are specifically about Sergeant Kopf, I can't hardly come to another conclusion but that they were caused by this event with Sergeant Kopf.

Q Stated differently, could any other stressors in Lavetta's life have caused those flashbacks in your opinion?

A I don't see -- I'm not aware of other stressors that would have done that.

Q I'd like to assume for the moment that other events in Lavetta's life prior to the assault caused her some distress. How would that impact how much she is affected by the assault?

A Well, people who have had past traumas tend to be

more vulnerable to subsequent traumas, but I don't hear that she's had really serious past traumas. The question or the issue of some depression around -- during the second half of her senior year in high school has come up. In my mind, any kind of depression or other psychological experience that suggests some difficulty coping with your environment probably suggests that a person is at least suddenly more susceptible to PTSD.

Q Stated differently, if someone has preexisting issues before a trauma, are they more likely to suffer more harm than someone who has no preexisting issues?

A Yes. It depends on the issues and a host of other factors, but probably all things being equal, considered equally, yes, perhaps.

Q Okay. Lavetta testified that she moved around a lot after the assaults to different parts of the country. What significance, if any, did you attach to that?

A I think I heard her say that she just couldn't get comfortable anywhere. You know, everywhere -- she tried sort of a geographic cure, you know. Go somewhere else and see if she'd feel better, and it wasn't working. I think she felt like she needed to get away from Pine Ridge Reservation, because that was -- there were too many reminders of the event there.

And finally after traveling around to several

different places, she ended up coming back to Pine Ridge Reservation. It's kind of an interesting sort of circuit that brings her back home to where it began, and, you know, I guess I'm attributing the return home to that's where really her support system was.

Q You heard testimony that Lavetta has had changes in appetite, at times bingeing, at times not wanting to eat at all. Did you attach any significance to that?

A Well, those could be depressive symptoms. They are, you know, sort of coping strategies that people use sometimes to deal with feeling bad, bingeing or conversely not eating.

Q In arriving at your conclusions, did you take into account other events in her life preceding the assaults?

A I attempted to as well as I could.

Q Okay. And how do we factor those in? I mean, how do they come into play in assessing her injuries from this assault?

A Well, the other events that have been noted have been deaths of what are called grandparents. That's one group. Miscarriages. It seems like there was a couple of others. Her weight back in entering the military; her difficulty finding a job; relationship problems with her husband at times, those are all certainly things that would

be stressors in most people's lives.

They are things that would cause dysphoria for most of us. They aren't things that would cause post traumatic stress disorder for most people. Most people deal with those kinds of things over a fairly short period of time and move on with their lives. They're kind of normal life events.

I mean, you know, kind of looking at those different groups, first, the deaths of the grandparents, I think you may have picked up that grandparent means something more than my mother's or father's parent in Pine Ridge. It means any elderly person in the community that you're related to are considered grandparents, so great uncles, great aunts.

And you probably also picked up from David Swallow's testimony that everybody is related to everybody else on Pine Ridge Reservation. I mean, there's a lot of interconnectedness if you track out blood lines. So there are lots of people who are related to you who are dying at any given time. I mean, also people die young in Pine Ridge, and so it's not uncommon for -- it wouldn't be at all uncommon for Lavetta Elk to have been -- have dealt with many deaths of people that she considered grandparents in her life span.

Q Okay.

A It is always a big deal. People are always very concerned about it, but there are cultural ways of dealing with that that seem to work well for that community.

Q Okay. Along those lines, ordinarily speaking, is the loss of a grandparent when one's a teenager, is that ordinarily a traumatic event that may cause PTSD?

A No. I don't think that would be considered the kind of event that would cause PTSD.

Q Okay. In your experience, are suicides -- how common are they on the reservation?

A Suicide is common on the reservation. It is approximately three times what it is in the general population in the United States and three times what it is in the rest of the state of South Dakota. The rate is about 30 per 100,000 people per year.

Q Okay. Given that, as you said, suicides are common, in your experience, do you find that those who live on the reservation are equipped differently to deal with those types of events?

A I think people are kind of -- are sort of used to it in a way, a little bit numbed to the event, because it's so -- it's not an uncommon experience.

Q Okay. And on the reservation, how common or how often do you come across miscarriages as being a trauma that might cause PTSD?

A Well, I think that was a few questions.
Q Yes.
A I can't tell you the miscarriage rate. I don't know that. I can tell you that the infant mortality rate is about -- it's a couple of magnitudes of order above the average population in the United States. How often does it cause PTSD? I would say -- I'm not sure I've ever run into that, and I've seen many -- I mean, I do a sexual history on every person I interview, and they tell me if they have had miscarriages or not, and certainly shortly after a miscarriage, there might be an issue, and I can recall one person who it's been an ongoing issue in therapy for out of approximately 25,000 people that I've had ongoing work with.
So I don't think it is a -- I think it is considered a natural event that people adjust to and work through generally well in that setting.
Q Okay. And do you find a distinction between -- any distinction between early-term miscarriages and late-term miscarriages?
A Sure. I mean, the later, the more traumatic it would be.
Q Okay. And in your review of the records, when did Lavetta's miscarriages occur, or when did she report that they occurred?
A They appeared to be fairly early for the most

part.

Q And in your experience, when a woman successfully delivers a child after having had a miscarriage, does she often think about the miscarriages anymore?

MR. BRYANT: Objection.

THE COURT: I think you need to reframe it so it's not leading.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q In your experience, what effect does the miscarriage have after a mother successfully delivers a child?

THE COURT: You're getting soft again, Mr. Horowitz.

MR. HOROWITZ: Getting softer?

THE COURT: Getting softer, yes. You need to be louder.

MR. HOROWITZ: Louder. Okay. I'm sorry.

THE COURT: I'm not sure why I keep telling you this. If you can't hear your voice being projected, then you're not loud enough.

MR. HOROWITZ: I can hear my voice. Okay.

THE COURT: Ask the question again.

MR. HOROWITZ: Sure.

BY MR. HOROWITZ:

Q What sort of effect do the miscarriages have after a child is successfully delivered, in your experience?

A I think a successful delivery diminishes the effect of a miscarriage to some degree.

Q Can you talk in a more general sense about the effects of a sexual assault when the perpetrator is in a position of power?

A Well, if you look at the literature on PTSD, the two issues that seem to be most -- that people, you know, focus on as being the issues that create the most trauma are: Does the person feel controlled? In other words, did they lose control of their body? And the second one is: How much fear do they have?

In this case, a man who is apparently large and experienced by her as being powerful would be experienced as a more controlling force. She also -- it also is a situation where she -- as has been discussed -- and this is, I think, a true statement. On the reservation military people are paradoxically highly revered, so they're highly, highly respected, and so a person -- so she'd be giving him power as a result of that also.

Then to have a person who is -- the more powerful a person is, the less control you feel like you have over yourself, the more frightening the situation is going to be and the more traumatic it may be.

Q And can you talk about the effects on the sexual abuse victim when the perpetrator is not only powerful but someone in a position of trust or confidence?

A Right. And that's -- yes. He was both powerful and a person that had kind of drawn her intentionally or inadvertently into a trusting relationship, where he was almost confidant-like in a way.

Q So are --

A So you have another betrayal of trust in addition to --

Q So are the power issue and the trust/confidence issue separate elevators, so to speak?

MR. BRYANT: Objection.

THE COURT: I don't think that is leading. Go ahead.

THE WITNESS: Yes. I think so.

BY MR. HOROWITZ:

Q How do you feel the sexual assault has affected Lavetta's employability?

MR. BRYANT: Objection, Your Honor.

THE COURT: It's in the report. What's the nature of the objection?

MR. BRYANT: It's in the report, but we don't think this witness has the expertise to --

THE COURT: He's talking about from a

psychological standpoint. I think he does. Overruled.

BY MR. HOROWITZ:

Q Psychologically speaking.

MR. BRYANT: Can we just have a continuing objection on that.

THE COURT: Very good. It's noted.

THE WITNESS: Well, as you can imagine, a person -- and this is what Ms. Elk tells me also, but as you can imagine, a person who's having the kinds of experiences that she has from kind of the depressive spectrum experiences to anxiety spectrum experiences to psychotic symptoms, flashbacks, hallucinations, those kinds of things, these things would be very distracting to anybody. And I think that they have affected her employability also.

BY MR. HOROWITZ:

Q Do you find that she's someone who's able to focus for long periods of time?

A Well, I think she can focus for -- I think she can focus. She focused during her interview here pretty well, I thought, generally speaking. I thought she did a fairly good job in my interview with her. That's different than day in and day out going to a job, so based on what I said just a few minutes ago, I think that she would have a lot of distractions in her internal milieu, so to speak, in her mind, that would -- her depression, her anxiety,

flashbacks and so forth, that would ultimately make working difficult for her, and that's what she has described also.

Q In your report, you used the word "molestation" rather than assault. Can you tell us about the --

MR. BRYANT: We're going to object.

BY MR. HOROWITZ:

Q -- use of those terms?

THE COURT: Hold on. What's the nature of the objection?

MR. BRYANT: Just objecting to that term.

THE COURT: I'm sorry?

MR. BRYANT: We're just objecting to that term describing what the incident was.

THE COURT: Well, the term is in the report. Correct?

MR. BRYANT: Yes, Your Honor.

THE COURT: Well, cite a rule, Mr. Bryant.

MR. BRYANT: It is -- that term has connotations of -- it's prejudicial.

MR. BRYANT: It's in the report. He's asking him to explain the report. Cite a rule, sir.

MR. BRYANT: I'm citing that it's not relevant, because --

THE COURT: That's not a number. Cite a rule, please.

MR. BRYANT: If I could explain, I don't have the exact -- well, I'll get a number.

THE COURT: From now on, if you pose an objection, I expect you to cite a rule number. Which rule is it?

MR. BRYANT: If I could lay sort of a proffer --

THE COURT: Go ahead.

MR. BRYANT: The term "molestation" has connotations of child abuse, and we don't think the facts have been laid to establish that --

THE COURT: Well, he's been asked to explain the term. You're objecting simply to the fact that he's being asked a question about something that's in the report, so I'm still having a hard time, I guess, understanding what rule it is you're citing that would pose an objection to that. It's already in the report. Correct?

MR. BRYANT: It is. Withdrawn.

THE COURT: Ask the question again.

MR. HOROWITZ: I wish I could remember it.

BY MR. HOROWITZ:

Q You used the term "molestation" in your report. Why did you do that?

A I wasn't trying to imply that this was child abuse. I was trying to say that -- I could have used "assault." I could have used the term "assault," but since

there wasn't sexual intercourse, since there wasn't bodily injury, I decided to use the term "molestation." Whether that's accurate or inaccurate use of that term, I'm not sure. I think in actuality this sort of speaks for itself. I feel that what happened was an abduction followed by a molestation.

Q Okay. And tell us about your use of the word "abduction." Why do you use that term?

A She was taken against her will to a place where nobody could help her. That is an abduction.

MR. BRYANT: Objection. Facts not in evidence to support that statement.

THE COURT: I think there are facts in evidence that support that statement at least arguably, so overruled.

THE WITNESS: I think that abduction piece of it heightens the fear aspect of it significantly. I don't know that this is a lot different -- I mean, it's somewhat different, and I'm not trying to say it's the same thing, but I've been in my own mind trying to sort out how different is this than the lady I knew who was thrown in the trunk of the car and taken out to a remote part of Pine Ridge and killed. I'm not sure that there's a radical difference.

BY MR. HOROWITZ:

Q Are you familiar with the term "grooming"?

A Sure.

Q Can you explain that term?

A Well, it's a term actually used with -- usually with children who are kind of the -- they're sort of seduced by an older person who gets their trust and then convinces them to become involved with sexual behavior.

Q Okay. And based on the testimony you've heard and your interview with Lavetta, were there aspects of grooming involved in terms of Sergeant Kopf gaining trust and confidence?

A Well, there are certainly aspects of gaining trust and confidence. Whether it was intentionally preplanned that he was going to groom her to have sex with her at some point, I can't say.

Q And in terms of gaining the trust and confidence, was there anyone other Lavetta who you felt he had gained the trust and confidence of?

MR. BRYANT: Objection.

THE COURT: Well, I'm having trouble, I guess, at that point. You need to tie this in to something that has to do with one of his opinions. I mean, at some point, you're starting to ask him factual questions that are separate from his opinion, so it seems to me that if you want to lay some foundation for that question, go ahead.

BY MR. HOROWITZ:

Q I'll just do it this way. Let me -- when a sexual abuse victim and her family are groomed, do you find -- and later betrayed, do you find that significant?

MR. BRYANT: Objection. Leading.

THE COURT: I don't think that's leading. Ask the question again.

BY MR. HOROWITZ:

Q When a sexual abuse victim, such as Lavetta, and/or her family are groomed and place their trust and confidence in the ultimate perpetrator, how does that affect --

MR. BRYANT: I'm going to object that there are no facts in evidence that this family was groomed.

MR. HOROWITZ: May I respond?

THE COURT: Ask the question first generally about his opinion, and then if you want to ask about the evidence in this case, you can.

THE WITNESS: Do you want me to respond or --

THE COURT: No. I don't want you to respond. I want him to ask the question again. Start by -- I think we need to establish whether or not associated with any condition that could be present here grooming plays a role, and maybe even get a little bit better definition of what that means, so we know why it's relevant to his opinion. Then it seems to me that you could ask him about the facts

in this case.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Was the trust and confidence placed in Sergeant Kopf relevant to any of your opinions?

A Sure.

Q Did you find that, in fact, the Elk family placed trust in Sergeant Kopf?

A Did I find that they placed trust in Sergeant Kopf and what?

Q Did you find it significant -- well, first of all, did you find that they did?

A It appeared that they did.

Q Okay. All right. And when a victim and her family place trust in the ultimate perpetrator, does that affect the ultimate outcome for the victim?

A Well, certainly the fact that the family and Ms. Elk trusted Sergeant Kopf got her into that situation in the first place. They trusted that she was going to be taken to Sioux Falls apparently, and she probably wouldn't have got into the car with a person that she didn't know and didn't have some level of trust in, and the family wouldn't have, you know, accepted that, I would imagine.

Q Okay.

A Did that affect the long-term outcome? I think a

betrayal of trust is a piece of the trauma, but I don't think it's as significant a piece as the fact that she was controlled and became extraordinarily frightened in that situation.

Q Okay. You used the term betrayal. Can you tell us how you're using that term?

A That her trust was betrayed, that she was essentially trapped into doing this. It certainly affects long-term trust issues with other people.

Q Did you make a finding as to whether Lavetta had trust issues following the assault?

A I'm not sure I stated that in my report, but I've got opinions about that.

Q Okay. Can you share those with us?

A I feel that she does have trust issues regarding -- certainly regarding military. There's no question about that in my mind anyways that this made her not trust the process or not trust to be in the military. I would imagine, though I haven't asked her specifically, I would predict that she might have some problems with trust of other people in similar positions of authority.

Q And how common is it for a sexual abuse victim who's abused by a person in a position of authority to have trust issues?

A I think that's a common sequela.

Q Okay. Is that consistent with PTSD?
A Yes.
Q In your opinion, with Lavetta Elk need counseling in the future for optimal coping?
A I think she could benefit from counseling.
Q What kind of counseling would you recommend?
A I would recommend psychotherapy that focuses on helping her deal with the symptoms that she has, helping her minimize those symptoms, and I also think that she could benefit possibly by pharmacologic management through a psychiatrist.
Q Okay. And how often, in your opinion, should she be seeing those individuals?
A I think it would be reasonable to suggest weekly therapy with a psychologist or a psychotherapist of some sort, and perhaps monthly, at least initially, medication management.
Q And for what period of time?
A It's a little bit hard to predict. Now you're getting into sort of averages, and in my mind, I would hope that there would be significant improvement within three years.
Q And what is the average cost for a session like that?
A I believe an average cost for a psychologist

doing an hourly psychotherapy session in this part of the country is about $130 an hour.

Q Okay.

A And psychiatrists for, say, a 30-minute session would be about $110 an hour.

Q Okay. Your diagnosis of PTSD was on what date?

A The date that I made the diagnosis?

Q Yes. At around the time you generated the report?

A Yes. It would have been when I did the report, which was April 20, 2007.

Q Okay. So that's over four years after the assaults.

A That's accurate.

Q Okay. How common is it for an individual to be suffering from PTSD that many years after the assault?

A It's not uncommon. If you look at all the potential traumas that could cause PTSD and looked at the length that people have responses to those traumas, I think that you would find that the average was much, much less than four years.

Q In your report, you considered the possibility that the litigation itself might be worsening Lavetta's symptoms. Is that correct?

A That's true.

Q My question for you is: Might there be an intrinsic benefit for Lavetta in standing up for herself, seeking the restraining order, going to the police, filing a lawsuit?

A Certainly.

Q Okay. Can you talk about any potential intrinsic benefits from a victim taking power back by standing up for herself?

A Well, I think you have to start by recognizing that the Indian population is a extraordinarily disempowered population in our state and probably in our country, and I think that makes them feel that they are not competent, they can't do things because they're disempowered. So I think that doing something that begins to take back power is a step toward moving on with her life.

Q And like the long-term healing process, might the benefits of standing up for yourself outweigh any sort of short-term harms of throughout the litigation when she has to talk about the memories of the assaults?

A Well, you know, I don't know the answer to that for sure, but I think that once she gets through the litigation, she'll be able to get back on track to dealing with these issues, so I don't think it's going to create a permanent problem. So -- and yet I think that having taken a step to stand up for her rights and to take care of

herself has some positive long-term effects.

Q Stated somewhat differently, when a sexual abuse victim does not report the crime, when she doesn't go to the police and she doesn't report it to family members, and she doesn't go to counseling, and she doesn't seek a restraining order against her perpetrator, how might that impact her overall recovery?

A I think that they don't have then that opportunity to sort of take their -- take control back, and I think it doesn't always affect people that adversely, but I certainly see people who, when they don't do that, feel that they've lost something.

Q You mentioned that you performed an MMPI.

A Yes, I did.

Q Okay. And can you just give us the sort of crash course on what an MMPI is intended to do?

A An MMPI is a test that has over 500 questions, and they're all true and false, and they're meant to get a picture of the person's psychological status. The test that we did, the MMPI we did, was invalid.

Q Can you explain to us why it wasn't valid, or which of the scales caused --

A There's not a way of knowing for sure why it wasn't valid. There are a couple of hypotheses that are generated by an invalid MMPI. The person might be feeling

stress certainly to seek attention for their problems. They might be uncooperative and defensive. They might be confused and having precarious contact with reality, suggesting serious psychopathology. And they might be deliberately exaggerating their symptoms.

Q And of those possibilities, what was your hypothesis as to the reason why the test was invalid?

A I think in fairness you just simply can't say from the MMPI that we did. Since I was aware, having interviewed her, that she had fairly -- a fairly dramatic symptom picture, it certainly seemed possible that the MMPI could be reflecting serious psychopathology.

Q Did you draw -- or could you draw a conclusion from your MMPI whether exaggeration was a factor in the invalidity of the results?

A You could not draw that conclusion from my MMPI.

Q I'm sorry. Can any such finding with regards to exaggeration or manipulation be made from your --

MR. BRYANT: I'm sorry, Your Honor. He's tailing off, and with the banging, I just can't hear.

THE COURT: It would be nice if you could just elevate your voice some more.

MR. HOROWITZ: Certainly.

BY MR. HOROWITZ:

Q Could any determination with regard to

exaggeration, manipulation be made from that data?

A No.

Q You mentioned in your report that you would like the benefit of reviewing an MMPI that was not invalid.

A I'm not sure if I mentioned that, but that's true.

Q I think you recommended that she retake an MMPI.

A Okay.

Q Have you had an opportunity to review an MMPI?

A Yes. Dr. Mills had her do one when he was interviewing her, so I did have an opportunity to review that.

Q Okay. Was that a valid MMPI?

A Yes.

Q And what findings did you draw from that?

A My overall findings were that she has tremendous anxiety with psychotic symptoms, and she's -- you know, again supporting the notion that I had from my interview, that she had fairly severe psychopathology.

Q And --

A Consistent with depression and PTSD.

Q And are there scales within the MMPI data?

A Yes, there are.

Q Okay. Were there any significant scales in that data?

A Definitely.

Q Can you share those with us?

A When you look at the MMPI, the first scales that most of us look at are the validity scales, and the first validity scale that one looks at is the F scale. Her F scale was high. It was 92, and that brings up some of the hypotheses that I mentioned before. Was she cooperating? Was it some serious psychopathology? Was she exaggerating symptoms?

There's a couple of other issues that are -- that I took into account when I looked at the F scale. First of all, she had a T score of 92. We know that -- and there's date to support this -- that normally-functioning Indians have higher F scales when they're under stress than the Caucasian population, so I think it's appropriate -- and this is based on having -- based on -- I'm not a psychologist.

I'm not an expert in MMPIs, but I've looked at many MMPIs on both Caucasian and Indian people, and I have worked with psychologists in my practice and reviewed them and discussed them, and I discussed this MMPI with psychologists in my practice and elsewhere who are experts on the Indian population. And they tell me that you would expect a higher F scale with an Indian person in this situation.

So kind of in your own mind, you drop that F scale down some portion. Now, she had a T score of 92, as I mentioned moments ago. T scores of 70 to 90 are thought to potentially reflect serious psychopathology or reflect very stressful circumstances, so she's right in that range where she has a T score and an F scale that is consistent with serious psychopathology.

In addition to that, if one looks at the MMPI, there's another F scale that's called the FB scale, and that B stands for back, and that's a term that is used to -- that's what psychologists use to describe that's the F back, and what the F back refers to is the validity of the second half of the test. And a high FB, like Ms. Elk was portraying in her scores -- and hers was a 97 -- that tells us that she did not maintain attention and cooperation throughout the entire test, so she wore out or something along those lines.

So a high FB also pulls up the F scale, because FB is a subset of F. So if you have a high FB, if you're invalid because of wearing out at the end of the test, it's going to pull your F scale up. So we've got several reasons why her F scale was kind of elevated, and these are really suggestive -- they're very consistent with psychopathology.

Her other validity scores, she had a fairly low L score which indicates that she was at least admitting faults

and shortcomings. One could argue that maybe she was over-exaggerating them, but the K was not low enough to support that. That's another scale. The other scores really didn't -- one's called a variant and one's called a trend. They were -- from my perspective they didn't show -- they didn't lean me either way about the validity issues.

So after looking at her validity scales, I concluded that they were -- it was a valid test, to some degree based on what the content scale showed, and that is if the content scales were consistent with this high level of psychopathology, that the high -- that the somewhat elevated F scale showed.

The content scales did show that. They showed a high 7 and a high 8. The high 7, that was her highest -- now, when one looks at the content scales, most psychologists and most experts on MMPIs, look at the two highest scales first, so the 7 and the 8. 7 is called psychasthenia; 8 is called schizophrenia.

Psychasthenia, what does that mean? If that's high, a person has excessive doubts, fears, somewhat obsessive-compulsive. They feel guilty. It's related to high anxiety and distress. Hers was high. They tend to blame themselves for things that go wrong and that sort of thing.

The high 8, which was the second highest scale,

not quite as high as the 7, is this sort of schizophrenic scale. That suggests the possibility of a psychotic disorder, confusion, disorganization, unusual thoughts or attitudes, which would be consistent with the PTSD symptoms that Ms. Elk has been telling me about and that I've shared with you.

Together, when you put those two scores together, the 7 and the 8, that is the highest 7 with the second highest being the 8, they suggest that she is in a great deal of turmoil, that she is not hesitant to admit psychological problems. She seems to lack defenses to keep herself comfortable. It kind of tends to indicate that there's an anxiety driving the psychotic symptoms, which is what we think happens in PTSD. We think the psychotic symptoms, that is, the flashbacks and the hallucinations and stuff, are driven by anxiety.

Her third highest scale was the 4 scale which is called psychopathic deviance. That scale is moderately elevated. It's the third highest score, but it still has some meaning. One could look at that and say that they are being rebellious or manipulative against authority figures and that sort of thing. But there are other scales that are subsets of that psychopathic deviance scale that are called the Harris-Lingoes scales that psychologists use to break that down further.

And if you look at her Harris-Lingoes scales, you'll see that she scored highest in the areas of that -- on those scales as show social isolation and a negative self-concept kind of piece. She did not score high in the areas that talk about mistrust of authorities or rebelliousness or that sort of thing. So that third highest scale appears to be elevated due to this kind of sense of disconnectedness and social isolation that she has.

And I think that -- so I put all those together. There's one other scale that was moderately elevated which is the PK scale, which is the PTSD scale that kind of synthesizes other scales, and that was elevated.

What the MMPI showed me was that we have a lady who has a lot of psychopathology. She has a lot of anxiety, and it's driving the psychotic symptoms which are the PTSD symptoms. She's also depressed, and she has a lot of anxiety.

Q Have we covered your opinions on the MMPI?

A I think that's pretty much accurate.

Q Have we covered all the opinions in your report?

A Yes.

MR. HOROWITZ: I have no other questions.

THE COURT: Let's take a 15-minute break. We'll actually go till 20 to the hour. At that point, we'll resume with cross-examination.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated.

Mr. Bryant, anytime you're ready, sir.

CROSS-EXAMINATION

BY MR. BRYANT:

Q It's still the morning, so I'll say, good morning, Dr. Manlove.

A Good morning.

Q Steve Bryant. I wanted to turn back to your educational history quickly. I couldn't hear all your responses, and you said you went to -- graduated from St. Olaf College.

A Yes.

Q And what was your degree?

A My degree was -- it was a -- it was called societal structures, ethics and myth. It was an experimental school within St. Olaf College. Societal structures, ethics and myth.

Q And what is that about?

A It was essentially a philosophy major.

Q I see. And then you said you went to divinity school for a year, grad school. Was that for a master's or a Ph.D.?

A I was in a master's program. An M.Div. program is what it was called, master's of divinity.

Q And did you complete that program?
A No, I did not.
Q And why did you leave that program?
A Well, the short story is I decided to go to medical school instead. The long story is I had been interested in doing academic theology, but decided that I didn't have any real-world experience, and I thought I should go get my hands dirty.
Q And then you went to medical school, and first went into -- you were an internist. Is that what you were saying?
A Well, I went to medical school, and then I went to my residency, and I did -- it was a combined program, putting together internal medicine and psychiatry at the University of Virginia.
Q All right. And you became boarded in forensic psychiatry in 1996, I believe you said. Is that right?
A That's true.
Q Okay. And since you became boarded in forensic psychiatry, how many times have you been accepted as a forensic psychiatrist expert in a courtroom?
A You want me to make an estimate? I can't --
Q Not exact numbers, but an estimate.
A -- tell you an exact number. I'm thinking that I testify perhaps four times a year, five times a year.

Q And are those in civil and criminal matters?
A Yes.
Q Roughly what's the percentage?
A I do more criminal work. It might be 70-30, 60-40, weighted toward criminal.
Q Towards criminal. And then in terms of the civil arena, do you have a breakdown of the percentages that you've testified on behalf of a plaintiff versus the defendant?
A I think that I've actually testified on behalf of a -- let me think here. I'd definitely be more with plaintiffs, and I don't do much -- I don't think I've done -- I can't remember one that I've done where I actually testified for a defense case.
Q And then in the criminal arena, could you tell me your percentage of testifying on behalf of the plaintiff versus the Government in those cases?
THE COURT: You call them defendants in those cases.
MR. BRYANT: I'm sorry.
BY MR. BRYANT:
Q The defendant versus the Government. My apologies.
A I've only testified on behalf of the defendant -- or, you know, I've only been hired by the attorneys of

defendants except for one occasion, when I was hired by a prosecuting attorney.

Q Okay. So there's only one occasion when you testified on behalf of the Government in a criminal matter?

A I don't think we ended up -- I don't think I ended up testifying in that case.

Q And you say your clinical work and your forensic practice are split, I think, 80 percent and 20 percent, weighed toward the clinical. Is that correct?

A That's correct.

Q Okay. And is it fair to say that with clinical psychiatry, you accept what your patient is saying as true and there's not really an effort to investigate and corroborate their statements generally speaking?

A I would say it's true that you generally don't corroborate or investigate. I don't think it's necessarily true that you accept what they say as true.

Q And the reason why you're not investigating or corroborating, I gather, is because they're coming to see you and they're paying money to be treated for some psychological issue.

A That's true. You kind of accept that they have a problem that they want you to work on, but there are occasions where you -- where people come for other purposes, of course.

Q And when you say you don't necessarily accept what plaintiff says is true, can you elaborate on that a little bit?

A Well, people tell their stories as they see it. That doesn't mean it's true. It's their perspective of it. Certainly people come to see me to try to be manipulative, to try to get something from me, you know, one way or another, try to get a certain kind of medicine or a certain kind of -- some kind of statement that they don't have to go to work. Or there's a variety of other reasons.

Q And ulterior agenda.

A Sure.

Q And what do you do to test the veracity of their statements and their motives?

A You get as good a history as you can, and you compare that to expected clinical patterns, expected patterns of behavior, and if it doesn't feel right, then you begin to question it more.

Q And turning to forensic psychiatry, there it's sort of a different ball game. The objective is to scrutinize those allegations. Is that right?

A Correct.

Q And you verify with other records.

A Yes.

Q And statements?

A Sure.

Q Deposition testimony or whatever may be available?

A Yes.

Q Criminal investigation reports?

A (No audible response.)

Q You have to articulate.

A Well, you're making statements. Do you want me to --

Q Yes. If you agree with what I'm saying.

A Yes. Okay. Yes.

Q Do you agree with that?

A Yes.

Q And turning -- shifting gears here just for a moment, a vocational expert, are you familiar with that?

A Am I familiar with that job?

Q What a vocational expert is.

A Yes. I know a few.

Q And doesn't a vocational expert specialize in evaluating the degree a physical or mental disability can impact a person's ability to perform different jobs?

A They may do that.

Q Is that what their expertise is in?

A I'm not sure exactly what all their expertise is in, but I think they may do that task as part of their job.

Q And would you agree that they identify the types of jobs a person with a physical or mental disability can perform?

A I think they do that.

Q And you don't hold yourself out as a vocational expert, do you?

A No.

Q Now, your CV, which is PX-39, it is dated July '05, with the most recent version January '06. Is that the most recent version of your CV, or is there a more recent version now?

A I think that's the most -- I don't think it's changed dramatically since then.

Q The CV does not reflect any publications of yours. Has that changed?

A I've not published.

Q And does that apply to -- withdrawn. So have you published at any time in your career or when you were --

A I have not published ever.

Q Okay. Now, you are familiar with the peer review process. Is that right?

A Yes.

Q Okay. And do you agree that that's a methodology designed to ensure that a proposed article meets the publication standards?

A I'm aware of that.
Q And where colleagues are rigorously scrutinizing the article for reliability?
A I understand that.
Q Have you ever served as a referee in the peer review process?
A No.
Q Are you familiar with the Comprehensive Textbook of Psychiatry?
A I am.
Q And that's currently in its eighth edition. Is that right?
A I couldn't tell you.
Q Okay. Do you agree that it is generally considered the principal authoritative treatise in psychiatry?
A No. I think it's a reference source that people use. I don't think it's the authoritative statement in psychiatry.
Q What would you say is the authoritative treatise?
A I don't believe there is one.
Q Is there a limited number of treatises that you would point to as the ones that sort of would be generally considered the principal authoritative treatises?
A No. By the time things become books, they tend

to be almost outdated, you know, these days, and so I think that there's almost -- you know, virtually every book that's been written recently, there's something new since that book has been published that, you know, kind of changes something a little bit, and so I think most clinicians read broadly from a variety of sources and maybe look at textbooks once in a while, but not regularly.

Q Are you aware of what the most -- this eighth edition of the Comprehensive Textbook of Psychiatry -- when it was published?

A No.

Q So you do not own that book.

A I don't think I own the most recent one.

Q You do own it?

A I'm not sure I own the most recent one.

Q You own a prior edition?

A You know, I can't tell you every book that I have on my shelves, but it seems like I recall that, but I don't want to swear to that.

Q Was this earlier edition of this textbook part of your studies when you were at University of Virginia, for example?

A That's probably when I got it.

Q I'm sorry?

A That's probably when I got it. I probably looked

at it to some degree during that time.

Q So it was included in your academic instruction?

A What's that?

Q It was included in your academic instruction?

A Gosh, I don't recall what I read while I was a resident, you know.

Q And in terms of teaching, have you ever had an academic appointment?

A Yes.

Q And where is that?

A I teach psychiatry to the family residency program, family practice residency program here in Rapid City Regional Hospital.

Q At the hospital, but what about an educational institution?

A Well, I guess I'm considering the family practice residency program an educational institution.

Q But, I mean, at a university or a college?

A No. I've never taught at a university.

Q And the MMPI-II which you discussed on direct examination, is that something that you use in your practice?

A Yes.

Q About how many times have you used it?

A I guess I would say it's used fairly routinely,

but I couldn't -- I guess I'd just be making a wild guess to say how many times that I'd used it, and I'm not sure what you mean by used.

Q Have you administered the MMPI to your patients or to your expertise as a -- when you've been retained as a forensic psychiatrist in cases?

A I've never personally administered an MMPI. I've had other people do that, psychologists and so forth do that.

Q You've had it caused to be administered to a client, a patient?

A Are you asking me if I've --

Q Have you directed that a psychologist administer this to one of your patients?

A Yes, yes.

Q And have you done that -- you said routinely, I gather.

A Yes.

Q And more than 50 times?

A Sure.

Q And do you consult the psychologist after the results of the test --

A Yes.

Q -- come out?

A Yes.

Q And did you do that with your MMPI in this case?
A Yes.
Q And was that individual Tony Morton?
A I consulted with him and a couple of other psychologists also He administered it.
Q And Mr. Morton, we'll start with him. What are his academic credentials?
A He's got a master's degree in psychology.
Q Does he have a Ph.D.?
A No.
Q Does he have any publications that you're aware of?
A I'm not aware of any.
Q And who are the other individuals you consulted with?
A I consulted with a lady named Kari Scovel who's a Ph.D. psychologist, and a man named Dewey Ertz who's an Ed.D.
Q And how long did you speak with Ms. Scovel or Dr. Scovel?
A How long?
Q Yes.
A Let's see. I suppose I spent an hour, hour and a half with her. I probably spent, I think, about 45 minutes with Dewey Ertz.

Q I want to now turn to your report, PX-8. Do you have that handy?
A Yes. I've got the report.
Q You have the report. On the -- on page 1, item number 4 and continued to page 2, lists the sources of information that you considered.
A Yes. And there's more than that that I've looked at since then.
Q I think you supplemented that on direct examination.
A Right.
Q And that was with a few of the deposition transcripts. Is that right?
A Yes. And there was also the different interrogatories and things like that, the interrogatories and so forth.
Q Okay. And I think those are listed. Is that not right?
A I know I didn't look at all of them before I did this report, so they're probably not all listed.
Q Would you agree that your opinions in large measure are predicated on Lavetta's truthfulness to you?
A That's where I started.
Q I'm sorry?
A Yes. That's where I started.

Q That's where you started.

A By interviewing her.

Q And where did you go from there?

A Well, then I reviewed the other records and all the other sources of information were part of the thought process.

Q Okay. So you would agree that if she were inaccurate or untruthful, that could affect the reliability of your opinions?

A If I found out she lied to me, sure. I would revise my opinion, if I had evidence that she lied to me, you know, from some --

Q I'm sorry?

A If I had evidence that she lied to me from some other source, I would rethink my opinion.

Q Okay. Now, you've had three interviews with her. Is that correct?

A That's accurate.

Q And did you discuss the assault in detail during all three of those interviews or --

A Probably two of them.

Q Two of them. Okay. And then her psychological symptoms, did you discuss those in detail during the three interviews?

A Yes.

Q Did you discuss the psychological symptoms she experienced before the assault?
A Yes.
Q And did you discuss the psychological symptoms after the assault?
A Yes.
Q Now, with respect to the psychological symptoms before the assault, did you document those in your report?
A Yes. At that time, I was not aware that she had had the counseling, oh, in 1972, a couple of sessions when she was a senior in high school, so that's not mentioned in my report.
Q Did you say -- did you mean 2002?
A I'm sorry. 2002. Yes.
Q And you said you were not aware of those during your interviews with Ms. Elk?
A Right. No. She did not tell me about those.
Q So you asked her about any treatment or diagnosis she may have received for psychological conditions?
A Yes. If she had any other psychiatric/psychological care.
Q And she didn't inform you of the treatment in February and April that we talked yesterday?
A That's true.
Q And you were present during her testimony. Is

that right?

A Yes.

Q Did you tell her it was important for her to give you a complete picture of any treatment and diagnosis she may have received?

A I didn't use those terms but --

Q What terms did you use?

A I said, Can you tell me about your -- I mean, I think she understood that this was an important interview. I didn't -- I don't think I needed to emphasize that every time I spoke with her, but she -- you know, she didn't mention those.

Q I'm sorry?

A She didn't mention those.

Q Okay. And did you take notes during the interviews?

A Yes.

Q And do you have those notes today?

A Yes, I do.

Q You do have those notes?

A Uh-huh.

Q Those have not been produced to us.

MR. HOROWITZ: Pardon me?

MR. BRYANT: We'll take that upon a break, Your Honor.

MR. HOROWITZ: That's fine.

MR. BRYANT: I'll move on.

BY MR. BRYANT:

Q Getting back to Ms. Elk's truthfulness and the effect it might have on your opinions, would you agree that at the extreme, that if she were significantly distorting the information she conveyed to you, that would undercut the reliability of your conclusions?

A There would be some point at which it would. Sure.

Q Would you agree that the MMPI, that examination, is the only source of information that you considered that specifically measured whether Ms. Elk exaggerated or distorted her symptoms?

A No.

Q And what would be the other source that you would consider?

A Well, I was interested in the -- I think one of the most important issues was were her symptoms consistent -- was the event traumatic? And I think I thought carefully about that. And was her response to it suggestive of it being traumatic? Was her -- were the subsequent symptoms over the past four years or five years now --

Q If I can --

A -- were they consistent with what one would expect from a serious trauma? If she was telling me something that wasn't consistent with that, then I would have questioned if it was true.

Q So just to be clear, what I'm asking about is: Of the sources of information that you considered, which ones it specifically measured whether she was exaggerating or distorting her symptoms, the MMPI did that. Right? Is that correct?

A That is one of the things that MMPI looks at.

Q Okay. And then I think what you were just discussing are your interviews with her. So your own view of her credibility and the statements she provides you. Is that correct?

A Well, it's not just, am I looking at her and thinking that she's telling me the truth. I mean, are the things that she's reported consistent with what one would expect psychologically from this kind of event?

Q So -- but that specific measurement of whether there was exaggeration or distortion is your experience in your mind, your interpretation. Is that correct? I'm talking about the documents themselves. None of those other documents specifically measured this, other than the MMPI. Is that correct?

A The other documents? You mean, the

interrogatories? Certainly they wouldn't.

Q I'll go through them. The sources of information, you considered the complaint, the various response to discovery requests. This is on page 1 of your report.

A Oh, I see. Okay.

Q Then we go to the next page, and there's a statement there of hers, medical records from the women's health clinic, her deposition, statement of her father, the Bureau of Indian Affairs criminal investigative report, restraining order, the Oglala Lakota National Department of Public Safety report, the interviews you did and the MMPI-II.

What I'm saying -- my question is: Of those sources of information -- and I recognize you supplemented it with some other depositions. None of those, other than the MMPI itself, specifically measure whether the individual was exaggerating or distorting symptoms. That's the only one that does that, and it statistically does that. Is that not correct?

A You know, I think -- I mean, I'm not quite sure what you're asking, but certainly you compare a person's -- their account of the situation now to the account that they had -- they gave to the police to the account that they gave to, you know, their friends, those kinds of things, and they

tell you if there may be distortion or not. Those are --

Q Okay. So in other words --

A -- certainly valid --

Q Sorry.

A -- ways of assessing it.

Q I see. So in other words, it's important to look at other statements she may have made, her deposition testimony, and I assume it would be very important if there are inconsistencies throughout those various forms of her testifying, interviewing with you and the like. Is that correct?

A Yes. If there were significant inconsistencies, they would raise your, you know, concern.

Q And would you agree --

A And then the MMPI does the same thing. It helps you form an hypothesis. It doesn't tell you. It creates hypotheses.

Q And would you agree that the -- that statements close in time to an assault are -- well, I should -- strike that. That individuals have a better memory of what happened close in time to an assault or some other significant event, as opposed to years down the line? Is that correct?

A I think it depends on the event.

Q Please explain.

A Well, I think that -- I think you need to take into account, of course, that statements that are close in time to an assault are going to be colored to some degree by a person's emotional state. That makes sense, doesn't it? So that you might -- a person might forget things. They might be flustered. They might not, you know, think something was significant. There might be something that they thought was not significant early in the course after the assault that later on they thought was more significant and thought that they should mention, so certainly when people give accounts of an assault right after an event, they're giving their -- what they think at that moment needed to be attended to, but that can change. That can evolve over time.

Q I think that's answering a different question. You're saying attributing the significance of certain events or certain facts, that may change. That may be different soon after or later, and that's what I think you're speaking to. Is that correct?

A That's part of what I'm speaking to.

Q What I'm asking, though, is the specific memory, one's memory tends to be better in time close to an event rather than years later. Do you not agree with that?

MR. HOROWITZ: Objection. Asked and answered.

THE COURT: Sustained. Ask him if you want him

to explain it, but I think he's -- the particular question I think you've asked, I think he has answered. If you want to ask some other aspect of that question, I think that that's fair game. He's already told you the answer to that question is no, so if you want to explore the question, I think that's fine.

BY MR. BRYANT:

Q And maybe I didn't get the answer, but is it your response then that one's memory close in time to an event is not as good as it is years later?

MR. HOROWITZ: Objection. Asked and answered.

THE COURT: No. That's not asked and answered. Go ahead and ask the question again.

THE WITNESS: I don't think that I can -- I don't think that there's a yes or no answer to that one. I think that -- there's some variability to how memories work, what people remember when. When something -- I would say that if -- let me see. I'm trying to think of an example. If there's something very objective that I -- you know, what did I do yesterday from, you know, 12:00 until 1:00, or something like that, you know, I can say, Well, okay, I remember, you know, today in my kind of cool-headed state of mind can say, Well, yes, I went and I had lunch, and I went to this restaurant or something. I think that would be more accurate than it would be ten years from now or five years

now.

However, I think there's some -- a little bit of fluidity to memory around the time of a traumatic event that sometimes people don't remember things as well immediately as they might later on. You know, that's just kind of -- maybe a subtle issue, but I think there are things that --

BY MR. BRYANT:

Q Well, is it your opinion that Lavetta's memory, based on your interviews with her and review of the documents, was better in the interviews you had with her from February through April 2007 about the assault, or was it better the day of the assault and in the days thereafter in January 7, 2003?

A They were what they were. I mean, it was simply her account at different times, and they were meaningful, I mean, comparing them to each other. That's what I felt I should do. I didn't feel like I should say, Well, which one is really true. Was there some consistency between them? Was there inconsistency? Was the inconsistency meaningful? You know, those kinds of issues.

Q So it sounds like you don't have an opinion whether her memory was better then as opposed to when you interviewed her in 2007.

A That's probably accurate.

Q Okay. And in terms of the inconsistencies that

there may be or consistencies through documents, statements, and testimony and interviews with you, you do agree that those are significant and things that need to be examined and explored.

A Sure.

Q And in terms of you mentioned in your reference to the next day, if you had a cool head, I think was the description you used, your memory would be better.

A Yes.

Q And would you agree that someone who is -- appears to be calm and is responsive to questions and is -- has eye contact or appears to understand what questions are being asked and responding to them, that would be a person in that sort of mental state that would tend to have a better memory than perhaps one who's hysterical?

A I think that's, generally speaking, true. However, there are certainly who look calm and coherent who aren't.

Q But generally speaking, you would agree with that.

A Yes.

Q Briefly turning back to the MMPI-II for a moment, do you agree that it's the most widely analyzed and validated psychological test in the world?

A I think that's accurate.

Q And are you aware that -- or what's your understanding of the approximate number of academic discussions of its scales, for example?
A Oh, gosh, I don't know. I mean, a lot of them.
Q Tens of thousands?
A Probably.
Q You wouldn't disagree that it might be 50,000 or more.
A I wouldn't disagree with that.
Q And that scale is reliability, replicability, discussions of those issues?
A I don't know if there are 50,000 discussions of the validity scales. I don't know.
Q But you know there's a lot.
A I know there are a lot.
Q Would you agree it's an effective tool in identifying the reliability of the test-taking attitude of the individual taking the test?
A I think it's a good tool to form hypotheses out of.
Q And you trust the methodology, I gather.
A Sure.
Q Turning back to your report on page 4, you list surgical problems, and it says, "She has had two dilation and curettages." What is that referring to?

A D&Cs. It's a strategy -- or it's a tool, a procedure that's used to clean out a uterus.

Q And I gather you're referring to the miscarriages.

A I think they were after the miscarriages.

Q And did you discuss with Ms. Elk in her interviews the psychological impact she experienced as a result of the miscarriages she suffered?

A I think -- I mean, I don't think I documented that. I believe that there was brief discussion that they were events that occurred and, you know, were of some difficulty for her, but then she moved on.

Q So you didn't think they were significant psychological stressors?

A I thought they were acute stressors that she dealt with quickly.

Q What about the fact that it's -- that it was sort of one after another? Does that tend to take it away from just an acute stressor that one moves on from? Doesn't that make it sort of more impactful and worse, the more you go along and the more of those that occur? And that's as a general matter, not maybe so much with Ms. Elk at the moment.

A My impression was that some of them were -- some of the miscarriages, at least one of them and maybe more,

were -- occurred when she was on birth control pills or thought she was on birth control, had been using some kind of contraception, so my impression was that, you know, those weren't highly wanted pregnancies, and so I'm not sure that all of these pregnancies were, you know, like a person who desperately wanted to be pregnant.

I think that to the extent that a person really wanted to be pregnant, certainly a miscarriage would be something that would be an unhappy event.

Q And you've heard the testimony of Lavetta's mother yesterday, Jerilyn Elk.

A Yes, I did.

Q Regarding the burial service for one of those stillborn babies.

A Yes. I mean, I don't actually -- I'm not sure I was here for that, but I'm aware of that.

Q And did you -- so did you hear Ms. Elk talk about the family being devastated as a result of that?

A I think I was not here for that, but I believe they could have been upset about it.

Q And did Ms. Elk in your interviews with her share similar descriptions of that event and how it impacted her?

A I don't think that we talked about that event.

Q But you did ask her for not just psychological treatment or depression she might have suffered before the

assault. You also asked her for any other things that might have happened that would affect her.

A I tried to, you know, make myself open to that information as well as I could.

Q And she didn't bring that information forward?

A Which information?

Q About the burial of this stillborn baby?

A No. I don't recall talking about that. I don't recall that coming forward.

Q Having that information now, would that affect your opinions in any way?

A Well, I think that that would be a sad event. I think it's the kind of sad event that most people deal with and move through okay, and it certainly is not an event that would have caused the symptoms of post traumatic stress disorder that she has. I would have expected that to cause sort of an adjustment disorder with a depressed mood.

Q And speaking of sadness, we've heard -- and I don't know if you were here or not, but we've heard a number of the witnesses describe Lavetta's sadness or being sad, a layman description. And my question for you is: Is it possible that a layperson's description of the psychological trauma as sadness, that same exact sadness might, for a psychiatrist like yourself, be diagnosed as depression?

A Certainly people come in and say, I'm here

because I'm too sad, and we make a diagnosis of depression, so that certainly can occur.

Q Have you looked at the documents that we -- the medical records that we went through yesterday since the time of your report that refer to Ms. Elk's treatment for depression in February and April 2002?

A I have.

Q Is it possible that her not disclosing those to you in the interviews might be her minimizing or attempting to minimize the psychological harm she experienced at that time? Is that possible?

A It's an interesting question. I think it is -- I think that is in the realm of possibility. I don't think that is a really significant piece of information, though.

Q And when you say it's not a significant piece of information, you're referring to the diagnosis and the treatment itself. Are you also referring to the potential of an inconsistency of failure to divulge information on both counts?

A I'm mostly referring to -- I thought I was referring to the fact that she didn't disclose it to me.

Q Okay. So the latter you're talking about.

A Yes.

Q And so you didn't think that that was a significant issue, that she didn't disclose that

information.

A I mean, I think it was notable. I think it's worthwhile that it came up, but I think it's not surprising that she didn't mention it to me, because I don't think it was something that was really notable to her at the time that I was talking to her.

Q You don't think it's significant even though -- and I think you said this before -- that you did specifically ask for any psychological treatment she may have sought and obtained before the assault, though.

A Yes. This happens all the time. People don't recall -- you know, I've had people come into my office to see me for a new evaluation who I've seen before, and they don't even remember -- they can't even tell me that they've seen me before, and I've got their record in front of me. So in other words, people don't always remember things that they have done in the past.

If you've ever filled out an insurance document that asks about your medical history -- you're probably too young to have needed to that, but, you know, I mean, I have a hard time remembering medical events in my life or different people that I've seen, so I wouldn't do it unless I actually have the documents or something to prove that I had -- it would be complete.

Q Let's explore that a little bit. Did you

specifically ask her whether she ever suffered depression leading up to the assault?

A No. I asked her if she had any psychiatric, psychological problems, you know, that she had noted before then, you know.

Q You didn't think it was necessary to delve further and see if there was any specific like PTSD, for example, that she may have suffered previously?

A Well, there's no reason to ask her if she had PTSD. There was no trauma that she had described.

Q That you're aware of. My point is: Did you not think it was necessary to ask whether she specifically had depression previously, or did you just simply ask, Well, was there any other psychological problems?

A I would say that that's a pretty appropriate opening statement to say, Have you had any psychological or psychiatric problems. That's a broad, open-ended question that is fairly inclusive, and I didn't, wrongly, I guess, in retrospect, didn't go back and say specifically, Were you ever treated through IHS for depression. I think if I would have done that, I might have gotten a response about this.

But I think that, you know, when you're asking people questions, you know, they're hearing it, and they're answering about what they're attending to in their lives and what's important to them in their lives. And if I don't ask

it specifically enough, then I may not get exactly the information I'm looking for. So, yes. I probably made an error in not being more specific in this case.

Q And that's what I was going to ask. Isn't that your job, to delve further and make sure you're getting all that information?

A That's my job.

Q And you failed in that regard with respect to this --

A I would say that I did not get that piece of information.

Q Well, it wasn't just one piece of information. It was pieces of information. Is that right?

A What do you mean?

Q It was multiple going to the hospital for treatment of depression. She went four times.

A Four times? I can't remember exactly, but it was a few times. It was, you know --

MR. HOROWITZ: I'm objecting to the counsel testifying about the number of times.

THE COURT: I don't think he is. He's asking for opinions based upon -- first of all, I think it's factually accurate, and second of all, I think that it's an appropriate question.

BY MR. BRYANT:

Q I want to turn now, Dr. Manlove, to your discussion on direct examination of known abductions on the reservation, and I believe you described it as that's an important piece of this case. Is that -- that's what you said?

A I think so.

Q And that's your belief. Is that true?

A That's accurate.

Q But known abductions was not -- sort of the history of known abductions and its impact on Native Americans specifically, you didn't discuss that in your report, did you?

A No.

Q And what is your source of information for the known abductions as you described?

A Well, I've been doing forensic work in this area for quite a while, and I do a lot of criminal work, and I've seen, you know -- I've seen -- I don't know -- five cases, something like that, in the past ten years, where people have -- something like this has occurred.

Q Five cases?

A Yes. Maybe. I'm just estimating. The other issue is the Anna Mae Aquash story that is all over the news, and most people are aware of it.

Q Was that the woman in the trunk you were talking

about earlier?

A No, no. She was involved with the American Indian Movement in 1972, and she was abducted and taken out to a remote part of the reservation and was murdered and left there. And it just happens to be that in the past couple of years, the people who were charged with that crime are -- they found the people who are charged with that crime, and they're coming to trial. So it's been an item that's been, you know, well-known in this area about the events of that case.

Q And how many Native Americans have you talked to about that case?

A About Anna Mae Aquash?

Q Yes.

A You know, I was just talking to a couple last night about it, about -- I was asking about what would they think if they were taken, you know, somewhere on the reservation, and they said, Well, Anna Mae Aquash. That was their response.

Q And who were these individuals you were talking to?

A You want their names?

Q Yes.

A Okay. One was named Lynn Rapp and one was named Frank Rapp. They're brother and sister who grew up on the

edge of Pine Ridge and ranch.

Q Now, the five cases you mentioned in the last how many years? I'm sorry.

A Maybe ten years.

Q Ten years. And how many of those cases involved a non-Native American going on the reservation and abducting someone?

A They weren't generally non-Native American. One of them was an American Indian who abducted a white person. Another one was --

Q A Native American abducting a white person, you say?

A Yes. Essentially.

Q All right. So that was one of the cases. Let's talk about the four others.

A I'm not going to be able to give you real accurate data on those. I mean --

Q You did say these are well-known abductions in the Native American community and in your own experience as a forensic psychiatrist, so you mentioned five cases. If you could talk about those, I'd appreciate it. You mentioned one. How many of them involved a white person or white people abducting a Native American and taking them to a remote location on the reservation and killing them or doing something else of the like?

A Okay. The case involving the white guy who was abducted was from Martin, and he was taken by some friends who were Indians to -- they were going to go drinking together. They went out to a remote part of the reservation, and they beat him and killed him.

Q So this was a group of males. Is that correct?

A It was males. Yes.

Q And they were all Native Americans.

A Well, except for the white guy who got killed.

Q Okay. I'm sorry. And that's the one case you've talked about. What about the four other cases you mentioned?

A You know, I may have to think about this for a minute, but let me just give -- give me a minute, and I can --

Q Are you still certain these are very well known abductions, or do you want to pull back from that statement?

A No. I -- you know, everybody I've talked to about this kind of situation on the reservation --

Q Everybody?

A Everybody who's involved in that area has told me that they are aware that, you know, if you get driven to a remote location, you are in serious danger.

Q And what did they tell you about these four other cases that you can't recall? What did these people, these

everybody that you talked to about on the reservation, what did they say about these four other cases?

A What do you mean? I wasn't asking them about those --

Q You mentioned you've talked to people, and everybody you talked to about it tells you this concern about going to a remote location on the reservation. Did you talk to these people about these four cases that you can't remember?

A No. Why would I have done that?

Q So you agree these five cases that you mentioned that are so well known really aren't that well known.

A Well, no. I guess I don't agree with that. I mean, I think the people that I speak to are referencing those kinds of cases, so I've talked to somewhere around 20 people, just because I was curious what level of fear would they have that they were going to be abducted, and they say things like, Well, Anna Mae Aquash. Or they say things like, you know -- well, there's this joke that if somebody takes you out from the reservation, you know, out in the sticks, you're going to be thrown off of a cliff. Or there's -- you know, this situation that, you know, that they are aware of.

I don't know if they were referencing those five cases specifically, but I do not think that this is -- I'm

not just making this up. That's not a fair characterization of what I'm talking about.

Q But you can't specifically remember the five cases that you cited. That's --

A Well, if you'd like me to, give me a few minutes. You've interrupted me when I was going to start going through those.

Q And the -- I'm sorry. I can't pronounce it. The Minnaqua [phonetic], the case you just mentioned, the case that you do remember, the 1972 case?

A Oh, Anna Mae Aquash.

Q Thank you. That was a Native American abduction as well. Is that right?

A That's true.

Q Okay. And you mentioned also in your direct testimony, I believe, that a woman placed in the trunk of a car, locked in the trunk of a car, and I think -- you were describing an abduction where a woman was thrown into the trunk of a car. Do you recall that testimony?

A Yes.

Q And I think you said specifically you're not sure that that is radically different from the situation we have here.

A That's accurate.

Q And you stick by that.

A Sure.

Q Now, in that case, do you know the facts of that case?

A Yes.

Q And in that case, were the woman -- who abducted the woman? Was it one person or was it a group of people?

A It was a man.

Q It was one man?

A Uh-huh.

Q And was he white or was he Native American?

A I mean, I guess I wasn't saying that that specific case is the same as this case. I was saying that the general idea --

Q Would you please answer my question.

A -- was she was put into a trunk and taken off the reservation.

THE COURT: Doctor, I need you to answer his question, and then Mr. Horowitz can bring out additional points if he wants to on questioning.

Go ahead. Ask the question again, Mr. Bryant.

MR. BRYANT: If I can remember it.

BY MR. BRYANT:

Q That case, of the woman being abducted in the trunk, was that Native Americans, or what were the --

A Those were actually both Caucasian.

Q Both Caucasian. Okay. And were those individuals, were they friends?

A No.

Q So I assume it was a male that abducted the female.

A Yes.

Q And did she -- did he drag her off the street somewhere and abduct her?

A No.

Q In other words, did they have a prior relationship or friendship or anything?

A No.

Q Did the man in that case bring a flower to that woman at her place of business?

A No.

Q Okay. Do you still think it's radically different -- it's not radically different from the situation we have here?

A The fear that one has when put in the trunk of a car and they're being abducted would be similar to the kind of fear that one would have when they were being taken control of by a person that they felt that they were weaker than and who drove them to a place where they could not get help. They're formally similar situations. You are being controlled by somebody else and taken away to a place where

something bad could happen to you. I think they are similar.

Q And would you agree -- strike that. I want to turn back to your report, PX-8, on page 5. And you talk about -- there's a section about the Plaintiff's account of the assault, what led up to it, and so forth. Is that correct?

A That was number 17.

Q Thank you. First I want to step back from the assault itself but prior to that. Did Lavetta in the interviews tell you that she was -- when she was at college, that she was homesick?

A In the interviews that I did with her?

Q Yes.

A Yes. I think I was aware of that.

Q And did she also talk about the close relationship she has with her extended family?

A Yes. Certainly.

Q And she was in Rockhurst University. You're aware of that.

A Yes.

Q And that's several hours away.

A Uh-huh.

Q And so she missed her family.

A Right.

Q Did she tell you that while she was away, that she had phone conversations and email communications with the sergeant?

A Yes.

Q And she told you that when her grandfather died or great-uncle, the person she chose to share that with was Sergeant Kopf?

A No. She told me that he was one of the people she shared that with.

Q Did she tell you that he was the first person she called to share that with or email?

A I don't recall that.

Q She did tell you that she quit school and then came home. Is that correct?

A Yes. She -- my understanding was that she left school to come to the funeral, and I don't know if she quit at that moment.

Q Okay. I'm referring to the fourth paragraph from the bottom of page 5, the last sentence, if you could read that. "She quit school and came home." Is that what she told you in the interview?

A Yes. So it's -- if you look at that paragraph, it says, later, and not saying exactly when that was. So I don't know. Eventually she did quit school, but I'm not saying that she quit school the day she heard of her great-

uncle or somebody dying, at that point quit school, but I know she did quit at some point.

Q I guess -- I'm not suggesting it had anything to do with the grandfather or not either way. I'm saying: Did she tell you that she quit school, quit college and came home?

A Yes. At some point she did that. Yes.

Q Okay. So was it then your understanding that when she quit college, she wasn't yet accepted into the Army?

A Yes. That's my understanding.

Q Assuming she was not accepted into the Army, would that change your opinion as to the damages, as you phrased it, one might view?

A Well, it would -- I guess she wouldn't have had the damage of -- the specific damage that would be due to her not pursuing the military, you know, after the assault.

Q She wouldn't have the damages associated with a military career if she were not accepted into the Army. Is that correct?

A Well, that's true, but I'm not sure if that's -- that wasn't what I was just saying.

Q Well, that's what I'm asking. And the same question for college. If she quit college, then would that impact your opinion as to the damages, again, one might view

if she quit college, because you refer to, you know, she might have continued and made a career.

A Well, I think there's a difference between those two issues. I think that if she -- you know, she might have resumed college. I think that seems very possible, despite not getting into the military, but I think she probably wouldn't have -- you know, if she hadn't been accepted, then she would have gone in to the military. Yes.

Q It seemed reasonable that she might resume college, even though she quit school and came home?

A It happens all the time.

Q And that was after two months, less than two months, of attending school?

A That's my understanding.

Q Did you ask her how she was doing in terms of academically? Did she have any grades at that point?

A Yes. I suppose she probably didn't even have grades at that time.

Q So you'd agree then that you're speculating that she would have been successful in college. Is that correct?

A You know, I don't know that for sure. I think she had been successful in high school, and it sounded like she -- from everything that I know, she had the potential to be a college student.

Q I want to shift gears for a moment --

THE COURT: Actually, why don't we do this, because I get the sense that -- am I right that you're not a few minutes from being done, that you have a little while to go here?

MR. BRYANT: I'm sorry, Your Honor?

THE COURT: I'm trying to get an estimate as to how much longer you're going to go so I can estimate --

MR. BRYANT: I have a ways to go.

THE COURT: Well, as long as it's not more than a few minutes, we're going to take a lunch break, so --

MR. BRYANT: Oh, it's going to be much longer than a few minutes.

THE COURT: All right. So let's go ahead and take our break then, and we're going to go from now, and we'll resume at 1:45. And at that point, we'll resume with cross-examination at that time. Anything that we need to take up, Mr. Bryant, before we take a break?

MR. BRYANT: No, Your Honor.

THE COURT: Anything like that, Mr. Horowitz?

MR. HOROWITZ: Nothing.

THE COURT: All right. So we're going to resume then with this witness at 1:45.

(Whereupon, at 12:40 p.m., the trial in the above-entitled matter was recessed, to resume at 1:45 p.m., this same day, Tuesday, April 29, 2008.)

A F T E R N O O N   S E S S I O N

(2:04 p.m.)

THE COURT: Mr. Bryant, you have an exhibit you want to offer?

MR. BRYANT: There is. There's one housekeeping matter.

THE COURT: Go ahead and stay seated, Mr. Bryant. You can stay seated.

MR. BRYANT: Oh, yes, sir. What I have are the notes that Dr. Manlove took with the interviews with Ms. Elk, and these were originally marked as an exhibit on Plaintiff's exhibit list. They removed it, and we haven't seen them until now. I haven't had a chance to look at them. We may want the opportunity to cross-examine on this document once we -- I'm going to have co-counsel review it while I'm doing my examination.

THE COURT: They had something on their list that you've not seen before? How could that happen?

MR. BRYANT: I was informed -- and I would defer to Mr. Horowitz, but I was informed that they were lost or that you didn't have them, is what I -- okay. I'll defer to Mr. Horowitz.

THE COURT: Well, they were on their list. I mean, how did -- I would think that the first thing that you'd be doing is objecting to anything that's on their list

that you don't have.

MR. BRYANT: I requested repeatedly these documents, and they weren't forthcoming, and then through that process, Mr. Horowitz informed me that, We don't have these, so we're going to withdraw them as an exhibit. So I said, Okay. And then I found out on examination that he -- that Dr. Manlove does have these notes.

THE COURT: All right. So at this point, you're marking just -- are you going to introduce them, or are you going to potentially introduce them?

MR. BRYANT: Potentially. I don't even know, because we haven't had the time to even look at them.

THE COURT: All right. Well, then, rather than getting into too much debate as to how we got where we're at now, I think your proposed solution is reasonable, so why don't you go ahead and operate on the assumption that if you need them, that we can admit them in as Defendant's, I guess it would be, 21. That's next in sequence.

And for now, let's wait and see, I guess, where you come out on that. But anticipate -- and I know you have enough copies, because we just provided them with them, but if the need arises to use them, that we can introduce them as 21.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. So anything else from a

housekeeping standpoint, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: Anything else, Mr. Horowitz?

MR. HOROWITZ: Nothing.

THE COURT: All right. Then, Mr. Bryant, why don't you go ahead and resume your cross-examination.

MR. BRYANT: Thank you.

BY MR. BRYANT:

Q Good afternoon, Dr. Manlove.

A Good afternoon.

Q I think where I left off is I said I was going to shift gears, and I'd like to now talk to you about the time of an assault, how long an assault lasts and what impact that may have. Would you agree that the length of the time of an assault, sexual assault, or -- we'll leave it at that -- a sexual assault may be relevant to the psychological trauma that would be associated with the assault?

A Sure.

Q In other words, the longer the assault, potentially the more damaging it would be psychologically?

A That would be one factor to consider.

Q Would there be something else?

A Sure. I mean, the situation, the --

Q Okay. Fair enough. But that's one piece to be

considered. Did you uncover an estimated time for the time of Sergeant Kopf's assault of Ms. Elk?

A I don't think I asked her for an estimated time.

Q Did you uncover it in the review of the various statements she made to criminal investigators?

A I can't remember, but I think that I've heard her say that she thought it was maybe 30 minutes.

Q And that was going to be my question. Is the first time you've heard that estimate of time yesterday with her testimony?

A I'm not certain about that, but I did hear it yesterday.

Q Is there anything that you would need to look at that would refresh your recollection as to whether you heard it before?

A Yes. The accounts, the other accounts.

Q I'm sorry?

A The other accounts, I would need to review.

Q Okay. All right. But if you did find it in the accounts, the statements, you agree that it's something that could potentially be significant. Is that right?

A Sure.

Q And Ms. Elk's representation of it lasting 30 minutes, would you consider that significant, if, in fact, it lasted that long?

A Well, you know, I think she's making her best guess at it. You know, I don't think she was timing it. It would be unlikely that she was.

Q Well, I want to --

A I heard her saying, This went on for quite a while but not forever.

Q And I'm not talking about the characterization of her testimony. I'm talking about, let's assume for the moment that, in fact, the assault did last 30 minutes as she represented on her testimony. Would that be a significant fact for you?

A It would be -- yes. It would be a fact that I'd consider.

Q Is that something you would include in your report?

A I would probably, if she would have -- if I would have had that, I would probably written it down.

Q You probably would have?

A I think so.

Q So if you're saying you probably would have, you may not have? I'm trying to figure out how -- if it's significant or not. Is it? I mean, if it were 30 minutes --

A Yes. I think it's significant. Sure.

Q So if she told you it were 30 minutes in one of

those three interviews, that's something you would have put in your report. Is that correct?

A Well, yes. I would have done that, if she had told me.

Q And it's not in the report. Is that correct?

A I believe that's accurate.

Q So is yesterday the first time you've ever heard an estimate of that assault lasting 30 minutes?

A I didn't memorize all of the accounts, okay, so I'm not -- I recall -- that's the first thing I remember or remember it from some other source. It may well have been from another source, but I didn't -- I don't have that committed to memory.

Q And would the sources that you would look at, the statement that she made on January 2003 within hours of the assault?

A That would be one source.

Q That would be one. Correct? And would you also look at the statement that was -- that you have in your source of information on page 2 of your report, paragraph 4, subparagraph (f), the statement of Lavetta Elk regarding January 7, 2003, that was received January 9? Is that something else you would consider?

A Sure.

Q Okay. And I gather you would look at the

deposition of Ms. Elk as well?

A I would.

Q Is there anything else you'd look at?

A I think the main sources would be police reports and the depositions.

Q I should have also pointed out the BIA report dated 1/7/03 that's your subparagraph 4(j). You would look at that also?

A Sure. Police reports and depositions would be the main sources.

Q And then subparagraph 4(m), the public safety report dated 1/7/03.

A I couldn't understand you.

Q I'm sorry. Would you also look at, on page 2 of your report, subparagraph 4(m), the Oglala Lakota Nation Department of Public Safety report dated 1/7/03?

A Yes.

Q And is the final thing you would look at to verify that the interviews you did with Ms. Elk on those three occasions, your notes from the interviews?

A I would look at all of them. I'm not sure which order I would look at them in.

Q What I'm trying to find out is: What are all the sources that you would look at to verify whether you've ever heard this before or seen it before?

A Yes. Those are the sources.

Q And that's the full picture of the sources you would look at.

A I think so.

Q Okay. And you do have --

MR. BRYANT: I think this is the time to talk about the interview notes, Your Honor, DX-21.

BY MR. BRYANT:

Q You have in front of you your notes. Is that correct, Dr. Manlove?

A I do.

MR. BRYANT: May I approach the witness?

THE COURT: You may. If you're going to start to use it, though, I think everybody's going to have to get their copies.

MR. BRYANT: Let me get it marked.

(The document referred to was marked for identification as Defendant's Exhibit 21.)

MR. BRYANT: Should I provide this to you, Your Honor?

THE COURT: Actually if you can just give me one of the other -- the reporter's copy should stay with the reporter, so that first one should stay with the reporter, and if you could distribute the other ones that you have,

that would be fine.

MR. BRYANT: The three that --

THE COURT: Well, we made six, so I don't know how -- I thought we had six.

THE CLERK: I think I made five.

THE COURT: You made five. All right. If there's just five then, Mr. Bryant, then you can just give us one and distribute the rest. The main thing is to make sure the witness has one, that I have one, that Mr. Horowitz has one, and of course, that you have one.

MR. BRYANT: (Handing documents.)

BY MR. BRYANT:

Q If you could please review your notes, Dr. Manlove, and tell me if you find any estimate of the time that the assault -- how long the assault occurred according to Ms. Elk in your interviews.

A (Perusing document.)

Q And please let me know when you've completed that review.

A (Perusing document.) I don't see a time.

Q Okay. So that would account for all three of your interviews with Ms. Elk. Is that correct?

A Yes.

Q And with regard to the statements, I think we'll come back to that in a moment, because I'm going to ask you

other questions about that. I'd like to now turn to PX -- I'm sorry -- page 7 of your report, again PX-8. Let me know when you're there.

A I'm with you.

Q And it's paragraph 18 -- I mean, Section 18, effect of the alleged sexual molestation, as you described it.

A Yes.

Q In paragraph (c) there, you say that, "Lavetta reports that she is sad and wants to cry very frequently. She notes that she has wanted to cry every day since the sexual assault." Did you inquire with her whether there were days where she was happy and didn't cry?

A Yes. She said she had times of some happiness, but she said that virtually every day -- you know, I mean, she said every day she has the need to cry at some point.

Q And I understand your opinion on direct, but I'm going to ask you another question regarding the pre-assault depression that we've talked about earlier. Is it possible that the pre-assault depression could have contributed to her sadness that she is subsequently experiencing after the assault? Is that possible?

A Well, it is true that people who have depression at one point in their life are probably more prone to have depression at another time, so it's possible.

Q Outside of that context, where you're prone to depression again, might the events that led to the depression she was treated for in 2002, the deaths of loved ones and so forth, is it possible that that would have contributed to her sadness that she's experienced, as you said, virtually every day following the assault? Is it possible that those sorts of emotions would have stayed with her?

A Well, it's possible that she could have had some predisposition to depression that was worsened or something. She indicates that it was significantly worse, I guess.

Q And she did inform you that she was very close to the loved ones that died associated with the depression she experienced in 2002?

A Yes. She said she was close to them.

Q And might the depression from the miscarriages that she experienced, might that have contributed to her sadness after the assault?

MR. HOROWITZ: Objection. I think that's misstating the testimony.

THE COURT: There's no testimony that I know of that clinically observed her as being depressed as a result of the miscarriages.

MR. BRYANT: I'll rephrase.

BY MR. BRYANT:

Q Might the sadness that we talked about that she experienced from the miscarriages, might that have contributed to her crying, as she said, virtually every day, as she described to you?

A Well, I think it's normal for people to be sad after miscarriages, if it's a wanted pregnancy, and so it wouldn't be surprising if she were sad as a result of that. I don't really see how that would have created this prolonged, dramatic picture that she has now, though. I think that would be unusual.

Q But it is possible.

A It's a possibility.

Q And you'd agree that -- well, strike that. And you didn't discuss any of those possibilities in your report, did you?

A No. I didn't think that they were likely strong factors in this situation.

Q So you didn't explain in your report that they were not strong factors in any sense?

A I didn't explain that. No.

Q Okay.

A I just didn't -- I didn't think they were factors.

Q And staying at page 7, you also discussed -- actually towards the top of the page, the second paragraph,

where Ms. Elk obtained a restraining order --

A Yes.

Q You recall that. And on the -- I think it's the fourth sentence, you say, "Despite that, Sergeant Kopf continued to call her and email her." Is that despite the restraining order, he continued to call her?

A Yes.

Q And you're sure of that?

A That's what I understood her to be telling me.

Q That's what she told you.

A That's how I understood it. Yes.

Q I'd like you to look at for a moment -- well, did you find in your review of the various documents, deposition testimony of Ms. Elk, anything that contradicted that statement she made to you about contact after the restraining order?

A Not specifically. Not that I remember.

Q If I can direct your attention to the binders, DX-9C, page DEF 1638, and if you need some assistance, please let me know.

A Did you say DES?

Q DEF -- I'm sorry.

MR. BRYANT: May I approach, Your Honor?

THE COURT: Yes.

(Pause.)

BY MR. BRYANT:
Q 1638.
A I'm there.
Q And I'm right now referring to -- this is actually before the restraining order. If you could turn to page -- I'm sorry -- the next page, 1639, and the question on line 5 is -- and if you need to go back to read further to put it in context, please let me know. That's fine.
Question: "Did you ever receive any emails from Sergeant Kopf?" The answer was, "No." And the next question: "Did you seek a restraining order against Sergeant Kopf?
"Yes." Does this contradict your statement of continued emails?
A Yes. That's a different statement.
Q I have no further questions about that at the moment. And then turning to page 9 of your report, the formulation section -- and you talked about this on direct examination, that it's your opinion that she has experienced post traumatic stress disorder. That's the last paragraph of page 9, first sentence. Do you see that?
A Yes.
Q And I think it says, if you follow there, "The essential feature of post traumatic stress disorder is the development of characteristic symptoms following exposure to

an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury or other threat to one's physical integrity." Do you agree with that?

A Yes.

Q And then on the next page, page 10, the second paragraph, again referring to the DSM, which is talking about PTSD here, I believe -- and correct me if I'm wrong. "The DSM-IV TR notes that the person's response to the event must involve intense fear, helplessness or horror. In Ms. Elk's situation, she was extremely frightened at the time of the sexual molestation" -- as you characterize it. "She had intense fear, and she also felt somewhat helpless, because she was with a person who she believed was physically powerful and able to do what he wanted to do."

That's your -- one of your opinions. Right?

A That is accurate.

Q And what did you find in your review of the various statements, deposition testimony and other documents, such as criminal investigation reports, that contradict that claim of extreme fear and being extremely frightened, as you have stated here?

A And contradicted?

Q That's my question. Yes.

A (No response.)

Q You're still contemplating that --
A I'm having a hard time thinking of something that contradicts that.
Q Does that mean you didn't find anything that contradicted it, or you just don't remember at the moment?
A You know, I guess they sort of mean the same thing to me. I mean, if I don't remember it, I don't recall finding it.
Q Okay. If you had found something that contradicted this statement of extreme fear, would you have put it in your report and explained it?
A I'm not sure. It depends on what it was.
Q Let me direct your attention to DX-11, and if you need assistance, let me know.
A DEF 11?
Q I'm sorry.
MR. BRYANT: May I approach, Your Honor?
THE COURT: Yes.
(Pause.)
BY MR. BRYANT:
Q Let me know when you've had a chance to look at that document.
A (Perusing document.)
Q And I'm just going to ask you generally about the document itself first, not the entire substance.

A (Perusing document.)
Q Do you recognize the document, Dr. Manlove?
A I believe so.
Q Is this the BIA report dated 1/7/03 that you had referenced in your sources of information on page 2, paragraph 4, subparagraph (j)?
A It seems like that would be it.
Q If I could direct your attention to page 3 of this document --
THE COURT: Why don't you use the DEF numbers since --
MR. BRYANT: My apologies, Your Honor.
BY MR. BRYANT:
Q DEF 0094. Thank you. The very bottom of that page. I'll go ahead and read that. "Elk said that Kopf was making no threats of harm. Elk advised that on a fear scale of 1 to 10, 1 being totally unafraid and 10 being totally frightened, that she was a 6."
Do you consider that that statement contradicts your statement of assessment of extreme fear, intense fear which you have identified in your report?
A That would weigh against my statement.
Q It contradicts your statement, does it not?
A Well, she's saying that she's got some significant fear. It's just not extreme fear.

Q Is it inconsistent with your statement that she was extremely frightened and suffered intense fear during the assault with Sergeant Kopf?

A I think that it's a different statement, and I'm sure that -- they're not like opposites or something like that. They're in close proximity to each other.

Q So you think this statement is consistent with your assessment that she was experiencing extreme fear, intense fear, during the assault with Sergeant Kopf. Is that what you're saying?

A I think I just said what I was saying. I mean, I think it leans in that direction. It's saying that the fear wasn't as much as I was hearing, but it was some significant amount of fear.

Q So if she had said, 10, which is totally frightened, that certainly would have been consistent with your statement of extreme fright.

A Certainly.

Q And if she had said, 1, which is totally unafraid, that would not have been consistent with your statement. Is that right?

A That's true.

Q And what is your testimony regarding 6 on this scale?

A It sounds like it's significant fear but not

overwhelming fear.

Q It doesn't sound like it's kind of in the middle between totally unafraid and extremely frightened?

A It's in the middle area. Sure.

Q And you didn't discuss this in your report, did you?

A No, I didn't.

Q You didn't explain why you think this is consistent with your assessment of her being extremely frightened.

A I didn't.

Q I'd now like to turn your attention to DX-18, which should be in the same exact binder, Dr. Manlove. Have you reviewed this statement?

A I have.

Q Is this referenced in your report on page 2 as the paragraph 4, subparagraph (m), the Oglala Lakota National Department of Public Safety report, dated 1/7/03?

A That sounds probably accurate.

Q In any event, you've reviewed this statement.

A This isn't titled that here, I guess.

Q In any event, you have reviewed this statement in your evaluation.

A Yes.

Q Okay. Can you tell me anywhere in here in this

statement where Ms. Elk describes herself as being extremely frightened?

A May I read it?

Q Oh, of course. Please do. Yes.

A (Perusing document.) I guess that the statement of fright or being upset might be -- in this particular one is that she went to the bathroom and threw up.

Q Do you see anywhere in this document where she described herself as being extremely frightened?

A I don't see her using those exact words.

Q Okay. I'm going to direct your attention -- and just for some clarification, you've gone to the next page, DEF 97?

A Yes.

Q And that's signed by Lavetta Elk, dated 1/7/03. Is that correct?

A Yes.

Q Okay. Returning back to DEF 096 -- and I obviously don't want to read the whole thing, but I want to pick out a portion here. On the -- I believe it's 14 lines from the bottom, and it starts, "He stopped and started asking about my family and how things were going. He leaned over and said he was going to take care of me. He started kissing me again. Pretty soon he started putting his hand up my shirt. I kept pushing him away. Pretty soon he

stopped. I was asking him where he needed to go and suggested that we go. We started back towards Manderson. We took the back road between Manderson and the Evergreen Road" -- I believe that says.

Is that statement that I just referred consistent with being extremely frightened or intense fear that you describe in your report?

A It doesn't really seem like she's describing her emotional state to me there.

Q So you're saying it's -- are you saying it's consistent --

A I believe she's describing the activities or the acts that were going on.

Q Do you agree that that sounds like a pretty matter-of-fact rendition of her --

A She was describing a sequence of events.

Q Okay. Is your interpretation of that sequence of events that she's extremely frightened or not or just --

A I don't think you can interpret that.

Q It's not relevant to that question.

A I don't think you can make -- I think you can say, is it potentially a frightening event. It's an event that could be very frightening, but we -- she doesn't say that in --

Q It's not specified one way or the other in here.

A Right.

Q Okay. Did you discuss this report at all in your -- this statement at all in your report?

A I don't recall discussing it. I, you know, referenced --

THE COURT: Could you be more specific about the statement? Are you talking about the statement or the admission?

MR. BRYANT: The --

THE COURT: You just read a whole bunch of things, so I'm not even sure I know for record purposes which statement you're referring to when you say -- do you mean the statement in composite? Do you mean the statement in the language you just read? Do you mean a portion of that statement?

MR. BRYANT: I mean the entire statement, any portion of the statement.

BY MR. BRYANT:

Q Did you discuss this statement at all in your report?

A I don't recall specifically referencing it in my report, other than that I reviewed it.

Q If, in fact, she was not extremely frightened, as you claim in your report, then she would not meet the DSM-IV standard for PTSD. Is that correct?

A Yes. That's true. You have to have a sense of fear or concern about bodily harm, those sorts of things.

Q And you also discuss -- I'm sorry -- on page 10 -- and this is that same paragraph, second paragraph. The DSM-IV notes -- and it discusses helplessness as being associated with PTSD. Is that correct?

A Can you tell me where you are?

Q On page 10 of your report, second paragraph, beginning, "The DSM-IV."

A Yes. Helplessness is a term that's used.

Q Do you agree that helplessness is sometimes or can be associated with PTSD?

A Yes. It's that sense of being not in control of yourself, of your body.

Q And was it your -- is it your opinion that Ms. Elk was helpless during this assault?

A Yes. I think she felt that she wasn't in control of her body.

Q Okay. I want to go back to DX-18 for a moment, and this is the eleventh line from the top. I'm going to read a little bit here, because it's really the only way to do it. My apologies.

"He started asking me about my family and how college was. He slowly started rubbing my hand. I pulled away, but he grabbed my hand. He started talking about how

he thought I was cute and how he liked me. He leaned in to kiss me, but I pushed him away. He kept asking me about what was wrong. He started kissing me. I pushed him away and told him that we shouldn't be doing this and that this was wrong. He just asked why and started kissing me again. I pushed him away and told him I wanted him to stop. He stopped and started asking me about my family."

Are those acts of pushing away and telling him to stop, are they consistent with being -- feeling helpless?

A Yes. I think if you are an Indian woman with a white Army officer that had just been taken somewhere on the -- deep into the country that you didn't -- you knew there wasn't anybody around and you thought that he was making sexual advances of you, you would have some feelings of helplessness.

Q Would you agree that her pushing him away as she describes four times and pulling away one time and then him stopping and telling him to stop and then he does stop, that that's taking control of the situation which would be empowering? Do you agree that that's consistent with that conclusion?

A I think there was --

MR. HOROWITZ: Objection, Your Honor.

THE COURT: I'm having a hard time, I guess, Mr. Bryant, with your course of conduct in terms of the way this

questioning is going and your stipulations in this case, because at some point, I get the sense that you're starting to cross the line. And you stipulated that Sergeant Kopf indecently assaulted Lavetta Elk by kissing her and touching her breasts against her will.

And I'm going to remind you, I guess, that I'm not going to obviate -- I'm not going to allow you essentially to wiggle off of that stipulation. You're getting precariously close to doing so.

MR. BRYANT: That's not my intent at all. What I'm trying to address is the claims of intense fear and feelings of helplessness. It says right here --

THE COURT: Well, if you're going to take statements out of isolation and try to ask him about them, without taking them in the context of your stipulation, then in my view, I guess, you are starting to wiggle off your stipulation, because you're making it sound like those are the only things that happened, and that as a result in those circumstances, can she have experienced the emotions she's having.

And that might be something that would be fair game for you to do, had you not stipulated that he had indecently assaulted her and done so against her will. So that's the -- it's not the -- if everything was read in context with the rest of the record, I don't think that that

would necessarily be a problem, but you're asking him about isolated statements in a way that I think is inconsistent with your stipulation.

MR. BRYANT: Okay. That's not my intent at all, and it says right in this document, "Pretty soon he started putting his hand up my shirt." We're not disputing that. What I'm trying to do is --

THE COURT: Well, that's my problem. My problem is if you take isolated statements out there and you ask him those questions, to a certain extent, you get very close to, I think, violating your stipulation. So if you want to go through the entire fact pattern and ask him that question, but if you do it in pieces the way you're doing it, I think that effectively you're attempting to back away from your stipulation. And if I hear you, you're not trying to do that.

MR. BRYANT: I'm not.

THE COURT: But that's the impression I get.

MR. BRYANT: Okay.

BY MR. BRYANT:

Q Let me ask you this. You just read this statement a few moments ago. Is that right?

A That's accurate.

Q Could one potentially -- one potential interpretation of this statement be that there is some

contradiction of feelings of helplessness from your reading of this statement? Is that a possible interpretation?

A She doesn't talk about her feelings in this statement.

Q I'm sorry?

A She doesn't talk about her feelings, you know, to any extent in this statement. This is a sequence of events.

Q Okay. Well, then, my next question is: You didn't feel the need, I gather, to discuss any of this statement, any of it, and explain it in your report. Is that correct?

A Well, I didn't reference it specifically, but I looked at it, compared to it what -- compared it to what she told me, compared it to other reports, recognized that, you know, certain things are going to be more important to her at different moments in time when she's discussing an event, and didn't feel that I needed to say something more about it.

Q And one of the important pieces to you, as I recall, on direct examination was the threat of hiding a body out in a remote location. You talked abductions and the like. That was a significant piece to you. Is that right?

A Yes.

Q And that hiding of a body in a remote location,

that's not mentioned anywhere in this statement, is it?
A I don't recall seeing that.
Q Please feel free to read through it to verify that.
A (Perusing document.) I don't see that in the part at the beginning.
Q And did you explain that lack of mentioning that specific issue that you consider important in your report?
A No.
Q I now want to turn in your report to, I believe it is, the last page, page 11, where it refers to the MMPI.
A Yes.
Q And in my reading, judging by your report, you administered the MMPI because of the possibility that Ms. Elk was exaggerating her symptoms. Is that a fair statement?
A Yes.
Q Did you instruct Ms. Elk to answer the questions on that test as truthfully as possible?
A I didn't administer it to her myself, but I believe that the person who administered it probably did that. Those are standard instructions.
Q Okay. And turning to DX-20, if you could find that document, there's a fax transmittal sheet on the first page of this, but I'll describe it for the record. DEF

3152, handwritten, to DEF 3170. Let me know when you've had a chance to look at that.

A I see it.

Q You're familiar with that document?

A Yes.

Q That's the MMPI that was administered to Ms. Elk at your request?

A Yes.

Q Now, if you'd turn to page DEF 3154 --

A Yes. I'm at that page.

Q What is the significance of the line, horizontal line, where the number 50 is?

A I believe that between the two horizontal lines is considered average score kind of range.

Q That's a normal range. Do you know the percentage of test-takers that would fall within this range?

A No.

Q Do you know if it's more than 50 percent?

A I'm not -- I could guess at that, but I'm just not certain what it would be.

Q You just don't know.

A That's true.

Q Okay. And do you know what the significance of -- in terms of standard deviations, what it means to be above the line 65, that horizontal line that appears to be

at 65?
A You know, I can't -- I don't know the exact standard deviation. It's -- you become an outlier, I'm sure.
Q Now, you would agree that -- what is the -- strike that. What does the scale go to? What is the highest one could score?
A 120.
Q And what was the F score for Ms. Elk on this portion?
A 120.
Q Is it -- it was 120?
A The T score.
Q And how does that -- that's exceedingly unusual, isn't it, for a score that high?
MR. HOROWITZ: Your Honor, I object. I think Dr. Manlove testified that his MMPI is invalid, is not interpretable --
THE COURT: Well, I think that it's appropriate for Mr. Bryant to probe why he thought it was invalid, and it seems to me that that's consistent with that subject matter.
MR. HOROWITZ: Okay.
THE WITNESS: I'm sorry. What was the question?
BY MR. BRYANT:

Q A T score of 120, is that exceedingly unusual in your experience?

A Yes.

Q How many times have you seen a score of 120 in your experience?

A I have no idea.

Q More than once?

A Not very often. I've never seen it.

Q You've never seen one of 120.

A I don't recall.

Q And you'd agree that the higher the score is, the more unusual in terms of being away from the norm.

A Yes. That's true.

Q Now, if you'll turn to page 3157, DEF 3157, this is entitled, Profile validity, and it states, "The client" -- and that's referring to Ms. Elk. Is that right?

A Yes.

Q -- "responded to the MMPI-II items in an extremely exaggerated manner, endorsing a wide variety of rare symptoms and attitudes. These results may stem from a number of factors that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a confused state." Is that correct?

A Yes.

Q Do you agree with that statement?

A Yes.

Q Now, for excessive symptom checking, that would refer to someone just identifying all over the place, all kinds of psychological trauma and problems that person's suffering. Is that what that means?

A That's my understanding.

Q And falsely claiming psychological problems, that would be lying on the exam. Is that correct?

A Correct.

Q So that could have been an explanation for this score of 120, this T score. Is that right?

A Possible explanation.

Q And the next one is a low reading level, and that would mean someone who doesn't understand the questions, I gather. Is that correct?

A Correct.

Q And I gather you ruled that out as a possibility, because of your interaction with Ms. Elk and the fact that she graduated from high school and so forth.

A Yes. That's true.

Q And skipping over a plea for help for the moment, the final one is a confused state, and I gather you ruled that out because of your dealings with Ms. Elk and her having, you know, clarity in responding to your questions and so forth.

A No.
Q No? You didn't rule out a confused state?
A No. I mean, I think it's possible that when she took this exam, that she was in a confused state. That's a possibility.
Q Okay. Do you think it's a possibility that she was lying on the exam?
A It's a possibility. You can't tell from this exam.
Q Let's return to your report for the moment, again to the last page.
A I'm there.
Q I'm not quite there. Okay. I'm now at the third sentence. "The MMPI-II indicates that Ms. Elk responded to items in a manner that reflected a possible cry for help or severe psychopathology rather than exaggerating her symptoms. It is possible that the litigation is worsening Ms. Elk's symptoms."
Okay. So where do you explain how this is a possible cry for help or severe psychopathology rather than exaggeration?
A The statement is there. I don't explain it more than you just read.
Q And you also don't explain how you ruled out lying as a potential option for this high score.

A Lying is -- I think should be considered a potential option.

Q Then why didn't you put it in the report?

A I guess -- actually I was following the lead of the psychologist at the time, and I believe that's what he suggested. He didn't think it sounded like -- looked like lying in our estimation. When we looked at the psychopathology that we were being presented in our interviews, we felt that it was more likely confusion or severe psychopathology.

Q So are you saying that you just defer to what your psychologist says, or do you make your own independent determination?

A I defer to him in that setting. At this point, I guess I'm questioning that, after looking at it more.

Q And in retrospect, don't you think it would have been a better idea to explain each one of those possible explanations for why she got that T score of 120?

A There are so many things you could explain here that I didn't explain. You know, there's kind of --

Q So you agree with me?

A That would have been something that one could have done.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Redirect, Mr. Horowitz.

MR. HOROWITZ: Just real brief.

REDIRECT EXAMINATION

BY MR. HOROWITZ:

Q Dr. Manlove, you heard Lavetta's account yesterday when she testified regarding this undisputed sexual assault. Correct?

A I did.

Q And you were in the room and you saw her emotions?

A Yes.

Q Okay. When you were listening to her testify, did that sound like an event that involved intense fear --

MR. BRYANT: Objection --

BY MR. HOROWITZ:

Q -- helplessness or horror?

THE COURT: Ask the question. Don't answer it just yet. Go ahead and ask the question, please.

BY MR. HOROWITZ:

Q Was her testimony consistent with a person who had experienced intense fear, helplessness or horror?

THE COURT: Okay. Pause now.

MR. BRYANT: No objection.

THE COURT: All right. Please answer that question.

THE WITNESS: I felt that it was.

MR. HOROWITZ: Thank you.

MR. BRYANT: No recross, Your Honor.

THE COURT: Doctor, in the process that I've used for some other witnesses, so you're not the first, I have some questions for you. I'm going to ask those questions. I'm going to allow Mr. Horowitz and Mr. Bryant in turn to follow up.

I want to make sure I understand a little better. There are some factual disputes that are occurring in this case regarding exactly what happened, so there's certain core aspect of agreement. So, for example, as I indicated, it's been stipulated that Sergeant Kopf indecently assaulted Lavetta Elk by kissing her and touching her breasts against her will. But there are some factual debates that I'm going to have to resolve regarding certain other things that occurred with respect to the assault.

And what I want to try to do is to get an understanding as to how the various alternatives in terms of the potential facts would have impacted your analysis. So, in other words, if the fact was one way versus another way, would that really have made a difference in terms of your diagnosis. So let me just go through a few of these, and I'm just going to ask to your reaction to each.

The basic question that I'm going to be asking you over and again is: If the facts were one way versus

another way, would it have impacted your analysis of her situation? Okay? All right. So the first one I'm going to ask you about has to do with the fact that in some situations here, we have reports that would indicate that there was no mention of contact with her pants or legs or vaginal area.

MR. HOROWITZ: Judge --

THE COURT: Yes.

MR. HOROWITZ: -- can I just say one thing, because I think that's part of the stipulation.

THE COURT: No. I don't think that's anywhere in the stipulation. I'm looking right at it.

MR. HOROWITZ: Judge, I'll tell you how it becomes part -- I mean, they've stipulated to the Article 15 findings, and it's part of that.

THE COURT: Show me where in the Article 15 findings that statement is made, because I guess I looked through them, and I didn't see them there.

MR. HOROWITZ: Sure.

THE COURT: What's the exhibit number?

MR. BRYANT: JX-5, Your Honor. Oh, that's the stipulation. I'm sorry. It's JX-1, Your Honor.

THE COURT: It's not a very long document, Mr. Horowitz. Am I missing a page?

MR. HOROWITZ: I'm sorry?

THE COURT: It's not a very long document. Am I missing a page?

MR. HOROWITZ: No. I just want to get the -- I just wanted to see something in the pretrial stipulation.

THE COURT: I'm looking right at the stipulation. I can tell you it's not in there, so if you're saying it's in the --

MR. HOROWITZ: You're referring to the breasts?

THE COURT: No. That's not what I said.

MR. HOROWITZ: Okay.

THE COURT: Sit down.

MR. HOROWITZ: I wasn't clear.

THE COURT: All right. So once again with the question: So the question I'm asking you is whether it would have made a difference to you if you would have seen some statements that made reference to -- some statements that she gave that made reference to whether or not there had been contact by Sergeant Kopf with her pants, her legs her vaginal area, and other statements that didn't? Would it have made a difference to you in terms of your evaluation if, in fact, he had not made those touchings; in other words, if it had been restricted to kissing and fondling of breasts and things of that nature?

THE WITNESS: I think the event started when she was taken off the road, off the main road, and she was taken

somewhere that she didn't know where she was going but it was into the country, and so I think there was a sense of fear that began to build at that point. And at some point then, you know, there was sexual contact.

Whether or not he touched her vaginal area or not -- I think if he did, it would be more severe. If he didn't, it would be less severe of a stress. But I think if you're going to put it in percentages, I think at least a significant trigger for the fear is the sense of being abducted.

THE COURT: All right. So if I'm understanding your answer, you're saying that if there'd been no evidence of vaginal touching in this case, you'd have come to the same conclusion?

THE WITNESS: Yes, yes. I would say so.

THE COURT: Okay. A couple more questions along those lines. There's been some dispute here as to the time -- as to whether or not Sergeant Kopf made these statements about, you know, This would be a good place -- I'm just paraphrasing -- this would be a good place out here to lose a body, so to speak. And there's also been some debate about when he made those statements. Let's deal with the latter of those.

All right. So if -- would it make a difference to your analysis if he had made the statement on the way to

the spot where the assault occurred or after the car had stopped?

THE WITNESS: I think the sooner he makes it, the more frightening the statement is.

THE COURT: All right. So to your analysis, your conclusion, would it have made a difference if he had made the statement at one point versus the other, on the way there or --

THE WITNESS: No.

THE COURT: I'm asking whether it alters your conclusion.

THE WITNESS: No, it does not.

THE COURT: All right. Would it have altered your conclusion in terms of a question regarding whether he made the statement?

THE WITNESS: I would say it would be probably significantly less traumatic were it not for that statement. I think that statement made it --

THE COURT: So that's saying it does potentially impact then your analysis.

THE WITNESS: Yes.

THE COURT: Okay. Let me ask you about another one, because there's been a dispute about this, although you've not specifically been asked about this. There's been some discussion regarding how long she cried during the

course of the assault, whether or not the crying was continuous or occurred at some point during the course of the assault. If it wasn't continuous and it only occurred at some point during the assault, would that be indicative of anything to you that would have any impact upon your conclusions here?

THE WITNESS: No.

THE COURT: Okay. We've had some questions here about the length, the time of the assault. Would it impact your conclusion if the assault were 20 minutes instead of 30 minutes?

THE WITNESS: No.

THE COURT: Ten minutes instead of 30 minutes?

THE WITNESS: I don't think the length of the assault makes a lot of difference, I mean, unless -- it would be different if he had taken her someplace and had assaulted her over and over again for hours or something.

THE COURT: In other words, at some point, the length of the assault could make it more intense, but doesn't necessarily mean that because it's a short assault, that that means it's not something that could trigger the type of psychological reaction that you're describing.

THE WITNESS: That's true, and partly because in my mind, the trauma began when she was taken off the road, so there was this period of time when she was taken off the

main road to when the actual sexual encounter began that is going --

THE COURT: So you view the composite of the event as being something which is important.

THE WITNESS: I'm sorry?

THE COURT: You view the composite of the event as being --

THE WITNESS: Yes.

THE COURT: -- as something which is important.

THE WITNESS: Yes.

THE COURT: Let me also get down to another point, because you made a statement at one point that I want to make sure I understand, which is that you said that if you saw significant inconsistencies in what she said, that that would be problematic, and you would do what if you saw significant inconsistencies?

Let's say she had made a statement to you, and you saw a significant inconsistency -- you used those words; I wrote down those two words -- between what she said at one point to you and, say, for example, earlier reports. What would you have done if you had seen such a significant inconsistency?

THE WITNESS: I mean, first I'd want to understand what the inconsistency was -- what was the inconsistency specifically, because there are some

inconsistencies that, I think, wouldn't, you know, wouldn't likely be particularly meaningful. You know, maybe something she noticed once but didn't comment on noticing another time may not be that significant to me.

THE COURT: You were asked by Mr. Bryant about differences between some of these reports. Did you view it as a significant inconsistency that some of the references to touching legs, touching of her pants, vaginal touching, were not in the first statement but were in some of the later statements?

THE WITNESS: It didn't surprise me that that might have -- it might have been laid out like that. I mean, I think people remember certain things at some points, think certain things are significant at some points, and don't at other times.

THE COURT: Well, to be more specific, as far as I can see in the record, it looks like in her initial statement didn't make references to them, but by the time she's making statements to the Bureau of Indian Affairs, she is referencing them, and it appears that that's the same day. Would you view it as a significant inconsistency if at two points in the same day, you had no reference to this initially, and then a few hours later, you did have a reference to it?

THE WITNESS: I would call it a minor

inconsistency. I mean, I think she's describing the event. She's upset. She's confused. She's trying to lay it out in some kind of way to explain it to people. All the time she's got family around. She's trying to explain it to them, and there's emotional upset. You know, I just don't -- I don't see that as being a major issue in this situation.

THE COURT: That would cause a red flag to go up in your mind to basically say, I need to do some further checking here.

THE WITNESS: I'm not sure what further checking you could do. I mean, you could ask her, but she's already made two statements that are somewhat different. I think the question is, why would she have made them different. So I guess the question is: Was she in between those comments, those two statements, to say, Oh, okay, well, I'm going to sue, you know, the Government, and so I need to add that he touched my vaginal area. That just seems highly unlikely to me in this setting.

THE COURT: You were asked some questions -- and you can turn back to that. It's page 10, I guess, of your report, and Mr. Bryant asked you questions about the statement in which you're saying -- you're talking about the factors that are associated with your diagnosis, so I'm looking at the first full paragraph on that page.

And you were asked: "In Ms. Elk's situation, she was extremely frightened at the time of the sexual molestation. She had intense fear, and she also felt somewhat helpless, because she was with a person who she believed was physically powerful and able to do what he wanted to do."

All right. Now, he pointed out to you the statement that she made in the Bureau of Indian Affairs interview where she gave a ranking of 6 out of 10. Can you summarize for me the other evidence that you're looking at in coming to the conclusion that she was extremely frightened?

THE WITNESS: Sure. Just one second. (Perusing document.) She -- when she got away from Sergeant Kopf, she apparently cried uncontrollably for some time, 15 minutes or something along those lines. This was her -- I believe her report and also the report from the people who were with her at that time. That would suggest that she was extremely upset, and people who were with her during that time, everybody commented on her being very upset, except for the scale in Mr. Bennett's report.

The fact that she didn't sleep well for -- now, this is her report, so you could contest this, but she said she didn't sleep well for at least two weeks, and her family seems to support that notion, would suggest that she was

pretty disturbed by the situation.

And then the subsequent symptoms that she began describing fairly early on about flashbacks and different kinds of reexperiencing the trauma would again suggest that this was a pretty traumatic event, and they occurred -- you know, some of those were -- you know, the insomnia occurred immediately, and I believe the nightmares began to occur immediately by her mother's testimony, so --

She also sought help, which a person might not have done if they hadn't been traumatized. She sought help from Cangleska and then the Indian Health Services later on. So --

THE COURT: So when you make a finding like this -- I'm trying to get, I guess, an understanding as to how you professionally -- in terms of your sort of mode of operations here, come to a conclusion like this. Are some of these findings based upon symptoms that you have been told? In other words, one possibility is that you look at the initial stimulus and you examine that and say, Was the person extremely frightened.

The other possibility is that you look at things that have occurred since the initial event and see how the person reacted to them, and see whether that gives you some sense as to whether they were initially extremely frightened. Am I understanding you correctly, that you look

at both?

THE WITNESS: Yes.

THE COURT: Okay. All right. I have nothing further. Mr. Horowitz?

MR. HOROWITZ: Nothing.

THE COURT: Mr. Bryant?

MR. BRYANT: One moment, Your Honor.

(Pause.)

MR. BRYANT: Just one question.

THE COURT: Sure. Go ahead.

RECROSS-EXAMINATION

BY MR. BRYANT:

Q If Ms. Elk lies or exaggerates her description of the assault, wouldn't she be more likely to exaggerate or lie about the resulting psychological trauma?

A I guess, depending on what her intent was. You know, if you postulate that she's, you know, done research on the DSM and knows what the symptoms are and her PTSD, then maybe she's trying to, you know, match kind of symptoms for herself with that. It's in the realm of possibility.

MR. BRYANT: No further questions.

THE COURT: Anything else, Mr. Horowitz?

MR. HOROWITZ: No. I just want to note a couple of comments that were made in the pretrial conference, so we understand the scope of the stipulation.

THE COURT: You can argue on brief, Mr. Horowitz. You can argue them on brief if you need to.

MR. HOROWITZ: Okay. That's all.

THE COURT: All right. Doctor, you're excused with the thanks of the Court.

(Whereupon, the witness was excused.)

THE COURT: Mr. Horowitz, next witness?

MR. HOROWITZ: Next witness is Donald Frankenfeld.

Whereupon,

DONALD FRANKENFELD

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Can I have you please take a seat, sir.

THE WITNESS: (Complying.)

THE COURT: If you'll begin by stating your name for the record and then please spell it.

THE WITNESS: My name is Donald Frankenfeld, Donald, D-O-N-A-L-D, Frankenfeld, F-R-A-N-K-E-N-F-E-L-D.

THE COURT: Thank you. Proceed, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Mr. Frankenfeld, can you please tell us your profession?

A Yes. I'm hoping somebody will give me a high sign on the mike here, since we seem to be having trouble.

THE COURT: So far you're doing fine.

THE WITNESS: Thank you. I am appearing today in my capacity as a forensic economist.

BY MR. HOROWITZ:

Q Okay. And is that your occupation?

A It is principally, yes.

Q Okay. What other kind of work do you do?

A How much time do we have? I started a venture capital company in South Dakota that's devoted to economic development. I started an Internet-related company, and I do some other kinds of economic consulting not related to testimony. But for the most part, over the last two or three years, I would say, my work as a forensic economist has been the principal work that I've done.

Q Okay. And can you tell us about your educational credentials?

A I grew up here in Rapid City, went to country school and local high school, received a National Merit Scholarship and a Presidential Scholarship so long ago that the president was Lyndon Johnson, and used that to pay the tuition at Yale University. And I graduated from Yale with a bachelor's degree in American studies. I worked for a period of time in the investment in Hartford, Connecticut,

and in Los Angeles.

During that time, I was an investment analyst and an associate economist, and then I returned to school. I went to Harvard Business School and graduated with a master's in business administration in 1975. And then after a long interval, received a Bush Foundation Fellowship, not related to the president, and that is a mid-career fellowship. I returned to Harvard to the Kennedy School of Government, got a master's in public administration.

There would be other intervals of education, continuing education courses for one thing or another, but that would be the degree-granting education that I have.

Q Okay. And can you share with us your professional experience?

A Yes. As I indicated, I worked for some years in Connecticut and then later in California as an investment analyst and associate economist for a money management firm. After graduating from business school, I was an accountant for a television station here in Rapid City.

I worked for investment firms, Piper Jaffray & Hopwood and E.F. Hutton -- Lamentably, neither exists any longer -- working in various capacities there as a marketing representative or registered representative and also a trainer with Hutton in their financial planning department.

I began -- you asked me about professional

experience. I began as a testifying expert, I think, about 1984 from time to time, and have been doing it intermittently ever since, and somewhere -- I suppose it counts as professional experience -- I was a legislator and served in the State Senate here in South Dakota for eight years. That a part-time job, which is why I was hesitating about whether that constitutes professional experience.

Q Okay. And you said that at a certain point in time, you became a testifying expert. What year was that?

A I believe it was 1984.

Q Okay. And has your testimony been in the area of forensic economics?

A It has. Also in securities cases. I've testified often as an expert in securities cases and have occasionally sat as an arbitrator in securities cases, but with that exception -- and that often involves economic analysis as well, but with that exception, the rest of it has been what I would call forensic economics.

Q Okay. Yes. What sort of categories of testimony has dominated the majority of your testimony?

A The bulk of it has been personal injury or wrongful death cases. I would categorize the case at hand as the equivalent of a personal injury case. I've also done a fair amount of business litigation of one kind or another. The work is not divided equally between plaintiff and

defense, but generally speaking, I would say about two-thirds of my engagements are plaintiff engagements. About one-third are defense engagements, and I have worked for the U.S. Attorney's office.

Q You said the most recent case you described as a personal injury or as a wrongful death. Were you referring to a particular case?

A I perhaps misspoke. I was putting this case into the category of a personal injury case.

Q Okay. How many times have you testified in court as an expert?

A I'm not certain, but my testimonial history is available for the last -- whatever it is -- four years. I suppose that I've been testifying -- I've testified in the courtroom probably a hundred times, maybe a little more than that, over the last 20 years or so; testified in deposition probably some multiple of that, I suppose two or three times that.

Q Okay. And have you been qualified as an expert in both state and federal courts in --

A Yes.

Q -- the area of forensic -- as a forensic economist?

A Yes.

Q Okay. Have you been retained by the United

States in other matters?

A I have.

Q What was the scope of your retention in this case?

A In this case, it was to do an economic loss analysis pertaining to Ms. Elk, based principally on -- I'm assuming we'll talk in more detail about this, but on the report of Dr. Manlove. The question you asked me was: To what extent has she been economically damaged as a result of the January 7 assault?

Q Okay. And did you undertake to determine that figure?

A I did.

Q Okay. And were you compensated for your time?

A Yes.

Q And did you perform the methodology in arriving at that number that you typically do in the cases of this nature, personal injury cases, as you said?

A Yes. With cutting myself a little slack here in the sense that my methodology is consistent from one case to the next. No case, in my opinion, is truly typical. There are always variations from one circumstance to another, but I think I take the meaning of your question, and, yes, this is the kind of case I often do, and I used the methodology that I typically do in a case like this.

Q Okay. We're going to get into the specifics of the methodology in a moment, but is it a methodology that you developed, or one that's accepted among forensic economists?

A I guess I would have to say both. The methodology that I use is one that I've developed. I would say that it is generally used by other forensic economists, and it's kind of an argumentative bunch, so not every forensic economist is going to agree with other one about specific details. But the overall methodology, I think, would be reasonably consistent within the profession.

Q Okay. Well, that leads me to the next question, which is: What was that methodology?

A The basic mission is to look, using the facts and statistics at hand, at what Lavetta Elk is capable of earning, what is her earning capacity in her current circumstances; compare that year by year against her earning capacity had this assault not occurred; and you take the difference one from the other, and you have an annual measure of loss potential.

And that then needs to be discounted to present value in such a way that the finder of fact can determine what an appropriate lump-sum award would be if he should determine that a lump-sum award is appropriate.

Q And in terms of arriving at the pre-assault and

post-assault statistics, what assumptions did you make about educational achievement?

A In this circumstance, I relied principally upon the analysis and conclusions of Dr. Manlove, and the part of those conclusions that was pertinent to me were the fact that the appropriate comparison pre-assault would be a professional military career on one hand, or the typical career of a college graduate on the other. That would be pre-assault.

Post-assault, I believe Dr. Manlove used what she was earning at the time he interviewed her, which was, if memory serves, about 9.15 an hour. That would be what I would refer to as the mitigation earnings. I adjusted that somewhat when I did my own analysis. I used 9.35 an hour, because that's what she was earning at the time I talked to her.

Q Okay. And did you interview Ms. Elk as well?

A I did.

Q Focusing for a moment on the pre-assault earning capacity, did I understand you to say correct either a college degree or a military career?

A Well --

Q Or both?

A May I refer to Dr. Manlove's report? And you'll have to tell me where it is.

MR. BRYANT: Should be PX-8.

BY MR. HOROWITZ:

Q It's Exhibit 8, Plaintiff's Exhibit 8.

A I'm looking at page 10 of Dr. Manlove's report, the very last sentence. "Thus, one might view lost earnings in the future to equal the estimated earnings of a college graduate or military professional who is married and has one child minus the estimated earnings of a CNA" -- which, I believe, is a certified nursing assistant -- "who is married and has one child."

I took that as my starting point, and I'm sure it will arise but I might as well volunteer it, that the central analysis I did was based on the attaining of a college degree, and the earnings analysis that I presume we'll be talking about is based principally on that. But I did look at the other alternative as well.

Q Okay. Does the fact that the Plaintiff, the fact that Lavetta lives in the Pine Ridge Indian Reservation come into play at all?

A Not ultimately, and here's -- that, I suppose, requires some explanation. I'm aware that she has grown up on the Pine Ridge Reservation, and I'm aware also that she's a graduate of Red Cloud Indian School. That is a Jesuit academy of high renown. It was in the newspaper today for having placed more Gates scholars than any other institution

in the country.

The people who graduate from Red Cloud characteristically will go on to college, often to another Jesuit school, which was her circumstance, and it's possible, of course, that they would return to Pine Ridge, and the significance of that is that the unemployment rate in Pine Ridge is very high. The earnings level in Pine Ridge, even for a college graduate, unless he or she is working for the Government or some external employer, is very low.

So if one were to confine her prospects to the prospects of somebody living on the reservation, one might legitimately assume that her earning capacity is lower by reason of that. I heard her testify yesterday that she wanted to leave, and that's consistent with what she had told me when I interviewed her. So I know that's a long answer.

I considered her origins in Pine Ridge, but I didn't attribute her earnings to the earnings of somebody living for the rest of her life on Pine Ridge.

Q Okay. In other words, she's not confined to Pine Ridge for the rest of her life.

A That's correct.

Q Got it. Did you prepare a graphic report in this case?

A I did.
Q Okay. You have the notebook in front of you. I believe it's Plaintiff's Exhibit 7.
A 7? Yes.
Q And by the way, are graphic reports typically the type of reports that you prepare in cases?
A They are the type that I characteristically prepare. I think other economists would rather create long, black and white reports, but I think that charts and graphs are a better way of conveying information, and that's characteristically what I do.
Q Okay. Can you walk us through each of the charts and explain the graphics, starting with chart 1 or chart 2, wherever you think is the most logical place to start.
A Well, I'm embarrassed to admit that the most logical place to start is table 2. The reason for that, Your Honor, is that I try to create a model to measure economic losses, and that model is displayed on table 2. And having done that, I then test the model for sensitivity against different assumptions, and that's what we'll see on the other tables and charts on page 1.
So the essence of the model is divided into three categories. In the upper left-hand corner, upper left-hand quadrant, I guess I would say, are the basic facts of the case as I understand them, and I would propose to go through

those carefully in just a minute.

To the right is a summary of my calculations for each element of calculated loss in this case, pre-injury earnings and fringes, post-injury earnings and fringes, which, of course, is a subtraction, household services, and I've got an element or a space there for health care, but I didn't take any account of future health care, past or future health care, and I divided it further into past and future, to get the total.

The long string of columns that dominate the page represent the year-by-year analysis, and so if one adds up the various columns, one will get a discounted present value, based on the assumptions that I made. I'll recur now, if it's all right, to that first left-hand quadrant which has the assumptions.

Some of them, I think, don't require -- I wouldn't think they would require much explanation: the date the report was done; the date damages commenced would be the date of the assault; her name; her date of birth; her gender, which is pertinent because it bears on her work-life expectancy and also on her life expectancy, although in this analysis, life expectancy is not a major element of the analysis.

We have two figures that show life expectancy and work-life expectancy, and that probably requires more than

just a cursory nod. These are taken from statistical tables that I characteristically employ. Life expectancy is a government table. Work-life expectancy is derived from government tables. And you'll see that here the work-life expectancy for Lavetta Elk is 57.5.

The first thing to say about this is that tables and charts and graphs and statistics give a false sense of precision, and I would be the first to acknowledge that. 57.5 represents a midpoint for a population of people in her circumstance; that is, her age, her gender. There's not a table that I'm aware of, a race-based table that pertains to Native Americans, so this is a generalized table, and what the table says is that half the people in a given population, that is to say, her gender, her age, can expect to work to age 57.5. The other half will work longer -- half will work shorter; half will work longer.

Below that are some numbers that probably are confusing about minimum zero rate, maximum zero rate, fixed rate equivalent, and the date of the U-curve. That is all pertaining to the method of discounting that I use. I believe that government securities are the appropriate discounting mechanism, to discount to present value, and I try to match the losses year by year with the maturity of government securities.

So we would look, if we have a loss in the tenth

year of $10,000, let us say, we would say, What is the interest rate or discount rate on a government security that matures in ten years, and we would apply that to that particular loss. So it's a hybrid, if you will, using many different discount rates. And the reason I use the fixed-rate equivalent is just so there's a shorthand way to refer to the interest rate. In this case, it is 4.65 percent.

On the column to the right, we list the circumstances, as I understood them, that applied to Lavetta Elk, so we have her pre-injury hourly capacity, and I should acknowledge that that is actually inferred from the number just below that, pre-injury capacity, annual capacity, and that will require some explanation. Whether now or later, I don't know. But $37,730 is the figure.

Q Go ahead. Now's the time.

A Okay. That represents the best estimate I can make for the earnings of a college graduate based on -- the starting earnings of a college graduate based on statistical tables provided by the government. It is an inferred number, and the reason it is is, first, the tables typically talk about what one earns beginning at age 25. That is to say, the government tables don't usually talk about your starting salary out of college.

Secondly, the tables are a little old, about six years old. It's the most current available, so what I have

to do is to adjust by backing off the earnings at age 25. It was about $33,000, if I remember, and then escalating them to account for the passage of time, so we're reducing on the one hand and increasing on the other to get to that $37,000 figure. And let's acknowledge that's a gross measure of earning capacity, because I don't think there's enough information.

I know she was interested in health care and medicine. If we made an assumption that she were to get her degree and become a registered nurse, the earnings would be higher, but I don't know that there's enough information to draw that conclusion, so I used the gross statistic that applies generally to college graduates.

The next figure is fringe benefits. That is a standard figure that I use. It is certainly true that in the United States people have fringe benefits. Some are government-mandated, Social Security, for example. Others are either at the discretion or at the partial discretion of an employer. Nationwide, the figures tend to be more like 30, 35 percent. A good part of that is health care. 23 percent is the number that I will characteristically use for somebody who's a college graduate.

I try not to be either conservative or liberal. When somebody says, Are your numbers conservative, I don't try to shave them. And yet because it's very difficult to

measure fringe benefits with the kind of precision one would like, I think it's appropriate to back off a little bit from what the standard government statistics would be. Hence, the 23 percent.

Growth rate, 3 percent, and that's a reflection of inflation and productivity, and it's also a reflection of the generalized salary history that Americans have witnessed over the last several years. And, again, there's a false precision, but it's reasonable to think that most people in our society will have their earnings grow at about that rate. Some years, it will be a little more; some years, a little less. That also is the rate that I characteristically employ.

Then we have the mitigation question. The assertion by Dr. Manlove is not that she's unable to work but that she's unable to work at what would otherwise have been her full capacity, and so for that, as I've indicated, I've used $9.35 an hour, which is what she was earning at the time she was talking to me times a standard work year, and that works out to $19,448.

I kept the fringe benefits at 23 percent. I should indicate, I think, that my understanding is that Lavetta is not working outside the home at the moment. That does not affect my analysis. That's sort of encompassed in that 57.5 work-life expectancy. We normally think of

ourselves as working to age 65, but there will be periods for all of us, most of us anyway, where we're not in the workforce, so it doesn't change my analysis that she's not earning.

Growth is also at 3 percent, and the final calculated element here is household services. This again is probably lower than some economists would choose, but it's true that people provide services or work around the home that have value. In her case, given that her disability is not a physical disability, I didn't think it was appropriate to use the tables that would apply to a physical disability. They would suggest that a person would typically contribute, a woman, 20 to 40 hours a week in household services.

I used an hour a day, and I will fully acknowledge that's a rough estimate. I think it's reasonable, but it could be a little high or a little low. That works out to $2,555 a year.

Once those assumptions have been made or those conclusions have been drawn, the rest is a fairly tedious mechanical process, which is what we see below, where the spreadsheet is projecting year by year each element of loss and discounting at the present value, and I'm going to suggest that we maybe look at year one and year ten, just --

Q Sure.

A Year one, which is actually -- I did the report about a year ago, but she would be 24.5 at the end of the first year of this analysis, term of one year. The interest rate at that time, 5.12 percent. I should note rates have fallen a little bit since the last year, since I did that analysis. That would increase the present value but not dramatically, and I didn't choose to alter my report.

Q When you say not dramatically, do you mean for that year or for --

A No. I'm sorry. I was triggered by the fact that I was looking at the one-year figure at 5.15. Today the one-year Treasury is 2-1/2 or something ridiculous like that. But overall, over the whole stream of the projection -- rates are down, but they're not dramatically down.

Q How does the current state of interest rates affect your calculations? In other words, if you were to do this same analysis today as opposed to a year ago --

A It would increase the calculated present value. Okay. So the next column over is the discount factor. My eyes are so bad, I think that's .9513. What that says is that if you wanted to invest so as to have a dollar at the end of one year, it would cost you 95.13 cents. If you put that money into a Treasury security -- the Government would laugh at you if you invested only a dollar, but if you did,

it would mature and be worth a dollar at the end of one year.

So the loss, as I've calculated it, undiscounted, is $25,793 in that first year. We'll look at the elements in just a minute. But present value of that loss is $24,537. The elements of the loss are to the right: pre-injury capacity, fringe benefits, post-injury capacity, and fringe benefits, and household services. The sum of those four figures adds up to $25,793. So the key figure after all of that is the present value for one year, 24,537.

And, again, even I am getting bored with this discussion. After ten years, the interest rate is lower. I think it's 4.15, but I can't read that for sure. It's lower. The discount rate is now .84, the discount factor, and that means it takes only 84 cents invested for five years to have a dollar. The loss is higher, however, because of inflation and productivity, $33,000 and change, but the present value of the loss is $21,000 and change.

So if you looked at that one, two, three, four -- sixth column over, it shows the present value for each year of the measured years of loss. You can see that it grows until approximately age 57, which is the end of her work-life expectancy and continues then at a much reduced level, owing to the fact that the only loss at that point would be household services.

And if you add it all up, the total is $671,170. That represents future losses. A small adjustment needs to be made to look at the losses that have occurred from the time of the injury, the assault, until the time I did the report. These numbers are comparatively small, because under my analysis, most of that time would have been in school and would not have been -- there would not have been an income produced, and therefore, not a necessity to analyze it.

But for a period of time, about a year, 1.1 year, there would have been income, and that results in a net loss of $35,900. That's not been discounted, but if you add those two together, you get $695,905.

Q Okay. And if we go to the final column, the total, can you just sort of read left to right what those numbers represent?

A Sure. Each of the elements are there. We're talking about the upper right-hand --

Q Yes.

A -- summary. I just wanted to make sure.

Q Yes.

A I don't want to read any more numbers than you want. The pre-injury earnings for past period are 41,503; for the future, 985,656, so the total is 1,027,159. The pre-injury fringes, likewise, are right below that: 9,000

and change for past; 226,700 for future, and a total of 236,247. Against that, we have mitigation, so we're subtracting, in the case of earnings 21,000 for past, 508,000 for future, total of 529,000. Likewise, fringe benefits have a total of 121,000; household services, 83,721; and no allocation -- I'll master this, but then I'll be done, I suppose -- no allocation for health care, and so the aggregate total is $695,905.

Q Okay. And then based on your analysis, what is the total pecuniary loss?

A That would be the total pecuniary loss.

Q 695,905?

A Yes.

Q Okay. And that's already been reduced to present value.

A Yes. The portion of it that goes from the time the report was done until off into the future is reduced to present value. Looking backward, it's not reduced to present value. My understanding is it's not legally appropriate.

Q And are your findings made with a reasonable degree of economic certainty?

A Yes.

Q Is there anything that we haven't covered on page 1?

A I think there's only one part that's really important. The charts that we see, chart 1, 2, and 3, are illustrating the analysis. Table 1 is the part that I wanted to devote a little bit of time to and also to add one figure that the Judge may find useful.

Once I do my analysis, I do a sensitivity analysis. I look at the assumptions that have been made, and I test those assumptions. In this case, one assumption is, what is your mitigation capacity. And I've arrayed the choices from $8 to $11 per hour as a potential earnings, and then her ability to work on a weekly basis from zero hours to 40 hours.

So I've run the analysis 25 different times, and the figure that I think is the most appropriate is the one in the middle of the rows, so it's under central estimate, $9.35, and 40 hours a week, $695,905. Now -- and that's a figure that I've just testified to, but it's possible using this to interpolate and make other judgments about what the appropriate lump sum would be and the additional calculation, Your Honor, which in retrospect, I wish that I had done when I first did this report, is to look at how a different measure of earning capacity would affect the result.

I used $37,000 and change, and as I think about it, that's one of the more sensitive assumptions, and it

might be interesting to know how a different earning capacity, pre-injury earning capacity figure, would affect the result. And the answer is $1,000 change in earning capacity up or down would result in about a $33,000 change in discounted present value. So if one wanted to apply a number different from the 37,000, it would be fairly easy to calibrate the effect of that.

MR. HOROWITZ: No further questions. Thank you.

THE COURT: Okay. Let's take a 12-minute break to four o'clock, at which point we'll start cross-examination.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated.

Go ahead, please. It's Ms. Costello. Right?

MS. COSTELLO: That's right.

THE COURT: Yes. Please proceed.

CROSS-EXAMINATION

BY MS. COSTELLO:

Q Good afternoon, Mr. Frankenfeld.

A Good afternoon.

Q Your major in college wasn't economics. Right?

A That's correct.

Q And your master's degree was not in economics. Right?

A Well, I would quibble with that. My master's

degree was in business administration, which I believe is appropriately regarded as a degree in applied economics.

Q And you've testified many times in the past?

A Yes.

Q And in the past four years, you've testified on behalf of plaintiffs and claimants approximately 60 times?

A I don't recall. If you're referring -- if you got that from my testimonial history, it probably is accurate.

Q Would it refresh your recollection to take a look at the list of your past four years that you're --

A Well, no. I'll accept your representation. I should note that testimonial appearances on behalf of defendant are fairly rare. It doesn't mean I wasn't retained, but they don't often put a defense expert up to testify.

Q So in the past four years, you've testified on behalf of the defense five times. Right?

A That sounds right probably. Yes.

Q You testified that your analysis is predicated on a certain number of assumptions. Right?

A Yes.

Q And so your analysis is predicated on the accuracy of those assumptions. Right?

A Well, it depends on which assumption. As I think

I've indicated, there are lots of factors that go into the model, and some factors can be critical to the outcome, and some factors not.

Q So if one of the critical factors was inaccurate, then your opinion would also be inaccurate?

A Only -- I essentially agree with you, but point out that the table 1 chart that has the sensitivity analysis is in there sometime -- it's in there, because sometimes I do make an error, and -- it's rare, but it's happened, and I still want to leave the finder of fact with an opportunity to make some calculations about what losses would pertain.

Q And the basis of your pre-assault earning capacity calculation for Ms. Elk is that she had the earnings equivalent to that of a female college graduate or a military professional. Right?

A Well, female college graduate is the number I used, starting salary for a female college graduate, making allowances for the fact that it would have taken her time to achieve that college degree. And with respect to military professional, the numbers would be different but not materially different. I didn't ultimately display that, because there were so many sub-assumptions required that I was uncomfortable, but just to sort of cut to the chase, the starting pay grade for a lieutenant, which is what a nurse would be in the military, is $3,100 a month, and that works

out uncannily close to the $37,000 figure that I used for a college graduate.

Q So if Ms. Elk did not have a pre-injury or an incapacity similar to that of a female college graduate or a lieutenant in the Army, your calculation would be affected. Right?

A It would be.

Q You didn't review any of Ms. Elk's educational records from high school prior to making your calculation. Right?

A I knew that she was a graduate of Red Cloud, which is impressive to me, and I believe that I read, probably in Dr. Manlove's report, that her grades were A's and B's, and I knew that she had a full ride, in fact, multiple full-ride scholarships to choose from. Beyond that, I did not look at her high school transcripts, for example.

Q And you didn't look at any of her standardized test results. Right?

A I did not.

Q You didn't review any of her evaluations from teachers?

A No. As I indicated, I think I just told you the things I did look at. I didn't look at anything beyond that.

Q You didn't look at any of Ms. Elk's educational records from Rockhurst University. Right?
A No, I didn't.
Q When you made your calculation, were you aware that Ms. Elk didn't complete a single semester at Rockhurst?
A Yes.
Q Does your pre-injury earning capacity calculation of $37,730 take into account that she dropped out of Rockhurst before completing one semester?
A Does it take into account? It assumes that she would ultimately have returned to college and gotten a degree, had the assault not occurred. It doesn't specifically look at her experience at Rockhurst.
Q And if she didn't have the ability to ultimately graduate from college, your calculation would be affected. Right?
A If she didn't have the ability? It would be affected if that were true.
Q Did you review any of Ms. Elk's Army records prior to making your calculation?
A Again, only to the extent they would have been referred to in Dr. Manlove's report. I don't think I looked at any records generated by the Department of Defense.
Q So your calculation doesn't take into account that prior to this assault, Ms. Elk was disqualified under

the Army's height-weight or alternative body fat requirements?

MR. HOROWITZ: Objection, Your Honor. I think it misstates the testimony, misstates the evidence.

THE COURT: I don't think it does. Go ahead, and ask the question again, please. At least it doesn't -- it seems to me that she can ask -- he's an expert witness, so she can ask him, even as a hypothetical question and it would be appropriate.

Try it one more time, Ms. Costello.

BY MS. COSTELLO:

Q So your calculation doesn't take into account that prior to the assault, Ms. Elk was disqualified under the Army's height-weight or alternative body fat requirements?

A In a qualified sort of way, it does take into account that, and the reason I say that is I'm not using a military career as the measure of her earning capacity.

Q You're not using a military career as the basis for your calculation, but you did testify earlier that if you had looked at that, it would be equivalent to that of a female college graduate.

A Well, I was speaking in shorthand, and I'm sorry that I did that. I should, I think, elaborate, if it's all right with you.

Q Go ahead.

A All right. I began looking at the question of a military career, and I realized that there was quite a bit of uncertainty involved in making that projection, that first there is the question of whether she would have been accepted by the military. Second, there is the question of whether she would, in fact, have pursued an education as a nurse or some other medical professional that would lead to a four-year degree. Third is the question of how long it would take to achieve that degree, given that it's by definition part-time while you're in the military.

It looked, by the way, that it would be about a six-year experience to achieve that. Then there is the question, presuming that she gets a nursing degree, of whether she would, in fact, then be commissioned as an officer. That, I think, was quite likely, that particular eventuality, because it's a function of whether the military needs nurses, and I believe the military does need nurses.

So if she'd been able to hurdle all those various barriers and been commissioned as a nurse, her earnings today, approximately today, would be about $3,100 a month, which is the rough equivalent of the $37,000 figure that I used. In the interim, you've got about a seven-year period of time during which instead of paying tuition, she would be receiving pay from the military, so instead of a burden that

would be necessary to achieve that college degree, she would actually have a benefit.

I looked at all those questions. I drew some preliminary conclusions about what the net result would be, and I decided that I wasn't comfortable trying to string those eventualities together and still be able to testify as I must that to a reasonable degree of economic certainty, that's the position she would have been in. It doesn't seem unreasonable to me that it would have been that position, but it seemed less an economic -- reasonable degree of economic certainty, so I didn't include that scenario, after a lot of thought. I think it could reasonably have been included, but I didn't.

Q Okay. And you didn't review Ms. Elk's employment history before making your pre-injury earning calculation. Right?

A Well, I think I reviewed her -- in my interview with her, her recent employment history. I don't recall asking about work that she would have done prior to the assault, but the current work that she was doing, I talked to her about.

Q Did you incorporate the current work that she was doing in your calculation of pre-injury earning capacity?

A Not pre-injury, but post-injury. Yes.

Q Did you review Ms. Elk's historical earnings

before making your calculation?

A No. For somebody who had just graduated from high school and was in the midst of college or entered college, work history is not very pertinent.

Q Did you review any of Ms. Elk's medical records from prior to the assault?

A I did not.

Q So your pre-injury earning capacity calculation doesn't take into account that Ms. Elk experienced depression prior to the assault?

A I can't say whether it takes it into account or doesn't. It -- I'm not in a position to offer that kind of medical analysis, and I didn't undertake it.

Q So your pre-injury earning capacity calculation doesn't reflect that.

A Doesn't reflect that. Well, probably not. It reflects an average earner and some percentage of average earners would be depressed, but beyond that, it doesn't reflect, as far as I'm aware -- I've seen no statistic that says depressed college graduates typically earn X. It wouldn't shock me if some of the really high-earning college graduates are depressed, but that's only a speculation.

Q And your analysis is based upon a 40-hour work week.

A It is.

Q And if Ms. Elk worked less than 40 hours a week, your calculation would be affected. Correct?
A You say, if she worked less, and again, we're talking about projections of the future, and if it came to pass that she were less -- well, implicitly, if it came to pass that she worked fewer hours than most college graduates, then, yes, I think that would affect the calculation.
Q And you testified that there's a high rate of unemployment on the Pine Ridge Reservation. Right?
A Yes.
Q And you'd agree that if Ms. Elk stayed in this area, your analysis of pre-injury earning capacity calculation might be affected.
A It might be affected, but it sort of contradicts economic common sense to do that. The unemployment rate is very high. Alcoholism is very high. It's a pretty tough place to live. And for that reason, there are not very many college graduates, except for those, as I indicated earlier, working in government positions where they're earning what average college graduates earn or maybe even a little more.
Aside from that, there's really not much for a college graduate to do there for that reason. Yes. If she were to stay, she would -- I guess she'd be washing dishes or something, but the likelihood is that -- I mean, the

assumption, the starting assumption we characteristically make is that a person will act to maximize his or her economic potential, and the way for her to do that is to take her very good college education and employ it somewhere where it has more value.

Q And you've testified that other parts of the country have higher average wages than Rapid City.

A Yes.

Q And does your report take this into account?

A That other parts of the country have higher wages? No. The -- I probably wasn't clear. The wage rate I'm using is not a Rapid City wage rate. It's a national rate.

Q And you would agree that Rapid City has a lower average rate than that national rate.

A Yes. Of course, I mean, the magnitude is far less. The magnitude of the deficiency is far less than on the reservation. But, yes. It's true that in -- well, in South Dakota generally the earnings are about 20 percent less than the national average. In Sioux Falls, they're at the national average, and in Rapid City, they're probably about 10 percent less than the national average.

Q And if Ms. Elk retired earlier than age 57-1/2, your calculation would be affected. Right?

A If her work life were less than age 57-1/2, yes.

Q And you assumed that the assault would have an impact on Plaintiff's earning capacity. Right?

A I took that as a starting assumption. Yes.

Q And the starting assumption was that her earning capacity would be reduced by 48 percent. Right?

A That's a deduction. Essentially you're right.

Q In making this assessment, you relied primarily on information from Dr. Manlove. Right?

A Principally, yes.

Q And you didn't consult a vocational expert. Right?

A I didn't. It wouldn't be appropriate in a case like this.

Q Would you agree that generally vocational experts have the expertise to evaluate the degree to which physical or psychological disturbance would affect one's ability to do certain jobs?

A You used the word "physical or psychological," and we need to differentiate. A vocational analyst usually is engaged when a person's physical disabilities are such that he or she is not able to perform regular full-time work or perform at the same level as he or she would have been able to prior to whatever happened to them. A vocational analyst studies vocations and is not in a very good position to evaluate how one's emotional or mental state has affected

one's ability to do work.

I have -- implicit in my analysis is the assessment that Lavetta Elk is physically capable of doing whatever she was physically capable of doing prior to the assault.

Q Would you agree that in general, a vocational expert specializes in assessing vocational disabilities?

A A vocational expert -- yes. I agree.

Q And you don't specialize in that. Right?

A That's correct.

Q And there have been other cases in which you've utilized analysis from a vocational expert in order to determine reduced earning capacity. Right?

A Yes. Just to be clear about the relationship, I don't recall that I've ever retained or engaged a vocational expert. It's possible that I might have, but typically an attorney will engage if he or she feels there's the need, or sometimes if I recommend it, they will engage an independent vocational expert.

Q And you testified in Garland v. Rossknecht. Correct?

A I did. I thought I might hear that from you.

Q And in that case, you acknowledged that in most instances where you testify concerning economic loss, you do so on the basis of a vocational expert. Right?

A Well, and that statement is true. I don't recall that I said it, but it's true, so I must have said it. But most cases do not involve a mental or emotional disability. They involve physical disability.

Q Mr. Frankenfeld, if any of Ms. Elk's symptoms improved, your analysis could be affected. Right?

A I think so. Yes.

Q And if Ms. Elk recovered from any of her injuries, your analysis could be affected. Right?

A Could be.

Q And if she had the ability to perform higher-paying jobs than that of a job with an hourly rate of $9.35, your analysis could be affected. Right?

A If she were able to earn more, yes, my analysis would be affected.

MS. COSTELLO: No more questions.

THE COURT: Redirect.

MR. HOROWITZ: No questions.

THE COURT: In a process that you probably know I've used with some other witnesses, I have some questions for you.

THE WITNESS: Yes, Your Honor.

THE COURT: I'm going to ask those questions, and then first give Mr. Horowitz and then Ms. Costello an opportunity to follow up if they feel the need. I have a

lot of experience with present value calculations, dating back probably 25 years to when I was a bond attorney.

THE WITNESS: I thought maybe you did.

THE COURT: And so I'm going to try to see if I can ask the questions correctly and with the right terminology, but if I slip up, you can help me get to the right spots. Let's start with your discount rate determination.

THE WITNESS: Yes, sir.

THE COURT: Give me a sense, I guess, in this type of calculation the type of factors that you look at in selecting a discount rate.

THE WITNESS: Well, there's only one essential factor, but I presume that this would bear on some of the work that you've done in other cases, and that is, how certain is the loss.

THE COURT: Well, how certain -- it impacts a whole number of things, doesn't it? For example, it impacts how certain the high level of income is to be realized. If there's risk associated with the realization of it, that would be reflected in the discount factor. No?

THE WITNESS: Well, it could be, but at least in my experience, in this jurisdiction and in others in which I've testified, personal injury and wrongful death -- by the way, I've explored this sometimes to my detriment, because I

looked at other potential ways of discounting, and I've been instructed characteristically, which I understand doesn't mean I'm going to be instructed today, that we are to use -- I think it's -- there's a Jones and Laughlin case -- the highest -- the safest and best investment is the appropriate investment to use as a discounted vehicle in a personal injury or a wrongful death case, not in a business loss case, where, at least in my view, normally you're going to discount by the cost of capital which is going to be much higher than what we're using here.

THE COURT: All right. Well, that's something, I guess, I'll have to explore in terms of that difference, because ordinarily the way I would look at a discount rate would be pick a point in time, and let's use yours as an example, so if you could turn to table 2.

THE WITNESS: Yes, sir.

THE COURT: If I was approaching this from an investment standpoint and you were saying, Well, what type of payment would you expect to make now to receive a certain payment ten years hence, taking into account the discount rate, if I looked at your chart and let's take the ten-year flow that you talked about, and I'm having a little trouble reading the numbers, but as I see it, it looks like the ten-year number is something on the order of 33,655. Is that correct?

THE WITNESS: That looks right. Yes.

THE COURT: All right. Now, if I'm understanding you, you're basically saying that with the -- the risks associated with the potential receiving that income, that under this scenario you would be willing to make the payment of $21,000 and -- let's just get the number here -- 568 in exchange for receiving that payment ten years hence.

THE WITNESS: Yes.

THE COURT: Is that what you're saying?

THE WITNESS: Yes. But, Your Honor, if I can expand a little bit, I'm saying that in part, because I think I'm required to say that. The question as it's characteristically posed to me is: Assume that the loss is a certain loss and that it must be funded in a way that carries with it no risk. If those two things are true, then in my opinion, Treasury securities are the only appropriate investment vehicle that can fund such a loss.

THE COURT: Now, of course, if it turned out that we started using higher discount factors, these flows would collapse. Depending on high how that discount factor is, it could collapse fairly quickly.

THE WITNESS: They would, indeed.

THE COURT: For example, going up to a 10 percent discount factor would have a significant impact. Going up, for example, to 15 percent -- I just did a rough

calculation -- would drop the ten-year flow from $21,000 and some additional dollars, down to below $10,000 if you go to a 15 percent discount factor.

THE WITNESS: I'm certain that's right. Yes.

THE COURT: And by the time you get out to 20 and 30, the impact of a discount factor at that level would be substantial. In other words, we would end up with flows starting at 20 or 30 that would probably be in the hundreds of dollars here, as opposed to the thousands of dollars.

THE WITNESS: You are not only right, you are damn right. That is to say, if you use a discount rate in excess of 15 percent, you can almost ignore anything after the first ten years, because --

THE COURT: Well, in fact, there's conventions that do things like that, so there's --

THE WITNESS: That's right.

THE COURT: -- rules out there that do that actually as a matter of course in terms of estimation.

THE WITNESS: That's right.

THE COURT: All right. So I guess -- but your testimony is that the reason why you use this rate is that your view is it's custom and legally required.

THE WITNESS: Yes. And I fully appreciate -- I've been told and asked -- and I'm not a lawyer; I should be careful with this. But I will tell you, sir, that I have

in the past used non-government securities as a discount rate and told I couldn't do that.

THE COURT: All right. Let's explore just a couple other things. When did you determine that Ms. Elk would graduate from college under this analysis?

THE WITNESS: The analysis was done about a year ago, but it was 1.1 year from the date of the report, so --

THE COURT: All right. So the report -- the first flow there that says 24 -- well, let me back up. Let's go over to the chart that talks about past and future.

THE WITNESS: Okay.

THE COURT: What's the date that you used for determining what is past at that point for calculation purposes and what is future?

THE WITNESS: Okay. Forgive me. I'm probably going to complicate the answer more than I want to, but --

THE COURT: Well, just give me the one you think's accurate.

THE WITNESS: I will. The point of measurement is the date of the assault -- from the date of the assault to the date of the report. That would be 4.38 years. However --

THE COURT: All right. So -- all right. Go ahead. Finish your answer. I'm sorry.

THE WITNESS: Well, in most situations, it would

be appropriate to use that full period of time as a measure of earnings. Not in this case, because she would be in school, so my assumption is she would have been out of school at the time I did this report for 1.1 years, and I can't tell you exactly why I said 1.1, except that at the end of the year -- at the time I did this, she would have been 23.5, so that would take her to 22.6, which I think is a reasonable measure for when she would graduate from college.

THE COURT: All right. Though -- and correct me if I'm wrong here -- at the time of the assault -- that was in -- that was late 2002. Correct? All right. And she had just started --

THE WITNESS: I thought -- was it '2?

THE COURT: Did I get the date correct?

MR. BRYANT: Your Honor, it was January 7, 2003.

THE COURT: I'm sorry. 2003. And she'd been out of school prior to that time. Correct?

THE WITNESS: Out of --

THE COURT: Out of college.

THE WITNESS: Oh, yes.

THE COURT: So the assumption would be that she would have returned to college sometime after the time of the assault -- correct? -- is your assumption.

THE WITNESS: Yes.

THE COURT: So that means that she would have started college in, say, the spring of 2004.

THE WITNESS: Sure.

THE COURT: All right. And she had no college credits. Of course, we don't know this. When would you have projected then is the date she would start receiving income based upon a college degree?

THE WITNESS: I'm going to have to use my fingers. 2005, spring, 2006, 2007, 2008. So it's now.

THE COURT: All right. Is that what you did in this chart?

THE WITNESS: No, sir. And under the assumptions that you've just asked me about, which do not seem unreasonable, the prior losses would be about $11,000, representing household services, no loss for education.

THE COURT: Okay.

THE WITNESS: I didn't say that clearly. No loss for salary.

THE COURT: When -- based upon the facts we just talked about, when would the flows on your chart begin? What would be the first year on the chart here that reflect the flow that you now say would be compensable?

THE WITNESS: It would be one year ago, because that's when I did the report.

THE COURT: Okay. All right. I think I

understand. Let me just ask you a couple more questions. Explain to me one more time this household income concept.

THE WITNESS: Okay. Although it's not a substantial part of the calculated loss here, it does represent something of economic value, that if a person is unable to do certain things -- and characteristically, we're talking here about somebody who is physically disabled. But if they're not able to do things around the home that they would have otherwise been able to do, washing dishes, mowing the lawn or balancing the checkbook, then that either requires one to hire somebody to do it or to go without, which is the equivalent of a loss.

So characteristically it's an element of loss that I think is appropriately calculated. I also think it's appropriate to be conservative about it, because it's not a market transaction. When I wash the dishes, I don't do it quite the way my wife would like me to do, particularly when the phone rings or I see something on television. So here, my assumption is that similarly as her ability to work as a professional has been diminished, her ability, I'm thinking -- I'm not the psychologist, but probably motivational ability to do work around the home has been diminished.

THE COURT: Well, the other assumptions you based upon Dr. Manlove's report. Correct?

THE WITNESS: Correct.

THE COURT: Is there anything in his report indicating she's incapable of doing household service?

THE WITNESS: No, sir.

THE COURT: All right. So what are you basing that upon?

THE WITNESS: I'm basing it on a routine that I characteristically use to ascribe some value to household services. Here I've ascribed one hour a day.

THE COURT: Now, when you look up at the calculation there, looking at the -- look on the future, for example.

THE WITNESS: Yes.

THE COURT: See the number next to household services that's equal to 83,721.

THE WITNESS: Yes.

THE COURT: How do you get that figure? What does that figure represent?

THE WITNESS: That represents -- there's a column -- it's actually the far right-hand column.

THE COURT: Right.

THE WITNESS: That represents one hour a day at, I believe, $6 -- I'm sorry -- $7 -- no -- $6 an hour times 365 days, which works out to $2,555 a year. That's the starting point, and that's in the chart at the upper part,

the 2,555. And then it escalates at 3 percent a year until --

THE COURT: What do you use -- I mean, so determining an hourly rate for something like that, what type of statistics do you use?

THE WITNESS: I tend to use a low market rate. That is to say, if you looked in the statistics, they're going to say 10 to $12 an hour to hire somebody to clean your house. I don't think that's reasonable. So I'm using $7 an hour, and I will acknowledge to you people can argue about whether it should be 6 or whether it should be 8. It wouldn't be less than 6, because that's the minimum wage.

THE COURT: Let's talk --

THE WITNESS: Your Honor, I'm sorry. Just one other thing there.

THE COURT: Yes.

THE WITNESS: We stop -- we reduce the household service calculation at about age -- we don't cut it off entirely. We reduce it at about age 60, to reflect, I think, a reasonable measure of the fact that a person doesn't work as hard as they get as old as I am.

THE COURT: One more question. The 3 percent growth rate in the salaries, is that based upon Bureau of Labor statistics?

THE WITNESS: It is, and probably you and I have

both read how to lie with statistics. There's a big difference whether you measure that over three years, five years, ten years. This is a long-term measurement, ten years, and --

THE COURT: You said you used the national rate?

THE WITNESS: Yes.

THE COURT: Not the South Dakota rate?

THE WITNESS: Well, the South Dakota rate of growth is very unlikely to be materially different from the national rate.

THE COURT: Well, did you look to see?

THE WITNESS: I have. I didn't in this case.

THE COURT: Okay. My sense of those labor statistics, they're very specific to labor categories. In other words, certain types of degrees probably would reflect a higher than 3 percent level of increase. Other types of degrees potentially would reflect a lower than 3 percent. And, of course, that 3 percent figure, also if you're using the composite, also would take into account rate increases with respect to people with high school diplomas or lower degrees of education as well, would it not?

THE WITNESS: It would.

THE COURT: Is this just a 3 percent associated with the national rate of increase for college degrees?

THE WITNESS: No. It's 3 percent increase in

compensation, and it is a national rate. The components of it, just to be clear, are 2 percent for inflation, which isn't going to vary in South Dakota or New York, and 1 percent for productivity. And in point of fact, again, there's not one column here we can't talk about various methods, but I use the 3 percent.

I'm comfortable with the 3 percent. What tends to happen in reality is that at a younger age, a person has higher growth, and at a -- again, once you get to my age, it seems to be lower. So 3 percent is an average, and I'm not suggesting it's like a ruler. It isn't.

THE COURT: Well, I guess your explanation's making me wonder if you can explain where it came from. Did you actually study statistics to get to this conclusion, or is this a convention that you use?

THE WITNESS: Well, it's both. I studied statistics, and I developed a convention, and I've used the 3 percent figure probably for five years. I should acknowledge sometimes personal circumstances are such that a different figure is appropriate. You have somebody who's on a fast track. I'm just saying occasionally I will deviate from that 3 percent if the personal circumstances seem to suggest it's appropriate, but that's very rare.

THE COURT: What type of statistics did you rely on in determining that her income flow would be

uninterrupted, because I guess I would assume that if I looked at a typical pattern, particularly for a female who was a family person, that there would be maternity gaps at a minimum, and perhaps longer gaps, depending on what they decided to do and could do from a financial standpoint in terms of child upbringing.

THE WITNESS: You're right on, and that is accounted for, but it's accounted for in kind of a gross way. I don't mean gross meaning bad. The work-life expectancy, according to the statistical table that I used is age 57-1/2. In reality -- I'm sorry. I'm going to try to be brief. The expectation -- most of us expect to be working to age 65, and it's not uncommon in an analysis like this to use to age 65, but the fact is you're absolutely right.

People are in the workforce and they're out of the workforce, so there's a period of time -- and it pertains more to women than to men, so a woman's work-life expectancy, given her age and gender, is 57-1/2. A man's would be about age 61. And the difference has to do with departures from the workforce.

Now, it's not measured with the kind of precision that we might like, because implicitly in my analysis, instead of having in and out, we have continuous work to age 57-1/2, and then out. That's not the way it's going to

work, but it's a reasonable proxy for the entry and exit from the workforce.

THE COURT: Well, let me ask some questions about that, because I guess that's not striking me as necessarily the case. If I have a set of income flows and I have a discount factor, and to account for a gap, I subtract flows from the end of the calculation, it's going to have a lot more -- a lot less impact on the ultimate present value than if I, instead, were to subtract the flows from the outset of the calculation.

So to use an example, if I thought a person was not going to be employed for a four- or five-year period, and I did it by shrinking their age to, say, 57 when I might otherwise use 61, that would not have the same impact on the calculation as assuming that in the, say, time period between 24 and 30, that there was those same four years missing, because the discount rate impact on those late years is diminished. The discount rate impact of losing those income flows in the early flows is substantial.

So explain to me why that is not a problem here.

THE WITNESS: Well, it can be a problem. In this case, it's not a problem, because the difference between the discount rate and the growth rate is comparatively small, and that's just a function of the economic times we're in right now.

THE COURT: Well, let's use an example, just to make sure I'm understanding this.

THE WITNESS: All right.

THE COURT: If, for example, she didn't work from the years 26.5 to 27.5 -- and so I'm looking at your flows there.

THE WITNESS: Okay.

THE COURT: All right. And you can pick, because I'm not sure which it is, which of the flows would be lost there, which one of the flows under your calculation would be lost if she didn't work for that year? Would it be flow 5 or flow 4?

THE WITNESS: If I get with you, flow 4.

THE COURT: Okay. And so if I'm reading this correctly, then in your calculation, the loss of that flow would reduce your ultimate determination by $23,644. Correct?

THE WITNESS: If that were the only change we made, yes.

THE COURT: All right. Well, if she's not working that one year --

THE WITNESS: Right.

THE COURT: -- and that was built into your assumptions --

THE WITNESS: Well --

THE COURT: I'm asking the question. So if that assumption that she was not going to work that year was built into your assumption, your determination would be reduced by that number. Correct?

THE WITNESS: It would, but I'm going to ask you to look at what's -- at the offset as well.

THE COURT: Go ahead.

THE WITNESS: So presumably that means if that age 57.5 is a reasonable average, it means we need to add a year to the end of her flow, which is, I think, addressing the point you --

THE COURT: Well, let's just take a look at what 57.5 would -- so that's 66,413. All right?

THE WITNESS: Right.

THE COURT: All right. And by that time, even using your discount factor, the impact of that much higher figure is still down to 14,400. Right?

THE WITNESS: That's right.

THE COURT: All right. So even if we assume next year's flow -- so now she's got a flow where right now she doesn't have one -- and it goes up by 3 percent on the loss figure -- all right; so in other words, the 66,000 figure goes up by 3 percent -- we still have a difference between -- even if we use the 57.5 figure of 14.4, there's going to be a financial impact between when that flow comes.

THE WITNESS: There will be -- I'm not disputing that. I didn't say that it was exactly even. You have correctly identified the problem with this particular dynamic, but the magnitude of the problem is about a quarter of what you were suggesting initially. Instead of a -- she loses 21-, and she -- not a quarter; a third. She loses 21-; she gains 14-.

THE COURT: Okay. But, of course, that depends upon me verifying that the legal constriction that you think you're under in terms of a discount rate is correct, because, in fact, if the discount rate were 10 or 15, the impact between subtracting a flow from the beginning of the calculation as compared to adding a flow to the end would be much more extreme.

THE WITNESS: It would.

THE COURT: All right. I have nothing further. Mr. Horowitz?

MR. HOROWITZ: No questions.

THE COURT: Anything, Ms. Costello?

MS. COSTELLO: One more question.

THE COURT: Sure. Go ahead.

RECROSS-EXAMINATION

BY MS. COSTELLO:

Q Mr. Frankenfeld, would you agree that the yearly salary for an enlisted soldier in contrast to an officer,

like a lieutenant, would be less than $37,730 a year?

A Yes.

Q Do you know how much less?

A I know approximately. An E-1, which would be the entry level, would be about 1,300 a month.

Q Thank you.

A Yes.

MS. COSTELLO: No more questions.

THE COURT: Anything else, Mr. Horowitz? I was just making sure that your question didn't prompt one from Mr. Horowitz now.

MR. HOROWITZ: No.

THE COURT: Okay. You're excused with the thanks of the Court.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: Any other witnesses, Mr. Horowitz?

MR. HOROWITZ: I do. What time are we working till today?

THE COURT: Well, who do you have left?

MR. HOROWITZ: Lea White Bear Claws.

THE COURT: Your estimate yesterday was a little off, because you thought we'd be able to complete both sides of his testimony in about ten or fifteen minutes. What do you anticipate in terms of direct with this witness?

MR. HOROWITZ: Fifteen to twenty minutes.

THE COURT: We actually sort of messed up the marshals' routine a little bit yesterday leaving. I'm a little bit concerned about leaving quite as late today as we did yesterday. We left about 5:25 yesterday, and we were sort of leaving while they were still expecting to shut up the building, so I think the latest that we can probably go is about 5:15.

You anticipate how much on direct with this witness?

MR. HOROWITZ: Fifteen minutes.

THE COURT: All right. Who's going to do cross with him?

MR. ACOSTA: I am, Your Honor.

THE COURT: Any ballpark? I know it's hard for you to estimate, because you don't know what he's going to say, but --

MR. ACOSTA: That's precisely my point. I know that based upon what I think I'm going to do, approximately 15 to 20 minutes, but that could change, Your Honor.

THE COURT: All right. I think that rather than -- well, let me ask you this. I mean -- and, Mr. Horowitz, you tell me this. I mean, what I'm concerned about is we're going to get halfway through, and he's going to have to come back tomorrow morning anyhow, so -- that's

one point. On the other hand, I realize that people are traveling around, and I don't want to have to make them travel any more than is necessary. Do you think it's worth taking a shot and see what happens?

MR. HOROWITZ: I do.

THE COURT: All right. Let's just see what happens, operating on the assumption, though, that 5:15 is pretty much as far as we can go, and I'm going to ask you to be as concise as possible on your direct testimony particularly, so that we can see if we can accomplish completing this witness.

MR. HOROWITZ: I will.

(Pause.)

Whereupon,

LEA WHITE BEAR CLAWS

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Please take a seat.

THE WITNESS: (Complying.)

THE COURT: And could I have you begin by stating your name for the record, and please spell it.

THE WITNESS: My name is Lea White Bear Claws, L-E-A, W-H-I-T-E, B-E-A-R, C-L-A-W-S.

THE COURT: Thank you.

Proceed, Mr. Horowitz.

DIRECT EXAMINATION

BY MR. HOROWITZ:

Q Good afternoon. Where do you live?

A I live in Wounded Knee, South Dakota.

Q Okay. And where are you currently employed?

A I'm not employed right now.

Q Okay. Was there period of time when you were employed at a business called Cangleska?

A As of two weeks ago, yes.

Q Okay. And during what period of time were you working there?

A I was working there from -- I volunteered from December of '97 to February of '98, and as of two weeks, that's where I've been working, employed there for eleven years.

Q All right. And during the time that you were employed, in what capacity were you employed? What was your job title?

A First I was employed as an office manager, and then after three months, I began working in the outreach advocacy part.

Q Okay. What year did you start working outreach advocacy?

A It would probably be like June or July of '98.

Q Did you stay in that capacity until two weeks

ago?

A Yes, I did.

Q Okay. And can you tell us a little bit about what services Cangleska offers?

A We offer the shelter for -- and advocacy for victims of domestic violence and sexual assault. We provide a safe house for them to go. We go visit with victims who have been assaulted, you know, just ask them what they might need, if they need to talk or if there is a seriousness, we might encourage them to file a police report or seek medical attention, or just support services mostly.

Q Okay. Do you sometimes provide referrals or leads to --

A Yes.

Q -- women? And do you provide legal support or referrals?

A We do, and we have a legal staff aboard. Other than that, we do that on our own. We help them obtain -- if they feel they need a protection order or a restraining order, we can help them do the paperwork, and then we can go with them to see an attorney or go with them if they wish to do it on their own.

Q Did there come a time when Lavetta Elk came to Cangleska for service of the organization?

A Yes, there was.

Q Okay. And do you recall when that was?

A I think -- it was quite a while ago. Quite a while ago, but it was in the first part of the year, January, the first part of the year.

Q Okay. Do you recall whether she came to Cangleska with a particular event on her mind?

A Sometimes I would receive a referral from another employee, and my part of that, I'm pretty sure that's what happened, that one of my coworkers had called me that a lady needed some services.

Q Okay.

A And that's common. That happens a lot. That's how we got a lot of referrals.

Q Were you assigned to work with her?

A Yes.

Q Okay. And is advocate the right title?

A Yes.

Q Okay. And by that time, had she already been to the police department?

A I think a police officer was called by the time I had gone to talk with her. Yes.

Q Okay. Were you involved in the process with the law enforcement and the tribal police?

A Not firsthand, not right away.

Q What issue did Lavetta Elk come to you with?

A When I got to visit with Lavetta, she was really upset. She had told me that she had been assaulted by an Army recruiter, a person who was supposed to take her for a physical to Sioux Falls, and on the way to the physical, he took one of the side roads, and he began to make sexual advances toward her. He started to touch her and say things to her, and she was really upset about it.

MR. ACOSTA: Objection, Your Honor. This testimony is hearsay.

THE COURT: I don't think she said anything about specific statements. It seems to me she's talking about her impression. I don't view that as hearsay. Or it's undisputed facts, so it seems to me it's a silly objection, to be objecting to something which you stipulated to. So overruled.

BY MR. HOROWITZ:

Q And did she indicate what parts of the body she had been touched?

A She -- her shoulder, the breast area, between her legs. He had tried to kiss her. She described trying to struggle, get away from her, and I think he licked her cheek or something like that.

Q I'm sorry?

A He licked her cheek, the side of her face.

Q Oh. The leg sort of goes from one end to the

other. Are we talking about --

A The inner thigh.

THE COURT: I don't view this actually as consistent with the description of this witness's testimony in your statement, so it seems to me you should get to the topics that you listed for her.

BY MR. HOROWITZ:

Q What support or advocacy did she come to you with -- come to you seeking?

A Well, what we always -- you know, like I said, medical -- when there's a sexual assault victim, we ask if they have seen like a midwife or if this has been reported. It was reported. Then we encouraged her to talk with one of the midwives, get a rape kit done, get some kind of counseling for them, you know, because Lavetta was really -- to me, she was really -- she felt really betrayed by her recruiter. I felt like she had trusted him, and he had abused that trust, you know, by making advances toward her, and she was upset. She was upset about the whole thing.

Q How do you know she was upset?

A She was crying. She had tears in her eyes. She was very withdrawn, you know. She couldn't believe that this had happened to her, you know.

Q As best you can recall, how many days had passed between the date of this assault and your first contact?

A I can't recall.
Q Okay.
A It was pretty quick.
Q Are we talking about a week or --
A No. Less than that.
Q Less than that. And what was the first referral that you made for Lavetta?
A The first referral, I think, I made to her was to go see a midwife.
Q Okay. Just to be clear, were there any other events, problems, issues that Lavetta was coming to Cangleska for?
A That was my first, you know, working with her. It's the first time I had worked with her.
Q And in the course of your dealings with her, were there other issues that came up, or did it center on the assaults?
A Mostly everything that I dealt with her centered around the assault.
Q Okay. At Cangleska, had you had experience dealing with a number of teenage sexual abuse victims?
A Yes, I have.
Q And did the way Lavetta presented herself seem consistent with that of other sex abuse victims?
A Yes, it did. Yes.

Q In total, how many times did you meet with her or accompany her places?

A I don't have my records in front of me. Personally, I went visiting her. I think I went to her house a couple times. I did accompany her to Rapid City to a meeting with the guy who assaulted her. There was a meeting at one of our offices with his commanders and him. And personally that's it.

But then there were some phone calls. Sometimes she would feel -- she was feeling upset or, you know -- and she needed to talk to somebody, so sometimes she would call me. She was really upset about not being able to go to college. I know that was one of her things that she talked a lot about college, and her idea was the Army was going to help her to, and then she felt -- like I said, she felt totally betrayed by the whole thing that happened.

Q Okay. Does Cangleska also offer group support sessions?

A Yes, we do.

Q Okay. And did Lavetta participate in group support?

A When they're available. When they're available, and we haven't had a support group facilitator in a long time, so, you know, she could come visit with us or the other girls, whoever might want to do the group, but if we

don't have an on-staff facilitator, we won't have group.

Q Are you familiar or did you participate in any events precipitating the -- strike that.

Did you participate in any way in Lavetta pursuing a restraining order?

A Yes. I attended the hearing with her.

Q Okay. And what was Lavetta's emotional state at that point in time?

A She was scared. She was going to go to court, and she was scared that he would show up. She didn't want to see him. She was really emotional about that. We -- usually if we know that one of the persons we're helping is upset or scared, we'll check with the bailiff or whoever's in the courthouse, to see if they could put us in another room or, you know, so they separate them from each other. The guy didn't show up, so it was really good for her, because she was very upset about it.

Q Throughout your role as an advocate for Lavetta Elk, did she maintain a consistent account of what took place that day?

A Yes. I mean, she told me what had happened, what was going on, you know. Basically what I had told you or your -- about she -- you know, her intent, what she thought was going to happen didn't happen, and she was really upset, and she couldn't believe what had happened to her, that he

had taken her to a different place.

Q Okay. I'm just going to -- you have a notebook in front of you. I'm going to ask you to open to Plaintiff's Exhibit 4.

MR. HOROWITZ: May I approach?

THE COURT: You may.

(Pause.)

BY MR. HOROWITZ:

Q Can you turn to what in the bottom is page 3.

A Okay.

THE COURT: Am I correct that this is not in evidence yet? Correct?

MR. HOROWITZ: Correct.

THE COURT: All right. So you're going to have her review this and get it admitted first, or are you going to start asking her questions about it?

MR. HOROWITZ: Well, we'll do it this way.

BY MR. HOROWITZ:

Q Does Cangleska keep records in the ordinary course of business?

A Yes.

Q Okay. And focusing on pages 3 and 4, are those the type of records kept in the ordinary course of business at Cangleska?

A Yes, it is.

Q Was it the practice of Cangleska to keep records of this type?

A Yes, it is.

Q Okay. And did you make these entries, page 3 and 4?

A 3 and 4 are mine. Yes.

Q Okay. And were those records generated at or about the time that Lavetta came to seek your services at Cangleska?

A Yes.

MR. HOROWITZ: Okay. Judge, Your Honor, we'd ask to move those documents into evidence.

THE COURT: All right. Those two pages?

MR. HOROWITZ: Yes. Page 3 and 4.

THE COURT: Mr. Bryant?

MR. ACOSTA: No objection to pages 3 and 4. We'd ask that perhaps pages 1 and 2 of Plaintiff's exhibit which are also records of Cangleska, also be admitted.

THE COURT: Well, it's not your exhibit to admit, so, Mr. Horowitz?

MR. HOROWITZ: The handwritten --

THE COURT: What about pages 1 and 2?

MR. HOROWITZ: Well, do you want me to --

THE COURT: I want to know whether -- he's making a point. I want to know if you want to include them or not.

MR. HOROWITZ: No, I do not want them in. Just pages 3 and 4.

THE COURT: All right. So 3 and 4 is what's admitted, and we're going to keep the designation of this as Plaintiff's Exhibit 4, but the only two pages, for clarification and for record purposes, that are in that exhibit are what are enumerated as page 3 of 48 and page 4 of 48. Correct?

MR. HOROWITZ: Correct.

(The document referred to, having been previously marked for identification as Plaintiff's Exhibit 4, pages 3 and 4, was received in evidence.)

BY MR. HOROWITZ:

Q All right. Please take a moment to review pages 3 and 4.

A (Perusing document.) Yes.

Q Have you had a chance to review that?

A Yes.

Q Is this a accurate account of the -- of what Lavetta described to you?

A Yes.

Q Okay. And on the first page, on page 3, it says

the date of contact is January 14.

A Okay.

Q Okay. Does that refresh your recollection as to when Lavetta first started --

A It probably happened on that day, when i first made contact, because we have to put the date that we actually make contact.

Q Okay. That's my question. Is January 14, 2003, the date of your first contact with Lavetta?

A Yes.

Q Okay. And you indicated that this was her first time at Cangleska?

A As far as I was aware of.

Q Okay. Did you accompany Lavetta to any of her doctors or midwives or any of those visits?

A I can't remember.

MR. HOROWITZ: I have no other questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. ACOSTA:

Q Good evening, ma'am. My name's Lanny Acosta. To clarify, your group does not provide direct counseling services.

A We do on occasions if staff provides. Yes. If we do have staff available, if we have a counselor on board,

then, yes, we do.

Q Are you a counselor, ma'am?

A No, I'm not.

Q Are you aware of whether or not Ms. Elk saw a counselor provided by Cangleska?

A No. I'm not aware if she did or didn't.

Q But you were assigned to manage her case for Cangleska.

A I was assigned to act to be her advocate, to advocate for her.

Q Was there anybody else within Cangleska that was assigned to Ms. Elk?

A I think Cecilia Fire Thunder had assisted her also.

Q Is she a counselor?

A I don't know.

Q Your group is an advocacy group primarily, though. Correct?

A Yes, it is.

Q And it is not a health care provider.

A No, we're not.

Q And you stated a couple of times on direct examination that when she came to you on the 14th of January 2003, that was the first time that you were aware at the time that she had come to Cangleska. Correct?

A Yes, it is.

Q Were you subsequently made aware that she had been referred to Cangleska previously?

A No, I wasn't.

Q So you're not aware of a 2002 referral to Cangleska --

A No.

Q -- for an abusive boyfriend.

MR. HOROWITZ: Objection, Your Honor. I believe that's triple hearsay.

THE COURT: Well, are you saying that it's factually inaccurate, Mr. Horowitz, or what?

MR. HOROWITZ: I am.

THE COURT: Is there something in the record that supports that statement?

MR. ACOSTA: Yes, Your Honor. I have Defense Exhibit --

THE COURT: Back up. There's no objection -- he can ask her if she's aware of something. That doesn't mean that that means that it's true or not, so --

MR. HOROWITZ: Fair enough.

THE COURT: Go ahead and ask the question.

BY MR. ACOSTA:

Q So you were not aware of a previous referral?

A No, I'm not.

Q If I showed you a Cangleska record that reflected that she had been referred there previously, would that surprise you in any way?

A No. It wouldn't surprise me.

Q Can I direct your attention to one of the binders next to you. It's Defense Exhibit 6C.

MR. ACOSTA: And, Your Honor, do I have permission to approach?

THE COURT: You can -- yes, Mr. Horowitz?

MR. HOROWITZ: Yes. I mean, it's for purposes of refreshing her recollection or -- I mean, I object to the document.

THE COURT: Well, is the document we're going to refer to in evidence?

MR. ACOSTA: No, Your Honor. It is not.

THE COURT: All right. So I guess the first question I have is how you're going to get it in evidence if you're -- well, are you going to use it to refresh her recollection?

MR. ACOSTA: I was going to show it to her and see if she had any remembrance of ever seeing it, Your Honor.

THE COURT: That's a fair question to ask, and it doesn't have to be in evidence to do that, so go ahead and you can show it to her.

MR. ACOSTA: Okay. Thank you, Your Honor. May I approach?

THE COURT: You may.

(Pause.)

THE COURT: While he's finding the page, I want to make sure that the witness understands that the question he's going to ask you, he's going to show you a document, and he's going to ask you whether you, based upon reviewing the document, now have a recollection of something. And so you're not to testify based upon the document that you think it happened. You have to say, No, my memory has been refreshed, and now I remember that this did happen. That's the question he's asking.

BY MR. ACOSTA:

Q (Handing document.) Have you had a chance to look at the page, ma'am?

THE COURT: Can you make sure we state that page, so Mr. Horowitz can look at the same document.

MR. ACOSTA: Oh, yes. I apologize, Your Honor. It's Defense Exhibit 6C, page DEF 1105.

THE WITNESS: And your question was?

BY MR. ACOSTA:

Q My question is: Do you recall when Ms. Elk had been referred to you ever having seen that record?

A No.

Q No. Okay. Your group does not provide medical treatment of any type. Correct?

A No, we don't.

Q And you mentioned that you took her to see a midwife.

A Yes.

Q Was there any physical injury that you took her to be treated for?

A Usually when I get an individual who's been sexually assaulted, that's one of the things that -- the first thing I do is suggest that they see a midwife, because a lot of injuries, you can't physically see. You know, I couldn't see if you had a bruise on your shoulder or nothing by looking at you, and I'm not -- like you said, I'm not a medical person to say, Hey, you know, you need to do that.

So I always suggest that they go see a medical person, such as a midwife, and in most sexual assault cases, I suggest they go see a midwife, in case there's something that I can't see that they need to get checked over, for their own safety, for their own, you know, well-being.

Q And she came to see you seven days after the event. Correct?

A I talked with her seven days afterwards. Yes.

Q And she didn't relate to you that she had any physical injury, though. Correct?

A When she talked to me about how he grabbed at her and stuff, I still suggested that. Like you said, I'm not a medical person, but knowing that myself being grabbed, there could be an injury, and I always suggest to women or whoever's been assaulted, that they do seek medical attention, even if it happened, you know, a month earlier or something.

Q I call your attention to the exhibit that I did show you just now.

A Yes.

Q Is there a -- can you see that there is a symbol on the top, I believe on the top left --

THE COURT: She's already said it doesn't refresh her recollection. How are you asking her questions about this document?

MR. ACOSTA: Your Honor, in an attempt to get it in as a business record of Cangleska.

THE COURT: Is it on your list? It's on the list. Correct?

MR. ACOSTA: Pardon me? It is on our list.

THE COURT: It's on your list. Okay. All right. So let's go over one time that page number again.

MR. ACOSTA: It's Defense Exhibit 6C, page 1105.

THE COURT: Okay. Go ahead.

BY MR. ACOSTA:

Q Do you see the symbol on the top left where it says, Cangleska, Incorporated?

A Yes, I do.

Q Is that your group's letterhead?

A It's our logo. Yes.

Q And is this the same type of form, outreach contact sheet, that you filled out when she was referred to you?

A Yes, it is.

Q And this is the type of record that is normally kept in the course of business of Cangleska?

A It's the type. Yes. It's not completely filled, so -- my -- if you see my contact sheet, we will have more information, like her date of birth and how to get ahold of her. That's not filled in, so --

Q Correct. But this is the type of record or the --

A Yes.

Q It is the type of record.

A Yes.

MR. ACOSTA: Your Honor, I move to enter Defense Exhibit 6C, page 1105, into evidence.

MR. HOROWITZ: Your Honor, I object.

THE COURT: I don't think that you've met all the requirements actually of 6. 6 seems to require that

somebody has to have knowledge of the way the document was developed, not just the way that it was retained. She doesn't have personal knowledge about the document, so it seems that you -- let me just read you the rule.

It says, "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge." All right. So she was able to testify as to the other document, as to how it got generated. We don't know anything about the circumstances of the generation of this document, because she didn't generate it.

So can you explain to me what part of that rule I'm missing? Is there something there?

MR. ACOSTA: You're not, Your Honor. The --

THE COURT: All right. Then sustained. Not in.

BY MR. ACOSTA:

Q When did your group -- withdrawn. Your group only helped Ms. Elk for a limited period of time. Correct?

A No. If she called us tomorrow, we'd help her.

Q When did she stop coming in for help/

A I -- like I said, if she called us tomorrow, we'd help her, so it's not that we only assist you for a month. It's nothing like that. It's as needed. If she needed to come in and visit with somebody, we would help her.

Q Besides the one meeting that you -- the two meetings at her house, the one meeting with Kopf, and attending the --

A Restraining order hearing.

Q -- hearing --

A Yes.

Q -- was there any other contact that your group had with her?

A She would call me on occasion, like I had stated before. She would call me --

Q And this ended in the spring of 2003?

A No, I don't think it did.

Q When did it end?

A I don't have my records in front of me to show the last contact that she might have made.

Q Was it within the last year?

A Yes.

Q Was it related to this incident?

A Yes, it was.

Q But the bulk of your assistance that you provided her was within the immediate time afterwards. Correct?

A Yes, it was.

Q And that was primarily in facilitating and getting an attorney and in the restraining order. Correct?

A And she needed someone to talk to, so I was there

for her to talk to.

Q But not counseling services.

A No. I didn't counsel her. I supported her.

MR. ACOSTA: Nothing further, Your Honor.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: Just one clarification. I think this is just one question.

REDIRECT EXAMINATION

BY MR. HOROWITZ:

Q When -- I think there was a question on cross-examination about referral to an attorney. Was that -- did I mishear something?

A I don't remember that question.

Q Did you do any referral to an attorney?

A I don't think I did.

MR. HOROWITZ: Okay. Thank you.

THE COURT: Anything?

RECROSS-EXAMINATION

BY MR. ACOSTA:

Q I'm sorry. But I did ask you -- one of the last questions I asked you was, you did help her find an attorney. Correct?

A I did help her find an attorney?

Q Yes.

A I don't remember. I'm sorry if I did say yes. I

know we did go assist her with a restraining order, and I don't -- like I said, I don't have my notes or anything in front of me. I don't remember if there was an attorney at the restraining order hearing or not, but I know that I was with her, and the other person did not show up.

MR. ACOSTA: Okay. Thank you very much. Nothing further, Your Honor.

MR. HOROWITZ: Nothing further.

THE COURT: The witness is excused with the thanks of the Court.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: All right. So I'd like to start tomorrow at 9:00. Let me ask you first, Mr. Horowitz. Does that conclude your case?

MR. HOROWITZ: Before we conclude, the Plaintiff moves for judgment on the issue of liability, given the stipulations and the testimony here today.

THE COURT: I'm not going to render fact-findings at this point, so that's denied. Anything else, Mr. Horowitz?

MR. HOROWITZ: No, Your Honor.

THE COURT: Mr. Bryant, is nine o'clock -- well, first of all, does that mean that your case is concluded, Mr. Horowitz?

MR. HOROWITZ: Yes, yes, to answer your question.

THE COURT: Mr. Bryant, so can you start your case tomorrow at 9:00?

MR. BRYANT: We can, but I should just point out we're only -- there's only three witnesses left, just to clarify.

THE COURT: Well, considering that we had, you know, one witness today was estimated that testimony on direct for an hour, and basically by virtue of direct and cross, it went about four, I guess that doesn't leave me in a state of confidence. So let's --

MR. HOROWITZ: Can I just address that? I know of two witnesses, and there are only two witnesses left on their witness list, so --

THE COURT: Right.

MR. HOROWITZ: This third one --

THE COURT: Did you say three? Is that the question?

MR. BRYANT: Yes. I informed opposing counsel that we're going to have one impeachment witness.

MR. HOROWITZ: Well, Your Honor, there's no -- whoever that person is -- and I still to this moment don't know who it is -- it's not on their witness list as a may-call, and that's where rebuttal witnesses --

THE COURT: I mean, you're going to have to

explain to me what -- first of all, who are we talking about?

MR. BRYANT: We're talking about a sergeant from the military entrance processing station.

THE COURT: Right. If they're not on your list, they're not testifying, so if you want to proffer them tomorrow, that's fine, but you're going to do it with a written memorandum that indicates how that's consistent with the Court's rules. Understood?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. So take a look at --

MR. BRYANT: We can --

THE COURT: Hold on. Take a look at Appendix A, and I want you to explain to me how this witness comes -- you're going to have to point to something in the testimony that was not anticipated, which means I'm going to go back and look at the deposition testimony. If I get any indication that you could have anticipated this prior to this time, it's not going to be a good thing. Understood?

MR. BRYANT: I understand.

THE COURT: So I want you to consider that, and in fact, as part of your memorandum, you might want to indicate what about this testimony was not anticipated that you're talking about.

MR. BRYANT: Understood.

THE COURT: Okay? And I'll take the proffer. It may be the proffer will change my mind. I'll take a look at the rule myself, but my sense of Appendix A is that if every time somebody wanted to put up an impeachment witness they could do so, then the meaning of the witness list would essentially be meaningless, because there's always going to be something a little different in an opening case, and that would basically mean that the Defendant could basically operate below the radar, which I'm not prepared to allow unless you can really demonstrate how it's consistent with the rule.

MR. BRYANT: Yes, Your Honor.

THE COURT: Understood? All right. So with or without that witness, nine o'clock tomorrow morning. Are you going to be able to produce at least somebody at that point, Mr. Bryant?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Then nine o'clock, and we'll see each other at that point.

(Whereupon, at 5:25 p.m., the trial in the above-entitled matter was recessed, to reconvene at 9:00 a.m., Wednesday, April 30, 2008.)

//

//

//

REPORTER'S CERTIFICATE

DOCKET NUMBER: 05-186L

CASE TITLE: Lavetta Elk v. USA

DATE: April 29, 2008

LOCATION: Rapid City, South Dakota

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 5/15/2008

Carol Dawley
Official Reporter
Heritage Reporting Corporation
1220 L Street, N.W.
Washington, D.C. 20005