UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 05-186L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 522 through 722

Place: Rapid City, South Dakota

Date: April 30, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAVETTA ELK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 05-186L |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

3rd Floor Courtroom
U.S. Courthouse
519 9th Street
Rapid City, South Dakota

Wednesday,
April 30, 2008

The above-entitled matter resumed for trial, pursuant to recess, at 9:00 a.m.

BEFORE: HON. FRANCIS M. ALLEGRA
Judge

APPEARANCES:

<u>For the Plaintiff</u>:

ADAM D. HOROWITZ, ESQ.
Herman & Mermelstein, P.A.
18205 Biscayne Boulevard, Suite 2218
Miami, Florida 33160
(305) 931-2200

<u>For the Defendant</u>:

STEVEN D. BRYANT, ESQ.
SARA E. COSTELLO, ESQ.
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424

LANNY ACOSTA, JR., ESQ.
U.S. Army Legal Services Agency
901 North Stuart Street, Suite 400
Arlington, Virginia 22203
(703) 696-1636

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| (None) | | | | | |
| For the Defendant: | | | | | |
| Robert Bennett | 532 | 549 | -- | 564 | |
| Mark Mills | 565 | 631 | 676 | 681 | |
| | -- | 665 | 683 | | |

## E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| DX-6B | (previously) | 713 | Medical records |
| DX-6C | (previously) | 713 | Medical records |
| DX-11 | (previously) | 547 | BIA incident report |
| DX-22 | 529 | 530 | Cited excerpts from depositions 9C & 9D |
| DX-23 | 710 | 711 | Cited excerpts from 6C |

P R O C E E D I N G S

(9:00 a.m.)

THE CLERK: The United States Court of Federal Claims is now in session. The Honorable Francis M. Allegra presiding. Please be seated.

THE COURT: Good morning. We might have other preliminary things, but let's first take up Defendant's motion to call this witness for impeachment purposes. The key word in the rule that I'm not sure that, Mr. Bryant, you're focusing on is the word "exclusively." The rule draws a distinction between rebuttal witnesses, if you look carefully, and impeachment witnesses.

A rebuttal witness is a witness -- I'll give you an example. Somebody testifies the car is red. Another witness comes up and says, No, the car is black. That's a rebuttal witness. It does have impeachment value, all right, because it's indicating that the person's statement could be incorrect for a variety of reasons, one of which being lack of credibility. Okay? But it's not solely for purposes of impeachment, not exclusively for impeachment, so that type of testimony would not come in.

The only type of testimony that comes in under this rule is a situation where somebody said, I said to person A, X, and then you put person A on the stand who says, No, that person did not say that to me; they said,

this. Okay? That's exclusively, okay, for impeachment, and that type of testimony is the narrow band of situations that come in under this rule. All right?

I don't understand -- and maybe you can correct me if I'm wrong -- the nature of the testimony that you're talking about as involving a direct conversation or something like that -- stay seated; you can use the mike right there.

MR. BRYANT: Yes, Your Honor.

THE COURT: -- involving her having said something that she said to this person and this person saying, No, I said something different. Am I getting this wrong? Go ahead. Tell me some more about what this person's testimony is going to be.

MR. BRYANT: I think this is the exact situation of what you just described, Your Honor, that -- and I should first point out that obviously Plaintiff's credibility in this case is an issue of paramount importance.

THE COURT: Right. But that's not the point, you can understand, from what I just described, so --

MR. BRYANT: And this particular witness is going to testify for probably less than five minutes, and it's to the exact point that she made on the stand that she was not notified of being disqualified during this MEPS examination.

THE COURT: Right.

MR. BRYANT: This witness will testify that he's the NCO in charge of this MEP station, and they notify every time that there is a disqualification.

THE COURT: Did he -- is he going to testify that he notified her?

MR. BRYANT: He is not going to testify to that.

THE COURT: All right. Then the motion's denied. Now, let me, by the way, cite you a couple cases, and I actually welcome the opportunity for this, because I think it's time that this be addressed in an opinion, because I think that the notion that you can just bring up for impeachment purposes any witness would effectively allow Defendant to call witnesses at will that are not on the list, and that's not the intent of the rule, and I'm going to make that very clear in any written opinion that I issue in the case.

But if you want to go look at a couple of cases, as it turns out, while there's no interpretation of this rule as far as I know at our Court in a written opinion, there are opinions that deal with this at the circuit level that have the same rule and other local rules. All right. So one is Sterkel versus Fruehauf Corp., 975 F.2d 528, 532, and that's an Eighth Circuit 1992 opinion. And, again, I'll cite these back to you when the time comes in an opinion.

The second one that I know of is a District Court

opinion from the District of Maryland, and I don't know that I have that written down, but when the time comes.

All right. But in any event, that's my interpretation of the rule. It's consistent with those opinions, and that's my ruling, so your motion -- what I'd suggest to you that you do is you go ahead and file electronically so it's actually on the docket of the Court, and I will reflect that I've denied it, and then I'll explain the basis of my denial in the opinion.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. Anything else preliminary that we need to take up, Mr. Horowitz?

MR. HOROWITZ: I don't think so.

THE COURT: All right. Anything else preliminary beyond what we just discussed, Mr. Bryant?

MR. BRYANT: Yes, Your Honor. And I'm referring to DX-9C and 9D. I confirmed with Plaintiff's counsel about the portions of the transcript that they wanted to add to it. We've done so, and I can lay those out and read off the page numbers if you want.

THE COURT: All right. Yes. Let's do it both ways, Mr. Bryant. So you have a copy then for the reporter of those pages?

MR. BRYANT: And we've removed everything else from those exhibits.

THE COURT: Good, and does she already have that, or do you need to hand that to her still?

MR. BRYANT: She has that, Your Honor.

THE COURT: Okay. So -- all right. And just for clarification purposes, I think we're going to mark this as a different number so we don't have any confusion about what we did here. Am I right that 22 is the next one in your sequence?

MR. BRYANT: That's correct, Your Honor.

THE COURT: All right. So let's mark this then as DX-22.

(The document referred to was marked for identification as Defendant's Exhibit 22.)

THE COURT: And, Mr. Horowitz, I just want to double-check. You're okay with the references here?

MR. HOROWITZ: Yes.

THE COURT: All right. So DX-22 will be accepted essentially into evidence, representing the pages that were reviewed with various witnesses. It's not just one witness. It's a combination of what you did with the two depositions. Correct?

MR. BRYANT: That's correct, Your Honor.

THE COURT: All right. And as well as accompanying provisions that were cited by Mr. Horowitz per

the rule, just to identify them.

(The document referred to, having been previously marked for identification as Defendant's Exhibit 22, was received in evidence.)

THE COURT: And then I would appreciate it, Mr. Bryant, if you would then just read right now the page numbers that are affected.

MR. BRYANT: Okay. Referring to deposition of Lavetta Elk, the page numbers are DEF --

THE COURT: Just pause for a second. Is that 9C originally?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. BRYANT: DEF 1565, 1589 through 1591, 1593, 1623 through 1625, 1638 through 1639, 1668, 1790 through 1791. That's the extent of the pages from --

THE COURT: Okay. All right. And then is there pages from the second deposition?

MR. BRYANT: That's correct, Your Honor. And this is the deposition of Noretta High Hawk, and the pages from this -- which was previously DX-9D, and the pages from this document are DEF 1833, 1835, 1856, 1867 through 1869.

THE COURT: Any comment on that, Mr. Horowitz?

MR. HOROWITZ: No.
THE COURT: All right. Then -- so thank you for clarifying that, and so again DX-22 is admitted into evidence, and we have the page numbers there just to double-check if at some point we have a question.
Anything else preliminary, Mr. Bryant?
MR. BRYANT: No, Your Honor.
THE COURT: All right. Then are you prepared to move into your case?
MR. BRYANT: We are, Your Honor.
MR. ACOSTA: Your Honor, Defense calls Special Agent Robert Bennett.
THE COURT: Very good.
(Pause.)
MR. BRYANT: Your Honor, may I be excused to make sure the sergeant -- tell him he can leave?
THE COURT: Yes. Sure. Go ahead and do that.
Whereupon,
ROBERT BENNETT
having been first duly sworn, was called as a witness herein and was examined and testified as follows:
THE COURT: Could I have you please take a seat.
THE WITNESS: (Complying.)
THE COURT: Sir, could you begin by stating your full name and then please spelling it.

THE WITNESS: My name is Robert Bennett, R-O-B-E-R-T. Last name is spelled B-E-N-N-E-T-T.

THE COURT: Very good. Proceed.

MR. ACOSTA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. ACOSTA:

Q Good morning, Agent Bennett.

A Good morning.

Q What is your current occupation?

A I'm employed as a special agent for the Federal Bureau of Investigation.

Q And how long have you been with the FBI?

A Over five years.

Q And prior to working as an agent for the FBI, what did you do before that?

A For about two-and-a-half years, I was employed by the United States Department of the Interior, Bureau of Indian Affairs, as a special agent.

Q And what did you do in that capacity?

A I worked out of Rapid City for the internal affairs and inspections division. We would conduct reviews of tribal and BIA police departments, jails and investigative divisions, and also when any of the U.S. reservations were short on criminal investigators, I would be sent on temporary duty assignments.

Q And what did you do prior to working for the BIA?

A I was a Pennington County deputy sheriff in Rapid City here for two years, as well as a Rapid City police officer for one year.

Q And what is your educational background?

A I earned a degree in government and a minor in Native American studies from Dartmouth College. I graduated in March of 1994, and I graduated from Rapid City Central High School here in 1989.

Q So you're from Rapid City originally?

A Yes.

Q And you are Lakota as well?

A Yes. I'm enrolled over in Rosebud.

Q In Rosebud. Can you review your police training, starting at the very beginning, before you became a Rapid City police officer, I think you said was your first job.

A Actually it was Pennington County deputy sheriff. I was hired in November of 1997, and state law at the time required any new officer to attend the basic police certification for the state, so in -- if I remember correctly, it was March of 1998 I attended the state academy which was an eight-week program. And basically it was just an indoctrination into state law, officer safety issues, firearms, and just how to become a basic police officer for the state.

Q And what formal training did you receive, have you received since then?

A I've attended numerous in-services, which range from domestic violence training, crime scene investigation, interviewing techniques, and many others, as well as with the sheriff's office and then with the police department. And then when I left the police department to become a BIA agent, I had to go to Glencoe, Georgia, and attend the federal criminal investigator basic certification course to become a federal criminal investigator with the 1811 status attached to us.

Q And what type of officers attend that training?

A The class that I attended was comprised of tribal and BIA investigators, people that were leaving patrol and going to become detectives or BIA investigators, as well as special agents for Department of Education, Social Security Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives sent their agents there, Secret Service. Pretty much everybody except the FBI would send people there to become certified as federal criminal investigators.

Q And how long was that course?

A If I remember correctly, it was about ten weeks.

Q And that was prior to your two-and-a-half years with the BIA. Correct?

A Correct.

Q And when did you leave the BIA?
A I left the BIA in February of 2003.
Q And where did you go to from there?
A I obtained employment as a special agent for the Federal Bureau of Investigation. My reporting date for duty was February 23 of 2003, and I reported to new agents training at Quantico, Virginia.
Q And how long did that new agents training last?
A At that time, it was 17 weeks.
Q All in residence in Quantico?
A Yes.
Q And you completed that training successfully?
A Yes.
Q Have you had any training that focused on sexual assault in the -- you described in-services. Were any of those focused on sexual assault?
A Yes. Part of the basic certification courses all kind of dealt with that as a crime, and I can't quantify the number of hours, but I've had several trainings on speaking to people in incidents such as sexual assault.
Q In the course of your career up until 2000, until January 2003, how many sexual assault victims would you say you'd interviewed?
A The best estimate I could give is probably around 40, give or take a little, maybe more, maybe less, but that

would be a fair number.

Q And how many since then?

A Since then, probably another 60. I've probably interviewed over a hundred people over the course of the past ten years.

Q Okay. Taking you back now to January 2003, what was your duty station at that time?

A I was on temporary duty status on the Pine Ridge Agency as a criminal investigator for the Bureau of Indian Affairs.

Q Now, you mentioned earlier that you would do the temporary duty status when the BIA was short agents.

A Correct.

Q And was that the case at this time?

A That was the case there. Yes.

Q And on January 7, 2003, were you notified -- where were you that day?

A I was in Pine Ridge, and we received notification from the tribal police that an alleged sexual assault occurred, and the victim was at the Kyle Police Department.

Q And do you remember about when you were notified of the incident?

A It was around one o'clock, 1:00 p.m.

Q And how far is Pine Ridge where you were to Kyle Police Department?

A I drove that countless times, but I don't know an exact mileage. It's probably around 40, 45 miles from Pine Ridge or 45 minutes, or depending on how fast you're going, maybe an hour drive.

Q Do you remember when you arrived at the Kyle Police Department?

A It should have been right around 1:45 p.m. Within an hour I was there from being notified.

Q And when you arrived, were you directed -- what did you do when you arrived?

A I asked where the victim was and was led to the tribal prosecutor's office where I conducted an interview.

Q You said she was in an office. Can you describe the office?

A It was an office assigned to the tribal prosecutor, and I'm trying to figure out how bit the room was, but it's a standard office, probably 12 by 15. It had a door, a desk, computer, just an office that you'd expect the tribal prosecutor to maintain.

Q And was she located in that office?

A Yes.

Q Was it a private room?

A Private in the sense that we could close the door and talk one on one.

Q Were you along in the room with her?

A Yes.
Q When you first got to -- and when you say the victim, you're talking about Ms. Lavetta Elk. Correct?
A Yes.
Q How did she physically appear to you when you saw her?
A Calm. She was seated. Calm.
Q Did you -- do you recall -- you were told that this was an assault. Did you conduct any physical examination?
A Yes.
Q Can you describe what you did?
A During the course of the interview, I asked her where she was touched and if she had any bruising or any markings, and what she described during the interview was touching through the clothing, and at one point she described a circumstance where the Army recruiter's hands went under her shirt and may have touched bare breast or did touch bare breast.
But what caught my attention the most is there was a point where she said that her arm was grabbed and held about her head or above her head, so I asked permission to physically look at the place where she said she was grabbed, and I examined it from within, you know -- from my eyes to that part of her arm, within a foot.

Q And what did you observe of that part of her arm?
A I noticed no noticeable injuries or impressions or anything.
Q If there had been any impression -- if there had been any marks of any type, what would you have done?
A Generally when we try to document injuries, you would take a -- just a general photo, and then the next series of photos would have a scale, and when I say a scale, you'd place a ruler or something of a known dimension next to what could be a wound and photograph it.
Q But you did not at this time.
A Right.
Q You said you were in a private room with her. About how long did you interview her?
A It lasted around 45 minutes.
Q And were there any interruptions?
A No.
Q Was there any time constraints on this interview?
A No.
Q During the course of the interview, did you have the chance to observe her demeanor?
A Like I said, she was calm. She was responsive to any questions that I asked.
Q You say she was calm. Did she appear to have been crying to you?

A Nothing noticeable in terms of puffy, red eyes or puffy skin under there. I mean, she could have been, but I didn't notice. There was nothing obvious.

Q If she had been, would you have noted -- put it in your notes?

A Sure.

Q The same with the injury, if she had -- if you had observed any physical injury on her, you mentioned you would have photographed it. Would you have also put it in your notes?

A Yes.

Q What were you told when you were called in on the event?

A The call came in as an Army recruiter -- I can't remember if they said raped or sexually assaulted an adult female. The female is located in Kyle.

Q And upon arriving, what did you learn about what you were told as far as the event?

A Ms. Elk herself was on scene there at the police department and made the initial report. We were contacted, and the Army recruiter, Sergeant Kopf, was conducting other business elsewhere but believed to be on the reservation still.

Q Okay. And what did Ms. Elk tell you during the course of your interview?

A Basically that it was a non-intercourse, non-penetration assault that involved groping. His hands were placed on her legs. He rubbed her inner thigh. He rubbed her groin area. He was stopping the car, rubbing her, having a conversation. You know you want it; come on. And then at the same time, she was telling me how she was pushing him off. He would stop. They would drive. He would stop again. And it was a series of six or seven intervals such as that where he would stop, try to kiss her, try to touch her, drive, stop again, and this was all done on a back road up there behind Manderson.
But specific question being, you know, did his clothes stay on; you know, did he penetrate you, penetrate. No. Clothes stayed on, but I had to fight him off, so the nature of the incident was described as that.
Q You mentioned that the touching of the legs and the groin area was -- strike that. You mentioned that the shirt -- there was touching, skin on skin contact under the shirt. Did she mention whether or not it was skin on skin on the legs and in the groin area?
A Specifically on her legs and groin area, it was through the pants. It was his bare hand through the pants.
Q Do you recall anything else that she told you during the course of the interview?
A I asked her how specifically scared she was, and

part of an interview technique that I learned to kind of quantify what was going on, I asked her specifically how scared were you, or how frightened or unfrightened you were, and on a scale of 1 to 10, to rate it for me, with 10 being completely afraid and 1 being completely unafraid. And she quantified it for me with saying she was at about a level 6 or so.

Q During the course of your interview with Ms. Elk, did she ever mention any conversations that she had with Sergeant Kopf in the vehicle that day?

A It was mainly just trying to tell him to stop. At one point during one of the series of gropings, she mentioned to him something about, you know, was this -- isn't this illegal. I do a lot of illegal things. And he was trying to make light of it. You want it; come on, things like that. But basically she just described the incident. We got into a history of her interaction with Sergeant Kopf previous to that day of what happened.

Q As far as the conversation that occurred in the vehicle that day, did she mention anything that Kopf might have said about hiding a body?

MR. HOROWITZ: Objection to hearsay.

THE COURT: That's very -- that's also leading, so -- and the nature of the question is particularly problematic now, because now that you've asked that

question, you've now directed him to an answer, so the evidentiary weight of what he's about to say here is not going to be very good. So rephrase the question.

BY MR. ACOSTA:

Q Was there any other conversation that you recall that Ms. Elk had with Sergeant Kopf in the vehicle that she mentioned to you?

MR. HOROWITZ: Objection. Hearsay.

THE COURT: No, it's not. It's an admission, Mr. Horowitz. Go look at the rules.

BY MR. ACOSTA:

Q Do you recall any other conversation that they had in the vehicle that day?

A Nothing -- it would be redundant if I said. Pretty much what we had talked about and what I wrote was what we spoke of.

Q I'm going to call your attention to -- if you could -- in the binders next to you, there are -- I want to draw your attention to what's marked as Defendant's Exhibit 11.

MR. ACOSTA: Permission to approach, Your Honor.

THE COURT: Let's see if he can find it.

MR. ACOSTA: Okay.

THE COURT: Something tells me he's seen an exhibit book before.

THE WITNESS: I've got it.

BY MR. ACOSTA:

Q Do you recognize that document?

A That's our -- well, at the time, that's the Bureau of Indian Affairs incident report.

MR. HOROWITZ: Your Honor, I object. This document's not in evidence.

THE COURT: 11's not in yet? Let me see.

Can I verify with the reporter? Is 11 in?

THE REPORTER: No, it is not.

THE COURT: Okay. Are you going to work to get it in at this point?

MR. ACOSTA: Yes, Your Honor.

THE COURT: Okay.

BY MR. ACOSTA:

Q You were saying?

A This is the Bureau of Indian Affairs incident report that at the time my employer made us file.

Q And your employer being the Bureau of Indian Affairs?

A Correct.

Q And is this the report that you filled out that day?

A It's a facsimile transmission of it, but it is -- it's -- I recognize it as my writing and what I wrote.

Q Could you go ahead and review from page DEF 0091 to DEF 0095 for me, please.
A (Perusing document.) I've looked at it.
Q Do those four pages constitute your report from that day?
A Yes.
Q Is this the report that you wrote that day?
A Yes.
Q And when does it reflect that you -- does it reflect when you wrote the report?
A It's dated January 7, 2003, and the incident date was January 7, 2003, so I began writing it later on on the day, on January 7, 2003.
Q Was it your regular practice to write such reports in the course of your duties?
A Yes.
Q And what would you do with the reports, once you had completed them?
A We had a filing system, an incident report system, where our secretary would file them in there, and then regarding communicating with the United States Attorney's office, we would either send them a fax, or if they required a clean copy -- by clean copy, no fax numbers or anything like that attached to it -- either mail it to them, and then also send a copy to Aberdeen to the special

agent in charge of the division, to let him know what is going on.

Q You've looked at all four pages. Is this an accurate copy of the report that you made that day?

A Yes.

Q And to your knowledge, the Bureau of Indian Affairs maintains these reports?

A Yes.

MR. ACOSTA: Your Honor, Defense moves to have Defense Exhibit 11 admitted into evidence.

THE COURT: Yes, Mr. Horowitz.

MR. HOROWITZ: Your Honor, I have several objections. A couple things. One --

THE COURT: Stay seated, now that I know you're objecting, so you can stay by the mike. Go ahead.

MR. HOROWITZ: Several portions of the report are contrary to the stipulation in place. For instance, Sergeant Kopf's account of what occurred. Second, there's a portion of the report reflecting decision or deliberations as to whether to prosecute criminally, not relevant.

Third, if the proffer that was made was for purposes of a business record, I don't know that the Bureau of Indian Affairs is a business in the sense of the rule.

THE COURT: It's actually covered by multiple exceptions to the hearsay rule, another one involving public

records, which involves the record of an investigation. So if you're going to object, why don't you deal with that one, too, then.

MR. HOROWITZ: If they're trying to get it in under public records, I don't think it's a public record. An account of a sexual assault is not a public record. It's actually a confidential record that a public records request would not yield.

THE COURT: That's not the definition of public, so it's a record generated by a public office or an agency. It doesn't have to be made available to the public.

MR. HOROWITZ: Well, again, the portions that relate to the deliberations to charge criminally and Sergeant Kopf's account simply should not come into evidence. They're contrary to the stipulation.

THE COURT: All right. Well, I will not read this document in any fashion as contradicting anything that's in the stipulation. Subject to that limitation, it seems to me it's covered by multiple exceptions to the hearsay rule, and therefore is admitted.

(The document referred to, having been previously marked for identification as Defendant's Exhibit 11, was received in evidence.)

BY MR. ACOSTA:

Q You mentioned in response to one of my questions that she talked about their relationship prior. Can you relate to the Court what she told you about that?

A She had spoken of being in his hotel room, accompanying him outside the scope of her recruit status, driving around, being kissed once before in his hotel room in a small town of Martin, South Dakota, and just explained that they have had a more familiar relationship, I guess is just the general way to describe it, other than what happened on this particular day.

Q Did she tell you anything -- that she did anything about the incident that occurred, you said, in Martin?

A I asked her about it, why didn't she report that one, and she just said she thought it was over. You know, he attempted to kiss her and talked to her in a sexual way, and she thought it was over.

Q In the course of your interviews of victims of sexual assault, do you normally ask them whether or not there was any threat of physical or bodily harm?

A Yes.

Q Did you ask Ms. Elk that question?

A Yes.

Q What did she say to you?

A She said there were no threats of physical harm.
Q Is that reflected in your report?
A Yes.
MR. ACOSTA: Nothing further, Your Honor.
THE COURT: Very good. Cross-examination.

CROSS-EXAMINATION

BY MR. HOROWITZ:
Q Did you go over your questions and answers with counsel for the United States before testifying today?
A Yes.
Q You knew what they were going to ask you?
A Yes.
Q And you knew -- you told them how you were going to answer the questions?
A I didn't tell them how I was going to answer. I answered them. They might be a little different today.
Q Okay. How did you go about recording your interview with Ms. Elk?
A I take notes -- or I took notes.
Q How did you go about electronically recording your interview with Ms. Elk?
A In this incident, we did not.
Q Okay. Is that your training, not to record an account of a sexual abuse?
A It's a decision made out in the field. It's --

you can do it or you can't.

Q That was a decision you made?

A That was the decision that was made that day.

Q You didn't consult with anyone before making that decision?

A No, I didn't.

Q Okay. You indicated that you started interviewing with Lavetta at approximately 1:45 p.m.

A Right.

Q Okay. Now, you weren't the first law enforcement member to speak with her. Correct?

A Correct.

Q And she had met with numerous members of her family before you met with her?

A I don't know for sure who she met with in her family.

Q When you arrived, were several members of her family at the police station?

A They could have been.

Q Did you ask her to give you a calm and collected account of the events?

A I asked her to tell me what happened. Yes.

Q Okay. Did you want her to be hysterical, crying, or was it easier for you to hear her accounts once she had calmed down?

A I asked her to tell me what happened, and it came out calmly.

Q Okay. Did you ask her to calm down when you arrived?

A No.

Q Okay. And in your experience, is it easier to take down a statement when someone's calm, than opposed to when someone's hysterical?

A Yes. It's easy.

Q Okay. I just want to be clear. You indicated that Lavetta might have had her breasts touched. Have you had opportunity to review your report, the one in front of you?

A Oh, she told me her breasts were touched.

Q Okay. And then you hesitated. I just wanted to clarify. Her breasts were touched. She reported to you that her breasts were touched, skin to skin.

A Correct.

Q Okay. And she reported to you that her groin area was fondled. Correct?

A Correct.

Q Okay. And she reported to you that Sergeant Kopf also kissed her. Correct?

A Yes.

Q Okay. And all of these acts she reported to you

were against her will.

A Yes.

Q And they were -- he continued to do these acts after she pushed him away.

A Yes.

Q Okay. And you didn't find any of that to be an expressed or implied threat to her bodily integrity?

A Inherently it is. Yes.

Q Okay. So she described an inherent threat to her bodily integrity. Correct?

A Sure.

Q Okay. You don't dispute that all of these acts were contrary to what she wanted to have happen. Correct?

A She said she did not want them to happen. Yes.

Q Okay. Did she describe the situation in which Sergeant Kopf had his way with her?

A On this particular day or a different --

Q Yes.

A I'm not sure I -- can you ask the question again, please, sir?

Q Did she describe a situation in which Sergeant Kopf was doing things that she did not want to happen to her?

A She was describing a general situation like that. Yes.

Q A general situation or a specific sexual assault?
A There were a series of, according to her statement, six or seven times where he stopped and did this, so --
Q You indicated that there were -- strike that. When yo were interview Lavetta, how did she refer to Sergeant Kopf?
A Sergeant Kopf.
Q She didn't call him Joseph. She didn't call him Joey.
A Recalling what I wrote down, I asked her how she refers to Sergeant Kopf, and she said, Sergeant Kopf.
Q Okay. And did she tell you that each time she pushed away, he came back at her?
A Yes. There was a series of that. Yes.
Q You list the location of the incident as a back road in Manderson, South Dakota.
A Correct.
Q Are you familiar with that location?
A Not completely familiar.
Q What's the name of that road?
A I believe she said it was Gooseneck Road.
Q You believe the assault was on Gooseneck Road or a trail off of Gooseneck Road?
A It was in the back area there.

Q Okay. You're not quite certain where it is or --
A I did not go to the physical location. I didn't.
Q Pine Ridge Indian Reservation, you're familiar with the general location?
A Sure.
Q Pretty barren, remote reservation. Correct?
A Yes.
Q Would you agree that this is an even more barren, remote location than the rest of the reservation?
A I can't answer that. It's on the reservation, and it's --
Q This location that she described, any housing developments, housing projects?
A It's out of the way. Yes.
Q Okay. You wouldn't take that road to Sioux Falls. Correct?
A No.
Q You wouldn't take it to Kyle?
A You could take it to Kyle.
Q It's not the shortest route to Kyle. Correct?
A It's not a main route. No.
Q Is it the shortest route to Manderson?
A Depending on where you're coming from.
Q Okay. Well, let's --
A It's not a main route. It's not a paved road.

It's not anything like that.

Q And if you're -- are you familiar with where the Elks live in Wounded Knee?

A No.

Q Okay. If you're traveling from Wounded Knee, is that a main road you would take to Manderson?

A I don't know.

Q You mentioned that Lavetta reported to you that she had some prior episodes with Sergeant Kopf. Is that correct?

A That's correct.

Q Okay. You're not suggesting that Lavetta initiated any of those contacts, are you?

A No.

Q Okay. She didn't report that to you?

A No. She told of other incidents, is what she told us.

Q Okay. And her accounts of those incidents involved similar episodes in which she told him to stop.

A Correct.

Q Okay. And the difference being in those incidents, he did stop, and in this instance, he did not. Correct?

A Yes.

Q How many weeks of CI school training did you go

to?

A It was ten weeks.

Q Okay. How much of that CI school pertains to investigations of sexual assaults? Any of it?

A There are probably, during the interview portion, you know, several hours of the day. It may be a couple of days of training.

Q You received actual sexual assault training in CI school.

A There are basic reviews of what to expect during sexual assault investigations. It's part of the training, and I'd have difficulty quantifying how many hours, how many days, but it's part of what we learn.

Q Lavetta had just turned 19 just a few weeks before this assault. Correct?

A I'm not sure when her birthday is, but she was 19 at the time of the incident. Yes.

Q Did you ask her if she wanted other people in the room?

A No.

Q Did you speak with other officers who had investigated the incident before you arrived?

A I spoke with an officer there, just to get a little brief and ask where she was located, and then I was directed to her.

Q And did you ask him how she was emotionally when he interviewed her?

A No.

Q Okay. You have no idea if she was hysterically crying moments before you walked in the room?

A Right.

MR. HOROWITZ: Okay. No further questions.

THE COURT: Redirect.

MR. ACOSTA: Nothing.

THE COURT: Special Agent, in a process that I've used for some other witnesses, I have some questions for you.

THE WITNESS: Sure.

THE COURT: Once I'm done asking those questions, I'll give both the Government and the Plaintiff an opportunity to follow up in case I break any new ground.

I just want to get an understanding of just a couple of points actually of the ones that you made. So I think I heard you indicate that you did not go to the physical location where the assault occurred. Correct?

THE WITNESS: Correct.

THE COURT: That, I guess, strikes me as odd. Why would you not go to the location, to see what the location looked like, to see if there was anything there that might have indicated -- that would have corroborated

the story, that would have -- you know, whether or not something was left at the site that might have corroborated that they were? How come no physical examination?

THE WITNESS: When I finished the interview with Ms. Elk, I was informed that Sergeant Kopf was at her residence, and the tribal police had him detained, if you will. So I made a direct route to his location, to conduct an interview with him.

THE COURT: Why at some point after that would you not have gone to see the physical location?

THE WITNESS: I spoke with the criminal chief assigned to the United States Attorney's office here, the criminal chief who decides whether or not something gets prosecuted. I spoke with him earlier in the day, before I spoke to Ms. Elk, spoke to him after the interview, and said, I've got the alleged subject or I've got Sergeant Kopf detained by tribal police. Talk to him, and then call me back.

Upon speaking to Sergeant Kopf, I called Mr. Mandel, briefed him on her statement and his statement, and he declined to prosecute --

MR. HOROWITZ: Objection, Your Honor.

THE COURT: Pause.

MR. HOROWITZ: I just objected to Mr. Mandel's decision.

THE COURT: Well, it seems to me that he's responding to my question, and I think it's relevant, so go ahead. Continue, please.

THE WITNESS: I briefed Mr. Mandel about what had occurred, and immediately he made the decision to not prosecute it federally in this jurisdiction here, but refer it to the Army for any action that the Army deemed appropriate.

THE COURT: Uh-huh. The -- is it normally the case when you investigate sexual assaults that you don't go to the location of the alleged assault?

THE WITNESS: Not usually. That's something you would want to do.

THE COURT: And wouldn't you think that that would be evidence that you'd want to factor into any determination of whether or not to prosecute?

THE WITNESS: What was going on in my mind at the time and after consulting with Mr. Mandel is that the location would not -- that wasn't in dispute. I told him, yes, something happened. And it was -- at that time, with the case being declined federally, write it up and forward it on. But basically -- I'm sorry.

THE COURT: Would location have any impact on any of the potential elements to a crime? I mean, if you were in a threatening location as opposed to a place that was

less threatening, does that have an impact in terms of proof, isolated areas versus areas that are well trafficked? What about the --

One of the things, I guess, I'm wondering about, too, is that if somebody is forcibly moved to an area where they do not want to be, I'm wondering whether or not other federal crimes are at issue, beyond sexual assault. Kidnapping is one that comes to mind.

THE WITNESS: When you're referring to kidnapping, I don't think this was -- it didn't rise to that level. With her getting into his car around her residence and going on a ride --

THE COURT: So once somebody gets into a car, no matter where the person takes them, you can't have a kidnapping charge. Is that what you're saying?

THE WITNESS: In this case, the thought or the idea of kidnapping never came into my mind.

THE COURT: Do you always, as part of the interview process, ask the witness on a scale of 1 to 10, how -- what was the phrase? -- frightened you were?

THE WITNESS: Completely afraid or totally -- totally afraid or completely unafraid.

THE COURT: Is that standard in your practice for a sexual assault interview?

THE WITNESS: It's a question where I think would

get at what you would want to know, her level of fear; did he make any specific threats, or how afraid were you --

THE COURT: Well, I understand those other things. I'm wondering about the scale. Is that a question you ask as sort of a standard practice in a sexual assault investigation?

THE WITNESS: It's not in every interview, but during the interview this date, that's how it was phrased.

THE COURT: What element, I guess, of a crime does that particular question relate to?

THE WITNESS: Level of fear, any overt threats to do that. There are specific statutes that deal with threat of physical harm as opposed to direct physical harm that add credence to the statute or corroborate, you know, charging someone out with a more severe sexual assault crime.

THE COURT: But, of course, there's a subjective element, of course, to perception of fear, and there's a subjective element to the perception of the scale. Correct?

THE WITNESS: Correct. Yes. There's a lot of subjectiveness.

THE COURT: So I would assume that with that scale and if you've used it in other situations, that you've seen somewhat different fact patterns with people coming up with numbers that if you stacked them up, once against the other, you'd say, Well, gee, I'm not getting numbers here

that are absolutely consistent.

In other words, it's not -- if you understand the question I'm asking you, there's a subjective aspect to that scale, in that one person might experience a particular event and asked to deal with that scale, they'd say it was an 8. Another person might experience the exact same event and say it was a 6, and somebody else might experience a much worse event, you know, and say it's a 6.

THE WITNESS: Sure.

THE COURT: Do you see that variability in terms of the --

THE WITNESS: Yes.

THE COURT: -- in terms of the scale?

THE WITNESS: Yes.

THE COURT: All right. So basically it isn't an absolute measure of fear, at least from an objective standpoint. Is that correct?

THE WITNESS: No. There would be nothing absolute about it.

THE COURT: All right. And so it's not meant to be an objective measure of fear. It's more just asking this person subjectively what they felt.

THE WITNESS: Yes. How did you feel? Can you put a number to it?

THE COURT: All right. And so would it, in your

view -- I mean, if it was used, for example, to counteract an element of the crime, in your view does that perception of the witness necessarily counteract the notion that the person might have felt threatened? I mean, if they come in at a 6, is that still in your view consistent with them being threatened?

THE WITNESS: Yes. And then you've got to quantify threatened also, too. I mean, there's other perceptions of that.

THE COURT: All right. But if you were talking about whether or not a person who said 6 on that scale felt threatened, your conclusion is that would be consistent with that.

THE WITNESS: Yes.

THE COURT: And so are we talking about matters of degree here to a certain extent?

THE WITNESS: To a certain extent, yes.

THE COURT: Variability from person to person, the same person might describe the exact same events and come up with a different number on the scale.

THE WITNESS: Right.

THE COURT: Okay. All right. That's all I have. Any type of further questions from Mr. Acosta?

MR. ACOSTA: No, Your Honor.

THE COURT: Anything, Mr. Horowitz?

MR. HOROWITZ: Yes, I do.

RECROSS-EXAMINATION

BY MR. HOROWITZ:

Q Lavetta was wearing a sweater on the day of her assault. Correct?

A I can't recall. I know she had -- I know she was clothed. I can't recall what it was.

Q Did you ask her to remove any clothing to inspect her physically?

A I think I -- if she -- if it were a long-sleeved shirt, I would have asked her to pull it up to look at where she said she was grabbed.

Q Up to her elbow?

A At least up to there. Yes.

Q You didn't ask her to remove any clothing?

A No.

MR. HOROWITZ: No further questions.

THE COURT: All right. Anything else?

MR. ACOSTA: Nothing, Your Honor.

THE COURT: Okay. You're excused with the thanks of the Court.

THE WITNESS: Thank you, sir.

(Whereupon, the witness was excused.)

THE COURT: Next witness, please, Mr. Bryant.

MR. BRYANT: The United States calls Dr. Mark

Mills.

Whereupon,

MARK MILLS

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

THE COURT: Could I have you please take a seat.

THE WITNESS: Of course. Thank you.

THE COURT: And could you begin by stating your name for the record, and then please spell it.

THE WITNESS: Sure. It's Mark, M-A-R-K, Mills, M-I-L-L-S.

THE COURT: Proceed, Mr. Bryant.

MR. ACOSTA: I apologize. Agent Bennett is still in the courtroom. Is that --

THE COURT: No. Actually it's not. No, it's actually not, because there's some potential he could get called as a rebuttal witness.

MR. ACOSTA: Understood.

THE COURT: Thank you for alerting me.

DIRECT EXAMINATION

BY MR. BRYANT:

Q Good morning, Dr. Mills.

A Good morning, Mr. Bryant.

Q I'd first like to discuss what your current position is, your occupation.

A Oh, I'm a psychiatrist and forensic psychiatrist, mostly practicing as a forensic psychiatrist in Washington, D.C., and I'm a professor, full professor of clinical psychiatry at the Columbia University in New York, and I'm an adjunct professor of psychiatry at New York Medical College, St. Vincent's Hospital, also in New York.

THE COURT: And, Doctor, if I could ask you, as you're about to guess, I need you to stay a little bit closer to that microphone.

THE WITNESS: I'll do my best, Your Honor. It's tough in this room. I don't know quite what it is.

BY MR. BRYANT:

Q And are you self-employed?

A Yes.

Q And how long have you been self-employed?

A Twenty-one years.

Q And what do you do as a forensic psychiatrist?

A Primarily I consult to attorneys in lawsuits that raise mental state issues of some kind or other. That can be psychological distress or damages issues, such as in the present case. It can be insanity, competency to stand trial, competency for some particular capacity, like testamentary capacity, competency to be executed, a wide variety of issues that -- where mental states are relevant in the law, both civilly and criminally.

Q And with respect to Columbia University, what are you a professor of at that --
A I'm a professor of psychiatry, and they -- Columbia breaks it down into research psychiatry and clinical psychiatry. I'm a professor of clinical psychiatry.
Q And how long have you done that?
A About five, six years now.
Q And you mentioned New York Medical College.
A Yes.
Q Can you tell me what you do there?
A I really do the same thing. I teach residents and fellows on an occasional basis.
Q And how long have you been teaching?
A Well, I've been teaching since I was a chief resident. That goes back to 1977.
Q And what is your educational background?
A University of California, Berkeley, undergraduate; Harvard Law School, law degree 1970; back to Berkeley for a year of pre-medical education; and then Stanford University School of Medicine, graduating 1975.
Q And can you briefly discuss some of the high points in terms of where you've taught over the years, other than the ones we've mentioned?
A Sure. I mean, very briefly, I started off as an

assistant professor at Stanford in the department of psychiatry. I was also an adjunct professor -- adjunct assistant professor on year at the law school at Stanford. I then moved to the Harvard faculty. I was an instructor and assistant professor in psychiatry and an adjunct professor at the law school and co-taught a course with Alan Dershowitz in criminal law.

I then moved back to California to UCLA where I was first an associate professor and then full professor in the department of psychiatry and bio-behavioral sciences, kind of a cumbersome term, but psychiatry basically.

Q Well, you must be honored to have been a professor at so many fine institutions.

A Well, it's a nice thing to say. I'm not sure, you know, it's terribly relevant here, but I've been fortunate to have had some very intriguing positions.

Q And are you board certified in --

A Yes. I'm board certified both in psychiatry, 1982, I believe, and in forensic psychiatry, 1983.

Q And what is the significance of board certification?

A Well, it's the profession's imprimatur of confidence essentially. It's an acknowledgment that one has been rigorously evaluated by one's peers, and that one's work and qualifications have been found at least adequate.

Q Your curriculum vitae -- and that's DX-1, page DEF 1172 -- if you could pull that for me for a moment -- through 1197.
A I will --
Q If you need some help, please let me know.
A DX-1? Is that the one?
Q That's correct. And it's --
A I assume it's in that.
Q Your CV follows the report.
A Got it. Thank you.
Q And this is a 26-page CV. Is that correct?
A Yes.
Q It mentions on page DEF 1173 through 1174 a number of hospital appointments. Can you identify any in particular that would be relevant to your testimony today?
A Yes. From '83 through '87, I was the chief of psychiatry for the West Los Angeles Veterans Administration Medical Center. At that point, the West LA VA was the largest psychiatric hospital in North American, that is, larger than any other institution in Canada, the United States or Mexico. We had about 450 in-patient beds and did more than 200,000 outpatient visits per year, and I had about 100-plus psychiatrists reporting to me.
It's important, because obviously in that era, we were serving World War I veterans, a few; World War II

veterans, many; Korean War veterans, quite a few; and a number of Vietnam War veterans, and it was really in that group that we saw the rise of and the sort of definition of post traumatic stress disorder. So I have seen scores, probably literally hundreds of veterans with PTSD during my time at the VA.

Q And how many people did you supervise in that position?

A Well, a hundred-plus psychiatrists and then, you know, obviously, derivatively the entire work of clinical psychiatry.

Q There's also a section referring to, on the same page, DEF 1174, of board certification, fellowships, awards and grants. Can you tell me what they are and why they're given?

A Well, I mean, look, I mentioned the two board certifications. I think at the other end of that enumeration in 1986 and now 20-plus years ago, I was named a distinguished fellow by the American Psychiatric Association. That's an honor that most psychiatrists don't receive, and again it's very flattering, but my colleagues have recognized my work as, you know, substantial. I guess that's a nice word.

Q And with respect to editorial boards, it's on DEF 1175. Can you tell me how you were selected for those

positions?

A Well, again, because I have written extensively, I have authored articles in monographs and in treatises, and because of my knowledge of forensic issues, I was often and still am asked to review articles that have either direct forensic topics incorporated within them or have forensic implications.

Q And in that position or in other positions, have you had the opportunity to be involved in refereeing potential publications?

A Again, hundreds probably, but certainly scores.

Q And can you tell me what that process is about?

A Well, it's about really two things: one, deciding whether or not a particular article or paper merits publication in terms of the topic presented, in terms of the utility of the information presented. And then, two, it's about whether or not the statistics and the information is methodologically rigorous. So it really is a twofold process. Is this interesting, and is this done well enough to merit publication?

Q So I gather that means there's sort of scrutinizing process of the publication to ensure that it meets the standards?

A That's right. I mean, I would say that most demanding journals, the American Journal of Psychiatry, the

Archives of General Psychiatry, for example, probably publish something like one paper that they receive in eight or in ten, so most papers are rejected, and even those that ultimately are published are often revised once or twice prior to publication.

Q And have you had any publications of your own in referee journals?

A Yes. I mean, in my CV --

Q Is that from DEF 1177 to 1180? Does that --

A That's right. I think it enumerates --

Q Forty-nine is my --

A -- some 49 referee publications.

Q Is there anything, any publications within those 49 that are specifically relevant to this case that you recall?

A Well, we'll come to my opinions in this case, but certainly one of the opinions I've -- perhaps the ultimate opinion is that Ms. Elk is not a reliable witness. One of the bases for that opinion has to do with the psychological testing results that she produced both for me and for Dr. Manlove, and one of the reasons I'm familiar with such testing is I've written an article about a test for malingering that was published in the American Journal of Psychiatry, so the topic of malingering has been of interest to me for several decades now.

Q And what is another term or description of what malingering?

A Well, malingering is faking or elaborating for gain. In a criminal matter, it can be the gain of less sentence or no sentence or of serving one's sentence in a psychiatric hospital which probably is more pleasant than a prison. In a civil case, it can be -- the gain can be one of increased damages or some additional kind of potential benefit.

Q And are you referring to number 31 on your referee publications, which is on DEF 1179? Is that the --

A That's correct.

Q And have you been involved in analysis of malingering and studying that topic over the decades of your career?

A Yes. I mean, since that article was written, I have been interested in malingering and in sort of, you know, how you do forensic assessment in a way to adduce data that's useful to the Court and to the attorneys, and I have written, the CV also reveals, in The Comprehensive Textbook of Psychiatry the chapter for the current edition and the two prior editions on malingering, and continue to find the whole approach of forensic psychiatry something worthy of discussion and careful thought.

Q And you mentioned The Comprehensive Textbook of

Psychiatry. What is that?

A Well, it came up briefly yesterday in Dr. Manlove's cross-examination. It is one of two major English language, American English language texts in psychiatry. The other is the American Psychiatric Association's Textbook of Psychiatry. The comprehensive textbook is the older and more voluminous, that is, the more detailed text, and is revised about every five years. The American Psychiatric Textbook is more recent, somewhat shorter, and is revised on about that same schedule. I guess there have only been about four editions of it versus the eighth of the Comprehensive Textbook.

Q And of those eight editions, I believe you said you offered the malingering chapter in three of those?

A In the three most recent ones. That's right.

Q And if you could turn to DEF 1182, just for a moment --

A Sure. Got it.

Q The most recent edition of that, the chapter you wrote, is that number 83? Is that correct?

A Yes. It's the Comprehensive Textbook of Psychiatry, and it's the eighth edition, written in 2005.

Q Your curriculum vitae also indicates 200-plus presentations. Can you tell me what those are about?

A Well, when you're presenting something away from

your academic center -- that is, if I'm teaching at UCLA and I give a lecture on some topic, it's not going to be enumerated there, but if Harvard invites me to talk about current topics in forensic psychiatry or, as I did two months ago, I presented something to the American Bar Association about cultural issues in legal assessments, then that would be ordinarily enumerated in the curriculum vitae.

Q And I gather some of those presentations involve forensic psychiatry?

A Almost all of these involve some kind of forensic topic. There was a period when I was commissioner of mental health for the Commonwealth of Massachusetts, and during that period, I frequently spoke about deinstitutionalization, funding and public sector for psychiatry and for the mentally ill, and obviously for the mentally retarded, because at that point, my job embraced the mentally retarded as well, so there's a -- you'll see a shift, depending upon the setting where I am in terms of the presentations.

Q And did some of those presentations also specifically talk about malingering?

A Yes.

Q How many times have you been qualified as an expert in court?

A How many times have I testified in court or --

Q How many times have you been qualified as an expert and testified in court?
A Oh, yes. Certainly well over a hundred, probably closer to a couple hundred.
Q And what have the topics been?
A Well, they've been insanity, serious mental illness, psychological harm, psychiatric or psychological distress, competence to be executed, competency to stand trial. I'm sure there's some additional ones, but that -- oh, fight/flight reaction, post traumatic stress disorder, of course, that kind of thing.
Q And that's civil and criminal matters?
A Yes.
Q And can you roughly state the percentage of time in civil matters you testified on behalf of the defendant as opposed to the plaintiff?
A In civil matters, it's probably 55 or 60 percent for the defense and 40 or 45 percent for the plaintiff, and in criminal matters, it's pretty close to 50-50, probably a slight edge for the prosecution but not much.
Q And turning to civil matters and specifically perhaps tort cases which we heard about a little bit yesterday and the issue of lost earning capacity --
A Right.
Q What is -- how many of those cases like that do

you recall that you've been involved in?

A Well, many of my civil cases where psychic harm is alleged or claimed raise issues of difficulty working, difficulty returning to working, and therefore of lost earnings, so it's a common but by no means inevitable allegation when one is raising issues of psychological distress.

Q And what is the procedure in your experience of proving those lost earnings?

A Well, the most common procedure that I see is that really three experts are retained typically: one, a psychiatrist to look at the psychological distress and make an assessment of it; two, some kind of vocational therapist or vocational expert --

MR. HOROWITZ: Judge, I'm going to object. This is outside the scope of the report.

THE COURT: Well, not only that. Can you explain to me how this is within his area of expertise? He's not a fact witness, so it's either within his area of expertise or it's not, and I don't see how this is -- it may be something he knows, but it's not something I view as within the area of expertise. So I think it's -- I'm going to sustain the objection, so you need to ask the next question. And I'm going to strike the answer to this point.

MR. BRYANT: Can I lay some foundation for his

experience and how it's been laid out --

THE COURT: Is he going to be certified as an expert in the areas you're talking about? He can't be a fact witness and an expert witness, so if you're going to ask him to testify about things he knows from other trials he's been involved in, that's facts. Somehow if you can tie into something -- that something he's an expert in involves knowing, for example, what proof is in a case, or what's the typical proof in a case, that would be the case, but I don't think -- he's testifying here, as I understand it, as a psychiatrist. Correct? He's testifying here as a psychiatrist. Correct?

MR. BRYANT: That's correct.

THE COURT: And so I don't see how that could be within the scope of his expertise, at least in terms of the way this is set up.

BY MR. BRYANT:

Q In terms of forensic psychiatry versus clinical psychiatry, you may have said this and I -- I apologize if you have. Roughly what amount of time have you spent on each of those, roughly speaking?

A I spent about a decade doing mostly clinical and clinical administrative psychiatry and then about two decades now doing forensic psychiatry.

Q And what is the difference between forensic

psychiatry and clinical psychiatry?

A Well, there's a substantial difference in the approach obviously. Both disciplines require the same core sets of skills, but when a patient or a client comes to one as a psychiatrist, I mean, the meta message is, I'm hurting; help me. And generally, therefore, one says, Tell me about it; let's see if we can figure out the kinds of things that might help you. That might be medication. That might be psychotherapy. It might be some kind of behavioral intervention. But the process is collaborative and tends not to focus terribly critically on, you know, whether or not each of these statements by the patient is actually correct. One looks at it more metaphorically.

In forensic psychiatry, issues of credibility, reliability, candor, precision all are very important, and so one relies upon the written record in a way one does not in clinical psychiatry. Often there is no written record except the notes one generates, and one looks at other sources of data, a prominent one being psychological testing to help triangulate on, you know, what is really going on with the particular individual who is being assessed or this set of individuals who are being assessed.

Q And in a forensic capacity, how many times roughly have you had cases involving claimed sexual assault?

A Well, three or four dozen, somewhere in that sort

of 30 to 50 range.

Q And how many cases have you been in a forensic capacity involving post traumatic stress disorder?

A I'd say as an allegation, certainly north of a hundred, but I can't give you an exact number. It is a frequent allegation when people really mean, I'm significantly upset. You can be significantly upset without having post traumatic stress disorder. You can have post traumatic stress disorder that has resolved and therefore not be very upset. So often it's kind of a spurious allegation or a slightly incorrect one from the psychiatric perspective.

Q And turning to this case, generally speaking, what information did you consider in arriving at your opinions?

A Well, I pretty much reviewed the same pool of data that Dr. Manlove described yesterday that he reviewed and that is laid out in his report, but essentially Ms. Elk's preexisting and successive medical records, that is, before the incident and following the incident. I reviewed the depositions that have been taken in this case. I reviewed the BIA investigation of Special Agent Bennett.

And I reviewed Ms. Elk's description, descriptions, plural, of what happened, so that's one pool of data. I spent about a day with her, assessing her,

administering two tests, so I have my notes from that assessment and the psychological test results. I have my reports. I have the report of Dr. Manlove and his psychological test, the MMPI-II. And then I've actually been fortunate enough to be able to sit in on the trial, so I've heard the various witnesses that have appeared so far, and I guess I'm the last.

Q Turning to the medical records that you mentioned, if you could please look at Defense Exhibit 6B --

A I have 6B.

Q And I'm not going to go through this page by page. If you could just sort of go through there, and tell me. Are these some of the documents that you looked at and considered in reaching your opinions?

A Yes, they are.

Q And we're talking about DEF 454 through DEF 497.

A Yes.

Q And then turning to 6C, the next in line, these again sort of -- without going through every page -- there's quite a bit there to glance through, and I have the same question, whether these were the documents you looked at.

A Yes, they are.

Q And referring to DEF 781 through DEF 1164 --

A 781 is correct, and 1164 is correct.

Q And, lastly, I'd like you to look at a Joint

exhibit, and that's the thinnest binder up there, JX-2.

A Joint Trial Exhibit JX-2, I have it.

Q And it's DEF 1 to 90. Are those documents that you looked at as well?

A Give me a moment, please, and I'll tell you. (Perusing document.) Yes, they are.

MR. BRYANT: The United States moves the admission of DX-6B and 6C, Your Honor.

(Pause.)

THE COURT: Question pending?

MR. BRYANT: No, Your Honor. I moved the admission of DX-6B and 6C.

THE COURT: All right. Mr. Horowitz?

MR. HOROWITZ: Yes, if it's because Dr. Mills reviewed them, I mean, not for the truth of the matter.

THE COURT: Well, I want to make sure we continue to stress that point, because that's true in my view of all the documents that we're referring to as ones that the experts reviewed. So with that limitation -- and I'm understanding, Mr. Bryant, that that's the limitation that you're -- that you recognize that limitation.

MR. BRYANT: I do recognize the limitation, Your Honor.

THE COURT: Mr. Horowitz, you were going to say something.

MR. HOROWITZ: Well, sort of off that point, likewise there are matters in the report that you made an evidentiary ruling on.

THE COURT: I'm not sure what you're referring to.

MR. HOROWITZ: Okay. Do you want me to get specific at this point?

THE COURT: Yes. I would like you to get specific.

MR. HOROWITZ: Sure. Dr. Mills points out in his report an incident involving an abusive boyfriend. Yesterday we had the ruling that that is not in evidence.

THE COURT: Well --

MR. HOROWITZ: And what --

THE COURT: The point that I'm talking -- I mean, you're talking about his report now?

MR. HOROWITZ: Well, yes.

THE COURT: All right. His report stands as his report. It doesn't have any factual weight any more than the factual statements that were in your expert's report have independent factual weight. All right. So there's nothing inconsistent about the report in anything he's just -- the report is the report. All right.

And so from a fact-finding standpoint, nothing in the report is going to impact any fact-finding, because it

can't. He's just talking about his perceptions and his findings. That doesn't make them facts. If that was the case, we'd have problems with the reports themselves then being hearsay. The reason why we don't is because those things are not viewed as independently factual. It's his opinion then, his findings regarding the medical things that are, in fact, the portion of it that is probative from an evidentiary standpoint.

MR. HOROWITZ: I was just going to point out that the particular reference in the report goes to the truth of the matter asserted.

THE COURT: It does not, so if that were true, then no expert report could ever come in, so -- all right. So basically making sure that we understand -- and, in fact, that was a general instruction I want to make sure of which is that you all put this limitation on in terms of admitting numbers of documents with the notion that they were being admitted simply as documents that were reviewed by the experts.

I think they come in in that regard, and if there were any questions regarding what was reviewed by the expert, they could be looked at for that point, but they can't be asserted on that basis as the basis for an independent factual finding.

MR. BRYANT: I have one clarification of that,

Your Honor.

THE COURT: Sure.

MR. BRYANT: I specifically went over some documents in DX-6C, some medical records, with Ms. Elk on cross-examination, and those -- I could lay out those pages. I'd have to find them, but I believe it's 1101 through --

THE COURT: Well, we better clean this up at some point --

MR. BRYANT: Okay. I will. That's my only --

THE COURT: -- because I viewed that limitation that you both used in your introduction of exhibits as a significant one, and maybe I should have made it much clearer at that point. All right. But if you're saying that they're coming in -- as far as I'm concerned, they're coming in as the equivalent of something that would be an appendix to a report that would include all the materials that the person relied up. All right. And that sometimes happens in a report. It certainly happens in other types of reports.

All right. So that's what I viewed them as the equivalent of. If there's some basis for suggesting that those same things are going to be relied on as a factual matter, you better identify those and we better make sure that those pages are somehow separately dealt with, because if they're not, I will not rely upon them as a factual

matter.

MR. BRYANT: Then that's something I will clean up certainly in a housekeeping matter after we have the witness.

THE COURT: All right.

MR. BRYANT: Specifically those pages.

THE COURT: All right. And realize, too, there's also a potential of things going on here, too, because there's potential for using the same pages for refreshing recollection or for impeachment, so it's possible that they're going to come in in a different way in that fashion as well.

MR. BRYANT: I understand that, Your Honor.

THE COURT: Okay.

MR. BRYANT: And I'd also just point out one other thing. The JX-4, which is a Plaintiff's amended answer, first request for admission, that specifically refers to medical and/or psychological assistance for depression on or about April 2002, so that is in evidence.

THE COURT: All right.

MR. BRYANT: For the truth.

THE COURT: Go ahead.

MR. BRYANT: Yes, Your Honor. Thank you.

THE COURT: I was actually reading the document,

so I got stalled here while you were asking for the admission, so if you're wondering why --

MR. BRYANT: I'm sorry, Your Honor?

THE COURT: If you're wondering why I was sitting here stunned, I was reading the document you were admitting, and I got caught up with the document more than I did with the admission request, so go ahead.

MR. BRYANT: Understood, Your Honor.

BY MR. BRYANT:

Q You mentioned a few moments ago -- we got off track a little bit, but that you interviewed Ms. Elk, I believe it was, for all day, and you had some psychological tests that you administered.

A That's correct.

Q What were your impressions of her in terms of her demeanor and so forth?

A She arrived slightly late, but not particularly late. She was friendly, was very business-like. I mean, she answered my questions appropriately, didn't elaborate particularly, but didn't appear evasive or endeavoring to minimize her answers. When I asked her to do the test, she was cooperative. At one point, she introduced me to her husband and several of her family members. I was very pleased to meet them. She was nice. I liked spending the day with her, and I felt I learned a fair amount from her.

Q I'd like to turn your attention to DX-19, if you could -- sorry to keep making you jump from one to the other.

A I can go back there, I'm sure.

Q And if you need assistance finding it, please let me know.

A DX-19 is withdrawn, it says.

Q DX-19? You're on DX-19? Not PX. DX.

A Oh, I'm sorry. I've got the wrong binder.

Q Here, let me --

THE COURT: Go ahead. You can approach, Mr. Bryant.

(Pause.)

THE WITNESS: Okay. Thank you. I have DX-19 in front of me.

BY MR. BRYANT:

Q Do you recognize that document or --

A I do. It is a eight-page, handwritten document dated October 20, 2006, which is a copy of my notes from the day-long session that Ms. Elk and I had together.

Q If you would now, please summarize your expert forensic psychiatric opinions with respect to Ms. Elk in this case.

A Well, I mean, there's really one opinion, that based upon my assessment for the reasons that we'll come to,

I do not consider Ms. Elk a reliable witness. I view her as having minimizing important history on both before and after the incident, and more importantly perhaps, in the testing exaggerating in such a dramatic fashion that her test results cannot be utilized, but in a fashion that clearly demonstrates an intention to make her hurt or her difficulties appear much greater than they are, in fact.

Q And you mentioned the psychological tests. Was that -- what other bases did you do to help you reach those conclusions?

A Well, I took a history. I compared the history that I obtained from her to the history that is revealed in her medical records. I compared the history that I took from her or obtained from her to the history that Dr. Manlove obtained from her, and I tried to understand what had been going on in her life prior to the incident, around the time of the incident, and following the incident.

And to my surprise, I discovered that, at least as I perceived it, she was minimizing systematically difficulties in her life unrelated to the incident and -- I hate to use the term -- "embellishing" is a nice term as opposed to say, "exaggerating -- but embellishing the quality of the hurt that was derived or apparently derived from the incident.

Q And what were the -- you said you looked at pre-

assault and post-assault. What were some of the stressors that you're referring to in the post situation?

A Well, on a -- for example, the first of her multiple miscarriages was the one that occurred, I think, we heard from her mother around week 18 and was, I think, Mom said, devastating to the family, but clearly that was an upsetting event. Ms. Elk told me that she had been upset by it and that her family had attended the funeral for the stillborn child.

And yet when I said, Well, you know, sort of, what happened; how did that feel, she said, you know, well, I was upset briefly but life went on. And it isn't that that couldn't be true. It's just my sense is if she were so reactive as to be continuing to dwell on this assault -- by the way, I believe the assault occurred; I understand that; I'm not trivializing it -- that one would expect that she would have been more upset than she revealed to me about the spontaneous abortion, about the miscarriage.

And then she revealed -- and it's in my notes, I think, primarily on page 6, if I recall correctly. She told me that she had had multiple miscarriages. I document the dates there. She actually told me seven. But -- and the exact number is not important, but if one is having multiple miscarriages and if one of them at least has been quite significant and the family has been devastated, one's apt to

be cumulatively upset by that.

And I had the sense that she was pulling her punches. She wasn't being very forthcoming about the degree or the duration of her upset and that she was attributing almost all of her distress in life to the incident with Sergeant Kopf.

Q It was mentioned a moment ago a document within DX-6C regarding an abusive boyfriend. Is that something you reviewed in your evaluation?

A Yes.

Q And what was your -- did you draw any conclusions or any thoughts based on that?

A Well, I mean, to the extent that that it's accurate, I mean, it suggests that like many teenagers she had had some difficulties with boyfriends. I didn't draw -- I mean, I didn't form any ill opinion about that, but it seemed to me if that were accurate -- that's a Cangleska, I think is how they pronounce it, note from -- I can't remember if it's January or February of 2002. I mean, it suggests that she was distressed. I mean, she says this guy is beginning to hit her. That would be upsetting, I think, to almost anyone.

And, again, that was not something that she told me about. And, again, if that were accurate, that would suggest that she wasn't being forthcoming with some of the

preexisting stressors in her life. I mean, for most adolescents, late adolescents, applying to college, going to college, you know, adapting to being away from home is plenty stressful.

In Ms. Elk's case, we have the additional stressors of in that first semester at college or a little bit thereafter, three grandparents -- and we learned yesterday that grandparents may mean something other than specific father's father, mother's father, et cetera -- three grandparents died, and a long-term relationship with a boyfriend ended or a friend that was a boy or a man, and that she had broken up with somebody with whom she had been dating for some time, so there had been multiple stressors, any one of which could be moderately to significantly meaningful during that period of one's life.

And, in fact, as we know, she came back from college. She decided not to return. I mean, there was evidence long before the incident that her life, as that of many adolescents, was in some turmoil. Not dramatic turmoil, not devastating turmoil, but some turmoil.

Q And what about earlier in 2002 in terms of seeking treatment for depression? Can you talk about that?

A Well, sure. I mean, we know that in February of 2002, she began to seek or was referred to treatment for sadness or depression, and then in April, there were three

appointments, the last of which, I believe, was April 26. I think the first was April 11, and I can't remember where -- when the second one was. But there were three for depression, and she, in fact receives a diagnosis of either dysthymia or dysthymic disorder NOS, not otherwise specified, but that is a depressive diagnosis.

And in those notes, it indicates that she is seeking treatment and medication. Again, she disagreed with some of those when she testified. I don't know. I mean, generally the medical record speaks for itself. That apparently was the impression the treatment provider had. They don't have the pipeline to truth either, so I don't know what they were thinking. But it suggests certainly that she was upset and unhappy during that period towards the end of high school, prior to graduation.

Q And is that something that you'd want to consider in terms of evaluating an individual's psychological trauma related to an assault that happened later?

A Of course, because you want to understand where the problem is in his and her life at the time of an incident, whether it's a traumatic incident or a wonderful incident occurs, if one's trying to assess how the incident had an impact upon them.

Q And what did she say to you, if anything, about the treatment for depression that she sought at that time?

A She didn't acknowledge it. She didn't mention it, and she didn't mention it to Dr. Manlove either. I mean, I understand if she had sought treatment on one occasion, it could have slipped her mind, but if she seeks treatment on four occasions and one of them apparently indicates that she was seeking medication, that suggests that she was pretty distressed, and it's hard to understand how seeking treatment on four occasions could have totally slipped her mind, unless she was endeavoring to kind of minimize what had gone on before the incident.
Q I'd like to turn now to the psychological testing that you conducted. Can you tell me what tests you administered or had administered?
A Right. I certainly can, and they are discussed obviously in my report. I administered two: the Minnesota Multiphasic Personality Inventory or -- which is the second edition of that test, and the Personality Assessment Inventory.
Q Can you describe what the -- there's no way I can say that, the full -- the MMPI-II, what that is and --
A Sure. I mean, and you heard some of this from Dr. Manlove yesterday, as did His Honor. But the MMPI-II is the oldest, most reliably, most widely utilized, most validated personality assessment. It's been used roughly since the end of World War II and has gone -- undergone a

major revision in the last decade and a half, and it is very good way of really doing two things: one, of assessing personality and psychopathology, if any, and two, of getting a real clear sense of a test-taker's, the evaluee's attitude. Is he or she being cooperative, open, defensive, exaggerating, et cetera?

So it is a very robust and, therefore, very widely used instrument, 567 items. It takes most people about two hours. I mean, it's relatively quick to learn a great deal of information.

Q And how is that test standardized?

A That's a very important question. It is standardized on groups of populations that so-called experts have identified as having a particular psychopathologic characteristic, so one gets a hundred patients with schizophrenia together and one asks the question, Can we develop a group of items that distinguish this group from normals. And then one does one other thing on the MMPI-II. One tries to ascertain, Can one develop items that are not obvious.

So if schizophrenics, in contrast to normal, like the color purple, like the novel, Great Expectations, want to be a fireman or alternatively a sports writer -- if they say "yes" to all of those things and normals don't, there's no intrinsic reason when you look at those test items that

you say, Ah, that means I'm schizophrenic. So the test is powerful in part because not only are these populations very well defined and controlled, but because the items that discriminate from one kind of pathology to another or from one kind of pathology to no pathology are not obvious.

Q So is it just limited to schizophrenic population?

A No, no. There are ten primary clinical scales. We touched upon them briefly in Dr. Manlove's testimony yesterday. I'm happy to tell you what they are. They're hypochondriasis, depression, hysteria, psychopathic deviance -- these days we'd say antisocial -- masculinity or femininity, paranoia, psychasthenia which is an old-fashioned term for neuroses, schizophrenia, mania, and social introversion.

Q So is it fair to say then they would take some of these sort of non-obvious questions and apply them to these different groups to identify trends?

A It's not trends. It's traits. I mean, these are long-term, stable personality aspects. Some people are very wary, very suspicious, very guarded. Those are paranoid people. If they have all of those traits but they hear voices, they have the belief that they're Christ come a second time, then we say they have hallucinations and delusions. That's beginning to sound like schizophrenia.

Obviously most folks, if you looked at a pre-employment group or you look at even a standard clinical group, most people do not have a major mental disorder. They're not psychotic, but they have either troubles in living -- that's why they're at the clinic -- marital distress or whatever, job distress, or they have chronic lower-level kinds of neuroses, dysthymia, that is, chronic depression, anxiety disorders of which there are a bunch. They have something more like that. So the test is very good at helping one figuring out one kind from another.

Q Turning to Ms. Elk's taking this test, this MMPI, did you give her any instructions?

A I did. And I think it's important to do so. I told her, one, to be honest and straightforward; two, not to exaggerate or embellish; three, not to minimize; and finally, I said, Don't be afraid to acknowledge ordinary foibles. I think the example I generally use -- I don't remember what I said to her -- is most people as a kid took a pack of gum or a candy bar without paying for it. If that's the case and you're asked about it, say, Yes, I did that. Don't try to be kind of a goody two-shoes.

Q And why do you give those instructions?

A Well, because I want litigants to know that (a) they should be open. I mean, the most important thing you can do on this test in litigation is to be open, so you're

not perceived as somebody who is unreliable; and (b) because if you are open, then the test may describe something that's actually clinically useful. Sadly, when people are very defensive or very much in the direction of exaggeration, you can't say very much that's clinically useful.

Q I'd like to step back just a moment. You were describing the standardization of the test and how long it's been in existence. Is that discussed in your report in footnote 3?

A It is.

Q On page DEF 1166?

A I don't have the -- I can find it. Let's see if that's --

Q Well, if I represent to you that that's where it is, would --

A I'd be inclined to agree with you.

Q Okay.

A I'm using an unmarked copy of my report.

Q Okay. So it's footnote 3, though, it is discussed somewhat.

A Yes.

Q Okay. I'd now like to turn -- we just discussed briefly the instructions you gave Ms. Elk before she took the exam. I'd like to turn to the MMPI itself, which is DX-2.

A I have it.

Q Okay. Let's turn to page DEF 745. It's -- or page 2 of the report, by your -- would you like me to --

MR. BRYANT: Can I approach, Your Honor?

THE COURT: Yes.

MR. BRYANT: So we're on the same pages.

THE WITNESS: No pun intended. Right? Even literally on the same page.

(Pause.)

THE WITNESS: All right. I've got it.

BY MR. BRYANT:

Q First, can you describe for me what the horizontal line at the 50 is and then what appears to be 65?

A Yes. The horizontal line at 50 is the mean value, the average value that the typical MMPI-II test-taker receives on each of these scales, and the scales themselves are important. This page, this validity pattern is very important in forensic work, and the scales have funny names, some of which are quite descriptive, some of which are not, but they're highly relevant here.

VRIN, the variable rate of inconsistency, tells us: Is this person able to read and understand the items, and is she or he -- obviously she in this case -- able to respond in a reliable fashion, reliable fashion meaning that if you say, True, when I was growing up, my mother was my

favorite person, and when you're later asked, When I was growing up, my father was my favorite person, there you have to say, False. If you say "true" to both, that's inconsistent.

So what this tells us for Ms. Elk is that her VRIN was -- she was reading the test well. She understood the items. She was slightly more inconsistent than the average person, but not the -- the second line, the line at 65, is when things become clinically significant, so this score does not rise to the level of clinical significance. She is able to read, understand, and reliably report between items at the back of the test, the middle of the test, and the front of the test.

Q And can you describe that 50 to 65? What is that encompassing in terms of --

A Okay. Each ten points there is a standard deviation, so between 50 and 65 is a standard deviation and a half, and if you go the other way, between 50 and 35 is another standard deviation and a half. Three standard deviations contain 99 percent of the answers, so 99 percent of the test-takers on any one of these scales will fall between 65 and 35, and anything beyond 99 percent is obviously highly significant, and the further away it is from the mean, the more significant.

Q And what about TRIN, the next --

A TRIN is a measurement of how often the person is indicating true. That is, some people endorse -- if you want to say that, I'm really hurting, you say "true" a lot. If you want to say, I'm just fine, you say "no" a lot or "false" a lot. So it tells us that she was tending to indicate "true" more often than not, and it's somewhat elevated into the clinical range, but not dramatically elevated.

I didn't find it particularly meaningful, but it says something, and similarly, if you look down on the lower left of that page, it says, Percent true, 57; percent false, 43. So although she's -- on the significant items, she's saying "true" more often than not, she's not saying "true" an awful lot more in the general test.

Q And what about the next, F?

A The next F is often thought to be fakey, but it actually means frequency, and what it really means is infrequency. The test basically says -- there are a group of items that distinguish between psychopathic deviance, schizophrenia, mania, depression, et cetera. And then these are items that even people with clear, demonstrable psychopathology don't endorse, don't say "yes" to. These items are so weird that essentially no one says "yes" to these items. And so -- and they're called, infrequent items.

And so when somebody endorses these items and says "yes," that means they're saying something very unusual that even people with clear-cut pathology do not. That has been interpreted to mean as this is somebody who is saying, I'm hurting, or, I need a lot of attention, or, I'll say anything to make my point that I am really having a bad time. And for reasons we'll come to, I think in Ms. Elk's case, it is the latter interpretation that is the most correct one.

Q And what about FB?

A FB, we heard from Dr. Manlove correctly that FB, infrequent at the back of the test, is saying the same thing, same kinds of items. It's relevant, because when somebody is trying to elaborate or trying to fake or try to indicate more psychopathology than they really have, as they take more of the test, they get cued to saying, Oh, yes, I have that, too; I have that, too. So where you see a pattern as we do here of F greatly elevated and FB even more elevated, that means the test-taker is going along with the test, to try to continue to appear very distressed or very upset.

FP is F as in faking or infrequently, as in psychotic. She's not endorsing -- she's endorsing very unusual items, if you will, but not manifestly crazy items. L, K and S are in this particular rendition not very

significant, except that L is very, very low. I mean, she's not being at all defensive. She's sort of letting it all hang out, and as we see from the Fs, letting it all hang out plus.

K is ego strength. K correlates highly with education. We would expect her to be in the lower 50s rather than below 50. And S is artificial serenity. You know, even when you're distressed, you're saying she's very serene, so this is a slightly odd value as well. But the important point of this graph -- and Dr. Manlove's is even more in the same direction -- is that her F and FB scales are greatly exaggerated, and that means her clinical scales cannot be trusted. It means she is elaborating far beyond --

You know, litigants as a group put their best foot forward, and I understand that. I've been doing this a long time, so if she exaggerated a little, I wouldn't even mention it. This is not a little exaggeration. This is not even very considerable exaggeration. This is great exaggeration.

Q Is there anything else about this particular page that would be helpful to the Court?

A No. I believe that's it.

Q Okay. Turning to the next page, DEF 746, if you could read the first -- I'll read the first paragraph.

"This MMPI-II profile should be interpreted with caution. There is some possibility that the clinical report is an exaggerated picture of the client's present situation and problems. She's presenting an unusual number of psychological symptoms. This response set could result from poor reading ability, confusion, disorientation, stress, or need to seek a great deal of attention for her problems."

Now, I think you discussed the reason why you ruled out poor reading ability, because of the --

THE COURT: Mr. Bryant, could I get you to lay a little foundation, not from an admissibility standpoint, but I'd kind of like to know who generated this language, whether it was Dr. Mills or somebody else, all right, so I know what he's commenting upon.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q Could you please describe where this --

A No. And, in fact, it's a question we should have done. It's a great question. The answer is, Your Honor, that this report is generated by a computer program from the originators of this particular test. So as we talked about this test -- and if you go to DEF 0744, the front page, you see it's copywritten by the regents of the University of Minnesota, '89, '93, 2001, and that the original test goes back to 1942.

And so the regents have licensed this to a private corporation that markets this and that periodically updates a computer program. So one of the reasons I like this -- and I have nothing to do with this language. It really does give me a separate and independent view of the client or of the evaluee.

Q And in talking about the various responses that could result, could you talk about those and --

A Yes. Let me -- let's go through them. There are -- we've already dealt with poor reading ability. You can't have a poor reading ability if your VRIN is within normal limits. Similarly, if you're confused, if you have Alzheimer's disease, if you're grossly intoxicated, if you have thyroid toxicosis, if you have uremia, but if you have a cognitive reason to be confused, again, your reading ability is impaired, and your VRIN will be in the elevated range. So we can eliminate confusion.

Similarly with disorientation. Now, you don't need this test to tell me that Ms. Elk is not disoriented. Her responses to me were polite. They were cogent. They were clear. She wasn't disoriented, but I know that she was not disoriented as well again because of the VRIN.

Stress, well, I think Dr. Manlove said and obviously it's true that litigation is stressful, even -- you know, I've done this a lot of times. I find myself at

times stressed up here on the stand, so, I mean, she was undoubtedly a little stressed, but stress is not going to elevate your F scale. Stress may elevate the clinical scales that correlate with anxiety. That would be the PT scale when we come to the clinical scale. So that doesn't really give you a significant F elevation.

And "or the need to seek a great deal of attention" to her problems. Well, I mean, she's asking for a great deal of attention, because if she's particularly upset or hurt, presumably her case is more valuable. But that, I think, is this case, that she is asking -- she's saying, Hey, I'm really hurting; I'm really, really, really, really hurting; look at me. And that's what this test and that's what this profile demonstrates.

Q And then the next paragraph talks about that she -- there's the possibility of an invalid profile.

A Correct.

Q Could you talk about that?

A Well, as we see in Dr. Manlove's, ultimately his was declared invalid. This is not as exaggerated as his, and so it just raises that possibility. Please recall that this is a clinical profile, not produced specifically for litigation purposes. If we had done one -- if I had asked the computer to print out a litigation one, it would have said, Be extremely cautious; this is probably invalidated.

I don't do that, because I don't want the extra spin, if you will, of the litigation overview. I want to look at her just like any patient or any client or any evaluee, and so I routinely get the outpatient mental health interpretative report, which is what this particular report is. But I consider this, for all practical purposes, invalid. If anything, I can get a few trends. I can compare a few high points, but this -- you would never even use this test to generate hypotheses about actual diagnosis.

Q Okay. And then in the next sentence, I'll read part of it. It says, "She may be showing a lack of cooperation." And you talked about her -- that not being an issue.

A Well, it says, "lack of cooperation with testing," or she may be malingering or attempting to present a false claim. I don't think she's outright -- I mean, I think there is a core of genuine distress for Ms. Elk, so I don't think it's complete, whole fabrication. I just think she's saying so much more than is really there for reasons we're talking about, her self reports cannot be fully trusted.

Q Are there -- anything else in this page you think is worth --

A No. I think you've got the essence of it.

Q And turning to the next page, anything on here

that --

A No. I would skip ahead to DEF 0749, which is the standard clinical profile.

Q And what is the significance of that? What does that mean?

A Well, it's -- look, there are one, two, three, four, five, six on the standard ten. Six of the ten are in the clinically significant range, so it -- and that almost never happens, and that again is consistent with very significant exaggeration, and again Dr. Manlove was correct. The way you score such a report is you look at the two highest scales. They are PT, psychasthenia or general neurotic-level distress, and schizophrenia. That means odd kinds of symptoms. I don't think Ms. Elk is schizophrenic.

But even if you look at the third highest peak which is psychopathic deviance -- and he's correct that when you look at the sub-scales, it doesn't look like she's antisocial. It looks like she's alienated. But all of those scales are greater than the PK scale over on the right, which is the post traumatic stress disorder scale on the MMPI-II.

So although all of them are probably grossly exaggerated because of her overall exaggeration, what it tells us is whatever kind of specific PTSD-like anxiety she is experiencing is less important than her general level of

psychological distress -- that's the PT scale -- her unusual symptoms, the SC scale, and her somewhat self-alienated perceptions which are the PD scale.

So this also suggests, not by any means dispositive, that whatever issues of PTSD she has are comparatively less than her other psychological levels of distress.

Q And you talked earlier about the standardization of the test. Is the test in that process submitted to all racial profiles?

A All racial groups, all ethnic groups. The are standardized pools for different nationalities. For instance, there's the MMPI-J for Japanese. There's one that has been done for the Hispanic population, such as those in Puerto Rico, and there are other languages, and I don't know what they all are, but, I mean, the standard MMPI includes African Americans, Native Americans, Hispanics, and every other group that one can think of, roughly in proportion to their percentage in the population.

Q Is there anything else in the report that you think is worth explaining at the moment?

A No. I think we have the MMPI-II down.

Q I'd now like to talk about the PAI, the Personal Assessment Inventory. Is that another test that you conducted?

A It is. It is a slightly shorter test. It has four alternative answers rather than true and false, and many people kind of get hung up on the true and false, because so often it's really sort of in between. So it's 330-odd items, 344. It is -- takes more like an hour and 15 minutes than two hours. But what's fundamentally different about it is its items are much more obvious, so I gave you, you know, various occupation or a book or a song or whatever like make one schizophrenic on the MMPI.

On the PAI, the questions are, you know, I often feel that television is controlling me, you know, or my thoughts are broadcast out of my head, or I hear voices inside my head. Now, there are lots of other not-so-crazy, not-so-psychotic kinds of questions, but the point is that with the PAI, most intelligent people can figure out what the answer means, and therefore can shape their answer in the direction that they want to.

Is there a reason why you would do -- and I gathered this from what you said -- the MMPI with a generally non-obvious answers versus the PAI with the more obvious? Is there a reason why you did that?

A There absolutely is in forensic settings. One assumes that for clinical populations, where people are being straightforward, that the two tests are going to correlate very, very highly, and that's what you see. When

you give them to clinic patients, they look virtually identical, and the language, I think, the narrative language of the PAI is a little better than the MMPI, but the MMPI data is a little more robust and a little more specific, so you get two different slants.

In the forensic setting, the MMPI gives you sort of what the real picture is, and the PAI gives you the sort of sanitized picture that the patient or evaluee wants you to believe or how she or he, again she in this case, wants to present herself as. So we see a somewhat different picture here, which is intriguing, and we'll talk about it.

Q In terms of the PAI, to step back a moment, has it been validated?

A It's very well validated, but not anywhere near as well as the MMPI-II. I mean, again, the MMPI has been around since the '40s. The PAI, I think, is from the -- essentially 1990, really 20 years old, so it's much more recent.

Q Let's turn to the PAI that you administered to Ms. Elk, DX-3.

A Right. And again let's just note that this, like the MMPI-II report, was generated by the computer. I had nothing to do with this. This is the computer program from the originator of the test, PAR, Psychological Assessment Resources.

Q Let's turn to page DEF 762.
A I have it.
Q And that's entitled the full-scale profile.
A Yes.
Q Can you please talk about this?
A Okay. Well, if you go to the left four items, this is the equivalent to that second page on the MMPI-II, to the validity pattern.
Q To the left four items, are you referring to ICN --
A ICN, INF, NIM, and PIM, and those stand for inconsistency, infrequency, negative impression management, positive impression management.
Q And those correlate with what on the MMPI?
A Those correlate with the validity pattern items from the MMPI-II on DEF 0745.
Q Okay.
A And, again, she is elevated, but not so much elevated on infrequency. Infrequency is like F and FB, which she is just over the line, so again we have the sense that she's exaggerating, and when we turn to the narrative report, it will say that that is the case.
Then we have -- the next big band are the clinical scales. There are one, two, three, four, five, six, seven, eight, nine, ten, eleven, rather than ten on the

MMPI-II, and she's on the border line with anxiety. She is clearly in the elevated range on ARD, on anxiety-related disorders, and even more elevated on DEP as in depression. And if we turn quickly to the next page, we can see where those -- within each of those things, where the elevations occur.

And we see that most of the things are below 70. Scales are ranged --

Q And you're on page DEF 763 at the moment?

A Correct.

Q And we're now -- the scale has been flipped 90 degrees, so as you move to the right, you're talking about more elevation, but most of her items are below 70, except for health concerns, barely above 70; physiologic anxiety, that is, sweaty palms, sighing respiration, increased heart rate. But then we get down to traumatic stress, and bingo she is almost at 100.

So what she is saying is on the test with the obvious items, I'm really having a bad time with things -- with something that happened bad to me in the past, and obviously this would be the incident with the sergeant. So where on the MMPI, where it wasn't so obvious, she didn't look like she had post traumatic stress disorder. On this test where she can, if you will, control the outcome much more, she looks like she has post traumatic stress disorder.

Where we see that discrepancy, where we see the MMPI saying one thing and the PAI saying another, that's another sign of the test-taker being manipulative and trying to sell, if you will, or convey a particular message.

Q So in other words, for this to be consistent with the MMPI, you would have expected the PTSD factor on the MMPI test to be way up also. Is that right?

MR. HOROWITZ: Objection. Leading, Your Honor.

THE COURT: It is.

MR. BRYANT: Okay. I'll move on.

BY MR. BRYANT:

Q Let's turn now -- one moment. Let's turn back to DEF 762.

A Okay.

Q There's an RXR that's below the line 50 towards the right side of the scale.

A Yes.

Q What's --

A And that's very important. That means treatment responsive. That's how interested the test-taker is in seeking or obtaining treatment for their problems. And, again, let me remind you that 50 is average. This says that this person is much less interested than an average person in seeking treatment for their difficulties.

Q I'd like to turn you to Dr. Manlove's testimony

in his report where he selected a cry for help as the possible explanation for the MMPI test results that he found.

A Right.

Q How does that correlate, if at all, with this RXR designation?

A Well, obviously, if you're crying for help, that's saying you want help, and this particular item significantly rebuts that interpretation. Now, there are plenty of other reasons to rebut that interpretation, too, and we'll come to them when we talk about his MMPI-II results. But the point is this says very clearly in a pretty obvious and open test that she's not very interested in having or seeking treatment. And, in fact, of all of the items on this test, it is the lowest one on that entire page as you can see.

THE COURT: Why don't we take a break at this point for 15 minutes, because -- unless there's some other logical spot you think that would work better.

MR. HOROWITZ: That's perfectly fine, Your Honor.

THE COURT: All right then.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated.

Whenever you're ready, Mr. Bryant.

MR. BRYANT: Your Honor, there's one housekeeping

matter. I was conversing with the court reporter on the break, and we're not sure if 6B and 6C were actually admitted. Are you waiting until I pull the pages that we're going to do separately?

THE COURT: Yes.

MR. BRYANT: Thank you, Your Honor. Appreciate that.

BY MR. BRYANT:

Q Okay. Dr. Mills, I'd like to have you now turn to page DEF 764.

THE COURT: Can we restate the document number, just for record purposes?

MR. BRYANT: Yes, Your Honor. DX-3, Personal Assessment Inventory.

BY MR. BRYANT:

Q And in the second -- I guess we'll call it a chart down there. Could you talk about the numbers, the .7, .697, and so forth, what the significance of those are?

A These are the coefficients of fit numbers. Is that the --

Q Yes.

A -- numbers you're referring to? Well, what this is -- let's see --

THE COURT: Doctor, you're getting a little bit far from the mike.

THE WITNESS: Oh, I'm sorry, Your Honor. You're right, indeed. What this basically says is let's take various potential diagnoses and see how those diagnoses correlate with, you know, the overall -- correlate with describing what we see on the test, and the number one fit here is negative impression management. Negative impression management is another way of saying, trying to fake bad. So this says that of all the potential diagnoses that could be on this test, that Ms. Elk -- again, it's another indication that she, at the time she took this test, was endeavoring to portray herself as worse than she really is or was.

BY MR. BRYANT:

Q Is there a point at which the coefficient becomes clinically significant?

A Well, around .7, because you square the coefficient in order to find what percentage of the variance is the case, so .7 would be 49 percent of the variance. .7, about 50 percent; .77 obviously is some number like 55 or 60 percent. I can't do it in my head anymore. But it's something like that. But the point of this is that of all potential diagnoses here, the one that fits the best is the negative impression management or faking bad.

Q Anything else we should talk about on this page, Your Honor?

A No.

Q I mean -- I'm sorry -- Dr. Mills. If you could now turn to page DEF 766 --
A Sure.
Q The last paragraph which then flows into DEF 767, and I think you just mentioned it, negative impression management. This appears to be discussing that.
A Among other things. That's correct.
Q Is there anything here that you need to add or explain, other than what you just did?
A No.
Q Okay.
A No. I think we've gone over this document, from my perspective at least.
Q I'd now like to turn to Dr. Manlove's MMPI. Or do you have anything else to say about the PAI?
A No. That's fine. We can go there. Just remind which tab it's under, please.
Q I will do that. It is PX -- I'm sorry. DX-20. And it begins DEF 3152.
MR. BRYANT: May I approach, Your Honor?
THE COURT: You may.
(Pause.)
BY MR. BRYANT:
Q And you've reviewed Dr. Manlove's MMPI. Is that correct?

A Yes.
Q Let me know when you're there.
A I'm there.
Q If you could turn to DEF 3154 --
A Yes. And that's the same validity pattern that we discussed in some detail on Ms. Elk's taking of the MMPI-II in my presence, and this is Dr. Manlove's equivalent. Here, however, the exaggeration is even more evident, and I'm happy to explain why.
Q You discussed the VRIN in your report. Can you talk about it here and what the score is and that sort of thing?
A Well, again, VRIN and TRIN are both exactly at 50, so they're -- that shows she's reading and comprehending well. She's not answering excessively "true" on the key items that are reflected in the TRIN scale, but here her F scale, her infrequent scale, sometimes called faking, sometimes called exaggeration scale, is literally at the maximum level. It's 120. Her FV's at 116, and it's so exaggerated that this program will not even allow one to print up a clinical profile. It says it's so unreliable, so, in the language of the test itself, extremely exaggerated that you can't determine anything from the clinical profile.
Q How many MMPIs in your career, if you can

estimate, have you reviewed or -- I'll say, reviewed or been made aware of in terms of the T score?

A Hundreds, maybe even 500. I mean, I've been using it now for quite a while, and I do about an evaluation a week, so if I've been doing it for a decade, that would be 500.

Q And how many times have you encountered an F score of 120?

A Only once before.

Q What about an F score above 110?

A Only that one time before.

Q What about above 100?

A Maybe a couple of times before. I mean, it's extremely rare, even amongst litigants.

Q And what is that indicating again?

A Overwhelming exaggeration.

Q Now, with respect to FB, the T score of 116, in those MMPIs that you reviewed, how many times have you seen a score of 116 or higher?

A Either never or maybe that one time before. I mean, again, it's extraordinarily rare, and I would say that on this test, 116 and 120 are essentially indistinguishable.

Q Anything else on this page that --

A No. I mean, again, it just underscores that which I said before, that on both the occasions when Ms. Elk

was given this test was relatively nonobvious or difficult-to-fathom items, that she answered in an extremely exaggerated manner, which is why I ultimately conclude that she is not a reliable witness. I just don't know what I can trust and what I can't trust of what she tells me.

Q And if you could turn to page DEF 3157 --

A I have it.

Q And I apologize if we've already talked about it, but assuming we have not, this is referring to -- and I'll read the first paragraph. "The client responded to the MMPI-II items in an extremely exaggerated manner" -- as you mentioned -- "endorsing a wide variety of rare symptoms and attitudes. These results may stem from a number of factors that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a confused state."

We clearly have covered a low reading level and a confused state.

A Correct.

Q What about the others in terms of a plea for help?

A Well, we talked about that with the PAI RXR score being very low. We don't need to look at the score. We have Ms. Elk's behavior, that as I recall she sought -- I think on her testimony she said she sought counseling on

five occasions in 2003 subsequent to the incident, and then she -- her medicine man uncle, I believe, testified that he saw her on seven occasions, and I don't know how many times she sought pastoral counseling, but that was in 2006.

So we have five clinical interviews, evaluations, and treatments in 2003, 2004, 2005. Obviously that's very little clinical activity or intervention. We have the low RXR score, so a plea for help seems contrary to both her, Ms. Elk's, history of seeking treatment and the independent assessment from the PAI.

Q And what about with respect to excessive symptom checking?

A Well, again, I mean, we know that she's answering more true than false, but on the TRIN score, which is, in effect, excessive symptom checking, she's exactly average on this, so it's not excessive symptom checking.

Q And then the final, falsely claiming psychological problems?

A Well, and, again, I don't know if you can say it's false, because I believe Ms. Elk did and perhaps still does experience some distress referable to the incident. But I think she's greatly exaggerating, and I can't say -- tell you how much psychological distress she's actually having. So I don't think it's false. I just think it's exaggerated.

Q Anything else on this page you'd like to --

A No, sir.

Q Okay. We'll pull away from the documents for a moment. Dr. Mills, you heard Dr. Manlove's testimony yesterday.

A Yes.

Q What concerns, if any, do you have with his opinions?

A Well, one is the one we've been talking about, and we're not going to spend much more time on it, but I think he did not adequately appreciate that the MMPI-II provided very clear information about Ms. Elk's exaggeration.

Two is that he seemed to take her symptoms pretty much at face value. That's a very appropriate stance for a clinician. For somebody who's doing significant forensic work, it's not an appropriate stance.

And, three, he sort of explained away, if you will, from my perspective, a consistent pattern of minimizing other psychological stressors that antedated or succeeded the incident in question in her life. And we've talked about some of them: the break-up of the boyfriend, the loss of the grandparents, you know, some of the problems and stresses associated with schooling, et cetera, and then following that, particularly the miscarriages, so that I

just don't think he used the critical intellectual facilities he had fully to at least question what was going on with her.

Q I'd like to now have you consider a hypothetical for a moment in terms of Plaintiff's description of the assault or some of the evidence that came out during the testimony and the documents. And let's assume -- and I'm going to list -- go through a list of potential issues. Assume all of these are true, the first being that beyond what was in the Article 15, which you've reviewed --

A I have.

Q -- that Sergeant Kopf is a big, strong guy who is in a position of authority over Plaintiff; that he positioned himself on top of her; that he rubbed his hands between her legs on the outside of her clothing; that he tried to put his hands down her pants; that during this process, he pinned her arm back; she pushed him away, and he would back off; she pushed him away, and he would back off, a total of four times; that during this process -- I mean, during this going on, that there were statements of, You're cute; I think you're cute; I want to take care of you, those kinds of things.

And then what you're -- and then Plaintiff responding, What you're doing is illegal and immoral, and that as a result of this, there's no bruises or scratches or

red marks, and no specific threats of harm. Assuming all of those facts, those hypothetical facts, do you have an opinion as to whether that type of assault is ordinarily consistent with a diagnosis of PTSD.

THE COURT: Pause. Mr. Horowitz?

MR. HOROWITZ: I object to the confusing hypothetical.

THE COURT: Also this is not within the scope -- does he have anything in this report where he concludes whether or not she does or does not have this diagnosis, any specific clinical evaluation of whether she does or does not have this diagnosis in his report?

MR. BRYANT: I would have to ask Dr. Mills that. I don't have a specific recollection of that.

THE COURT: Anything in your report, Doctor, about that?

THE WITNESS: No. I think -- I mean, what I conclude affirmatively is I can't say, Your Honor, because of the unreliability of the witness.

THE COURT: Well, show me, I guess, a reference in here to your report to the specific diagnosis that we have for this individual. Is there a specific reference in here?

THE WITNESS: There is not, Your Honor. I mean, the whole point of my report is you can't reach a reliable

diagnosis, because the key informant is not being forthcoming.

THE COURT: All right. Then I don't view this as inside the scope of his report, and I don't view your question as appropriate.

MR. BRYANT: Okay. Am I permitted to ask about factual situations where PTSD may be ordinarily diagnosed?

THE COURT: I don't view that as within the scope of his report either. He's talking about basically her reliability as a witness. Am I understanding the report -- now at this point I can tell you I've read every word here, that's here, so it seems that that's the scope of the report, and obviously that's the nature of his testimony, so I don't see anything in here that indicates that he actually evaluated, for example, the multiple factors associated with this particular disease and whether or not they were present and the like, so --

MR. BRYANT: May I explore -- Dr. Manlove testified yesterday in terms of treatment and recovering from PTSD over a three-year --

THE COURT: Not within the scope of the report. I mean, you clearly could have anticipated testimony of that nature. If you wanted to get an expert in here that talks about that, you could have done that. I'm not going to let you sort of extend out his expertise into areas not covered

by his report, for the same reasons, of course, that you objected to on several occasions with respect to Dr. Manlove, so --

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q Is your recollection that in Dr. Manlove's report -- in your evaluation, did you see anything about the term "grooming"?

A I didn't see it in his report. I heard it in his testimony.

Q Are you familiar with that term?

A Yes.

Q And what does it mean?

A It's a term generally applied to pedophiles who are seeking sexual gratification by sexual contact with children.

Q Is that situation consistent between the circumstances of Sergeant Kopf and Ms. Elk?

THE COURT: I think that's still within the same area that I told that you could not ask questions. There's nothing in the report that talks even remotely about that subject matter. Go ahead. Explain to me how it does come in.

MR. BRYANT: Well, the point is that it was raised on direct examination --

THE COURT: He's listed as an expert of a topic. He can respond to anything within the realm of his topic that he heard during the trial that he could have an opinion on, and he, in fact, has, because he's commented upon, for example, the testimony we heard about the MMPI.

But I don't view this as within the scope of the report, and it seems to me that I'm not going to just let you start asking general psychiatric questions or other questions to him.

MR. BRYANT: Can I ask him his opinion of what Dr. Manlove said regarding grooming?

THE COURT: No. I view it outside the scope of what you indicated his area of expertise was. We don't even know anything about that part of his expertise, one. And, two, the report doesn't even remotely -- if he'd had an opinion in here about whether or not she had this disease or not -- and, in fact, I've understood his answers to indicate that there may be questions of degree and exaggeration here, but he's not going to express an ultimate opinion as whether or not she does or does not have some form of psychological harm as a result of this.

But I don't see that anywhere in this report, and on that basis, I'm not going to let you basically bootstrap him into topics that are not dealt with in this report.

MR. BRYANT: I guess my response, Your Honor, is

that we were not put on notice of Plaintiff's expert, Dr. Manlove, talking about grooming and the connotations associated with that, so I --

THE COURT: But it's within the broader context of a topic on which he cannot testify, so it makes no difference. Mr. Bryant, I don't want to have to instruct you one more time --

MR. BRYANT: Yes --

THE COURT: -- about facial matters. When I d a ruling, I really don't appreciate you frowning, raising your eyebrows. It's disrespectful. Understood?

MR. BRYANT: That is not my intent. I didn't realize it was.

THE COURT: All right. Well, it's the second time I've had to tell you. I don't want to have to tell you a third time.

BY MR. BRYANT:

Q Doctor, do you have any other opinions that we've not talked about today, other than these specific issues that we're not permitted to discuss?

MR. HOROWITZ: Objection. Outside the scope --

THE COURT: It's ambiguous. I don't know, I mean, what topics he's going to talk about or the like.

MR. BRYANT: All right.

BY MR. BRYANT:

Q Do you have any other opinions that we have not talked about today?

THE COURT: Why don't you specify at least a general area, regarding the topics that were discussed in his report, or --

BY MR. BRYANT:

Q Regarding anything in your report, the assault.

A I mean, I have opinions about PTSD, but listening to His Honor, I don't think those opinions are appropriately expressed. I thought I was going to be in part responding to Dr. Manlove's opinions, and so I have a number of thoughts about that that I believe could be relevant, but I will abide by His Honor's ruling, of course.

THE COURT: Well, clarify something for me, Mr. Bryant. He has a supplemental report. Correct?

MR. BRYANT: He does, Your Honor.

THE COURT: Is there anything -- I want to make sure I understand this. Is there anything in the supplemental report that deals with the diagnosis?

MR. BRYANT: It's DX-4, and I think you both would have to look at it for a moment, if you would indulge us, Your Honor.

THE COURT: And I guess I had looked at it, and I thought it was consistent with the testimony that Dr. Mills gave regarding his criticisms of the approaches that were

taken by Dr. Manlove, but I don't see anything, I guess, in there talking about the diagnosis, the factors of diagnosis, whether or not particular things here would match up with those factors. Am I missing it?

MR. BRYANT: I don't see it myself.

BY MR. BRYANT:

Q Dr. Mills, do you --

A No. I think His Honor is correct.

THE COURT: All right. So the ruling stands then.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Very good. Mr. Horowitz.

CROSS-EXAMINATION

BY MR. HOROWITZ:

Q Good afternoon.

A Good morning, Mr. Horowitz.

Q Good morning. Thank you.

THE COURT: He's reflecting Miami time, so --

BY MR. HOROWITZ:

Q Dr. Mills, you would agree that this undisputed sexual assault of Lavetta by Sergeant Kopf was a very bad event in her life. Correct?

A I guess I would disagree ever so slightly. I certainly would agree it was a bad event, and to some extent, how you assess it has to do with her own subjective

sense. You heard His Honor's question to the preceding witness about subjective versus objective. I can't talk, I don't believe, reliably about her subjective sense. I believe it was a non-trivial assault. It was a significant assault. Fortunately it wasn't more grave. But I don't know how to assess the subjective stuff, because as you've heard me say, I don't deem her as reliable.

Q You wouldn't characterize it as a minor assault, would you?

A I would not.

Q Okay. And you wouldn't characterize it as simply a misunderstanding between her and Sergeant Kopf. Correct?

A I would not.

Q Okay. You're aware that in your report, you referred to this as a potential misunderstanding. Is that correct?

A Well, I think it started off that way, but I think it moved from there.

Q Okay. It's not a relatively minor assault either.

A It is not.

Q And you referred to this assault as relatively minor --

A Well, in terms of --

Q -- in your report --

MR. BRYANT: Objection. Asked and answered, Your Honor.

THE WITNESS: Let me finish the answer if I may. In terms of the physical damage that was done, it was clearly relatively minor. You heard the special agent testify that there was no bruising, there was no redness. There's no claim, so far as I'm aware, of any kind of injury resulting, so that's what I meant from the physical injury perspective.

BY MR. HOROWITZ:

Q Okay. That's fine. And at times in your report you refer to it as a purported claim, a mere allegation. As we sit here today, you do not dispute that the assault occurred in the manner that Lavetta has described. Is that correct?

A I absolutely do not dispute that fact. I don't recall anywhere in my report calling it a mere allegation. If you can find those words, then I will recant those words.

Q In your experience, does someone who malingers or exaggerate also tend to exaggerate about the events that caused their injuries?

A Sure.

Q Okay. And that didn't happen in this case. Correct?

A Well, no. I think it probably did, but I don't

think we're clear. Let me give you an example. Ms. Elk told me, she testified here in court that Sergeant Kopf told her something to the effect that, you know, bodies could be buried out here; people could be lost here forever, et cetera.

And yet as I understood -- His Honor's right here; he has his own understanding -- the testimony of Special Agent Bennett, there was no statement about that to him, and he was the first serious, detailed contemporaneous, you know, evaluator and investigator of what occurred. So, I mean, I think there is a actual factual dispute about what had occurred here.

Q Okay. Other than the conversation -- I was specifically referring to the physical contact between Lavetta and Sergeant Kopf. She's been consistent in that report in that regard. Correct?

A I think largely. Yes.

Q Okay. And given that Sergeant Kopf is not here and there were no eyewitness to the event, that would be a relatively easy event to exaggerate. Correct?

A It could be. Sure.

Q I mean, she would have gone much further. She could have said that her clothes were taken off. Correct?

A She could have.

Q She could have said that there was intercourse.

A Yes.

Q She could have said that she was hit, smacked, punched.

A Sure. But for some of those, there are objective indicators. For the later two, intercourse, obviously there's a whole test to determine whether or not there's been intercourse. And for punched, kicked, presumably there would be redness, bruises, something.

Q Okay. And she could have gone further with regard to --

THE COURT: At some point, are you going to tie this into something that actually deals with the direct testimony?

MR. HOROWITZ: Well, if I may proffer, I think the testimony was that she's an exaggerator and not a reliable witness, and she didn't -- I'm sorry.

BY MR. HOROWITZ:

Q She didn't say that Sergeant Kopf threatened her any further than what we've already talked about. Correct?

A Well --

MR. BRYANT: Objection. Asked and answered.

THE COURT: Go ahead and ask the question again.

BY MR. HOROWITZ:

Q She could have reported that Sergeant Kopf made even more threats than the ones that she reported. Correct?

A Do I answer, Your Honor?

MR. BRYANT: Objection. Asked and answered.

THE COURT: And I said he can ask the question again, because I intended that there would be an answer. So ask it a third time.

MR. HOROWITZ: I'll try and do my best to repeat the question.

BY MR. HOROWITZ:

Q Lavetta could have said that Sergeant Kopf made even more or greater threats than the ones that she actually reported. Correct?

A Of course, the answer is yes. On the other hand, the fact that she told me and apparently told Dr. Manlove that she feared for her life, that she thought she could be one of those bodies dumped outside, forgotten and lost -- I mean, that strikes me as pretty overwhelming, so if one believes that statement of hers, that's a pretty significant threat, as I understand it.

Q Okay. But doesn't it seem logical that if one wanted to exaggerate the injuries, that they would also exaggerate the underlying events, too?

A Well, I mean, you asked me that question before, and I said, yes, one certainly can see that. It seems to me that that's not how this occurred. I think Ms. Elk reported accurately what happened as she understood it, and I think

her testimony over time, that her memory has gotten better over time to the contrary, I think, in fact, her memory, like most folks, has eroded some and she's elaborated some, I don't think out of conscious desire, but out of unconscious reasons.

And I think over time she has seen this as more -- even more upsetting and more disgusting than it actually was. And that's -- she's sort of elaborated these other details. So initially, I think her report is probably pretty accurate. I think these more elaborated ones are less accurate.

Q Okay. And with regard to Lavetta telling you that her emotional response was worse over time, having time to dwell on the injuries and the trauma, that in and of itself could cause further damage. Correct?

A Well, it can, but again, I mean, it's a very good question. Most folks -- I mean, take the simplest physical analogy. You're getting out of a bathtub and you smash your shin on the toilet. It hurts enormously at the moment you do it, and over the next few days, it bruises, and over the next week or two, it goes away. And the same is true for most psychological trauma.

The biggest upset, the biggest psychologic hurt is at the time of the incident, and over time, we sort of put it behind us. It doesn't happen right away. It could

happen faster with therapy, et cetera. But that's generally what happens, so when somebody tells me years after the fact -- as you pointed out, we're now five years after the fact -- that they're still having, as Ms. Elk testified, they're still having daily flashbacks and/or nightmares, it's very difficult to fathom that testimony as being credible.

Q Okay. And you said that you would expect that the injury would be worse on the day of the events?

A Sure. In general, the biggest upset happens at the time of the injury.

Q But you wouldn't agree that the day of the event is the best day to articulate what occurred. Correct?

A Oh, no. I mean, it was good cross before. You're still right.

Q How much of your work involves Native Americans?

A I'm sorry. Say it again.

Q How much of your work involves Native Americans?

A Oh, very little.

Q Okay. Did you do anything in particular to educate yourself about Lavetta's upbringing culturally speaking?

A I spoke to her, of course, and listened as best I could. I spent about three hours talking to AUSA Mandel when I was here a year and a half ago about his perspective

on the reservation here, Native American culture, and these kinds of injuries. I don't necessarily consider him an expert, but he's been here a long time, and he struck me as well informed.

Q Okay. For instance, did you learn for the first time during the trial that Lavetta has many grandparents?

MR. BRYANT: Objection. Beyond the scope.

THE COURT: I think that's consistent, because he made statements about grandparents, and I think we need to get clarification when he knew what they were, so --

THE WITNESS: No. I knew it before.

BY MR. HOROWITZ:

Q Okay. You knew --

THE COURT: Ask the question again, so we make sure I get the answer clear.

BY MR. HOROWITZ:

Q Did you find out for the first time at trial that Lavetta had many grandparents?

A No. But I heard it again, and I referenced it as we heard it in the trial, I think.

Q Okay. Now, in your rebuttal report, you mentioned that she lost three of her four grandparents. Correct?

A That's correct.

Q And that's a false statement.

A I don't know it's false. It may be inaccurate.

Q Well, is it an exaggeration?

A No. I may have made a mistake, but I don't think it's a false statement. I think that implies some kind of intentionality. I was not trying to misrepresent the situation.

Q Is it a reliable statement?

MR. BRYANT: I object that this is misstating the facts that came out at trial from Ms. High Hawk, the Plaintiff's aunt, in terms of the number of --

THE COURT: No. I think I want to explore this subject, and let me ask the question. So before the trial, did you know that grandparents in her situation referred to someone other than what a traditional person would view as a grandparent?

THE WITNESS: Yes, Your Honor.

THE COURT: Well, then, why in a report would you indicate that three of four had passed away? That would suggest that you didn't know at that time.

THE WITNESS: It would suggest at that point, I made a mistake, Your Honor.

THE COURT: All right.

BY MR. HOROWITZ:

Q And three out of four is 75 percent of her grandparents dying. Right? I mean, that's simple math.

A That's the way I do the math.
Q And if only three of her 15 parents died, that would be only 20 percent. Correct?
A Yes.
Q Okay. And you would agree that 20 percent of your grandparents passing away might be less significant than 75 percent of your grandparents passing away. Correct?
A In general, of course I would agree. I think the qualifier would be that it depends how close she was to those particular grandparents.
Q Okay. Is that something you explored?
A No.
Q Are you familiar with the fact that on the Pine Ridge Indian Reservation, that the suicide rate is quite high?
A Yes.
Q Okay. And would you agree that many people on the Pine Ridge Indian Reservation would know someone in the course of their life who committed suicide? Is that a fair statement?
A I think that's probably an accurate statement. Sure.
Q Okay. And that might not be true in other parts of the country. Correct?
A Yes.

Q It might not be true of other patients that you treat or people that you evaluate.

A Yes.

Q Okay. Did you consider that when talking about the potential effect that it might have, the fact might have that Lavetta knew someone who had committed suicide?

A Well, it wasn't just she knew somebody who committed suicide, as I understood it. It was somebody who she felt close to. That, I think, for most of us would be dysphoriagenic, which is a fancy way of saying a downer. We'd be upset. If somebody we like or was close to commits suicide, we tend to feel we -- we mourn their loss. We feel bad about it.

Q Okay. Fair enough. But you had an understanding at the time you wrote the report that this was a boyfriend, and I imagine by putting those words together, you thought this was someone whom she was romantic with.

A No. I didn't know whether she was romantic or not, but that's how it had been described in the records.

Q Okay. And you described him as a companion of hers?

A I believe that's correct.

Q Okay. And, now, you heard Lavetta testify that this happened when she was away at college.

A Yes.

Q Okay. So they weren't physically companions at the time this occurred.

A That's my understanding now. Yes.

Q Okay. And she didn't return home from college to -- for his funeral like she did for one of her grandfather's.

A Correct.

Q Okay. And now that you have a broader context of how this suicide affected Lavetta and her reaction to it, does that change your opinions as to whether she might be altering the manner she responded to the suicide?

A Ever so slightly. My point was not -- I mean, she's entitled to any emotional reaction she had, whether it was somebody near, very near, rather distant. You know, that's fine. My point was when I asked her about difficulties in the past, I had the very clear sense that she wasn't being forthcoming.

Q Any other events that you feel that -- any other events pre-assault that you feel that Lavetta was minimizing?

A Well, the one about the boyfriend beginning to hit her, if that's accurate. She didn't tell me that. I discovered that in the records after the fact. I think that's the only other one I can think. Oh, yes. I mean, I think the record -- and I know there's a joint stipulation

about it as well, but I think the record is very clear that she sought treatment for depression in April of '02.

I thought her testimony about that was less than forthcoming -- again, that's my impression -- when she said that was just for sadness, implying somehow that sadness was necessarily distinct from depression. It can be, by the way, but the record is pretty clear that she was depressed. She had said she had been sad for quite a while, et cetera.

Q Okay. She disclosed that in the course of litigation in depositions and interrogatories and the response to requests for admissions. Is that correct?

A That's correct.

Q Those are materials you reviewed?

A Yes.

Q It wasn't something she was hiding in the course of litigation.

A Well, hold on. But, I mean, I think both with Dr. Manlove and I -- there are only two real interpretations here. One is the one Dr. Manlove offered, which was that she forgot, and the other one was the one that I tend to believe. I don't believe, but I tend to believe that she was not being forthcoming.

Q Are you talking about in the course of your interview?

A Yes. She did not reveal that in the course of my

interview.

Q Okay. Now, in your report, you focused on the fact that she didn't disclose it to other health care providers.

A That's correct.

Q Okay. Now, that has nothing to do with the litigation per se. I mean, you felt that she was minimizing something to her health care providers.

A No, no. If I said that, I misspoke. What I meant was that she didn't disclose to me that she had sought treatment for depression and for troubles and from multiple different providers previously.

Q Okay. And she had disclosed that in her deposition which preceded your interview.

A I thought my interview preceded her deposition, but I may be wrong, but it doesn't matter. The point is I felt she was less than -- I believed -- pardon me -- that she was less than forthcoming with me about her prior history of distressing events in her life.

Q Okay. Now, I note in your reports, you don't document at all Lavetta's account of the sexual assault. Is that correct?

A Sure. I mean, it's been well done, and it's not going to get any better by my doing it the sixth time.

Q Okay. And you also don't document the specific

questions and answers that you had in the course of your conversation that might have elicited responses such as, I had a prior counseling session.

A I mean, I've had a lot of cross over my years, Mr. Horowitz. I mean, I think that one just doesn't make sense. I'm not a stenographer. I can't take down full speech contemporaneous. I took nearly eight pages of notes here, and, you know, you've seen those, had a chance to review them. I can't write down every question and every answer. That's beyond my capacity. I mean, I could, but it would take three days to do a one-day evaluation.

Q Do you share in your report with us any of the questions that you asked Lavetta?

A Any of the questions? Sure.

Q Pertaining to her prior mental health history?

A I'm sorry?

Q Pertaining to her prior mental health history, pre-assault stressors, do you tell us in your report any question that you asked her?

MR. BRYANT: Objection. There's a question pending.

THE COURT: Ask the question Mr. Horowitz, not four times.

(Pause.)

THE COURT: Doctor, I think he was talking about

your report, and I think you're looking at your notes.

THE WITNESS: Oh, I'm sorry, Your Honor.

THE COURT: Did you ask about the report?

MR. HOROWITZ: Yes.

THE WITNESS: Oh, I'm sorry. Then the answer is it's not in there. I think you're correct. I don't -- and ordinarily I wouldn't. I mean, I try to articulate the fundamental conclusions. I had learned, I thought, that the odds were in this case that I'd write a report and that I would be deposed, as happens probably in 80 percent of my cases, and that would provide the opportunity to detail my opinions in somewhat, you know, greater specificity.

BY MR. HOROWITZ:

Q Okay. Now, it's not your testimony today that you specifically asked her if she went to counseling in 2002 and she denied it, is it?

A No, it is not that.

Q And it's not your testimony that you asked her whether she lost grandparents in and around 2002 and she denied that as well?

A No. I generally -- I mean, I think good psychiatric interviewing in general goes from the abstract of a general to the specific, so I would have probably said something like, given my style, Now, prior to this happening, have you had some upsetting events in your life

or some distressing events in your life. And then I would have listened, and, Can you give me some examples, you know, that kind of thing.

Q Now, you do mention in your reports that Lavetta minimizes miscarriages.

A That's correct. That was my sense of it.

Q Is there one single appropriate response for a woman who has miscarriages?

A Of course not.

Q Okay. And did you thoroughly review the records of when Lavetta had her miscarriages?

A I mean, I reviewed all the records. Yes. And I wrote down, I think it is, on page 6 the dates she told me that she had had her miscarriages, and I sort of enumerate them there.

THE COURT: 6 is a reference to your notes, Doctor?

THE WITNESS: That's correct, Your Honor.

BY MR. HOROWITZ:

Q All those miscarriages were after the assault. Correct?

A That's correct. Well, she hadn't had sexual intercourse prior to the assault.

Q Okay. We're going to explore that in a moment. But if in your report it indicates that Lavetta had

miscarriages before the assault, that would be erroneous.

A That would be incorrect. Absolutely.

Q Would that make you unreliable?

A No. It would make me make a mistake. I mean, unreliability is not one or two mistakes, just like one swallow does not a summer make. Unreliability is a consistent pattern of making mistakes to some particular end.

Q Okay. Any other pre-assault stressors that you feel that Lavetta was minimizing to you?

A No.

Q Any post-assault stressors that you feel Lavetta was minimizing?

A Sure. I mean, obviously we've talked about the miscarriages. That's the one I think I cite in my report. I thought and believe that most young adults who get married find marriage an exciting but also stressful adjustment. I think coming home after you've been away for several years is somewhat stressful. And I believe that having to change one's career goals, whether it's college or the military to something far less grand, is also stressful.

So had I asked the question specifically -- and I asked something analogous to it, but I don't recall the exact question. So following the incident, in addition to the incident, what other difficulties have you had or what

other stressors have you had, I would have thought a reasonably forthcoming, reasonably perceptive person would have said, Well, you know, I had to come back home; things have been a bit tough economically. I've got a new husband, a new baby. I mean, there have been a number of things that most folks find stressful.

And this isn't just sort of psycho-babble. There is a whole scale called the Holmes & Ray -- Richard Ray --

Q Okay. I think you've answered the question.

A I'd like to finish --

MR. BRYANT: Objection, Your Honor.

THE COURT: No. I think he has answered the question. Please continue with the next question.

BY MR. HOROWITZ:

Q In terms of the miscarriages, your review of the records reflects that with just one exception, all the miscarriages were very early, early on. Correct?

A That's correct.

Q Okay. And would you agree that early miscarriages are quite common?

A Absolutely.

Q And would you agree that early miscarriages, because they're quite common, tend to be less emotionally disturbing to women?

A Yes.

Q Okay. And would you agree that once a woman successful delivers a baby, that the miscarriages might be something that she just doesn't think about too often?

A I would certainly agree for the early miscarriages. The fact that Ms. Elk's mother said it was very upsetting for the whole family, the fact that Ms. Elk told me that the family gathered together and that the fetus was buried, that suggests to me it was more than just somewhat upsetting, and that I would expect even after first son or even after two, that she would still occasionally think back on that, and feel some sadness or some loss.

Q Certainly. And then Lavetta has testified -- did testify that she does feel sad about that miscarriage. Correct?

A Yes. However, with me -- I mean, I understand what her testimony was, at least my hearing of the testimony, but with me, I thought she, again, minimized it, that there wasn't -- she didn't seem to relate to that loss, and I would have thought as her first sort of significant pregnancy, that this would have been kind of a big deal, and I think we heard from her mother that the family viewed it as a big deal.

Q You also were relying on the testimony of Noretta High Hawk in challenging Ms. Elk's credibility. Correct?

A I don't think there's a great deal of challenge

there, but there's a little bit there, I think.

Q Okay. At the time you wrote your reports -- this is June 3, 2007 -- Lavetta and her entire family other than Noretta High Hawk had testified that they did not know that Sergeant Kopf was coming to their home that morning. Correct?

MR. BRYANT: Objection. That's not correct.

THE COURT: I think it would be better if you focus in on the report here and lay some foundation with that, but at this point, you're talking about characterizing a number of depositions. We've had a little bit of conflicting analysis. It's kind of hard to make a general statement, I think, of the nature you're trying to do.

MR. HOROWITZ: All right.

BY MR. HOROWITZ:

Q You make the statement in your report, "Ms. Elk and her parents appear to be misrecollecting or distorting the facts." Correct?

A Correct.

Q Okay. Is it fair to glean from that statement that you had read their depositions by that time?

A I had.

Q And that in each of their depositions, they had testified that they did not know Sergeant Kopf was coming to her home that morning?

A I recall Ms. Elk's testimony. I recall her mother's testimony. I don't recall her dad's testimony, although I read his deposition. And I do recall Noretta's testimony.

Q Okay. And yet you chose to conclude that Ms. Elk and her parents would be misrecollecting facts or distorting facts, rather than Noretta High Hawk. Is that correct?

A Well, theoretically both are certainly possible. It seems to me the family has an incentive to remember things one way, and presumably Ms. High Hawk has little incentive, and that's why I interpreted it the way I did. But you're absolutely correct. It could be the other way around.

Q In weighing things, if you have three to four witnesses on one side and one witness on the other, why is it that you chose to accept Noretta High Hawk's version in her deposition testimony, rather than Ms. Elk and her parents?

A Mr. Horowitz, I mean, I think I just gave the answer, but I'm happy to repeat it, that the Elk family has an interest, potentially a financial interest, in perceiving things one way. So far as I know, Ms. High Hawk has no particular interest one way or the other, so she can be comparatively objective, where they have an interest.

Q Okay. And Ms. High Hawk, of course, is family.

Correct?

A Oh, I understand that.

Q And, in fact, you were here when Noretta High Hawk withdrew her statement, corrected it, and said, I had no idea, and I was the one who misrecollected facts. Correct?

A I heard that. Yes, sir.

Q And would you still attach yourself to Noretta High Hawk's deposition testimony in concluding that Lavetta and her parents were unreliable?

A Certainly I would give some credence to what she said. I would be more uncertain.

Q Okay. You talked about Lavetta's -- I could point you to a page, page 6 of your report. You talk about Lavetta's inability to join the Army as being an additional stressor in her life.

A Yes.

Q Okay. Now, I want to focus on her inability, to use your words, inability to join the Army. Did you not see that as one and the same as the assault?

A No. No, I did not. First of all, I think it antedated the assault. I mean, she was weighed in sometime in December and was once again over the weight requirements and the body fat requirements, and it's my understanding from one of the documents that she may well have been

apprised -- she doesn't recall that apparently -- that she was no longer an appropriate candidate for the Army.

Q Well, we can look at that document, if you'd like, but doesn't it say that she's invited to come back a month later in February?

MR. BRYANT: Objection, Your Honor.

THE COURT: I really don't see purpose, I guess, arguing the facts of this case on this basis. He has impressions. If you want to impeach him with something, then you need to pull that document out and do it, but talking about oral representations here does not really advance the matter very much.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Do you dispute that Lavetta Elk was still an applicant for the Army on the date of her assault?

A I think she was still an applicant, but I think the Army had told her that she was not an active candidate. Let's put it that way.

Q Okay. And that's, you feel, because of her weight.

A Because of her weight and/or body fat.

Q Okay.

A And --

Q People gain and lose weight, and that's nothing

unusual.

A Well, obviously she had difficult doing that, sir.

Q Well, if she were to lose weight, she would be a candidate for the --

MR. BRYANT: Objection, Your Honor.

THE COURT: Yes. You're getting very far afield, Mr. Horowitz. This is not the witness that you're going to make fact points about. I mean, if on brief you want to demonstrate that the factual assumptions upon which he proceeded were incorrect, well, that's going to impact the reliability of his opinion.

MR. HOROWITZ: Okay. Fair enough.

BY MR. HOROWITZ:

Q You mentioned that Lavetta was sexually inexperienced at the time of the assault, according to your review of the records. Is that correct?

A Well, and according to your expert's report, who documents the time of her -- the people and dates of her first sexual encounter. So according to that and according to what she told me, all of that, yes.

Q Okay. And how might you expect the fact that she's sexually inexperienced to play into the equation her apprehension at the time of the assault?

A Oh, I would expect her --

MR. BRYANT: Objection, Your Honor. This seems to be going in the area of PTSD and the like, and if --

THE COURT: I agree.

MR. BRYANT: -- he can ask on it, then I should be entitled to ask on it.

THE COURT: I agree.

BY MR. HOROWITZ:

Q In your June 2007 rebuttal report, you indicate that Lavetta was inaccurate in her deposition when discussing medications. Correct?

A Just to correct the record here, I think the rebuttal report is dated June 18.

Q Okay. Thank you.

A But other than that, that's correct.

Q Okay. And what do you recall Lavetta saying about her medication use?

A Well, that she hadn't wanted to take any medication for her depression, and she gave me the impression that she had not taken any medication. And yet it looks like she was prescribed medication. I don't know if, in fact, she took that medication.

Q Okay. Now, if Ms. Elk were trying to portray herself as worse off than she actually were, why in your estimation would she downplay the medications?

A I don't have an answer for that, but, I mean, I

have a broad answer which is -- my point is not that she was necessarily at every opportunity trying to exaggerate one way or the other or minimize one way or the other. My point is that on many key pieces of her history, she didn't reliably report what happened. And, again, I agree with your point, that if it happens one or two times, that's not a pattern.

But when it happens multiple times, that suggests a pattern, and as you heard me say on my direct, I have maybe had one other evaluee in a decade of MMPI-II use have scales that are as exaggerated as her scales were on two separate administrations of the MMPI-II. I mean, to my mind, this is not a close call.

Q Well, we haven't yet moved into the testing, though. I'm talking about facts that you obtained, facts that you learned, conversations you had with Lavetta.

A Sure.

Q Having now been educated about Lavetta having many grandparents, having now heard Noretta High Hawk's revised testimony, having now heard other facts that were different than at the time you prepared the report, do you still feel that there were multiple inconsistencies or exaggerations?

A Yes.

Q Okay. As we sat here, what's left? What

exaggerations were there?

A Well, again, I've given you two cardinal ones, which is not reporting her psychiatric history prior to the incident, and from my perspective, minimizing the broad array of stressors, including the miscarriage following the incident. And, you know, most folks find early adult life or late adolescence plenty tough anyway, and marriage, moving, moving back home, having a child, having miscarriages, that's a lot going on.

Q Okay. Well, let's talk about her 2002 clinical history. Did you find a significant history? I mean, were there medications prescribed?

A There were medications prescribed.

Q Were there medications taken in 2002?

A It's not clear.

Q Now, in 2002 Lavetta was how old?

A She would have been 18.

Q Okay. And were her -- and she was still in high school. Correct?

A That's correct.

Q Did she see an indication that her parents were brought in?

A Pardon me?

Q Did you see any indication that her parents were brought in?

A I'm not sure how that cuts, but the answer is no.

MR. BRYANT: Objection.

THE COURT: Pause.

MR. BRYANT: -- with facts now at this point.

THE COURT: Well, no. He's asking a question, but your questions need to be more specific. Brought in, doesn't tell him very much about what you're asking about.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Did you see any indication that the nature of her complaints were of such a nature that the school or counselors felt they needed to be shared with parents?

MR. BRYANT: Objection. Calls for speculation.

THE COURT: Well, he should be able to look at the records and tell if he sees something there that indicates that this happened or not, and so the answer doesn't call for speculation. He's going to answer based upon what he did or did not see in the records. So ask the question again.

BY MR. HOROWITZ:

Q Did you see anything in the records that reflected that Lavetta's parents were notified by her school or by the counselors or in attendance at any of her daughter's visits?

A My recollection of the records is that her

parents were not notified or brought in by the school.

Q Okay. And Lavetta ended these sessions on her own volition.

MR. BRYANT: Objection. Calls for speculation.

THE COURT: That does call for speculation.

MR. HOROWITZ: Okay.

THE COURT: Mr. Horowitz, if you want to ask him what the records indicate, those are appropriate questions. If you're going to ask him flat-out fact questions, it's going to be a little bit more difficult for you to get questions that are consistent with the rules.

BY MR. HOROWITZ:

Q Do the records reflect that Lavetta was experiencing anxiety about college in her senior year in high school?

A Yes.

Q A very normal reaction?

A I don't think she's abnormal.

Q Let's focus on that on that particular element. Is it -- would you agree it's very common for high school seniors to have --

A I would -- I even have a high school senior right now, so I know this up front and close.

Q Not an unusual event.

A Not an unusual event.

Q And do you find it an unusual event that she might comment to her guidance counselor that a sponsor of mine died and it made me sad?

A No. I don't find that unusual either.

Q Okay. And at that time, she wasn't trying to -- do you feel like when she was going to those counselors, she was trying to exaggerate her conditions?

A No, no, no. I --

MR. BRYANT: Objection, Your Honor.

THE COURT: It calls for speculation.

MR. HOROWITZ: Okay.

BY MR. HOROWITZ:

Q Did you see anything in the records in which Lavetta was told about her diagnosis?

THE COURT: Which diagnosis?

BY MR. HOROWITZ:

Q The nonspecific depression.

A That's not the diagnosis she was given, sir.

Q Okay. Share with us the diagnosis that you feel she was given.

A I'm sorry. Say again.

Q Can you share with us the diagnosis --

A Can I show you?

Q Sure.

THE COURT: Mr. Horowitz, I don't even know which

time frame you're talking about.

MR. HOROWITZ: We're talking about --

THE WITNESS: 4/26/02, Your Honor.

THE COURT: All right. Well, that's what exactly I need.

THE WITNESS: And I think she's given the diagnosis either of dysthymia or dysthymic disorder, NOS, all caps, meaning not otherwise specified.

BY MR. HOROWITZ:

Q And did you see any indication that that diagnosis was shared with her?

A There's no indication one way or the other.

Q All right. Well, typically when a physician comes up with a diagnosis like that and you're dealing with a minor, do you share the actual name of the diagnosis?

MR. BRYANT: Objection. He's going into general psychiatry, and if I can do that on my redirect, then that's fine, but --

THE COURT: I don't think you're going to be asking him about what should or should not be seen on particular records, Mr. Horowitz. Sustained.

BY MR. HOROWITZ:

Q You heard Lavetta testify that she was unaware of the diagnosis that she received.

A Yes.

Q Okay. Do you find that -- do you find it conceivable that, in fact, she hadn't been given the name of her diagnosis?

MR. BRYANT: Objection. Calls for speculation.

THE COURT: Mr. Horowitz, we're going to take a 15-minute break. I suggest that you sit down and think a little bit more about the questions you're going to ask. Okay? At that point, we'll pick it back up. Any estimate as to length of what's remaining in your cross-examination?

MR. HOROWITZ: Twenty minutes.

THE COURT: All right. Here's what we're going to do instead then, because I have a lot of questions for this witness. All right. So let's take a break from now until 1:30, at which point we'll pick up your 20 minutes, whatever else that Mr. Bryant has in terms of redirect, and then at that point, I will move into some questions that I have.

(Whereupon, at 12:15 p.m., the trial in the above-entitled matter was recessed, to reconvene at 1:30 p.m., this same day, Wednesday, April 30, 2008.)

//

//

//

//

//

A F T E R N O O N   S E S S I O N

(1:37 p.m.)

THE COURT: Please be seated.

Mr. Horowitz, anything we need to take up before we go back to the witness?

MR. HOROWITZ: No, Your Honor.

THE COURT: Mr. Bryant, anything like that?

MR. BRYANT: No, Your Honor.

Whereupon,

MARK MILLS

having been previously duly sworn, resumed as a witness herein and was examined and testified further as follows:

THE COURT: All right. Then, Mr. Horowitz, anytime you want to recommence your cross-examination.

CROSS-EXAMINATION (Resumed)

BY MR. HOROWITZ:

Q Dr. Mills, would you agree that there are significant cultural differences between Lavetta Elk and that of the average person taking the MMPI?

MR. BRYANT: Your Honor, objection.

THE COURT: He testified about the MMPI being adjusted for various types of cultures. I think it's within the realm of the direct testimony.

THE WITNESS: I'm sorry. Would you repeat your question, please, Mr. Horowitz?

BY MR. HOROWITZ:

Q Would you agree that there are significant cultural differences between Lavetta Elk's upbringing and that of the average person taking the MMPI?

A I think there are some significant cultural differences.

Q Okay. And does the MMPI test take into effect those cultural differences?

A In aggregate, yes, because the way it's normed is a representative population. Is it specifically normed for Native Americans or Lakota? The answer is no.

Q Okay. Did I hear you to say that -- on direct examination, that there are certain nationalities for which the MMPI does make adjustments?

A Yes.

Q Okay. But that is not the case for Native Americans. Correct?

A That's correct, because in those versions of the MMPI, they are given in that particular language, i.e., Japanese or Spanish, in the case of the examples I mentioned.

Q You performed two tests?

A Correct.

Q PAI and the MMPI.

A MMPI-II. Yes, sir.

Q MMPI-II. Did the results of the PAI suggest PTSD or major depressive disorder?

A Yes. Of course. I mean, we agree -- or at least I testified that I believe that the PAI is by far the more amenable to a manipulation, but the diagnosis after negative impression management is post traumatic stress disorder, because that's because she answered a number of questions in a positive direction about that.

Q Okay. The answer to the question is yes.

A Well, no. The answer, sir, is the answer I gave.

Q And with regard to the MMPI, would you agree that that data presented problems regarding test interpretation?

A Well, that's exactly what I said, but it doesn't present problems regarding her test-taking attitude. It presents problems regarding the clinical interpretation of the test. And one case says you can interpret it, and the other case, it says you interpret it with grave caution.

Q Now, on Lavetta's MMPI data, her F score is elevated. Is that correct?

THE COURT: Can we make sure we're specifying which test you're talking about?

MR. HOROWITZ: Certainly.

BY MR. HOROWITZ:

Q Your -- we're just going to focus on your MMPI-II.

A Yes. Both her F and her FB are very significantly elevated, although not as elevated as Dr. Manlove's MMPI-II.
Q Okay. The F score is elevated. Correct?
A F and FB both, sir.
Q To a significantly -- significant number?
A Well, beyond a significant number.
Q And am I correct that the FB score elevates the F score?
A No. Dr. Manlove testified to that, but there's very little contribution there. They are different scales, but there is some small interrelationship.
Q Okay. The FB score, speaking strictly about the FB score, was an elevated 97. Is that correct?
A To 97. That's correct.
Q Okay. And the FB score is used to assess whether a person was paying attention throughout the course of the examination?
A No, sir. I mean, it's used to assess whether the person is endorsing or acknowledging or attributing to themselves very unusual states, the so-called infrequent states that I testified about on my direct. And it's the latter third of the MMPI-II is where the FB items are drawn from.
Q Okay. Is the FB score used to assess whether a

subject maintained attention toward the end of the examination?

A Well, it can be used to do that, inter alia, but that's not the primary purpose of the score. Remember, F scores in general are those infrequent items, so the purpose is to see whether or not somebody is saying things that even seriously mentally ill people or seriously disturbed people don't ordinarily say.

Q And is Lavetta's elevated FB score consistent with that of a person who took a valid approach in the first half of the exam but a hurried approach in the second half?

A No. Absolutely not. First of all, it's not -- as I already just said a moment ago, it's the last third, not the first half or the second half.

Q Okay.

A Secondly, her F scores are so similarly elevated, 92 is not very different statistically than 97, that what it shows is that she is greatly elevating both on the front part and the back part of the MMPI-II.

Q Okay. I'll change the question slightly. Isn't the FB score indicative of a valid approach in the first two-thirds and a hurried approach in the latter --

A Absolutely --

Q -- third? Isn't --

MR. BRYANT: Objection. Asked and answered, Your

Honor.

THE COURT: All right. Well, he's starting to answer the question before it's fully asked, so that sort of works both ways.

MR. HOROWITZ: Well, I --

THE COURT: Mr. Horowitz, you ask the question again, and if I could ask the witness to wait till he's done with the question before you start answering.

THE WITNESS: Of course you may, Your Honor. My apologies, Mr. Horowitz.

BY MR. HOROWITZ:

Q The test is broken up into thirds. Correct?

A Well, it's broken up into the first two-thirds and the latter one-third. That's correct.

Q Okay. And the FB score is an indication with regard to how the answers are made in the final third?

A Correct.

Q And isn't an elevated FB score consistent with someone who is hurrying through the final third of the exam?

A You can't take --

MR. BRYANT: Objection. Asked and answered, Your Honor.

THE COURT: No, it wasn't answered. Ask the question again.

THE WITNESS: I have the question in mind, Your

Honor.

THE COURT: All right. Go ahead.

THE WITNESS: That's not correct. You have to look at each one of these scales in the context of the others. That's why when I was explaining it to His Honor, I said, look at the VRIN and TRIN scores in terms of rejecting certain hypotheses about answering all "true" or about reading or being grossly confused. When the F is greatly elevated as it is here, the FB merely confirms that that same basic style of great elevation or great exaggeration is continuing.

BY MR. HOROWITZ:

Q And putting it all together, the FB elevated the F score.

A No. You actually asked me that before, and I said, no, sir, there is very little contribution from the FB to the score.

Q If we could shift to the PK scale.

A Fine.

Q Of your report.

A I understood that, sir.

Q There's a moderate elevation of the PK scale?

A No. That's a substantial elevation. I mean, anything over 65 is clinically significant. We're up here about 83. But, again, you have to consider it in two

contexts. One is that it is lower than at least three other clinical scales from the main ten-item clinical test, and, two, that she's exaggerating so much that everything has to be discounted.

Q Okay. You said that the PK scale is significantly elevated?

A Oh, absolutely. But, again, in the context of everything being greatly elevated and exaggerated.

Q Okay. And am I correct that the following symptoms are associated with elevation of PK scale: intense emotional distress, anxiety and sleep disturbances, guilt and depression, unwanted and disturbing thoughts, loss of emotional and cognitive control?

A That would be absolutely true, sir, if this was thought to be a true elevation. The whole point of my testimony for the first couple of hours this morning and carrying on briefly into the afternoon prior to our lunch break was that you cannot interpret the clinical scales because she has exaggerated so much on her approach to the test.

So although if this were in the context of a valid MMPI, you would be right about the PK, in this context, her PK is essentially meaningless. The clinical scales, the entire clinical scales here, are essentially meaningless.

Q Did the possibility that Lavetta Elk failed to follow instructions render interpretation difficult in your estimation?

A No, because, again, that's exactly why we spent the time on direct with the VRIN score. The VRIN score shows that she was able to read items, answer items truthfully, answer items consistently. It is a measure of inconsistency, and she does fine. She's not perfect, but she does fine on that scale.

Q And you would agree, though, that the issue of whether one has the aptitude to follow instructions is separate from the issue of whether one, in fact, follows instructions. Correct?

A Well, of course, but we know she has the aptitude. She was a B student at apparently quite a competitive high school, was admitted, as you're fond of saying, on a full-ride scholarship, which is impressive. I wouldn't deny that, by the way. But, I mean, we know she has the aptitude, and yet we know she exaggerated.

Q When assessing the MMPI-II, do most experts place emphasis on the two highest scores?

A When assessing a valid clinical profile, when looking at the clinical profile they do, and Dr. Manlove testified to that yesterday. He said this was a 7-8 profile, and I agree. This would be a 7-8 profile, if it

were valid.

Q And was psychopathic deviance one of the two highest scores?

A No, it was not, sir. It was the third highest.

Q The highest score on the MMPI-II is 7 or psychasthenia. Is that correct?

A Psychasthenia, that's correct. I mean, call it kind of a neurotic scale, if you will. It's easier.

Q Okay. And that indicates that Ms. Elk -- that's consistent with Ms. Elk having problems with excessive doubts, fears, and anxiety. Is that correct?

A Same answer as you gave -- as I gave you about the PK scale. That would be the answer if you thought this was a valid MMPI-II, but because it's grossly exaggerated, none of these scales, the clinical scales, the scales presented on page 6 of the report, can be considered valid.

Q Okay. I turn your attention to the F scale now. Generally speaking, a cry for help is a possible explanation for an elevated F scale. Is that correct?

A Yes. And it's given in the printout and Dr. Manlove mentioned that, but for the reasons I elaborated in considerable detail, that is an incorrect interpretation for Ms. Elk's MMPI-II per my administration.

Q And the basis for that opinion was a review of her clinical history?

A No, sir. The basis was that amongst other things, but primarily it was the fact that in a cry for help, people want attention and want psychotherapy. And you'll recall her RXR scale on the PAI was inordinately and atypically low, so that she is not crying out for help. She doesn't particularly want help, but she is exaggerating her symptoms.

Q Are all cries for help a cry for medical or psychological help?

A Are all? I guess the answer has to be no, but, I mean, most cries for people in psychiatric or psychological distress are for psychological or psychiatric aid and treatment.

Q Switching to the FP scale on your examination, was Lavetta's FP scale within the range of normal?

A My recollection is yes. Let me take a quick look here. (Perusing document.) Yes.

Q Okay. And the FP scale tests whether one is endorsing more psychotic symptoms than one who is actually psychotic. Is that correct?

A That's a reasonable interpretation. Yes.

Q So if her FP scale is not elevated, she's not endorsing more psychotic symptoms than one who is actually psychotic. Is that correct?

A Yes.

Q Okay. It's a fair statement then she wasn't trying to convey in this MMPI-II that she was more psychotic that one who was actually psychotic?

A Correct.

Q She wasn't exaggerating psychosis.

A Correct.

MR. HOROWITZ: No further questions.

THE COURT: Redirect?

MR. BRYANT: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. BRYANT:

Q Dr. Mills, good afternoon. I'd like to redirect your attention to DX-6C.

A I used to think I was a competent guy, until I couldn't find the exhibits in this case. I've found 6C.

THE COURT: Page number?

MR. BRYANT: DEF 1101. I'm sorry. We're going to start with DEF 1104. My apologies.

THE WITNESS: I have it.

BY MR. BRYANT:

Q There was some discussion on direct examination about the previous treatment for depression that Plaintiff sought, and there's also discussion about what she informed you of and whether you thought that it was the type of treatment that she would have remembered and told you about.

Is that correct?

A Correct.

Q Can you tell me about DEF 1104? Is there anything about this, this kind of diagnosis and the treatment sought here, that would be the kind in your experience a patient would remember several months later?

A Well, sure. I mean, the --

MR. HOROWITZ: Objection, Your Honor.

THE COURT: Nature?

MR. HOROWITZ: I think it exceeds the scope of the cross.

THE COURT: No, it doesn't. Go ahead. Do you need the question again, Doctor?

THE WITNESS: No. I have it, Your Honor.

THE COURT: Go ahead.

THE WITNESS: Thank you. What it says here, that she has broken up with her -- several weeks ago, of her boyfriend of four years, that she denied suicidal ideation, but --

THE COURT: I don't actually think that's responsive to his question. Could you answer the question he asked you, please?

THE WITNESS: I'm sorry. Let's --

THE COURT: Ask the question again.

MR. BRYANT: Yes, Your Honor.

BY MR. BRYANT:

Q Is there something about the type of trauma that's discussed here, type of grieving and so forth, that is the kind that, in your experience, would be remembered several months later --

A Yes.

Q -- or several years later when the exam is given?

A Pardon me. The answer to your question is, yes, sir.

Q And can you describe what those are?

A Yes. I mean, it talks about her grief over two lost relationships which are significant and that she, meaning Ms. Elk, refers -- is experiencing ongoing depression.

Q And would it be significant also that it specifically mentions her female sponsor died two years ago, and her male sponsor died a few weeks ago, and the fact that that's being brought up, something --

MR. HOROWITZ: Objection. Leading.

THE COURT: It is leading.

MR. BRYANT: Fair enough.

BY MR. BRYANT:

Q Is there anything else specifically about this particular patient referral notice that would be significant to you as something that, your experience, the patient would

recall and tell you about when asked?

A Well, to the extent that she is experiencing sadness and/or depression, the fact that one of the foci of that depression is an event of several years ago suggests that she is continuing to brood and to worry. That would be consistent with a dysthymic disorder or a neurotic depression kind of diagnosis.

Q I'm going to ask you the same question about the follow-ons, so if we can turn to DEF 1103.

A I have it.

Q The same question I just asked about this document.

A Let me refresh my recollection.

Q Please take your time to read it. Yes.

A (Perusing document.) Well, essentially it references the same events. It says that, "She has been feeling depressed and anxious and that" -- you know, again it references the sponsor's death two years ago as something that's causing her present distress, the present being 4/26/02.

Q Now --

A By the way, let me just correct it. I said I thought she had received the diagnosis of dysthymic disorder. In fact, the diagnosis here is depressive disorder. That diagnosis theoretically doesn't exist in

2002. The one I provided does, and they would be thought by most people to be absolutely synonymous, but the correct term is dysthymic disorder.

Q And then the same question with respect to 1102, and please take your time to read through it.

A (Perusing document.) 1102 is the report dating from April 17 of '02, and here to my mind what's significant again is the same events, but that she is now specifically seeking medication, and generally -- it's not an absolutely marker, but generally when somebody seeks medication, they're saying, My distress is really bothering me. If it's milder, typically people want psychotherapy. When it's more acute and more uncomfortable, they want medication, because they want something that will help more immediately.

Q Okay. And now turning to DEF 1101, the same question.

A (Perusing document.) And, again, it refers to her sponsors, and so again it suggests that she is brooding about past events and having some difficulty with that fact.

Q Now DEF 1104 through 1103, 1102, 1101, are dated respectively February 28, 2002; April 11, 2002; April 17, 2002; and April 26, 2002. Does that have any significance in terms of the type of depression and the type of psychological trauma that would be remembered subsequently?

A Well, two things, and I think I've said them

previously. Maybe not. One is this clearly was a depression that lasted for a while, so one would expect that she would remember it. And, two, in the context of four visits, while one might omit or misrecollect or forget one, it's much harder to forget four.

MR. BRYANT: No further questions.

THE COURT: Anything else, Mr. Horowitz?

RECROSS-EXAMINATION

BY MR. HOROWITZ:

Q With regard to these April 2002 visits, now, Ms. Elk did recall these events in her deposition. Correct?

A She testified about them. Yes, sir. That's correct.

Q Okay. And she did remember them in answering her I think so. .

A Well, presumably that was --

MR. BRYANT: Objection.

THE WITNESS: -- a collaboration, but I don't know.

THE COURT: I'm sorry? Well, he reviewed those documents. Correct? So I think it's fair game for him to ask questions about what's in the documents that he recalls. Go ahead. Ask the question again.

BY MR. HOROWITZ:

Q She testified about them in her deposition.

A Yes, sir.

Q And she answered interrogatories about them.

A Yes, sir.

Q And she even answered a response to a request for admissions about them.

A Yes, sir.

Q Okay. So in this litigation, she didn't forget about them. Is that correct?

A Well, no. She forgot about them in talking to me. She forgot about them in talking to Dr. Manlove. I don't know how you work, and it's not my business, but I can tell you that in general, in interrogatory answers and admissions, that those are done or drafted by the attorney in consultation with their client. So I don't know what she told you, but presumably you had a hand in that. So she did recollect them in her deposition, yes, but she twice, with Dr. Manlove and me, did not recall them.

Q Okay. And you didn't ask her a specific question about what you felt was a significant experience in her life. Is that correct?

A I asked her a specific question about prior history of distress. I did not ask her specifically, had she in April of 2002 sought the attention of a psychiatrist. That is correct.

MR. HOROWITZ: No further questions.

THE COURT: Anything else?

MR. BRYANT: Just one brief --

THE COURT: Sure. Go ahead.

MR. BRYANT: -- follow-on of that.

FURTHER REDIRECT EXAMINATION

BY MR. BRYANT:

Q If you could turn, Dr. Mills, to JX-3.

A Whoa. Now you're straining me here.

Q It's the --

MR. BRYANT: May I approach, Your Honor?

THE COURT: Uh-huh.

THE WITNESS: That's the thin book?

MR. BRYANT: Yes.

THE WITNESS: I have it.

BY MR. BRYANT:

Q Are you at JX-3?

A I am.

Q Did you review these documents? Please look through them and see if --

THE COURT: Can you tell me why this relates to a question that Mr. Horowitz just asked?

MR. BRYANT: It goes specifically to remembering that depression and that treatment.

THE COURT: Well, he was asking specifically -- it doesn't -- that's a nice general description of what he

was talking about. He asked him about interrogatories. He asked him about the depositions. I don't recall him asking about any other types of records, did he? Mr. Horowitz?

MR. BRYANT: Well, he was attempting to address the point of her remembering in other contexts, and this is a similar instance where that question was asked.

THE COURT: All right. Let's see where you're going.

BY MR. BRYANT:

Q So, Dr. Mills, is this something you reviewed? If not, then I'll --

A No, I did, Your Honor. I mean, I did. Yes.

MR. BRYANT: One moment, please.

(Pause.)

BY MR. BRYANT:

Q If you could turn to page DEF 289 --

A Okay.

Q And if you'll look at block 24 --

A Okay.

Q And just read that to yourself.

A (Perusing document.) I have it.

Q Okay. And if you could look down to the explanation section where there's the number 24 --

A I see it.

Q And if you could read that to yourself --

A I have.

Q Is this something you read in your review of the documents?

A Yes.

Q Is this another example of an instance where Plaintiff was not documenting those --

MR. HOROWITZ: Object -- sorry. I didn't know if the question -- objection. The document speaks for itself, and it's leading.

THE COURT: Well, I'm sorry. I don't know about either of those points, but I don't think this is within the realm of redirect, so --

MR. BRYANT: Withdraw the question.

THE COURT: Anything else, Mr. Horowitz?

MR. HOROWITZ: Nothing else.

THE COURT: Doctor, in a process since you've been here -- I know you've seen me use this with other witnesses -- I have some questions for you.

THE WITNESS: It will be my pleasure, Your Honor.

THE COURT: So I'm going to ask you those questions first, and then I'll first give Mr. Bryant and then Mr. Horowitz an opportunity to follow up if anything that I ask prompts them to ask related questions.

I'm trying to get a better sense, I guess, as to what you're saying and what you're not saying. I think I

have some sense of that obviously from your testimony. At one point in your direct, you gave me the sense, I guess, that you weren't suggesting that she had no stress or no distress as a result of the incident, but that it was a question of degree or whether there was exaggeration. Is that correct?

THE WITNESS: That's exactly correct. I mean, I think the incident was clearly a stressor, and I think almost anybody would have distress, and we've heard testimony that she has had distress and experienced it. I don't question that.

THE COURT: All right. And so you're not suggesting that, for example, all the symptoms that she's listed are, in fact, ones she has not had. You're just suggesting, based upon the results of the tests, that you think that she's exaggerated the symptoms. Is that correct?

THE WITNESS: Yes. And sadly more. I mean, I think she's greatly exaggerating at least on the test. The test doesn't prove that she's exaggerating in her description of symptoms more generally.

THE COURT: All right. Let's follow that last point, because I want to make sure. So, for example, you've heard her description of various types of symptoms.

THE WITNESS: Correct.

THE COURT: The test doesn't allow you to

determine, for instance, whether she is or is not having nightmares.

THE WITNESS: It does not.

THE COURT: All right. Or whether she is or is not having flashbacks.

THE WITNESS: Correct. It does not.

THE COURT: And we could go through the list, but as to any one of those particular ones, it doesn't really tell you that. It's an overall barometer of, in your view, credibility. Is that correct?

THE WITNESS: That's correct. And ordinarily if a person is credible, then the clinical scales give one reliable and in some cases reliable and robust information. Where the validity scales are invalid, you can draw no meaningful clinical conclusions.

THE COURT: I'm going to ask you about that in a second, so we'll get to that point.

THE WITNESS: Any way you want.

THE COURT: Could you turn to Defendant's Exhibit 1 and to page DEF 1168. It's your report, so if you have a copy of your report, I'm not sure that you have to go digging.

THE WITNESS: I have it here, and I was going to say, it looks familiar.

THE COURT: The paragraph that begins at the

bottom on my copy of DEF 1168 and continues onto 1169 talks about the tests. Okay. And it says, "Fourth, Ms. Elk's psychological testing demonstrates a pattern of exaggeration, manipulativeness, and an inaccurate attempt to portray herself as the victim of traumatic stress."

I'm getting the sense that -- that last line, I guess, I'm having problems with, because it says, "an inaccurate attempt to portray herself as the victim of traumatic stress." And I guess I'm hearing some things you're saying today that would suggest that you're not so sure that she's inaccurately portraying herself as having traumatic stress.

THE WITNESS: No. I think I am, and let me -- and that's why -- and perhaps I wasn't as clear as I had hoped to be. That's why I administer both the MMPI-II and the PAI. On the MMPI-II, even if you discount all the clinical scales and just say they're all exaggerated but the relative position is the same, the PK scale, the traumatic stress scale, is the fourth most elevated, and under any interpretation of the MMPI-II, you really only look at the top three scales, and principally, as you've heard today, the top two.

THE COURT: We're going to talk about that point in a second, because I really do sort of -- I want to ask you questions about how the test can be invalid on one hand

but you seem to be drawing observations from the results at the same time.

THE WITNESS: That's a good point.

THE COURT: So you point out on the next page -- so now we're at DEF 1169. It says, "While the footnote provides the relevant professional details, it's important to underscore that Ms. Elk's degree of exaggeration is great, and it cannot be accounted for by other problems such as constrained linguistic facility, concurrent distress, or limited intellectual ability."

Now, I thought I just heard you say a moment ago that you aren't discounting the fact that she was under some level of distress or stress. So if that's the case, how is it that you're sure that there was no stress that impacted the validity of the results here?

THE WITNESS: Oh, good question. Because even folks who are under moderate stress and who are experiencing moderate distress will have elevations in the clinical scales but ordinarily will have no elevation in the F or the FB scales. If there is elevation, which is rare, it will be minimal. I mean, maybe five points, so that might get her up to 70, but it's not going to get her into the realm of the 90s or the 80s.

THE COURT: Let's take a look at the actual test results and talk about that a little bit.

THE WITNESS: Okay.

THE COURT: So go to Exhibit 2 now.

THE WITNESS: I have it, sir.

THE COURT: All right. And look at DEF 0746.

THE WITNESS: I have it.

THE COURT: All right. And we talked some about this segment up top, that talks about profile validity.

THE WITNESS: Right.

THE COURT: All right. And, again, it says here that, "The MMPI-II profile should be interpreted with caution. There is some possibility that the clinical report is an exaggerated picture of the client's present situation and problems."

Now, of course, you've concluded that it's not just some possibility, but, in fact, the most likely one. Would that be a fair statement?

THE WITNESS: Exactly.

THE COURT: All right. How is it that your conclusion differs from the standard information that's provided in the test?

THE WITNESS: Because this is a generic report, written for these scores broadly, and as I said, it paints the most favorable picture, because it's a clinical interpretation. Had I sought a forensic interpretation, it would then say, Gee, there's something at stake here like

freedom, like money, like better treatment, and when the incentives to dissemble go up, the likelihood that there's exaggeration goes up.

THE COURT: All right. But the report language that's generated here is part of the standard report language generated by the computer is not consistent with your finding, in the sense that your finding is more certain than what is listed in the language here. Correct?

THE WITNESS: That's right, and that's because I use -- I mean, as you heard Dr. Manlove say, to some extent the MMPI-II should be used as a hypothesis-generator, and what I believe I found when I looked at the various data as we've discussed at some length now is that she was minimizing a number of things in the past and in the present, and so when you take that information, plus this information, then I think you can go beyond the language here, but you are clearly correct that the language here is less specific than my beliefs.

Q All right. And the language goes on to say, the last sentence of that same paragraph, "This response set could result from poor reading ability, confusion, disorientation, stress or need to seek a great deal of attention for her problems." All right.

And so again I'm left with you, on the one hand, saying that at some point this particular attack caused

stress, but that it wasn't the stress that's being referenced here in terms of the standardized notes.

THE WITNESS: That's right. I mean, we would see -- if she were -- if she just had distress or an acute stress reaction, even if she had PTSD and was not embellishing or exaggerating, we wouldn't see anything in the F scale elevated. We would see something in the psychasthenia scale, the 7 scale, elevated, and something in the PK scale, the post traumatic stress scale elevated.

THE COURT: All right. So the narrative's incorrect?

THE WITNESS: The narrative doesn't apply fully to her is what this is. The narrative is generic.

THE COURT: All right. Now, let's go down and take a look at a few paragraphs here that I don't think we talked too much about before.

THE WITNESS: Fine.

THE COURT: One is under symptomatic patterns, and I know that you've indicated that because of the validity scores, that one needs to exercise extraordinary caution in relying upon this. But take a moment -- and you probably know what's in there, since this language might be standard.

But it says, "The client has apparently experienced a great deal of psychological distress,

including extreme anxiety, tension and excessive self-doubts. She appears to be experiencing intense period of panic and anxiety at this time, compounded by a chronic problem with maladjustment and difficulty fitting into society. She appears to be quite confused and disorganized, and is prone to intense feelings of panic.

She reports being unable to sleep and is bothered by feelings of self-doubt and inadequacy and guilt, obsessively ruminating about deficits and problems. She is having difficulty concentrating and making decisions. She is likely to be preoccupied with her problems and precarious in her adjustment. She appears to have difficulty controlling her thinking."

Here's the question. If you can make some observations based upon these scales back here -- in other words, you didn't say, once we got to the validity thing, the entire test gets tossed, and nothing else that we look at on these scales is valid. How is it that we discount this language?

THE WITNESS: We don't discount that language. What we say is, that language is written for primarily her elevated 7 scale, the PT, the psychasthenia scale, but that language is key to that elevation, not that elevation minus the discount of the elevated F and FB, so --

THE COURT: All right. But this would be a

description of somebody who has the PT and SC scales that she has scores. Correct? The one the computer generates when that happens.

THE WITNESS: That's correct. But the computer's unfortunately not smart enough to discount, to take that language and discount it by the elevated F and FB.

THE COURT: Uh-huh.

THE WITNESS: But the overall tendency is correct, that -- you know, we haven't gotten there, but it sort of segues there, that I think her most likely sort of chronic diagnosis is that which would be suggested by the PT. She's got chronic symptoms of anxiety, maladjustment and depression, which have been in evidence for a while, which were clearly aggravated by what happened to her, but which clearly antedated what happened to her.

THE COURT: Okay. Let's -- we're going to talk about a couple more instances of that. The -- let's go on. All right. One more question about this same description. If I understood you correctly, you said that the MMPI -- I can remember years ago taking this test, so I have vague recollections -- but attempts to disguise essentially patterns, so that the person taking the test can't somehow answer questions in a particular way to produce a particular type of diagnosis, because that's the whole purpose for taking this 537, as opposed to just, you know, do you have

depression, you know.

THE WITNESS: Exactly. That's right.

THE COURT: All right. So I heard you correctly in that regard. In other words, someone reading this test at least would have to work very hard to be able to ascertain that a certain pattern of questions would produce a particular set of results in terms of things that are being observed or diagnoses that are being suggested. Is that correct?

THE WITNESS: Yes.

THE COURT: All right. Is it -- and maybe this is consistent with the answer you just gave me. That means that she testified about a variety of these types of symptoms having occurred with her. She wouldn't have known at the time she was taking the test that if she answered the questions in a particular way, she'd produce this computer printout that tracks many of the symptoms that she listed, would she?

THE WITNESS: No. But she would know the kinds -- I mean, if she sort of amplifies internally, if 1X level of distress is going on and she says, in effect, I'm going to report 3X level, I mean, she would take legitimate symptoms she has and make them more intense or more frequent or both, and that's what this pattern looks like.

It isn't -- I have not testified nor do I believe

that she is creating this de novo or out of whole cloth. I think she has some symptoms. I think she was injured by what her occurred. But I think the stories she's telling us now is meaningfully embellished.

THE COURT: All right. Let's take a look, I guess, now at Defendant's Exhibit 3.

THE WITNESS: I have it.

THE COURT: Start with 0762. That's the chart. Explain for me again. So there is a line on that chart that sort of goes from the 70th score across the page and from the 50th score across the page. Generally speaking, does that -- what do those two lines correspond to?

THE WITNESS: The 50th would sort of be the average response. That's where most answers would be expected to fall close to that, and the 70th, which is two standard deviations north of that, would be the answers that this test believes are clinically significant. So the 70 line on this line is like the 65 line on the MMPI-II.

THE COURT: All right. So what's the significance of having a dot show up between those two lines?

THE WITNESS: Well, not much is the answer. The things don't really get significant until they are at or above 70, and so we have the infrequency or the F response in effect, and then we have the anxiety, anxiety-related

disorders, and depression as being the clinical scales that are elevated.

THE COURT: All right. And so is that same basic description applicable then to all the various scales as we go across the page here? In other words, the significance is shown when the number starts to exceed the second standard deviation?

THE WITNESS: Yes, sir.

THE COURT: All right. The first four there -- so ICN, INF, NIM, PIM, I got the sense from your testimony that those have a role analogous to the validity F factor in the MMPI. Am I correct by that?

THE WITNESS: Exactly. This is a more truncated -- these four attempt to serve the same function as the eight on the MMPI, and they don't do it quite as precisely but they do it pretty well.

THE COURT: All right. But the fact then that she has three of her scores that are within two standard deviations from the mean and one which is slightly elevated beyond that, why in your view was that not indicative of the notion that this test was valid?

THE WITNESS: Well, it says that this test is somewhat exaggerated but not very. I agree with that. But what it -- this test is the one that's -- that one can move, where, you know, the items are obvious, unlike the MMPI.

THE COURT: Well, why would they have a validity scale, I guess, if it was so easy to manipulate? That would seem to be a silly thing to have.

THE WITNESS: Well, because -- no, no, no, because, I mean, the validity scale isn't as obvious as the clinical scales, so the validity things are things which look at consistency, and the clinical things are things which are sort of patient-based or evaluee-based self-report.

So when you look at this, where she looks like she had -- by far the highest scale, as you see on the next page, sir, is her traumatic stress, so that's the one on 763, and that's the one at a 99 level. So she's taken what is the fourth highest score seemingly from the MMPI-II and made it by far the highest score on this one, so this is another indication that she is shaping the results to portray her message.

THE COURT: Uh-huh. At least in your view.

THE WITNESS: At least in my view, sir.

THE COURT: The -- let's take a look -- I want to ask you a couple questions about DEF 0764.

THE WITNESS: Okay.

THE COURT: The first one is up in the top. There's a line there that talks about index. See it there in the first sort of -- it's not a table quite, but it's

sort of a table.

THE WITNESS: Yes.

THE COURT: And it lists various things under the defensiveness index, casual discrimination function. Do you see the part that I'm referring to?

THE WITNESS: I do.

THE COURT: What's the significance of the malingering index? What is that a reference to?

THE WITNESS: Well, I mean, that's to outright fabrication of symptoms that are not realistic or appear to be grossly different than the rest of the message.

THE COURT: Uh-huh. And her score is 44 on that. What does that signify?

THE WITNESS: That she's not malingering on this test, but she is exaggerating on this test, but not greatly.

THE COURT: All right. But specifically the malingering index indicates what then?

THE WITNESS: That she is not malingering, that she is not creating symptoms out of whole cloth.

THE COURT: All right. And her -- the score -- the number scale there, is that similar to the scale that we looked at on that first chart?

THE WITNESS: Yes.

THE COURT: All right. And we talked actually about the significance of numbers that were above the second

standard deviation. What's the significance on that chart of numbers that are below the mean?

THE WITNESS: You know, I mean, it's pretty close to the mean. It means that she looks very similar to an average test-taker, vis-a-vis her malingering index.

THE COURT: Okay. Let's go a little farther here. All right. So if we were looking at this test standing alone --

THE WITNESS: Right.

THE COURT: -- valid results or invalid results, if you didn't have the MMPI?

THE WITNESS: Largely valid, and again, if I was only going to do one, I think Manlove is correct. You do the MMPI-II.

THE COURT: No. But I'm asking: If somebody were interpreting this test, just this test --

THE WITNESS: This testing standing alone, you'd say, exaggerated INF but largely correct.

THE COURT: All right. And would they look at that malingering index also as something potentially to take into account in determining validity?

THE WITNESS: Sure.

THE COURT: So if that number was highly elevated, that would be some indication of exaggeration?

THE WITNESS: That would be a more general

indication of exaggeration.

THE COURT: All right. Now, let's look at the page which is at 0766.

THE WITNESS: I have it.

THE COURT: And is this like in the MMPI? Is this computer-generated, sort of when they see particular scores, that particular description comes out?

THE WITNESS: Exactly.

THE COURT: All right.

THE WITNESS: It reads better, as I think I testified to earlier.

THE COURT: All right. Now, look down. You see the first full paragraph starts with, "The PAI"; second one says, "Also evaluated"; third one says, "The degree."

THE WITNESS: Yes.

THE COURT: Fourth paragraph says, "With respect to." Do you see that paragraph?

THE WITNESS: Uh-huh.

THE COURT: The last sentence of that paragraph is the one I want to bring your attention to. It says, "Although there is no evidence to suggest an effort to intentionally distort the profile, the results may under-represent the extent and degree of any significant findings in certain areas due to the client's tendency to avoid negative or unpleasant aspects of herself."

Is the part of that language that says, "Although there is no evidence to suggest an effort to intentionally distort the profile," is that consistent with your overall impression of this person?

THE WITNESS: Yes. I mean, the problem is very often the language the computer spits out is not fully consistent, so if you slip down two paragraphs below --

THE COURT: Go ahead.

THE WITNESS: -- there is a subtle suggestion the client has attempted to portray herself in a negative or pathologic manner that really conflicts with there's no evidence to suggest an effort to intentionally distort the profile and may under-represent. I mean, they are really -- they say the opposite thing, and so you've got to take the test. You've got to look at other test data. I would never just use this test alone, and you've got to look at the totality of the --

THE COURT: All right. But the language I actually asked you about, "Although there is no evidence to suggest an effort to intentionally distort the profile," that would be inconsistent --

THE WITNESS: That's -- not only is it inconsistent with what the test says later; it's also in consistent with that slightly elevated INF on the test.

THE COURT: All right. Let's look -- I think I'm

getting near the end of the questions here. Let's go on 0767.

THE WITNESS: I have it.

THE COURT: So this is clinical features. I take it that this part of the printout is generated by looking at some of these other scales from other parts of the page. Correct?

THE WITNESS: They should be looked at with that big chunk of scales on 0762 and then the more detailed set of scales on 0763.

THE COURT: Uh-huh. Look under clinical features at the third full paragraph there.

THE WITNESS: I see.

THE COURT: All right. And it says, "The respondent indicates that she is experiencing specific fears or anxieties surrounding some situations. The pattern of responses reveals that she is likely to display significant symptoms related to traumatic stress. She has likely experienced a disturbing traumatic event in the past, an event that continues to distress her and produces recurrent episodes of anxiety.

"Whereas as the item PAI does not address specific causes of traumatic stress, possible traumatic events involve victimization, e.g., rape or abuse" -- it says, "rape, abuse" -- "combat experiences, life-threatening

accidents and natural disasters."

All right. So looking just at this test -- and I understand your overall testimony -- that paragraph is consistent with allegations made that this event caused some level of trauma and distress in her life. Correct?

THE WITNESS: Absolutely. But, again, you know, one would -- I mean, if one's doing a job properly, one would not just look at one test or one --

THE COURT: That wasn't the question I'm asking you.

THE WITNESS: Yes.

THE COURT: So this test, this paragraph, is consistent with the notion that there was -- I don't need to read it back to you --

THE WITNESS: And the answer is, yes, sir.

THE COURT: -- but traumatic stress caused by --

THE WITNESS: Yes.

THE COURT: -- a particular event. And it notes as one possibility something very similar to the type of attack that she had.

THE WITNESS: Correct.

THE COURT: Okay. Let me ask you just a couple more questions about the MMPI.

THE WITNESS: Your Honor, I'm here as long as you wish.

THE COURT: All right. Well, just a couple more. You indicated that for certain countries, the language was changed.

THE WITNESS: And the norms.

THE COURT: All right. Well, that's the part I want to ask you about. So they don't just take the American version of this test, if there is an American version, or the Minnesota version of this test --

THE WITNESS: Right.

THE COURT: -- and translate it into Japanese or translate it into Spanish. They make adjustments, do they not, in the questions so that somebody from a particular culture will be able to respond to the questions and produce answers that would be viewed as indicative of things in the context of that culture. Correct?

THE WITNESS: That's correct.

THE COURT: All right. And so in the case of the Japanese test that you referred to, it's not merely a matter of taking this test and converting it to Japanese. They're actually taking into account things about Japanese culture. Correct?

THE WITNESS: That's correct. First they translate it, and then they have renormed it, and so it really is a different test, but it's similar in concept.

THE COURT: It's similar in concept, but in terms

of the particular questions that would be asked, what would happen if somebody in Japan had taken the one from the United States and it had merely been translated? Apparently somebody thought that that would be problematic. Otherwise, they would not have renormed it. Correct?

THE WITNESS: That's correct.

THE COURT: All right. And the problematic result would be that the results from the test would not necessarily be indicative of what you wanted them to be if you didn't renorm the test. Correct?

THE WITNESS: Correct.

THE COURT: All right. And so when we talk about Spanish, the thing about that reference that struck me as odd is now it sounds like we're talking about a language as opposed to a country. Is, in fact, the other version -- what other versions of this test are you aware of that have been established for particular countries?

THE WITNESS: Spanish for the Puerto Rican population, not for the Spanish, Spanish population.

THE COURT: Okay.

THE WITNESS: And Japanese for the Japanese population. Those are the only ones I know of. There may well be others. I just --

THE COURT: All right. But in the case of -- so the Puerto Rican population, not just translated into

Spanish, but also renormed. Correct?

THE WITNESS: Correct.

THE COURT: All right. So somebody thought that Puerto Rican Spanish-speaking people had enough differences in their culture to require the test to be renormed to produce valid results. Correct?

THE WITNESS: Well, no. Close but to produce optimally reliable results. Yes, sir.

THE COURT: All right. And yours is more accurate, so I appreciate you saying that. Has anyone ever done a study as to whether or not such a renorming would be necessary to capture optimally accurate results for Native Americans?

THE WITNESS: I don't know is the answer. You heard Dr. Manlove's answer sort of derivative from one of the psychologists he consulted, saying that she believed or he believed -- I don't recall who it was, and I'm not sure he mentioned the name -- that there might be an increased F scale for some Native Americans. I don't know if that's accurate.

THE COURT: Are you aware of any research that's been done at all one way or the other, talking about Native Americans and the accuracy of the test?

THE WITNESS: No.

THE COURT: All right. So sitting here today

then, you don't necessarily know whether or not differences in culture may impact the scales here.

THE WITNESS: That's correct, with one small caveat. It's not a huge caveat that, I mean, this test has been so well discussed and given in so many different sub-populations that I'm virtually certain but not certain, only virtually certain, that had there been a significant problem, it would have been discussed in the literature and been addressed.

THE COURT: All right. But that's just supposition. You don't know one way or the other.

THE WITNESS: That is supposition.

THE COURT: You haven't seen an article out there someplace that's tested this with Native Americans and come to the conclusion that it's just adequate with that population as it is with any other Anglo-Saxon population, for example. Correct?

THE WITNESS: You're right.

THE COURT: All right. I have nothing further. Mr. Bryant?

MR. BRYANT: Nothing, Your Honor.

THE COURT: Mr. Horowitz?

MR. HOROWITZ: Nothing, Your Honor.

THE COURT: All right. Then you're excused with the thanks of the Court, Doctor.

THE WITNESS: All right. My pleasure. Thank you, Your Honor.

(Whereupon, the witness was excused.)

MR. BRYANT: Your Honor, I do have just one quick -- I wanted at least to preserve the record or to ask you to respectfully request that you reconsider your ruling with regard to testimony concerning grooming and abduction which were not raised in Dr. Manlove's expert report but were raised for the first time at trial and to give us an opportunity to explore that with our expert to rebut his findings.

THE COURT: The problem is that the generic -- in my view -- and you can sit down. I'll explain the ruling one more time to you. And I understand that you're reserving it.

The problem I'm having is I view it as a sub-topic of a larger topic which is not covered by his report, and so since the larger topic's not covered by his report, as far as I'm concerned, it's out of bounds for him to talk about anything that would be viewed as a subdivision of that topic, so you can reserve the point but the ruling stays the same.

MR. BRYANT: One last -- we can move to strike all references that Dr. Manlove made to grooming --

THE COURT: Too late. I mean, if you're going to

make that type of objection, you've got to make it on a timely basis. This isn't timely.

All right. Anything else, Mr. Bryant?

MR. BRYANT: That closes the Government's case.

THE COURT: All right.

MR. BRYANT: Oh, I should say -- I'm sorry.

THE COURT: Yes.

MR. BRYANT: The exhibit issue.

THE COURT: All right. The one that we're going to add in, that has -- these are -- just to make sure we clarify, these are the particular pages that are being used, relied upon, not simply as ones that were reviewed by an expert, but in fact, are actually going to come in as probative evidence of the matters asserted. Correct?

MR. BRYANT: Correct. I've redesignated those DX-23 --

THE COURT: Okay.

MR. BRYANT: -- and pulled them from DX-6C, and those pages are DEF 0978 through 0979, DEF 1093, and DEF 1101 through 1104.

(The document referred to was marked for identification as Defendant's Exhibit 23.)

THE COURT: Okay.

MR. BRYANT: I move their admission as DX-23,

Your Honor.

THE COURT: All right. And, Mr. Horowitz, have you had a chance to look at these?

MR. HOROWITZ: I have no objection, but I would like an opportunity just to review them before they go in.

THE COURT: Well, go ahead and take a look now, because now's your time.

MR. HOROWITZ: Yes. (Perusing document.) It's fine.

THE COURT: All right.

(The document referred to, having been previously marked for identification as Defendant's Exhibit 23, was received in evidence.)

THE COURT: So then you've got a copy for the reporter.

MR. BRYANT: We've done that, Your Honor.

THE COURT: All right. And I guess on the other one -- on the other exhibit that we did this on, did we make multiple copies, Mr. Bryant, or not?

MR. BRYANT: We did, Your Honor.

THE COURT: All right. But we don't have multiple ones of this, or you do?

MR. BRYANT: I do not have multiple copies of

this. No.

THE COURT: All right. Let's do this. One more time read those pages into the record, please.

MR. BRYANT: Yes, Your Honor. DX-23 refers DEF 0978 through DEF 0979, and DEF 1093, and DEF 1101 through 1104.

THE COURT: All right. Do you have then a copy of this that you'll be able to retain once you give the one that you have to the reporter?

MR. BRYANT: Let me see if I have marked this up, Your Honor. (Perusing document.) This one has been highlighted.

THE COURT: Does she have one --

MR. BRYANT: I've given it to her already.

THE COURT: Okay. She's got one. I'm just making sure you have a copy of something that looks like the exhibit.

MR. BRYANT: Oh, yes.

THE COURT: All right. Because what I need you to do is to file, when you get back to Washington, five more copies of this. Well, actually you don't need to do five. To be specific, you just need to do two more.

MR. BRYANT: Of just that --

THE COURT: Just that exhibit, so that I can complete the other binders that we're going to be using in

chambers.

MR. BRYANT: Yes, Your Honor. One final. The remaining DX-6B and what is left of DX-6C, excluding these we just removed from that, we'd move their admission for the purposes we've already discussed, in terms of Dr. Mills relying on those.

THE COURT: All right. For reliance purposes only, understanding that.

MR. BRYANT: Yes, Your Honor.

THE COURT: And, Mr. Horowitz?

MR. HOROWITZ: Reliance purposes only.

THE COURT: All right. Then those are admitted for that purpose alone, so basically indicating what he looked at, but that's the way they're coming in.

MR. BRYANT: Yes, Your Honor.

THE COURT: All right.

(The documents referred to, having been previously marked for identification as Defendant's Exhibits 6B and 6C, were received in evidence.)

THE COURT: Anything else, Mr. Bryant?

MR. BRYANT: That's all, Your Honor.

THE COURT: Rebuttal case, Mr. Horowitz?

MR. HOROWITZ: No rebuttal witness.

THE COURT: All right. Then let's talk about where we're going to go from here. As I mentioned to you at the pretrial conference, we are going to do post-trial briefing here. Timing-wise, the way that's going to work is this: When the transcript is filed in the case, I will issue an order closing proof, and at that point, we'll issue an order establishing the briefing schedule for these post-trial briefs.

There are going to be two of them. They're going to be filed simultaneously. So 45 days after I close proof would be the due date for the opening post-trial briefs. Thirty days after that date would be the date for simultaneously filed post-trial reply briefs. I can't tell you any more about what those dates are, because it depends when the transcript arrives.

And so those two sets of briefs will be filed. At that point then, I will determine actually whether we need closing argument. If we have a closing argument in that circumstance, you should expect it will take sort of two forms, because it won't just merely be you making a closing statement. I will be asking questions, and effectively, it will be sort of one part closing argument, another part oral argument, so I can ask you about things I see in your post-trial briefs.

We'll do that telephonically if we do it, so

that, Mr. Horowitz, there will be no need for you to have to come to Washington or anyplace else to do that. We can do that on the telephone. And we can make arrangements if Ms. Elk wants to listen to that, and for that matter, agency counsel, in your case, Mr. Bryant, as well.

Now, let's talk a little bit about the post-trial briefs themselves. The essence of those briefs is relatively straightforward. You synthesize the facts. You synthesize the law. You apply the law to the facts. All right.

But basically what that means is I need you to take the things that you looked at from a pretrial standpoint and now deal with the evidence that has actually been produced and be able to essentially present to me a factual summary that you think is supported by the evidence and then take it the next step in terms of applying the law and determining where we come out here.

In terms of the law, remember what I told you at the pretrial conference, and I want you definitely to do this in the post-trial briefs. I need additional briefing here that I think -- that would provide me more guidance in terms of what the legal standard is that I should be using in determining whether damages are applicable here, and if so, what their amount should be. There was materials in the pretrial briefs dealing with things like tort cases and the

like. What I need you to do, though, is to give me some indication as to why those things are relevant from a legal standpoint.

In other words, I know quite well that we're going to be able find analogs out there, so one would be tort cases obviously. Another one that you might want to take a look at in particular would be Federal Tort Claims Act cases. It's conceivable that perhaps those cases would provide some indication as to what to do here as well.

I can tell you that in that context, while there generally are not cases involving actual sexual assaults, because of the fact that assaults are excluded from the Federal Tort Claims Act, there are cases out there apparently that deal with the production of emotional distress as a result of those types of activities, and I know that I've seen, just in doing some preliminary research, some circuit cases involving that, so I would commend you to take a look and see what you'd find in that regard.

The main thing I think you need to do, though, is to go back, starting with the Treaty and work your way to those cases. In other words, I need to know why these particular bodies of law provide the reference point for deciding what damages, if any, are appropriate here, so don't just start by describing tort regime, for example, and

not explain to me why it is I have to apply that tort regime as opposed to some other tort regime.

It's particularly important, because if we're going to start applying tort regimes, the first question that's going to come up is which one, all right, because citing me a case from Florida is not necessarily going to be very probative if, in fact, the law I should be applying is that which is applicable in South Dakota.

And I'm not saying it is, but I'm just saying that one of the things with tort regime is that there's variation from state to state, and so if you're going to be pointing me to a tort regime, you're going to need to provide me some indication as to why you think that that would be the one that is controlling.

It very well could be South Dakota, the notion being that in applying the Treaty, you would look to the law of the state, but I don't know that. I'm just suggesting that I need some careful research on that point and see what there is, and it may be that this is not exactly a question you're going to go out and find 27 cases on point, and if that's the case, just do your best job in terms of making arguments as to how you think this should be resolved as a matter of first impression, and then we'll resolve it.

There's a couple other issues I want to make sure come up in the context of those post-trial briefs, so

certainly I want you to spend some time dealing with these expert reports, and in particular, it's going to become critical -- and I really didn't want you to explore this with the experts, because I don't think that's the appropriate time, but expert opinions, of course, are only as valid as the facts or premises upon which they're based, so you, in particular, need to spend some time dealing with factual premises and assumptions that underlie those reports and being able to corroborate them.

For you to be able to rely on the end result of the report, you're going to have to show me that the facts that that person assumed, in fact, have been proven and are correct, prove or at least are stipulated. All right. So don't overlook that.

The last issue that I really want some briefing on, because the issue has been nagging at me, and I just want your views on this, is whether or not any adverse inference can be drawn by the fact that Sergeant Kopf did not appear. It's not clear to me that it can, and it's not clear to me that it can't, so I want you to address that issue in the post-trial briefs.

It may be that the process that was employed here would mean that there would not be an adverse inference, but I don't know that one way or the other, and I want to know the answer to that question. All right. So the fact that

he didn't appear and whatever the circumstances were surrounding it, I need to understand how the law would view that, and whether or not that provides any basis for rendering fact-findings here.

So pretty much that's the main things we're talking about from a legal standpoint, but again, I need you to synthesize the facts with the law, so it's not a matter of just setting them both out. You need to come to some bottom-line conclusions in terms of where you think I should go here.

So the briefs are due -- that's, again, simultaneous opening briefs, and then your reply briefs would be designed to allow you both to respond to each other's opening briefs.

Any questions about how we're going to proceed? Mr. Horowitz?

MR. HOROWITZ: No questions.

THE COURT: Any questions, Mr. Bryant?

MR. BRYANT: No questions. I have one housekeeping question when we're done with this.

THE COURT: Sure. Go ahead. I just want to verify that, okay, two copies of DX-23 you want filed and then our motion for the impeachment witness this morning. Is there anything else you would like us to file?

THE COURT: No. File that. I want to make sure

the record clearly reflects that you made the proffer and the motion and that I denied it. The explanation is that I can tell you it likely will show up in an opinion in this case, but I want you to not just preserve this in terms of the transcript but actually get it up onto the docket of the Court, and I think that's the best way to do that, so just when you get back to Washington, electronically file that.

You probably would expect then very quickly basically to have me indicate that I had previously denied it, and, you know, at that point, any explanation of rationale, as I indicated, will be in the final opinion in the case.

And beyond that, you're quite correct. The two copies of the other exhibit will just put in the position -- because the original reporter copy stays in the clerk's office, and while we could look up those pages, I'd much rather have a composite exhibit that would be in the exhibit books that we can use when it comes time to do fact-findings here.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. Any other questions, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: All right. Then so next thing that you see from me will be that order closing proof, shortly

followed by the schedule, and then we'll see what we're going to do with closing/oral argument here.

All right. We are concluded.

(Whereupon, at 2:30 p.m., the trial in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

REPORTER'S CERTIFICATE

DOCKET NUMBER: 05-186L

CASE TITLE: Lavetta Elk v. USA

DATE: April 30, 2008

LOCATION: Rapid City, South Dakota

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 5/19/2008

Carol Dawley
Official Reporter
Heritage Reporting Corporation
1220 L Street, N.W.
Washington, D.C. 20005