**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(E-Filed August 1, 2008)

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-186L |
| v. | ) | Judge Francis M. Allegra |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

STEVEN D. BRYANT
SARA E. COSTELLO
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424 (phone)
(202) 305-0267 (fax)
steven.bryant@usdoj.gov

Of Counsel:

Major Lanny Acosta
U.S. Army Litigation Division

Sharon Pudwill
Department of Interior

**TABLE OF CONTENTS**

I. Summary of Facts ..... 1

A. Plaintiff's Friendship with Kopf ..... 1

B. Plaintiff's Application and Disqualification from Army Enlistment ..... 2

C. Plaintiff's Trial Testimony Concerning the Assault is Unsupported by the Record ..... 3

D. Plaintiff's Limited Mental Health Treatment is Inconsistent with Her Claims of Ongoing Emotional Trauma ..... 7

E. Plaintiff has Experienced Emotional Trauma Outside of the Assault Which She Attempts to Minimize ..... 8

F. Dr. Manlove's Opinions ..... 9

G. Frankenfeld's Opinions Concerning Damages ..... 13

H. Dr. Mills's Opinions ..... 14

II. Legal Standards for Assessing Liability and Damages ..... 20

A. The "Bad Men" Clause Provides Certain Relevant Requirements for Assessing Liability and Damages ..... 20

1. Historical Context of "Bad Men" Clauses ..... 21

2. The Plain Language of the Treaty Must be Examined ..... 22

3. Plaintiff Must Provide Proof of Her Damages ..... 23

4. The Treaty Does Not Encompass Plaintiff's Alleged Injuries ..... 24

B. Plaintiff is Not Entitled to Speculative and Uncertain Damages ..... 26

C. Tort Law May Provide Guidance in This Matter ..... 27

1. It is Appropriate for the Court to Consider Tort Law ..... 27

2. Damage Awards in Similar Cases May Provide Guidance ..................... 28

a. Damage Awards in Sexual Assault Cases in the District of South Dakota .................................................................... 28

b. Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, Cases May be Considered. .......................................................... 31

3. Other Related Tort Cases May be Considered ........................................ 31

D. The Jury Verdict Method Should Not be Utilized .............................................. 34

E. An Adverse Inference Should Not be Drawn .................................................... 36

III. Plaintiff is Not Entitled to the Damages She Seeks ....................................................... 38

IV. Conclusion ................................................................................................................ 44

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Andrews v. United States*,
548 F. Supp. 603 (1982) .................... 33

*Barlow v. United States*,
51 Fed. Cl. 380 (2002) .................... 28

*Big Owl v. United States*,
961 F. Supp. 1304 (1997) .................... 32

*Boston Edison Co. v. U.S.*,
80 Fed. Cl. 468 (2008) .................... 28

*Carey v. Piphus*,
435 U.S. 247 (1978) .................... 24

*Carolina Power & Light Co. v. United States*,
82 Fed. Cl. 23 (2008) .................... 26

*Cook v. United States*,
32 Fed. Cl. 170 (1994), *aff'd*, 86 F.3d 1095 (1996) .................... 22

*Choctaw nation of Indians vs. United States*,
318 U.S. 423 (1942) ....................26

*Cosmo Const. Co. v. United States*,
196 Ct. Cl. 463 (1971) .................... 23

*Cusati v. Sec'y of HHS*,
2005 WL 4983872 (2005) .................... 28

*Dawco Const., Inc. v. United States*,
930 F.2d 872 (1991) .................... 35, 36

*Doe v. United States*,
976 F.2d 1071 (1992) .................... 33

*Friend v. United States and the Comanche Indians*,
29 Ct. Cl. 425, 1800 WL 1867 .................... 24, 38

*Garreaux v. U.S.*,
77 Fed. Cl. 726 (2007) .................... 26

*Gila River Pima-Maricopa Indian Community v. United States*,
199 Ct. Cl. 586 (1972) ........................................................................................ 22

*Glenn v. Copeland*,
2006 WL 1662921 (2006) .................................................................................. 23

*Graves v. United States*,
150 U.S. 118 (1893) ........................................................................................... 36

*Grumman Aerospace Corp. v. Wayne*,
497 F.3d 1350 (2007) ......................................................................................... 35

*Hansen v. United States*,
65 Fed. Cl. 76 (2005) ......................................................................................... 27

*Herbert v. Wal-Mart Stores, Inc.*,
911 F.2d 1044 (1990) ......................................................................................... 37

*Herrera vs. United States*,
39 Fed Cl. 419 (1997).........................................................................................26

*Indiana Michigan Power Co. vs. United States*,
422 F.3d 1369 ..................................................................................................... 26

*Jennings v. Rivers*,
394 F.3d 850 (2005) ........................................................................................... 23

*Joseph Pickard's Sons Co. v. United States*,
532 F.2d 739 (1976) ........................................................................................... 36

*Land v. United States*,
35 Fed. Cl. 345 (1996), *aff'd*, 37 Fed. Cl. 231 (1997) ....................................... 28

*Locke v. United States*,
215 F. Supp. 2d 1033 (2002) .............................................................................. 31

*Lord v. Hy-Vee Food Stores*,
720 N.W. 2d 443 (2006) ..................................................................................... 27

*Luria Bros. & Co. v. United States*,
177 Ct. Cl. 676 (1966) ........................................................................................ 36

*NavCom Defense Electronics, Inc. v. England*,
53 Fed. Appx. 897 (2002) ................................................................................... 35

*North Star Alaska Housing Corp. v. U.S.*,
76 Fed. Cl. 158 (2007) .......... 35

*Northern Paiute Nation v. United States*,
8 Cl. Ct. 639 (1986) .......... 26

*Puritan Associates v. United States*,
215 Ct. Cl. 976 (1977) .......... 23

*Raytheon Co. v. White*,
305 F.3d 1354 (2002) .......... 35

*Reese v. United States*,
28 Fed. Cl. 702 (1993) .......... 27

*Richardson v. East River Elec. Power Coop., Inc.*,
531 N.W.2d 23 (1995) .......... 32

*Richmond Am. Homes of Colo., Inc. v. United States*,
75 Fed. Cl. 376 (2007) .......... 28

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557 (1997) .......... 26

*Sheesley v. The Cessna Aircraft Co.*,
2006 WL 1084103 (2006) .......... 27

*Simmons v. United States*,
805 F.2d 1363 (1986) .......... 33

*St. John v. United States*,
240 F.3d 671 (2001) .......... 31

*Stockton East Water Dist. v. United States*,
76 Fed. Cl. 497 (2007) .......... 37

*Swope v. United States and the Comanche and Kiowa Indians*,
33 Ct. Cl. 223, 1800 WL 2041 .......... 25

*Tucker v. Secretary of Dept. of Health and Human Services*,
1990 WL 293879 (1990) .......... 26

**FEDERAL STATUTES**

15 Stat. 581 .......... 24

15 Stat. 635 .......... 23, 38

28 U.S.C. § 1346(b) .......... 28

28 U.S.C. § 2671 .......... 31

42 U.S.C. § 1983 .......... 24, 33

**FEDERAL RULES**

RCFC 45(b)(2) .......... 37

**DEFENDANT'S POST-TRIAL BRIEF**

Defendant, the United States of America, hereby files its Post-trial Brief pursuant to this Court's order and RCFC, Appendix A, ¶ 19. In this case, Plaintiff brings suit against Defendant for compensation under the "Bad Men" clause of the Treaty with the Sioux of April 29, 1868, based on being sexually assaulted, on January 7, 2003, by United States Army Staff Sergeant Joseph P. Kopf. Plaintiff seeks damages in the amount of $100 million for claimed emotional and psychological injuries allegedly sustained as a direct and proximate result of this incident, plus attorneys fees and costs. However, Plaintiff failed to prove that she has sustained losses that would entitle her to reimbursement under the Treaty.

## I. Summary of Facts

### A. Plaintiff's Friendship with Kopf

Plaintiff is a member of the Oglala Sioux Tribe living on the Pine Ridge Indian Reservation in South Dakota. Joint Exhibit ("JX") 5 at ¶ 1. Plaintiff requested information about joining the United States Army, which Sergeant Joseph Kopf, a recruiter, provided. JX 5 at ¶s 4-5. Kopf and Plaintiff spoke throughout her junior and senior years in person and over the phone. JX 5 at ¶ 6. The two became friends, discussing personal issues, in addition to military service. JX 5 at ¶ 7. Despite Plaintiff's claims to the contrary, the evidence suggested that Kopf was romantically interested in her, given that he asked her out on dates and gave her a flower. Record of Trial ("RT") 106-07.

Plaintiff graduated from high school and in August 2002 moved to Kansas City, Missouri for college. JX 5 at ¶s 2, 8. Plaintiff gave Kopf her phone number and address (RT 108), and their friendship continued over the phone and by email. JX 5 at ¶ 9; RT 113. They discussed

personal issues, such as Kopf's family and his wife's infidelity. RT 109. Kopf sent Plaintiff a letter stating "South Dakota misses you." RT 111.

In September 2002, Plaintiff's grandfather[1] died. JX 5 at ¶ 10. Plaintiff was very sad and contacted Kopf because it helped to talk to him. RT 112-13. Plaintiff returned home to grieve with her family, and attend her grandfather's funeral. JX 5 at ¶ 11. Kopf called everyday that week to see how she was doing. *Id*.

**B. Plaintiff's Application and Disqualification from Army Enlistment**

Plaintiff testified that Kopf informed her that the medical field in the Army was available. JX 5 at ¶ 12; RT 114. Despite completing less than two months of her first semester in college and having not yet been accepted into the Army, Plaintiff quit college in late September to apply for an enlisted Army medic position. JX 5 at ¶ 8; RT 114-15, 117-18.

On December 17, 2002, Kopf drove Plaintiff to the Sioux Falls Military Entrance Processing Station ("MEPS") for an examination as part of the application process. JX 5 at ¶ 14. Plaintiff completed a form documenting her medical history for the examination. JX 3 at DEF 289; RT 128. Plaintiff was aware that the form was part of her application and was a serious matter requiring her to be honest and completely forthcoming. RT 128. However, Plaintiff failed to identify a series of four hospital visits (*see infra*, pp 9-10) for psychological treatment between February and April, 2002. JX 3 at DEF 289; RT 129-30. Plaintiff attempted to explain the omission as a mental lapse. RT 129, 131, 136. It strains credulity that Plaintiff failed to remember four visits earlier that year, but could recall a counseling session at Pine

[1] The relative was actually a great-uncle; however, plaintiff referred to him as a grandfather because of their close relationship. RT 112-14.

Ridge Hospital for "family problems" in May 1999, three and one-half years earlier, which she reported on the form. JX 3 at DEF 289; RT 129-30.

Plaintiff claimed that Kopf informed her that she was accepted into the Army at the end of the MEPS examination, but her entry would be delayed because the medical field was temporarily unavailable. RT 82-83. Plaintiff received no documentation supporting this contention. RT 82. Additionally, Plaintiff did not meet the Army's height weight regulatory requirements, or alternative percentage body fat standards. JX 5 at ¶ 15. Plaintiff claims she was not informed that she was disqualified. RT 125. However, Plaintiff signed and dated Department of Army Form 2808, Report of Medical Examination ("MEPS Form") in block 75, which reads: "I have been advised of my disqualifying condition." JX 3 at DEF285; RT 126. Further, block 75 is checked stating Plaintiff "is not qualified for service." Finally, block 76 of the MEPS form signed by Plaintiff, reads: "Significant or Disqualifying Defects" and was completed as follows: "Item number 54 Medical Condition diagnosis, overweight." *Id.*

### C. Plaintiff's Trial Testimony Concerning the Assault is Unsupported by the Record

A few weeks later on January 7, 2003, Kopf visited Plaintiff's home. JX 5 ¶ 16. Plaintiff claimed that the visit was unannounced.[2] RT 81. Plaintiff testified that she departed with Kopf after he informed her that her "paperwork had been lost again" and she needed to return to the MEPS in Sioux Falls for another height and weight evaluation. RT 81.

Kopf drove to a remote part of the reservation and parked behind a hill. JX 5 ¶ 16. There he indecently assaulted Plaintiff by kissing her and touching her breasts. JX 5 ¶ 17. After

---

[2] Plaintiff's Aunt Noretta High Hawk testified in her deposition that the visit was expected, and that she intended to visit with Plaintiff early in the morning of January 7, 2003 to see Plaintiff off. RT 248-51. At trial Ms. High Hawk reversed her sworn deposition testimony. RT 243-44. She claimed that she recalled this alleged mistake in her deposition approximately six months later while reading a magazine. RT 246-47.

leaving the location of the assault they stopped at a convenience store, before Kopf dropped Plaintiff off at her cousin's house. JX 5 ¶ 18.

At trial, Plaintiff claimed that Kopf "tried to rape her." RT 85. Plaintiff said she was "terrified" (RT154) during the assault, describing her fear as a "10" on a 1 to 10 scale with 1 being "totally unafraid" and 10 being "totally frightened." RT 144. Plaintiff claimed that Kopf – a friend – asked her "if somebody hid a body out there, would anybody find it." Plaintiff averred that she perceived this alleged statement as a death threat. RT 143-44. For the first time, Plaintiff estimated that the assault lasted "at least thirty minutes" and that she cried throughout the assault. RT 87, 143, 151.

Plaintiff's version of the assault at trial – more than five years later – portrayed a different picture than her two contemporaneous official written statements and interview with the criminal investigator. Plaintiff's official statements and interview do not describe an attempted rape where she feared for her life. Additionally, Kopf and Plaintiff had been friends for over two years and looked to each other for emotional support. That type of relationship is inconsistent with the threats and fears Plaintiff asserted at trial.

Within hours of the assault, Plaintiff made a written statement to an Oglala Public Safety Officer. DX 18, RT 155-63. Plaintiff did not allege that Kopf tried to rape her or how long the assault lasted. DX18. Plaintiff did not report that she was afraid or crying or that Kopf made a threat or that she perceived one. RT 157; DX18. There was no mention of the hidden body threat Plaintiff asserted at trial. RT 157; DX 18. Rather, Plaintiff reported he asked about her family and college. DX 18 DEF96. Plaintiff stated that Kopf said she was "cute," he "liked," her and wanted to "take care of" her between his attempts to kiss that Plaintiff resisted. *Id.*

Plaintiff reported that she "kept pushing him away. Pretty soon he stopped [and] I was asking him where he needed to go [and] suggested that we go. We started back to Manderson." *Id.*

The afternoon of the assault Bureau of Indian Affairs investigator (and now FBI special agent (RT532)) Robert Bennett interviewed Plaintiff for approximately 45 minutes at the Kyle Police Department. RT 156, 537, 539. Agent Bennet described Plaintiff as calm and responsive to his questions. RT 538-39. Agent Bennett documented the interview in a BIA incident report, detailing Plaintiff's account of the assault. RT 544-45; DX11. Agent Bennett examined Plaintiff for any bruises, red marks, or other evidence of injuries, but found none. RT 538; DX 11 DEF91, 95. Agent Bennett testified that had he discovered any injuries he would have photographed them and documented them in the report. RT 539-40. As of that point in his career, Agent Bennett had interviewed approximately 40 sexual assault victims. RT 535-36. As was his standard practice (RT 548), Agent Bennett asked if Kopf threatened her with physical harm and she responded that he did not. RT 548-49. Further, Agent Bennett's BIA report did not reflect any threat of "hiding a body" as Plaintiff asserted at trial. DX 11. Agent Bennett also asked Plaintiff how scared she was, on a 1 to 10 fear scale with 1 being "completely unafraid" and 10 being "completely afraid." RT 541-42; DX 11 DEF94. Plaintiff quantified her fear as about a "6," which was documented in the BIA report, in contrast to her trial testimony that her fear was a "10." RT 542, 144; DX 11 DEF94.

Plaintiff implausibly asserted that Agent Bennett was either lying or mistaken because she claims she is <u>certain</u> he did not ask that question. RT 176. This unsupported explanation calls Plaintiff's credibility into question. Plaintiff produced no evidence that Agent Bennett, a Sioux criminal investigator, had any motivation to lie about an assault victim's fear, nor is there any basis to infer that he mistakenly reported the question and her response in his report.

Agent Bennett asked Plaintiff what was said during the assault. RT 542. Agent Bennett testified that Plaintiff told Kopf to stop. RT 542. Plaintiff described telling Kopf that what he was doing was "illegal" and Kopf making light of it by stating that he does a lot of illegal things. RT 542; DX 11 DEF94.

Plaintiff prepared her only other written statement the next day, January 8, 2003. RT 163-64. This statement also does not contain many of the more flagrant allegations Plaintiff raised at trial. Plaintiff did not mention that she cried or how long the assault lasted. RT 164. In contrast to Plaintiff's testimony that she was "totally frightened" or "terrified," there was no mention at all of fear. RT 164-65. Instead, Plaintiff described herself as "really uncomfortable" in response to Kopf's romantic overtures: "he started talking about how [Plaintiff] was cute and how he liked [her] ... and soon he leaned in and tried to kiss [her]." RT 165. Kopf stated that "he was going to take care of [Plaintiff]." RT 165.

In this statement, Plaintiff described "pushing [Kopf] away and he kept asking [her] what was wrong." *Id.* Plaintiff reported that Kopf kissed or attempted to kiss her, and Plaintiff pushed him away or turned her head so he could not kiss her. RT 165-66. Plaintiff added that Kopf tried to unbutton her pants and rubbed her pants. Plaintiff reported that she repeatedly pushed Kopf and he finally stopped. RT 166. Plaintiff's written statement further elaborated on their conversation during the assault:

> I told him I wanted to go, and I was asking him where he needed to go. He told me he cancelled all morning appointments so we could be together. I was telling him that what he was doing was illegal, and he asked how. I told him because he was married, he had kids, he was older than me, and that he was my recruiter. He said it didn't matter because he does a lot of illegal things. RT 166-67.

Plaintiff reported that she felt "uncomfortable with Kopf and suggested [they] go." Kopf complied with her request and they drove back to Manderson. RT 167.

On the return to Manderson, Kopf stopped at a convenience store at Plaintiff's request. RT 167; JX 5 at ¶ 18. There was an employee in the store, and at least three ("more than two") customers. RT 168-69. Plaintiff entered the restroom and locked the door. RT 168. Plaintiff recognized that she could have remained in the bathroom. *Id.* Instead, Plaintiff unlocked the door and walked back into the common area.[3] RT 168. Plaintiff did not seek help from the clerk or customers, nor did she tell Kopf that she wanted to stay. RT 168-69. Rather, they returned to the car and she asked him to drive her to her cousin's house, which he did. RT 169-70.

Kopf was punished for the sexual assault on August 8, 2003, in nonjudicial criminal proceedings, Art. 15, Uniform Code of Military Justice. JX 1, DEF373-76. Kopf was found to have violated Art. 134, by kissing Plaintiff and touching her breasts against her will. JX 5 ¶ 21. Kopf was reduced in rank, lost military pay, and was removed from recruiting duties. *Id*. at ¶ 22.

### D. Plaintiff's Limited Mental Health Treatment is Inconsistent with Her Claims of Ongoing Emotional Trauma

Plaintiff asserted that she had difficulty eating and sleeping and was too scared to go anywhere for the first few weeks after the assault. RT 91-92. Plaintiff further alleges that she is still experiencing depression, anxiety, and insomnia, and claims she wants to continue therapy. RT 96-97. This assertion is inconsistent with her failure to seek ongoing treatment. Indeed, Plaintiff was treated less than five times (RT 192) by mental health professionals in the five years since the assault: once or twice at Kyle Mental Health (RT 92-93, 190-91; DX 13), and Pine Ridge Mental Health (RT 92-93, 191-92; DX 13, DEF519). Plaintiff's failure to seek further professional medical treatment is inexplicable if she is truly suffering as she claims,

---

[3] Plaintiff alleged that she vomited in the bathroom. RT 170. Plaintiff had been sick (vomiting and diarrhea) for several days, requiring treatment at a hospital. RT 170-71; JX 2, DEF 37.

given that these services are available at no cost. RT 193. Plaintiff has never spent any money on medication, treatment, or psychological counseling related to the assault. JX 5 ¶ 27.

Plaintiff attended Cangleska, a women's support group, for three or four months after the assault. RT 93, 192-93; DX 13, DEF 519. Plaintiff admitted waiting until 2006, more than three years after the incident, to meet with her medicine man (RT177; DX 13), and her uncle who is a minister (RT92-93, 188-89; DX 13).

### E. Plaintiff has Experienced Emotional Trauma Outside of the Assault Which She Attempts to Minimize

Aside from the assault, Plaintiff has suffered emotionally from other traumatic events, which she attempted to minimize. Plaintiff testified to a series of miscarriages beginning in October 2003 that caused sadness and made her feel like a failure. RT 204-06. One of the miscarriages was a stillborn son, followed by a burial service attended by the family and their minister. RT 284-85. Plaintiff's mother testified that the family was "devastated." *Id.* Plaintiff's Aunt Noretta High Hawk observed that Plaintiff was sad, depressed, and lost sleep as a result of the miscarriages. RT 241, 243. Plaintiff's aunt also testified regarding the deaths of close family members. She reported that three of Plaintiff's grandparents died and a friend of hers committed suicide (JX 5 ¶ 13), which all caused her to be sad and depressed.[4] RT 240.

Additionally, nearly a year before the assault Plaintiff sought mental health treatment four times from February 28 to April 26, 2002. DX 23, DEF1101-04. The medical records reflect that Plaintiff had depressive disorder and sought and was prescribed antidepressant medication resulting, in part, from the death of two sponsors and the end of a four-year relationship with a boyfriend. DX 23 DEF 1103-04. At trial, Plaintiff attempted to characterize

---

[4] A medical record indicated that this was a "boyfriend." DX 23, DEF1093. Plaintiff, however, asserted that there was no romantic interest, that he was a "male friend." RT 138.

her psychological problems in 2002 as temporary (*i.e.* did not "dr[a]g out") "sadness" rather than ongoing depression, but the medical records refute that claim. RT 67-68, 133-34, 137, 140.

The February 28, 2002 medical record stated that Plaintiff had "ongoing depression for one year [and] want[ed] counseling to cope with losses." RT 131; DX 23, DEF1104 (emphasis added). The April 11, 2002 medical record stated that Plaintiff "has been feeling depressed and anxious with symptoms that are becoming worse." RT 133; DX23, DEF 1103 (emphasis added). The April 17 medical record indicated that Plaintiff "wants appointment with Dr. Wortel and wants med[ication] for depression." RT 135; DX23, DEF 1102 (emphasis added). Plaintiff averred that a teacher that accompanied her to the hospital convinced her to seek prescription medication. RT 136. However, Plaintiff admitted informing the teacher that "she had been depressed for two months with mood swings and feelings of hopelessness." RT 136. Plaintiff's denials at trial of the nature and extent of her prior psychological problems are simply implausible in light of the testimony of her mother and aunt and the series of treatment she received, including requesting medication. Her testimony further undermines her credibility.

Though unrelated to the assault, another example of Plaintiff's lack of credibility was her ability to hide her marriage from her parents for nearly three years and her attempts to explain it at trial. Plaintiff met her husband in December 2003 and they were married in January 2004. RT 101. The couple and their children have lived with Plaintiff's parents for over two years. RT 101-02. Despite this daily interaction, Plaintiff concealed her marriage from her parents until December 2006 when it was revealed during the depositions. RT 102-03. When pressed about hiding this information for nearly three years, Plaintiff reversed course, stating that she was certain she informed her mother in May 2004. RT 103. Plaintiff's mother contradicted her, admitting that she did not learn of the marriage until after the depositions. RT 287.

**F. Dr. Manlove's Opinions**

At trial, Plaintiff called Dr. Stephen Manlove, a board certified psychiatrist, to testify on her behalf. Dr. Manlove has never published a peer reviewed article concerning psychiatry, or served as a reviewer, or taught at a university. RT 353, 356. Dr. Manlove opined about alleged psychological injuries and damages arising from the assault as reflected in his report. RT 300-01; PX 8. Dr. Manlove asserted that Plaintiff experienced post-traumatic stress disorder ("PTSD") and major depression. RT 303. Dr. Manlove said he based his opinions on his three interviews with Plaintiff, various deposition transcripts, legal briefs, Dr. Mark Mills's expert reports, the Minnesota Multiphasic Personality Inventory II ("MMPI") administered to Plaintiff, and "the cultural situation on the reservation." RT 301-02. Dr. Manlove testified that PTSD is characterized by: (1) exposure to an extreme traumatic stressor, involving actual or threatened death or serious injury, or other threat to one's physical integrity, and (2) extreme fear, helplessness, or horror. RT 303.

Dr. Manlove said he attempted to consider other negative events in Plaintiff's life in reaching his opinions, including the deaths of grandparents (great uncles or aunts), miscarriages, her weight issues with respect to entering the military, her difficulty obtaining a job, and periodic marital problems. RT 321-22. Dr. Manlove characterized these stressors as normal life events that most people resolve over a fairly short period of time, rather than experiencing PTSD.

Dr. Manlove admitted that his opinions were predicated on Plaintiff's accuracy and truthfulness, and noted that forensic psychiatry requires one to scrutinize the individual's allegations: "If I found out [Plaintiff] lied to me ... I would revise my opinion, if I had evidence that she lied to me." RT 351, 360, 363. Dr. Manlove acknowledged that significant inconsistencies between the documentary evidence and Plaintiff's interviews and testimony

would raise concern. RT 366. Dr. Manlove noted that one of the MMPI's purposes is to measure whether Plaintiff was exaggerating or distorting her symptoms. RT 364.

With regard to Plaintiff's psychological history, there were notable omissions. Plaintiff did not inform Dr. Manlove about her series of treatments at Pine Ridge in early 2002 despite specific inquiries whether she had any other psychiatric or psychological care. RT 361, 377-78. Dr. Manlove acknowledged that it is possible that pre-assault depression could have contributed to her sadness after the assault because people with depression in the past are more prone to it in the future. RT 401-02. Plaintiff also omitted any mention of the burial service for her stillborn son, and the resulting emotional trauma. RT 373-74.

Regarding the assault, Dr. Manlove failed to thoroughly review the BIA incident report. Dr. Manlove was unaware that Plaintiff assessed her fear as a 6 on a scale of 1 to 10 in an interview the day of the assault. RT 408. After being pressed on cross examination, Dr. Manlove agreed that a 6 was in the "middle area" of the scale between "totally unafraid" and "extremely frightened." RT 408-10. Dr. Manlove acknowledged that a 6 "weigh[s] against" his assessment of extreme fear reflected in his report. RT 408. Dr. Manlove admitted that if Plaintiff were not "extremely frightened" as he opined in his report then Plaintiff would not meet the standards for a PTSD diagnosis. RT 413-14.

Dr. Manlove also admitted on cross examination that had Plaintiff informed him that the assault lasted 30 minutes as she claimed at trial that he would have considered that significant and documented it in his report. RT 396-97. That information was not in his report or his interview notes, demonstrating that Plaintiff did not make such an allegation during their interviews. RT 396-97, 400. Additionally, Plaintiff's T- score on the MMPI was so high on the

F - scale – the scale that identifies, among other potential explanations, a test-taker’s truthfulness – that it invalidated the test. RT 339-40, 422-23; DX 20, DEF 3154.

Concerning the MMPI, Dr. Manlove acknowledged that it is the most widely analyzed and validated psychological test in the world, and is a good tool for forming a hypotheses concerning the reliability of the test-taker. RT 370-71. Dr. Manlove testified that Plaintiff’s score on the F-scale – 120 – was exceedingly unusual and does not recall ever seeing a score that high. *Id.* In fact, a 120 is the highest score possible for the validity pattern. DX 20, DEF 3154. High scores on the F - scale indicate a wide variety of rare symptoms and attitudes. RT 422-23. Dr. Manlove admitted on cross examination that one explanation that should have been considered is that Plaintiff was lying about her psychological problems. RT 422-25. However, Dr. Manlove did not discuss this possibility in his report. RT 424-25. He attempted to divert responsibility for this weakness in his analysis to the psychologist he had administer the test: “I was following the lead of the psychologist.” RT 425. Dr. Manlove claims that he defers to the psychologist rather than making his own independent determination, but “At this point, I guess I’m questioning that, after looking at it more.” RT 425.

Dr. Manlove also opined that “known abductions and assaults” in remote areas of the reservation over the years are important for the background of this case. RT 316-17. Dr. Manlove suggested that Native Americans have a cultural sensitivity to abductions. He claimed that there were five well known abductions in the last ten years. RT 379. However, he only named one, and it involved several Native American men abducting a Caucasian man. RT 382. Dr. Manlove also referred to a case where a Caucasian man abducted a Caucasian woman in his trunk. Neither of these cases involves a factual scenario analogous to the present case.

Dr. Manlove opined on Plaintiff's employability. He recognized that Plaintiff can focus as evidenced by her responsiveness during three interviews. RT 328. Nevertheless, he claimed that Plaintiff would have difficulty working. RT 328-29. Dr. Manlove, however, acknowledged that he is not a vocational expert. RT 328, 352-53. He is familiar with vocational experts and believes that they identify jobs for the physically or mentally disabled. RT 353.

Finally, Dr. Manlove noted that the average time for PTSD symptoms is "much, much less than four years." RT 337. He opined that he would expect Plaintiff to have significant improvement with three years of weekly psychotherapy and medication. RT 336.

**G. Frankenfeld's Opinions Concerning Damages**

Plaintiff called Donald Frankenfeld to opine about alleged damages. Frankenfeld assumed that Plaintiff had a different earning capacity before and after the assault based on Dr. Manlove's opinions. RT 446-447. Frankenfeld's assumed Plaintiff's pre-assault career was that of a military professional,[5] or alternatively, a college graduate. *Id.* Frankenfeld assumed Plaintiff's post-assault earning capacity was the hourly wage position she held at the time he interviewed her. RT 446, 454. Frankenfeld prepared graphs to estimate the discounted present day value of the difference in lifetime earnings between an average college graduate and Plaintiff's hourly wage. PX 8.

Frankenfeld estimated Plaintiff's post-assault annual earning capacity (based on her hourly wage) at $19,448. RT 446, 455. Frankenfeld estimated an average college graduate's earnings at $37,730, which he used for Plaintiff's pre-assault earning capacity. RT 452.

[5] Frankenfeld did not rely on a military career for the estimated pre-assault earnings, because he was uncomfortable with the number of assumptions required, including whether she would be accepted, whether she would have pursued a nursing degree, and then whether she would have been commissioned as an officer. RT 463, 467. Assuming all those hurdles occurred, Frankenfeld testified that a commissioned nurse earns approximately $3,100 per month ($37,200 per year). RT 467. Frankenfeld further testified that an enlisted soldier earns approximately $1,300 per month ($15,600 per year). RT 491.

Frankenfeld relied on several assumptions, which may or may not apply to Plaintiff, such as average life expectancy, average work-life expectancy (57.5 years), and average national wages for a female. RT 451. Frankenfeld admitted that the table gives "a false sense of precision." *Id.* Moreover, the information Frankenfeld relied on for average earnings was six years old. RT 452. Additionally, this dated information did not reflect average wages for college graduates, but instead referred to wage earners beginning at 25 years old. RT 452-453. Absent current information, Frankenfeld resorted to unspecified adjustments to arrive at his estimated average college graduate salary. RT 452-53.

Frankenfeld then added a twenty-three percent "fringe benefits" adjustment, in an attempt to address benefits such as Social Security and health care. RT 453. Frankenfeld admitted that it is "very difficult to measure fringe benefits [precisely]." RT 454. Moreover, health care is available to Plaintiff at no cost, which Frankenfeld did not consider. Then Frankenfeld tacked on an estimated average growth rate, and a reduction for the estimated value of household services. Frankenfeld further recognized that his calculations would be affected if a different discount rate had been chosen.

Frankenfeld's estimates further assume that the alleged difference in pre-assault and post-assault earning capacities were permanent. On cross examination, Frankenfeld admitted that if Plaintiff's symptoms improved or she recovered from her alleged emotional injuries his analysis could be affected. RT 474. He also acknowledged that the average earnings in South Dakota are about 20% less than the national average, and in Rapid City about 10% less; however, he did not factor this into his estimates. RT 471.

**H. Dr. Mills's Opinions**

Defendant called Dr. Mark Mills, a board certified forensic psychiatrist who has been called as an expert well over 100 times. RT 575, 568. Dr. Mills is a full professor in psychiatry at Columbia University and an adjunct professor at New York Medical College, St. Vincent's Hospital. He has previously taught at Stanford University's Schools of Medicine and Law, as well as Harvard University, and the University of California at Los Angeles. RT 567-68, DX 1, DEF 1173. He was formerly the chief of psychiatry for the West Los Angeles Veterans Administration Medical Center, the largest psychiatric hospital in North America at the time. RT 569. Dr. Mills has served as a referee on scores, if not hundreds, of peer reviewed articles, and published 49 peer-reviewed articles of his own. RT 571-72; DX 1, DEF 1177-80.

Dr. Mills has spent the last two decades of his career focusing on forensic psychiatry. RT 578. In forensic psychiatry, credibility, reliability, candor, precision are very important; therefore, written records and psychological testing assist in triangulating what is really occurring. RT 579. Dr. Mills has handled dozens of cases involving claimed sexual assault, somewhere between 30 and 50 cases. RT 579-80.

Additionally, Dr. Mills has a particular expertise in malingering. Malingering is "faking or elaborating for gain." RT 573. In a criminal case it could be the gain of a lesser sentence or serving time in a psychiatric hospital rather than prison. *Id.* In civil matters, it may involve increased damages through exaggeration of injuries, which is the core issue in the present case. *Id.* Dr. Mills authored the chapter of the current and two prior editions on malingering in The Comprehensive Textbook of Psychiatry, one of the two major (American English) psychiatry textbooks. RT 573-74; DX 1, DEF, 1182. He has also published a separate article concerning

malingering that was published in the American Journal of Psychiatry, and has given presentations on malingering. RT 572, 575; DX 1, DEF 1179.

In reaching his opinions, Dr. Mills relied on his wealth of experience, his interview with Plaintiff, her official statements, her medical records, the deposition and trial testimony of the witnesses, the BIA criminal investigative report, and the psychological tests administered to Plaintiff. RT 580-81; DX 1. Based on that information and his expertise, Dr. Mills concluded that Plaintiff is not a reliable witness; she minimizes important history before and after the incident. RT 589; DX 1. Moreover, Dr. Mills noted that Plaintiff exaggerated so dramatically on the psychological testing that the results cannot be utilized, and in a fashion that he opined demonstrates her intent to make her difficulties appear much worse than they are. RT 589.

With respect to minimization, Dr. Mills pointed first to Plaintiff's miscarriages. Plaintiff indicated that she was only briefly upset and moved on. RT 590-91. Dr. Mills found that Plaintiff "was pulling her punches. She wasn't being very forthcoming about the degree or duration of her upset and that she was attributing almost all of her distress in life to the incident with Sergeant Kopf." Dr. Mills noted that Plaintiff's supposed temporary upset was refuted by her mother who described the miscarriage and burial service as "devastating." RT 590. Dr. Mills opined that one would expect Plaintiff to be more upset about the miscarriages, given the way she claims to have dwelled on the assault. RT 590. Moreover, multiple miscarriages would be expected to have a cumulative effect, exacerbating the sadness. RT 590-91. Additionally, there were other stressors such as the deaths of close relatives that Plaintiff minimized. RT 592.

Dr. Mills also relied on Plaintiff's failure to mention the psychological treatment she sought between February and April 2002. RT 592-94. Dr. Mills pointed to the medical records, which indicated that Plaintiff sought treatment and medication, and was diagnosed with

depression. RT 593; DX23, DEF 1101-04. Dr. Mills concluded that while a single hospital visit may have slipped her mind, it is highly unlikely she would forget four visits, unless she was attempting to minimize her pre-assault psychological trauma. RT 593-94.

Dr. Mills also administered two psychological tests, the MMPI (DX 2) and the Personality Assessment Inventory ("PAI") (DX 3). RT 594. Dr. Mills noted that the MMPI is the oldest, most reliable, most validated, and widely used personality assessment. RT 594-95; DX 1 DEF1166 n2. The MMPI is very effective at assessing personality or psychopathology and identifying the test-taker's attitude, such as whether she is being cooperative, open, defensive, or exaggerating. RT 595. It has been standardized on populations with certain pyschopathologic characteristics, where non-obvious questions are identified that distinguish a particular group from normals. RT 595-96; DX 1 DEF1166 n3.

The MMPI includes a graph that plots the test-taker's validity pattern. RT 599; DX 2 DEF 745. The "50" line is the mean, and "65" and "35" are each a standard deviation and a half from the mean. RT 599-600. Ninety-nine percent of test-takers will respond between 65 and 35. RT 600. Anything outside these lines is highly significant, and the further away a scale is from the mean, the more significant. RT 600.

The VRIN scale measures the consistency of the answers and indicates if the testee understands the questions. RT 599-600. Plaintiff's T-score on the VRIN scale was 62. DX2, DEF 745. This score indicates that she understood the questions, because it is between 50 and 65. RT 600; DX2, DEF 745. The F - scale addresses questions that even people with clear, demonstrable psychopathology would answer in the negative. RT 601. These questions are so odd that essentially no one says "yes" to these questions. *Id.* If someone endorses these questions then it is a person saying "I'm hurting, or, I need a lot of attention, or I'll say anything

to make my point that I'm really having a bad time." RT 602. The F(B)-scale addresses these odd questions toward the end of the test. *Id.* Dr. Mills identified the F and F(B) as the important scales on both of Plaintiff's MMPIs because they are so far away from the mean. Dr. Mills noted: "This is not a little exaggeration. This is not even very considerable exaggeration. This is great exaggeration," consistent with Dr. Manlove never having seen a score this high. RT 603.

The MMPI also graphs a clinical profile. RT 608; DX 2 DEF749. Six of the ten scales are in the clinically significant range, which Dr. Mills noted, "almost never happens." *Id*. Dr. Mills stated that having so many of the scales in the clinically significant range is consistent with very significant exaggeration. Dr. Mills observed that he would not use this test to hypothesize about clinical diagnosis, given the exaggeration. RT 607. Nevertheless, if one were to look at clinical diagnosis, Dr. Mills agreed with Dr. Manlove that the two highest scales are used. Plaintiff's two highest scales were PT – general neurotic-level distress – and SC schizophrenia. The PK scale, which reflects PTSD symptoms, is the fourth highest peak Dr. Mills concluded that although all are probably grossly exaggerated, the PTSD like anxiety she alleges is less important than her general level of psychological distress, which undermines Dr. Manlove's assertion that Plaintiff suffered from PTSD. RT 608-09; DX 2 DEF749.

Dr. Mills also administered the PAI (DX 3) which he observed is fundamentally different from the MMPI in that the questions are more obvious; therefore, a test-taker can "game" the test. RT 609-10. Dr. Mills does this in a forensic setting so he can get the "real picture" from the MMPI and the "sanitized" view from the PAI. RT 611. What stood out to Dr. Mills on the PAI is how significantly elevated Plaintiff was on traumatic stress. RT 613; DX 3 DEF763. He concluded that she intended to present herself as having traumatic stress because of something

bad in the past – the assault. By contrast the MMPI, where it was not obvious, she did not look like she had PTSD. RT 613.

Dr. Mills also found Plaintiff's RXR scale, which measures the test-taker's interest in seeking treatment, to be important. RT 614; DX 3 DEF762. Given that "50" is the average, Plaintiff's low RXR score, the lowest of all the scales, reflects Plaintiff's lack of interest in treatment. RT 614. Dr. Mills also testified that her low RXR score was corroborated by the very limited treatment she has sought since the assault. RT 621-22. Dr. Mills concluded that such a low RXR score and her lack of clinical activity are inconsistent with Dr. Manlove's opinion that her elevated F score on the MMPI was a cry for help. RT 615, 622.

Dr. Mills also reviewed the MMPI Dr. Manlove administered to Plaintiff. RT 618-19; DX 20. The VRIN scale indicated that Plaintiff understood the questions. DX 20, DEF 3154. Plaintiff's F - scale was even more exaggerated than on Dr. Mills's test. Plaintiff responses were so exaggerated that she maxed out the F - scale with a 120. RT 619; DX 20, DEF 3154. Plaintiff's F(B) scale was also excessively exaggerated with a 116, just under the maximum of 120. DX 20, DEF 3154. Dr. Mills noted that the answers were so unreliable and exaggerated that the computer program would not print a clinical profile. RT 619; DX 20, DEF 3154. Consequently, one cannot determine anything clinically from the profile. RT 619. Dr. Mills stated that he has reviewed hundreds of MMPIs over his career, perhaps 500, and has only encountered a 120 on the F- scale once before. RT 619-20. In fact, Dr. Mills has only encountered a score above 100 on the F - scale a couple of times. "I mean, it's extremely rare, even amongst litigants," he said. RT 620.

Considering the entirety of the evidence, it is undeniable that Plaintiff exaggerates the severity of the assault, as well as, the resulting psychological symptoms. Plaintiff's description

of the assault at trial – a life threatening attempted rape – is belied by her contemporaneous official statements, her interview with Agent Bennett, the absence of corroborating evidence for her claims, and her friendship with Kopf. Her prior statements describe Kopf's awkward romantic overtures causing Plaintiff's discomfort, rather than fear for her life. Kopf went too far, groping a friend's breasts and kissing her against her will, but that is not attempted rape. There were no bruises, scratches, or any other injuries. Kopf did not abandon Plaintiff, but complied with her request to drive back to Manderson, including stopping at a convenience store. Additionally, Plaintiff's self-assessed level of fear within hours of the assault – 6 on a scale of 1 to 10 – demonstrates that her allegations at trial of death threats and fear are untrue. Her willingness to conceal information, such as her marriage, and change her story under oath demonstrate at a minimum, faulty memory, if not outright lying.

Concerning Plaintiff's alleged emotional harm, the psychological tests demonstrate that she is grossly exaggerating her claims. The MMPI, which is not easily manipulated because of its non-obvious questions, exposed Plaintiff's wildly overblown claims of psychological injuries. The F - scales on Dr. Manlove's MMPI were extraordinarily high. The F - scale was at the maximum level and the F(B) was not far behind. Between Dr. Manlove and Dr. Mills, they have observed a combined total of one maximum T score on the F-scale in the span of both of their careers. Conversely, on the PAI that can be gamed, because of its obvious questions, Plaintiff scored highest on PTSD in accordance with her claims in this lawsuit. Additionally, Plaintiff's failure to seek cost-free medical psychological treatment further shows that she is not experiencing the harm she claims.

## II. Legal Standards for Assessing Liability and Damages

First, the "Bad Men" clause provides certain relevant requirements for assessing liability and damages. Second, Plaintiff is not entitled to speculative and uncertain damages. Third, tort law may provide guidance to the Court. Fourth, the "jury verdict" method should not be utilized in this matter. Finally, the absence of Kopf at trail should not lead to an adverse inference against the government.

### A. The "Bad Men" Clause Provides Certain Relevant Requirements for Assessing Liability and Damages.

In this case, Plaintiff seeks damages in the amount of $100 million for alleged emotional and psychological injuries allegedly sustained as the result of her assault. Plaintiff's claim is premised upon the "Bad Men" clause set forth in the Treaty with the Sioux of April 29, 1868. An examination of the plain language of the "Bad Men" clause shows that the claimant is required to provide "proof," in order to be entitled to reimbursement. In addition, Plaintiff must sustain a compensable "loss." Because emotional and psychological injuries do not fall within the scope of Treaty, Plaintiff is not entitled to recover them.

#### 1. Historical Context of "Bad Men" Clauses

In Indian treaties, it was common to include as treaty terms a guarantee of peace between the parties, a delineation of boundaries that often included a cession of specific lands to the federal government, a statement that the tribe recognized the authority of the United States, an agreement regarding the regulation of trade and the travel of persons in Indian country, and a provision for the punishment of crimes between Indians and non-Indians. *See generally* Felix S. Cohen, Handbook of Federal Indian Law 62-107 (1982 ed.) ("*Cohen*").

Tensions grew between Indians and whites in the western territories in the late 1850's and throughout the 1860's, as the railroads began moving west. *Cohen* at 60-69. Following the Civil War in 1861-1865, and the opening of western lands to white settlement under the Homestead Act of 1862, many Indian tribes experienced an escalating series of encounters with white men, many of which devolved into wars that required military intervention. *Id.* at 69-71. This culminated in a series of Indian "uprisings" throughout the west, including the Plains, and Congress led several peace initiatives to resolve the conflicts. *Id.* One such initiative was the creation of an Indian Peace Commission to investigate and address relations between the Indians and whites. *Id.* at 72-74. Based on extensive interviews with Tribes, the Indian Peace Commissioners determined that there were many "bad men" among the whites who had committed outrages against the Indians, and that despite all social restraints these bad men too frequently escaped punishment. "Report to the President by the Indian Peace Commission, January 7, 1868" at 49, 102 (http://facweb.furman.edu/~benson/docs/peace.htm).

To discourage retaliation and warring by Indians for depredations by white men, government treaty negotiators began including Bad Men Clauses in treaties. These peace treaties were intended to end the war-making and other hostilities between the United States, white settlers, and the various Indian tribes - all of which hampered western settlement and required that government expend extraordinary dollar amounts to resolve. The Treaty with the Sioux of April 29, 1868, 15 Stat. 635, is one such peace treaty.

**2. The Plain Language of the Treaty Must be Examined.**

In order to assess the liability and damages in this case, the language of the "Bad Men" clause must be examined. "Treaty interpretation is a matter of law." *Cook v. United States*, 32 Fed. Cl. 170, 171 (Fed. Cl. 1994), *aff'd, Cook*, 86 F.3d 1095 (Fed. Cir. 1996). Further,

agreements between the Indians and the United States 'are to be read as the Indians understood and would naturally understand them'" at the time the treaties were executed. *Id.* at 173-74 (quoting *Gila River Pima-Maricopa Indian Community v. United States*, 199 Ct. Cl. 586, 593 (1972)) (additional citation omitted). The "Bad Men" clause provides, in relevant part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Article I, Treaty with the Sioux of April 29, 1868, 15 Stat. 635.

The "Bad Men" clause provides two requirements that are relevant to assessing liability and damages in this matter. First, the plain language of the Treaty requires the claimant to provide "proof." As set forth below, caselaw also supports the proposition that Plaintiff must provide proof of her damages. Second, the Treaty provides that the United States will "reimburse" the "loss sustained" by the injured person. Accordingly, in order to recover damages, Plaintiff must sustain a compensable "loss." As described below, however, the term "loss" does not encompass emotional and psychological injuries.

**3. Plaintiff Must Provide Proof of Her Damages.**

The "Bad Men" clause requires Plaintiff to provide "proof" of her damages. This concept is also supported by caselaw. As noted in Defendant's Memorandum of Contentions of Fact and Law, absent establishing proof of the damages for the loss, there can be no recovery. *Cosmo Const. Co. v. United States*, 196 Ct. Cl. 463 (Ct. Cl. 1971) ("[T]here must be *some* evidence of damage to support a finding on liability.") (emphasis in original); *Puritan Associates*

*v. United States*, 215 Ct. Cl. 976, 978 (1977) (the "plaintiff as part of its proof of entitlement, must show it was damaged to some extent").

Moreover, "[i]t is axiomatic that a plaintiff bears the burden of providing evidence in support of her damages claim." *Jennings v. Rivers*, 394 F.3d 850, 853 (10th Cir. 2005) (discussing damages claim in sexual assault action); *Glenn v. Copeland*, 2006 WL 1662921 *2 (N.D. Fla. 2006) ("The burden rests upon Plaintiff to provide evidence supporting his claims of longterm physical and medical damages."). *See also Carey v. Piphus*, 435 U.S. 247, 264 (1978) (considering a claim pursuant to 42 U.S.C. § 1983 and stating "we hold that neither the likelihood of [mental and emotional] injury nor the difficulty of proving it so great as to justify awarding compensatory damages without proof that such injury actually was caused.").

As set out below in Section III, Plaintiff has failed to offer the requisite "proof" that she is entitled to damages in the amount of $100 million.

**4. The Treaty Does Not Encompass Plaintiff's Alleged Injuries.**

The term "loss" is not specifically defined within the Treaty with the Sioux of April 29, 1868, 15 Stat. 635. An examination of caselaw, however, does not indicate that when the Treaty was ratified, the term "loss" would be read and understood to encompass emotional and psychological injuries. In *Friend v. United States and the Comanche Indians*, the court considered a claim for damages for the personal injuries of the claimant, his wife, and son. 29 Ct. Cl. 425, 1800 WL 1867 (Ct. Cl.). In analyzing the "Bad Men" clause of the Treaty with the Comanche Indians, August 25, 1868, 15 Stat. 581 – a treaty contemporaneous with the Treaty with the Sioux – the court cast doubt upon whether the clause would provide reimbursement for

such injuries.[6] The court stated that "'reimbursed for his loss' are not apt words to describe damages for personal injuries to one's self, or for scalping his wife, or carrying off his son and detaining him in captivity for some years." *Id.* The court then found that if it "conced[ed] that they are broad enough to include the present claim, the tribe was to become chargeable" only if certain conditions were met. *Id.* Because such conditions were not met, the court concluded that the tribe did not become liable pursuant to the Treaty. In addition, the court concluded that the Indian Depredation Act of March 3, 1891 did not "intend to include anything but depredation to property." *Id.*

In *Swope v. United States and the Comanche and Kiowa Indians*, the court also emphasized that the "'idea of property' runs through the whole scheme of jurisdiction intended to be conferred upon the Court of Claims." 33 Ct. Cl. 223, 1800 WL 2041 (Ct. Cl.). In *Swope*, the court described the injuries of an individual who had been taken captive stating:

> The claimant's mind for nearly two years after the wrong was very much impaired. She became listless and silent, and never fully recovered her brightness and cheerfulness. She still suffers from the consequences of the nervous shock incident to the infliction of the wrong.

*Id.* The court, however, found that Indian Depredation Act of March 3, 1891 did not provide a remedy for "damages for the personal injury to the plaintiff." *Id.*

---

[6] The clause at issue stated:

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of anyone – white, black or Indian – subject to the authority of the United States and at peace therewith, the tribes herein named solemnly agree that they will, on proof made to their agent and notice by him, deliver up the wrongdoer to the United States to be tried and punished according to its laws, and in case they willfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

Treaty with the Comanche Indians, August 25, 1868, 15 Stat. 581.

The "Bad Men" clause's use of the term "reimburse" further indicates that emotional and psychological injuries are not compensable. The term "reimburse" contemplates a repayment of a monetary loss suffered. Black's Law Dictionary includes the following definition for "reimburse." "To pay back, to make restoration, to repay that expended; to indemnify, or make whole." BLACK'S LAW DICTIONARY 1157 (5th ed.). Thus, the term "reimburse" reinforces the property-based nature of any payment available pursuant to the "Bad Men" clause. Indeed, Defendant is unaware of any case in which damages were awarded by a court pursuant to a "Bad Men" clause for emotional and psychological injuries.

In a recent case, the court undertook a lengthy examination of the "Bad Men" clause set forth in the Treaty. *Garreaux v. U.S.*, 77 Fed. Cl. 726, 733-37 (Fed. Cl. 2007). As explained in *Garreaux*, courts "cannot rewrite or expand treaties beyond their clear terms to remedy a claimed injustice." *Id.* at 737 (citing *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *Herrera v. United States*, 39 Fed. Cl. 419, 421 (1997)). Plaintiff has not sustained the type of "loss" for which she is entitled to have the United States "reimburse" her. Plaintiff's claims of emotional and psychological injuries do not fall within the reach of the "Bad Men" Clause. Thus, Plaintiff is not entitled to recover for her alleged emotional and psychological injuries. *See also id.* (finding "that the claims asserted by Plaintiff do not fall within the confines of the "bad men" provision of Article I of the Fort Laramie Treaty of April 29, 1868").

**B. Plaintiff is Not Entitled to Speculative and Uncertain Damages.**

Plaintiff is not entitled to speculative and uncertain damages. "Plaintiffs may only recover those damages that they can show with reasonable certainty." *Carolina Power & Light Co. v. United States*, 82 Fed. Cl. 23, 43 (Fed. Cl. 2008) (citing *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). "While the amount of damages need not

be 'ascertainable with absolute exactness or mathematical precision[,]' recovery for speculative damages is precluded." *Indiana Michigan Power Co.*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. (1997) (precluding recovery of speculative damages against the government)). This principle was applied in *Northern Paiute Nation v. United States*, where the court held that the plaintiff was required to show a "reasonable basis" for the amount of damages sought and could not recover truly speculative damages. 8 Cl. Ct. 639, 646 (Cl. Ct. 1986) (discussing the proper method of measuring damages in this Indian Claims Commission case). *See also Tucker v. Secretary of Dept. of Health and Human Services*, 1990 WL 293879, *3 (Cl. Ct. 1990) ("Petitioner is required to prove his case by a preponderance of the evidence. The speculative nature of the evidence concerning compensable damages in this case provides an inadequate basis for an award of compensation.").[7] Consequently, Plaintiff is not entitled to speculative and uncertain damages based upon unfounded assumptions.

**C. Tort Law May Provide Guidance in This Matter.**

Because this matter involves legal principles with roots in tort law, the Court may look to tort law for guidance in assessing damages.

---

[7] The principle that plaintiffs are not entitled to speculative damages is also evident in tort cases. For example, in *Sheesley v. The Cessna Aircraft Co.*, the court considered damages in a wrongful death action. 2006 WL 1084103, *28 (D.S.D. 2006). The court noted that "[p]laintiffs must present evidence that they can reasonably expect to receive the economic benefit from the decedent." *Id*. (citation omitted). The court went on to state that "[s]peculative damages are not recoverable." *Id*. (citation omitted). In a case involving an allegation of retaliatory discharge, the court also stated "damages must be reasonable and must be proved with reasonable certainty." *Lord v. Hy-Vee Food Stores*, 720 N.W. 2d 443, 454 (S.D. 2006) (citation omitted). "Proof of damages requires a reasonable relationship between the method used to calculate damages and the amount claimed." *Id*. (citation omitted). The court "noted that the difficulty in computing damages should not be confused with the requirement of proving damages as an essential element for recovery." *Id*. (citation omitted).

**1. It is Appropriate for the Court to Consider Tort Law.**

Although well-established that the Court of Federal Claims lacks jurisdiction over cases sounding in tort, the case before the court necessarily involves legal principles with roots in tort law. In such cases, the Court of Federal Claims has looked to tort concepts in rendering decisions in a number of opinions. *See e.g., Reese v. United States*, 28 Fed. Cl. 702, 705 (Fed. Cl. 1993) (utilizing tort law principles for guidance on punitive damages, because the wording of the statute at issue was ambiguous); *Hansen v. United States*, 65 Fed. Cl. 76, 101 (Fed. Cl. 2005) (commenting that "[w]hile not all torts are takings, every taking that involves invasion or destruction of property is by definition tortious," and "[r]ecent cases support the conclusion that tort and takings claims may arise from the same operative facts, both in practice and in principle."); *Richmond Am. Homes of Colo., Inc. v. United States*, 75 Fed. Cl. 376, 394 (Fed. Cl. 2007) (examining the decision of the Armed Services Board of Contract Appeals and approving the Board's use of the tort concept of economic loss); *Boston Edison Co. v. U.S.*, 80 Fed. Cl. 468, 483 (Fed. Cl. 2008) ("An analogue is found in tort law, where diminution in market value is the basic rule for the measure of damages for injury to a chattel.").

In utilizing tort principles to provide guidance, the Court of Federal Claims has looked to multiple sources. For example, in allocating the parties' respective burdens of proof, the Hearing Officer in *Land v. United States*, followed the practice of district courts in cases arising under the FTCA. 35 Fed. Cl. 345, 349 (1996), *aff'd*, 37 Fed. Cl. 231 (1997). Accordingly, the court applied the law of *lex locus delicti*, that is the law of the state where the act or omission forming the basis of the plaintiff's claim occurred. *Id.* (citing 28 U.S.C. § 1346(b)). In addition, in *Cusati v. Sec'y of HHS*, the court noted that "the Federal Circuit has invoked also traditional tort principles, adopting the Restatement (Second) of Torts as 'a uniform approach' to analyzing

'causation' in [National Vaccine Injury Compensation] Program cases" 2005 WL 4983872 *9 (Fed. Cl. 2005). *See also Barlow v. United States*, 51 Fed. Cl. 380, 394 (Fed. Cl. 2002) (referencing Restatement (Second) of Torts regarding applicable burden of proof for intentional infliction of emotional distress).

**2. Damage Awards in Similar Cases May Provide Guidance**

In assessing the appropriate award, if any, for Plaintiff, the Court may be guided by damage awards and settlements in similar cases.

**a. Damage Awards in Sexual Assault Cases in the District of South Dakota.**

Defendant has attached to this pleading the declaration of the designated Civil Chief for the U.S. Attorney's Office in the District of South Dakota, AUSA Diana Ryan. Def.'s Ex. 1 [Ryan Decl.]. In her declaration, AUSA Ryan provides "a summary of the damage awards from past sexual assault cases filed against the government in the District of South Dakota . . . ." Ryan Decl., ¶ 3. An examination of AUSA Ryan's declaration and the supporting documentation show that compensation in such cases are significantly lower than $100 million.

For example, AUSA Ryan describes a case in which "the plaintiffs accuse[d] three [Oglala Sioux] tribal police officers of stopping their vehicle without probable cause and sexually assaulting them, spraying them with mace, and placing them under arrest in an area where the officers lacked jurisdictional authority to make an arrest." Ryan Decl., ¶ 4 (describing *Theresa Imitates Dog, Guardian Ad Litem on Behalf of her Minor Daughter, Celeste Imitates Dog, Tanya Hernandez, Viola Hernandez and Shirley Salway v. United States of America*, Civ. 96-5044 (W.D.S.D.)) ; *see also id.*, Ex. 1. The plaintiffs alleged that they were near Martin, South Dakota when such events occurred. *Id.*, Ex. 1 at ¶ 8. The settlement agreements in this

matter are attached to AUSA Ryan's declaration and show that each plaintiff received less than $6,000 in exchange for dismissal of such claims. *Id.*, ¶ 4; Ex. 1.

AUSA Ryan also provides information about a case in which "the Complaint allege[d] that a tribal reserve officer, while on duty, arrested the 14 year old juvenile and instead of taking her to jail, had consentual [sic] sex with her instead." *Id.*, ¶ 5 (describing *Geraldine White Butterfly, Guardian Ad Litem of Janelle White Butterfly*, Civ. 97-5075 (W.D.S.D.)). In this matter, the minor plaintiff, who resided in Pine Ridge, South Dakota, sought $1,250,000 in damages. *Id.*, Ex. 2., ¶¶ 2, 10. Ultimately, the plaintiff received $90,000 (an annuity with $630.00 montly payments for ten years) in exchange of the dismissal of the claims. *Id.*, ¶ 5.

In another matter, the plaintiff "allege[d] that while [she] was incarcerated in the tribal jail, a jailer forcibly raped her." *Id.*, ¶ 6 (describing *Melanie Williams v. United States of America, acting through the Department of the Interior, Bureau of Indian Affairs and Rio Lunderman*, Civ. 98-3018 (C.D.S.D.)). As noted in AUSA Ryan's declaration and the settlement agreement, "[t]his case was settled for the sum of $1,000.00." *Id.*, ¶ 6; *see also id.*, Ex. 3.

AUSA Ryan also describes a case in which the plaintiff "allege[d] that a tribal police officer repeatedly picked up the thirteen year old plaintiff for sexual intercourse, during which she became pregnant." *Id.*, ¶ 7 (describing *Rodger Red Elk, Guardian Ad Litem on Behalf of his Minor Daughter, Melinda Red Elk, et al., v. United States of America*, Civ. 92-5100 (W.D.S.D.)). The complaint further alleged that "[o]ne of these sexual acts occurred in the presence of another officer." *Id.* This case was tried to the court. *Id.*; Ex. 4 [Court's Order of July 18, 1994]. In the damages phase of the trial, the court concluded the plaintiff's "educational/vocational goals have suffered." *Id.*, 2. The court found that the plaintiff "suffered substantial physical discomfort and illness, including diabetes and morning sickness." *Id.*

During her relationship with the tribal police officer, the court found that the plaintiff had "suffered both physical and emotional pain because the sexual activities were forced upon her by [the tribal police officer] against her will." *Id*. The court also concluded that since her pregnancy, the plaintiff's "social activities – both those engaged through school and routine friendships – have been more limited." *Id*. Based upon these findings, the court stated that "a reasonable award for all the damages suffered by [the plaintiff] is $100,000." *Id*.

In addition, AUSA Ryan provides information on a case in which the plaintiff alleged "that her ex-husband, while on duty as a Bureau of Indian Affairs police officer, arrested and jailed her, and then removed her from jail, taking her out into the country where he forcibly raped her." *Id*., ¶ 8 (describing *Debra St. John v. United States of America, acting through the Bureau of Indian Affairs*, Civ. 97-3051 (C.D.S.D.). This case also went to trial. *Id*.; Ex. 5 [Court's Order of October 6, 1999]. The court found in the defendant's favor regarding the alleged sexual assault. *Id*., 5.[8] The court, however, found in the plaintiff's favor regarding the unlawful arrest and awarded $3,000 in damages. *Id*., 5.

It is appropriate for the Court to look to similar cases in the District of South Dakota in assessing the damages awarded, if any, to Plaintiff. As set forth above, the awards and settlements in other similar cases from South Dakota are significantly lower than $100 million.

---

[8] The Eighth Circuit Court of Appeals initially reversed this finding and remanded the case for factual findings regarding the sexual assault. *St. John v. United States*, 240 F.3d 671, 678-79 (8th Cir. 2001)(affirming adequacy of damages award). Ultimately, the Eighth Circuit upheld the finding of the district court. Ryan Decl., Ex. 5 [Court's Order of March 17, 2003].

**b. Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, Cases May be Considered.**

**3. Other Related Tort Cases May be Considered.**

In assessing Plaintiff's damages, if any, the Court may also be guided by relevant cases brought pursuant to the FTCA and other statutes. An examination of such cases demonstrates that Plaintiff's request for damages in the amount of $100 million is excessive.

For example, in *Locke v. United States*, the plaintiff alleged that a "tribal police officer, while acting within the scope of his employment, wrongfully assaulted plaintiff, then a tribal police dispatcher, by twice placing an air pistol to the back of her head and pulling the trigger." 215 F. Supp. 2d 1033, 1035 (D.S.D. 2002). The plaintiff brought suit pursuant to the FTCA for, among other things, intentional infliction of emotional distress. *Id*. at 1036. In the event that such a claim would not be barred by the intentional torts provision of the FTCA, the *Locke* court concluded that the plaintiff failed to state a cause of action for intentional infliction of emotional distress. *Id*. at 1041. The court stated that the alleged conduct "does not constitute conduct which is utterly intolerable in a civilized community; it was silly and childish but not so extreme in degree as to go beyond all possible grounds of decency." *Id*.

In *Big Owl v. United States*, the plaintiff also sought damages for intentional and negligent infliction of emotional distress pursuant to the FTCA. 961 F. Supp. 1304 (D.S.D. 1997). In this matter, the plaintiff alleged that she was not properly notified that her teaching contract at Porcupine Day School would not be renewed. *Id*. at 1306. Plaintiff claimed that she "suffered shock, anger, worry and stress over the loss of her employment. She couldn't sleep." *Id*. (citation omitted). The court concluded that plaintiff had not made a "prima facie case of either intentional or negligent infliction of emotional distress under South Dakota law." *Id*. at

1309. "As a matter of law, the conduct complained of is not 'so extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id*. (quoting *Richardson v. East River Elec. Power Coop., Inc*., 531 N.W.2d 23, 27 (S.D. 1995)). The court also found that the plaintiff had not alleged any facts showing that "she suffered any accompanying physical injury as a result of the alleged negligently inflicted emotional distress." *Id*. (citation omitted).

Further, in *Jane Doe, et al. v. United States of America*, two high school students who were potential U.S. Marine Corps recruits sought damages pursuant to the FTCA. 2007 Mealey's Jury Verdicts & Settlements 2841 (attached as Def.'s Ex. 2) (summarizing *Jane Doe, et al.*, Case No. C 06-1777 (N.D. Cal.)). In this matter, one of the students alleged that a Marine Corps recruiter "coerced and pressured [her] to have sex with him in the back room of the recruiting office, ultimately raping [her]." *Id*. Following this incident, the student alleged that she contracted chlamydia. *Id*. In addition, the other student alleged that the recruiter "got into [her] sleeping bag, undressed himself and raped her." *Id*. The parties reached a settlement in this matter on May 30, 2007. *Id*. As a result of the settlement, each student received $100,000 in exchange for the dismissal of their claims. *Id*.

Plaintiff's request for damages in the sum of $100 million is also excessive as compared to other actions brought pursuant to the FTCA. *See e.g.*, *Doe v. United States*, 976 F.2d 1071 (7th Cir. 1992) (affirming award of $25,000 each pursuant to the FTCA to children who were sexually abused at a government run day center); *Simmons v. United States*, 805 F.2d 1363 (9th Cir. 1986) (affirming award of $150,000 pursuant to the FTCA to a "woman who sued because her Indian Health Service counsel wrongfully engaged her in a sexual relationship"); *Andrews v. United States*, 548 F. Supp. 603 (D.S.C. 1982) (awarding $70,000 to the plaintiff and $30,000 to

her husband pursuant to the FTCA stemming from "sexual advances, seduction and improper medical treatment" by a physician's assistant).

Comparing the instant action to similar cases brought pursuant to other statutes also indicates that Plaintiff's claim for $100 million is unfounded. For example, in *Montalvo v. Nowotarski*, the plaintiff alleged that when she was a seventh-grade student "she was manipulated into sexual relations" with the school music teacher. 2007 Mealey's Jury Verdicts & Settlements 107 (attached as Def.'s Ex. 3) (summarizing *Montalvo*, 3:CV-04-1239 (M.D.P.A.)). The plaintiff sought damages for invasion of personal security through sexual abuse pursuant to 42 U.S.C. § 1983. *Id*. The plaintiff claimed that she and the music teacher had extensive physical and sexual contact, including engaging in intercourse on 29 occasions. *Id*. This matter was heard by a jury. *Id*. The jury concluded that the defendant committed a battery against the plaintiff. *Id*. Further, the jury found that the defendant's conduct was extreme and outrageous. *Id*. The jury found that the plaintiff was entitled to damages in amount of $50,000. *Id*.

In addition, in *Leggett v. Gold International Inc.*, the plaintiff sought damages claiming that an employee of the Days Inn engaged in sexual harassment and discrimination against her and retaliated against her for not allowing a sexual battery to take place. 2006 Mealey's Jury Verdicts & Settlements 3233 (attached as Def.'s Ex. 4) (summarizing *Leggett*, CV205-137 (S.D.G.A)). Following a trial in this case, "the jury found in favor of [the plaintiff] and awarded her $5,000 in punitive damages." *Id*. Similarly, in *EEOC, et al. v. Subway of Asheville #7, et al.*, the EEOC alleged that five employees were "subjected to unwelcome sexual comments, gestures and touching by a male supervisor." 2006 Mealey's Jury Verdicts & Settlements 3200 (attached as Def.'s Ex. 5) (summarizing *EEOC*, Civil Action No. 1:05CV46 (W.D.N.C.)). The

EEOC further alleged that the "women were forced to resign because no action was taken to prevent it." *Id*. Ultimately, the parties entered into a settlement in this matter, which provided each plaintiff with $25,000. In another employment case, the plaintiff alleged that "she was raped and repeatedly sexually assaulted by her male supervisor . . . ." 2006 Mealey's Jury Verdicts & Settlements 2658 (attached as Def.'s Ex. 6) (summarizing *Hernandez*, 5:05-CV-504 (D.N.C.)). In this suit, the Equal Employment Opportunity Commission ("EEOC") alleged that the "defendant subjected [the plaintiff] to sexual harassment and a sexually hostile work environment." *Id*. A settlement was reached in this matter. *Id*. The plaintiff received $24,250 as a result of the settlement. *Id*.

As evidenced by the cases described above, Plaintiff's request for damages as a result of at most unwelcome kissing and touching in the amount of $100 million is excessive.

**D. The Jury Verdict Method Should Not be Utilized.**

The "jury verdict" method should not be utilized to assess damages in this matter. "The jury verdict method is designed to produce an approximation of damages based on the entire record." *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002). The Federal Circuit has made "clear, however, that the jury verdict method may only be used when other, more exact, methods do not apply." *Grumman Aerospace Corp. v. Wayne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (citation omitted); *see also North Star Alaska Housing Corp. v. U.S.*, 76 Fed. Cl. 158, 217 n.78 (Fed. Cl. 2007) (the jury verdict method "is highly disfavored") (citation omitted).

As detailed in *Dawco Const., Inc. v. United States*, in order to utilize the "jury verdict method," the court must find that "(1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." 930 F.2d 872, 880 (Fed. Cir. 1991)

(citing *WRB Corporation v. United States*, 183 Ct. Cl. 409, 425 (1968)) *overruled on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). *See also id.* ("[T]he [lower] court's determinations that Dawco had met the first and second of these requirements were erroneous."). "Under this 'jury verdict' approach, the claimant bears the burden of proving the fact and amount of loss with sufficient certainty." *NavCom Defense Electronics, Inc. v. England*, 53 Fed. Appx. 897, 908 (Fed. Cir. 2002) (citation omitted).

Here, Plaintiff failed to present "evidence sufficient for a court to make a fair and reasonable approximation of the damages." *Dawco Const., Inc.*, 930 F.2d at 880.[9] Plaintiff's estimation of her damages remains speculative and uncertain. *See* Sections I, III (explaining that Plaintiff's limited mental health treatment indicates that Plaintiff is not experiencing ongoing mental trauma, psychological testing revealed Plaintiff exaggerated her alleged injuries, Plaintiff's alleged injuries are attributable to other distressing events in her life that she minimizes, Plaintiff's experts relied upon unfounded assumptions in their damage calculations, Plaintiff has identified no expenses associated with the assault, and that the positive strides that Plaintiff has made in her life make clear that an extensive award of damages is unwarranted).

The lack of evidence in support of Plaintiff's damages request, however, does not indicate that the "jury verdict" method should be employed. *Luria Bros. & Co. v. United States*, 177 Ct. Cl. 676, 696 (1966) ("the mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury not provide a sufficient basis for making a reasonably correct approximation of damages") (citation omitted). To use the jury verdict method, Plaintiff

---

[9] Defendant does not concede that clear proof of Plaintiff's injury exists and that there is not a more reliable method for computing damages in this matter.

must demonstrate a justifiable inability to substantiate her damages. *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742 (Ct. Cl. 1976). Plaintiff has offered nothing in this regard.

The "jury verdict" method's "primary peril . . . is the risk that unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls." *Dawco Const., Inc.*, 930 F.2d at 882. In this case, Plaintiff clearly failed to substantiate her request for damages in the amount of $100 million. *See* Section III. Utilizing the jury verdict method would reward Plaintiff for the preparation of an imprecise and unsupported claim. Furthermore, it could lead to an unjustified windfall recovery for Plaintiff.

**E. An Adverse Inference Should Not be Drawn**

The "uncalled witness rule" provides that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States*, 150 U.S. 118, 121 (1893). The finding of an adverse inference is generally within the fact-finders discretion; however, it is subject to the following conditions:

> Before a party can properly argue to the jury the possibility of drawing such an inference from the absence of a witness, the party must establish that the missing witness was peculiarly within the adversary's power to produce by showing that the witness is physically available only to the opponent or that the witness has the type of relationship with the opposing party that pragmatically renders his testimony unavailable to the opposing party.

*Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 505 (2007) (quoting *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983) (emphasis added)).

Moreover, the Court of Appeals for the Fifth Circuit has rejected this archaic rule, noting that the "uncalled witness-rule has no place in federal trials conducted under the Federal Rules of Evidence and ... Civil Procedure." *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1047 (5th Cir. 1990). Indeed, modern discovery procedures allow witnesses to be subpoenaed, deposed, and the Rules of Evidence permit a party to treat a witness as hostile. *Id.* at 1048. Courts may impose sanctions if a party attempts to conceal a witness. Considering the modern rules of procedure and evidence, this Court should likewise abandon the uncalled witness-rule.

Plaintiff cannot establish the prerequisites for the uncalled witness rule because Kopf was not peculiarly within Defendant's power to produce. Indeed, he was equally available to both sides, because of this Court's nationwide jurisdiction and subpoena power. RCFC 45(b)(2). Plaintiff had every ability to subpoena Kopf, but elected not to. Plaintiff's strategic decision not to call Kopf to testify evidences her conclusion that Kopf would not have provided testimony beneficial to Plaintiff and adverse to Defendant. Consequently, this Court should not draw an adverse inference against Defendant.

The only arguable way Kopf would have been practically unavailable to Plaintiff, (*i.e.*, unavailable for service), and available to the United States would have been if he was in an active war zone immediately before trial. But even in that hypothetical situation, the the United States may have been able to be accommodate a request. But that is not the situation. Kopf had retired from the United States Army, and he could have easily been subpoened under the Court's modern Rules of Procedure. No party was in such a superior position that the archaic rule on adverse inference, developed in a foregone era, should have any applicability or justification.

For the foregoing reasons, even assuming this Court concludes that the uncalled witness-rule is not obsolete, it should not apply to the present case.

## III. Plaintiff is Not Entitled to the Damages She Seeks

The evidence at trial demonstrates that Plaintiff failed to meet her burden of proving "loss sustained," a prerequisite to reimbursement under the Treaty. First, Plaintiff did not prove any direct losses stemming from the assault. Plaintiff stipulated that she had no medical expenses associated with the assault, be it psychological counseling, medications, or otherwise. JX 5 ¶ 27. The limited medical treatment Plaintiff did receive was provided at no cost. *Id*. Consequently, there are no expenses – losses sustained – for which the United States may "reimburse" Plaintiff. Article I, Treaty with the Sioux of April 29, 1868, 15 Stat. 635.

Second, as discussed above, the emotional damages Plaintiff seeks are not a compensable loss available under the Treaty. As a predecessor of this Court recognized, a claim for "reimbursement" of sustained losses implies property damages rather than compensation for personal injury. *Friend, supra,* 29 Ct. Cl. 425, 1800 WL 1867. Plaintiff's asserted emotional damages are therefore not compensable.

Even assuming emotional damages are considered a reimbursable loss under the Treaty, Plaintiff failed to prove them at trial. Outside of Plaintiff's allegations and her family's anecdotal testimony, there is a dearth of independent evidence corroborating her claim of ongoing emotional harm. Notably, there is no consistent medical treatment record to support her claim. Plaintiff sought professional psychological medical treatment <u>less than five times</u> in the more than five years since the assault, which would indicate a temporary problem at most. RT 92-93, 190-91; DX 13. Indeed, Plaintiff sought treatment, including prescription medication, as many times (for ongoing depression and anxiety according to the medical records) approximately a year earlier between February and April 2002. DX 23, DEF 1101-04. Plaintiff dismisses that series of treatment as mere temporary sadness.

Other than attending a women's support group for a few months and some meetings with her medicine man and uncle, a minister, that did not begin until three years after the assault, Plaintiff offered nothing to support her claim. RT 92-93, 177, 188-89, 192-93; DX 13. Plaintiff's failure to seek readily available professional medical treatment and her refusal to take medication contradict her claim that she continues to experience emotional problems. Plaintiff testified that she now wants psychological therapy. RT 97. Her actions demonstrate otherwise, calling into question her credibility and the validity of her unsupported claims.

The only remaining potential support for Plaintiff's claims of ongoing emotional problems is Dr. Manlove. However, Dr. Manlove's opinions, which were predicated on Plaintiff's accuracy and truthfulness (RT 351, 360, 363), are unsupported by the evidence and should be rejected. Dr. Manlove opined that Plaintiff has PTSD; however, he admitted that the diagnosis would be incorrect if Plaintiff were not "extremely frightened" as she claimed. RT 413-14. The evidence demonstrates that Plaintiff was not extremely frightened. Plaintiff, did not report being scared or threatened in her contemporaneous written statements. Instead, she described herself as "uncomfortable." She quantified her fear to Agent Bennett as a 6 on a scale of 1 to 10. RT 408. Dr. Manlove acknowledged that a 6 is in the middle of the scale and weighs against his assessment of extreme fear. RT 408. Apparently realizing that her self-assessed fear on the day of the assault would sabotage her damages claim, Plaintiff incredibly testified that Agent Bennett never asked this question, and must have been lying or mistaken when he documented it in his report. This baseless and patently implausible assertion only further undermines Plaintiff's credibility.

Plaintiff's actions at the convenience store following the assault further demonstrate that her present claims of fear are overblown, if not outright false. There were at least three

customers, plus the store clerk, at the store. Plaintiff did not seek help from any of them, or ask to call the police, or even tell Kopf to leave and she would remain at the store. At an absolute minimum, Plaintiff would have remained in the locked bathroom if she were truly frightened.

Additionally, given her more than two-year friendship with Kopf and the nature of the assault, Plaintiff's claims of extreme fear are unfounded. Kopf did not hit her or threaten to do so, nor did he brandish a weapon. Rather, the assault included at most kissing and groping. Kopf made romantic overtures, stating Plaintiff is "cute" and he wanted to "take care of her." Following the assault, Plaintiff experienced no bruises, red marks, or other evidence of injuries. Further, as Plaintiff acknowledged, they were friends with a history of relying on each other for emotional support. This friendship is evident from the emails, phone calls, and correspondence between Plaintiff and Kopf. Indeed, Plaintiff turned to Kopf for support when a family member died. In short, the assault was not the attempted rape with corresponding extreme fear Plaintiff attempted to portray at trial.

Dr. Manlove's diagnosis is further undermined by his failure to obtain a complete picture of Plaintiff's psychological history. Dr. Manlove was ignorant of other significant psychological stressors in Plaintiff's life, such as the burial service for Plaintiff's stillborn son. RT 373-74. This was clearly a traumatic experience, one her mother described as devastating.[10] Similarly, Plaintiff never informed him of the series of psychological treatments she sought at Pine Ridge in early 2002. RT 361, 377-78.

Finally, the psychological tests demonstrate that she is grossly exaggerating her claims of emotional injuries. Drs. Manlove and Mills both recognized that the MMPI is the oldest, most

---

[10] Plaintiff experienced multiple miscarriages. Plaintiff testified that when each of these miscarriages occurred, she experienced sadness and felt "like a failure." RT 207. Following these events, Plaintiff sought no treatment or counseling to cope with her feelings. *Id.*

reliable, most validated, and widely used psychological test. RT 594-95. The MMPI consists of non-obvious questions so it cannot be easily manipulated. The F - scales on both of Plaintiff's MMPIs, which in part identify if a testee is lying about her symptoms, were wildly exaggerated. Plaintiff's F - scale on Dr. Manlove's MMPI was completely maxed out, something he had never seen before and Dr. Mills had only observed one other time in his career.

Dr. Manlove attempted to explain the high F- scale as a cry for help, but this opinion should be viewed with skepticism. First, Dr. Manlove admitted that this interpretation was not based on his own independent analysis of the MMPI. Instead, he merely "follow[ed] the lead of the psychologist" that administered the test. RT 425. Moreover, Dr. Manlove retreated from this conclusion at trial: "At this point, I guess I'm questioning that, after looking at it more." RT 425. Indeed, he admitted that "Lying ... should be considered a potential option." *Id.*

Second, Dr. Manlove could not even explicitly articulate the significance of the score ranges on the validity graph, which calls into question the depth of his understanding of the test. RT 420.[11] As Dr. Mills explained, 50 represents the mean score, and the range between 35 and 65 (1 ½ standard deviations in each direction) includes ninety-nine percent of all test-takers. All Dr. Manlove could muster when pressed on the meaning of these scores is his agreement that a score outside of this range would be an outlier. RT 421.

In keeping with the scrutiny appropriate in a forensic setting, Dr. Mills took the next step and administered the PAI to help triangulate what was really happening. As noted earlier, the PAI consists of obvious questions, allowing a test-taker to can be gamed. RT 609-10. Unsurprisingly, Plaintiff scored highest on PTSD in accordance with her claims in this lawsuit.

---

[11] Dr. Manlove said he "believed that [a score] between the two horizontal lines is considered [an] average score kind of range." RT 420. He was unaware what the standard deviation is and the percentage of test-takers that score between 50 and 65. *Id.*

The results of that test support the conclusion that Plaintiff is malingering. Specifically, Dr. Mills found that Plaintiff intended to present herself as having traumatic stress, and given the PAI's obvious questions did so. RT 613; DX 3 DEF763. By contrast the MMPI, where the questions were not obvious, she did not appear to have PTSD. RT 613; DX 2, DEF 749 (PK was the fourth highest score).

Plaintiff's only remaining alleged damages claim is Frankenfeld's estimated lost earning capacity, which should be rejected.[12] As a preliminary matter, it should be noted that Plaintiff was unemployed at the time of the assault. The limited medical treatment she sought for the assault did not cause her to miss work and forego any wages. Indeed, Plaintiff did not (and could not) present any evidence of direct quantified lost wages. Consequently, there are no reimbursable lost wages.

Instead, Frankenfeld generated calculations on a series of unproven assumptions to estimate Plaintiff's potential lost earning capacity. Frankenfeld assumed that Plaintiff had a different earning capacity before and after the assault based on Dr. Manlove's opinions. RT 446-447. Essentially, Frankenfeld calculated the difference in lifetime earnings between his estimate of the average female college graduate and the hourly wage position Plaintiff held at the time he interviewed her. RT 446, 454. This entire analysis is exceedingly speculative and therefore cannot be considered compensable under the Treaty.

Frankenfeld's opinion is based on the fundamentally flawed assumption that Plaintiff's alleged emotional injuries <u>permanently</u> prevent her from returning to college or that she would have finished college in the first place. Frankenfeld conceded that his analysis could be affected

---

[12] Tellingly, Plaintiff did not provide testimony from a vocational expert, who would have been qualified to provide testimony about Plaintiff's ability to perform various jobs following the assault.

if Plaintiff's symptoms improved or she recovered. RT 474. Plaintiff has not proved that she is permanently disabled. Even assuming Plaintiff is still experiencing emotional symptoms, (which Plaintiff failed to prove, given her extreme exaggeration), there is no evidence that she will continue to experience them indefinitely. In fact, Dr. Manlove concluded that Plaintiff should be significantly improved in three years with weekly psychotherapy and medication. RT 336. Plaintiff could have been treated at no cost for several years now, but has elected to do nothing. Regardless, at best, Frankenfeld should have confined his speculative analysis to three years.

Moreover, even assuming this Court considered Plaintiff's emotional injuries permanent, Frankenfeld's calculations rely on far too many speculative assumptions to be considered reasonably certain. As noted earlier, he relied on average life expectancy, average work-life expectancy, and an inferred average national wage for a female college graduate. RT 451-53. Frankenfeld acknowledged that the table with this information gives "a false sense of precision." RT 451. Frankenfeld compounded the speculative nature of these numbers with a twenty-three percent "fringe benefits" adjustment (excluding health care Plaintiff receives free of charge) and his estimated average growth rate. RT 453-54. Frankenfeld further recognized that his calculations would be affected if a different discount rate had been chosen. Last, Frankenfeld failed to account for the fact that average earnings (by his estimate) are 20% less than the national average in South Dakota, and 10% less in Rapid City. RT 471.

Additionally, Plaintiff's contention is that she would have been accepted into the military had Kopf not assaulted her. This assertion is not only speculative, but wholly inconsistent with her disqualification under the Army's height/weight standards. Nevertheless, even assuming Plaintiff had not been assaulted and was able to qualify for military service, Frankenfeld's testimony demonstrates that Plaintiff would actually have earned less money on active duty than

in her hourly wage position. Frankenfeld estimated Plaintiff's annual salary at $19,448, based on the hourly wage position she held at the time he interviewed her. RT 452. Had she been accepted into the Army, Plaintiff's salary would have been less. Frankenfeld noted that an enlisted soldier earns approximately $1,300 per month, which equates to $15,600 per year. RT 491. Given that her military salary would have been roughly $4,000 less than the position Plaintiff held after the assault, there are no lost earning capacity damages.

For the foregoing reasons, Plaintiff has failed to prove that she has sustained losses that would entitle her to reimbursement under the Treaty.

## V. Conclusion

Plaintiff bears the burden of demonstrating that she is entitled to her damage request of $100 million for alleged emotional and psychological injuries allegedly sustained as a direct and proximate result of the assault, plus attorneys fees and costs. For the reasons stated above, Defendant respectfully requests that the Court find that Plaintiff failed to prove that she has sustained losses that would entitle her to reimbursement under the Treaty. DATED: August 1, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

s/ Steven D. Bryant
STEVEN D. BRYANT
SARA E. COSTELLO
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

(202) 305-0424 (phone)
(202) 305-0267 (fax)
steven.bryant@usdoj.gov

Of Counsel:

Major Lanny Acosta
U.S. Army Litigation Division
901 N. Stuart Street
4th Floor
Arlington, VA 22202

Sharon Pudwill
Department of Interior
Office of the Field Solicitor
Bishop Henry Whipple Federal Bldg.
1 Federal Drive, Room 686
Twin Cities, MN 55111