**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **LAVETTA ELK,** | ) | Case No. 05-186L |
| | ) | Judge Francis M. Allegra |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF PURSUANT TO**
**ORDERS DATED JUNE 3, 2008 AND JUNE 4, 2008**

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiff
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Telephone (305) 931-2200
Facsimile: (305) 931-0877
www.hermanlaw.com

*CASE NO.: 05-186L*

**TABLE OF CONTENTS**


I. WHAT IS THE APPROPRIATE LEGAL STANDARD FOR ASSESSING LIABILITY AND DETERMINING DAMAGES IN THIS CASE? .................................. 1

II. SHOULD THE "JURY VERDICT METHOD" FOR AWARDING DAMAGES BE USED IN THIS CASE? .............................................................. 5

III. SHOULD ANY ADVERSE INFERENCE BE DRAWN FROM THE FACT THAT SERGEANT KOPF DID NOT APPEAR AT TRIAL? ............................................ 7

IV. WERE THE FACTUAL PREMISES AND ASSUMPTIONS UPON WHICH EXPERTS BASED THEIR OPINIONS SUPPORTED BY THE RECORD? .................. 13

**TABLE OF AUTHORITIES**

**Cases**

Arpin v. United States, 521 F.3d 769 (7th Cir. 2008) ........ 3

Begay v. United States, 219 Ct. Cl. 599 (1979) ("Begay I") ........ 2, 6

Bohac v. Dept. of Agriculture, 239 F.3d 1334 (Fed. Cir. 2001) ........ 3

Calva-Cerqueira v. United States, 281 F.Supp 2d 279, 296 (D.D.C. 2003) ........ 18

Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335 (7th Cir.1983) ........ 10

Dawco Constr., Inc. v. United States, 930 F.3d 872 (Fed. Cir. 1991) ........ 5, 6

Day & Zimmerman Services v. United States, 38 Fed. Cl. 591, 603 (1997) ........ 9

Dent v. United States, 404 A.2d 165, 169 (D.C.1979) ........ 9

Duboise v Railway Express Agency, Inc., 409 S.W.2d 108 (Mo. 1966) ........ 10

Ehrle v Bank Bldg. & Equipment Corp., 530 S.W.2d 487 (Mo. App. 1975) ........ 11

Elk v. United States, 70 Fed. Cl. 405 (Ct. Fed. Cl. 2006) ........ 1,

Ford v. United States, 210 F.2d 313 (5th Cir.1954) ........ 9

Garreaux v. United States, 77 Fed. Cl. 276 (Fed. Cl. 2007) ........ 5

Georgia Southern & Florida Railway Co. v. Perry, 326 F.2d 921 (5th Cir. 1964) ........ 9

Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893) ........ 9

Grumman v. Wynne, 497 F.3d 1350 (Fed. Cir. 2007) ........ 6

Hebah v. United States, 428 F.2d 1334 (Ct. Cl. 1980) ........ 4

Jones v. Otis Elevator, 861 F.2d 655 (11th Cir. 1988) ........ 10, 18

Mathie v. Fries, 935 F.Supp. 1284, 1304-05 (E.D. N.Y. 1996) ........ 6

McClanahan v. United States, 230 F.2d 919, 925 (5th Cir.), *cert.* denied, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956) .......... 9, 10

Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172 (1999) .......... 1

Navajo Tribe of Indians v. United States, 9 Cl. Ct. 336 (1986) .......... 7

Shiner v Friedman, 513 N.E.2d 862 (Ill. Ct. App. 1987) .......... 10

Sokagon Chippewa Community v. Exxon Corp., 2 F.3d 219 (7th Cir. 1993) .......... 2

State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658 (1979) .......... 1

Trammell v. Williams, 97 Ga.App. 31, 101 S.E.2d 887 (1958) .......... 10

Trevino v. United States, 804 F.2d 1512, 1517-19 (9th Cir. 1986) .......... 18

Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987) .......... 2, 5

Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987) ("Tsosie II") .......... 2

Wahlstrom v. Metro-North Commuter R.R. Co., 89 F. Supp. 2d 506, 518 n. 11 (S.D. N.Y. 2000) .......... 4

Western & A.R. Co. v. Morrison, 29 S.E. 104 (Ga. 1897) .......... 10

White Mountain Apache Tribe of Arizona v. United States, 11 Cl. Ct. 614 (1987) .......... 6

**Statutes**

28 U.S.C. § 1346 (b)(1) .......... 3

**Treatises**

3 Wigmore, Evidence §§ 285-288 (4th Ed.1979) .......... 10

Restatement (Second) of Contracts §353 .......... 3

Annotation, Presumption-Failure to Call Witness, 5 A.L.R.2d 893 (1949) .......... 10

*CASE NO.: 05-186L*

Plaintiff, Lavetta Elk, by and through undersigned counsel, hereby submits Plaintiff's Post-Trial Brief, pursuant to Court Orders dated June 3, 2008 and June 4, 2008, as follows:

## I. WHAT IS THE APPROPRIATE LEGAL STANDARD FOR ASSESSING LIABILITY AND DETERMINING DAMAGES IN THIS CASE?

Lavetta Elk is a member of the Oglala Sioux Tribe. **(Direct Examination of Lavetta Elk, TR 63 L 1-8; PX No. 2)**. As a member of the Sioux Tribe, she is a beneficiary of the Treaty with the Sioux of April 29, 1868 (15 Stats. 635, ratified Feb. 16, 1869, proclaimed February 29, 1869) (the "Treaty"). Article 1 of the Treaty provides, in relevant part, as follows:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indian, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

As this Court noted in Elk v. United States, 70 Fed. Cl. 405 (Ct. Fed. Cl. 2006), neither the President, Interior nor any other agency of the Federal government has ever promulgated rules or regulations governing the handling of claims under the "Bad Men" clause.

"A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979). Treaties are accorded special rules of contract interpretation: "[T]reaties are to be interpreted liberally in favor of the Indians, . . . and treaty ambiguities to be resolved in their favor." Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 194 (1999). This rule of interpretation was adopted in recognition of the disadvantages of knowledge and power under which Indians labored in negotiation of these treaties

with a nation determined to use force if necessary to open up Indian lands to white settlement. Sokagon Chippewa Community v. Exxon Corp., 2 F.3d 219 (7th Cir. 1993).

While the Treaty is indisputably a contract, numerous decisions hold that the Treaty, as well as analogous treaties containing "bad men" provisions, are breached when an intentional tort is committed upon a member of a Tribe. See e.g., Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987) ("Tsosie II"); Begay v. United States, 219 Ct. Cl. 599 (1979) ("Begay I"). Thus, an intentional tort may constitute a breach of the Treaty. Nevertheless, since the Treaty is a contract, the law on interpreting contracts is an appropriate starting point for an analysis of recoverable damages and applicable law.

The "bad men" clause of the Treaty requires that the United States "reimburse the injured person for *the loss sustained*." (Emphasis supplied). This language is by its nature broad. Nothing in the language of the Treaty would support the argument that emotional distress damages are excluded. Indeed, such an exclusion would be illogical. A "wrong" committed by "bad men" would necessarily encompass a rape, whether in 1869 or today. The wrong of rape or sexual assault can be expected to cause emotional damage, without physical injury. Accordingly, if emotional injuries caused by rape were excluded from the Treaty, a significant category of "wrong" would not be compensable. That would not be a fair interpretation of the Treaty, which as discussed above, must be interpreted liberally in favor of the Indians.

The etymology of the term "reimburse" is as follows:

> 1611, from re- "back" + imburse "to pay, enrich," lit. "put in a purse" (c.1530), from M.Fr. embourser, from O.Fr. em- "in" + borser "to get money," from borse "purse," from M.L. bursa (see purse).

Online Etymology Dictionary, www.etymonline.com. Nothing in the etymology of this term

suggests that it is limited to recovery of out-of-pocket losses. The Treaty provides a remedy for "the loss sustained" when a wrong is committed upon a "person or property". A fair reading of the Treaty, particularly given the 1868 date of the Treaty and the favorable inferences that must be made on behalf of Indians, is that the term "reimburse" includes compensation for all losses foreseeably resulting from the "wrong" of a "bad man", including emotional pain and suffering.

The Court asked the parties to analyze what jurisdiction's law should govern the damages analysis in this case. Unlike the Federal Tort Claims Act which expressly provides that a federal court must follow the law of the state where the pertinent act or omission occurred, the Treaty is silent on this issue. 28 U.S.C. § 1346 (b)(1)**;** Arpin v. United States, 521 F.3d 769 (7th Cir. 2008). As there does not appear to be any precedent on whether the Treaty should follow a similar rule of law, it appears to be a case of first impression.

Restatement (Second) of Contracts §353, which has been cited as authority by many courts, including the Federal Circuit, allows recovery for mental suffering or emotional disturbance in a contract action where the breach also causes bodily harm or the nature of the contract is such that a breach of it is likely to result in serious emotional disturbance. See Bohac v. Dept. of Agriculture, 239 F.3d 1334 (Fed. Cir. 2001). The rule in the Restatement is stated in the negative, providing that: "[r]ecovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbances was a particularly likely result." Restatement (Second) of Contracts §353.

Serious emotional disturbance is particularly likely to result when "bad men" commit a "wrong." The Treaty implies an act of an intentional and criminal nature, which common sense dictates will foreseeably create emotional trauma. This is particularly true for a rape or sexual

assault. See Wahlstrom v. Metro-North Commuter R.R. Co., 89 F. Supp. 2d 506, 518 n. 11 (S.D. N.Y. 2000) (noting that sexual assault victims suffer more severe post-trauma symptoms than do non-sexual assault victims). Serious emotional disturbance *was* a likely result of Sgt. Kopf's sexual assault of Lavetta Elk, particularly given many circumstances, including: (1) Sgt. Kopf continued to assault Lavetta Elk after she said no and pushed him away multiple times **(Direct Examination of Lavetta Elk, TR 85 L 21 – TR 86 L 14)**; (2) the assaulted occurred in a locked vehicle in a remote location **(Direct Examination of Lavetta Elk, TR 86 L 18 – 23)**; (3) the assault occurred after Sgt. Kopf asked Lavetta Elk, "if somebody hid a body out there, would anybody find it?" **(Direct Examination of Lavetta Elk, TR 87 L 21 – TR 88 L 1)**; (4) an imbalance of power existed between Sgt.Kopf and Lavetta Elk based on his status in the military **(Direct Examination of Lavetta Elk, TR 73 L 23 – 25, TR 88 L 6 – 10)**; (5) Sgt. Kopf was older and stronger than Lavetta Elk **(Direct Examination of Lavetta Elk, TR 70 L 20 21, TR 75 L 25 – TR 76 L 6, TR 88 L 2 – 5)**; (6) Lavetta Elk was sexually inexperienced at the time of the assault **(Cross Examination of Dr. Mark Mills, TR 648 L 20 -23)**; and (7) Lavetta Elk placed her trust and confidence in Sgt. Kopf, whom she believed to hold the key to her future in the military **(Direct Examination of Lavetta Elk, TR 88 L 6 – 10)**. Thus, regardless of whether tort or contract law is applied, damages for emotional disturbance should be recoverable.

In Hebah v. United States, 428 F.2d 1334 (Ct. Cl. 1980), the Court permitted a widow of an Indian to file suit in her own behalf and that of her children for the death of her husband pursuant to an analogous "bad man" provision in a Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe of Indians. As in the instant case, the Treaty in Hebah used the word "reimburse", yet the Court permitted to the widow and children's claim despite the fact that

they seemingly only had a pain and suffering claim.

## II. SHOULD THE "JURY VERDICT METHOD" FOR AWARDING DAMAGES BE USED IN THIS CASE?

The case meets the criteria for using the "jury verdict method" to award damages in that Lavetta Elk has brought an unliquidated damages claim against the United States. The "jury verdict method" of damages has historically been used by this Court in non-jury trials where government liability is clear, but damages are incapable of a precise calculation or itemization. Dawco Constr., Inc. v. United States, 930 F.3d 872, 880 (Fed. Cir. 1991)**.** That is the case here. With regard to liability, the parties stipulated that Sgt. Joseph Kopf sexually assaulted Lavetta Elk. It has been held by this Court that sexual assaults are wrongs within the meaning of the Treaty. See e.g., Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987); Begay v. United States, 219 Ct. Cl. 599 (1979). On the date of the assault, Sgt. Kopf picked up his recruit, Lavetta Elk, in a military vehicle for a recruiting trip followed by a height-weight evaluation. (**Direct Examination of Lavetta Elk, TR 81 L 6 – TR 82 L 13)**. Thus, Sgt. Kopf was an agent of the United States and acting under its authority at the time of the assault. See Garreaux v. United States, 77 Fed. Cl. 276 (Fed. Cl. 2007). By committing this assault, Sgt. Kopf is a "bad man" in the sense of the treaty. See Tsosie and Begay. Finally, Lavetta Elk is a member of the Oglala Sioux tribe and a beneficiary of the treaty **(Direct Examination of Lavetta Elk, TR 63 L 1-8; PX No. 2)**. This is accordingly a case in which government liability is clear.

By their very nature, Lavetta Elk's emotional injuries and pain and suffering are incapable of precise calculation. There is no single dollar amount that can be placed on the indignity suffered by a young woman when she is the victim of a horrific sexual assault in a remote location by a trusted

military recruiter. Similarly, no precise figure can be placed on injuries such as depression, anxiety, fear, loss of trust, loss of self-worth, difficulties with intimacy, sleep disturbances, and flashbacks. Unlike pecuniary losses, damages for psychological and emotional injuries caused by a sexual assault are "not susceptible to mathematical computation." See Mathie v. Fries, 935 F.Supp. 1284, 1304-05 (E.D. N.Y. 1996). Thus, a "jury vedict" measure of damages is appropriate in that the nature of injuries and evidence would require the court to make its own approximation of damages.

It has been held the "jury verdict" measure should only be resorted to when: (1) there is clear proof of injury; (2) there is no more reliable method for computing damages; and (3) a fair and reasonable approximation of damages can be determined by the court based on expert testimony and other sufficient evidence. Dawco Constr., Inc. v. United States, 930 F.3d 872, 880 (Fed. Cir. 1991). This case meets these requirements. First, there was no dispute at trial that Lavetta Elk suffered injuries as a result of the sexual assault by Sgt. Kopf. While the extent of injuries is disputed by the parties, the Defendant's own expert acknowledged that an injury had been sustained. **(Cross Examination of Dr. Mark Mills, TR 631 L 20 – TR 633 L 16**). Second, the nature of the injuries and consequent damages render them incapable of a precise calculation. Thus, an approximation of damages is necessary and appropriate. Finally, the Court heard testimony of the Plaintiff, as well as Plaintiff's family members, Plaintiff's treaters, and competing experts on the extent and scope of Plaintiff's damages. Thus, this case may be distinguished from Grumman v. Wynne, 497 F.3d 1350 (Fed. Cir. 2007). in which the jury verdict method was rejected because more exact methods of measuring damages were available. Id. at 1358. Moreover, it has been held in other cases that use of the jury verdict method is appropriate for damage claims brought by tribes against the United States. White Mountain Apache Tribe of Arizona v. United States, 11 Cl. Ct. 614 (1987) (damages assessed

under jury verdict method in claim for the government's mismanagement of the tribe's grazing lands); Navajo Tribe of Indians v. United States, 9 Cl. Ct. 336, 429 (1986).

As for Lavetta Elk's lost earning capacity, the Court heard testimony from economist/financial expert Donald L. Frankenfeld and received evidence during Lavetta Elk's testimony. The evidence included a chart setting forth how Mr. Frankenfeld arrived at his economic calculations. If the Court accepts Mr. Frankenfeld's testimony, then a "jury verdict method" will not be necessary as to this portion of the claim. Similarly, even if the Court adjusts the projected economic figures, the table of damages prepared by Mr. Frankenfeld provides the Court with an opportunity to make appropriate adjustments. Thus, with regard to Plaintiff's lost earning capacity, the Court may render a finding without the need to resort to the "jury verdict method."

## III. SHOULD ANY ADVERSE INFERENCE BE DRAWN FROM THE FACT THAT SERGEANT KOPF DID NOT APPEAR AT TRIAL?

Plaintiff requests that this Court draw an adverse inference from Sergeant Kopf's failure to appear at trial. It is beyond dispute that Sergeant Kopf was in a position to provide unique testimony relative to material issues in dispute. Indeed, he was the Government's only true fact witness. If he had any testimony that would support the position of the Government on the facts, it would be reasonable to assume that he would have been called by the Government to testify. The fact that he was not called warrants an adverse inference against the Defendant.

Although a large portion of the assault he perpetrated was a stipulated fact at trial, Sergeant Kopf could have offered testimony on facts including the following: (a) any aspects of the assault not contained in the parties' joint stipulation; (b) the circumstances that led to Lavetta Elk being in his military vehicle on the date of the assault; (c) the duration of the assault, (d) the location of the

assault and the circumstances leading to he and Lavetta arriving at that location, (e) the events preceding the assault, and (f) Lavetta Elk's emotional state during and after the assault. With regard to all of these topics, Sgt. Kopf would have superior information to any witness called by Defendant at trial.

Additionally, the United States appeared to contend at trial that Lavetta Elk was "not qualified" for service on the date of the assault pursuant to a height-weight evaluation of December 12, 2007. **(Cross Examination of Lavetta Elk, TR 123 L 2-4)**. Although it is undisputed that Lavetta Elk was still being recruited for the military on the date of the assault, and the document on which the United States relies contradicts this contention by disclosing that Lavetta Elk had a "return" date (RBJ) of February 15, 2003 to get qualified for the military, Sgt. Kopf would nevertheless be in the best position to testify as to Lavetta Elk's specific status with the military and whether he manipulated the circumstances leading to Lavetta being in his military vehicle on the date of the assault. **(Cross Examination of Lavetta Elk, TR 124 L 11 – TR 127 L 2)**. At trial, the United States attempted to suggest that Sgt. Kopf's assault of Lavetta Elk was the result of a misunderstanding. **(Cross Examination of Lavetta Elk, TR 145 L 10 – TR 147 L 7)**. If that were the case, which Plaintiff vehemently disputes, one would expect that Sgt. Kopf would have been called by the United States to testify under oath on this point. Similarly, where was Sgt. Kopf at trial to testify as to Lavetta Elk's emotional response at the time of the assault and the reason he picked her up in his vehicle to go to Sioux Falls for the MEPS evaluation? Again, one would expect the United States to have Sgt. Kopf testify if it were expected that his testimony would support the United States' case.

It appears that Sgt. Kopf was available and under the control of the United States as its

employee at the time of the trial. Yet, the United States chose not to call Sgt. Kopf as a witness and did not account for his absence. Under these circumstances, an adverse inference is warranted that Sgt. Kopf intended to deceive Lavetta Elk regarding her status with the military for the purpose of their trip on the day of the assault; that he intend to lure Lavetta Elk to a secluded location to seduce her or rape her if she would not consent; that Sgt. Kopf intended that Lavetta Elk fear for her life; that he attempted to rape Lavetta Elk; and she was visibly traumatized by his actions. See Day & Zimmerman Services v. United States, 38 Fed. Cl. 591, 603 (1997) (describing the principle that an adverse inference may be drawn from the failure to call a material witness as a "well settled principle of evidence").

The United States Supreme Court established the missing witness rule nearly 100 years ago when the Court stated "that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). Interpreting this language, courts have set forth two criteria which must be established before comment or instruction on the inference is appropriate. Dent v. United States, 404 A.2d 165, 169 (D.C.1979); Georgia Southern & Florida Railway C. v. Perry, 326 F.2d 921, 925 (5th Cir.1964); McClanahan v. United States, 230 F.2d 919, 925 (5th Cir.), *cert.* denied, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956); Ford v. United States, 210 F.2d 313 (5th Cir.1954).

First, the requesting party must establish the potential witness' unavailability in a physical or practical sense; and second, the potential testimony must be relevant and noncumulative. Georgia Southern & Florida Railway Company v. Perry, 326 F.2d at 925. Although Plaintiff theoretically

could have subpoenaed Sergeant Kopf for trial, a witness' availability is not determined solely from his physical presence at the trial or his accessibility to subpoena. See Jones v. Otis Elevator, 861 F.2d 655 (11th Cir. 1988). Rather, availability also will turn on the witness' relationship to the non-producing party. A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party. McClanahan v. United States, 230 F.2d 919, 926 (5th Cir.1956); Trammell v. Williams, 97 Ga.App. 31, 101 S.E.2d 887, 890 (1958); *see generally* 3 Wigmore, Evidence §§ 285-288 (4th Ed.1979). Because of an employee's economic interests, the employer-employee relationship is recognized as one creating practical unavailability. Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335, 1353 (7th Cir.1983); Western & A.R. Co. v. Morrison, 29 S.E. 104 (Ga. 1897); Annotation, Presumption-Failure to Call Witness, 5 A.L.R.2d 893, 896 (1949).

An employee is the type of witness who is not equally available to both parties due to the likelihood that such a witness' testimony would be expected to be favorable to his employer. See Shiner v Friedman, 513 N.E.2d 862 (Ill. Ct. App. 1987). In Shiner, the appellate court affirmed the trial court's missing witness instruction regarding the defendant restaurant owners' failure to present testimony from the busboys responsible for cleaning the floor of the bathroom where the plaintiff customer allegedly slipped and fell. 513 N.E. 2d at 867. The court pointed out that one of the owners testified that the busboys regularly cleaned the restaurant's bathroom floors, and that two busboys had inspected the bathroom after the customer fell. 513 N.E. 2d at 867. It is beyond question that a defendant's employee is not an equally available witness to the plaintiff in a tort action, declared the court, in Duboise v Railway Express Agency, Inc., 409 S.W.2d 108 (Mo. 1966), where there was no explanation for a trucking company's failure to call as witnesses its employees

who had inspected a truck for signs of damage from the collision at issue, thereby obtaining material information. The court held that an unfavorable inference arose from the company's failure to call them. 409 S.W. 2d at 114.

The general rule is that an employee of one party is not equally available as a witness to the opposing party, noted the court, in Ehrle v Bank Bldg. & Equipment Corp., 530 S.W.2d 487 (Mo. App. 1975), observing that this rule follows from the notion that "availability" in the context of the missing witness rule does not mean accessible for service and compulsory process, but depends, among other things, on the relationship borne by the witness to the particular party as would make it natural to expect him to favor one party against the other. In Ehrle, even though the only evidence supporting the plaintiff employee's claim that he had orally applied for his employer's disability program was his own testimony, only he and the employer's chief executive officer were present when the discussion in question took place, and the court held that a strong presumption unfavorable to the employer arose from its unexplained failure to call the officer, who was its employee, as a witness.

A witness is unavailable in a *practical* sense when this relationship is such that it creates bias or hostility against the opposing party.[1] In this case, Sgt. Kopf's employer was the defendant in this action and the plaintiff had brought action against the United States arising from the acts of Sgt. Kopf. Given these circumstances, Sgt. Kopf was "unavailable" at trial for purposes of applying the adverse inference principle.

With regard to the materiality of Sgt. Kopf's testimony, it is beyond dispute that the

---

1 Further, with regard to Sgt. Kopf's practical unavailability to Plaintiff as a witness, it should be noted that Ms. Elk was fearful and anxious from the prospect of seeing Sgt. Kopf in the courtroom at

perpetrator of an alleged assault is a relevant witness in a case arising from the assault. Similarly, Sgt. Kopf's potential trial testimony would not have been cumulative – except to the extent of the parties' stipulation. Indeed, as one of the only two persons who were present immediately before, during, and after the assault, Sgt. Kopf would be expected to provide testimony on behalf of the United States pertaining to what occurred during that period of time. Given the United States' failure to call Sgt. Kopf as a witness at trial, however, an adverse inference should be drawn against the United States as to the points set forth above.

---

trial.

## IV. WERE THE FACTUAL PREMISES AND ASSUMPTIONS UPON WHICH EXPERTS BASED THEIR OPINIONS SUPPORTED BY THE RECORD?

| ***ASSUMPTIONS AND FACTUAL PREMISES OF MARK J. MILLS, M.D.*** | ***ARE THE ASSUMPTIONS AND PREMISES SUPPORTED BY THE EVIDENCE?*** |
|---|---|
| Dr. Mills opined that Lavetta Elk is minimizing other stressors, including the loss of three of her four grandparents in 2002.<br>**DX No. 1, p. 4** | In the Lakota Sioux culture, the term "grandparent" is used loosely to describe elders, with whom one may or may not have a familial relationship. Not all of these deaths were in 2002 or were of a conventional "grandparent". There is accordingly no basis to conclude that Lavetta Elk had an unusual or extraordinary psychological response to this loss.<br>**Direct Examination of Lavetta Elk, TR 76 L 20 - TR 77 L 4;**<br>**Direct Examination of Dr. Stephen Manlove, TR 322 L 8-14** |
| Dr. Mills opined that Lavetta Elk is minimizing other stressors, including that she lost the companionship of a long-term boyfriend in 2002 due to suicide. **DX No. 1, p. 4** | A male friend with whom Lavetta Elk had no romantic involvement committed suicide in approximately 2002. **Cross Examination of Lavetta Elk, TR 138 L 9-15;**<br>**Cross Examination of Dr. Mark Mills, TR 643 L 1-3**<br>Lavetta and did not attend his funeral.<br>**Cross Examination of Dr. Mark Mills, TR 643 L 4-7**<br>Suicide is prevalent on the Pine Ridge reservation, and the suicide of a friend may not be the significant stressor for a Native American which Dr. Mills suggests. There is accordingly no basis to conclude that Lavetta Elk had an unusual or extraordinary psychological response to this loss. **Direct Examination of Dr. Stephen Manlove, TR 323 L 9-23** |
| Dr. Mills opined that Lavetta Elk is minimizing other stressors, including that she dropped out of college to go into the Army for which she was rejected. **DX No. 1, p. 4** | Lavetta Elk elected to withdraw from college to pursue a military career. **Cross Examination of Lavetta Elk, TR 114 L 10 - 24**<br>Lavetta Elk was never permanently disqualified from the military. **Cross Examination of Lavetta Elk, TR 82 L 23 – TR 83 L 8; PX No. 5, p. 183** |

| | |
|---|---|
| | She chose not to join the military after the assault. **Direct Examination of Lavetta Elk, TR 92 L 6-16**<br>Indeed, even the document relied upon by the United States expressly states that she was to return for a height-weight evaluation.<br>**PX No. 5, p. 183**<br>Moreover, Lavetta Elk did not know that her weight was an obstacle to joining the military.<br>**Examination by Court of Lavetta Elk, TR 211 L 17 – TR 212 L 6**<br>She was being recruited on the date of the assault and continuing to exercise per Sgt. Kopf's instructions.<br>**Direct Examination of Lavetta Elk, TR 82 L 23 – TR 83 L 8**<br>Thus, this event is not an external stressor, as her failure to pursue a military career is a product of the assault. |
| Dr. Mills opined that Lavetta Elk is malingering in that she contends there is a link between her assault-induced stress and her miscarriages.<br>**DX No. 1, p. 4** | Lavetta Elk offered no such opinion as to the cause of her miscarriages. Moreover, Dr. Mills offered no expert credentials for his opinions on the actual causes of miscarriage. To the extent that Dr. Mills opines that Lavetta Elk had fewer miscarriages than she reports, this opinion is internally inconsistent.<br>**See, generally, Examination of Lavetta Elk and Dr. Mills.** |
| Dr. Mills opined that Lavetta Elk is unreliable in that her testimony as to whether she knew Sgt. Kopf was coming to her home is contradicted by deposition testimony of Noritta High Hawk.<br>**DX No. 1, p. 5** | Noritta High Hawk corrected her erroneous deposition testimony. **Direct Examination of Noritta High Hawk, TR 232 L 21 – TR 233 L 2**<br>Moreover, Lavetta Elk's testimony that she did not know Sgt. Kopf was coming to her home on the day of the assault was consistent with the deposition testimony of both of her parents and the trial testimony of her mother. **Direct Examination of Jerilyn Elk, TR 261 L 6-8; Cross Examination of Dr. Mark Mills, TR 653 L 5 – TR 654 L 12** |
| Dr. Mills opined that Sgt. Kopf's sexual assault was "relatively minor, a "purported" event, and arguably represented a "misunderstanding." | Sgt. Kopf sexually assaulted Lavetta Elk, including touching breasts, her vaginal area, and kissed her as she pushed him away. **Direct** |

*CASE NO.: 05-186L*

| | |
|---|---|
| **DX No. 1, p. 6** | **Examination of Lavetta Elk, TR 85 L 21 – TR 88 L 1; Joint Stipulation of Undisputed Facts, Para. 17**<br>The assault occurred in a remote area after Sgt. Kopf locked his vehicle and commented that a body could not be found in the remote location. **Direct Examination of Lavetta Elk, TR 86 L 18 – TR 87 L 25**<br>Dr. Mills admitted this assault should not be characterized as a misunderstanding. **Cross Examination of Dr. Mark Mills, TR 632 L 8 – 13** |
| Dr. Mills opined that Lavetta Elk is minimizing other stressors, including that, including Lavetta Elk was the victim of an abusive boyfriend.<br>**DX No. 1, p. 4** | There is <u>no</u> evidence in the record that Lavetta Elk was the victim of an abusive boyfriend. |
| Dr. Mills opined that Lavetta Elk is minimizing other stressors, including the impact of her miscarriages.<br>**DX No. 1, p. 6** | Lavetta Elk acknowledged that her multiple miscarriages made her upset and caused her to feel like a failure. **Direct Examination of Lavetta Elk, TR 205 L 7 – TR 206 L 4**<br>Dr. Mills acknowledged that there is not a singular response to miscarriages, and that if a mother does have a baby following a miscarriage, (as Lavetta did twice) they tend not to focus on the miscarriages. **Cross Examination of Dr. Mark Mills, TR 648 L 7-9, TR 651 L 1-5**<br>The fact that Lavetta is not minimizing the effects of her miscarriages for litigation purposes is corroborated by the fact that unlike other events in her life, including the assault in particular, Lavetta did not seek counseling following any of the miscarriages. **Cross Examination of Lavetta Elk, TR 207 L 5-11** |
| Dr. Mills opined that Lavetta Elk's psychological testing demonstrates a pattern of exaggeration, manipulativeness, and an inaccurate attempt to portray herself as the victim of traumatic stress.<br>**DX No. 1, p. 6** | Dr. Mills acknowledged that if the report on Lavetta Elk's psychological testing had been prepared for litigation purposes, it would have *probably* said the testing was invalid. **Direct Examination of Dr. Mark Mills, TR 606 L 15-25**<br>It could not be used to generate hypotheses about actual diagnosis. **Direct Examination of Dr. Mark Mills, TR 607 L 8-9** |

| | |
|---|---|
| Dr. Mills opined that Lavetta Elk failed to disclose her April 2002 treatment near the time she was graduating high school. **DX No. 1, p. 3** | Lavetta Elk openly disclosed this treatment during her deposition and in discovery responses. **Cross Examination of Dr. Mark Mills, TR 681 L 10 – TR 682 L 24** |

| ***ASSUMPTIONS AND FACTUAL PREMISES OF STEPHEN P. MANLOVE, M.D.*** | ***ARE THE ASSUMPTIONS AND PREMISES SUPPORTED BY THE EVIDENCE?*** |
|---|---|
| Lavetta Elk "is of average to above average cognitive functioning and was on track toward obtaining a college degree or a military career before she was sexually molested." **PX No. 8, p. 10** | **Supported by evidence.** **Direct Examination of Lavetta Elk, TR 65 L 18-21, TR 68 L 5 – 13, TR 71 L 17 -24, TR 74 L 8 – 18;** **Direct Examination of Jerilyn Elk, TR 253 L 23 -25** **Cross Examination of Dr. Donald Frankenfeld, TR 464 L 11 -15** |
| Lavetta Elk was sexually assaulted by her military recruiter, Sgt. Kopf, in his military vehicle in a remote location of the Pine Ridge Indian Reservation. During the assault, Sgt. Kopf placed his hand up Lavetta Elk's shirt, rubbed his hand between her legs, tried to unzip her pants. During the assault, Lavetta cried, told him to stop, and tried to push Sgt. Kopf off of her. **Examination by Court of Dr. Manlove, TR 429 13 – TR 433 L 10** | **Supported by evidence.** **Direct Examination of Lavetta Elk, TR 82 L 5 – TR 86 L 14;** **Joint Stipulation of Undisputed Facts, Para. 16-17** |

| ***ASSUMPTIONS AND FACTUAL PREMISES*** | ***ARE THE ASSUMPTIONS AND PREMISES*** |
|---|---|

| ***OFDONALD FRANKENFELD*** | ***SUPPORTED BY THE EVIDENCE?*** |
|---|---|
| Lavetta Elk would have either joined military or graduated from a 4-year college.[2] **Direct Examination of Donald Frankenfeld, Trial Transcript P 445 L 25 – P 446 L 8** | Lavetta Elk received A's and B's in high school and had no discipline problems. **Direct Examination of Lavetta Elk, TR 65 L 18 – TR 66 L 1;** **Direct Examination of Jerilyn Elk, TR 253 L 23 – 25, TR 255 L 15 - 22** Lavetta attended a high school with excellent reputation. **Direct Examination of Donald Frankenfeld, TR 447 L 211 – TR 448 L 1** She received full scholarships to attend three universities. **Direct Examination of Lavetta Elk, TR 74 L 14 – 18** At the time of the assault, Lavetta was being recruited by Sgt. Kopf and she had a dream of joining the military. **Direct Examination of Lavetta Elk, TR 70 L 4 – 16** She was working out and following a training regimen at time of assault**. Direct Examination of Lavetta Elk, TR 83 7 - 8** |
| Lavetta Elk's income should be based on the national average. **Direct Examination of Donald Frankenfeld, TR 448 L: 11 - 23** | Lavetta Elk desires to move off the Reservation for more economic opportunity. **Direct Examination of Lavetta Elk, TR 97 L 11 - 15** |
| Lavetta Elk's losses include her household services, valued by Donald Frankenfeld at $83,721. **Direct Examination of Donald Frankenfeld,TR 483 L 11-15.** | It may reasonably be inferred that Lavetta Elk's depression affects her motivation and effectiveness in performing household services. **Direct Examination of Lavetta Elk, TR 96 L 18 – 22;** **Direct Examination of Noritta High Hawk, TR 236 L 5 - 7** |

Mr. Frankenfeld properly calculated future earnings damages by selecting a discount rate based on the rates of treasury securities. In Jones & Laughlin Steel Corporation v. Pfeifer, 462 U.S.

[2] The assumption is that she would have returned to college shortly after the date of the assault. She would therefore have received a college degree in 2008. Mr. Frankenfeld calculated losses relating to education accruing prior to the time of trial, which he testified was in error. **TR 481 L 8-15.** As a result, the amount of $24,736 should be subtracted from Mr. Frankenfeld's calculation.

523 (1983),[3] the Supreme Court decided under federal law that the appropriate discount rate to apply to future earnings was that "reflecting the safest available investment." Id. at 537-538. The methodology in the federal courts for determining an appropriate discount on future earnings has been described as follows:

> In discounting a lump-sum award for future damages to present value, the discounting methodology must take into account two factors. First, the methodology must take into account the time-value of money, that is, the fact that money awarded today can be invested to earn a return. Id. Second, the methodology must consider the effects of inflation. The discount rate should be based on the interest that can be earned with the safest available investment.

Calva-Cerqueira v. United States, 281 F.Supp 2d 279, 296 (D.D.C. 2003) (citing to Jones & Laughlin) (FTCA case); see also Trevino v. United States, 804 F.2d 1512, 1517-19 (9th Cir. 1986) (FTCA case, holding that the Supreme Court's "guidance on the issue of economic predictions and discount rates cannot be disregarded"). Accordingly, the risk that the predicted outcome will not be realized is not factored into the discount rate. Rather, the sole function of the discount rate in the future earnings calculation is to account for the time value of money. Mr. Frankenfeld's use of treasury securities as the measure of the safest available investment is appropriate under Jones & Laughlin. **(Examination by Court of Donald Frankenfeld, Trial Transcript P 475 L 4 – 476 L 10)**. Likewise his use of a 3% factor for inflation and productivity is proper. **(Direct Examination of Donald Frankenfeld, Trial Transcript P 454 L 5-13)**.

Dated: August 1, 2008

[3] The Supreme Court applied federal law in deciding the discount rate for future earnings damages in a case brought for injuries to a longshoreman under the Longshoreman and Harborworker's Compensation Act, 33 U.S.C. §904.

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiff
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Telephone (305) 931-2200
Facsimile: (305) 931-0877
www.hermanlaw.com

By: s/ Jeffrey M. Herman
JEFFREY M. HERMAN, ESQ.
jherman@hermanlaw.com
STUART S. MERMELSTEIN, ESQ.
ssm@hermanlaw.com
ADAM D. HOROWITZ, ESQ.
ahorowitz@hermanlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 1, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Steven Douglas Bryant
steven.bryant@usdoj.gov

s/ Jeffrey M. Herman