**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **LAVETTA ELK,** | ) | Case No. 05-186L |
| | ) | Judge Francis M. Allegra |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S POST-TRIAL REPLY BRIEF**

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiff
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Telephone (305) 931-2200
Facsimile: (305) 931-0877
www.hermanlaw.com

**TABLE OF CONTENTS**

I. FACTUAL REBUTTAL ........ 1

II. ARGUMENT ........ 10

A. PLAINTIFF IS ENTITLED TO RECOVER FOR HER PSYCHOLOGICAL AND EMOTIONAL DAMAGES UNDER THE "BAD MEN" CLAUSE OF THE TREATY ........ 10

B. WHERE THE CONDUCT AT ISSUE AGGRAVATES A PREEXISTING CONDITION, THE GENERAL RULE IS THAT THE DEFENDANT IS LIABLE FOR THE PLAINTIFF'S ENTIRE INJURY ........ 13

C. DEFENDANT'S CRITICISM OF MR. FRANKENFELD'S METHODOLOGY IS BASELESS ........ 15

D. PLAINTIFF IS NOT COMPELLED TO USE COST-FREE THERAPY TO TREAT HER PSYCHOLOGICAL SYMPTOMS, AND IS ENTITLED TO DAMAGES FOR FUTURE PSYCHOLOGICAL MEDICAL CARE ........ 16

E. THE PURPORTEDLY COMPARABLE VERDICTS AND SETTLEMENTS PRESENTED BY THE UNITED STATES ARE NOT EVIDENCE AND ARE NOT PROPERLY CONSIDERED BY THIS COURT IN DETERMINING DAMAGES ........ 17

F. DEFENDANT'S REPEATED REFERENCE TO PLAINTIFF'S "$100 MILLION" CLAIM IS DISINGENUOUS AND CONTRIVED ........ 19

G. THIS COURT SHOULD AWARD PLAINTIFF DAMAGES FOR HER EMOTIONAL PAIN AND SUFFERING, AS WELL AS OTHER ELEMENTS OF DAMAGES PROVEN AT TRIAL ........ 20

III. CONCLUSION ........ 21

*CASE NO.: 05-186L*

# TABLE OF AUTHORITIES

## Cases

Colon v. Rinaldi, M.D., 2006 WL 3421862 *10 (quoting 22 Am. Jur. 2d *Damages* §240) ..... 14

Feeley v. United States, 337 F.2d 924 (3d Cir. 1964) ..... 16, 17

Friend v. The United States and the Comanche Indians, 29 Ct. Cl. 425, 1800 WL 1867 (1894) ..... 10, 11

Martinez v. United States, 780 F.2d 525 (5th Cir. 1986) ..... 20

Mauer v. United States, 668 F.2d 98, 99-100 (2d Cir. 1981) ..... 14, 15

McDonald v. United States, 205 Ct. Cl. 780, 507 F.2d 1271 (1978) ..... 19

Reilly v. United States, 863 F.2d 149 (1st Cir. 1988) ..... 16

State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658 (1979) ..... 12

Swope v. The United States and the Comanceh and Kiowa Indians, 33 Ct. Cl. 223, 1800 WL 2041 (1898) ..... 10, 11

## Statutes

28 U.S.C. §2675(b) ..... 20

## I. FACTUAL REBUTTAL

The discussion of facts in the Post-Trial Brief filed by the United States contains material omissions and factual misrepresentations of the record. In addition, as Plaintiff's counsel alerted the Court during the trial, the United States failed to honor the pre-trial stipulation to which it agreed at the Pre-Trial Conference, and continues in its Pre-Trial Brief to ignore the stipulation. (Tr. 438-439). At the Pre-Trial Conference on March 27, 2008, the following dialogue occurred:

> **Court:** …But the specific question I'm asking them [United States] is, what about her assertions that other parts of her body were touched?
>
> **Mr. Bryant (counsel for United States):** Outside of her breast, outside of the clothing, and attempt to go into her pants – but that was not successful.
>
> **Court:** All right, so are you contesting that point or not, Mr. Bryant?
>
> **Mr. Bryant (counsel for United States):** On that point, no we're not.
>
> **The Court:** okay.

At trial, the United States disregarded this representation it made to the Court. In particular, after stipulating at the Pre-Trial Conference that Sgt. Kopf attempted to go into Lavetta's pants, the United States would only stipulate at trial that Sgt. Kopf kissed Lavetta and touched her breasts against her will. Plaintiff's counsel objected on several occasions to the United States' attempt to avoid the Stipulation.[1] (Tr. 415-17, 428, 438-439).

The United States' factual errors in its Post-Trial Brief are most significant in the following two areas: (1) The effect of Sgt. Kopf's friendship with Lavetta Elk on the nature of the sexual

---

[1] At trial, the Court instructed Plaintiff's counsel to address this discrepancy in a Post-Trial Brief. (Tr. 438-439).

assault and its impact on Lavetta Elk; and (2) Lavetta Elk's status with the military on the date of the assault.[2]

United States demonstrates an utter lack of understanding of the nature and effect of sexual assaults in arguing that Sgt. Kopf's assault was not as bad as Lavetta's claimed because the two "looked to each other for emotional support." (Defendant's Post Trial Brief, p. 4)**.** This line of argument is not only unsupported by the record (including the parties' stipulation and Sgt. Kopf's conspicuous absence at trial), but it is demeaning to Lavetta Elk and other sexual assault victims. The United States contends that Lavetta Elk's account of the assault is incredulous and her description of its impact should not be believed because certain facts demonstrate that Sgt. Kopf developed a friendship with Lavetta Elk. Indeed, United States argues this "type of relationship is inconsistent with the threats and fears Plaintiff asserted at trial." (See Defendant's Post-Trial Brief, p. 4.) Apparently the United States believes that only strangers commit sexual assault. Perhaps the United States does not believe in the existence of date rape or spousal abuse either.

The United States' theory fails to consider the following facts demonstrating that this was a forceful, premeditated assault which created a genuine fear for Lavetta Elk that she *was* going to be raped[3] by her military recruiter Sgt. Kopf: (1) the parties stipulated that Sgt. Kopf committed a sexual assault against Lavetta Elk's will (Tr. 427); (2) Sgt. Kopf abducted Lavetta to a secluded part

---

[2] As explained elsewhere in this Brief, the United States also mischaracterizes the legal significance of these facts.

[3] United States contends that Lavetta Elk did not mention she was "totally frightened", "terrified" or crying during the assault in her written statements following the assault. Brief, p. 4-5 Yet, Lavetta testified that she prepared a summary of the facts of the assault, rather than her emotions. (Tr. 158-159). Additionally, Lavetta's family members confirmed she was crying hysterically like they had never seen her cry before following the assault. (Tr. 217, 290).

of the Pine Ridge Reservation, asked her whether a missing body could be found at the location, and locked the doors in his military vehicle (Tr. 86-87); (3) Sgt. Kopf continued his assault *after* Lavetta Elk said "no", pushed him away multiple times and told him "it was illegal" (Tr. 86, 166); (4) Sgt. Kopf used force in pinning Lavetta Elk's arm down and unzipping her pants (Tr. 86); (5) Sgt. Kopf told Lavetta a series of lies pertaining to her status within the military and her need for a height-weight evaluation in Sioux Falls on the date of the assault (Tr. 81); and (6) even after Lavetta reported the assault to law enforcement, she had to obtain a restraining order to prevent Sgt. Kopf from further contact with her (Tr. 93). Additionally, as immense cultural imbalance existed between Lavetta Elk and Sgt. Kopf. (Tr. 306-307). The fact that Sgt. Kopf befriended Lavetta Elk before the assault makes these unrefuted facts of assault by a trusted military recruiter even more despicable. It does not make them less credible. Indeed, it appears that Sgt. Kopf seized on the "trust" and "confidence" that Lavetta placed in him, and that her view of him as "powerful" and a key to her future in the military facilitated the assault. (Tr. 73, 88).

The United States' argument that the assault did not occur in the manner Lavetta describes and the injury did not occur to the extent Lavetta contends because she was friends with Sgt. Kopf before the assault also fails to recognize that it is precisely in those situations where the perpetrator of a sexual assault is a trusted friend or authority figure that the damages can be most likely to have a pernicious impact on the victim. (Tr. 326-327, 333-335). When the assault is perpetrated by such a trusted individual in a position of authority, it can create a heightened sense of betrayal, distrust, difficulties with intimacy, loss of faith, and uniquely impacts the victim's self-esteem. (Tr. 326-327, 334). Indeed, Lavetta Elk testified that she is experiencing all of those symptoms and lost her ambition to join the military which had given her family so much pride. (Tr. 96-97).

It must also be noted that United States goes to great lengths to mischaracterize the "friendship" between Sgt. Kopf and Lavetta Elk. When personal matters were discussed between Lavetta and Sgt. Kopf, they were initiated by Sgt. Kopf. (Tr. 112). Regardless of the subject of the conversations, Lavetta always addressed Sgt. Kopf as "Sergeant." (Tr. 73). By her senior year, Lavetta had place her "trust" and "confidence" in Sgt. Kopf. (Tr. 73). Although Lavetta did not particularly like talking about personal matters with Sgt. Kopf, she understood the recruiter getting to know her to be part of the recruitment process and "trusted him." (Tr. 74). Additionally, Lavetta did not interpret any gestures by Sgt. Kopf to be romantic overtures. (Tr. 106-07).

United States describes Sgt. Kopf sexual assault as "at most unwelcome kissing and touching." (Defendant's Post Trial Brief, pp. 3, 7). This is not only inaccurate (and inconsistent with even the stipulation of the parties), but disingenuous. At trial, Lavetta Elk provided an emotional and *unrefuted* testimony of a horrific sexual assault. The assault can be summarized as follows:

(1) Sgt. Kopf, a "tall", "strong" and "well-built" military recruiter in his thirties came to 19-year old Lavetta Elk's home on January 7, 2003 to drive Lavetta in his military vehicle for a height-weight evaluation in Sioux Falls (Tr. 76, 81-83).;

(2) Lavetta Elk placed her "trust" and "confidence" in Sgt. Kopf and viewed him as "powerful" and essential to her future in Army (Tr. 73, 88).;

(3) Sgt. Kopf told Lavetta that he needed to visit another recruit in Manderson before going to Sioux Falls. (Tr. 84). Instead of going to Manderson, Sgt. Kopf drove onto a secluded dirt road for miles. (Tr. 85). He then drove off a trial behind a hill – past where anyone lived to a remote part of the reservation (Tr. 85).;

(4) In this particularly remote location on a barren reservation, Sgt. Kopf asked Lavetta if she thought anybody would find a hidden body. (Tr. 87). Sgt. Kopf parked his car and locked the doors. (Tr. 86). Lavetta felt scared and feared for her safety because she knew that no one lived on this remote part of the reservation. (Tr. 85). This location of the assault was so barren that Lavetta had no place to run. (Tr. 85-86).;

(5) Sgt. Kopf grabbed Lavetta's hand and tried to kiss her. (Tr. 85). When Lavetta pushed him away with force, he came back at her. (Tr. 85). Sgt. Kopf positioned himself on top of her with his hand between her legs and began rubbing her vaginal area and pulling at her zipper. (Tr. 86, 87, 541). Sgt. Kopf unbuttoned her pants, placed his hands up her shirt, and began rubbing her breasts. (86). Sgt. Kopf thought she was going to be raped. (Tr. 85, 87). Lavetta repeatedly pushed Sgt. Kopf away, but each time he came back at her. (Tr. 552-553). Sgt. Kopf grabbed her hand and held it above her head. (Tr. 86). She was crying and kept telling him "no", but he kept assaulting her. (Tr. 86-88). Lavetta felt shock and paralyzed. (Tr. 86). Lavetta was a virgin on the date of the assault (Tr. 648);[4] and

(6) Following the assault, Lavetta was dropped off at her cousin's home. Upon arrival, she began crying hysterically. (Tr. 89). It took Lavetta's cousin 20 minutes to calm her down. (Tr. 89). Her cousin's boyfriend immediately called the recruiting station to report the assault. (Tr. 90).

These facts, many of which United States carefully omitted from its Brief, are consistent with the significant damages sustained by Lavetta Elk. Nevertheless, the United States contends that Lavetta Elk's actions at the convenience store immediately following the assault "demonstrates that her present claims of fear are overblown, if not outright false." (Defendant's Post Trial Brief, p. 7).

---

[4] These undisputed actions are a far cry from United States' characterization of the Sgt. Kopf's

This contention may be the result of the United States' failure to acknowledge the following evidence: After the assault, Lavetta was feeling physically ill (as she had been the day before) and asked Sgt. Kopf to stop at a convenience store. (Tr. 89). She had a friend who worked at the store and she wanted to report the assault to him. (Tr. 89). But, her friend was not working that day, so she went to the bathroom and threw up. (Tr. 89). She did not know any of the people she saw at the convenience store. (Tr. 89). She tried to escape out the back door of the convenience store, but when Sgt. Kopf was waiting there when she exited. (Tr. 89).

The United States never clarifies what it means when it says in its Brief that Lavetta's actions at the convenience store belie her claim, but apparently the United States believes that a real victim would have reported her assault to two or more strangers at a convenience store, or alternatively, remained indefinitely in a convenience store bathroom. (See Defendant's Post Trial Brief, p. 41). The notion that the assault should have been reported to a stranger within minutes of the attack while still in a state of shock is simply inconsistent with the realties of how a sexual abuse victim can be expected to behave. Indeed, disclosing her victimization to a stranger would be *inconsistent* with Lavetta's feelings of shame, embarrassment, and humiliation. (Tr. 315-316). The suggestion that Lavetta should have remained indefinitely in a convenience store bathroom is absurd. Indeed, Lavetta's intended action of running out the back door seems to be a more logical approach than confining herself in a bathroom.

Of course, the United States also fails to acknowledge that upon exiting Sgt. Kopf's car she began crying hysterically. (Tr. 89, 290). Her cousin Jackie Randall "couldn't figure out what was wrong with her." (Tr. 290). It took her "about 20 minutes" to calm Lavetta down and find out what

---

conduct as "at most unwelcome kissing and touching…" (Defendant's Post Trial Brief, p. 35).

occurred. (Tr. 290). Lavetta appeared "scared" and "believed [Sgt. Kopf] was coming back" when she reported the assault to her cousin. (Tr. 291). Immediately upon reporting her assault to her cousin and cousin's boyfriend, a call was placed to the recruiting station and police department to report the crime. (Tr. 90).

The United States also appears to misapprehend the scope and nature of the treatment that Lavetta Elk received following the assault.[5] The United States focuses on her treatment with mental health counselors – without an appreciation of the cultural norms of Native Americans on the Pine Ridge Indian Reservation. Native American females traditionally confide primarily in family members, particularly female members such as the mother, aunts, and sisters. (Tr. 286). Lavetta discussed her emotions often with her mother, sisters, and aunts. Lakota Indians such as Lavetta also visit with a medicine mean to for "healing the body and the mind and the spirit…" (Tr. 222). Lavetta did visit with the medicine man David Swallow, Jr. on multiple occasions beginning "a couple of weeks" after the assault. (Tr. 227). Lavetta was emotional and tearful when she described the assault and resulting "fear" to the medicine man. (Tr. 223). She also described to him that she felt "scared", "worthless", "vulnerable". (Tr. 94). Although Lavetta has known this particular medicine man "since she was a young girl", no other events in her life caused Lavetta to seek the aid of this medicine man. (Tr. 22, 228). The medicine man observed that Lavetta became "withdrawn" and underwent a marked change in her demeanor following the assault. (Tr. 225, 227-228). Additionally, the medicine man recommended that Lavetta continue to receive treatment for feelings about the assault in the future. (Tr. 225-226).

[5] This may be the result of the fact that the United States' expert, Dr. Mills, does "very little" work with Native Americans. (Tr. 638).

Lavetta consulted with a minister in connection with her assault to receive coping strategies and learn meditation techniques. (Tr. 95). Lavetta also received support from Calgnelska within a week of being assaulted by Sgt. Kopf. (Tr. 500). Cangleska is a shelter and advocacy center for victims of sexual assault. (Tr. 496). At Cangleska, Lavetta was again crying and expressed a feeling of betrayal. (Tr. 499).

Although the United States contends that Lavetta experienced emotional "trauma" other than the assault, such as miscarriages and loss of relatives, it must be noted that Lavetta did not seek out the medicine man, minister, or Cangleska for any of the other events in her life. With the exception of her miscarriages, these events occurred *before* the assault, and therefore *before* litigation arising from the assault could have been contemplated. Thus, Defendant's contention that Lavetta minimizes the other stressors for purposes of the litigation is not supported by the record as these events occurred *before* the litigation commenced. Indeed, even Lavetta's military applications omits her prior history of counseling in high school. (Tr. 128-130). Surely she did not omit that information on the application to benefit the litigation – as the assault had not yet occurred. With regard to the miscarriages, Lavetta testified that she felt like a "failure." (Tr. 201). Yet, The United States continues somehow insists she is still "minimizing" the miscarriages. The United States fails to articulate what they feel should have been Lavetta's response to the miscarriages, particular given their expert Dr. Mills' admission that there is not just one appropriate reaction for women who have a miscarriage. (Tr. 648).

The fact that Lavetta received more counseling and support services from Native American services such as Cangleska, a medicine man, and a minister rather than she did from conventional medical care providers makes her suffering no less significant and her claim no less credible. To

find differently would be to ignore the cultural realities of life on the Pine Ridge Indian Reservation for Lavetta Elk.

The United States discusses at some length Lavetta Elk's status in the military on the date of the assault. (Defendant's Post Trial Brief, pp. 2-3). The legal significance of Lavetta's actual status with the military on the date of the assault is nowhere stated and it is not otherwise evident. The fact is that Lavetta Elk viewed Sgt. Kopf as her recruiter and Sgt. Kopf was still recruiting Lavetta on the date of the assault. (Tr. 81-82). Indeed, Sgt. Kopf told Lavetta and her family that he was taking her for a re-examination as part of her admission process on the date of the assault. (Tr. 81). Sgt. Kopf also asked Lavetta to accompany on him while he recruited other students on the reservation. (Tr. 84).

The United States also appears to mislead the Court as to the term "disqualification" in Joint Exhibit 3. A close examination of Exhibit 3 reflects that Lavetta was "not qualified for service" in December 2002, but had an RBJ ("reevaluation believed justified) date of February 15, 2003. JX 3, DEF 286. Thus, even according to the terms of Lavetta's "disqualification", she was still eligible to join the military at a later date and could still be recruited by Sgt. Kopf. The enumerated defect was only that she was "overweight" . Id. Of course, as Lavetta testified, Sgt. Kopf did tell Lavetta about her disqualifying condition and deceived her by telling her that she was in a "delayed entry" program. (Tr. 82-83).

## II. ARGUMENT

### A. Plaintiff is Entitled to Recover For Her Psychological and Emotional Damages Under the "Bad Men" Clause of the Treaty

The United States asserts that losses covered under the "Bad Men" clause of the Treaty with the Sioux, 1868 (the "Treaty"), do not encompass psychological and emotional injuries, yet fails to cite to any authority even remotely supporting this proposition. The two principal cases relied upon by the Government, Friend v. The United States and the Comanche Indians, 29 Ct. Cl. 425, 1800 WL 1867 (1894), and Swope v. The United States and the Comanceh and Kiowa Indians, 33 Ct. Cl. 223, 1800 WL 2041 (1898), not only fail to support the Government's interpretation of the "Bad Men" clause, but they demonstrate that the language of the clause was intended to encompass claims for personal injuries. Both of these cases concern depredations by Indians brought under the Indian Depredations Act. As made clear by the Court in Friend, this Act addresses exclusively claims for *property* of citizens of the United States taken or destroyed by Indians. 33 Ct. Cl. at *3. The use of the term "property" necessarily excludes claims for personal injuries. As a result, the claimant's personal injury damages were not compensable. Id. In stark contrast, the "Bad Men" clause of the Treaty applicable in this case expressly encompasses "any wrong upon ***the person*** or property of the Indians. . . ." (Emphasis supplied).

The Court in Friend also examined the Indian depredations language of the treaty involved in that case, and found it inapplicable. The "Bad Men" language at issue there was very different from the language of the Treaty in this case. There, only when the Indians willfully refused delivery of the wrongdoer for punishment "on proof made to their agent and notice by him, [then] the person injured shall be reimbursed for his loss. . . ." Id. at *4. The Court considered the words "reimbursed

for his loss", and *"conceding that they are broad enough to include the present [personal injury] claim,"* held the depredation language to be inapplicable because there was no willful refusal to deliver up the wrongdoer. Id. (Emphasis supplied). Accordingly, Friend does not by any stretch support the Government's proposition that the "Bad Men" clause of the Treaty is limited to property claims.[6]

The Government's reliance on the Swope case is likewise puzzling. The only issue in Swope was whether the Court of Claims had jurisdiction over a claim for personal injuries under the Indian Depredation Act. As the Court in Friend made clear, the language of that Act is expressly limited to claims for property. The meaning and scope of a "Bad Men" clause is not addressed in Swope.

The Government asserts that the plain meaning of the Treaty must be examined, yet fails to explain why a "loss sustained" by an "injured person" would not by its plain meaning encompass psychological and emotional injuries. If anything, the plain meaning of the "Bad Men" clause supports Plaintiff's position. The Government in its analysis otherwise ignores the basic tenets of treaty construction which must guide the Court's exercise of treaty interpretation. Under these tenets, treaty language must be construed liberally in favor of the Indians:

> Accordingly, it is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule. It has held that the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which

[6] The Government focuses on the statement in the Court's opinion that the words "reimbursed for his loss" are not "apt words" to describe damages for personal injuries. This oblique discussion of the treaty language in *dicta* provides no assistance in this case to the Court in the pertinent inquiry of how the Indians understood damages under the "Bad Men" clause. (See, discussion infra).

> they would naturally be understood by the Indian." *Jones v. Meehan*, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49.

State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675-76 (1979). The United States contends that psychological and emotional injuries which naturally flow to the victim of rape are not compensable under the Treaty. The Government's interpretation essentially leaves an Indian woman raped by a "bad man" unprotected by the Treaty. It is difficult to imagine that anyone could have so understood this clause of the Treaty, particularly the Indians whom it was intended to protect.[7]

The Government asserts that an Indian claimant under the Treaty must provide proof of her damages. This is not apparent from a review of the language of the "Bad Men" clause. The clause begins that if "bad men . . . *shall commit any wrong upon the person* or property of the Indian, the Unites States will, *upon proof made*. . . ." (Emphasis supplied). This language indicates that the "proof" necessary is the commission of the wrong. The Clause then requires the United States to proceed at once to have the offender arrested and punished, "*and also* reimburse the injured person for the loss sustained." (Emphasis supplied). A fair reading of the Treaty language, therefore, is that a proven intentional wrongdoing by "bad men" will necessarily result in a "loss sustained". That being said, Plaintiff does not dispute that the nature and extent of damages under the "Bad Men" Clause must be proven by the Plaintiff, either in an administrative proceeding or, in the present posture of this case, a court of law. For the reasons discussed above, these damages must include psychological and emotional pain and suffering caused by the wrongdoing particularly where, as

[7] It is common knowledge that sexual violence against Indian women by "white men" was a serious problem in Indian - settler relations at the time of the Treaty. The notion advanced by the Government that the "Bad Men" clause, plainly directed to remedy violence against Indians, did not encompass this problem simply ignores an undeniable historical reality and makes no sense.

here, the nature of the wrongdoing is to cause only such injuries. The record in this case demonstrates the devastating mental and emotional pain and anguish suffered by Lavetta Elk as a result of being threatened and violently attacked in a sexual assault by her trusted military recruiter.

### B. Where the Conduct at Issue Aggravates a Preexisting Condition, the General Rule is that the Defendant is Liable for the Plaintiff's Entire Injury

Defendant attempts to make much of the fact that there are references in medical records to Plaintiff being depressed in 2002, prior to the sexual assault. (Defendant's Exh. 23). There is no evidence that such depression was chronic or longlasting. To the contrary, there is evidence that the Plaintiff's pre-assault psychological issues, which arose from the deaths of persons close to Ms. Elk, were temporary. (Tr. 321-322). There is no evidence that Lavetta Elk was in a state of depression in January, 2003, just prior to the sexual assault. As a result, the Defendant's evidence of preexisting depression is of dubious probative value. In any event, as discussed below, a preexisting depression is not a basis to eliminate or reduce Lavetta Elk's damages relating to clinical depression arising from the sexual assault.

Defendant asserts that tort law may provide guidance in this matter. Although Plaintiff agrees generally with this proposition, the parties diverge on the tort law principles that would be applicable here.[8] One such principle that Defendant would be hard pressed to dispute is that regarding aggravation of preexisting injury, which is represented by the well known maxim, "the defendant takes the plaintiff as he finds him":

---

[8] For example, in its discussion of tort law, as well as its discussion of comparable verdicts and settlements (see infra), the United States refers to cases involving the tort of intentional infliction of emotional distress. Because this tort requires no physical contact, its elements include extreme and outrageous behavior by the tortfeasor. It provides no guidance in the present case, brought under the strict liability provision of a "Bad Men" clause, where the plaintiff was sexually attacked by the

> It is a settled principle of tort law that when a defendant's wrongful act causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more sever than they would have been for a normal victim. ***The defendant takes the plaintiff as he finds him.***

Mauer v. United States, 668 F.2d 98, 99-100 (2d Cir. 1981) (emphasis supplied).

There are two exceptions to this general rule, neither of which are applicable here. The first exception is triggered when a plaintiff is incapacitated or disabled prior to the incident, in which case the defendant is liable only for the additional harm or aggravation attributed to the subject incident. Id. at 100. Such an apportionment should be made if possible; if, however, the trier-of-fact is unable to apportion damages between the preexisting condition and the subject conduct, "then the defendant is liable for the total disability." Colon v. Rinaldi, M.D., 2006 WL 3421862 *10 (quoting 22 Am. Jur. 2d *Damages* §240). In this case, there was no evidence that Lavetta Elk was incapacitated or disabled by depression prior to the sexual assault. There does not even appear to be an actual prior diagnosis of depression.[9] Further, there is no basis to apportion damages for depression pre-assault and post-assault.

Under the second exception to the rule, where the plaintiff has a condition that would "inevitably worsen", the defendant is not liable for those damages that would have occurred even in the absence of the subject incident. It is the defendant's burden to show the extent of damages that would have been caused by the preexisting condition. Maurer, 668 F.2d at 100. The testimony at

---

Government's agent.

[9] The United States also attempts to avoid responsibility for Lavetta Elk's mental anguish after the sexual assault by contending that her condition was caused by her miscarriages, not by the assault. The record evidence does not support such an inference. The Court at trial noted that lack of a clinical diagnosis of depression arising from the post-assault miscarriages: "THE COURT: There's no testimony that I know of that clinically observed her as being depressed as a result of the

trial does not support the proposition that Lavetta Elk had a preexisting depression that would "inevitably worsen" irrespective of the sexual assault. The only evidence on this point was from Plaintiff's expert, Dr. Manlove, who testified as follows:

> Q. Outside of that context, where you're prone to depression again, might the events that led to the depression she was treated for in 2002, the deaths of loved ones and so forth, is it possible that that would have contributed to her sadness that she's experienced, as you said, virtually every day following her assault? Is it possible that those sorts of emotions would have stayed with her?
>
> A. Well, it's possible that she could have had some predisposition to depression that was worsened or something. She indicates that it was significantly worse, I guess.

(Tr. 402). The notion that it is "possible" that Lavetta Elk had a predisposition to depression that was worsened by the sexual assault falls far short of demonstrating that her depression would have inevitably worsened absent Kopf's assault. Accordingly, neither exception is applicable, and the general rule is controlling: To the extent that a preexisting depression caused the psychological and emotional effects of Sgt. Kopf's sexual assault to be more severe, "the Defendant takes the Plaintiff as it finds her," and is liable in this case to the full extent of her psychological damages.

### C. Defendant's Criticism Of Mr. Frankenfeld's Methodology Is Baseless

Defendant criticizes Mr. Frankenfeld's analysis of Lavetta Elk's lost earning capacity using a shotgun approach. Many of the points raised by Defendant concern the statistical data used by Mr. Frankenfeld. This data is provided by the government, and as testified by Mr. Frankenfeld, "[i]t's the most current available." (Tr. 452). The Court is entitled to rely upon such statistical sources. See Reilly v. United States, 863 F.2d 149, 167 (1st Cir. 1988) (holding that Court was entitled to

miscarriages." (Tr. 402).

accept estimate of plaintiff's expert that plaintiff would have likely worked for 48 years). The predictive methods and analysis used by Mr. Frankenfeld cannot be expected to have exact precision. As one court noted, "[d]eath and taxes, arguably, may be certain; statistics, though often a valuable predictive aid, usually are not." Id.

Defendant asserts that Mr. Frankenfeld in his fringe benefits analysis should have taken into account that plaintiff is entitled to free health care on the reservation. This is incorrect, as Plaintiff has the right to damages for the costs of private health care even where free health services may be available. Feeley v. United States, 337 F.2d 924 (3d Cir. 1964) (see discussion infra).

Defendant further questions whether the Plaintiff's lost earnings capacity is permanent. Dr. Manlove's testimony supports the claim to these damages for the entirety of Lavetta Elk's working life, noting that her "depression spectrum experiences to anxiety spectrum experiences to psychotic symptoms, flashbacks [and] hallucinations. . ." would continue indefinitely to affect her employability. (Tr. 327-328). Moreover, it is significant that the brutal sexual assault cut the Plaintiff down at the age of 19, when Plaintiff's future prospects and possibilities, including a potential military career and college, were just sprouting. After the assault, Lavetta Elk's psychological well being necessary to pursue her career hopes and aspirations was devastated.[10]

### D. Plaintiff is Not Compelled to Use Cost-Free Therapy to Treat Her Psychological Symptoms, and is Entitled To Damages for Future Psychological Medical Care

Defendant attempts to make much of the fact that Plaintiff did not avail herself of cost-free psychological therapy available on the Pine Ridge Reservation, asking this Court to infer from this

[10] Defendant also criticizes the data and analysis on Plaintiff's earning capacity before the age of 25, even though these were rendered moot when the Court pointed out to Mr. Frankenfeld at trial that absent the assault Plaintiff would have been in college, before obtaining a degree, in that period.

that she is not suffering from the assault and does not require therapy. As discussed above, Lavetta Elk's use of alternative means of therapy native to her culture belies the Government's argument. Indeed, she is not required nor expected to seek out cost-free medical care to treat her condition. In Feeley v. United States, 337 F.2d 924 (3d Cir. 1964), the government disputed the plaintiff's claim to future psychological care expenses on the grounds that cost-free care was available to the plaintiff. The Court repeated the Government's argument and held that the plaintiff was entitled to damages in an amount that would compensate him for private medical care:

> A victim of another's tort is entitled, we think, to choose, within reasonable limits, his own doctor . . . . To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice. The plaintiff may not be satisfied with the public facilities; he may feel that a particular private physician is superior; in the future because of over-crowded conditions he may not even be able to receive timely care. These are only a few of many considerations with which an individual may be faced in selecting treatment.

Id. at 934-935. Accordingly, a plaintiff should not feel compelled to seek out free medical care to support a claim of damages, nor should she be required to accept free medical care in lieu of a damage award compensating her for private care. Dr. Manlove testified that Ms. Elk will require three years of psychotherapy sessions at an estimated cost of $130 per session and monthly psychiatric medication management at a cost of $110 per session. (Tr. 336-337). Defendant does not refute these amounts. Damages for Plaintiff's future psychological medical care are thus in the total amount of $24,240.

### E. The Purportedly Comparable Verdicts and Settlements Presented by the United States Are Not Evidence and Are Not Properly Considered by this Court in Determining Damages

---

(Tr. 481; see also Plaintiff's Post-Trial Brief at 17 n. 2).

The United States asserts in its Brief that "the Court may be guided by damage awards and settlements in similar cases", and attaches the Declaration of AUSA Diana Ryan for the purpose of introducing in this case settlements and verdicts in unrelated cases against the United States. (See Defendant's Post Trial Brief at 29 *et seq.*) It is assumed without discussion in the United States' Brief that it is appropriate for this Court to consider such verdicts and settlements in determining the amount of damages. To the contrary, it is highly inappropriate and improper. Plaintiff is aware of no authority for this Court as trier-of-fact to consider settlements and verdicts in unrelated cases in determining damages. Such verdicts and settlements, involving unrelated incidents and different legal claims, are not evidence. They cannot properly be considered by this Court.[11]

It is beyond dispute that comparable verdicts and settlements are not properly presented to a jury in making a damages determination. The rule is no different when the judge is the trier-of-fact. While a judge sitting in a non-jury case can hear both admissible and inadmissible evidence without committing reversible error, it is well established that the judge must "exclude from his consideration the inadmissible evidence and *base his decision solely on the evidence that is competent or probative.*" McDonald v. United States, 205 Ct. Cl. 780, 507 F.2d 1271, 1274 (1978) (emphasis supplied). A cursory and superficial review of other unrelated cases provided by counsel

[11] The verdicts and settlements discussed by AUSA Ryan are obviously cherry-picked by the United States, and apparently concentrate on the extreme low end of the damages spectrum. The United States has an unfair advantage in this exercise because it has peculiar knowledge of cases and matters it has litigated which is not available to the Plaintiff. In any event, because this exercise is wholly improper, Plaintiff chooses not to engage Defendant and present its own verdicts and settlements. Plaintiff's counsel notes, however, that there is no shortage of cases where millions of dollars were awarded as damages for sexual assault. As examples, in a verdict from the U.S. District Court for the Southern District of New York, Judge Leisure awarded rape victims $35 million each in compensatory damages in a case involving Radovan Karadzic, the former Bosnian Serb leader. The U.S. District Court for the District of Delaware in 2007 awarded $6 million in compensatory damages to a victim of rape by a priest. Also in 2007, a jury in Dallas awarded $119 million to 10

for the United States is neither competent nor probative.

There has been a movement in legal academia advocating "comparability review" by trial courts in rendering verdicts on intangible losses. This movement has been sharply criticized and has not taken hold. As stated by one commentator:

> Losses like pain and suffering and emotional distress affect the most unique aspects of our being and cannot in principle be equated from case to case. Comparability review ignores this difficulty. It rests instead on a discredited form of utilitarianism, one that treats the internal states of different individuals as virtually the same. In this way, it flies in the face of our intuitive sense of self and the law's fundamental assumption that separate persons are juridically basic entities.

Lind, *The End of Trial on Damages? Intangible Losses and Comparability Review*, 51 Buff. L. Rev. 251 (2003).

Accordingly, other settlements and verdicts are not evidence and cannot be considered by this Court in determining damages. The presentation of such verdicts and settlements by Defendant in its Post-trial Brief is improper, and should be stricken.

### F. Defendant's Repeated Reference to Plaintiff's <u>"$100 Million" Claim is Disingenuous and Contrived</u>

A theme of Defendant in its Brief involves repeated references to her "$100 million" claim in an apparent effort to disparage Plaintiff's claim for psychological and emotional injuries. The $100 million figure is based on the amount stated in Plaintiff's pre-suit administrative claim, which is repeated in the Complaint. At no time during trial did Plaintiff or her counsel state that Plaintiff was seeking to recover $100 million in damages. It should not be disputed that her damages are unliquidated and are to be determined by this Court as trier-of-fact. An administrative claim under

---

men sexually molested as altar boys.

the FTCA must be stated in a specific dollar amount,[12] which serves as a cap on the amount of damages which may ultimately be recovered in a court action. 28 U.S.C. §2675(b); Martinez v. United States, 780 F.2d 525 (5th Cir. 1986). That amount, operating as a cap, may not be pertinent to the damages claimed at trial. In this case, the Defendant's references to Plaintiff's "$100 million" claim are disingenuous and contrived, and are simply not helpful to this Court as trier-of-fact.

### G. This Court Should Award Plaintiff Damages for Her Emotional Pain and Suffering, as well as Other Elements of Damages Proven at Trial

The evidence demonstrates that Lavetta Elk will suffer the trauma of that fateful day and Sgt. Kopf's brutal sexual assault for the rest of her life. There is no formula for placing a monetary value on this pain and suffering and the affect it has had on Lavetta Elk's life, which must be left to the good conscience, discretion and sound judgment of the trier-of-fact. Lavetta Elk's life expectancy is 81.6 years. (Plaintiff's Exh. 7). If she were awarded just $100,000 per year for each year of this suffering, past and future, the amount would be $6,250,000. Alternatively, one could imagine a market for employment in which the employee, as part of the job description, must endure a brutal sexual attack by a trusted person in a position of authority and control over the employee. What amount would the market dictate as pay for such a job? Plaintiff suggests that damages in the range of $3-$6 million are warranted in this case for Plaintiff's psychological and emotional pain and suffering. A suggested award may be summarized as follows:

| | |
|---|---|
| Mental anguish, emotional Pain and suffering | $ 5,000,000 |
| Loss of future earning capacity | $ 680,000 |

[12] There are no procedures for making a claim to the Department of Interior under a "Bad Men" Clause. Plaintiff in this case followed the procedures set forth in the FTCA.

| | |
|---|---|
| Future costs of psychological/ Psychiatric treatment | $ 24,000 |
| **TOTAL LOSS** | **$ 5,704,000** |

## III. CONCLUSION

Plaintiff respectfully requests entry of a judgment for Lavetta Elk in the full amount of her damages as discussed above.

Dated: September 12, 2008

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiff
18205 Biscayne Boulevard
Suite 2218
Miami, Florida 33160
Telephone (305) 931-2200
Facsimile: (305) 931-0877
www.hermanlaw.com

By: s/ Jeffrey M. Herman
JEFFREY M. HERMAN, ESQ.
jherman@hermanlaw.com
STUART S. MERMELSTEIN, ESQ.
ssm@hermanlaw.com
ADAM D. HOROWITZ, ESQ.
ahorowitz@hermanlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 12, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

*CASE NO.: 05-186L*

Steven Douglas Bryant
steven.bryant@usdoj.gov

s/ Jeffrey M. Herman