**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(E-Filed September 12, 2008)

| | | |
|---|---|---|
| LAVETTA ELK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-186L |
| v. | ) | Judge Francis M. Allegra |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF**

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

STEVEN D. BRYANT
SARA E. COSTELLO
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424 (phone)
(202) 305-0267 (fax)
steven.bryant@usdoj.gov

Of Counsel:
Major Lanny Acosta
U.S. Army Litigation Division

Sharon Pudwill
Department of Interior

## TABLE OF CONTENTS


I. Plaintiff is Not Entitled to Recover For Alleged Emotional and Psychological Injuries . . . . . 3

II. The Jury Verdict Method Should Not be Utilized . . . . . 6

III. An Adverse Inference Should Not be Drawn Against Defendant . . . . . 8

IV. The Factual Assumptions Plaintiff's Experts Relied On Do Not Support Plaintiff's Speculative Claims of Lost Earning Capacity . . . . . 13

V. The Evidence Supports the Factual Assumptions Dr. Mills Relied On in Contrast to Dr. Manlove's . . . . . 17

VI. Conclusion . . . . . 22

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bohac v. Department of Agriculture*,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 3, 4

*Buchbinder v. Natanzon*,
205 Fed. Appx. 984 (4th Cir. 2006) . . . . . . . . . . 5

*Chicago College of Osteopathic Medicine v. George A. Fuller Co.*,
719 F.2d 1335 (7th Cir. 1983) . . . . . . . . . . 12

*Choctaw Nation of Indians v. United States*,
318 U.S. 423 (1943) . . . . . . . . . . 6

*Dawco Const., Inc. v. United States*,
930 F.2d 872 (Fed. Cir. 1991) . . . . . . . . . . 7

*Friend v. United States and the Comanche Indians*,
29 Ct. Cl. 425, 1800 WL 1867 (Ct. Cl.) . . . . . . . . . . 5

*Garreaux v. United States*,
77 Fed. Cl. 726 (Fed. Cl. 2007) . . . . . . . . . . 6

*Hall v. United States*,
69 Fed. Cl. 51 (2005) . . . . . . . . . . 4

*Hebah v. United States*,
428 F.2d 1334 (Ct. Cl. 1980) . . . . . . . . . . 5

*Herbert v. WalMart Stores, Inc.*,
911 F.2d 1044 (5th Cir. 1990) . . . . . . . . . . 10

*Herrera v. United States*,
39 Fed. Cl. 419 (1997) . . . . . . . . . . 6

*Jones v Otis Elevator*,
861 F.2d 655 (11th Cir. 1988) . . . . . . . . . . 9

*Navajo Tribe of Indians v. United States*,
9 Cl. Ct. 336 (1986) . . . . . . . . . . 7

*Porter v. United States*,
163 F.3d 1304 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pratt v. United States*,
50 Fed. Cl. 469 (Fed. Cl. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rodriguez v. United States*,
69 Fed. Cl. 487 (Fed. Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*South Carolina v. Catawba Indian Tribe, Inc.*,
476 U.S. 498 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Stockton East Water District v. United States*,
76 Fed. Cl. 497 (Fed. Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Swope v. United States and the Comanche and Kiowa Indians*,
33 Ct. Cl. 223, 1800 WL 2041 (Ct. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Underwriters Lab. v. NLRB*,
147 F.3d 1048 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*White Mountain Apace Tribe of Arizona v. United States*,
11 Cl. Ct. 614 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATE CASES**

*Ellerman v. Skelly Oil Co.*,
34 N.W.2d 251 (Minn. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Industrial Mut. Ind. Co. v. Perkins*,
98 S.W. 709 (Ark. 1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Naughton Co. v. American Horse Exchange*,
49 Misc. 227, 97 N.Y.S. 387 (N.Y. 1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sauer v. Union Oil Co.*,
43 La. Ann. 699, 9 So. 566 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tuthill v. Belt Railway. Co.*,
145 Ill. App. 50 (1st Dist. 1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Zuber v. Northern Pacific Railway Co.*,
74 N.W.2d 641 (Minn. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**FEDERAL RULES**

RCFC 45(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF**

**I. Plaintiff is Not Entitled to Recover For Alleged Emotional and Psychological Injuries.**

In its Post-Trial Brief, Defendant explained that the "Bad Men" clause provides certain relevant requirements for assessing liability and damages. Def.'s Br., 21-26. Namely, Defendant examined the plain language of the "Bad Men" clause, which shows that the claimant is required to provide "proof," in order to be entitled to reimbursement. *Id.* at 23-34. Further, the Treaty requires Plaintiff to sustain a compensable "loss." *Id.* at 24-26. In addition, emotional and psychological injuries do not fall within the scope of Treaty. *Id.* Consequently, Plaintiff is not entitled to recover for her alleged emotional and psychological injuries.

In Plaintiff's Post-Trial Brief, Plaintiff draws upon contract law to argue that she is entitled to recovery for such alleged injuries. Pl.'s Br., 2 ("since the Treaty is a contract, the law on interpreting contracts is an appropriate starting point for an analysis of recoverable damages and applicable law"). As set forth below, however, Plaintiff fails to show that she is entitled to the relief she seeks.

Plaintiff's citations to contract law provide little support for the assertion that damages for emotional and psychological injuries should be recoverable. Pl.'s Br., 3. In *Bohac v. Department of Agriculture,* the United States Court of Appeals for the Federal Circuit analyzed a provision of the Whistleblower Protection Act and concluded that the claimant could not recover for pain and suffering. 239 F.3d 1334, 1340 (Fed. Cir. 2001) (applying the traditional contract law prohibition against emotional distress damages to an employment contract). The *Bohac* court observed that courts have permitted the recovery of emotional distress damages in certain limited circumstances. *Id.* (citing the Restatement (Second) of Contracts § 353 examples of

contracts involving carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death). Plaintiff's claims, however, do not fit into these limited circumstances. *Pratt v. United States*, 50 Fed. Cl. 469, 482 (Fed. Cl. 2001) (finding that the court lacked jurisdiction to award damages for emotional distress and pain and suffering, because "except in limited circumstances related to common carriers and innkeepers not applicable here, the court cannot award damages for the emotional consequences of a breach of contract because such consequences are speculative as a matter of law.") (citing *Bohac*, 239 F.3d at 1339). *See also Rodriguez v. United States*, 69 Fed. Cl. 487, 494 (Fed. Cl. 2006) (same); *Hall v. United States*, 69 Fed. Cl. 51, 57-58 (2005) ("Although the court has jurisdiction to adjudicate this claim because it is ultimately one arising in contract, the court has no authority to award Plaintiff damages for 'emotional distress and pain and suffering.") (internal quotation omitted).

Plaintiff also contends that the language of the "Bad Men" clause "is by its nature broad." Pl.'s Br., 2. Despite Plaintiff's contentions, however, the Treaty does not provide for the recovery of nebulous damages. Indeed, the "Bad Men" clause includes terms that indicate that emotional and psychological injuries are not compensable. The "Bad Men" clause uses the terms "reimburse" and "loss sustained." These terms indicate that the Treaty contemplated payment for injuries that could be specifically valued such as property destroyed, lost past wages, and medical expenses rather than open-ended and speculative damages like those for pain and suffering. Plaintiff parses the etymology of the word reimburse. Pl.'s Br., 2. This term, however, does not mean that a claimant under the Treaty is entitled to recover more than the specifically quantifiable sums expended or lost. As Defendant pointed out in its Post-Trial Brief,

"reimburse" means "[t]o pay back, to make restoration, to repay that expended; to indemnify, or make whole." BLACK'S LAW DICTIONARY 1157 (5th ed.). Indeed, "[t]he term 'reimburse,' which means 'to pay back,' . . . inherently assumes a prior pay-out." *Buchbinder v. Natanzon*, 205 Fed. Appx. 984, 990-91 (4th Cir. 2006) (quoting *American Heritage Dictionary*, 4th Ed., 705 (Houghton Mifflin 2001)).

Plaintiff's assertion is also undercut by the fact that Plaintiff fails to point to any case in which damages were awarded by a court pursuant to a "Bad Men" clause for emotional and psychological injuries. Moreover, *Hebah v. United States*, 428 F.2d 1334 (Ct. Cl. 1980), does not support Plaintiff's theory. Pl.'s Br., 4. In *Hebah*, the court was concerned with whether the treaty at issue provided rights to individual Indians and if the court had jurisdiction over such claims. *Id*. at 1337-40. Subsequently, *Hebah* was dismissed on grounds unrelated to damages. 197 Ct. Cl. 729, 456 F.2d 696, 704-10 (Ct. Cl. 1972) (finding that a tribal policeman "did not commit a wrong within the meaning of the Treaty of 1868" in shooting the plaintiff's husband).

In actuality, caselaw indicates that when the Treaty was ratified, the "Bad Men" clause would be read and understood to not encompass emotional and psychological injuries. *See* Def.'s Br., 24-25 (discussing *Friend v. United States and the Comanche Indians*, 29 Ct. Cl. 425, 1800 WL 1867 (Ct. Cl.) (casting doubt upon whether the clause would provide reimbursement for the personal injuries of the claimant, his wife, and son) and *Swope v. United States and the Comanche and Kiowa Indians*, 33 Ct. Cl. 223, 1800 WL 2041 (Ct. Cl.) (finding that the Indian Depredation Act of March 3, 1891 did not provide a remedy for "damages for the personal injury to the plaintiff").

Furthermore, Plaintiff provides no support for the conclusory assertion that "[s]erious emotional disturbance is particularly likely to result when 'bad men' commit a 'wrong.'" Plaintiff does not cite to any textual support in the Treaty for this assertion nor does Plaintiff provide caselaw in this regard. In any event, as demonstrated in Defendant's Post-Trial Brief, at trial Plaintiff failed to prove that she is entitled to damages for emotional and psychological injuries. *See* Def.'s Br., 39-45 (summarizing the lack of evidence corroborating Plaintiff's claim of ongoing harm).

Plaintiff's assertion that treaties are to be interpreted liberally in favor of Indians fails to salvage her claim. "The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986)). Moreover, "[a]lthough it is true that the Court is to construe treaties liberally, resolving ambiguities in favor of the Indians, the Court cannot rewrite or expand treaties beyond their clear terms to remedy a claimed injustice." *Garreaux v. United States*, 77 Fed. Cl. 726, 737 (Fed. Cl. 2007) (citing *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *Herrera v. United States*, 39 Fed. Cl. 419, 421 (1997)). Plaintiff simply cannot expand the "Bad Men" clause to include her alleged emotional and psychological injuries.

## II. The Jury Verdict Method Should Not be Utilized.

Contrary to Plaintiff's suggestion, the "jury verdict" method should not be utilized. As Defendant explained in its Post-Trial Brief, Plaintiff failed to present "evidence sufficient for a court to make a fair and reasonable approximation of the damages." *Dawco Const., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991). Instead, Plaintiff's estimation of her damages

remains speculative and uncertain. Plaintiff's Post-Trial Brief admits as much contending that "[t]here is no single dollar amount that can be placed" on her injuries. Pl.'s Br., 5.[1/] The "jury verdict" method, however, isn't intended to award undocumented claims with an unjustified windfall. *Dawco Const., Inc.*, 930 F.2d at 882.

Moreover, Plaintiff's arguments regarding the "jury verdict" method only serve to highlight that her alleged damages do not fall within the purview of the Treaty. For example, Plaintiff contends that her injuries are "incapable of precise calculation." *Id.* at 5. As Defendant explained above, the Treaty does not contemplate that such indefinite damages would be compensated. Rather, in enacting the Treaty, Congress intended that claimants would be reimbursed for specific losses sustained.

In any event, the cases cited by Plaintiff also fail to establish that the "jury verdict" method should be used in this case. For example, in *White Mountain Apace Tribe of Arizona v. United States*, this method was utilized, because of the "historical nature of the claims." 11 Cl. Ct. 614, 663 (1987). *White Mountain Apace Tribe of Arizona* involved "events and conditions occurring on the reservation's rangeland over periods of time dating back 100 years." *Id.* Accordingly, the parties had to rely on historical documents that were "incomplete and provid[ed] less information than would be necessary to establish damages with precision." *Id.* Thus, the court opted to utilize the "jury verdict" method. *Id.* at 663-64. Likewise in *Navajo Tribe of Indians v. United States*, the court utilized the "jury verdict" method to assess damages that occurred decades earlier. 9 Cl. Ct. 336, 381-82, 387, 393, 429 (1986). This case certainly

[1/] With the exception of Plaintiff's claims regarding lost earning capacity, which she claims need not be calculated through the "jury verdict" method. Pl.'s Br., 7. As Defendant demonstrated in its Post-Trial Brief, however, Plaintiff is not entitled to recover for lost earnings. Def.'s Br., 43-45.

does not involve historical claims stemming from events that occurred decades ago. Consequently, *White Mountain Apace Tribe of Arizona* and *Navajo Tribe of Indians v. United States* provide little support for the proposition that the "jury verdict" method should be utilized in this matter.

In this case, Plaintiff has failed to substantiate her request for extensive damages in the amount of $100 million. Instead, Plaintiff relies upon speculation and unsupported claims. The "jury verdict" method should not be utilized to reward Plaintiff for her unsubstantiated claims.

**III. An Adverse Inference Should Not be Drawn Against Defendant.**

The absence of Kopf at trial should not result in an adverse inference against Defendant. As discussed in Defendant' Post-Trial Brief, the modern Federal Rules of Evidence and Civil Procedure render the "uncalled witness rule" obsolete. Additionally, even if the rule were still valid, it is inapplicable to the present case because Plaintiff cannot establish that Kopf was peculiarly within Defendant's power to produce. Indeed, Kopf was equally available to both sides, because of this Court's nationwide jurisdiction and subpoena power. RCFC 45(b)(2).

Plaintiff has failed to establish that Kopf was unavailable. Plaintiff concedes – as she must – that she could have subpoenaed Kopf to appear at trial. Pl.'s Br., 9-10. Having acknowledged that Kopf was subject to the Court's subpoena power, Plaintiff alternatively suggests that Kopf was "practically unavailable." Pl.'s Br., 10. Under the archaic uncalled witness rule, courts have deemed witnesses practically unavailable in certain circumstances where a relationship exists between a witness and a party that creates bias or hostility against the opposing party. An employee's economic interest has given rise to a finding of practical unavailability in the context of the employer-employee relationship. In the past, courts have

concluded that an employee is not equally available to both parties because of the likelihood that the employee would have testified favorably to the employer had the witness been called.

In support of the "practically unavailable" argument, Plaintiff first points to *Jones v Otis Elevator*, 861 F.2d 655 (11th Cir. 1988). There the uncalled witness rule was applied against Otis for failing to call one of its elevator mechanics in a tort action alleging negligent elevator maintenance. Notably, however, the Court of Appeals for the Eleventh Circuit, *sua sponte*, challenged the continuing validity of the uncalled witness rule in light of the modern federal procedural and evidentiary rules:

> [W]e question the wisdom of permitting the missing witness charge when the potential witness is within the subpoena power of both parties and physically available to be called ... With the evolution of the Federal Rules of Evidence , a party is no longer required to vouch for the credibility of a witness. Today the calling party is free to impeach the credibility of any witness. Hence, the deterrent which existed against calling a hostile witness is no longer applicable. In addition, the more liberal discovery procedures permitted under the Federal Rules of Civil Procedure give opposing counsel the mechanism with which to discover in advance what the proposed testimony will be.

*Jones v Otis Elevator*, 861 F.2d at 659 n4. The Court of Appeals observed that Otis failed to raise the issue of whether the uncalled witness rule remained viable under the modern rules of evidence and procedure. *Id.* ("The soundness of the rule permitting the missing witness charge was not challenged on this appeal."). Consequently, the Court of Appeals did not invoke its clear misgivings about the rule to reject it outright. Nevertheless, the court's analysis underscores why the rule is obsolete.

The same modern evidentiary and procedural rules discussed in *Jones* apply in this case. Plaintiff deposed Kopf and obtained his proposed testimony in advance of trial. Ex. A. Plaintiff could have subpoenaed Kopf and treated him as a hostile witness, but elected not to. In fact,

Plaintiff identified Kopf as a potential trial witness up until a week before trial.[2/] *See Stockton East Water District v. United States*, 76 Fed. Cl. 497, 505 (Fed. Cl. 2007) (noting that the court declined to draw an adverse inference because both parties listed the uncalled witnesses); *also Underwriters Lab. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir. 1998) (judge's decision rejecting application of adverse rule is appropriate, given that uncalled witness was available to both parties and present during hearing). For the reasons elucidated in *Jones*, this Court should reject the uncalled witness rule as obsolete. *See also*, *Herbert v. WalMart Stores, Inc.*, 911 F.2d 1044, 1048 (5th Cir. 1990) (federal evidentiary and procedural rules render uncalled witness rule an anachronism).

Even assuming the uncalled witness rule remains valid, Plaintiff's reliance on the employer-employee relationship for the assertion that Kopf was "practically unavailable" is misplaced. Courts have recognized that an adverse inference should not be drawn where the witness is no longer employed by a party to the litigation. *See Zuber v. Northern Pacific Railway Co.*, 74 N.W.2d 641, 649 (Minn. 1956); *also*, *Naughton Co. v. American Horse Exchange*, 49 Misc. 227, 97 N.Y.S. 387 (N.Y. 1906) (there is no greater obligation on defendant than plaintiff to call a former employee who is no longer in defendant's control and direction); *Industrial Mut. Ind. Co. v. Perkins*, 98 S.W. 709 (Ark. 1906) (trial court erred in drawing adverse inference against party for failure to call former employee); *Tuthill v. Belt Railway. Co.*, 145 Ill. App. 50 (1st Dist. 1908)(failure to produce former employee does not warrant adverse inference);

---

[2/] *See* Plaintiff's Witness List, dated January 25, 2008; Plaintiff's Amended Witness List, dated March 21, 2008; and Plaintiff's Second Amended Witness List, dated April 21, 2008.

*Sauer v. Union Oil Co.*, 43 La. Ann. 699, 9 So. 566 (1891) (adverse inference inapplicable where there is no evidence absent potential witness remains employed by party).

In *Ellerman v. Skelly Oil Co.*, the Minnesota Supreme Court explained that an adverse "presumption arising from the failure of an employer to produce an employee as a witness is limited to the cases where such witness is actually in the employment and under the control of the party at the time of trial." 34 N.W.2d 251, 254 (Minn. 1948). Conversely, the uncalled witness rule does not apply when the witness is no longer employed by the defendant and the plaintiff has the burden of proof. *Id.* The court further explained that it was plaintiff's responsibility to produce the former employee, and her failure to do so cannot give rise to an adverse inference against the defendant. *Id.*

Plaintiff has failed to establish that Kopf was a United States employee at the time of the trial.[3] Plaintiff produced no evidence at trial – or for that matter in her post-trial filing – to support her allegation that Kopf was employed by the United States at the time of trial. Pl.'s Br., 8-9. Kopf's military orders discharging him from active duty demonstrate that he was not employed with the U.S. Army during the trial. As of December 31, 2007, approximately four months before trial, Kopf retired from active duty military service. Ex. B. Considering that Kopf was no longer employed by the U.S. Army at trial, an adverse inference should not be drawn against Defendant.

Additionally, even assuming Kopf had not retired before the trial, the rationale giving rise to the adverse inference rule is not present, and therefore, it should not apply. The

[3] Further, Plaintiff's counsel was aware that Kopf retired from active duty, because it was discussed during the telephonic pretrial conference on March 27, 2008.

underlying basis for the uncalled witness rule was the potential bias an absent witness would likely have towards its employer and hostility against the opposing party because of the employee's economic interest. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983). No such employer bias exists in the present case concerning the facts on which Kopf would have testified. If anything, Kopf is hostile to both parties. The events to which he would have testified involve his criminal conduct, which he disputes. As reflected in his deposition, Kopf maintains his innocence. Kopf asserts that Plaintiff made sexual advances towards him and he tried to resist. Ex. A, DEF2022-24. Kopf accuses Army investigators of forcing him to sign a false confession. *Id.*, DEF2060-65. Considering Kopf's accusations against Army investigators and his disagreement with the findings and punishment imposed by his commander with respect to the events at issue in this case, it is clear that Kopf would have been hostile toward Defendant. Thus, even if Kopf were on active duty at the time of trial, there certainly is no evidence of the bias one might find in the traditional employee-employer relationship. *See Chicago College*, 719 F.2d at 1353-54 (where the absent witness was physically available to both parties and the relationship with the witness' former employer was very tenuous given that he resigned because of his misconduct, any potential error arising from the trial court's refusal to provide an adverse inference instruction was harmless).

For the foregoing reasons, even assuming this Court concludes that the uncalled witness-rule is not obsolete, it should not apply to the present case.

**IV. The Factual Assumptions Plaintiff's Experts Relied On Do Not Support Plaintiff's Speculative Claims of Lost Earning Capacity.**

Contrary to Plaintiff's suggestions, the factual assumptions her experts relied on do not support her speculative claims of lost earning capacity. Plaintiff references Dr. Manlove's factual assumption that Plaintiff had the "cognitive functioning" to complete college and was on track toward a four-year college degree or military career before the assault in support of Dr. Manlove's opinions concerning Plaintiff's alleged emotional trauma and Frankenfeld's opinions as to estimated lost lifetime earnings capacity. Pl.'s Br., 16-17. Whether or not Plaintiff has the intelligence to finish college does not support the speculative conclusion that she, in fact, was on track for a college degree or military career.

Plaintiff did not prove that she was on track to complete a college degree. Plaintiff quit college after completing less than two months of her first semester. JX 5 at ¶ 8; RT 114-15, 117-18. Moreover, Plaintiff quit college despite the fact that she had not been accepted into the Army. *Id.* All indications are that Plaintiff's short-lived collegiate experience was enough for her to determine that she did not want to pursue a four-year degree. First, if Plaintiff intended to complete her college education, at a minimum, she would have continued her studies during her first semester while simultaneously applying for enlistment in the Army. As discussed below, pursuing her alleged "dream" of becoming an Army nurse would have required, among other things, a four-year college degree. RT 114-16. Plaintiff admitted that she did not even explore a Reserve Officer Training Cadet program at her college or Officer Candidate School. RT 115-16. Had becoming an Army nurse truly been her plan, then Plaintiff would not have taken the counterproductive step of withdrawing mid-semester and walking away from her scholarship.

Second, Plaintiff's actions since the assault further demonstrate that she was uninterested in pursuing a college degree. Significantly, Plaintiff presented no evidence that she has completed a single course toward a four-year degree in the nearly six years since she dropped out. Given the multitude of available options for courses on-line, by correspondence, or in residency and Plaintiff's failure to complete any, the only reasonable conclusion is that her two-month collegiate experience was enough for Plaintiff to conclude that it was not for her. This is yet another example of Plaintiff's actions refuting her words. Regardless, Plaintiff certainly has not proven that, but for the assault, she would have earned a four-year degree and then gone on to obtain employment at the estimated national average female salary Frankenfeld used in his calculations.

Plaintiff did not prove she was on track for a military career either. As a preliminary matter, it is important to distinguish between the earnings of an enlisted solider versus those of a commissioned officer. Frankenfeld's lost earnings analysis is based on the assumption that Plaintiff's lifetime earning capacity was higher before the assault than afterwards. Frankenfeld's hypothesis fails if Plaintiff's projected career was that of an enlisted soldier because she would have earned less as an enlisted soldier than she did in her employment after the assault. Frankenfeld estimated Plaintiff's annual salary to be $19,448 for the hourly wage position she held at the time he spoke with her. RT 452. Whereas, had Plaintiff been accepted into the Army, her annual salary as a newly enlisted solider would be approximately $1,300 per month or $15,600 per year. RT 491.

Conversely, if one assumes that Plaintiff would have been commissioned as an officer then she would have earned significantly more. The assumptions that this Court would have to

make in order to consider Plaintiff having a career as a commissioned officer are at least threefold: (1) Plaintiff would have been accepted into the Army as an enlisted soldier; (2) then in some unspecified period of time she would have completed a college degree in nursing; and (3) then Plaintiff would have applied for and received a military commission. RT 463, 467. Plaintiff failed to prove that any of these assumptions are anything but sheer speculation. Plaintiff failed to clear even the first – and least burdensome– hurdle for a military career as she was disqualified under the Army's height weight or alternative body fat regulatory requirements. JX 5 ¶ 15.

These hypothetical assumptions are so speculative that even Frankenfeld declined to calculate the estimated pre-assault earnings based on Plaintiff having a military career.[4/] RT 463, 467. However, Frankenfeld attempted to bootstrap the annual salary of a commissioned nurse to support his opinions concerning the average national salary for a female college graduate. As Frankenfeld stated, a commissioned nurse earns approximately $37,200 per year, which approximates the $37,730 average female college salary he estimated for Plaintiff's pre-assault earning capacity.[5/] RT 452, 467. Thus, Plaintiff is asking this Court to make speculative

---

[4/] Moreover, the Federal Circuit has long recognized that court's do not have the expertise to speculate about the propriety of military promotion decisions: "The promotion of an officer in the military service is a highly specialized function involving military requirements of the service and the qualifications of the officer in comparison with his contemporaries, plus expertise and judgment possessed only by the military. No court is in a position to resolve and pass upon the highly complicated questions and problems involved in the promotion procedure, which includes, but is not limited to, an analysis of the fitness reports and personnel files and qualifications of all the officers considered evaluate the various considerations the military considers and determining who is promoted and should not intrude upon military promotion decisions." *Porter v. United States*, 163 F.3d 1304, 1316-17 (Fed. Cir. 1998).

[5/] Plaintiff asserts that her alleged "desire" to move off the Pine Ridge Reservation supports Frankenfeld's reliance on a national average rather than the depressed wages available on the Reservation. Pl.'s Br., 17. Plaintiff's actions belie her words. The fact that after moving away shortly after the assault (RT 95), Plaintiff returned to the Reservation in 2006 (RT 101-02) and continues to live there (RT 62) is far stronger evidence of where she intends to reside than her testimony. Additionally, the average earnings (by Frankenfeld's estimate) are 20% less than the

assumptions about her nonexistent military career that Plaintiff's own expert is unwilling to make.

Additionally, Frankenfeld's entire analysis is based on the erroneous assumption that Plaintiff's alleged emotional injuries are permanent. RT 474. In fact, the evidence demonstrates otherwise. Beyond Plaintiff's self-serving allegations and her family's anecdotal testimony, there is no support for her claim of ongoing emotional harm. To the contrary, Plaintiff sought professional psychological medical treatment less than five times in the more than five years since the assault, which indicates her symptoms were temporary at most. RT 92-93, 190-91; DX 13. Notably, Plaintiff relies on the fact that she did not seek counseling following any of her miscarriages to corroborate her claims that they did not cause her significant grief. Pl.'s Br., 15. Plaintiff cannot have it both ways. If the lack of counseling after her miscarriages points to an absence of grief, then, by that same reasoning, Plaintiff did not suffer significant emotional trauma from the assault, given the limited number of times she sought medical treatment. RT 92-93, 190-91; DX 13.

Even if Plaintiff were still experiencing emotional symptoms, there is no evidence that the symptoms will continue permanently. Plaintiff has utterly failed to prove that any emotional symptoms she alleges are permanent. Dr. Manlove acknowledged that Plaintiff should experience significant improvement in three years with weekly psychotherapy and medication. RT 336. Consequently, at most the evidence indicates that any impact on Plaintiff's earning capacity would be limited to three years, not the lifetime estimates Frankenfeld postulated.

---

national average in South Dakota, and 10% less in Rapid City. RT 471.

## V. The Evidence Supports the Factual Assumptions Dr. Mills Relied On in Contrast to Dr. Manlove's.

The evidence supports the factual assumptions that Dr. Mills relied on in making his conclusions. Dr. Mills's principle conclusion is that Plaintiff was malingering for gain. There is an abundance of evidence to support this conclusion as discussed in this section, and with more detail in Defendant's opening brief. Plaintiff exaggerates the symptoms she attributes to the assault, and minimizes other emotional trauma. The underlying issue is Plaintiff's lack of credibility as demonstrated by her own statements following the assault, the absence of physical evidence supporting her claims, her failure to seek medical treatment for her alleged emotional symptoms, as well as the psychological tests both forensic psychiatrists administered.

With respect to Dr. Manlove's opinions, Plaintiff omits the most significant factual assumptions, her credibility and whether the alleged fear she claims is supported by the evidence. Pl.'s Br., 16. Dr. Manlove agreed that his opinions were predicated on Plaintiff's accuracy and truthfulness (RT 351, 360, 363). Dr. Manlove admitted that his PTSD diagnosis would be incorrect if Plaintiff's allegations of extreme fear were false. RT 413-14.

Plaintiff attempted to substantiate the PTSD diagnosis at trial, claiming that Kopf "tried to rape her" and that she was "terrified" during the assault. RT 154. However, Plaintiff's trial testimony was belied by her own statements immediately following the assault. Those contemporaneous statements significantly undermine her credibility and support Dr. Mills's conclusion that the assault was relatively minor. Plaintiff described Kopf making romantic overtures, saying she was "cute," and that he "liked" her and wanted to "take care of" her. RT 165 ; DX 18 DEF96. Plaintiff described her state of mind as "<u>uncomfortable</u>" rather than scared

or threatened. RT 167 (emphasis added). Plaintiff did not even mention fear, much less being terrified, in either of her contemporaneous written statements. RT 157, 164-65; DX 18.

At trial, Plaintiff again tried to support the PTSD claim by describing her fear as a 10 on a scale of 1 to 10 scale. RT 144. Within hours of the assault, however, she informed Agent Bennett that her fear was only a 6 on the same scale. RT 542; DX 11. Dr. Manlove admitted that this was inconsistent with his assessment of extreme fear. RT 408. Plaintiff attempted to conceal her self-assessed fear on the day of the assault by accusing Agent Bennett of lying or being mistaken about asking the question. RT 176. Plaintiff's unfounded allegations about Agent Bennett only serve to further damage her own credibility.

Further, Plaintiff's actions at the convenience store immediately following the assault demonstrate that her claims of fear are unsupported. Plaintiff did not seek help from any of the customers or the store clerk. RT 168-69. She did not ask to call the police or even tell Kopf to leave her there. *Id.* Plaintiff admitted that she could have stayed in the locked bathroom. *Id.* Instead, she unlocked the bathroom door and rejoined Kopf. Her actions, yet again, are wholly inconsistent with her trial testimony that he attempted to rape her and she was "terrified."

Additionally, her friendship with Kopf and the nature of the assault itself do not support her claims. They relied on each other for emotional support. JX 5 ¶s 6-11. Kopf was the first person Plaintiff turned to for support when her grandfather died. RT 112-13. During the assault, Kopf did not hit her or threaten to do so, nor did he have a weapon. Plaintiff informed Agent Bennet in the interview following the assault that Kopf did not threaten her with physical harm. RT 548-49. Plaintiff had no bruises, red marks, or other evidence of injuries. RT 538-40; DX

11 DEF 91, 95. The independent evidence overwhelmingly contradicts the story Plaintiff presented at trial of an attempted rape and extreme fear.

Plaintiff's failure to inform Dr. Manlove and Dr. Mills of other psychological events and treatment in her life supports Dr. Mills's conclusion that Plaintiff minimizes the impact of these other stressors. For example, Plaintiff did not inform either psychiatrist about the burial service for her stillborn son. RT 373-74. Plaintiff's mother described the tragedy as devastating. RT 284-85. Similarly, Plaintiff never informed them of the series of psychological treatments she sought at Pine Ridge in early 2002. RT 361, 377-78.

Additionally, the psychological tests demonstrate that Plaintiff is grossly exaggerating her claims of emotional injuries, and attempting to manipulate the results for purposes of the litigation. Drs. Manlove and Mills both recognized that the Minnesota Multiphasic Personality Inventory II ("MMPI") is the oldest, most reliable, most validated, and widely used psychological test. RT 370-71, 594-95. The MMPI consists of non-obvious questions so it cannot be easily manipulated. RT 609-13. The F- scales on Plaintiff's MMPIs, which in part identify if a testee is lying about her symptoms, were wildly exaggerated. Plaintiff had the maximum possible T-score of 120 on the F- scale for the MMPI that Dr. Manlove administered. RT 339-40, 422-23, DX 20, DEF3154. Dr. Manlove did not recall ever observing a score that high. RT 370-71. Dr. Mills, who has reviewed approximately 500 MMPIs in his career, could only recall seeing a 120 on the F-scale one other time. RT 619-620. In fact, Dr. Mills has only encountered a score above 100 on the F - scale a couple of times. As he observed, "I mean, it's extremely rare, even amongst litigants," he said. RT 620.

In his report, Dr. Manlove attempted to summarily dismiss the high F- scale as a cry for help, but retreated from that assertion when pressed on cross examination: "At this point, I guess I'm questioning that, after looking at it more." RT 425. He admitted that "Lying ... should be considered a potential option," which goes to the core of Dr. Manlove's opinions. *Id*. As he stated on cross examination, Plaintiff's truthfulness was critical to his opinions: "If I found out [Plaintiff] lied to me ... I would revise my opinion, if I had evidence that she lied to me." RT 351, 360, 363. Additionally, all of Dr. Manlove's opinions concerning the MMPI should be questioned. As he admitted, his interpretation was not based on his own independent analysis of the MMPI, but rather he "follow[ed] the lead of the psychologist" that administered the test. RT 425.

Dr. Mills did not rely on the MMPI exclusively. He took the appropriate follow-up step of administering the Personality Assessment Inventory ("PAI") to help triangulate whether Plaintiff was attempting to manipulate her responses. DX 3. The PAI is comprised of obvious questions, which permits a test-taker to game the results. RT 609-10. Unsurprisingly, Plaintiff scored highest on PTSD in accordance with her claims in this lawsuit. The results of that test support the conclusion that Plaintiff is malingering. Specifically, Dr. Mills found that Plaintiff intended to present herself as having traumatic stress, and given the PAI's obvious questions, did so. RT 613; DX 3 DEF763. By contrast the MMPI, where the questions were not obvious, she did not appear to have PTSD. RT 613; DX 2, DEF 749 (PK was the fourth highest score).

Notably, Plaintiff omitted any reference to the psychological tests in her very limited discussion of whether Dr. Manlove's opinions were supported by the evidence. Pl.'s Br., 16. The clear implication of this omission is Plaintiff's recognition that the results of the

psychological tests, undermine her credibility and therefore her claims. Indeed, the results of the tests clearly support Dr. Mills's conclusion that Plaintiff is malingering for gain.

With respect to the psychological tests and Dr. Mills's opinions, Plaintiff's limited comments in her Post-Trial brief only serve to strengthen Dr. Mills's conclusion that Plaintiff grossly exaggerates her alleged symptoms related to the assault. Pl.'s Br., 15. Plaintiff references Dr. Mills's testimony that he generated a clinical report rather than a litigation report from Plaintiffs' MMPI, and that it could not be relied on to generate a clinical diagnosis given Plaintiff's extreme exaggeration. RT 606-07. Dr. Mills noted that had he generated a litigation report it would have said "Be extremely cautious; this is probably invalidated." RT 606-07. This statement is entirely consistent with Dr. Mills's opinions that Plaintiff is grossly exaggerating her symptoms. Dr. Mills explained why he generates a clinical report rather than a litigation report from the MMPI:

> I don't do that, because I don't want the extra spin, if you will, of the litigation overview. I want to look at her just like any patient or any client or any evaluee, and so I routinely get the outpatient mental health interpretative report, which is what this particular report is.

RT 606-07. Thus, in contrast to Dr. Manlove who defers to whatever psychologist administers the MMPI (RT 425), Dr. Mills applies his own independent analysis and interpretation of the results and does so in a fashion that minimizes the "extra spin." In any event, irrespective of which report Dr. Mills generated from the MMPI, it is clear that Plaintiff exaggerates her symptoms from the assault.

## VI. Conclusion

Plaintiff bears the burden of demonstrating that she is entitled to her damage request of $100 million for alleged emotional and psychological injuries allegedly sustained as a direct and proximate result of the assault, plus attorneys fees and costs. For the reasons stated above and in Defendant's Post-Trial Brief, Defendant respectfully requests that the Court find that Plaintiff failed to prove that she has sustained losses that would entitle her to reimbursement under the Treaty.

DATED: September 12, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

s/ Steven D. Bryant by Sara E. Costello
STEVEN D. BRYANT
SARA E. COSTELLO
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 305-0424 (phone)
(202) 305-0267 (fax)
steven.bryant@usdoj.gov

Of Counsel:

Major Lanny Acosta
U.S. Army Litigation Division
901 N. Stuart Street
4th Floor
Arlington, VA 22201

Sharon Pudwill
Department of Interior
Office of the Field Solicitor
Bishop Henry Whipple Federal Bldg.
1 Federal Drive, Room 686
Twin Cities, MN 55111