# In The United States Court of Federal Claims

No. 05-186L

(Filed:  April 28, 2009)
_____

| | |
|---|---|
| LAVETTA ELK,<br><br>            Plaintiff,<br><br>   v.<br><br>THE UNITED STATES,<br><br>            Defendant. | * Trial; Claim under bad men clause of Fort<br>* Laramie Treaty of 1868; Sexual assault of<br>* Sioux woman on Pine Ridge Indian<br>* Reservation; Construction of the word<br>* "reimburse" as used in the Treaty;<br>* Noneconomic damages recoverable under<br>* bad men clause; Assault victim found<br>* credible and a reliable witness; Nature of<br>* damages inquiry; Medical damages<br>* determined; Other economic damages<br>* determined; Damages for pain, suffering and<br>* emotional distress determined; Judgment<br>* awarded. |

_____

**OPINION**
_____

*Adam D. Horowitz,* Herman & Mermelstein, P.A.*,* Miami, FL, for plaintiff.

*Steven D. Bryant*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ronald J. Tenpas*, for defendant.

**ALLEGRA, Judge:**

> *"The best thing a man can do is when he makes a promise to stick to it."*[1]

This case is before the court following a trial in Rapid City, South Dakota.  Plaintiff, a member of the Oglala Sioux Tribe, seeks relief under Article I of the Fort Laramie Treaty of April 29, 1868 (the 1868 Treaty), which provides that if "bad men" among the whites commit "any wrong" upon the person or property of any Sioux, the United States will reimburse the injured person for the loss sustained.  Based on the evidence adduced at trial, the court finds that

_____

[1] Chief Swift Bear, Council with the Brule Sioux at Fort Laramie, Dakota Territory, Apr. 28, 1868, as recorded in The Institute for the Development of Indian Law, Proceedings of the Great Peace Commission of 1867-68 at 110 (1976).

plaintiff sustained a loss within the meaning of this clause and that she, therefore, is entitled to monetary relief from the United States under the Treaty of 1868 in the amount of $590,755.06.

## I.    FACT FINDINGS

Lavetta Elk was born in late 1983, the third youngest of seven children.  As a member of the Oglala Sioux Tribe, Ms. Elk is a beneficiary of the 1868 Treaty. 15 Stat. 635, ratified Feb. 16, 1869, proclaimed by President Andrew Johnson on Feb. 29, 1869.  Article I of the Treaty, the so-called "bad men" clause, states:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

In this same Treaty, the United States set aside lands in South Dakota west of the Missouri River as the Great Sioux reservation, a "permanent home" for the Sioux Nation.  Ms. Elk grew up with her parents and siblings on a portion of this land – in Wounded Knee, South Dakota, on the Pine Ridge Indian Reservation.[2]

Ms. Elk attended Red Cloud High School (Red Cloud), a nationally-recognized Jesuit institution named after one of the Sioux chiefs who negotiated the 1868 Treaty.  There, she received excellent grades, participated in interscholastic team sports (captaining the volleyball team) and worked on community service projects.  Her life-long ambition was to join the U.S. Army (the Army), following in the footsteps of her grandfathers, uncles, and brother, all of whom served in the military.  During her junior year at Red Cloud, when she was sixteen years old, she requested enlistment information from the Army, hoping, as she testified, "to be the first female in [her] family in the military."  Staff Sergeant Joseph Kopf (Kopf), an Army recruiter from the local recruiting station in Rapid City, South Dakota, was assigned to work with Ms. Elk and came to Red Cloud to provide her with the information she had requested.  Ms. Elk indicated to Kopf that she wanted to be assigned in the nursing field.  During her final two years of high school, Ms. Elk spoke regularly with Kopf on the telephone and, on occasion, in person at the recruiting station, her school, and her parents' house.  While their conversations initially focused only on military service, they eventually became more personal.  Kopf asked Ms. Elk about her family, college plans, and boyfriends, and shared information about his wife and children.  Over time, Kopf's behavior increasingly suggested that he had more than a professional interest in Ms. Elk – he brought her flowers at the hospital where she worked, attended her high school volleyball games, and repeatedly asked her to the movies.  Ms. Elk declined the latter invitations

---

[2]    The history surrounding the 1868 Treaty and the 1890 massacre of Sioux Indians that occurred at Wounded Knee is well-documented.  *See* S. Rep. No. 106-368, at 3-5 (2000).

and, in general, was uncomfortable with Kopf's personal advances.[3]  During this same general time period, Ms. Elk was briefly treated for depression.[4]

In May 2002, Ms. Elk graduated from Red Cloud.  She was accepted to four colleges, three of which offered her full scholarships.  In August 2002, prior to starting college, Ms. Elk accompanied Kopf on a recruiting trip.  At one point during that trip, while in Martin, South Dakota, Kopf told Ms. Elk to come to his hotel room so he could measure and weigh her as part of her military application process.  While Ms. Elk was holding out her arms to be measured, Kopf hugged her around the waist; he then turned off the light, grabbed her and kissed her.  Ms. Elk became angry and pushed him away.  He relented for the moment, but on the drive home he pulled off the road on two occasions and asked Ms. Elk if she liked him.  She again reacted angrily, resisting the advances, at which point Kopf apologized and promised that it would not happen again.  Though disturbed, Ms. Elk did not report the incident, because she still trusted Kopf and thought "it was over."

Later in August 2002, Ms. Elk moved to Kansas City, Missouri, to attend Rockhurst University on a full scholarship.  At that time, she told Kopf that she would delay joining the Army until after completing school – nonetheless, they continued to communicate by phone and electronic mail.  At one point, Kopf informed Ms. Elk that a military job in the medical field was available – one that he knew interested her.  During this period, he continued to initiate more personal discussions, calling Ms. Elk late at night on a few occasions, for example, and informing her that his wife was cheating on him and wanted a divorce.

---

[3]  In her deposition, Ms. Elk indicated that she stopped speaking with Kopf for a while in high school because "[h]e started asking me to the movies and asking me out, so I didn't talk to him for a few weeks [but] I really wanted to join the military, so, yeah, I started talking to him [again]."  At trial Ms. Elk reiterated her discomfort with Kopf's advances.

[4]  On January 17, 2002, halfway into her senior year, Ms. Elk contacted a counselor indicating that she wanted to leave an abusive relationship with a boyfriend.  Five weeks later, on February 28, 2002, Ms. Elk sought treatment at PCC Mental Health/Social Service.  At PCC, Ms. Elk expressed grief over the death of two of her educational sponsors, indicated she had been depressed for a year, and requested counseling.  Ms. Elk was referred to a therapist, and on April 11, 2002, had an initial session with Tami Osburn, who diagnosed Ms. Elk with a depressive disorder.  The following week, on April 17, 2002, Ms. Elk went to PHS Indian Hospital Health Services with her teacher.  Her teacher reported that Ms. Elk was experiencing depression, mood swings, and feelings of hopelessness for two months and suggested to the PHS personnel that Ms. Elk might benefit from medication.  At a second therapy session on April 26, 2002, Ms. Elk expressed feeling overwhelmed by finals, graduation, college scholarship applications, and summer camp.  Ms. Elk did not keep a scheduled June 11, 2002 appointment and received no further mental health treatment until after the sexual assault that gives rise to this action.

In September 2002, Ms. Elk's great-uncle died, and she returned home to Pine Ridge to grieve with her family and attend the funeral.[5]  When Kopf was informed of the death, he called Ms. Elk daily the week of the funeral, ostensibly to console her.  At this time, Ms. Elk chose not to return to college, but to stay with her family in Wounded Knee – a decision prompted, at least in part, by Kopf's comments regarding the availability of a medical job in the military.  Later in the fall of 2002, Ms. Elk spoke further with Kopf about pursuing a career in the Army, and he provided her with an application.  Ms. Elk applied to be a medic.

On December 17, 2002, Kopf drove Ms. Elk and another female recruit to Sioux Falls, South Dakota (a six-hour drive), for a physical examination at the Military Entrance Processing Station (MEPS).  The examination was a standard part of the application process.  When asked, Ms. Elk told the soldier who weighed and measured her that she wanted to be in the nursing field.  Ms. Elk did not satisfy the Army's height-weight requirements or alternative percentage body fat standards during this exam.  Nonetheless, Kopf congratulated her and informed her that she had been accepted into the military, giving her an Army shoulder bag and t-shirt, and causing Ms. Elk to sign various papers, including permission forms.  Kopf told Ms. Elk that her entry into the Army would be delayed until a job in the nursing field became available.  All of Kopf's statements and actions were fabrications – Ms. Elk had not been accepted into the military and, indeed, never was.  Kopf also recommended that Ms. Elk continue exercising and lose ten pounds.  Kopf and the two recruits spent the night in Sioux Falls, with Kopf staying at a different hotel from the recruits.

Several weeks later, on January 7, 2003, at approximately 9:20 a.m., Kopf arrived unannounced at Ms. Elk's home in a government vehicle.  Kopf informed Ms. Elk and her father that she needed to return to the MEPS in Sioux Falls for another height and weight evaluation, contending that her "paperwork had been lost again."  Kopf instructed Ms. Elk to bring a change of clothes because they would stay overnight in Sioux Falls and return the next day.  Ms. Elk packed a bag of clothes and departed with Kopf.

After telling Ms. Elk that he needed to visit a recruit in Manderson, South Dakota, before going to Sioux Falls, Kopf instead drove for several miles on the secluded White Horse Creek dirt road to a remote part of the reservation.  Kopf then turned onto an unmarked trail.  While driving through this barren and desolate area, Kopf alarmingly asked, "if somebody hid a body out there, would anybody find it?," a comment that Ms. Elk took as a threat.  Kopf parked the car behind a hill, turned off the engine and locked the doors.  Because of the remote location, miles from the nearest house or building, Ms. Elk felt trapped and scared.[6]  It is undisputed that Kopf

---

[5]  Ms. Elk and several of her relatives testified at trial about the closeness of the Elk family.  On the Pine Ridge reservation, younger Native Americans refer to any related elder, such as a great-uncle, as a grandparent.

[6]  Ms. Elk testified as follows: "He turned on a dirt road.  It's called White Horse Creek Road [and he drove] three, four miles . . . . It's secluded.  It's real secluded.  There's nothing out

then sexually assaulted Ms. Elk.  First, he grabbed her hand and tried to kiss her.  Ms. Elk protested, telling him "no" and pushing her away.  But, this time, Kopf would not stop.  He started to rub Ms. Elk's hand and leg, pulled her close, and said "[c]ome on, I thought you liked me."  Kopf moved out of his seat to position himself on top of Ms. Elk.  He put his hand between her legs, rubbed her vagina through her pants, then unbuttoned her pants and tugged at the zipper.[7]  Kopf next reached his hands up Ms. Elk's shirt, slid it under her bra, and began grabbing her breasts.  Ms. Elk cried, repeatedly tried to push Kopf away, and kept telling him "no."  But, Kopf continued to assault her – using one hand to pin her arms above her head and another to grope her.  At one point, apparently in an attempt to coerce her into having sex, Kopf told Ms. Elk he could get her any military position she wanted.  But, Ms. Elk continued to resist and, after about thirty minutes, Kopf finally relented.[8]  He turned the car's engine back on, drove back to the dirt road and then onto the main road in Manderson, heading towards Kyle, South Dakota.

Soon after they reached the main road, Ms. Elk requested that Kopf stop at a convenience store, Common Cents, where a friend of hers worked.  Ms. Elk intended to report the assault to her friend, but, upon entering the store, found that he was not working that day.  She proceeded to the bathroom, where she vomited.[9]  Ms. Elk tried to escape out of the store's back door, but when she came out of the bathroom Kopf was waiting for her, leaving her little option but to return with him to his car.  They continued to drive toward Kyle.

---

there.  It's just open.  It's a dirt road. . . . He drove off on a trail behind a hill . . . at least a mile. . . . I was scared.  I knew nobody lived that far out[.]"

[7]  Defendant stipulated that "Sergeant Kopf indecently assaulted Lavetta Elk by kissing her and touching her breasts against her will."  At an April 3, 2008 pre-trial conference, defendant's counsel also acknowledged that Kopf made "an attempt to go into her pants."  Nonetheless, at trial, defendant appeared to back away from its prior concessions, questioning, for example, whether any vaginal contact had occurred.

[8]  In estimating the duration of the assault, Ms. Elk testified that it went on for "[a]t least 30 minutes, but it felt like forever."  On cross-examination, Ms. Elk added that thirty minutes was an estimate from the time "the car was parked" by Kopf until the time "[w]hen he stopped" assaulting her.  During that same examination, defendant asked Ms. Elk a number of questions concerning the length of the assault and how long she was crying, attempting to impeach her by comparing her answers to those she gave at her deposition.  In the court's view, however, the discrepancies between the answers she gave at her deposition and at trial were trifling, with any variations more than understandable given the traumatic nature of the assault.  Moreover, the two statements Ms. Elk gave the day of the assault, as well as a third statement given the following day, more than adequately documented the critical facts of the attack.

[9]  It is unclear whether this vomiting was induced by the trauma Ms. Elk suffered.  She had been ill for several days before the assault and, in particular, had sought medical treatment for vomiting and other symptoms.

As they proceeded to Little Wound High School in Kyle, where Kopf was planning to meet another recruit, Ms. Elk requested that he drive her to her cousin, Jackie Randall, whose house was approximately ten minutes away from the school.  Kopf dropped Ms. Elk off at Ms. Randall's house at around 11:30 a.m. and told her that he would return for her at 1:30 p.m.  After running into her cousin's house, Ms. Elk cried uncontrollably for twenty minutes before Ms. Randall could calm her down enough to get sketchy details of what had happened.[10]  Ms. Randall's boyfriend, Shane Montgomery, called the Army recruiting station to report the incident.  Ms. Elk then called an aunt to tell her what had happened, and that aunt relayed news of the incident to Ms. Elk's father, who called the police department to report the assault.

At approximately 12:30 p.m., Oglala Public Safety Officer Molanna Clifford arrived at Ms. Randall's house, and spoke with Ms. Elk about the assault.  Officer Clifford instructed Ms. Elk to write down a description of what had happened.  In that preliminary account of the assault, she wrote, in part:

> He slowly started rubbing my hand and I pulled away, but he grabbed my hand. He started talking about how he thought I was cute and how he liked me.  He leaned in to kiss me but I pushed him away.  He kept asking me what was wrong. He started kissing me.  I pushed him away and told him that we shouldn't be doing this and that it was wrong.  He just asked why and started kissing me again. I pushed him away and told him I wanted him to stop.  He stopped and started asking about my family and how things were going.  He leaned over and said he was going to take care of me.  He started kissing me again.  Pretty soon, he started putting his hand up my shirt.  I kept pushing him away.

After receiving this statement, Officer Clifford transported Ms. Elk to the Kyle Police Department and notified Bureau of Indian Affairs criminal investigator Robert Bennett of the incident.  From the Kyle police station, Ms. Elk called her older sister, Daverine, at work and, while still crying, told her to come to the station right away.[11]  At 1:45 p.m. on the afternoon of the assault, Agent Bennett interviewed Ms. Elk at the police station for approximately forty-five minutes.  Agent Bennett documented the interview in a BIA incident report, detailing her account of the assault.  He wrote, in part:

---

[10]  Ms. Elk testified: "I got out of his car.  I ran inside.  I was trying to tell Jackie what happened, but I was crying so hard.  She was trying to calm me down, but – it took her at least 20 minutes to calm me down."  Ms. Randall's testimony corroborates Ms. Elk's description of her emotional state: "Hysterical.  She was crying.  I couldn't figure out what was wrong with her. . . . [It took] about 20 minutes or so [before she was composed enough to explain what happened]."

[11]  As related by Daverine Elk at trial: "She said she was at Kyle, and she was crying, and I never heard her cry like that, so I took time off from work, and I left that way."

> Elk reported that she was fondled about her breasts, legs, hands, and vaginal area
> against her will by S. Sgt. Joseph Kopf . . . [who] attempt[ed] to kiss her and
> touch her through her clothing.  She said at one point Kopf had slipped his hand
> under her bra and made contact with her breasts.  Elk alleges that she was
> resisting his advances and telling him to stop.  At one point Elk said Kopf held her
> arm behind her head as he attempted to touch her. . . . He was also pulling at her
> pants zipper and button.  He rubbed her vagina through her pants. . . . She
> explained that each time she pushed him away he would push back.

The following day, Ms. Elk drafted another statement that expanded upon her earlier account of
the assault.  In this statement, Ms. Elk provided additional details regarding the assault itself and,
for the first time, described events that occurred later on the day of the assault.[12]

   Meanwhile, at 3:20 p.m. on the day of the assault, Agent Bennett conducted a twenty
minute interview with Kopf, who, by then, had been detained.  Kopf denied the allegations Ms.
Elk had made against him.  That same afternoon, Kopf told Army Captain James Fernelius that
he had not touched Ms. Elk.  Approximately three weeks later, on January 29, 2003, Kopf
reiterated to other investigating Army officials, including Special Agent Alberto Tello from the
Army's Criminal Investigating Command, that he had not attempted to kiss or touch her.

   Ms. Elk was extremely distressed by the assault.  In the days that followed she stayed at
her parent's house, experiencing insomnia, loss of appetite, fear, nightmares, sickness, and body
aches.  Various stimuli – smelling men's cologne, seeing food that Kopf liked or a place that she
identified with him – recurringly triggered flashbacks of the assault.  Family members witnessed
these significant physical and behavioral changes, observing that Ms. Elk, once talkative and

---

   [12] Defendant seizes on slight differences in the statements Ms. Elk made around the time
of the assault in an attempt to undermine her credibility.  But, defendant's nitpicking only serves
to highlight the extent to which Ms. Elk's basic recitations of what happened during the assault
are consistent and reliable.  To begin with, Ms. Elk's initial written statement does not contradict
her later statements, but merely omits certain details she provided to the police verbally or in her
subsequent written account.  As confirmed by one of the forensic psychiatrists who testified,
these omissions are unsurprising as the earliest statements were made mere hours after the
assault, when Ms. Elk, by virtually all accounts, was crying uncontrollably and in shock.
Moreover, the first of these statements was written in haste for potential use as a basis for
detaining Kopf.  Ms. Elk testified uncontrovertedly that the tribal police instructed her to write "a
summary of what happened," and to "finish [her] summary before the [BIA investigator] gets
here."  Ms. Elk's first written account was also rushed because she feared that Kopf would return
to her cousin's house while she was still there.  "I felt I was in danger," she testified, "and I
wanted to get some place safe [because I was at my cousin's house and Kopf] said he would
come back."  Recalling that she had been "writing faster than [she] could think," Ms. Elk
testified: "[i]t was important for me to be safe . . . It wasn't important for me to write down every
single time he touched me, every single time I cried."

sociable, was now detached, quiet, and moody.[13]  Ms. Elk abandoned any interest in joining the military.  Within a week of the assault, she also sought support from Cangleska, a shelter and advocacy center for victims of sexual assault.  After Kopf attempted to contact her in the days following the assault – on one night calling her three or four times – Ms. Elk feared that he might cause her further bodily harm and secured restraining orders against him on January 24, 2003, and February 5, 2003, both times with Cangleska's assistance.  Ms. Elk received therapy at Kyle Mental Health, as well as treatment at the Indian Hospital in Pine Ridge, where she was prescribed anti-depressants and sleeping pills for insomnia.  She also consulted with a minister, John Two Bulls, for coping strategies and meditation techniques.  A few weeks after the assault, and for the first time in her life, Ms. Elk visited a Sioux medicine man, David Swallow, Jr.  She described to him feeling scared, worthless, and vulnerable.  Mr. Swallow, a family friend who had known her since she was a baby, observed that she was withdrawn and had undergone a marked change in her demeanor following the assault.

The assault continued to take its toll on Ms. Elk.  Reminders of that nightmarish episode prompted her to take frequent showers.  She stopped exercising, yet lost twenty pounds, avoided intimacy with men, and, in February 2003, started drinking alcohol for the first time in her life.  On April 18, 2003, the United States Department of Justice declined to prosecute Kopf.  In June 2003, Ms. Elk was arrested in Manderson for driving drunk and trying to elude the police.

On August 8, 2003, in non-judicial criminal proceedings conducted pursuant to Art. 15, Uniform Code of Military Justice (UCMJ) (10 U.S.C. § 815), Colonel David Ellis found that, on January 7, 2003, Kopf had "commit[ted] an indecent assault" upon Ms. Elk "by kissing her and touching her breasts, with intent to gratify [his] sexual desires," in violation of Article 134 of the UCMJ (10 U.S.C. § 934).  Colonel Ellis also found Kopf's statements to Captain Fernelius and Special Agent Tello regarding the sexual assault to be false and knowingly made with intent to

---

[13]   Ms. Elk's mother, Jerilyn, testified that prior to the assault her daughter "would always be laughing and telling me things.  She was happy," but that in the days after the assault, Ms. Elk "was crying.  She was upset.  She didn't eat.  She didn't feel good at all. . . . She had mood swings.  She didn't sleep, and she hardly ate.  She'd throw up.  She didn't talk much either. . . . She was a completely different person than the loving child that I had."  Ms. Elk's aunt, Noretta, testified that as a child her niece "was always happy, getting along with others, doing things . . . [and] always a good student," but that after the assault, Ms. Elk was "in a depressed mood[,] . . . just wasn't herself . . . [s]he's always crying.  She's scared.  She just doesn't want to be alone."  Ms. Elk's older sister, Daverine, testified that in the first few weeks after the assault her sister "was emotional, and she was crying . . . having nightmares . . . she had some doctor's visits that she went to, and they were giving her medication, but the medication was giving her nightmares, and it was a tough time for our whole family."  Daverine added that Ms. Elk "was withdrawn . . . [h]er weight was fluctuating for a while," and that five years after the assault, "she's been having nightmares in trying to deal with everything, and . . . it keeps coming back to haunt her."

deceive, in violation of UCMJ Article 107.  Kopf was punished with a reduction in rank from Staff Sergeant to Sergeant, loss of military pay, and removal from recruiting duties.

During this same period (albeit on a date not reflected in the record), Ms. Elk purchased a bus ticket and left town unannounced.  She traveled alone through a number of states, including Idaho, Iowa, Texas, North Carolina, and Wisconsin, sometimes staying with extended family. Having briefly become sexually active for the first time following the assault, in October 2003, Ms. Elk had a miscarriage in her second trimester.  In December 2003, she met Jorge Romero in Texas.  The two married in January 2004, and moved to Wisconsin where they lived for two years, during which time Ms. Elk received a medical assistant certificate from Milwaukee Career College.  Ms. Elk was employed briefly as a medical assistant, but found that the memories of the assault made it difficult to work.  In 2004 and 2005, she experienced four miscarriages, each very early in her first trimester.  She and her husband returned to live with Ms. Elk's parents in South Dakota before their first child was born in May 2006, and still reside with them along with their two children.  Ms. Elk continues to experience depression, anxiety, sleeplessness, and loss of self worth, all of which have adversely affected her marriage and her relationships with her children.

*          *          *          *          *

Some time before April 7, 2004, plaintiff sent a Notice of Claim to the Department of the Interior (Interior); the claim was received by Interior on April 7, 2004.  This claim invoked both the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.*, and the "bad men" clause of the 1868 Treaty.  On April 30, 2004, the Army notified plaintiff that it would handle the FTCA claim, while Interior would review the treaty-based claim.  By letter dated October 1, 2004, the Army denied plaintiff's FTCA claim.  Five months passed, with plaintiff still not hearing anything from Interior about the treaty portion of her claim.  Having still heard nothing, plaintiff, on February 3, 2005, filed a complaint with this court, demanding, *inter alia*, a judgment in the amount of $100 million, costs, attorney's fees, and all other damages permitted by the Treaty.  On March 16, 2005 – nearly a year after her Notice of Claim was filed – a representative from Interior finally contacted plaintiff's counsel, requesting support for the treaty-based claim.  On April 19, 2005, defendant filed a motion to dismiss the complaint for lack of subject matter jurisdiction under RCFC 12(b)(1), claiming that plaintiff had failed to meet the prerequisites for bringing a claim under the 1868 Treaty.  On January 20, 2006, oral argument was held, at the conclusion of which the court denied defendant's motion.  This court held that neither the 1868 Treaty nor any other source of law required plaintiff to await an administrative decision on her claim before filing suit and suggested that, even if such an exhaustion requirement existed, plaintiff had essentially met that requirement by not filing her suit until after the Army had denied her FTCA claim and the Department of Justice had decided not to prosecute Kopf.  The court later published a further exegesis of its reasoning.  *See Elk v. United States*, 70 Fed. Cl. 405 (2006).[14]

---

[14]  During this period, Ms. Elk continued to pursue a career in nursing.  In 2006, she applied for various jobs at hospitals and nursing homes and was eventually hired as a nurse's aide and floating pharmacy aide at Beverly Health Care systems.

Following discovery, trial in this case was held on April 28-30, 2008.  At trial, Ms. Elk, members of her family, an FBI agent, and competing forensic psychiatrists testified about the assault and its effects on plaintiff's well-being.  Testimony was also received from a Sioux medicine man and from an advocate for sexual assault victims, both of whom had provided counsel to Ms. Elk following the assault.  Plaintiff also offered the testimony of a forensic economist in an attempt to quantify the economic losses she experienced as a result of Kopf's misconduct.  The parties filed post-trial briefs on August 1, 2008, and on September 12, 2008.  Closing arguments were held telephonically on October 23, 2008.

## II.    DISCUSSION

Unlike the "very great majority of Indian treaties [that] create tribal, not individual, rights, . . . Article I of the 1868 Treaty . . . concerns the rights of and obligations to individual Indians." *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970) (*Hebah I*).  The "bad men" clause of the Treaty of 1868 "contains a number of requisites which plaintiff has the burden of proving." *Hebah v. United States*, 456 F.2d 696, 704 (Ct. Cl. 1972) (*Hebah II*), *cert. denied*, 409 U.S. 870 (1972).  First, it must be shown that "bad men among the whites" committed a "wrong upon the person or property of the Indians."  Defendant, in fact, has admitted that such a wrong was committed – that, on January 7, 2003, Sergeant Kopf sexually assaulted plaintiff on a remote portion of the Pine Ridge Indian Reservation.  Under the treaty, plaintiff must also show the amount needed to "reimburse" her for the "loss sustained."  The parties widely disagree as to the amount of reimbursement owed by the United States – indeed, they disagree as to what the Treaty of 1868 meant when it used the word "reimburse."  Before proceeding, the court must first resolve what the treaty means.

### A.

A treaty with an Indian tribe is a contract and should be interpreted to give effect to the intent of the signatories.  *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979) ("A treaty . . . is essentially a contract between two sovereign nations.");  *Santovincenzo v. Egan,* 284 U.S. 30, 40 (1931);  *Tsosie v. United States*, 825 F.2d 393, 397 (Fed. Cir. 1987).  More specifically, in *Hebah I*, the Court of Claims held that the 1868 Treaty's "bad men" provision created an individual third-party contractual right through which an individual claimant could directly pursue a suit against the United States.  *Hebah I*, 428 F.2d at 1338;  *see also Chippewa Cree Tribe of Rocky Boy's Reservation v. United States*, 73 Fed. Cl. 154, 159 (2006).  While principles of contract interpretation aid in discerning the intent of treaty partners, *see Air France v. Saks*, 470 U.S. 392, 397 (1985), those principles are not applied to treaties in precisely the same way they are used to construe private contracts.  Thus, the Supreme Court has made clear that while the court should look to the parties' "choice of words," it should also consider the "larger context that frames the Treaty," including its "history, purpose and negotiations."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196-203 (1999);  *see also Medellin v. Texas*, 128 S.Ct. 1346, 1357 (2008);  *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999).  In this fashion, treaties are construed "to give effect

to the terms as the Indians themselves would have understood them." *Minnesota*, 526 U.S. at 196; *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970).  Owing to the special relationship between the United States and the tribes, "Indian treaties are to be interpreted liberally in favor of the Indians," with "any ambiguities . . . resolved in their favor."  *Minnesota*, 526 U.S. at 200.[15]

Defendant reads the word "reimburse" in the Treaty of 1868 narrowly and argues that plaintiff may only recover the funds needed to cover her out-of-pocket expenditures.  Under this view, plaintiff could not recover for any income lost as the result of her injuries nor for any noneconomic damages, such as those associated with her pain and suffering.  Plaintiff vigorously disagrees with this interpretation, suggesting that the damages here ought to be akin to those recoverable in a tort action.  In the court's view, plaintiff's interpretation better comports with the intent of the treaty signatories.

Defendant emphasizes those definitions of the word "reimburse" that talk in terms of paying back or restoring an amount paid.  But, a review of lexicons dating closer to the time of the 1868 Treaty reveal that the word "reimburse" also was construed more broadly to mean "to indemnify or make whole."  *Black's Law Dictionary* 1015 (1st ed. 1891) ("to pay back; to make return or restoration of an equivalent for something paid, expended, or lost; to indemnify or make whole"); *see also* Webster's Unabridged Dictionary 606 (1868 ed.) (hereinafter "Webster's") ("to replace in a treasury or purse; to pay back; to indemnify").  The use of the word "indemnify" in these definitions is significant, as it connotes an obligation to "secure against loss or damage," "to make good" and "to compensate."  *Black's Law Dictionary*, *supra*, at 614; *see also* Webster's, *supra* at 383.  Accordingly, contrary to defendant's claims, the word "reimburse" is susceptible to two reasonable interpretations.  Indication that the treaty drafters likely intended to invoke the broader of these meanings may be found in the accompanying language of the "bad men" clause, which talks not in terms of "reimburs[ing]" the injured person for amounts paid or costs incurred, but rather for the "loss sustained."  The latter phrase, which in no way refers to out-of-pocket expenditures, seemingly clashes with the notion that the operative verb – "reimburse" – ought to be construed in the crabbed fashion defendant argues.  *See Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991) (courts should consider the treaty's language in the "context in which the written words are used"); *see also United States v. Cienfuegos*, 462 F.3d 1160, 1163-64 (9th Cir. 2006) (construing the word "reimburse," as used in 18 U.S.C. § 3663A, broadly to include future income lost by a decedent based on the surrounding statutory language).

---

[15]  *See also McClanahan v. State Tax Comm'n*, 411 U.S. 164, 174 (1973) ("'[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith'") (quoting *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930)); *Cty. of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943); *Winters v. United States*, 207 U.S. 564, 576-77 (1908); *see generally*, F. Cohen, Handbook of Federal Indian Law § 2.02[1] (2005) (hereinafter "Cohen").

The broader view of the "bad men" clause finds support in the history of the 1868 Treaty. The Treaty of 1868 "was concluded at the culmination of the Powder River War of 1866-1867, a series of military engagements in which the Sioux tribes, led by their great chief, Red Cloud, fought to protect the integrity of earlier-recognized treaty lands from the incursion of white settlers." *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980).  In 1867, various tribal leaders spoke to Congress about the mistreatment of their people by white men.  Their testimony documented the mistreatment of the women in their nations, who were killed, mutilated, otherwise attacked and coerced into prostitution and other sexual relationships with United States soldiers.  This testimony was well-documented in Conditions of the Indian Tribes: Report of the Joint Special Committee Appointed Under Joint Resolution of March 3, 1865, S. Rep. 39-156 (1867), commonly known as the Doolittle Commission Report.  *See id*. at App. 29, 42, 51, 53, 56-57, 60-75, 96-97, 205, 234, 249, 251-255, 259-263, 326, 332, 356, 360, 371, 386, 407-09, 417-18, 466-70, 499 (describing the mistreatment of Indian women); *id*. at App. 371, 386, 465, 469-70 (describing the coercion of Indian women into sex, often in exchange for food for starving children).  The sexual offenses committed by whites were particularly pernicious as they led to the spread of syphilis, which ravaged the women and men of the tribes alike, causing, in turn, many deaths.  *Id*. at 5, App. 428, 480.  Finding that a "large majority of cases [of] Indian wars are to be traced to the aggressions of lawless white men," the report urged that various steps be taken "to preserve amity" and "save the government from unnecessary and expensive Indian wars."  *Id.* at 5, 9.

Various contemporary sources indicate that the Fort Laramie treaties of 1868 were designed to address these problems.  Thus, for example, the Report to the President by the Indian Peace Commission, January 7, 1868, one of whose authors was Lieutenant General William Tecumseh Sherman, a principal negotiator of these treaties, describes the breaking out of hostilities as often attributable to the actions of "bad men" among the whites.  *Id.* at 49-50.  The report further indicates that "[i]n making treaties it was enjoined on us to remove, if possible, the cause of complaints on the part of the Indians," adding that "[t]he best possible way then to avoid war is to do no act of injustice."  *Id*. at 79; *see also* Edward Lazarus, Black Hills White Justice: The Sioux Nation Versus the United States 1775 to the Present 46-48 (Harper Collins 1991).  Those drafting the Fort Laramie treaties had ready examples of provisions that would oblige the United States to compensate the Indians for harm committed by bad white men.  As early as 1825, treaties with the Kansa and Ponca tribes had required the United States to provide "full indemnification for any horses or other property which may be stolen from them by any [other] citizens."  *See* Treaty with the Kansa, June 3, 1825, 7 Stat. 244; Treaty with the Ponca, June 9, 1825, 7 Stat. 247.  Later, the 1855 treaty with the Choctaws and Chickasaws dealt more broadly with injuries occasioned by white persons, stating:

> The United States shall protect the Choctaws and Chickasaws from domestic strife, from hostile invasion, and from aggression by other Indians and white persons not subject to their jurisdiction and laws; and for all injuries resulting from such invasion or aggression full indemnity is hereby guaranteed to the party or parties injured, out of the Treasury of the United States[.]

Treaty with the Choctaw and Chickasaw, June 22, 1855, 11 Stat. 611.  This Choctaw treaty is notable not only because, like the earlier treaties, it requires the payment of "full indemnity . . . to the party or parties injured," but also because it contained a host of other provisions like those found in the 1867-68 Indian Peace Commission treaties, including the Fort Laramie treaty with the Sioux.  Indeed, all of the latter treaties contain "bad men" clauses identical to that in the Sioux Treaty.[16]  Yet, there is no indication that the drafters of these later treaties intended them to be narrower or less beneficial to injured Indians than the Choctaw treaty, and certainly one would not expect that given the record of the harm inflicted on Indians documented in the Doolittle Commission Report (which post-dates the Choctaw treaty).[17]  Rather, as noted in *Montana v. United States*, 450 U.S. 544, 573-75 (1981) (Blackmun, J., dissenting), the 1851 and 1868 treaties all were "necessitated by the same 'public purpose' or 'exigency.'"  As such, it is reasonable to assume that the drafters of the treaties did not intend any significant difference to attach to their use of the word "indemnity" in the Choctaw treaty and the word "reimburse" in the others.

_____

[16]  Three of these treaties were concluded before the Sioux Treaty, *see* Treaty with the Kiowa and Comanche, Oct. 21, 1867, 15 Stat. 581; Treaty with the Cheyenne and Arapaho, Oct. 28, 1867, 15 Stat. 593; Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619; and four treaties were concluded thereafter, *see* Treaty with the Crow, May 7, 1868, 15 Stat. 649; Treaty with the Northern Cheyenne and Northern Arapaho, May 10, 1868, 15 Stat. 655; Treaty with the Navajo, June 1, 1868, 15 Stat. 667; Treaty with the Eastern Band Shoshoni and Bannock, July 3, 1868, 15 Stat. 673.  Notably, these treaties were among the last entered into by the United States and the Indians.  A rider in the Indian Appropriation Act of March 3, 1871, 16 Stat. 544, 570, forbade further treaties between the United States and Indians.  *See Hebah I*, 428 F.2d at 1338 n.4.

[17]  Notably, the 1868 treaties were also predated by a series of bills – some enacted, others not – either compensating various white settlers, and Indians and tribes for their losses or referring such claims to the newly created Indian Claims Commission.  These bills appear to use the terms "reimburse" and "indemnify" interchangeably, including two similar bills that were introduced during the same session of Congress in 1866.  *See* H.R. 305, 39th Cong. (1st Sess. 1866) (to relieve "damages sustained by reason of depredations and injuries by certain bands of Sioux Indians . . . [so that those who] have suffered and been injured by said Indians should be indemnified"); H.R. 505, 39th Cong. (1st Sess. 1866) (to relieve "damages sustained by reason of depredations and injuries by certain bands of Arapahoes, Cheyenne, and Sioux Indians . . . [where many settlers] have been murdered and a large amount of property has been destroyed; and . . . it is just and equitable that such persons should be reimbursed for the damages sustained.").  Moreover, many of the bills that referred to reimbursements nonetheless provided for recoveries in round numbers, suggesting that the amounts were not tied to specific costs identified.  *See* H.R. 358, 37th Cong. (2d Sess. 1862) ($6,000 "in satisfaction of personal injuries"); H.R. 563, 37th Cong. (2d Sess. 1862) ($2,000 for "23 head of horses stolen from him"); S. 354, 37th Cong. (2d Sess. 1862) ($6,000 for "depredations committed upon his property"); H.R. 582, 37th Cong. (3d Sess. 1863) ($1,500,000 for "depredations committed"); *see also* S. 1298, 41st Cong. (3d Sess. 1871) ($110,000 for "depredations committed upon their property"); S. 1315, 41st Cong. (3d Sess. 1871) ($5,000 for "property taken and destroyed").

Thus, it would seem that the history of the treaty suggests that, among the various meanings of the word "reimburse," the court ought to choose "indemnify." Even were there not this history, the court would be obliged to adopt this broader construction based upon the deeply-rooted canons of construction applicable to Indian treaties, again requiring that ambiguities "be resolved in the Indians' favor." *Choctaw*, 397 U.S. at 631; *see also McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 174 (1973); Cohen, *supra*, at § 2.02[1]. Nor, as defendant hints, is there any reason to construe the 1868 Treaty as if it were locked in time – to limit the recovery only to the specific types of damages that the signatories would have anticipated. *Per contra*. The decisional law holds that it is unjustifiable "for a court to view a treaty as frozen in the year of its creation." *Reed v. Wiser*, 555 F.2d 1079, 1090 (2d Cir. 1977), *cert. denied*, 434 U.S. 922 (1977) (quoting *Day v. Trans World Airlines*, 528 F.2d 31, 35 (2d Cir. 1975)). In *Day* and *Reed*, the Second Circuit applied the Warsaw Convention indemnification provisions for air-travel hazards to injuries occuring during terrorist attacks, despite the risk of such attacks being a "modern day reality," *Reed*, 555 F.2d at 1090, "unforeseeable by the Warsaw framers" when the treaty was ratified in 1929, *Day*, 528 F.2d at 37-38. Courts have likewise held that Indian treaties are "not static." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State*, 653 F. Supp. 1420, 1430 (W.D. Wis. 1987). For example, it has been found that modern hunting and fishing techniques may be employed by tribes under treaties entered into during the 1800s.[18] A similar interpretational rule requires that Ms. Elk receive here the types of damages that, in the modern view, would make her whole, that is, those that indemnify her loss.[19]

_____

[18] *See Lac Courte*, 653 F. Supp. at 1430 ("Plaintiffs are not confined to the hunting and fishing methods their ancestors relied upon at treaty time. . . . Plaintiffs may take advantage of improvements in the hunting and fishing techniques they employed in 1842."); *United States v. Michigan*, 471 F. Supp. 192, 260 (W.D. Mich. 1979) ("the means used to fish were not restricted by the Treaty of 1836 nor by the Indians in any other agreement with the United States. The Indians' right to fish . . . is not a static right. . . . The right may be exercised utilizing improvements in fishing techniques, methods and gear."); *see also Robinson v. Wolff*, 349 F. Supp. 514, 523 (D. Neb. 1972), *aff'd*, 468 F.2d 438 (8th Cir. 1972) (rejecting the view that the relationship between the Omaha tribe and the federal government was "frozen by the treaty of 1854" because it was not the framers' intent "to determine inflexibly the status of Indians for all future times," nor "beneficial or desirable for the members of the Omaha Tribe").

[19] Any view to the contrary is also in tension with the Federal Circuit's holding in *Tsosie* that the "bad men" clauses in the treaties had not become obsolete and were still enforceable despite the considerable passage of time. *Tsosie*, 825 F.2d at 398-400. Moreover, it would be rash to assume that damages of the sort being contemplated here were not awardable around the time of the 1868 Treaty. A review of an old treatise and several cases suggests to the contrary. *See* William B. Hale, Handbook of the Law of Damages 96 (West Pub. Co. 1896) ("The damages recoverable for an indecent assault upon a woman include compensation for plaintiff's shock, fright, outraged feelings, anguish of mind, shame and humiliation, and loss of honor or good name."); *see also Wolf v. Trinkle*, 3 N.E. 110 (Ind. 1885); *Fay v. Swann*, 7 N.W. 215 (Mich. 1880); *Newell v. Whitcher*, 53 Vt. 589 ((Vt. 1880); *Alexander v. Blodgett*, 44 Vt. 476 (Vt. 1872); *Ford v. Jones*, 62 Barb. 484 (NY. Sup. Ct. 1871).

That reading of the Treaty, moreover, conforms with the Department of Interior's own view of the "bad men" clause.  In *Tsosie*, this court remanded to that agency the plaintiff's claim for damages resulting from an alleged sexual molestation that occurred when she was a patient at a Public Health Service Hospital in Shiprock, New Mexico.  *Tsosie*, 825 F.2d at 397, 403.  In a decision dated July 25, 1988, the Secretary of Interior awarded Ms. Tsosie $3,507 for incidental expenses and "$15,500 for physical pain and suffering and humiliation, shame, embarrassment and mental anguish."  While noting that it was "extremely difficult to assess the amount of damages for physical pain, suffering and mental anguish," the decision, nonetheless, awarded such damages based on medical findings that Ms. Tsosie was suffering from a "Depressive Disorder" and "Post Traumatic Stress Disorder."  And the decision also awarded $2,550 to cover future mental health treatment.  In the court's view, the Secretary's interpretation and application of the Treaty is entitled to great weight – certainly more than can be attributed to defendant's cramped litigating position here.  *See El Al*, 525 U.S. at 168 (in construing treaty language, "[r]espect is ordinarily due the reasonable views of the Executive Branch"); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").  This administrative decision, of course, merely confirms what the language and history of the Treaty already reveal.[20]

Based on the foregoing, the court concludes that plaintiff may recover damages that do not correspond to any specific out-of-pocket expenses she incurred, including damages for lost income, as well as pain, suffering and mental anguish.

## B.

With this interpretational task behind us, we turn back to the core facts of this case.  As noted, defendant has stipulated that plaintiff was sexually assaulted by Kopf.  It, however, contests the severity of that assault and the resulting injuries experienced by Ms. Elk.  In support of the latter claim, defendant introduced testimony from an expert in forensic psychiatry, Dr. Mark Mills, who emphatically opined that Ms. Elk was exaggerating both the severity of the attack and her resultant symptoms.  Plaintiff rebutted that testimony with evidence from its own

_____

[20]  In suggesting that plaintiff cannot recover for personal injuries under the "bad men" clause, defendant cites two cases decided under the Indian Depredation Act (IDA), 26 Stat. 851 (1891) – *Swope v. United States*, 33 Ct. Cl. 223, 226-27 (1898) and *Friend v. United States*, 29 Ct. Cl. 425, 428-29 (1894).  By its terms, however, the IDA restricts recovery to "claims for property," and thus is entirely unlike the "bad men" clause, which permits reimbursement for "***any*** wrong upon the ***person*** or property of the Indians" (emphasis added).  Moreover, while the Court of Claims in *Friend* stated *in dicta* that "the words 'reimbursed for his loss' [in the bad men clause] are not apt words to describe damages for personal injuries," it did not dwell on that issue in any detail and ultimately conceded that the cited phrase was "broad enough" to cover the plaintiff's personal injury claim, which related to the "scalping [of] his wife [and] carrying off his son and detaining him in captivity for some years."  *Friend*, 29 Ct. Cl. at 429.

expert, Dr. Stephen Manlove, who is also a forensic psychiatrist.  Dr. Manlove testified that, in his opinion, Ms. Elk had been truthful with him and was suffering from post-traumatic stress disorder.  Ms. Elk herself, of course, testified both as to the nature of the assault and its impact upon her life – and, not surprisingly, her credibility is critical in assessing the legitimacy of her claims.

Even with testimony from forensic psychiatrists, "ascertaining the credibility of evidence is 'quintessentially' a task for the fact-finder."  *O'Dell v. Netherland*, 95 F.3d 1214, 1250 (4th Cir. 1996); *see also United States v. Filler*, 210 F.3d 386 (9th Cir. 2000), *cert. denied*, 529 U.S. 1082 (2000)*; Halcomb v. Wash. Metro. Transit Auth.*, 526 F. Supp. 2d 24, 29 (D.D.C. 2007).[21]  The court found Ms. Elk to be a candid, sincere and reliable witness, whose testimony, in critical details, was corroborated by other witnesses and documents in the record.  To be sure, there are minor discrepancies between her various accounts of the attack, her reaction to the attack and the medical treatment she received.  But none alters the core findings that sprung from her testimony and that of supporting witnesses, *to wit*, that the sexual assault committed on Ms. Elk was severe and traumatic, that the assault had a fundamental life-changing impact, and that she continues to suffer from the attack.

So what of the contrary testimony of Dr. Mills, who concluded that Ms. Elk was a "manipulative" and "unreliable" witness?  Dr. Mills based his findings on several supposed premises.  First, he attached great significance to the fact that Ms. Elk did not disclose to him that she had received treatment for depression in February 2002, approximately one year before the attack.  Second, he attributed her depression symptoms to other "significant stressors" – that, in 2002, she had lost three of her four "grandparents," had lost a "long-term boyfriend" to suicide, dropped out of college and was precluded from entering the Army because of her weight.  Third, he asserted in his report that "Ms. Elk's psychological testing demonstrates a pattern of exaggeration, manipulativeness and an inaccurate attempt to portray herself as the victim of traumatic stress."  On this point, he noted that her scores on the "faking scales" of the tests he administered were "grossly exaggerated" and could not be explained on the basis of other reasons.  "The testing results only support one conclusion," he wrote, that Ms. Elk "is greatly exaggerating her presentation of herself; presumably to further her legal claim."  Finally, he asserted that the statements made by Ms. Elk to investigators describing the attack were "contradicted in the deposition of her aunt, Ms. Noritta High Hawk."  While admitting that he "was not a percipient witness to what occurred between Ms. Elk and Sgt. Kopf," he concluded that "the combination of a manipulative and/or unreliable witness and one who, at various times, exaggerates and/or minimizes her reports of her psychological state, seemingly to bolster her

---

[21]   Indeed, a variety of cases have held that while a forensic psychiatrist may opine on whether an individual "is telling him the truth during his examination," *Kakeh v. United Planning Org.*, 587 F. Supp. 2d 125, 128 (D.D.C. 2008), he or she may not offer opinion testimony about the credibility of particular witnesses.  *See Bassi v. Patten*, 592 F. Supp. 2d 77, 84 (D.D.C. 2009); *Halcomb*, 526 F. Supp. 2d at 29; *see also Swans v. City of Lansing*, 65 F. Supp. 2d 625, 645 (W.D. Mich. 1998).

case, must cause one to question the nature of the purported assault and her claimed emotional distress referable to it."

Yet, each of the premises upon which Dr. Mills initially relied were undercut and ultimately collapsed in the roll and surge of contrary evidence.  Take, for example, his claim that Ms. Elk's account of the assault was contradicted by her aunt.  The supposed conflict that caused Dr. Mills to classify Ms. Elk as "unreliable" did not involve any of the particulars of the assault itself or Ms. Elk's emotional reaction thereto, but was limited to this – Ms. Elk indicated that Kopf's visit the morning of the assault was unexpected, while her aunt, in her deposition, said that the family knew that Kopf was coming.  While, on the basis of this thinnest of reeds, Dr. Mills accused Ms. Elk and her parents of  "misrecollecting or distorting facts," he acknowledged in the same report that "[w]henever the family . . . knew of Sgt. Kopf's impending arrival and apparent agenda would not seem to matter so much."  Moreover, Dr. Mills seemed to back away from his reliance on this supposed conflict when Ms. High Hawk testified at trial that her prior recollection was "a mistake [and that she] didn't know that [Kopf] was coming until the day that he came."  After hearing this testimony, Dr. Mills admitted that he was "more uncertain" and that instead of Ms. Elk and her parents misremembering the facts, "it could be the other way around."[22]

At trial, Dr. Mills also partly backed away from another disturbing aspect of his written report – the implication that Ms. Elk may have made up the assault and that her emotionally distress was the result of a "misunderstanding" between her and Kopf.[23]  Dr. Mills, of course, was obliged to retreat on this point because, by the trial, defendant had stipulated that an assault occurred.[24]  Yet, one must wonder how Dr. Mills' initial impression of the assault colored his

---

[22]  At trial, Dr. Mills indicated that he had previously credited Ms. High Hawk's deposition testimony, rather than that of Ms. Elk and her parents, because he viewed the Elk family as having "an interest, potentially a financial interest, in perceiving things one way."

[23]  In his expert report, Dr. Mills wrote:

While she explained to me that she was upset by [a 2002 miscarriage], and the subsequent ones as well, she minimized her distress; essentially dismissing it as small in comparison to that related to the incident (her deposition testimony is similar).  My professional experience, with multiple victims of sexual assault and actual rape, suggests that where the assault was relatively minor, and arguably represented a misunderstanding, the emotional distress referable to a miscarriage would have been significantly greater.

[24]  Forced to deal with this stipulation, at trial, Dr. Mills testified, as follows:

Q.:     You wouldn't characterize it as a minor assault, would you?

A:      I would not.

other views.  Moreover, any notion that Ms. Elk had deceived Dr. Mills in failing to tell him that she had sought treatment for depression in the Spring of 2002 is belied by the fact that Ms. Elk had disclosed that treatment in various discovery responses made before her interview with Dr. Mills, including in her deposition.[25]

Likewise, Dr. Mills' description of the other "significant stressors" in Ms. Elk's life overstates the facts.  For example, while he claimed that Ms. Elk was stressed because three of her "grandparents" had died shortly before the assault, he apparently was unaware until just before trial, that, in Sioux culture, older relatives, such as great uncles or aunts, or even cousins, are referred to as "grandparents" even when not the parents of a parent.  And, indeed, the relatives who passed away during the period before the assault were Ms. Elk's "grandparents" only in the Sioux sense.  This is not to deny that Ms. Elk was close to at least one of those

---

Q:     Okay.  And you wouldn't characterize it as simply a
        misunderstanding between her and Sergeant Kopf.  Correct?

A:     I would not.

Q:     Okay.  You're aware that in your report, you referred to this as a
        potential misunderstanding.  Is that correct?

A:     Well, I think it started off that way, but I think it moved from there.


        *              *              *              *              *


Q:     . . . And at times in your report you refer to it as a purported claim,
        a mere allegation.  As we sit here today, you do not dispute that the
        assault occurred in the manner that Lavetta has described.  Is that
        correct?

A:     I absolutely do not dispute that fact.  I don't recall anywhere in my
        report calling it a mere allegation.  If you can find those words,
        then I will recant those words.

Notwithstanding these admissions, Dr. Mills continued to discount key aspects of Ms. Elk's account of the assault and to contend that Ms. Elk was "unreliable."

[25]  At trial, Dr. Mills admitted that he had reviewed these discovery materials before meeting with Ms. Elk.  He was unsure whether he had asked Ms. Elk, during her interview, about her prior mental health treatment.  His lack of certainty in this regard seems odd, for one would think that, given the culpability he attached to Ms. Elk's failure to reveal her prior mental health treatment, Dr. Mills would be more sure whether he had asked about that subject.

individuals – as the record indicates that she was – but it does mean that Dr. Mills' presumption that she would be distressed by all three deaths was unwarranted.[26]  In a similar vein, Dr. Mills' assertion that Ms. Elk was distressed by the suicide of her "long-time boyfriend" overstated the facts, as the individual in question was a friend of Ms. Elk, but nothing more.[27]  And in attributing stress to Ms. Elk's "inability" to join the Army, Dr. Mills seemingly overlooked the fact that it was the result of the assault, not a precursor.  At all events, Dr. Mills never remotely explained why the presence of these additional stressors meant that Ms. Elk was not experiencing post-traumatic stress disorder as the result of the assault.  Rather, it would seem that Kopf took his victim as he found her and, in fact, expressed interest in Ms. Elk's problems in a calculated fashion designed to win her confidence – confidence that he would later betray in preying upon her vulnerabilities.

This last point warrants further discussion.  The weight placed by Dr. Mills and defendant on Ms. Elk's prior emotional problems seemingly proceeds from the faulty notion that they somehow relieve defendant from liability.  Yet, neither Dr. Mills nor defendant, for that matter, ever explain why this is so.  Logic suggests – and defendant does not seriously contest – that defendant should be liable for all the natural and proximate consequences of Kopf's actions. Indeed, defendant readily admits that tort principles may guide the court in assessing liability and damages here.  Yet, under the so-called "eggshell skull" principle, it is well-accepted that the chain of causation is not broken simply because a victim has a fragile psyche.[28]  Under these

---

[26]  At trial, Dr. Mills agreed that he never explored "how close [Ms. Elk] was to those particular grandparents."  It is apparent then that Dr. Mills based his opinion solely on the mistaken assumption that these individuals were actually Ms. Elk's grandparents in the traditional Anglo-American sense.

[27]  At trial, Dr. Mills acknowledged that he did not know whether Ms. Elk and her friend were "romantic or not" and was unaware that she had not returned home from college for his funeral.  Yet, he refused to recant his finding regarding the manner in which Ms. Elk reacted to the suicide, confusingly stating "[m]y point was not – I mean she's entitled to any emotional reaction she had, whether it was somebody near, very near, rather distant."

[28]  *See, e.g.*, *Jensen v. Eveleth Taconite Co.*, 130 F.3d 1287, 1294-95 (8th Cir. 1997), *cert. denied*, 524 U.S. 953 (1998) (company that committed sex discrimination and sexual harassment took its employees as it found them and was responsible for aggravating preexisting emotional injuries); *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 507 (1st Cir. 1996) (same conclusion in case involving sexual harassment); *Wakefield v. NLRB*, 779 F.2d 1437, 1438 (9th Cir. 1986) (administrative agency wrongly held that plaintiff's predisposition towards mental illness relieved defendant of responsibility for plaintiff's psychological disability as it ignored "time-honored legal principle" that a wrongdoer takes a victim as the wrongdoer finds the victim); *Shimman v. Frank*, 625 F.2d 80, 100 (6th Cir. 1980), *overruled on other grounds*, 744 F.2d 1226 (6th Cir. 1984) (en banc) (defendant liable for plaintiff's psychological injury where the "personality structure" of plaintiff, who was victim of intentional beating, may have made

principles, even if defendant had shown that the assault "merely" aggravated a preexisting condition or disease, it would still have been incumbent upon it additionally to show how the subsequent injury and the damages associated therewith should be apportioned.[29]  And defendant made no such attempt, choosing instead merely to toss out a litany of "stressors" that might have contributed to Ms. Elk's mental state at any given time.  And it could not go beyond this litany for good reason, as every indication is that the mental distress Ms. Elk experienced as a result of the sexual assault was several magnitudes greater than any depression or distress she had ever before experienced.

_____

plaintiff more vulnerable to psychological harm); *Gipson v. Wells Fargo Bank N.A.*, 460 F. Supp. 2d 12, 13 (D.D.C. 2006) (defendant was "responsible for all damages proximately caused, even if her mental state was already fragile"); *Thames v. Zerangue*, 411 So.2d 17, 19-20 (La. 1982) (tortfeasor takes plaintiff as he or she finds plaintiff even though plaintiff had a history of emotional problems); *Freyermuth v. Lutfy*, 382 N.E.2d 1059, 1064 & 1064 n.5 (Mass. 1978) (defendant liable for tortious conduct that reactivated plaintiff's dormant mental illness).

[29]  In this regard, the Restatement (Third) on Torts § 26(b) (2000) provides:

Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine:

(1)     that any legally culpable conduct of a party or other relevant person to whom the facfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and

(2)     the amount of damages separately caused by that conduct.

Otherwise, the damages are indivisible and thus the injury is indivisible.

*See also* Restatement (Third) Torts-PH § 31 (2005) (proposed final draft) ("When an actor's tortious conduct causes physical harm to a person that, because of preexisting physical or mental condition or other characteristics of the person, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the person.").  Numerous cases are to similar effect.  *See, e.g., Garcia v. Wal-Mart Stores, Inc.*, 209 F.3d 1170, 1175-76 (10th Cir. 2000); *Stevens v. Bangor and Aroostook R.R. Co.*, 97 F.3d 594, 603 (1st Cir. 1996) (railway worker injured in a fall had post-accident cardiac event; "if the fact finder cannot separate injuries caused or exacerbated by the accident from those resulting from a pre-existing condition, defendant is liable for all such injuries"); *Dunn v. United States*, 569 F.Supp. 2d 258, 268 (D. Me. 2008) (applying this rule in an FTCA action); *see also Am. Jur. Damages* § 240 ("if the jury cannot apportion damages between the preexisting and the aggravating disability, the defendant is liable for the total disability").

Perhaps more than anything else, Dr. Mills' interpretation of Ms. Elk's test results reveals his closed-mindedness.  The record includes the computer-generated interpretative reports from the two tests Dr. Mills administered: the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2) and the Personality Assessment Inventory (PAI).[30]  In interpreting these reports, Dr. Mills systematically highlighted comments suggesting that Ms. Elk was faking, while seemingly donning blinders to descriptors that were in harmony with her accounts and symptoms.  For example, in interpreting the MMPI-2 profile, Dr. Mills emphasized that part of the report which indicated that "she may be malingering by attempting to present a false claim of mental illness," but brushed aside the portion that alternatively explained that "[s]he may be exhibiting a high degree of distress and personality deterioration."  He also discounted the report's accompanying discussion of Ms. Elk's symptomatic patterns, which stated that "[t]he client is apparently experiencing a great deal of psychological distress, including extreme anxiety, tension, and obsessive self-doubts," as well as "an intense period of panic and anxiety." Likewise, Dr. Mills seized on the portion of the PAI interpretive report describing the validity of the test results, which stated that certain indicators suggested that Ms. Elk "may not have answered in a completely forthright manner" and "attempted to portray herself in a negative or pathological manner in particular areas."  Yet, he virtually ignored the passages in the same segment which indicated that there was "no evidence to suggest an effort to intentionally distort the profile" and that Ms. Elk could be suffering problems from "traumatic events."  Perhaps most significantly, Dr. Mills glossed over the adjoining portion of the PAI report that tellingly stated:

> The respondent indicates that she is experiencing specific fears or anxiety surrounding some situations.  The pattern of responses reveals that she is likely to display significant symptoms related to traumatic stress.  She has likely experienced a disturbing traumatic event in the past – an event that continues to distress her and produce recurrent episodes of anxiety.  Whereas the item content of the PAI does not address specific causes of traumatic stress, possible traumatic events involve victimization (e.g., rape, abuse), combat experiences, life threatening accidents, and natural disasters.

---

[30]  As described in Dr. Mills' report –

The MMPI is the oldest comprehensive psychological test designed to assess psychopathology. . . . The test not only measures personality, but includes indices of validity that allows [sic] the interpreter to make assessments about the subject's test-taking biases.  Those assessments include whether the individual was attempting to minimize or amplify his/her symptoms, whether the individual was answering randomly or whether the individual was capable of understanding the items.

According to Dr. Mills, the PAI, in contrast to the MMPI-2, is a "more recent instrument with fewer questions . . . designed to document personality styles and conflicts that do not rise to the level of frank psychopathology."

In short, there were numerous indications in Ms. Elk's test results that she was suffering from traumatic stress – all of which Dr. Mills chose to discount.

Faced with the gaps in his analysis, Dr. Mills found himself at trial back-pedaling somewhat from his initial positions. Responding to the narratives in the test reports, for example, he admitted, "I have not testified nor do I believe that she is creating this *de novo* or out of whole cloth. I think she has some symptoms. I think she was injured by what . . . occurred [to her]." Along these same lines, although continuing to claim that Ms. Elk was exaggerating, Dr. Mills admitted that the results of the PAI test were consistent with a diagnosis that Ms. Elk had post-traumatic stress disorder or some other major depressive disorder. Asked during cross-examination, "Did the results of the PAI suggest PTSD or major depressive disorder?," Dr. Mills responded –

> Yes. Of course. I mean, we agree – or at least I testified that I believe that the PAI is by far the more amenable to a manipulation, but the diagnosis after negative impression management is post traumatic stress disorder, because that's because she answered a number of questions in a positive direction about that.

And at another point, he begrudgingly admitted that "[s]he's got chronic symptoms of anxiety, maladjustment and depression, which have been in evidence for a while, [and] which were clearly aggravated by what happened to her."

In short, while Dr. Mills repeatedly accused Ms. Elk of being "unreliable" and "manipulative," it was *he* that best fit that description. His reports and, in particular, his live testimony were, to say the least, a moving target: When shown that many of his initial factual premises were false – including his original view that the assault might have been nothing more than a "misunderstanding" – Dr. Mills attempted to sidestep those problems by citing new examples of supposed inconsistencies or omissions. When those new claims also proved false or mere quibbles, he sought refuge in the standardized test results. When it then became apparent that those results could be interpreted in several ways – one of which, perhaps not coincidentally, was that Ms. Elk suffered from post-traumatic stress disorder as the result of a sexual assault – Dr. Mills, nonetheless, trenchantly adhered to the interpretations of the results least favorable to Ms. Elk. Yet, in the end, there was no real factual basis to support any of his views, nothing, that is, except the naked impression that Ms. Elk, her parents and other relatives were exaggerating her injuries for financial gain. But, such armchair cynicism, even by a forensic psychiatrist, is no substitute for hard evidence or unbiased analysis – both of which were conspicuously lacking in Dr. Mills' dyspeptic attempt to undercut Ms. Elk's credibility. In the end, weighing the record as a whole, the court concludes that Ms. Elk was an exceedingly reliable witness.

That point was driven home by plaintiff's forensic psychiatrist, Dr. Manlove. Unlike Dr. Mills, Dr. Manlove deals with hundreds of Native American patients each year and thereby has a familiarity with Native American culture that lends additional sway to his opinions. With what he termed "reasonable medical certainty," Dr. Manlove diagnosed Ms. Elk with post-traumatic

stress disorder and major depression.  In his report and testimony, Dr. Manlove outlined and documented three findings relevant to his diagnosis.

First, applying a textbook definition of post-traumatic stress disorder, he found that Ms. Elk had developed "characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity."  In this regard, Dr. Manlove noted not only that Ms. Elk had been sexually assaulted, but also that Kopf was older and in a position of authority, had abducted Ms. Elk while taking advantage of her trust, and had made comments that could be viewed as threatening serious physical harm.  Second, he found that Ms. Elk's response to the assault "involve[d] intense fear, helplessness, or horror."  In support of this finding, Dr. Manlove noted that Ms. Elk's initial reaction to the assault – including crying uncontrollably upon entering her cousin's house – evidenced extreme fear, and that the circumstances surrounding the assault, in terms of where it occurred and the loss of bodily control it entailed, reflected helplessness.[31]  Finally, Dr. Manlove found that Ms. Elk had experienced, over a period of years, the "persistent re-experiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness."  As to this point, he found that Ms. Elk suffered both from recurrent nightmares and flashbacks, accompanied by a great deal of anxiety, and that she had withdrawn from her husband and family to deal with the stress.[32]

_____

[31]  During his examination, Dr. Manlove was asked how he could reconcile his finding that Ms. Elk was extremely frightened with the fact that, in an interview conducted on the day of the assault, she had reportedly advised a BIA officer that on a scale of 1-10, with ten being totally frightened, her fear was a six.  He responded that her conduct, following the assault, was consistent with her being extremely frightened – the fact that she cried uncontrollably upon entering her cousin's house, could not sleep for two weeks and experienced flashbacks.  Dr. Manlove noted that Ms. Elk's claims in these regard were corroborated by other witnesses.  In his view, these objective manifestations of her feelings were far more probative than the subjective number scale used by the BIA officer.

[32]  Dr. Manlove further recounted at trial – "She explained that . . . throughout many days, most days, she has memories of a sexual molestation.  She told me that at those times, she sometimes feels paralyzed, like she did at the time that she was molested, and she feels short of breath, anxious."  In addition, Dr. Manlove testified that during his interview with Ms. Elk, she –

> said that she was often unable to sleep because of nightmares, and they would wake her up.  In these nightmares, she was often raped or injured, and interestingly, she indicated that often the nightmares ended up worse than the actual event.

According to Dr. Manlove, Ms. Elk also told him that "she was frequently sad and cried a lot," "frequently sexual experiences would remind her of the assault and would . . . become upset and

Dr. Manlove effectively rebutted the notion that Ms. Elk's current symptoms were merely a continuation of the depression she experienced in high school. To be sure, he agreed that her prior bouts with depression probably made her "more susceptible to [post traumatic stress disorder]." But, Dr. Manlove rejected the notion that other stressors in her life had been the cause of the mental injuries she was suffering. Commenting specifically on several stressors cited by Dr. Mills, Dr. Manlove testified –

> Well, the other events that have been noted have been deaths of what are called grandparents. That's one group. Miscarriages. It seems like there was a couple of others. Her weight back in entering the military; her difficulty finding a job; relationship problems with her husband at times, those are all certainly things that would be stressors in most people's lives.

> They are things that would cause dysphoria for most of us. They aren't things that would cause post traumatic stress disorder for most people. Most people deal with those kinds of things over a fairly short period of time and move on with their lives. They're kind of normal life events.

He also noted that Ms. Elk's symptoms after the assault were "significantly worse" than anything she previously reported. Dr. Manlove also interpreted the results of Ms. Elk's psychological tests, finding that "she has tremendous anxiety consistent with psychotic symptoms" and that her "severe psychopathology" is "[c]onsistent with depression and [post traumatic stress disorder]."[33]

_____

not be able to continue with the sexual experience," and that "she had feelings of guilt about the event." He testified that all of these features were characteristic of someone suffering post-traumatic stress disorder.

[33] Dr. Manlove provided important insights regarding Dr. Mills' reading of the test scores. Dr. Mills relied heavily on Ms. Elk's scores on various scales on the MMPI-2 (e.g., F, F(B)), to conclude that she was malingering, manipulative, and unreliable. As pointed out by Dr. Manlove, though, these scales bear little of the weight that Dr. Mills would pile upon them. First, while he seizes on a few elevated scores he deems "grossly exaggerated," Dr. Mills seemingly dismisses many others he admits are "not very significant" (e.g., L, K, S) or that do not depart from the mean response in any "clinically significant" way (e.g., TRIN, VRIN, F(P)). Second, Dr. Mills attributed Ms. Elk's elevated scores to malingering, even though they were also consistent with a diagnosis of post-traumatic stress disorder – the clinical conclusion that Dr. Manlove adopted, but which Dr. Mills was unwilling to make. Third, Dr. Mills admitted that the tests were not "specifically normed for Native Americans" despite "some significant cultural differences." Dr. Manlove testified that normally-functioning Indians have higher F scales when under stress than the Caucasian population, and indicated that there were studies that supported this view. Dr. Mills was aware that the MMPI-2 had been modified before being administered to individuals from certain cultures (e.g., Puerto Rico and Japan). Dr. Mills indicated that he was unaware of any research about the accuracy of the MMPI-2 for Native Americans or any affects

And he emphasized that his conclusions would be the same even if the court were to adopt defendant's view of what happened – it mattered not to him whether, for example, there was evidence of vaginal touching; whether Kopf made his statement about the area being a good place to lose a body before or after the car had stopped; whether Ms. Elk cried continuously during the attack or only intermittently; and whether the assault lasted for more or less than thirty minutes.  Finally, Dr. Manlove emphasized that he saw no significant inconsistencies between Ms. Elk's various accounts of the assault, and between those accounts and other evidence in the case, as would warrant a finding that she was an unreliable witness.

Based upon Dr. Manlove's testimony, as well as the record as a whole, the court finds that Ms. Elk experienced post traumatic stress disorder and depression and that the proximate cause of those conditions was the sexual assault in question.  As such, the court concludes that she is entitled to be compensated for her loss under the 1868 Treaty.

**C.**

It remains to determine the damages Ms. Elk is owed.  Plaintiff, of course, has the burden of proving those damages.  *See First Third Bank v. United States*, 518 F.3d 1368, 1374-75 (Fed. Cir. 2008); *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997).  Nonetheless, in contract cases, and by extension in treaty cases, "where responsibility

---

of cultural differences on their scores.  Because the MMPI-2 "has been so well discussed and given in so many different sub-populations," Dr. Mills proclaimed that he was "virtually certain that had there been a significant problem [of administering the MMPI to Native Americans], it would have been discussed in the literature and addressed," adding that he had never seen such an article.  Apparently, though, he had not spent much time looking, as a cursory review of the literature reveals numerous studies and articles over the last three decades questioning the validity of the MMPI and the PAI as administered to Native Americans.  *See, e.g.*, D. Pollack, et al., "Validity of the MMPI with Native Americans," 137 Am. J. Psychiatry 946 (1980) (finding significant elevations in Sc, Pd, and Pa scales of Native Americans and a significant cultural affect on MMPI results); Albert Uecker, et al., "'Indianism' and MMPI Scores of Men Alcoholics," 41(3) J. of Stud. on Alcohol and Drugs 357 (Mar. 1980) (advising caution in using the MMPI to diagnose Native American psychiatric problems given effect on Hs, Hy, Pt, and Sc scales); Tom Hoffmann, "Measured Acculturation and MMPI-168 Performance of Native American Adults," 16(2) J. of Cross-Cultural Psychol. 243 (June 1985) (confirming that acculturation influences the MMPI performance of Native Americans (including significant elevations on F scales) based on its administration to 69 Sioux and urging caution in interpreting their MMPI profiles); Richard Dana, "Personality Assessment and Native Americans," 50(3) J. of Personality Assessment 480 (1986) (finding that personality assessments for Native Americans have been culturally inappropriate); R.W. Robin, et al., "Use of the MMPI-2 in American Indians," 15(3) Psychol. Assessment 351 (Sept. 2003) (finding clinically significant higher MMPI T-scores on validity and clinical scales that may reflect adverse historical, social, and economic conditions of Native Americans).

for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision:  It is enough if the evidence adduced is sufficient to enable a court . . . to make a fair and reasonable approximation."  *Bluebonnet Savings Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968 (Ct. Cl. 1965); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004).  Moreover, it is "well-settled" that "subject to certain controlling principles (for example, the recovery of damages must not serve as a windfall to the non-breaching party), determination of damages is a matter within the trial court's discretion."  *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1382 (Fed. Cir. 2004).  These basic canons aside, the nature of the damages inquiry here is somewhat different than in the typical contract case.  That is because, as both parties agree, the treaty language incorporates tort liability concepts.  Although, at times, tort-contract distinctions are doctrinally elusive, here the use of tort principles is consistent with the intent of the signatories, as the treaty language suggests that it was foreseeable that the United States would be liable for damages for "any wrong" committed "upon the person . . . of the Indians" by "bad men."  Under the language employed, the injured party here, Ms. Elk, is entitled to full compensation for her actual loss.  Thus, this is not a case in which damages for emotional disturbances should be viewed as a form of consequential or incidental damages for a breach.[34] In the case of the 1868 Treaty, rather, such damages are envisioned directly by the contract itself.

In the case *sub judice*, the potential damages fall into three categories: (i) those associated with the treatment of her condition; (ii) other economic damages caused by the assault, including loss of earning capacity; and (iii) noneconomic damages caused by the assault, including pain, suffering and mental anguish.  While plaintiff's original complaint sought damages in the amount of $100 million, she has long since abandoned that figure and now seeks damages totaling approximately $5.7 million, with $5 million of that figure attributable to pain, suffering and emotional distress.  Nonetheless, defendant repeatedly argues in its post-trial brief that plaintiff's "request for damages in the amount of $100 million is excessive."  Yet, conspicuously, it mounts little in the way of a factual defense to what plaintiff currently seeks.  Despite this, it remains for the court to analyze plaintiff's monetary claims.

**1.**

Defendant does not contest that, if Ms. Elk experienced emotional injuries as a result of the assault, she should receive any medical treatment needed to treat her condition.  Defendant, moreover, does not contest Dr. Manlove's testimony that such treatment ought to take the form of weekly psychotherapy and monthly pharmacologic management by a psychiatrist through 2011.  It implies, however, that the recovery of these expenses should be eliminated as the United States has offered in the past and is prepared to continue to offer Ms. Elk the needed medical care

---

[34]  *Compare* Restatement (Second) of Contracts §§ 347, 353 (allowing for the recovery of tort-like damages where "the breach . . . caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result"); *see also Pratt v. United States*, 50 Fed. Cl. 469, 482 (2001).

free of charge.  Defendant does not provide the rationale for the latter conclusion, presumably operating on the assumption that plaintiff should not recover what she will not be obliged to pay.

A similar issue has been presented in cases arising under the Federal Tort Claims Act.  In a number of cases, courts have examined this issue under the so-called "collateral source rule," under which the victim of a tort is allowed to recover for damages caused by the tortfeasor regardless of compensation received from other "collateral sources."  *See Leeper v. United States*, 756 F.2d 300, 303 (3d Cir. 1985).  Courts have adopted varying positions where the government was both the tortfeasor and the source of collateral benefits under various statutes, such as the Social Security Act or the Medicare statutes – in some cases, requiring the reduction of awards and in others, not.[35]  In each of those cases, however, it was established that the victim was entitled to receive free medical care from the government in the future.  *See, e.g.*, *Molzof*, 6 F.3d at 463.  There is, however, no such evidence here and any inferences made, on brief, by defendant's counsel in this regard are hardly a substitute for that evidence.  *See Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1339 (Fed. Cir. 2004) ("Statements of counsel . . . are not evidence.").  Accordingly, the court sees no evidentiary basis upon which to reduce the award for medical costs here to reflect free medical care that Ms. Elk might receive from various agencies or instrumentalities of the United States.  *See Feeley v. United* States, 337 F.2d 924, 935 (3d Cir. 1964) ("The plaintiff's past use of the government facilities does not ensure his future use of them."); *Lawson v. United States*, 454 F. Supp. 2d 373, 415 (D. Md. 2006) (declining to reduce medical damages "for anticipated benefits that may never be received").  Nor does the court believe that it is determinative that, as of the trial, Ms. Elk had not regularly obtained this sort of treatment, choosing instead primarily to pursue therapy native to her culture.  There is no proof that her conduct in the past is any indicator of the medical path she will take in the future, particularly given the advice she has received as the result of this litigation (and the availability of funds to pay for that treatment).[36]

---

[35]  *See*, *e.g.*, *Molzof v. United* States, 6 F.3d 461, 464-68 (7th Cir. 1993); *In re Air Crash Disaster,* 982 F.2d 1271, 1277 (9th Cir. 1992); *Berg v. United States*, 806 F.2d 978, 984-86 (10th Cir. 1986); *Siverson v. United States*, 710 F.2d 557, 560 (9th Cir. 1983); *Titchnell v. United States*, 681 F.2d 165, 174-76 (3d Cir. 1982); *see also* Application of Collateral Source Rule in Actions under Federal Tort Claims Act (28 U.S.C.A. § 2674), 104 A.L.R. Fed. 492 (1991).

[36]  In cases under the Federal Tort Claims Act, several courts have invoked their inherent authority in awarding medical damages in the form of a trust, with any sums not expended for medical care reverting to the government.  *See, e.g.*, *Dickerson v. United States*, 280 F.3d 470, 479 (5th Cir. 2002); *Deasy v. United States*, 99 F.3d 354, 360 (10th Cir. 1996).  This process has been employed to ensure that a plaintiff does not receive a windfall.  *Deasy*, 99 F.3d at 360.  Other courts, however, have held that no such authority exists and that damages must be made in a lump-sum award.  *See, e.g.*, *Frankel v. Heym*, 466 F.2d 1226, 1228-29 (3d Cir. 1972).  Defendant, however, has not requested that the medical damages here be awarded in trust and the court thus need not decide whether it has the authority to do this, and, if so, whether this is an appropriate situation in which to do so.

As such, the court finds that Ms. Elk is entitled to the cost of weekly psychotherapy and monthly pharmacologic management for three years.  In this regard, Dr. Manlove testified, without contravention, that the weekly psychotherapy sessions would cost $130 per session and the monthly psychiatric medication management would cost $110 per session.  Multiplying the former figure by 156 (corresponding to weekly treatments for 3 years) and the latter by 36 (corresponding to monthly treatment for 3 years), yields a figure of $24,240.  Operating on the assumption that payments for two of those years will be made in the future, the court believes it is appropriate to discount the award, to reflect the present value of those payments, leading to a total recovery for medical costs of $23,321.58.[37]

**2.**

Next, the court must determine what other economic damages are owed Ms. Elk, again with the overarching goal of putting her in the same economic position that she would have occupied had she not been injured.  *See Jones & Laughlin Steel*, 462 U.S. at 533.  According to plaintiff, those damages take two forms – the employment income lost as the result of her failure to join the military and receive medical training, and the cost of obtained household services to support Ms. Elk in raising her family.  Plaintiff seeks not only to recoup income that has already been lost, but also seeks to recover the present value of income lost and costs to be incurred in the future.  Recovery of such future damages is available only if the consequences giving rise to those damages are reasonably certain to occur.  *See, e.g.*, *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 119 (D.C. Cir. 1982).  The burden is on plaintiff to prove that it is more likely than not that the future harms alleged will actually occur.

Relying on testimony from her expert, plaintiff sought to quantify the cumulative impact of the assault in terms of lost income and additional non-medical expenditures.  In terms of lost income, the damages sought correspond to the difference between the income that Ms. Elk would have earned but for the assault (the pre-injury scenario) and that which she is actually projected to earn (the post-injury scenario).  In making these calculations, plaintiff's damages expert, Mr. Donald Frankenfeld, a forensic economist with broad experience, began by calculating the

---

[37] This figure is calculated by adding $8,080.00, corresponding to the cost of the medical care in the first year, to $15,241.58, corresponding to the present value (using a four percent discount rate) of the annual medical costs to be incurred over the next two years.  The four percent discount factor is designed to take into account the earning power of money over the period in question.  *See, e.g.*, *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536-37 (1983) ("It has been settled since our decision in *Chesapeake & Ohio R. Co. v. Kelly*, 241 U.S. 485 . . . (1916), that 'in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.' *Id*. at 490.");  *Ammar v. United States*, 342 F.3d 133, 147-48 (2d Cir. 2003).  The court need not discount damages that arose after the assault but prior to judgment herein.  *See Franconia*, 61 Fed. Cl. at 762-63.

income Ms. Elk lost immediately following the assault, a figure that he initially set at $35,914.[38] He then projected that but for the assault, plaintiff would have graduated from college at age 24.5 and would have begun to earn income at the average salary of a college graduate – with income of approximately $38,862 per year, which figures Mr. Frankenfeld took from the United States Bureau of Labor Statistics (BLS) and associated articles. To that figure Mr. Frankenfeld added a figure representing the value of fringe benefits lost, which he set at twenty-three percent of the salary figure or $8,938. To the sum of the salary and benefit figures, Mr. Frankenfeld added the cost of providing Ms. Elk with household services – a figure he calculated by assuming that Ms. Elk would need the equivalent of one hour of service per day at $7 per hour. From the resulting figure, Mr. Frankenfeld subtracted Ms. Elk's actual earnings, calculated at $9.35 hour and the value of her fringe benefits (again using the twenty-three percent convention). This calculation yielded a total loss for the year, which Mr. Frankenfeld then reduced to current value by performing a present value calculation. For the latter purpose, Mr. Frankenfeld used a discount factor equal to the rate paid on Treasury Bonds with a one-year maturity.

Projecting into the future, Mr. Frankenfeld performed similar calculations, based on the following assumptions: (i) Ms. Elk would continue to work until age 57.5; (ii) her projected and actual income would increase three percent per year; (iii) the cost of providing household services would likewise increase by three percent per year; and (iv) the discount factor would equal the rate on a Treasury Bond that had the same remaining maturity as the period for which the discounting was to occur (*e.g.*, for the fifth year of the calculation, the discount rate would equal the rate on a Treasury Bond with a five-year remaining maturity). The first three of these assumptions were again based upon statistics from the BLS.

Mr. Frankenfeld's calculations proceed from several key assumptions that he did not independently verify. Principal among these was that had Ms. Elk not been assaulted, she would have returned to college and graduated. In support of this apriorism, Mr. Frankenfeld relied not only on Dr. Manlove's testimony, but also on Ms. Elk's fine record of academic achievement at Red Cloud and her resulting scholarship offers. But, the court cannot agree with his approach as it is counter to Ms. Elk's own testimony that after she left Rockhurst University to attend the funeral of her great uncle, her intent was not to return to college, but to join the military. Nonetheless, Ms. Elk's prior record of academic and athletic achievement suggests that she was someone who attained the goals that she set for herself – and her lifelong goal had been to join the Army. As such, in the court's view, it is more likely than not that, had the assault not occurred (and she not been misled by Kopf as to her entry status), Ms. Elk would have lost the required weight (or body fat), entered the military, earned the salary and benefits of an entry-level private, and pursued a career in the medical field, most likely as a health care specialist. At this point, it becomes a bit more difficult to project her career path. The record supports a finding that Ms. Elk most likely would have left the service with medical training and embarked on the career of a practical nurse – a nursing profession that, according to the BLS, does not require a

---

[38] In her post-trial brief, plaintiff later recognized that this figure erroneously reflected pre-injury earnings of $51,049 that Ms. Elk would not have earned had she returned to college.

college degree.[39]  *See* BLS, Licensed Practical and Licensed Vocational Nurses, http://www.bls.gov/oco/ocos102.htm (as viewed on Apr. 28, 2009).  According to the BLS, the mean wage in 2007 for such nurses was $18.72 per hour, or $38,940 per year.  BLS, Occupational Employment and Wages, 29-2061 Licensed Practical and Licensed Vocational Nurses  http://www.bls.gov/oes/current/oes292061.htm (as viewed on Apr. 28, 2009).  Another of the financial assumptions employed by Mr. Frankenfeld was based upon statistics taken from the BLS, *to wit*, that Ms. Elk's salary and benefits would increase in the future at a rate of three percent per year, and this assumption would appear to apply to practical nurses, as well.[40]

Although defendant did not challenge this point, the court must also disagree with Mr. Frankenfeld's selection of the discount rate to be used in present value calculations.  In *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2003), the Federal Circuit indicated that the appropriate discount rate to be applied to future lost income is a "question of fact." *Id.* at 1332; *see also Monessen SW Ry. Co. v. Morgan*, 486 U.S. 330, 341 (1988); 1 Robert L. Dunn, Recovery of Damages for Lost Profits § 6.25 (5th ed. 1998).   Providing guidance on how this rate should be derived, the court stated "[w]hen calculating the value of an anticipated cash flow stream pursuant to the [discounted cash flow] method, the discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk." *Energy Capital*, 302 F.3d at 1333; *see also Franconia*, 61 Fed. Cl. at 764; Richard A. Brealey and Steward C. Myers, Principles of Corporate Finance 244 (6th ed. 2000) (when valuing an anticipated cash flow, "if the cash flow is risky, the normal procedure is to discount its forecasted (expected) value at a risk-adjusted discount rate").   In accordance with the decisional law, the appropriate discount rate, therefore, must reflect risk, in order to take into account the return the market would demand were an investor called upon to invest capital in the same venture.[41]   "The higher the risk," the Federal Circuit has stated, "the higher the rate of

---

[39]  Various testimony confirms that Ms. Elk's desire was to become a military nurse and retire from the military.  However, the record suggests that to become a full-fledged nurse, Ms. Elk would have had to become an officer.  As the court believes it is too speculative to assume that this would have occurred, it has opted for a more conservative approach that, nonetheless, is consistent with Ms. Elk's overall career goal, namely, to be a nurse, albeit a practical nurse.

[40]  Between 2001 and 2008, total compensation costs (wages and benefits) increased an average of 3.4 percent per year, with the lowest increase of 2.6 percent being in 2008.  *See* BLS, http://data.bls.gov/PDQ/servlet/SurveyOutputServlet?data_tool=latest_numbers&series_id=CIS1010000000000Q (reflecting data extracted on April 22, 2009 at 2:01:42 PM).

[41]  *See, e.g.*, *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 327 (7th Cir. 1992) ("A computation of damages that ignores the differences in risk between earnings in a volatile occupation and a judicial award of a lump sum equal to the present value of those earnings is unsound."); *In re Lambert*, 194 F.3d 679, 681 (5th Cir. 1999) ("The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved."); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1143-44 (7th Cir. 1985), *cert. denied*, 475 U.S. 1094 (1986) (same).

return an investor would require." *Energy Capital*, 302 F.3d at 1331 n.6; *see also Franconia*, 61 Fed. Cl. at 761.

Here, Mr. Frankenfeld did not adequately account for risk in selecting his discount factors. He set his discount rates extraordinarily low, using the safe rates associated with Federal Treasury notes of varying maturities, rather than say, for example, the rates associated with a riskier form of corporate bond. Yet, in no way does the minimal risk associated with the payment of a Treasury bond reflect the risks inherent in the assumptions that Ms. Elk would: (i) remain continuously employed for a period of thirty-three years from age 24.5 through 57.5; (ii) be employed in geographical areas of the country that track the national averages for salaries; and (iii) receive annual salary increases in lock-step with the average projected growth rate for salaries. Nor do the rates Mr. Frankenfeld selected account for the fact that the income being projected here is not for a person who already has a salary history in an established career, but rather for someone who, but for the assault, likely would have embarked on such a career. In the court's view, to reflect these and other risks in the receipt of the income stream, the discount rate employed here must be substantially higher than that associated with the safest form of public investments, albeit with the admitted effect of diminishing the present value of the income that Ms. Elk is projected to lose as the result of the assault.[42] While defendant did not provide an alternative to the discount rate that Mr. Frankenfeld employed, the court is not bound to accept the rate offered by plaintiff, even if unchallenged. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Lukens v. Comm'r of Internal Revenue*, 945 F.2d 92, 96 (5th Cir. 1991); *Seminole Indians of Fla. v. United States*, 455 F.2d 539, 545 (Ct. Cl. 1972). Finding that the situation here is more comparable to that of a Baa corporate bond and further increasing the historic rates associated with such bonds to reflect Ms. Elk's lack of work history in the nursing field, the court finds that the discount rate here should be twelve percent.[43]

---

[42] *See Price.*, 966 F.2d at 326-27 (pay award had to be reduced to take into account contingencies, including the volatile nature of earnings for the particular position); *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1173 (10th Cir. 1985), *cert. denied*, 474 U.S. 946 (1985) (courts may alleviate the uncertainty of future damages by discounting to present value); *compare Jones & Laughlin Steel*, 462 U.S. at 537; *see also* Wm. Gary Baker & Michael K. Seck, Determining Economic Loss in Injury and Death Cases (2d ed. 1993).

[43] Data available from the Federal Reserve Bank of St. Louis shows that the rates on such bonds varied over the last thirty years from approximately 6 percent to 17.5 percent, averaging 9.5 percent. *See* Moody's Seasoned Baa Corporate Bond Yield, Economic Research, Federal Reserve Bank of St. Louis, http://research.stlouisfed.org/fred2/series/WBAA?cid=119 (as viewed on Apr. 28, 2009). Corporations with bonds rated Baa are considered to have earnings adequate to pay interest and repay principal, albeit with more risk than more highly rated corporate bonds. *See* Baker & Seck, *supra*, at 93. Commentators in this area have also emphasized the need to adjust the discount rate where there is a lack of employment history and to reflect the probability of finding employment at any given point. *Id.* at 215-31.

In addition, the court sees no support in the record for allowing Ms. Elk to recover the cost of household services. Nothing in the record indicates that she has needed such services in the past, nor is there any indication that she will need such services over the next few years. Accordingly, there is a failure of proof as to this aspect of the damages requested.

Employing the revised assumptions identified above, the modified analysis of Ms. Elk's lost income yields the following results:

| Age | Pre-injury Capacity | Pre-injury Benefits | Post-injury Capacity | Post-injury Benefits | Loss | Present Value |
|---|---|---|---|---|---|---|
| 24.5 | $ 38,940 | $ 8,956 | $20,231 | $ 4,607 | $ 23,058 | $23,058[44] |
| 25.5 | $ 40,108 | $ 9,225 | $20,838 | $ 4,745 | $ 23,750 | $21,205 |
| 26.5 | $ 41,311 | $ 9,501 | $21,463 | $ 4,888 | $ 24,462 | $19,501 |
| 27.5 | $ 42,551 | $ 9,786 | $22,107 | $ 5,034 | $ 25,196 | $17,934 |
| 28.5 | $ 43,827 | $10,080 | $22,770 | $ 5,185 | $ 25,952 | $16,493 |
| 29.5 | $ 45,142 | $10,382 | $23,453 | $ 5,341 | $ 26,731 | $15,168 |
| 30.5 | $ 46,496 | $10,694 | $24,157 | $ 5,501 | $ 27,532 | $13,949 |
| 31.5 | $ 47,891 | $11,015 | $24,882 | $ 5,666 | $ 28,358 | $12,828 |
| 32.5 | $ 49,328 | $11,345 | $25,628 | $ 5,836 | $ 29,209 | $11,797 |
| 33.5 | $ 50,808 | $11,686 | $26,397 | $ 6,011 | $ 30,085 | $10,849 |
| 34.5 | $ 52,332 | $12,036 | $27,189 | $ 6,191 | $ 30,988 | $ 9,977 |
| 35.5 | $ 53,902 | $12,397 | $28,004 | $ 6,377 | $ 31,918 | $ 9,176 |
| 36.5 | $ 55,519 | $12,769 | $28,845 | $ 6,568 | $ 32,875 | $ 8,438 |
| 37.5 | $ 57,185 | $13,152 | $29,710 | $ 6,766 | $ 33,861 | $ 7,760 |
| 38.5 | $ 58,900 | $13,547 | $30,601 | $ 6,969 | $ 34,877 | $ 7,137 |
| 39.5 | $ 60,667 | $13,953 | $31,519 | $ 7,178 | $ 35,924 | $ 6,563 |
| 40.5 | $ 62,487 | $14,372 | $32,465 | $ 7,393 | $ 37,001 | $ 6,036 |
| 41.5 | $ 64,362 | $14,803 | $33,439 | $ 7,615 | $ 38,111 | $ 5,551 |
| 42.5 | $ 66,293 | $15,247 | $34,442 | $ 7,843 | $ 39,255 | $ 5,105 |
| 43.5 | $ 68,282 | $15,704 | $35,475 | $ 8,078 | $ 40,432 | $ 4,694 |
| 44.5 | $ 70,330 | $16,176 | $36,539 | $ 8,321 | $ 41,645 | $ 4,317 |
| 45.5 | $ 72,440 | $16,661 | $37,636 | $ 8,570 | $ 42,895 | $ 3,970 |
| 46.5 | $ 74,613 | $17,161 | $38,765 | $ 8,827 | $ 44,182 | $ 3,651 |
| 47.5 | $ 76,851 | $17,675 | $39,928 | $ 9,092 | $ 45,507 | $ 3,358 |
| 48.5 | $ 79,157 | $18,206 | $41,125 | $ 9,365 | $ 46,872 | $ 3,088 |
| 49.5 | $ 81,532 | $18,752 | $42,359 | $ 9,646 | $ 48,278 | $ 2,840 |
| 50.5 | $ 83,978 | $19,314 | $43,630 | $ 9,935 | $ 49,727 | $ 2,612 |
| 51.5 | $ 86,497 | $19,894 | $44,939 | $ 10,233 | $ 51,218 | $ 2,402 |
| 52.5 | $ 89,092 | $20,491 | $46,287 | $ 10,540 | $ 52,755 | $ 2,209 |
| 53.5 | $ 91,765 | $21,105 | $47,676 | $ 10,857 | $ 54,338 | $ 2,031 |
| 54.5 | $ 94,518 | $21,739 | $49,106 | $ 11,182 | $ 55,968 | $ 1,868 |
| 55.5 | $ 97,353 | $22,391 | $50,579 | $ 11,518 | $ 57,647 | $ 1,718 |
| 56.5 | $ 100,274 | $23,062 | $52,096 | $ 11,863 | $ 59,376 | $ 1,580 |
| 57.5 | $ 103,282 | $23,754 | $53,659 | $ 12,219 | $ 61,158 | $ 1,453 |
| | **$2,248,013** | **$517,031** | **$1,167,939** | **$265,963** | **$1,331,142** | **$270,316** |

---

[44]  Because the first flow reflected on this table has already occurred (as Ms. Elk is now 25.5), the court need not subject the loss for this first year to a present value calculation.

To the present value figure indicated on the chart ($270,316), the court must add the value of Ms. Elk's past lost income – reflecting the difference between the salary and estimated benefits Ms. Elk would have received in the Army for four years beginning at age 20.5 through 24.5, and the income she actually received in those same years (which figure was in Mr. Frankenfeld's report and is unchallenged by defendant).  This past income figure calculates to $48,319, which figure, of course, need not be discounted to present value.[45]  Adding the figures for past and future lost income yields a total value for lost income of $318,635.[46]

**3.**

This court faces a difficult task in attempting to value the pain, suffering and emotional distress that Ms. Elk has suffered and will continue to suffer as the result of Kopf's assault on her,

---

[45]  For this purpose, the court assumes that Ms. Elk would have joined the Army at age 20.5 at the E-1 pay grade and would have left four years later at the E-3 pay grade.  Using pay tables available on the Defense Finance and Accounting Service website for the years involved (see http://www.dfas.mil/militarypay/militarypaytables/militarypaypriorrates.html), and assuming benefits corresponding to twenty-three percent of salary (a figure that is undoubtedly low, given the wide range of Army housing, medical and educational benefits available, but is the most conservative estimate available) yields the following:

| Age | Grade | Pay | Benefits | Loss |
|-----|-------|-----|----------|------|
| 20.5 | E-1 | $13,960 | $3,211 | $17,171 |
| 21.5 | E-1 | $14,820 | $3,409 | $18,229 |
| 22.5 | E-2 | $15,282 | $3,515 | $18,797 |
| 23.5 | E-3 | $16,614 | $3,821 | $20,435 |

Accordingly, the court estimates that during Ms. Elk's hypothetical military career, she would have received a total of $74,632 in salary and benefits.  As reflected in Mr. Frankenfeld's report, it appears that Ms. Elk actually earned $26,313 during the same four-year period, with this relatively low figure attributable, at least in part, to her inability to work.  The difference between these figures is $48,319.  While Mr. Frankenfeld added to his past injuries a figure corresponding to household services, the court will not do so, for the reasons explained.

[46]  Defendant argues that plaintiff's damages for lost income should be projected only so far as is necessary to track her recovery period.  It notes that Dr. Manlove indicated that, with treatment, Ms. Elk should be substantially recovered by 2010 or perhaps 2011.  In the court's view, however, the economic damages suffered by Ms. Elk extend well beyond that limited period, as they reflect the long-term impact on her life of not being able to join the military and use her military training as a springboard to a nursing career.  In short, the court finds that defendant's limited view of the damages here is contrary to the record.

both because her emotional injuries do not readily translate into dollar amounts and because it is difficult to identify a truly comparable case which might be used as a barometer.  In setting a figure, the court must account for plaintiff's post-traumatic stress disorder, as well as the panic attacks, sleeplessness, insecurity, anxiety, humiliation and fear that occurred following the incident and that will occur in the future.  Based on the record, the court finds that Ms. Elk has suffered a significant amount of pain, suffering and emotional distress as a result of the assault and more than likely will continue to experience these same injuries at least over the next two years.

So where does the court go from here?  Outside of cases under the Vaccine Act, in which "pain and suffering" damages are often awarded (subject to a statutory cap), there are few decisions in this court, the Court of Claims or the Federal Circuit that deal with the determination of such damages.  *See Howard v. United States*, 101 Ct. Cl. 823, 830 (1944).  This is unsurprising given that this court generally lacks jurisdiction under the Tucker Act over tort actions.  28 U.S.C. § 1491(a)(1).  Nonetheless, the few decisions that discuss this task talk in terms of it being a "jury question."  *Howard*, 101 Ct. Cl. at 830.  Such references bring to mind the potential use here of the "jury verdict method," which is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures."  *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995); *see also United States v. Smith*, 94 U.S. 214, 219 (1876); *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1376 (Fed. Cir. 2004).  In order to adopt the jury verdict method, "[a] court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages."  *Dawco*, 930 F.2d at 880.[47]  In the instant case, of course, there is clear proof of an injury and no more reliable method for computing pain, suffering and emotional distress.  Moreover, as will be discussed, there is sufficient evidence from which the court can derive a fair and reasonable award of damages for pain, suffering and emotional distress here.  Accordingly, without specifically deciding whether *vel non* the "jury verdict" method applies here, the court believes that the jurisprudence surrounding this method generally informs its exercise of discretion in setting a damage figure for the pain, suffering and emotional distress felt by Ms. Elk.

The case law has developed several factors to be considered in assessing damages for mental pain and suffering, including (i) the expected duration of the pain and suffering; (ii) the intensity of the distress; (iii) the impact that the pain and suffering has on the injured party's productivity and lifestyle; (v) whether sedatives or other drugs were used to relieve pain and whether they were effective; and (vi) whether the suffering was occasioned by apprehension of impending death.  *See*, *e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Juiditta v.*

---

[47]  *See also Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007). *Bluebonnet Savings Bank, F.S.B.*, 266 F.3d at 1357 ("We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages – but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation.").

*Bethlehem Steel Corp.*, 428 N.Y.S.2d 535, 543 (N.Y. App. 1980); *see also Riley v. Sec'y of Dept. of Health and Human Servs.*, 1991 WL 123583, at *5 (Fed. Cl. Spec. Mstr. Jun. 21, 1991). As documented throughout this opinion, in the present case, Ms. Elk plainly experienced intense distress as a result of the sexual assault itself – distress that was heightened by the circumstances attendant to the assault, including the remote location of the attack and the betrayal she experienced at the hands of an authority figure who she had trusted. And she has continued to experience varying degrees of distress and anxiety in the years following the assault – nightmares, flashbacks, withdrawal, crying, weight fluctuations – on a frequent basis. Moreover, virtually every facet of her personal and professional lives has been severely affected by the depression and post-traumatic stress that she has experienced. And while, fortunately, it is expected that she will improve with medical treatment, her full recovery is still at least two years away.

Based upon the consideration of these factors, the court finds that an appropriate gross amount for such damages is $250,000 – $187,500 for the pain, suffering and emotional distress that Ms. Elk has already experienced, particularly at the time of the assault and in the period immediately thereafter, and an additional $62,500 for future pain, suffering and distress. As with the other components of the future damages awarded herein, it is the court's view that the award for projected pain, suffering and emotional distress must be reduced to net present value. For this purpose, the court will assume two income flows of $31,250, to be received annually for the next two years at a discount rate of four percent.[48] This yields total damages for pain, suffering and emotional distress of $248,798.48.

Various cases, including those arising under the FTCA, suggest that judges faced with the prospect of determining pain and suffering awards should look to the awards in similar cases. *See, e.g., Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008); *Muniz-Olivari v. Stiefel Labs., Inc.,* 496 F.3d 29, 40-41 (1st Cir. 2007); *DiSorbo v. Hoy*, 343 F.3d 173, 183-86 (2d Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001). Of course, one problem with this approach is determining what is an appropriate comparable – as noted by one district court, "[a] reported decision concerning a trial cannot possibly relate the course of trial with the same detail and flavor in which it was presented to the fact finder." *Zurba v. United States*, 247 F.Supp. 2d 951, 961 (N.D. Ill. 2001). Further, "different plaintiffs can experience different levels of pain and suffering from similar incidents." *Zurba*, 247 F. Supp. 2d at 962; *see also Batchkowsky v. Penn Central Co.*, 525 F.2d 1121, 1125 (2d Cir. 1975) ("differentiating facts in each case with respect to pain and suffering . . . limit[s] the precedential value of a court's treatment of awards in other apparently similar cases"). Nonetheless, a review of analogous cases suggests that the court's determination of damages for pain, suffering and emotional distress is reasonable as compared to the awards made in similar cases. In particular, the amount to be awarded here appears to track the

---

[48] As was true in the case of the medical damages, the court assumes a lower discount rate than it applied in the lost income calculation, as there is no risk associated with the receipt of these payments.

results in cases in which a sexual assault short of rape occurred, in which the perpetrator was a figure of authority or trust, and in which extended emotional injuries resulted.[49]

---

[49]  *See Metzler v. Kurtz*, 2009 WL 531108 (N.J. Super. Ct. Feb. 20, 2009) ($275,000 award for 19-year old college student groped by dentist while still under anesthesia, alleging that he pulled on her pants waistband in the operating room, fondled her buttocks as he walked her to the recovery room, and rubbed her thigh and genitalia area while she laid on a cot in the recovery room.  Plaintiff received extensive psychological counseling on account of the groping, was diagnosed with post-traumatic stress disorder, major depression, and general anxiety disorder, and claimed residual symptoms after the assault, including nightmares, crying episodes, and withdrawal); *Kahle v. Pennington County Jail*, 5:04-5024 (S.D. Feb. 23, 2008) ($600,000 in compensatory damages for a female inmate who was sexually abused by a jail guard who entered her cell on three occasions and claimed the sex was consensual); *Doe v. Paik*, 2007 WL 4876905 (Cal. Super. Ct. Dec. 10, 2007) ($313,550 judgment to female patient who claimed severe emotional distress and received 19-months of psychological counseling after follow-up examination in which doctor made sexual comments, inappropriately groped and touched plaintiff's buttocks, breasts, thighs, and other body parts, unhooked her bra, rubbed her back, asked if she wanted a massage, lifted her skirt, and rubbed her inner thighs); *Pro Ami v. United States*, 2005 WL 6037906 (N.D. Cal. 2005) ($200,000 settlement for sexual assault of two 17-year old female high school students by military recruiters at a party for potential recruits at defendant's recruiting office where plaintiffs, alleging military negligence, claimed they were provided with alcoholic beverages, sexually assaulted in the presence of other military personnel and recruits, and received permanent injuries); *Martinmaas v. Engelmann*, 612 N.W.2d 600 (S.D. 2000) ($450,000 award to each plaintiff affirmed where plaintiffs alleged a doctor had performed improper, sexualized medical examinations on them); *see also Onstad v. Payless Shoesource*, 9 P.3d 38, 40 (Mont. 2000) ($500,000 award to an 18-year old store clerk for the store's failure to provide a safe place to work where she was attacked by a stranger while alone in the store, who grabbed her waist, squeezed her buttocks, demanded sex and threatened to kill her if she refused, knocked her to the floor, and masturbated and ejaculated on her, and where following the attack the victim withdrew from college, returned to live with her parents, and was totally withdrawn for several months).

Defendant cites other cases, some with much lower damage awards.  A significant number of these cases, however, involve settlements, leaving the court to guess whether the relatively low damage figures reflected litigation risks.  Many of these cases, moreover, are more than a decade old, making the awards therein outdated absent an adjustment to current dollars. And defendant cites mostly cases arising under the Federal Tort Claims Act without indicating whether the various limitations associated with that law or the applicable state tort law regimes effectively capped the listed damages.  *See* 28 U.S.C. § 1346(b) (making state law controlling in this regard).  For these and other reasons, the court finds that the examples cited above provide a more accurate barometer as to an appropriate award.

**III.     CONCLUSION**

Based on the foregoing, the court finds that defendant is liable under the "bad men" clause of the 1868 Treaty and that, as a result, plaintiff is entitled to damages in the amount of $590,755.06.  The Clerk shall enter an appropriate judgment.  Costs to plaintiff.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge